UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

PHILLIP JEAN-LAURENT,

                              Plaintiff,
                                                          9:11-CV-00186
v.                                                        (NAM/TWD)

C.O. LANE, et al.
                              Defendants.
_____

APPEARANCES:                          OF COUNSEL:

PHILLIP JEAN-LAURENT
Plaintiff pro se
P.O. Box 200016
South Ozone Park, New York 11420


HON. ERIC T. SCHNEIDERMAN             JOHN F. MOORE, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

**ORDER AND REPORT AND RECOMMENDATION**

I.    **INTRODUCTION**

         Pro se Plaintiff Philip Jean-Laurent, formerly a prisoner in the custody of the New York

Department of Corrections and Community Supervision ("DOCCS"), commenced this civil

rights action pursuant 42 U.S.C. § 1983 on February 17, 2011.  (Dkt. No. 1.)  Plaintiff originally

brought suit against twelve DOCCS employee defendants.[1]  *Id*. at ¶¶ 9-16.  The Defendants

_____
         [1]  Plaintiff has also sued four Doe defendants.  The Docket maintained by the Clerk's
Office does not reflect the identification of, or service on, any of the Doe defendants during the

remaining in the action, all of whom have now moved for summary judgment (Dkt. No. 88) on

the surviving claims in Plaintiff's amended complaint (Dkt. No. 46) pursuant to Federal Rule of

Civil Procedure 56, are Cape Vincent Correctional Facility ("Cape Vincent") Corrections Officer

Patrick Lane; former Cape Vincent Sergeant Matthew Beard; Cape Vincent Sergeant David

Pawlin; retired Deputy Superintendent for Security at Cape Vincent, Brian McAuliffe; former

Medical Director at Cape Vincent, Dr. Charles Moehs; former Cape Vincent Superintendent,

Warren Barkley; Mid-State Correctional Facility ("Mid-State") Superintendent, William

Hulihan; retired DOCCS Assistant Director of the Inmate Grievance Program, Christopher

Lindquist; and DOCCS Director of Special Housing/Inmate Disciplinary Program, Norman

Bezio.[2]  (Dkt. Nos. 54 at 3[3]; 88-3 at ¶ 1; 88-5 at 30; 88-7 at ¶ 1; 88-8 at ¶ 3; 88-12 at ¶ 3.)

The claims on which Defendants seek summary judgment are: (1)  First Amendment

claims for retaliation against Defendants Lane, Beard, Pawlin, and Moehs; (2)  Eighth

Amendment medical indifference claims against Defendants Moehs, McAuliffe, Barkley,

Hulihan, and Lindquist; (3)  Eighth Amendment cruel and unusual punishment claims against

Defendants Pawlin and Barkley, in his supervisory capacity; and (4) a Fourteenth Amendment

---

more than five years the action has been pending.  The Court, therefore, recommends dismissal
of the action against the Doe Defendants without prejudice.  *See Pravada v. City of Albany*, 178
F.R.D. 25, 26 (N.D.N.Y. 1998) (dismissing the unidentified "John Doe" and "Jane Doe"
defendants after plaintiff had been provided "over two years to identify and serve these
individuals, including the full discovery period.").

[2]  Original Defendants Corrections Officers Allen Briggs and Seth Tyndall, and
Corrections Lieutenant Norman Jones were dismissed from the action by the Hon. Norman A.
Mordue, Senior District Judge, in a Memorandum-Decision and Order filed on October 20, 2014,
on initial review of Plaintiff's amended complaint.  (Dkt. No. 54 at 3.)

[3]  Page references to documents identified by docket number are to the numbers assigned
by the CM/ECF docketing system maintained by the Clerk's Office.

violation of due process claim against Defendants McAuliffe and Bezio. (Dkt. 88-1 at ¶ 11.)

Plaintiff has opposed the motion, and Defendants have filed a reply. (Dkt. Nos. 99 and 103.)

For the reasons that follow, the Court recommends that Defendants' motion for summary

judgment (Dkt. No. 88) be granted in its entirety.

## II.     FACTUAL BACKGROUND

### A.     Defendants Lane and Beard

According to Plaintiff, shortly after he was transferred to Cape Vincent on January 23,

2008, Defendant Lane informed him that he was not allowed to store two draft bags of his

belongings under his bunk bed and would have to purchase storage bins for his excess belongings

from the commissary. (Dkt. No. 88-1 at 36.) Plaintiff claims Lane gave him permission to store

the bags under his bunk until his funds arrived from his prior facility in about two weeks. *Id*.

Three consecutive times in January and February 2008 when Plaintiff's funds arrived they were

encumbered and unavailable for the purchase of storage bins. *Id*. at 36. While Plaintiff claims

Lane continued to allow him to keep the draft bags under his bunk, Lane denies ever having

granted Plaintiff permission to keep the bags under his bunk and claims he was without authority

to do so. (Dkt. Nos. 88-1 at 37; 88-6 at ¶ 8.)

On February 19, 2008, Lane issued a Tier I inmate misbehavior report to Plaintiff stating

that while doing the daily dormitory inspection he had noted that Plaintiff had two draft bags

under his bunk. (Dkt. No. 99-3 at 6.) The misbehavior report charged Plaintiff with improperly

keeping the draft bags under his bunk from January 24, 2008, through February 18, 2008. *Id*. at ¶

2. Plaintiff testified at his deposition that Lane issued the Tier I misbehavior report the day he

learned that Plaintiff was pursuing an excessive force lawsuit against New York City corrections

officers in the Southern District of New York. (Dkt. No. 88-1 at 37, 43; *see also* Dkt. No. 99-1 at 4.) Lane's Declaration omits any reference to the February 19, 2008, misbehavior report (*see* Dkt. No. 88-6), but he does deny seeing any correspondence regarding Plaintiff's excessive force litigation prior to issuing a second misbehavior report, also involving the draft bags, on February 25, 2008. *Id.* at ¶ 11.

Plaintiff was found guilty at the Tier I hearing held before Defendant Pawlin the following Saturday. (Dkt. No. 46 at ¶ 24.) The evening of the hearing, Plaintiff determined that DOCCS Directive 4913 and Facility Operations Management ("FOM") § 786 authorized the storage of the draft bags under his bunk. *Id.* at ¶ 25. Plaintiff claims that he informed Lane about the draft bag policy in DOCCS Directive and FOM on the morning of February 25, 2008, and Lane expressed his disregard for the policy. (Dkt. No. 46 at ¶ 25.) Plaintiff then began writing Grievance No. CV8241-08, dated February 25, 2008, regarding the draft bag issue and the Tier I misbehavior report, in which he noted that he had no money to purchase storage bins and claimed that DOCCS Directive 4913 and FOM 786 allowed him to store excess property in draft bags under his bed. *Id.*; Dkt. Nos. 88-1 at 44; 99-3 at 30. In the Grievance, Plaintiff wrote that Lane had persisted in maintaining that Plaintiff had to get rid of the draft bags and purchase property bags from the commissary despite being informed of the Directive and FOM section, leaving Plaintiff at risk for further misbehavior reports. (Dkt. No. 99-3 at 31.) The grievance was filed by the Grievance Clerk on February 28, 2008. *Id.* at 30.

Plaintiff contends that the morning of February 25, 2008, after Lane became aware he was writing the grievance, Lane engaged in a series of telephone conversations with an individual whom he referred to on the phone as "Sarge" regarding the draft bag situation, including the

Directive and FOM section referenced by Plaintiff. (Dkt. Nos. 46 at ¶ 26; 88-1 at 41.) Plaintiff surmised that "Sarge" was Defendant Beard. (Dkt. No. 88-1 at 41.) Plaintiff claims that Lane told Beard during one of the phone conversations that he did not want Plaintiff in his "house" any longer. (Dkt. No. 88-1 at 43.) Later that day, Lane issued the February 25, 2008, misbehavior report. (Dkt. No. 88-6 at ¶¶ 5-7.)

Lane denies that he had any communications with Beard concerning the subject matter of the February 25, 2008, misbehavior report before issuing the report. *Id*. at ¶ 9. According to Lane, at approximately 11:00am on February 25, 2008, he found that Plaintiff had two draft bags under his bunk and gave him a direct order to place his property in his locker and bring the draft bags to the Correction Officers' desk. *Id.* at ¶ 5. When Plaintiff still had the draft bags under his bunk at 12:25 pm, Lane repeated the order. *Id*. Lane claims that Plaintiff became very upset and began yelling that he was allowed to have two draft bags under his bed per the Directive and FOM. *Id*. Lane gave Plaintiff a direct order to be quiet and go to his cube at which point Lane emptied all of the property out of the draft bags onto the floor of his cube and brought the draft bags to the Corrections Officers' desk. *Id*.

In Lane's February 25, 2008, misbehavior report, arising out of the draft bag incident of that date, Plaintiff was charged with violating 106.10 Direct Order, 104.13 Disturbance, 118.21 Fire Hazard, and 118.30 Untidy Person or Cell. (Dkt. 88-7 at 5.) Beard claims that he became aware of the February 25, 2008, misbehavior report on that date and escorted Plaintiff to the Special Housing Unit ("SHU") at 1:32pm that afternoon on the authorization of Lieutenant Alexander. *Id*. at ¶ 7; 46 at ¶ 26; 88-1 at 41, 88-7 at ¶ 6. At the hearing on the misbehavior report, Plaintiff was found not guilty of 104.13 Creating a Disturbance, 118.21 Flammable

Materials, and 106.10 Refusing a Direct Order. (Dkt. No. 88-7 at 9.) Plaintiff was found guilty of 118.30 Untidy Cell or Person. *Id*.

Beard denies having any knowledge of Grievance No. CV-8241-08 before he was asked to investigate the grievance on February 28, 2008. (Dkt. No. 88-7 at ¶7.) Based upon his investigation, Beard determined that Plaintiff's personal items had to be stored in his locker and/or approved personal property storage bags available at the commissary. *Id*.

### B. Defendants McAuliffe and Bezio – July 29, 2008, Misbehavior Report

On July 29, 2008, Plaintiff was issued a misbehavior report for fighting with another inmate in the facility law library. (Dkt. Nos. 88-1 at 45; 88-5 at 9-10.) According to the misbehavior report, Plaintiff complained to the inmate about the manner in which he had handed Plaintiff a book and punched the inmate in the face, then rushed around the counter swinging at the inmate. (Dkt. No. 88-5 at 9.) Plaintiff is stated to have then struggled with the inmate and shoved him backwards at which point a corrections officer intervened. *Id*. During the course of the altercation, a microfiche machine was knocked over and broken. *Id*. at 10. Plaintiff was charged with violating 110.13 Fighting, 106.10 Direct Order, 104.11 Violent Conduct, 116.10 Destruction of State Property, 109.10 Out of Place, and 104.13 Disturbance. *Id*.

Plaintiff was allowed to choose an assistant in defending against the charges and met with the assistant on July 30, 2008. *Id*. at 13-14, 33. The assistant met with four witnesses whom Plaintiff wanted to testify at his Tier III hearing. *Id*. at 14. Two agreed to testify and two refused. *Id*. at 14, 21-22. Plaintiff also requested that his assistant obtain, among other things,

the misbehavior report issued to the other inmate involved in the altercation.[4]  *Id*. at 14.  The request was denied.  *Id.*

Defendant McAuliffe was the hearing officer at Plaintiff's Tier III hearing which began on Friday, August 1, 2008, and ended the same day when Plaintiff plead guilty to all charges.  *Id*. at 24; *see also* McAuliffe Declaration (Dkt. No. 88-5 at ¶¶ 1-23).  Plaintiff initially plead guilty to 104.13 Creating a Disturbance, 100.13 Fighting, 106.10 Refusing a Direct Order, and 109.10 Out of Place, and not guilty to 104.11 Violent Conduct and 116.10 Property Damage or Loss.  *Id*. at 24, 34-41.  However, when McAuliffe indicated that he was going to adjourn the hearing until the following Monday, Plaintiff told McAuliffe to change his plea to guilty on everything because he did not want to come back.  *Id.* at 42.  McAuliffe told Plaintiff he did not want him to change his plea if he was not guilty, but that it was up to Plaintiff to decide.  *Id*.  Plaintiff then brought up the denial of his request for the misbehavior report issued to the other inmate involved in the altercation and was told by McAuliffe that he could not have the report    that it was not his business    but that he could call the inmate as a witness.  *Id.*

While McAuliffe did inform Plaintiff that the other inmate also had a Tier III misbehavior report, he would not disclose information regarding the charges against the other inmate or whether the other inmate would have to share in restitution for the microfiche machine.  *Id*. at 43-45.  When McAuliffe asked Plaintiff if his concern was with not wanting to be held responsible for the entire cost of the microfiche machine when they were both fighting, Plaintiff responded "right."  *Id*. at 45.  Following the discussion regarding the other inmate, Plaintiff

---

[4]  The July 29, 2008, Use of Force Memorandum prepared by Sergeant Sisler indicates that misbehavior reports were issued to both participants in the altercation.  (Dkt. No. 88-5 at 18.)

reaffirmed his desire to plead guilty to all charges. *Id*. at 46. McAuliffe advised Plaintiff of his right to an appeal. *Id*. at 49-50.

Following Plaintiff's guilty plea, McAuliffe found him guilty on all charges except 109.10 Out of Place, and McAuliffe imposed a penalty of six months in SHU, six months loss of recreation, packages, commissary, phone, and special events, and three months recommended loss of good time. *Id*. at 25. Plaintiff appealed McAuliffe's determination to Defendant Bezio. (Dkt. No. 88-5 at 27-29.) Plaintiff argued in his August 11, 2008, appeal that denial of documentary evidence, presumably the other inmate's the misbehavior report requested by him at the hearing, had rendered his guilty pleas involuntary. *Id*. at 27. In addition, Plaintiff argued that denial of the misbehavior report deprived him of the opportunity to present evidence in mitigation of the penalties imposed. *Id*. Plaintiff asked that the penalties be modified and the SHU time and recommended loss of good time be reduced. *Id*.

On August 13, 2008, Plaintiff wrote a supplement to his appeal after finding out that the other inmate involved in the altercation had been released from SHU fifteen days after the fight. *Id*. at 28-29. Plaintiff claimed bias and impartiality on McAuliffe's part in the sentence imposed on Plaintiff. *Id*. at 28. Plaintiff also claimed that McAuliffe had misinformed him at the hearing by explicitly telling him that when two people fight they are penalized the same. *Id*. According to Plaintiff he would not have plead guilty but for the blatant and deliberate misrepresentation by McAuliffe. *Id*. at 29.

Bezio issued a determination on October 1, 2008, affirming the Superintendent's Hearing held before McAuliffe. *Id*. at 30. In response to interrogatories from Plaintiff, Bezio indicated that a review of Plaintiff's Tier III hearing records regarding the hearing held on August 1, 2008,

had been conducted and confirmed that Plaintiff's August 13, 2008, letter had been considered on the appeal. (Dkt. No. 88-1 at ¶ 21.) Bezio declined to respond to an interrogatory requesting information as to whether the other inmate involved in the altercation had been punished on the grounds that it would constitute an unwarranted invasion of personal privacy and could impair security of the facility and safety of the inmates and corrections staff. *Id*. at ¶ 23.

## C.    Plaintiff's Cape Vincent Medical and Dental History

### 1.    Medical

From the time of Plaintiff's arrival at Cape Vincent in January 2008 until near the end of July 2008, Dr. Rosner was Plaintiff's doctor of record and treating physician, and in January referred him to physical therapy for chronic back pain. (Dkt. Nos. 88-4 at ¶ 6; 89 at 7.) On February 14, 2008, Plaintiff indicated that he no longer wanted to go to physical therapy because the trip was too long. (Dkt. No. 89 at 9.)

A February 4, 2008, note in Plaintiff's Ambulatory Health Record Progress Notes ("Progress Notes") shows that Plaintiff complained of long term chronic back pain. (Dkt. No. 89 at 8.) X-rays of Plaintiff's lumbar spine, thoracic spine, and a frontal view of chest and abdomen were ordered and taken on February 14, 2008. *Id*.; Dkt. No. 88-4 at ¶ 7. A report on the x-rays with respect to the lumbar and thoracic spine revealed that "the vertebra are well mineralized and properly aligned, moderate degenerative changes are seen." (Dkt. No. 89 at 11.) According to Defendant Dr. Moehs, based on the x-ray, there was no evidence of significant back pathology. (Dkt. No. 88-4 at ¶ 7.)

A March 3, 2008, note reveals that Plaintiff complained of having lower back pain since the age of twelve and noted "x-rays    arthritis and scoliosis." (Dkt. No. 89 at 17.) The Progress

Notes indicate that Plaintiff was found "OK to work." *Id*. Plaintiff was given a bottom bunk pass on March 3, 2008. *Id*. at 16. A March 28, 2008, Progress Note reports that Plaintiff wanted to get off the Utility Gang work detail to which he was assigned because his back was still killing him and it hurt to straighten up, and that he requested pain medication (he was already taking Naprosyn). *Id*. The Note indicates that Plaintiff ambulated with a steady gate and moved his arms well, that no distress was noted, and that he "bends easily." *Id*. The Note appears to state that the nurse could not change his work program, denied his request to take the day off, and referred him back to the doctor. *Id*.

A March 31, 2008, Progress Note reveals that Plaintiff again complained that he was not fit for Utility Gang work because of his scoliosis and back pain. *Id*. at 18. The Note indicates that Plaintiff was cleared for work per Dr. Rosner, and that based on Plaintiff's x-rays, there was no limitation on specific kinds of work. *Id*. Upon examination, it was noted that Plaintiff was almost able to touch his toes, reached his hands above his head easily, twisted his trunk, and could squat, stand, and sit without difficulty. *Id*. Plaintiff was scheduled to see Dr. Rosner on April 7, 2008, but did not keep the appointment. *Id*. at 19.

On April 11, 2008, Plaintiff complained of shoulder pain. *Id*. at 20. He was taken to SHU that evening, and his Progress Notes reveal that he made no relevant medical complaints during SHU rounds through April 23, 2008. *Id*. at 20-24. On April 25, 2008, Plaintiff requested a note from the nurse excusing him from carrying his bags on a move from SHU to his housing unit, and the request was denied. *Id*. at 26. Thereafter, on April 30, 2008, Plaintiff wrote to Dr. Lester Wright, DOCCS Chief Medical Officer, describing his long time chronic back problem that caused him excruciating pain, and complaining: (1) that his work assignment on the Utility

Gang put considerable strain on his back, chest, and shoulder; (2) that he had been forced to carry his bags in moving from housing units without a push cart or the help of a fellow prisoner, and that the nurse he saw when he felt pain carrying the bags refused to excuse him from lifting his bags; and (3) he was receiving inadequate medical care at Cape Vincent. (Dkt. No. 88-1 at 16-17.)

On May 5, 2008, Plaintiff complained that he could lift but not bend. *Id*. at 27, 29-31. Plaintiff also complained of sternal pain. *Id.* Plaintiff refused physical therapy despite being advised it would be helpful and might alleviate his symptoms. *Id*. 27-28. Dr. Rosner, in his May 5, 2008, Progress Note opines that "[c]onsidering he has had pain for <u>22 years</u> and he is irate about working for another <u>2 wk</u> I think there may very well be some degree of manipulation here. . . . I think he may safely work pending further w/u." *Id*. at 27.

Dr. Rosner agreed to order an MRI, but his request was denied at DOCCS Central Office because Plaintiff did not meet the criteria. *Id*. at 27, 37-38. Dr. Rosner's request for a sternal CT scan was initially denied but later authorized, and while degenerative changes were observed on the June 6, 2008, CT scan, osteomyelitis was found unlikely. *Id.* at 35, 43. An x-ray of Plaintiff's clavicle was negative. *Id*. at 36. After the MRI was denied, on May 28, 2008, Plaintiff agreed to go back to physical therapy, and on June 12, 2008, was found by the physical therapist to have decreased lumbar extension but excellent flexion and rotation, and posture consistent with mild scoliosis. *Id*. at 38, 44. The physical therapist believed Plaintiff should benefit from a TENS unit and recommended the trial of a unit for three physical therapy visits. *Id*. at 44-45. On June 26, 2008, the physical therapist noted that Plaintiff had reported the TENS unit provided some relief. *Id*. at 48. The July 10, 2008, Physical Therapist Consultant Report

revealed that Plaintiff had a bad day and had gained little relief from the TENS unit. *Id*. at 49.

The Report from Plaintiff's final visit on July 15, 2008, indicated that the TENS unit had helped

some so far, and the physical therapist suggested a TENS unit be purchased for Plaintiff's use.

*Id*.

On July 25, 2008, Plaintiff saw Defendant Dr. Moehs for the first time. (Dkt. Nos. 88-4

at ¶ 22; 89 at 51.) Dr. Moehs was the Medical Director at Cape Vincent at the time. (Dkt. No.

88-4 at ¶ 1.) Plaintiff told Dr. Moehs that he had suffered from back pain since childhood and

nothing he had taken at home had helped. (Dkt. Nos. 88-4 at ¶ 22; 89 at 51.) Dr. Moehs

diagnosed Plaintiff with basic arthritis and told Plaintiff he would have to learn to live with it.

*Id*. The Progress Note on the visit reports that after Dr. Moehs made that comment, Plaintiff got

up and "quickly with normal stride walked out." (Dkt. No. 89 at 51.) Dr. Moehs declined to

approve the TENS unit recommended by the physical therapist. (Dkt. No. 88-1 at 51.)

According to Dr. Moehs, in his professional medical judgment, Plaintiff was not in need of any

additional medical care at the time, including a TENS machine. (Dkt. No. 88-4 at ¶ 27.)

Plaintiff's Progress Notes show that he did not receive any relevant medical treatment at

Cape Vincent between July 25, 2008, and his transfer to Mid-State on August 26, 2008. (Dkt.

No. 89 at 52-57.)

2.      Dental

Plaintiff's Dental Treatment Record indicates that he had his teeth cleaned by a dental

hygienist on February 12, 2008, and a consult with the dentist was requested. (Dkt. No. 89-2 at

8.) Plaintiff saw Cape Vincent dentist Dr. James L. Marks on February 28, 2008. (Dkt. No. 88-9

at ¶ 4.) Dr. Mark's treatment plan identified the following treatment as indicated for Plaintiff: (1)

"OS (4)," which according to Dr. Marks means oral surgery probably after x-rays and fillings; "X-Ray (2)", meaning x-rays would be performed first; and "OPER (3)," which indicates fillings would be needed. *Id*. X-rays were to be taken on the next appointment. *Id*.

An appointment was scheduled for April 11, 2008. *Id*. at ¶ 5. However, the Treatment Record for that date states "NO SHOW    MANDATORY CALL OUT." (Dkt. No. 89 at 8.) The Treatment Record shows that Plaintiff was scheduled for an x-ray of tooth 32 on June 6, 2008. *Id*. However, the Treatment Record entry for that date again states "NO SHOW MANDATORY CALL OUT." *Id*. Plaintiff was seen in dental on July 2, 2008. *Id*. Additional x-rays were taken, penicillin was prescribed for an infection, and Plaintiff was advised he would be on the call-out list for a tooth extraction. *Id*.; Dkt. No. 88-9 at ¶ 7.

On July 7, 2008, Plaintiff underwent a surgical extraction of his lower right wisdom tooth. (Dkt. Nos. 88-9 at ¶ 8; 89-2 at 8.) Plaintiff had a post-surgical follow up on July 14, 2008, and was not seen by dental again prior to his transfer to Mid-State on August 26, 2008. (Dkt. No. 89 at 8.)

### D.    Defendant Pawlin

In his amended complaint, Plaintiff claims that Defendant Pawlin informed housing unit officers that Plaintiff was on his target list and encouraged them to harass him and issue him infractions because Plaintiff "adamantly complained that the work detail assigned required him to perform certain work that aggravated his existing medical conditions." (Dkt. No. 46 at ¶ 36.) At his deposition, Plaintiff testified that Pawlin began harassing him after finding out about Plaintiff's Southern District lawsuit against corrections officers. (Dkt. No. 88-1 at 87, 114-15.)

Plaintiff claims that Pawlin knew about his bad back because he sat on the Grievance and

Program Committees where Plaintiff had complained of his medical condition. *Id*. at 90, 93. According to Plaintiff, Pawlin always gave him the most strenuous work like shoveling snow and lawn work. *Id*. at 92. Plaintiff's work assignment records at Cape Vincent reveal that on February 11, 2008, he was assigned to the Utility Gang, and on March 18, 2008, was moved to Dorm Porter before being reprogrammed back to Utility Gang on April 2, 2008. (Dkt. No. 88-3 at ¶ 13. On May 9, 2008, Plaintiff was moved from Utility Gang to lighter duty such as Painting, Dorm Porter, and Sanitation. *Id*.

Pawlin claims it is not part of his duties to assign work to inmates or make the determination as to what work program an inmate is assigned that work assignments are done by the Program Committee. (Dkt. No. 88-3 at ¶ 12.) Plaintiff, however, claims that Pawlin was on the Program Committee, and that when Plaintiff told Pawlin at Program Committee hearings that he could not do the job to which he was assigned because of his back, Pawlin told him there were no other jobs. (Dkt. No. 88-1 at 94.)

Plaintiff also claims that Pawlin caused him to be subjected to unusual patterns of movement from housing units and instructed housing unit officers not to allow Plaintiff to use available push-carts (also referred to as "draft carts") or to allow other prisoners to assist him in the moves. *Id*. at ¶ 35. DOCCS records reveal that Plaintiff's first move occurred on February 25, 2008, when he was moved from a top bunk in Dorm C-1, Cube 48 to a bottom bunk in Cube 42, a few cubes away in the same Dorm. (Dkt. No. 88-3 at ¶ 6.) The same day, Plaintiff was moved to SHU as a result of the misbehavior report filed by Lane. *Id*. at ¶ 7; Dkt. No. 88-7 at ¶ 7.

When Plaintiff was released from SHU on March 3, 2008, he was moved to Dorm D-1

and four days later was moved to a bottom bunk a few cubes away in Dorm-D.  *Id*.  On March

13, 2008, Plaintiff was moved from Dorm D-1 to Dorm F-2, a two or three minute walk away.

*Id*. at ¶ 8.  According to Pawlin, he does not know the reason for that move.  *Id*.  Plaintiff was

moved from Dorm F-2 to Dorm G-1, a ten to twenty second walk, on April 3, 2008.  *Id*.

Plaintiff was moved to SHU again on April 12, 2008, and on April 25, 2008, was moved

to Dorm F-1.  *Id*. at ¶ 9.  Plaintiff remained there in Cube 45 bottom bunk until July 15, 2008,

when he was moved a short distance Dorm F-1 Cube 23 bottom bunk.  *Id*.  Plaintiff was moved

back to SHU on July 29, 2008, and remained in SHU until his transfer to Mid-State in late

August.  *Id.*

Plaintiff claims that each time he moved, he had to carry two bags of state issued

property, a bag of food, and a number of bags of legal papers weighing at least eighty pounds

each.  (Dkt. No. 88-1 at 99-100.)  Plaintiff moved one bag at a time.  *Id*. at 101.  Plaintiff

contends that prisoners were generally allowed to use push-carts to transport their things from

one housing unit to another, but that Pawlin had told corrections officers not to allow Plaintiff to

use them and not to allow any inmates to assist him.  *Id*. at 102-03, 105-06.  Pawlin, however,

claims that inmates are not permitted to use push-carts to move personal belongings, and that

inmates are expected to carry their own property to new housing units.  (Dkt. No. 88-3 at ¶ 10.)

Pawlin also claims that other inmates are not allowed to assist in moving property unless the

inmate being moved has a documented medical condition that prohibits him from carrying his

own property, in which case a porter would be assigned to assist the inmate.  *Id*.  On May 16,

2008, Pawlin issued a memorandum which he describes as memorializing the policy that inmates

were to carry their own property to their new housing unit and were not allowed assistance from

other inmates absent a medical condition. *Id*.; *see also* Dkt. No. 88-3 at 11.

At his deposition, Plaintiff testified that on March 3, 2008, the first time he was released from SHU, Pawlin told the corrections officers to make him carry his own bags to the housing unit and told another individual, who was helping Plaintiff, to put the bag he was carrying down. (Dkt. No. 88-1 at 110.) Plaintiff was forced to walk from the SHU to his housing unit through snow and slush up to his ankles without taking shortcuts. *Id*. at 111, 117-18.

Plaintiff also testified concerning an instance on April 25, 2008, in which Pawlin required him to carry his property from SHU to his dorm. Plaintiff was coming out of SHU and his belongings were already in push-carts. (Dkt. No. 88-1 at 106.) When Pawlin came into the SHU, he told the corrections officer not to allow Plaintiff to use push-carts. *Id*. Plaintiff lifted a bag, and his back cracked. *Id*. at 107. He went to the infirmary and, according to Plaintiff, the nurse ridiculed him when he told her he was injured and needed to use a push-cart and denied his request. *Id*. Plaintiff's April 25, 2008, Progress Note reports that Plaintiff went to medical and requested a note stating that he had pain and did not want to carry his bags from SHU. The nurse noted no apparent distress and that when Plaintiff left, he threw his bag over his shoulder and walked out with no difficulty. (Dkt. No. 89-4 at 26.)

### E.    Grievance Nos. 8285-08, 8335-08, and 8406-08

In addition to Grievance No. 8241-08 (Dkt. No. 99-3 at 30) discussed above, while housed at Cape Vincent, Plaintiff filed: (1) Grievance No. 8285-08, dated April 10, 2008, complaining that he should not have been assigned to the Utility Gang given his chronic back problem (Dkt. No. 89-3 at 8); (2) Grievance No. 8335-08, dated June 12, 2008, complaining of inadequate dental care, *id*. at 19; and (3) Grievance No. 8406-08, dated July 31, 2008,

complaining of inadequate medical treatment by Dr. Moehs in denying the physical therapist's recommendation that a TENS unit be purchased for Plaintiff. *Id*. at 32.

### 1. Grievance No. 8285-08

On Grievance No. 8285-08, regarding Plaintiff's work assignment, the Inmate Grievance Resolution Committee ("IGRC") found that per the Nurse Administrator in the Medical Department, Plaintiff could work without restrictions. *Id.* at 5. On appeal, Superintendent Barkley noted that the findings of an investigation conducted by the Nurse Administrator indicated that Plaintiff had been seen by a physician for an examination, evaluation, and x-ray, and the doctor had determined that Plaintiff could work without restrictions at that time. *Id*. at 5. The Central Office Review Committee ("CORC"), of which Defendant Lindquist was a member, found that it had not been provided with sufficient evidence to substantiate staff malfeasance, and asserted that "consistent with Health Services Policy Manual #1.21　Health Care Referrals, the Facility Health Services Directors (FHSD) have the sole responsibility for providing treatment to the inmates under their care." *Id*. CORC also noted that Plaintiff had been removed from the Utility Gang effective May 12, 2008, and assigned as a porter and painter. *Id*. Plaintiff was advised to address medical concerns via the sick call mechanism. *Id*.

### 2. Grievance No. 8335-08

In Grievance No. 8335-08, Plaintiff claimed that he had been waiting over three months to have a wisdom tooth extracted, and it still had not been removed. (Dkt. No. 89-3 at 19.) The IGRC responded that as of June 18, 2008, Plaintiff was currently on the list to be appointed for dental treatment per Dr. Marks. *Id.* at 20-21. The July 9, 2008, finding on appeal by the Assistant Superintendent at Cape Vincent noted that a follow-up with dental revealed Plaintiff

had an appointment on July 7, 2008, and directed Plaintiff to address any further concerns on the matter to dental. *Id*. at 17. CORC upheld the determination of the Superintendent on appeal finding that it had not been presented with sufficient evidence to substantiate any malfeasance by staff. *Id.* at 13. CORC noted that Plaintiff had dental appointments on February 24, 2008, April 28, 2008, July 2, 2008, July 7, 2008 (wisdom tooth extraction), and follow up July 14, 2008. *Id.* CORC further noted that Plaintiff had been a no show for an April 11, 2008, appointment and had an outside medical trip on June 6, 2008, missing a scheduled dental appointment as a result. *Id*. at 13.

### 3.    Grievance No. 8406-08

In Grievance No. 8406-08, Plaintiff complained regarding Dr. Moehs' denial of a TENS unit that had been recommended by Plaintiff's physical therapist and requested that either Dr. Rosner be reinstated as his health care provider and he be provided with a TENS unit, or he be granted compensatory damages for his suffering. *Id*. at 32. The IGRC responded to the grievance in the following manner: "Per Dr. Moehs[,] [d]ue to lack of symptoms, and overall movement, and development of inmate behavior, providing a tens unit is considered inappropriate." *Id*. at 34. On appeal, Superintendent Barkley noted that Dr. Moehs' had indicated a tens unit was not medically necessary "due to [Plaintiff's] fluid movement, normal gait and based on x-rays which revealed [Plaintiff's] condition [was] considered mild." *Id*. at 31. In addition, the Superintendent noted that when Plaintiff had previously used the TENS unit during physical therapy sessions, the effect was limited. *Id*. CORC unanimously denied Plaintiff's grievance for lack of substantial evidence of staff malfeasance; because the Facility Health Services Director, Dr. Moehs, has sole responsibility for providing medical care to

inmates and did not find a TENS unit to be medically indicated; inmates are not entitled to see the physician of their choice; and monetary damages are not available through the grievance system. *Id*. at 24.

## III. APPLICABLE SUMMARY JUDGMENT LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible

evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit.[5] *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." "To defeat summary judgment, . . . nonmoving parties "may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys*, 426 F.3d at 554 (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations. "*Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro*

---

[5] Plaintiff's amended complaint this case was properly verified under 28 U.S.C. § 1746. (Dkt. No. 46 at 24.) *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65-66 (2d Cir. 1999) (use of the language "under penalty of perjury" substantially complies with § 1746).

*se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999)[6] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## IV.   PLAINTIFF'S MOTION PURSUANT TO RULE 56(d) OF THE FEDERAL RULES OF CIVIL PROCEDURE

Plaintiff concedes that he cannot present material facts to oppose claims asserted against Defendants Pawlin, Hulihan, Barkley, and Lindquist without additional discovery and has moved pursuant to Rule 56(d) for an order allowing that discovery.[7]  (Dkt. No. 99.)  Rule 56(d) provides that, where a party opposing summary judgment "shows by affidavit or declaration that, for specific reason, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed.R.Civ.P. 56(d).  To obtain relief under Rule 56(d), a party opposing summary judgment must establish: "(1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why affiant was unsuccessful in those efforts." *Hudson River Sloop Clearwater, Inc. v.*

---

[6]  Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[7]  Plaintiff makes the same claim with regard to Defendant Dr. John Doe.  However, as noted above, Dr. John Doe has not been identified or served during the more than five years this action has been pending, and the Court has recommended dismissal against him.

*Department of Navy*, 891 F.2d 414, 422 (2d Cir. 1989).

A number of courts have held that relief under Rule 56(d) is generally unavailable when summary judgment motions are made after the close of discovery. *See, Jean-Laurent v. Bowman*, No. 12 CV 2954 (KAM)(LB), 2014 WL 4662221, at * 13 (E.D.N.Y. July 7, 2014) ("The parties had ample time and opportunity to conduct discovery in this matter and relief under 56(d) is not available when summary judgment motions are made after the close of discovery.") (internal punctuation, quotation marks, and citations omitted); *Capitol Records, Inc. v. MP3tunes, LLC*, No. 07 Civ. 9931 (WHP), 2013 WL 1987225, at * 8 (S.D.N.Y. May 14, 2013) (quoting *Espada v. Schneuder*, 522 F. Supp. 2d 544, 549 (S.D.N.Y. 2007) (relief "under Rule 56(d) is not available when summary judgment motions are made after the close of discovery")).

This action was commenced more than five years ago on February 17, 2011. (Dkt. No. 1.) June 29, 2013, was set as the original discovery cut-off date by the Court on March 4, 2013. (Dkt. No. 34.) Following initial review of Plaintiff's amended complaint on October 10, 2014 (Dkt. No. 54), the cut-off date for discovery was reset by the Court to January 9, 2015, with dispositive motions due on March 16, 2015. (Dkt. No. 57.) On January 8, 2015, the cut-off date was reset by the Court to February 13, 2015. (Dkt. No. 59.) On January 12, 2015, Plaintiff moved for a further extension of the cut-off date for discovery to March 2, 2015 (Dkt. No. 60), and the Court granted the motion on January 13, 2015. (Dkt. No. 61.) The Court further extended the discovery cut-off date to June 1, 2015, in a Text Order dated March 19, 2015. On October 15, 2015, the Court granted in part a motion to compel discovery filed by Plaintiff and ordered that, with the exception of the Court ordered service of interrogatory responses by Defendants Lindquist and Hulihan, discovery was closed. (Dkt. No. 79.)

Defendants did not move for summary judgment until after the close of discovery (Dkt. No. 88), and the Court finds that Plaintiff had ample time and opportunity to conduct discovery in this case prior to the close of discovery some two and a half years after the Court set the initial discovery cut-off for June 29, 2013.  Even if Plaintiff were found to have been denied adequate time or opportunity to conduct discovery, or discovery had not closed before the summary judgment motion was filed, the Court would recommend denial of the motion on the grounds that Plaintiff's Declaration fails to satisfy all of the requirements set forth in *Hudson River*, 891 F.2d at 422. More specifically, Plaintiff's Declaration does not describe the efforts made by him to obtain the documents or categories of documents he claims to need to oppose the motion or why he was unsuccessful in those efforts.  In light of the foregoing, the Court recommends that Plaintiff's Rule 56(d) application be denied.

## V.   ANALYSIS

### A.   First Amendment Retaliation Claims Against Lane and Beard

To prevail on a First Amendment retaliation claim, an inmate must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected speech [or conduct] and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009); *see also Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (quoting *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema,* 534 U.S. 506, 508 (2002)).  "Adverse action" for purposes of a retaliation claim has been defined objectively as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Pidlypchak*,

389 F.3d at 381. Otherwise, the retaliatory act is simply *de minimis* and outside the scope of constitutional protection. *See Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 370 (S.D.N.Y. 2011) (citing *Dawes*, 239 F.3d at 292-93).

An inmate bears the burden of showing that "the protected conduct was a substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). In evaluating whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, "a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon*, 58 F.3d at 873). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.* A showing of temporal proximity, without more, has generally been found insufficient to survive summary judgment. *See Roseboro,* 791 F. Supp. 2d at 370 (citations omitted). There are, however, decisions by the Second Circuit in which courts have concluded that temporal proximity between protected activity and allegedly false disciplinary charges may be enough to withstand summary judgment where combined with evidence that the author of the charges knew of the protected conduct, as well as evidence of a prior record of good behavior, or that the charges were dismissed or successfully appealed. *See Washington v. Donahue*, 146 F. Supp. 3d 503, 506-07 (2015) (collecting Second Circuit cases).

Because of the relative ease with which claims of retaliation can be incanted, courts have scrutinized retaliation claims with particular care. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d

Cir. 1983), *overruled on other grounds*, *Swierkiewicz*, 534 U.S. 506.  As the Second Circuit has

noted,

> [t]his is true for several reasons.  First, claims of retaliation are
> difficult to dispose of on the pleadings because they involve
> questions of intent and are therefore easily fabricated.  Second,
> prisoners' claims of retaliation pose a substantial risk of
> unwarranted judicial intrusion into matters of general prison
> administration.  This is so because virtually any adverse action
> taken against a prisoner by a prison official--even those otherwise
> not rising to the level of a constitutional violation--can be
> characterized as a constitutionally proscribed retaliatory act.

*Dawes,* 239 F.3d at 491.  Accordingly, claims of retaliation must be supported by specific facts;

conclusory statement are not sufficient.  *Flaherty*, 713 F.2d at 13; *see also Houston v. Goord*,

No. 9:03-CV-1412 (GTS/DEP), 2009 WL 890658, at * 11 (N.D.N.Y. March 31, 2009)

("Analysis of retaliation claims . . . requires thoughtful consideration of the evidence presented

concerning the protected activity in which the inmate has engaged and the adverse action taken

against him or her, as well as the evidence tending to link the two.  When such claims, which

ordinarily are exceedingly case specific, are alleged in conclusory fashion, and are not supported

by evidence establishing the requisite nexus between any protected activity and the adverse

action complained of, the entry of summary judgment dismissing plaintiff's retaliation claims is

warranted.").

    Even if a plaintiff makes the appropriate showing of retaliation, a defendant may avoid

liability if he demonstrates that he would have taken the adverse action even in the absence of the

protected conduct.  *See Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) ("Regardless of

the presence of retaliatory motive, . . . a defendant may be entitled to summary judgment if he

can show . . . that even without the improper motivation the alleged retaliatory action would have occurred.") (citation omitted); *Roseboro*, 791 F. Supp. 2d at 371.

      1.   <u>Lane</u>

Plaintiff's amended complaint, construed liberally, alleges retaliation claims against Defendant Lane with regard to both the February 19 and 25, 2008, misbehavior reports. (Dkt. No. 46 at ¶¶ 23-26.) Plaintiff claims that Lane, who previously had been allowing him to keep two draft bags under his bunk, wrote the February 19, 2008, Tier I misbehavior report charging him with improperly keeping the bags under his bunk from January 24 to February 18, 2008, in violation of 118.30 Untidy Cell or Person, the same day Plaintiff had shown him a paper regarding an action for excessive force Plaintiff had pending against New York City corrections officers. (Dkt. Nos. 46 at ¶ 23; 88-1 at 37, 43; 99-3 at 6.) Plaintiff claims that Lane wrote the February 25, 2008, misbehavior report after observing Plaintiff writing Grievance No. 8241-08 regarding the draft bag storage issue and the Tier I misbehavior report that morning. (Dkt. Nos. 46 at ¶ 26; 88-1 at 42-44.)

      a.     February 19, 2008, Misbehavior Report

The filing of lawsuits is protected First Amendment conduct for purposes of a retaliation claim. *See Colon*, 58 F.3d at 872 ("Prisoners, like non-prisoners have a constitutional right of access to the courts and to petition the government for redress of grievances."). Although the filing of a false misbehavior report can qualify as an adverse action for purposes of establishing the second element of a retaliation claim, *Pidlypchak*, 389 F.3d at 384, the Court finds, based upon the evidence in the record, that the February 19, 2008, misbehavior report was not false. *See Woodward v. Ali*, No. 9:13-cv-1304 (LEK/RFT), 2015 WL 5711899, at * 11 (N.D.N.Y. Sept.

29, 2015) (denying Plaintiff summary judgment where the court, while recognizing that the filing of a false misbehavior report may constitute an adverse action, found that the record was devoid of evidence that the misbehavior report was false)*; see also Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994) ("When it is undisputed that an inmate has in fact committed prohibited conduct, no retaliatory discipline claim can be sustained").

The misbehavior report charged Plaintiff with keeping two draft bags under his bunk from January 24 through February 18, 2008, in violation of prison rules. (Dkt. No. 99-3 at 6.) Plaintiff does not deny that the bags were under his bed; he claims only that he was allowed to have them there. *Id*. at 5. In affirming the finding of guilt at Plaintiff's disciplinary hearing, Superintendent Barkley determined that Plaintiff was mistaken; that the only allowable storage containers were those sold at the commissary and Plaintiff's property must be stored only in those containers or in his locker. *Id*.; *see also* Dkt. Nos. 88-7 at ¶ 7; 88-10 at 2, 5.

In addition, even were the Court to assume that the misbehavior report did constitute adverse action, the evidence supports summary judgment in Lane's favor on the issue of causation. The Court finds that there is a question of fact as to whether Lane saw a document regarding Plaintiff's excessive force lawsuit against the New York City corrections officers prior to issuing the February 19, 2008, misbehavior report. Plaintiff claims that he showed Lane a document that disclosed the lawsuit, and Lane issued the misbehavior report the same day. (Dkt. No. 46 at ¶ 23.) Lane denies seeing correspondence concerning any litigation involving Plaintiff prior to the time he issued the second misbehavior report on February 25, 2008. (Dkt. No. 88-6 at ¶ 11.)

Even if Lane did learn of the lawsuit prior to issuing the misbehavior report, Plaintiff's

conclusory assertion that Lane did so in retaliation for the lawsuit suit is insufficient to withstand summary judgment. *See Flaherty*, 713 F.2d at 13 (conclusory statements are insufficient to support causation on retaliation claims).

As a general matter, it is difficult to establish that a defendant had cause to retaliate against a plaintiff for protected conduct against another party. *See Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009) (dismissing retaliation claim against a corrections officer when the only alleged basis for retaliation was a complaint about an incident involving another corrections officer); *Guillory v. Ellis*, No. 9:11-CV-600 (MAD/ATB), 2014 WL 4365274, at 18 at * 49 (N.D.N.Y. Aug. 28, 2014) ("it is difficult to establish one defendant's retaliation for complaints against another defendant"). Plaintiff's speculation that Lane retaliated against him because of his lawsuit against New York City corrections, without any supporting evidence, is insufficient to defeat summary judgment. *See McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006) (speculation alone is insufficient to defeat a summary judgment motion).

In addition, in his appeal from the guilty finding on the February 19, 2008, misbehavior report, Plaintiff stated that "[t]his ticket was given to me because I had no money to purchase property bags from commissary because I owe encumbrance money I've recently received was taken so I could not afford to buy storage bags. This ticket was written and the disposition rendered because of my inability to purchase property bags, not because my cube did not conform with the cleanliness and orderliness policy." (Dkt. No. 99-3 at 5.) There is no mention in Plaintiff's appeal of the misbehavior report having been filed for retaliatory reasons. *Id.*

Based upon the foregoing, the Court recommends that Lane be granted summary judgment on Plaintiff's retaliation claim regarding the February 19, 2008, misbehavior report.

b.    February 25, 2008, Misbehavior Report

Inasmuch as the filing of grievances is protected First Amendment conduct for purposes

of a retaliation claim, *see Colon*, 58 F.3d at 872, the Court finds that Plaintiff has satisfied the

first element of a retaliation claim.  In addition, because the filing of a false misbehavior report

can qualify as an adverse action, *Pidlypchak*, 389 F.3d at 384, the Court will assume for purposes

of this motion that Plaintiff has also satisfied the second element.

Lane argues that there is no causal connection between Plaintiff's Grievance No. 8241-08

regarding the draft bag storage issue and the Tier I misbehavior report and the February 25, 2008,

misbehavior report and taking Plaintiff to SHU.  (Dkt. No. 88-14 at 6-9.)  Lane claims that he did

not know about the grievance at the time he issued the misbehavior report.  (Dkt. No. 88-6 at ¶

10.)  Lane also argues that the grievance cannot serve as the causal connection for his retaliation

claim because Plaintiff acknowledged at his deposition that he wrote the grievance after

receiving the misbehavior report on the draft bags.  (Dkt. No. 88-14 at 8.)

Plaintiff contends that he wrote the grievance before Lane issued the misbehavior report,

and that Lane was aware of the grievance before the report was issued and Plaintiff was taken to

SHU and issued the report in retaliation for the grievance.  (Dkt. Nos. 46 at ¶¶ 25-26; 88-1 at 41-

43.)  The Court finds some confusion in Plaintiff's deposition testimony regarding the timing of

the grievance.[8]  However, considered in its entirety, Plaintiff's testimony supports his claim that

---

[8]  At his deposition, Plaintiff responded in the affirmative when asked if it was fair to say that the grievance was written after he got his misbehavior report from Lane concerning his draft bags.  (Dkt. No. 88-1 at 45.)  Inasmuch as the questioner did not identify which misbehavior report he was referencing, and the grievance in issue dealt with the February 19, 2008, misbehavior report, Plaintiff may well have responded to the question believing that the questioner was referring to that grievance.

he wrote the grievance, which dealt with the February 19, 2008, misbehavior report, the morning

of February 25, 2008, after Lane had disregarded his claim that Directive 4913 and FOM § 786

authorized him to keep two draft bags under his bunk.  (Dkt. Nos. 88-1 at 44; 99-3 at 30.)  After

testifying that he wrote and filed the grievance on February 25, 2008, Plaintiff testified:

> Oh, matter of fact I am not mistaken, this was the day I was
> punitively confined.  I wrote the grievance up and this was another
> basis of the claim.  The man came around and saw me writing,
> Lane came around, and . . . matter of fact, this is what happened:
> Lane came around and he saw me writing the grievance, okay, and
> when he saw me writing this grievance, which is when he spoke to
> Sergeant Beard and said, I don't want him in this house no more, I
> want him out of here.

(Dkt. No. 81-1 at 43.)  Lane is alleged to have issued the misbehavior report later that day.  (Dkt.

No. 46 at ¶¶ 5-7.)

While the temporal proximity weighs in favor of finding a causal connection, the

statement in Plaintiff's appeal as to why the misbehavior report was issued weighs against it.

Plaintiff stated in his appeal that "[t]his misbehavior report was written because I could not

afford to purchase storage containers from commissary because my funds were take (sic) to pay

for encumbrances."  (Dkt. No. 88-6 at 11.)  The appeal makes no mention of a retaliatory motive

on Lane's part.  *Id*.

Even if the Court were to find that a material issue of fact exists on the issue of causation,

it would recommend summary judgment in Lane's favor because the record shows that Lane

would have taken the adverse action in the absence of protected conduct.  *See Scott*, 344 F.3d at

287-88.  The two draft bags that had been the subject of Lane's February 19, 2008, misbehavior

report were still in Plaintiff's cube on February 25, 2008, despite the hearing officer's finding of

guilt. (Dkt. Nos. 46 at ¶ 24; 88-6 at ¶ 5.) By Plaintiff's own admission, he informed Lane that morning that he was allowed to keep the bags there under DOCCS Directive 4913 and FOM § 786. (Dkt. No. 46 at ¶ 25.)

The evidence establishes that Plaintiff's interpretation of DOCCS Directive 4913 was erroneous and that FOM § 786 had been rescinded in 2003. (Dkt. Nos. 88-7 at 11; 88-10 at 2, 5, 7.) Plaintiff has relied upon Directive 4913 Sections II(A)(1)(c) and III(A) & (B) in support of his claim that he was authorized to store property in two draft bags in his cell. (Dkt. Nos. 88-7 at 11; 99-3 at 5.) Prior to its revision on September 21, 2006, Part II(A)(1)(c) provided that newspapers, magazines, books, and audio tapes "shall be stored in the locker provided and/or in cardboard boxes which can be neatly stored under the bed to reduce their potential as a fire hazard." (Dkt. No. 88-10 at 5.) The section, as revised and in effect as of February 2008, provides that "[t]hese items shall be stored in the locker provided and/or in authorized storage containers which can be neatly stored under the bed to reduce their potential as a fire hazard." *Id*. at 2. The revision is disclosed in the Superintendent's Reply to Plaintiff's appeal from the disciplinary determination on the February 25, 2008, misbehavior report. (Dkt. No. 88-7 at 11.)

Directive 4913 Part III(A) & (B) set forth the rules with regard to personal property limits in double cell housing. (Dkt. No. 88-10 at 7.) Section (A) allows an inmate in double cell housing to possess in his cell two draft bags for storage of property beyond that which can be stored in the individual lockers. *Id.* It also allows both inmates to store property under the bottom bunk. *Id.* The Supervisor's Reply to Plaintiff's appeal explains that Part III refers to inmates in double cell housing, that Plaintiff was in a cube, and the provision for cells does not apply to cubes. (Dkt. No. 88-7 at 11.)

Although Plaintiff was found not guilty on the charges of 104.12 Creating a Disturbance, 118.21 Flammable Materials, and 106.10 Refusing a Direct Order, he was, for the second time in less than two weeks, found guilty of 118.30 Untidy Cell or Person as a result of his continued storage of two draft bags under his bed, the underlying reason for the issuance of the February 25, 2008, misbehavior report. *Id*. at 9. Even if Lane arguably had a retaliatory motive for the charges, it is undisputed that Plaintiff committed the prohibited conduct that led to the guilty finding for untidy cell or person.

Therefore, the Court finds that a retaliation claim based upon the February 25, 2008, misbehavior report cannot be sustained and recommends that summary judgment be granted in Lane's favor. *See Lowrance*, 20 F.3d at 535; *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (defendant's burden of establishing that plaintiff would have received the same punishment even absent the retaliatory motive can be met "by demonstrating that there is no dispute that plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report.") (citation and internal quotation marks omitted).

2. Beard

Plaintiff has also asserted a retaliation claim against Beard with regard to the February 25, 2008, misbehavior report. Plaintiff's retaliation claim rests entirely on speculation that Lane was speaking on the phone with Beard on February 25, 2008, after discovering that Plaintiff was writing a grievance regarding the draft bags, and that the two somehow colluded in the report. (Dkt. Nos. 46 at ¶ 26; 88-1 at 41-42.) Lane denies having any communications with Beard regarding the subject matter of the February 25, 2008, misbehavior report. (Dkt. No. 88-6 at ¶ 9.) Beard denies any knowledge of Plaintiff's February 25, 2008, grievance until he was asked to

investigate it on February 28, 2008.  (Dkt. No. 88-7 at ¶ 9.)

Because unsubstantiated speculation is insufficient to avoid summary judgment, *see Jeffreys*, 426 F.3d at 554, the Court recommends that Beard be granted summary judgment on Plaintiff's retaliation claim.

> **B.**     **Eighth Amendment Medical Indifference and Retaliation Claims Against Dr. Moehs**

Plaintiff has asserted Eighth Amendment medical indifference and retaliation claims against Defendant Dr. Moehs, arising out of his denial of the TENS unit the physical therapist had recommended for Plaintiff's use.  (Dkt. No. 46 at ¶¶ 45, 53-54, 58.)

> 1.     Eighth Amendment Medical Indifference Claim

The Eighth Amendment protects prison inmates from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials.  *Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).  While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement.  *Farmer*, 511 U.S. at 832.  To satisfy their obligations under the Eighth Amendment, prison officials must "ensure that inmates receive adequate food, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates." *Id*.

To establish an Eighth Amendment claim arising out of inadequate medical care, an

inmate must make a threshold showing that prison officials were deliberately indifferent to his serious medical needs. *Smith v. Carpenter*, 316 F.3d 178, 183 (2d Cir. 2003). A serious medical condition is one which presents "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (citation and internal quotation marks omitted); *see also Harrison v. Barkley*, 219 F.3d 132, 136-37 (2d Cir. 2000) ("A serious medical condition exists where the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." (internal citation and quotation marks omitted)). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: "(1) the existence of an injury that a reasonable doctor or patient would find important and worthy of treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain." *Chance*, 143 F.3d at 702-03.

Analysis of a § 1983 claim for deliberate indifference to a serious medical need involves a two-pronged inquiry consisting of objective and subjective components. The objective component requires a plaintiff to show that the alleged deprivation of medical care was "sufficiently serious." *Id*. at 702. A prison official need only provide "reasonable care," and an official who acts reasonably in response to an inmate's health risk "cannot be found liable under the Cruel and Unusual Punishments clause." *Id*. (quoting *Farmer*, 511 U.S. at 847).

Because the second requirement for an Eighth Amendment violation is subjective, the defendant prison official must act with a sufficiently culpable state of mind. *Salahuddin*, 467 F.3d at 280. The subjective showing is "deliberate indifference," which is akin to criminal recklessness: that the defendant acted or failed to act "while actually aware of a substantial risk

that serious harm will result." *Id.* It is well-established that "a difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Sonds v. St. Barnabas Hosp. Corr. Health Serv.*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001). Furthermore, an "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105-06. "A complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim . . . under the Eighth Amendment." *Id.* at 106. Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.*; *see also Smith*, 316 F.3d at 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.").

Depending on the circumstances, back pain may qualify as a serious medical condition. *See, e.g., Howard v. City of New York*, No. 12 Civ. 4069 (PAE)(JCF), 2012 WL 7050623, at * 7 (S.D.N.Y. Dec. 20, 2012) (dismissing claim as insufficiently pled claim of deliberate indifference to serious medical need where plaintiff alleged mild scoliosis), *adopted as modified on other grounds*, 2013 WL 504164 (S.D.N.Y. Feb. 13, 2013); *Cain v. Jackson*, No. 05 Civ. 3914 (LAP)(MHD), 2007 WL 2193997 at * 1, 6 (S.D.N.Y. July 27, 2007) (plaintiff's degenerative disc disease not sufficiently serious medical condition); *Nelson v. Rodas*, No. 01 Civ. 7887 (RCC)(AJP), 2002 WL 31075804, at * 1, 6 (S.D.N.Y. Sept. 17, 2002) ("severe back pain, especially if lasting an extended period of time, can amount to a 'serious medical need' under the Eighth Amendment.").

Even if the Court were to assume solely for purposes of this motion that Plaintiff's mild

scoliosis, moderate degenerative changes in his lumbar and thoracic spine, and what he has described as "excruciating pain" (Dkt. Nos. 88-1 at 16; 89 at 11, 17, 89), together constituted a serious medical condition, the evidence establishes that Plaintiff was given adequate medical treatment, and Dr. Moehs did not act with deliberate indifference in denying the physical therapist's recommendation that Plaintiff be provided with a TENS unit.  When Dr. Moehs examined Plaintiff on July 25, 2008, he observed that Plaintiff had a normal range of motion and moved well.  (Dkt. No. 88-4 at ¶ 22.)  Dr. Moehs' observation was in accord with Plaintiff's medical records which reported that on March 31, 2008, Plaintiff was "almost able to touch his toes, reached his hands above his head easily, twisted his trunk, and could squat, stand, and sit without difficulty."  (Dkt. No. 89 at 19.)  Dr. Moehs was also aware that Plaintiff was doing exercises such as weight lifting, as treatment for his back.  (Dkt. No. 88-1 at ¶ 27.)

Dr. Moehs diagnosed Plaintiff with "basic arthritis in his back which is considered a normal back with degenerative changes, a condition most people live with," and told Plaintiff he would have to learn to live with it.  (Dkt. No. 88-4 at ¶ 22.)  When Dr. Moehs denied the physical therapist's recommendation for a TENS unit based upon his professional medical judgment, review of Plaintiff's medical records, and objective data from Plaintiff's July 25, 2008, examination, he was aware that Plaintiff was taking Naprosyn, the ongoing treatment for his pain, and Dr. Moehs agreed that the treatment plan was appropriate as of July 25, 2008, and continued the Naprosyn.  *Id*. at ¶¶ 23, 30.

In a memorandum he prepared in response to Plaintiff's grievance over denial of the TENS unit, Dr. Moehs explained that the physical therapist's notes reported that the TENS unit "helped only somewhat, on one occasion, and little help on the other," and that in physical

therapy, Plaintiff "move[d] fluidly with a normal gait," and while "his range of motion was slightly limited in extension [it was] excellent in flexion and lateral movement." (Dkt. No. 89 at 89.) Dr. Moehs concluded in the memorandum that "[g]iven the limited effectiveness in the formal physical therapy sessions, and the lack of symptoms overall, demonstrated by [Plaintiff's] movement and behavior, not providing the tens unit is justified . . . ." *Id*.

The Court finds that Plaintiff's and Dr. Moehs' disagreement regarding the TENS unit does not create a constitutional claim for medical indifference. *See Sonds*, 151 F. Supp. 2d at 311. The evidence clearly shows that Dr. Moehs made a reasoned medical decision based upon Plaintiff's medical records, his own observations, and Plaintiff's ongoing treatment with Naprosyn and had no reason to conclude that serious harm would befall Plaintiff were he not given a TENS unit. *Salahuddin*, 467 F.3d at 280. Therefore, the Court recommends that Dr. Moehs be granted summary judgment on Plaintiff's Eighth Amendment medical indifference claim.

### 2. Retaliation Claim

Plaintiff has also asserted a retaliation claim against Dr. Moehs, claiming that Dr. Moehs took over his medical care and denied him a TENS unit because of Plaintiff's April 30, 2008, letter to Dr. Wright complaining he was receiving inadequate medical care at Cape Vincent. (Dkt. Nos. 46 at ¶ 63; 88-1 at 50.) The letter of complaint to Dr. Wright was protected First Amendment activity for purposes of his retaliation claim. *See Decayette v. Goord*, No. 9:06-CV-783 (TJM/GHL), 2009 WL 1606753, at * 9 (N.D.N.Y. June 8, 2009) ("[p]laintiff's right to send a letter of complaint to [a prison official] was a constitutionally protected activity").

The Court finds it questionable, however, whether denying the TENS unit is sufficiently

adverse to deter "a similarly situated individual of ordinary firmness" from exercising his constitutional rights. *Pidlypchak*, 389 F.3d at 381. Assuming solely for purposes of this motion that the denial did constitute an adverse action, there is not one shred of evidence establishing a causative link between the letter to Dr. Wright and Dr. Moehs' actions, let alone proof that it played a "substantial part in" Dr. Moehs' action. *See Baskerville*, 224 F. Supp. 2d at 732.

Dr. Moehs was not copied on the letter to Dr. Wright. (Dkt. No. 88-1 at 16-17.) Moreover, Dr. Moehs denies seeing Dr. Wright's letter prior to July 25, 2008, when he saw Plaintiff. (Dkt. No. 88-4 at ¶ 30.) Dr. Moehs was copied on a July 29, 2008, letter from DOCCS Regional Health Services Administrator Holly A. Collett regarding the letter to Dr. Wright. (Dkt. No. 88-1 at 19.) However, as Dr. Moehs points out in his Declaration, that letter was not sent until after he saw Plaintiff. (Dkt. No. 88-4 at ¶ 30.)

The sole support for Plaintiff's retaliation claim is that while he did not recall what had happened when Dr. Moehs took over his care, "it could have been a complaint that I wrote to the chief medical doctor, Dr. Wright, when they were not giving me some type of medical care and, finally, it came down to him and he got a whiff of it and that is when that happened. It is another retaliation claim." (Dkt. No. 88-1 at 50.) Plaintiff revealed in his deposition testimony that he had no evidence that Dr. Moehs knew of the letter before he denied the TENS unit and merely speculated that was the case. *Id*. at 52.

Unsubstantiated speculation is insufficient to avoid summary judgment. *See Jeffreys*, 426 F.3d at 554. Therefore, the Court recommends that Dr. Moehs also be granted summary judgment on Plaintiff's retaliation claim.

### C. Eighth Amendment Medical Indifference Claims Against McAuliffe, Barkley, Hulihan, and Lindquist

Plaintiff has also asserted Eighth Amendment medical indifference claims against Defendants McAuliffe, Barkley, Hulihan, and Lindquist.

#### 1. McAuliffe

Plaintiff's claim that McAuliffe violated his Eighth Amendment right to adequate medical care because of his inability to go to scheduled medical and dental appointments while in SHU is based solely on Plaintiff's allegation that "[o]n one occasion when defendant McAuliffe was making rounds in the SHU and plaintiff inquired why he was not taken to the medical facility for his medical and dental appointments; Defendant McAuliffe simply answered 'because you're in SHU' and walked away." (Dkt. No. 46 at ¶ 38.) Plaintiff conceded at his deposition that he never made McAuliffe aware of any particulars regarding his medical and dental condition. (Dkt. No. 88-1 at 140.) Furthermore, in his Declaration, McAuliffe, who under HIPAA has no authority to look at Plaintiff's medical records, claims to have no recollection of ever telling Plaintiff he could not receive medical care in SHU.[9]  (Dkt. No. 88-5 at ¶¶ 25-26.)

Based upon the foregoing, it is clear that McAuliffe did not undertake responsibility for Plaintiff's medical and dental care while he was in SHU, and McAuliffe cannot be found to have known of and disregarded an excessive risk to Plaintiff's health or safety, a requirement for the imposition of liability for the violation of an inmate's right to adequate medical care under the

---

[9]  In addition, evidence submitted by McAuliffe in support of Defendants' summary judgment reveals that inmates in SHU are given what is found to be necessary medical care. *See* DOCCS Directive 4933 (Dkt. No. 88-5 at 61.); N.Y. Comp. Codes R. & Regs. tit. 7, § 304.4 (2016).

Eighth Amendment. *Chance*, 143 F.3d at 702. Therefore, the Court recommends that McAuliffe be granted summary judgment on the claim.

      2.    <u>Barkley, Hulihan, and Lindquist Regarding Affirmance of the Denial of Plaintiff's Grievances</u>

      a.    Barkley

At his deposition, Plaintiff initially identified his Eighth Amendment medical indifference claims against Barkley as being solely for affirming the denial of, or denying, Plaintiff's grievances without properly reviewing his medical records. (Dkt. No. 88-1 at 141-42.) Later in his testimony, Plaintiff clarified that when he referred to grievances, he meant "all grievances, formal or informal, interfacility correspondence, complaints," *id*. at 146, thereby raising the possibility that he intended to include Barkley's alleged inaction with regard to Plaintiff's April 30, 2008, letter to Dr. Wright complaining about inadequate medical care at Cape Vincent, on which Barkley was copied, in his claim. (*See* Dkt. 46 at ¶ 43.) The Court has therefore considered Grievance Nos. 8285-08, dated April 10, 2008, and 8406-08, dated July 31, 2008, as well as the April 30, 2008, letter to Dr. Wright in its analysis of Plaintiff's Eighth Amendment medical indifference claim against Barkley.[10]

In Grievance No. 8285-08, Plaintiff complained he was medically unfit for assignment to the Utility Gang because of his chronic back problem and requested a change of assignment. (Dkt. No. 89-3 at 8-10.) Barkley affirmed the IGRC decision denying Plaintiff's request for a change of work assignment based upon the Nurse Administrator's findings that Plaintiff had been

---

[10]  The evidence establishes that the appeal to the Superintendent on Grievance No. 8335-08, dated June 12, 2008, complaining of inadequate dental care as the result of the delay in the extraction of his wisdom tooth, was handled by the Assistant Superintendent at Cape Vincent, and that Barkley had no involvement. (Dkt. Nos. 88-8 at ¶ 10; 89-3 at 17, 19.)

x-rayed, examined, and evaluated by the doctor, who determined that Plaintiff could work. *Id*. at 89-3 at 5-6.)

In Grievance No. 8406-08, Plaintiff complained about Dr. Moehs' denial of the TENS unit recommended by the physical therapist. *Id*. at 32. Barkley affirmed the decision of the IGRC denying Plaintiff's request for a TENS unit, finding it medically inappropriate based upon the opinion of Dr. Moehs that the TENS unit was not needed due to, among other things, Plaintiff's "fluid movement, normal gait and based on x-rays which revealed [Plaintiff's] condition [was] considered mild." *Id*. at 31.

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citations and internal quotation marks omitted). Vicarious liability of prison officials is not allowed under § 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873.[11]

---

[11] The Second Circuit has thus far expressly declined to determine whether *Iqbal* eliminated any of the *Colon* bases for liability. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013).

Merely affirming the denial of an inmate's grievance has been found insufficient to establish the personal involvement required for supervisory liability under § 1983. *See Joyner v. Greiner*, 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002) ("The fact that [the ] Superintendent . . . affirmed the denial of Plaintiff's grievance . . . is [alone] insufficient to establish personal involvement."); *Watson v. Wright*, No. 08-CV-00960 (A)(M), 2013 WL 1791079, at *8 (W.D.N.Y. March 26, 2013) (collecting cases). Furthermore, a prison official is permitted "to rely upon and be guided by the opinions of medical personnel concerning the proper course of treatment administered to prisoners and cannot be held to have been 'personally involved' if he does so." *Joyner*, 195 F. Supp. 2d at 506; *Battle v. Recktenwald*, No. 14 CV 2738 (VB), 2016 WL 698145 * 10 (S.D.N.Y. Feb. 19, 2016) ("A defendant's denial of an administrative grievance or refusal to override the medical advice of medical personnel are insufficient to establish liability for an Eighth Amendment violation) (citing *Graham v. Wright*, No. 01 Civ. 9613 NRB, 2003 WL 22126764, at * 1 (S.D.N.Y. Sept. 12, 2003) ("It is well established that supervisory officials are generally entitled to delegate medical responsibility to facility medical staffs and are entitled to reply on the opinion of medical staff concerning the proper course of treatment.")).

The Court therefore finds that Defendant Barkley's affirmance of the denial of Plaintiff's two grievances involving his medical condition did not violate Plaintiff's Eighth Amendment right to adequate medical care. Nor did Barkley violate Plaintiff's Eighth Amendment rights by taking no action with respect to Plaintiff's letter to Dr. Wright. *See Daley v. VonHagen*, No. 11-CV-1071Sr., 2012 WL 4464861, at * 5 (W.D.N.Y. Sept. 20, 2012) ("Superintendents . . . are not generally involved in the treatment of inmates . . ., and it is generally reasonable for non-medical personnel to rely on qualified medical staff to deal with an inmate's medical needs.; *see also*

*Graham,* 2003 WL 22126764, at * 1; *Inesti v. Hogan*, No. 11 Civ. 2596 (PAC)(AJP), 2013 WL 791540, at * 26 (S.D.N.Y. March 5, 2013) (collecting cases).  Because the letter complaining about the inadequacy of Plaintiff's medical treatment at Cape Vincent was sent to Dr. Wright, DOCCS Chief Medical Officer, it was reasonable for Barkley to leave it to Dr. Wright to address Plaintiff's complaint.[12]

In light of the foregoing, the Court recommends that Defendant Barkley be granted summary judgment on Plaintiff's Eighth Amendment medical indifference claim.

### b.      Hulihan and Lindquist

Plaintiff alleges in his amended complaint that after he was transferred to Mid-State, where Defendant Hulihan is Superintendent, he continued to be denied adequate medical and dental treatment and filed grievances as to both.[13]  (Dkt. No. 46 at ¶¶ 52-61.)  Plaintiff refers specifically to a grievance filed at Mid-State regarding inadequate medical care, including denial of a TENS unit, by Dr. John Doe, who, without actually examining Plaintiff, rejected Plaintiff's claim that he had a medical condition and refused to allow Plaintiff to go to physical therapy or obtain other medical treatment.  *Id*. at ¶¶ 53-54.  According to Plaintiff, he appealed from the denial of the grievance complaining of the lack of adequate medical care at Mid-State, and

---

[12]  Plaintiff's medical and dental records, in any event, reveal that Plaintiff received significant medical care for his lower back, shoulder, and sternum at Cape Vincent, and that any delays that occurred in the removal of Plaintiff's wisdom tooth were at least in part related to his missing two appointments because of mandatory call outs.  (See Dkt. Nos. 88-4 at 2-91; 88-9; 89-2 at 2-12.)

[13]  The grievances complaining about inadequate medical care and dental care that Plaintiff allegedly filed at Mid-State do not appear to be included in the summary judgment record.  The list of closed inmate grievances submitted by Plaintiff, which identifies grievances filed at Mid-State, reveals that he filed a grievance involving a cracked tooth on November 5, 2008.  (Dkt. No. 99-3 at 35.)

Hulihan relied exclusively on the memorandum that Dr. Moehs had filed in connection with Grievance No. 8406-08 that Plaintiff had filed at Cape Vincent in denying Plaintiff's appeal.[14] *Id*. at ¶¶ 54-55.

Plaintiff testified at his deposition that his Eighth Amendment medical indifference claim against Defendant Lindquist, who was Assistant Director of the Inmate Grievance Program, was based upon Lindquist's affirmance of Plaintiff's Grievance No. 8355-08 concerning Plaintiff's dental treatment, and Grievance No. 8406-08 concerning denial of a TENS unit by Dr. Moehs. (Dkt. No. 46 at ¶¶ 57, 59, 69-70.)   Plaintiff complains that Lindquist failed to investigate his medical and dental conditions.  (Dkt. No 88-1 at 151.)

Lindquist signed the CORC determinations on the appeals of the denial of both grievances, which relied upon the opinions and recommendations of dental and medical personnel.  (Dkt. No. 88-1 at 21; 89-1 at 2.)  According to Lindquist, any decision he made on an appeal would have been based on the CORC packet regarding the grievance.  (Dkt. No. 88-12 at ¶ 8.)   Lindquist also notes that in compliance with the Health Insurance Portability and Accountability Act of 1996, as Assistant Director of CORC, who was not employed as a DOCCS medical provider and had no medical training, he had no authority to view an inmate's medical or dental records.  *Id*.

---

[14]  At his deposition, Plaintiff testified that he had spoken to Hulihan about his dental condition at some point when Hulihan was making rounds in SHU, and that he had written to Hulihan about his medical and dental problems and believes Hulihan may have responded.  (Dkt. No. 88-1 at 147-48.)  Plaintiff testified that he did not have any of the letters.  *Id*. at 148. Plaintiff's vague statements regarding communications to and from Hulihan fail to provide a factual basis for an Eighth Amendment medical indifference claim.  *See Jeffreys*, 426 F.3d at 554 ("At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of events is not wholly fanciful.").

The Court finds that Plaintiff's Eighth Amendment medical indifference claims against Hulihan and Lindquist for affirming the denial of Plaintiff's grievances without investigating his medical and dental conditions fail for the same reason as the essentially identical claim against Barkley. Affirmance of the grievances did not constitute personal involvement, and Hulihan and Lindquist were entitled to rely upon the opinions of medical and dental personnel concerning the proper course of treatment administered to Plaintiff. *See Graham,* 2003 WL 22126764, at * 1. Therefore, the Court recommends that Defendants Hulihan and Lindquist be granted summary judgment on Plaintiff's Eighth Amendment medical indifference claims.

### D. Eighth Amendment Cruel and Unusual Punishment and Retaliation Claims Against Pawlin and Cruel and Unusual Punishment Claim Against Pawlin

Plaintiff has asserted an Eighth Amendment claim for cruel and unusual punishment against Defendants Pawlin and Barkley in his supervisory capacity. (Dkt. No. 46 at ¶¶ 34, 36, 62, 71-72.) Punishment is cruel and unusual if it involves the unnecessary and wanton infliction of pain, or it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle*, 429 U.S. at 97. "To establish an Eighth Amendment violation, an inmate must show: '(1) a deprivation that is objectively, sufficiently serious that he was denied the minimal civilized measure of life's necessities[;] and (2) a sufficiently culpable state of mind on the part of the defendant official, such as deliberate indifference to inmate health or safety.'" *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012) (quoting *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001)).

Under the objective component of this test, "a prisoner must prove that the conditions of his confinement violate contemporary standards of decency." *Phelps v. Kapnolas*, 308 F.3d 180,

185 (2d Cir. 2002) (internal quotation marks omitted). Under the subjective component, "[a] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety[.]" *Farmer*, 511 U.S. at 837.

        1.    <u>Pawlin</u>

            a.    Eighth Amendment Cruel and Unusual Punishment Claim Against Pawlin

Plaintiff claims that despite knowing of Plaintiff's painful back condition, Pawlin: (1) assigned him to the Utility Gang and refused to change the assignment; and (2) caused Plaintiff to be subjected to unusual patterns of movement in housing without justification and required him to carry his own bags during the moves, without using a push-cart or being assisted by another inmate, although other inmates were allowed to use push-carts. (Dkt. Nos. 46 at ¶¶ 33-36, 41-42, 71; 88-1 at 87-107.)

Pawlin has stated in his Declaration that it was not part of his duties as Housing Sergeant to make determinations as to work assignments for inmates, and that he was not made aware of any documented medical issue that limited Plaintiff from any work assignment at Cape Vincent. (Dkt. No. 88-3 at ¶ 12.) Pawlin has further stated that inmates are expected to carry their own belongings on housing unit moves, without the use of push-carts or the assistance of other inmates, unless the inmate has a documented medical condition prohibiting him from carrying his property. *Id*. at ¶ 10. On May 23, 2008, following both incidents in which Plaintiff was required to carry his property from SHU to his housing unit, Pawlin issued a memorandum, which he claims memorialized existing policy, indicating that inmates were required to carry

their own property without assistance from other inmates. *Id.* at 11.

Plaintiff claims that because of Pawlin's membership on the Grievance and Program Committees, he was aware of Plaintiff's painful back condition, and that the pain was exacerbated by work on the Utility Gang and carrying his bags.[15] (Dkt. No. 88-1 at 89-91.) The Court finds that even if Pawlin was present at Program Committee meetings and refused Plaintiff's request that he be given a new work assignment because of his back pain (*see* Dkt. No. 88-1 at 94), Pawlin did not violate Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment. The evidence in Plaintiff's medical records establishes that Plaintiff was cleared for work by Dr. Rosner with no limitations on specific kinds of work. (Dkt. No. 89 at 17-18, 27.) Plaintiff's medical records also show that Plaintiff's request to medical in late March 2008 that he be taken off the Utility Gang because of his back condition was rejected, *id.*, as was his request for a note from medical to excuse him from carrying his bags on a move from SHU to his housing unit. *Id.* at 26. On May 5, 2008, Dr. Rosner again opined that Plaintiff could work safely without limitation. *Id.* at 27.

Because Plaintiff was found by medical to be able to work without limitation, and medical declined his requests to be relieved of his Utility Gang assignment and to be excused from carrying his own bags for medical reasons, the Court finds that Pawlin cannot be found to have "know[n] of and disregard[ed] an excessive risk to [Plaintiff's] health or safety," as required to satisfy the subjective component of the test for cruel and unusual punishment. *See Farmer*, 511 U.S. at 837. Therefore, the Court recommends that Pawlin be granted summary judgment on

---

[15] Plaintiff's grievance regarding his assignment to the Utility Gang was not filed until April 10, 2008, well after the assignment had been made. (Dkt. No. 89-3 at 8.)

Plaintiff's Eighth Amendment cruel and unusual punishment claim.

b.       Retaliation Claim Against Pawlin

Plaintiff has also asserted a retaliation claim against Pawlin.  (Dkt. No.  46 at ¶ 36.)

Plaintiff claims that Pawlin retaliated against him by subjecting him to unusual patterns of

movement from housing units without assistance despite his back pain; requiring him to carry his

own bags without use of a push-cart or inmate assistance on two occasions when he moved from

SHU to his housing unit; and informing other housing officers that Plaintiff was on his target list

and encouraging them to harass him and issue infractions to him either because of Plaintiff's

adamant complaining regarding his work detail assignment or his excessive force lawsuit in the

Southern District of New York.[16]  (Dkt. Nos. 46 at ¶¶ 33-36, 40-42; 88-1 at 87-88.)

As noted above, the filing of grievances and lawsuits is protected First Amendment

conduct for purposes of a retaliation claim.  *See Colon*, 58 F.3d at 872.  Plaintiff has identified

the complaints regarding his work assignment as having been made to medical and in a

grievance.  (Dkt. No. 88-1 at 89.)  As noted above, sending letters of complaint to prison officials

has been found to constitute protected conduct for purposes of retaliation claims.  *See Decayette,*

2009 WL 1606753, at * 9.

However, even if Court were to conclude that Plaintiff's complaints to medical, his

grievance regarding his assignment to the Utility Gang (Dkt. No. 89-3 at 8), and his Southern

District lawsuit satisfy the protected conduct element of a retaliation claim, his retaliation claim

_____

[16] Plaintiff's assertion that Pawlin informing other housing officers that Plaintiff was on his target list and encouraging them to harass him and issue infractions to him is, with the exception of Plaintiff's claim that Pawlin told corrections officers not to allow Plaintiff to use push-carts to move his belongings, wholly conclusory and unsupported by any specific facts in the records.

against Pawlin would fail because the record establishes that Pawlin's actions were not adverse. The adverse action relied upon by Plaintiff is Pawlin forcing him into an unusual pattern of movements and forcing him to carry his own bags when he was moved, including two moves from SHU to his housing unit, despite knowledge of Plaintiff's painful back condition. (Dkt. No. 46 at ¶¶ 33-36, 40-42 ). Pawlin has stated in his Declaration that he was not made aware of any documented medical issue that prevented Plaintiff from moving his personal property. (Dkt. No. 88-3 at ¶¶ 11-12.)

The adverse action component of a retaliation claim requires an objective inquiry that must be tailored to circumstances in which the claim arises. *Dawes*, 239 F.3d at 493. "Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens before a [retaliatory] action taken against them is considered adverse." *Id*. (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999) (internal quotation marks omitted)). The medical evidence in the record establishes that there was no documented medical issue preventing him from carrying his belongings when he moved. Dr. Rosner found on more than one occasion that Plaintiff was not limited from working on the Utility Gang or any other work assignment. (Dkt. No. 89 at 16, 18, 27. ) In addition, when Plaintiff asked the nurse to excuse him from carrying his belongings from SHU because of back pain on April 25, 2008, she denied his request. *Id*. at 26.

The Court's objective assessment of Plaintiff's claim of adverse action in this case, given the determination by medical that Plaintiff was physically able to do work assignments without limitation and the denial by medical of his request to be excused from carrying his belongings due to his back pain, is that requiring Plaintiff to move with some frequency and to carry his

personal belongings, including when he moved from SHU, did not, as a matter of law, constitute adverse action for purposes of his retaliation claim against Pawlin.

The Court further finds that Plaintiff has failed to raise an issue of fact on the issue of causation. Pawlin has denied taking action against Plaintiff for preparing grievances and has also denied seeing or being informed of any litigation involving Plaintiff during the time he was at Cape Vincent.[17] (Dkt. No. 88-3 at ¶¶ 14-16.) Pawlin states in his Declaration that an inmate would never be moved to "mess with him" or retaliate against him. (Dkt. No. 88-3 at ¶ 8.) Pawlin further states that inmates are expected to carry their own belongings when they move to a new housing unit, and that the use of push-carts and the assistance of other inmates was not allowed unless the inmate had a documented medical condition that prohibited him from carrying his belonging. *Id*. at ¶ 10. Although Plaintiff claims that other inmates were allowed to use push-carts and inmate assistance to move their belongings, the record is devoid of even one specific instance when that occurred.

Even if Pawlin had been aware of Plaintiff's letters to medical, grievance, and the Southern District litigation, Plaintiff's claim that Pawlin retaliated against him because of those things is wholly conclusory. *See Flaherty*, 239 F.3d at 491 (claims of retaliation must be supported by specific facts; conclusory statements are not sufficient). Temporal proximity is not enough to avoid summary judgment in this case. *Roseboro*, 791 F. Supp. 2d at 370.

---

[17] As a general matter, it is difficult to establish that a defendant had cause to retaliate against an inmate for filing or bringing a lawsuit against a third party. *See Wright,* 554 F.3d at 274. There is no evidence in the record that Pawlin would be inclined to retaliate against Plaintiff because of a lawsuit he had commenced against New York City corrections officers, and Plaintiff's conclusory assertion is not enough. *See Flaherty*, 239 F.3d at 491 (claims of retaliation must be supported by specific facts; conclusory statements are not sufficient).

Based on the foregoing, the Court recommends that Pawlin be granted summary judgment on Plaintiff's retaliation claim.

2.     <u>Eighth Amendment Supervisory Capacity Cruel and Unusual Punishment Claim Against Barkley</u>

In his amended complaint, Plaintiff alleged that he had copied Barkley on Plaintiff's April 30, 2008, letter to Dr. Wright complaining, *inter alia*, about his work assignment on the Utility Gang, and Barkley had failed to act. (Dkt. No. 46 at ¶ 43.) On initial review of Plaintiff's amended complaint, this Court found that for purposes of the initial screening, Plaintiff had adequately alleged personal involvement by Defendant Barkley with regard to Plaintiff's claim against Pawlin for cruel and unusual punishment for purposes of stating a claim for supervisory liability. (Dkt. No. 50 at 15-16.)

The Court has recommended that Pawlin be granted summary judgment on Plaintiff's Eighth Amendment claim against him for cruel and unusual punishment. "For a supervisor to be liable under Section 1983, there must have been an underlying constitutional deprivation" by a subordinate. *Blyden v. Mancusi*, 186 F.3d 252, 265 (2d Cir. 1990). Inasmuch as the Court has concluded that there was no underlying constitutional deprivation by Pawlin, the Court recommends that Barkley be granted summary judgment on the supervisory liability claim for cruel and unusual punishment.[18]

**E.**     **Fourteenth Amendment Due Process Claim Against McAuliffe and Bezio**

Plaintiff has asserted a Fourteenth Amendment due process claim against Defendants

---

[18] In addition, as discussed with regard to Plaintiff's Eighth Amendment medical indifference claim against Barkley, because the letter complaining about the inadequacy of Plaintiff's medical treatment at Cape Vincent was sent to Dr. Wright, DOCCS Chief Medical Officer, it was reasonable for Barkley to leave it to Dr. Wright to address Plaintiff's complaint.

McAuliffe and Bezio with respect to the Tier III disciplinary hearing held before hearing officer McAuliffe and the affirmance of McAuliffe's determination by Bezio. (Dkt. No. 46 at ¶ 75.) To prevail on a claim under § 1983 for denial of due process, a plaintiff must establish both the existence of a protected liberty or property interest, and that he was deprived of that interest without being afforded sufficient process. *See Shakur v. Selsky*, 391 F.3d 106, 118 (2d Cir. 2004). In this case, Defendants McAuliffe and Bezio make no claim that Plaintiff lacked a liberty interest, instead arguing solely that he was not denied due process in the hearing.[19] (Dkt. No. 88-14 at 24-30.)

### 1. McAuliffe

Plaintiff claims that he was denied due process by McAuliffe as a result of: (1) McAuliffe's denial of Plaintiff's request for the misbehavior report issued to the other inmate participant in the altercation leading to the Tier III hearing for use in his defense (Dkt. Nos. 46 at ¶ 47; 88-1 at 45; 88-5 at 14.); (2) McAuliffe's false representation at the hearing that because both Plaintiff and the other inmate were involved in the fight, both would be equally punished, which influenced Plaintiff's decision to plead guilty and denied Plaintiff the right to present a defense, to confront McAuliffe concerning his bias, and to request that he recuse himself (Dkt. Nos. 88-1 at 46-48; 88-5 at 29); and (3) McAuliffe's bias and impartiality in "unfairly and unilaterally penaliz[ing] plaintiff for an altercation he had with another prisoner, sanctioning him

---

[19] Given Defendants' failure to dispute the existence of a liberty interest, the Court will assume for purposes of this motion, without deciding, that Plaintiff had a liberty interest in avoiding confinement in SHU for six months and recommended loss of three months good time. (Dkt. No. 88-5 at 25.) *See Mohamed v. Powers*, No. 9:14-CV-1389 (TJM/TWD), 2015 WL 8492472, at * 4 (N.D.N.Y. Dec. 10, 2015) (finding that plaintiff who was sentenced to SHU for six months had sufficiently plead a liberty interest subject to due process protection).

to punitive segregation for a period of six (6) months while the other prisoner was not sanctioned at all." (Dkt. No. 46 at ¶ 49.)

The Supreme Court has found that "[p]rison disciplinary hearings are not part of a criminal prosecution and the panoply of rights [do] not apply." *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). Under *Wolff*, the procedural due process protections to which a prison inmate is entitled in disciplinary hearings include: (1) written notice of the charges; (2) the opportunity to appear and be heard at a disciplinary hearing and to present witnesses and evidence subject to legitimate safety and penological concerns; (3) a limited right to assistance in preparing a defense; and (4) a written statement from the hearing officer explaining his or her decision, and the reasons for the actions taken. *Id*. at 563-67. A prison inmate is also entitled to a fair and impartial hearing officer, *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004), and a determination that is supported by "some evidence" in the record. *Superintendent v. Hill*, 472 U.S. 445 (1985).

The Court finds that Plaintiff was provided with written notice of the charges in the misbehavior report on July 30, 2008, and received 24 hours notice of the hearing. (Dkt. No. 88-5 at 9, 12.) He was allowed to select an assistant in preparing his defense and met with the assistant on July 30, 2008. (Dkt. No. 88-5 at 13-14, 33.) McAuliffe provided Plaintiff with a written statement explaining his decision and the reasons for the actions taken. *Id*. at 25-26. Moreover, McAuliffe's determination, based on Plaintiff's guilty plea and corrections officer Wanerka's misbehavior report, was supported by "some evidence" in the record. *Id.* at 26.

The Court also finds that, contrary to Plaintiff's claims, he was given the opportunity to appear and be heard at his disciplinary proceeding and to present evidence, subject to legitimate safety and penological concerns, and instead made the decision of his own volition, to plead

guilty to all charges. At the outset of the hearing on August 1, 2008, McAuliffe told Plaintiff to feel free to call witnesses and during the course of the hearing specifically informed Plaintiff that he could call the other inmate involved in the altercation as a witness. (Dkt. No. 88-5 at 34, 42.) Although Plaintiff did not request that corrections officer Wanerka, who had filed the misbehavior report, be called as a witness, McAuliffe let Plaintiff know that he was going to see if she was available to testify when the hearing resumed on Monday to clear up those areas with respect to which Plaintiff had plead not guilty. *Id*. at 41. It was at that point that Plaintiff informed McAuliffe that he wanted to plead guilty to all of the charges and proceeded to do so, despite being told by McAuliffe that if Plaintiff was not guilty, he did not want him to plead guilty. *Id*. at 42, 45-46.

Although McAuliffe's refusal to provide Plaintiff with a copy of the other inmate's misbehavior report did deprive Plaintiff of the opportunity to present it as evidence at the hearing, the record evidence establishes that McAuliffe's refusal was based on legitimate safety and penological concerns. The Supreme Court has instructed that "prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). "Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Pell v. Procunier*, 417 U.S. 817, 827 (1974).

In his Declaration, McAuliffe has explained that "records of or information regarding

other inmates, including disciplinary records, are confidential and disclosure of such information to other inmates could constitute and (sic) unwarranted invasion of personal privacy and could impair the security of the facility and the safety of correctional staff and inmates." (Dkt. No. 88-5 at ¶ 15. In objecting to Plaintiff's interrogatory asking for information regarding the disciplinary hearing of the other inmate involved in the altercation including when his disciplinary hearing commenced, the name of the hearing officer, and the outcome, Bezio gave the same explanation as McAuliffe for objecting to the request. (Dkt. No. 88-1 at ¶ 23.) According due deference to the articulated DOCCS practices regarding the confidentiality and non-disclosure of records and documents such as another inmate's misbehavior report, the Court finds that Plaintiff's due process rights were not violated by the denial of the misbehavior report.

In addition, "a hearing officer does not violate due process by excluding irrelevant or unnecessary testimony." *Kalwasinski v. Morse*, 201 F.3d 103, 109 (2d Cir. 1999). McAuliffe correctly informed Plaintiff that the misbehavior report issued to the other inmate in the altercation and the charges against him were not relevant to Plaintiff's guilt or innocence, which would be determined based upon testimony of witnesses and evidence as to what had occurred presented at Plaintiff's own hearing. (Dkt. No. 88-5 at 42-45.) Plaintiff himself admitted his major concern was with fairness    that he wanted to make sure the other inmate did not have a Tier II misbehavior report when Plaintiff had been issued a Tier III and would be sent to SHU. *Id*. at 43; *see also* Dkt. No. 88-1 at 47 ("My concern was clear on the record. My [concern] was I wanted to make sure that if you    if this was going to be a fair hearing, we were both going to be treated fair.")

Plaintiff claims McAuliffe made false representations regarding the other inmate involved

in the altercation, and he was not a fair and impartial hearing officer. As noted above, inmates are entitled to a fair and impartial hearing officer. *Sira*, 380 F.3d at 69. "The degree of impartiality required of prison officials does not rise to the level of that required of judges generally. It is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996). "Administrators serving as adjudicators are presumed to be unbiased,." *id*., and a prisoner's "own subjective belief that [the hearing officer] was biased . . . is not enough to create a genuine issue of fact." *Wright v. Conway*, 584 F. Supp. 2d 604, 609 (W.D.N.Y. 2008).

Plaintiff claims that McAuliffe falsely represented that he and the other inmate both received Tier III misbehavior reports and because they were both involved in a fight, they would be equally punished, when in fact the other inmate received no punishment.[20] (Dkt. Nos. 46 at ¶ 50; 88-1 at 46.) While McAuliffe did tell Plaintiff that the other inmate received a Tier III misbehavior report, McAuliffe consistently refused to disclose the content of that Report or the charges made against the other inmate.[21] (Dkt. No. 88-5 at 42-45.) Furthermore, the transcript from the hearing reveals that McAuliffe did not tell Plaintiff he and the other inmate would be equally punished as Plaintiff claims. *Id*. What McAuliffe did say during a discussion at the

---

[20] There is no evidence in the record supporting Plaintiff's claim that the other inmate involved in the altercation received no punishment or, if he did, the punishment imposed.

[21] At his deposition, Plaintiff claimed that the other inmate never received a misbehavior report because when Plaintiff made a FOIL request for the Report he was informed that there was no such document. (Dkt. No. 88-1 at 46.) However, there is no direct evidence disputing McAuliffe's statement that both received Tier III misbehavior reports and, as noted above, the Alteration/Fight Investigation Form completed by Sergeant Sisler on July 29, 2008, states that "both inmates were written misbehavior reports and Jean-Laurent was placed in SHU A-2 and [the other inmate] was placed in HOSP-ISO-1." (Dkt. No. 88-5 at 18.)

hearing regarding having to pay for the broken microfiche machine, was that "it takes two to fight . . . . [and] if state property gets broken we recognize that both inmates were fighting. . . . But I'm not gonna tell ya oh you're going to pay for all of this or you're not cause I haven't found you guilty or not guilty yet." *Id.* at 43. The sanctions imposed by McAuliffe required Plaintiff to pay for only half the cost of the microfiche machine. (Dkt. No. 88-5 at 25.)

Plaintiff also claims that McAuliffe was biased and unfairly sentenced him to six months in SHU, six months loss of privileges, and three months recommended loss of good time when the other inmate, who had provoked the altercation, received no punishment. (Dkt. No. 46 at ¶¶ 49-50.) There is no evidence of McAuliffe's involvement, if any, in the disciplinary handling of the altercation with respect to the other inmate. The record does show, however, that Plaintiff admitted that he had hit the other inmate. (Dkt. No. 88-5 at 40.) Moreover, there is evidence in the record that Plaintiff of his own volition elected to plead guilty to all of the charges against him, despite being told by McAuliffe that he could present witnesses, including the other inmate, at the hearing, and that McAuliffe told Plaintiff he did not want him to plead guilty if he was not guilty. *Id*. at 42. In short, the only evidence of bias on the part of McAuliffe is Plaintiff's own subjective belief which is not enough to avoid summary judgment. *Wright*, 584 F. Supp. 2d at 609.

Based upon the foregoing, the Court recommends that Defendant McAuliffe be granted summary judgment on Plaintiff's Fourteenth Amendment due process claim.

2.     Bezio

Plaintiff claims that Bezio showed bias and violated his right to due process by affirming McAuliffe's determination despite all of the evidence Plaintiff provided on appeal showing that

the determination was unfair. *Id.* at 76. According to Plaintiff, Bezio "just rubber-stamped [McAuliffe's determination] and allowed [Plaintiff] to lose the privileges, good time credit, and all that other stuff, allowed [him] to be punitively confined when what he should have done was overturn, dismissed the disciplinary, vacate it, whatever." (Dkt. No. 89-1 at 78.)

Courts in the Second Circuit are split over whether an allegation that a defendant affirmed a disciplinary proceeding determination is sufficient to establish personal liability for supervisory officials. *See Scott v. Frederick*, No. 13-CV-605 (TJM), 2015 WL 127864, at * 17 (N.D.N.Y. Jan. 8, 2015). In *Scott*, the court subscribed to the "affirmance-plus standard, which holds that the mere rubber-stamping of a disciplinary determination is insufficient to plausibly allege personal involvement." *Id.* (citing *Brown v. Brun*, No. 10-CV-0397A (MAT), 2010 WL 5072125, at * 2 (W.D.N.Y. Dec. 7, 2010) (noting that courts within the Second Circuit are split with regard whether to the act of affirming a disciplinary hearing is sufficient to allege personal involvement of a supervisory official, and concluding that the distinction appears to hinge upon whether the supervisory official proactively participated in reviewing the appeal or merely rubber-stamped the results).

This Court also subscribes to the "affirmance-plus standard" and concludes that Bezio, in affirming McAuliffe's determination, did not violate Plaintiff's due process rights and recommends that Bezio be granted summary judgment on Plaintiff's Fourteenth Amendment due process claim.[22]

_____

[22] There are a fair number of district court decisions holding that the affirmance of an unconstitutional disciplinary proceeding can be sufficient to find personal involvement. *See Samuels v. Fischer*, No. No. 13-CV-8287(KMK), 2016 WL 827781, at * 11-12 (S.D.N.Y. March 2, 2016) (collecting cases). Inasmuch as the Court has concluded that Plaintiff's due process rights were not violated in his disciplinary hearing, application of the standard applied in those

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 88) be **GRANTED**; and it is further

**RECOMMENDED** that the action be **DISMISSED WITHOUT PREJUDICE** against Defendants John Doe #1, John Doe #2, Dr. John Doe, and Nurse Jane Doe; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  __FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW__.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: August 18, 2016
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

decisions would not produce a contrary result in this case.

2016 WL 698145
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Ricky Battle, Plaintiff,
v.
Monica Recktenwald, Howard Hufford,
Diana Sommer, Chester Mckinney, and
Jayne Vander Hey-Wright, Defendants.

14 CV 2738 (VB)
|
Signed 02/19/2016

**Attorneys and Law Firms**

Ricky Battle, Butner, NC, pro se.

Brandon Herbert Cowart, U.S. Attorney's Office, SDNY,
New York, NY, for Defendants.

**OPINION AND ORDER**

Briccetti, J.

 **\*1** Plaintiff Ricky Battle, an inmate proceeding pro
se, brings civil rights claims alleging defendants were
deliberately indifferent to his serious medical needs.
Defendants Monica Recktenwald, Howard Hufford,
Diana Sommer, Chester McKinney, and Jayne Vander
Hey-Wright are employees or former employees of the
Bureau of Prisons at the Federal Correctional Institution-
Otisville ("FCI Otisville").

Defendant Vander Hey-Wright moves to dismiss the
complaint for lack of subject matter jurisdiction under
Federal Rule of Civil Procedure 12(b)(1). The remaining
defendants move for summary judgment. (Doc. #50).

For the reasons set forth below, defendants' motions are
GRANTED.

The Court has jurisdiction under 28 U.S.C. § 1331.

**BACKGROUND**

The following facts are undisputed. [1]

On September 12, 2003, plaintiff was sentenced to a 32-
year prison term. From November 15, 2007, to September
18, 2014, plaintiff was housed at FCI Otisville.

Plaintiff has several chronic medical conditions, including
asthma, hepatitis B, herpes, hypertension, arterial
sclerosis, anemia, esophagus reflux, ulcerous colitis, chest
pain associated with triple-bypass surgery, and HIV. On
February 10, 2013, plaintiff went to the prison health clinic
complaining of chest pain, stomach pain, and shortness
of breath. He had swollen parotid glands, causing pain
in his ear and mouth. Because plaintiff appeared to have
symptoms of a cold, medical staff gave him a misty
nebulizer for asthma, and prednisone, a steroid.

The next day, Dr. Sommer, the clinical director of the
health service unit at FCI Otisville, saw plaintiff
for follow-up treatment. Dr. Sommer prescribed an
antibiotic, issued an inhaler, and ordered chest x-rays.

On February 14 and February 21, 2013, Dr. Sommer
saw plaintiff to monitor his condition. Plaintiff's glands
remained swollen and he continued to have a cough
and chest congestion. Dr. Sommer attributed this to
plaintiff's immuno-compromised HIV-positive status. Dr.
Sommer ordered a sinus x-ray and laboratory work.
On February 23, 2013, medical staff gave plaintiff an
injection of an anti-inflammatory drug. On March 1,
2013, Ms. Vander Hey-Wright, a physician's assistant at
FCI Otisville, informed plaintiff his x-rays showed no
significant findings. She advised plaintiff to continue his
course of treatment.

Plaintiff's symptoms persisted, and on May 17, 2013, Dr.
Sommer referred him to a consulting doctor specializing
in diseases of the ear, nose, and throat. On May 23, 2013,
the consulting doctor examined plaintiff and found the
inflammation of his parotid glands was likely related to
his HIV. The consulting doctor recommended treatment
with a different antibiotic than the one Dr. Sommer
previously prescribed. Dr. Sommer prescribed plaintiff the
recommended antibiotic.

 **\*2** On June 4, 2013, medical staff evaluated plaintiff
for complaints of diarrhea and hemorrhoids. Ms. Vander
Hey-Wright prescribed loperamide for the diarrhea and
hydrocortisone suppositories for the hemorrhoids. She

also advised plaintiff to increase his fluid intake and complete the course of antibiotics as recommended by the consulting ear, nose, and throat doctor. In mid-June, the medical staff monitored plaintiff every few days for the effectiveness of the antibiotic treatment. Based on the recommendation of the consulting doctor, Dr. Sommer renewed plaintiff's antibiotic prescription.

On July 11, 2013, plaintiff returned to the health clinic complaining of ear pain, abdominal pain, nausea, diarrhea, and chest pain. Dr. Sommer concluded plaintiff could not receive another course of antibiotics because they were causing another condition, plaintiff's ulcerous colitis, to worsen. Dr. Sommer prescribed a course of prednisone and ear drops to relieve pain. On July 17, 2013, Dr. Sommer ordered a CT scan of plaintiff's neck to rule out other causes of plaintiff's conditions. The test results indicated plaintiff's parotid glands were normal.

Plaintiff continued to complain about his ear condition [2] and on August 13, 2013, Ms. Vander Hey-Wright examined his ear. Plaintiff described his pain as a ten on a scale of zero to ten. But his ear appeared normal to Ms. Vander Hey-Wright. She explained she could not provide additional treatment at that time. Dr. Sommer evaluated plaintiff's ear condition and confirmed Ms. Vander Hey-Wright's finding that plaintiff's ear was normal and plaintiff did not appear to have extreme pain. Based on this conclusion, Dr. Sommer advised plaintiff to take acetaminophen to control his pain. However, Dr. Sommer requested another consultation with an ear, nose, and throat doctor to assess plaintiff's pain. [3]

Twelve days later, on August 26, 2013, plaintiff presented to the health clinic with signs of severe pain in his ears, head, and jaws. Unlike the prior consultation, Dr. Sommer found plaintiff's demeanor to be consistent with significant pain. She believed plaintiff had temporal arteritis, a disease causing inflammation to the arteries supplying blood to the head. If untreated, temporal arteritis can lead to vision loss, but a course of steroids typically resolves the disease's symptoms within a few days. Dr. Sommer prescribed an intravenous steroid to reduce the swelling of the arteries, and morphine to reduce pain.

Within a few hours of receiving the treatment, plaintiff's symptoms subsided. Dr. Sommer instructed plaintiff to return to the health clinic immediately if he experienced any vision changes. The next day, plaintiff told Dr. Sommer his pain was reduced.

Two days later, plaintiff complained of pain in the left side of his head and requested new pain medication. Dr. Sommer prescribed a seven-day course of oxycodone. After seven days, plaintiff complained to Dr. Sommer of new joint and muscle pain. Dr. Sommer noted plaintiff's pain level seemed attenuated. Nevertheless, she prescribed a morphine injection to be administered two times per day for five days, and referred plaintiff to an outside vascular surgeon to confirm whether plaintiff had developed temporal arteritis.

**\*3** After one day of injections, plaintiff complained the morphine was not helping his pain. Ms. Vander Hey-Wright consulted Dr. Sommer and increased plaintiff's steroid prescription. On September 9, 2013, after four days of morphine injections, Dr. Sommer prescribed oxycodone for plaintiff to take twice daily for fourteen days.

On September 10, 2013, the vascular oral surgeon evaluated plaintiff. The surgeon concurred with Dr. Sommer's diagnosis of temporal arteritis and her treatment plan. The surgeon ordered a biopsy for October 3, 2013, to confirm the diagnosis. [4]

However, before the biopsy could occur, on September 17, 2013, plaintiff went to the health clinic complaining of blurry vision and swelling on the left side of his head. He was transferred to a hospital emergency room where he received an MRI and CT scan. The hospital physicians diagnosed plaintiff with temporal arteritis. They also diagnosed plaintiff with carotid artery stenosis, a disease unrelated to the temporal arteritis involving the narrowing of the arteries that supply the head and neck with blood.

After two days, the hospital discharged plaintiff. He began experiencing blurred vision and other symptoms of Bell's palsy. Bell's palsy is an ailment, unrelated to temporal arteritis or carotid artery stenosis, which causes weakness or paralysis of the nerves on one side of the face, interfering with facial functioning. On the day he was discharged from the hospital, an ophthalmologist examined plaintiff for Bell's palsy. The ophthalmologist diagnosed him with Bell's palsy, prescribed eye drops, and instructed plaintiff to tape his eye shut to sleep.

Dr. Sommer also prescribed prednisone and acyclovir, an antiviral drug.

On October 2, 2013, the outside surgeon canceled plaintiff's biopsy, which was scheduled for the following day. Dr. Sommer noted in plaintiff's record that the surgeon did not want to reschedule the biopsy because "by the time it will be rescheduled, [the biopsy would be] unlikely to be positive after the steroid usage." (Cowart Decl., Ex. 2 at G1259). In other words, plaintiff's steroid treatment meant the biopsy could not reliably diagnose temporal arteritis. [5]

Two days later, plaintiff complained of high levels of pain in his left ear. Ms. Vander Hey-Wright evaluated him and ordered an x-ray of his neck and an extension of plaintiff's pain medication. The following day, Dr. Sommer prescribed oxycodone, once daily for three days. She applied for approval to use a non-formulary form of oxycodone and then changed the prescription to the new, non-formulary form of oxycodone with one pill a day for seven days.

 **\*4** On October 10, 2013, an x-ray of plaintiff's back revealed degenerative changes in his neck. Two days later, Dr. Sommer prescribed Percocet twice daily for three days to begin when plaintiff's oxycodone prescription ended. [6]

On October 18, 2013, Dr. Sommer reviewed plaintiff's overall medical treatment with him. She noted in his record that he had already been referred to a neurologist for a follow-up appointment. [7] Dr. Sommer again prescribed oxycodone three times per day for five days. Four days later, she renewed his oxycodone prescription for seven days.

On October 28, 2013, plaintiff emailed Dr. Sommer to inform her he did not receive his pain medication in the prison pill line. Dr. Sommer replied to plaintiff's email saying "[w]ho ever works [on the] pill line can call me." (Cowart Decl., Ex. 2 at G1227). The same day, plaintiff went to the health clinic complaining of increased pain in the left side of his head. Dr. Sommer ordered a one-time morphine injection.

Two days later, Ms. Vander Hey-Wright assessed plaintiff's progress. Vander Hey-Wright consulted with Dr. Sommer, who renewed plaintiff's pain medication. But

again, plaintiff experienced extreme pain the next day. Ms. Vander Hey-Wright noted in plaintiff's records that "there is no explanation as to the cause of this pain" given he had been seen by several specialists and undergone several different procedures. [8] (Cowart Decl., Ex. 2 at G1219).

On November 10, 2013, plaintiff's Percocet prescription expired and Dr. Sommer renewed it for three days. Three days later, Dr. Sommer prescribed oxycodone for ten days.

 **\*5** On November 18, 2013, plaintiff went to the health clinic complaining of pain on both sides of his face. He reported the pain to be a ten on a ten-point scale. Ms. Vander Hey-Wright noted in plaintiff's record that he was "comfortably sitting in the chair and carrying on a normal conversation," indicating that his pain was not as extreme as he reported. (Cowart Decl., Ex. 2 at G1203). The following day, a neurologist evaluated plaintiff and recommended he continue prednisone and undergo two tests for possible peripheral neuropathy, or nerve damage.

On November 21, 2013, plaintiff complained his hands and feet were cramping. Dr. Sommer examined plaintiff and prescribed a muscle relaxant and oxycodone for thirty days. Dr. Sommer also renewed plaintiff's prescription for artificial tears and eye ointment to treat his Bell's palsy.

One month later, plaintiff's Percocet prescription was renewed for two days. After two days, Dr. Sommer prescribed oxycodone for fourteen days.

Ms. Vander Hey-Wright examined plaintiff on January 7, 2014, and plaintiff informed her he "gets relief from the [P]ercocet." (Cowart Decl., Ex. 2 at G1831). The following week, an optometrist evaluated plaintiff and noted no changes in his vision. The optometrist recommended plaintiff continue using the eye drops and ointment.

On February 3, 2014, plaintiff informed Ms. Vander Hey-Wright that his pain had worsened. He complained of pain in his back, leg, and hand, and expressed concern his fingernails were deteriorating. Plaintiff requested trigger point injections for pain relief, which Ms. Vander Hey-Wright approved. Plaintiff also received a transcutaneous electrical stimulation unit ("TENS") for pain relief. [9]

Dr. Sommer renewed plaintiff's prescription for oxycodone three times during the first half of February.

On February 18, 2014, Ms. Vander Hey-Wright evaluated plaintiff for back pain, and plaintiff informed her his treatment doses were "helping to keep the pain at a level he can deal with." (Cowart Decl., Ex. 2 at G1799).

On March 4, 2014, plaintiff received four trigger point injections. [10]

On March 12, 2014, an oral surgeon evaluated plaintiff for temporomandibular joint disorder, or problems with his jaw and the muscles in his face. The surgeon gave him mouth exercises to perform to lessen his symptoms.

On March 20, 2014, plaintiff went to a follow-up appointment with the outside neurologist who treated plaintiff in November 2013. The neurologist noted plaintiff's Bell's palsy was "improved." (Walls Decl., Ex. 1 at G1958).

On March 30, 2014, Dr. Sommer renewed plaintiff's prescription for oxycodone. The following day, Ms. Vander Hey-Wright examined plaintiff for pain. Once again, plaintiff informed her "the medication is effective in helping to relieve his pain" and stated he had no new symptoms. (Cowart Decl., Ex. 2 at G1764). Ms. Vander Hey-Wright renewed the oxycodone prescription.

**\*6** On April 15, 2014, plaintiff commenced this lawsuit, alleging defendants intentionally neglected him and the staff took "no course of action" to remedy his health problems. (Compl. ¶ 13). [11]

Defendants filed the instant motion to dismiss and motion for summary judgment on May 19, 2015. (Doc. #50). On June 23, 2015, defendants served notices pursuant to Local Civil Rules 12.1 and 56.2. (Docs. 63, 64). Plaintiff did not file a formal opposition to defendants' motions, despite being given two lengthy extensions to do so (Docs. 61, 66), but on October 9, 2015, he filed a one-page letter containing some information about his temporal arteritis and Bell's palsy. (Doc. #67). [12]

### DISCUSSION

I. Legal Standards

A. Rule 12(b)(1) Standard

"[F]ederal courts are courts of limited jurisdiction and lack the power to disregard such limits as have been imposed by the Constitution or Congress." Durant, Nichols, Houston, Hodgson, & Cortese-Costa, P.C. v. Dupont, 565 F.3d 56, 62 (2d Cir 2009) (internal quotation marks omitted). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Nike, Inc. v. Already, LLC, 663 F.3d 89, 94 (2d Cir. 2011) (internal quotation marks omitted). The party invoking the Court's jurisdiction bears the burden of establishing jurisdiction exists. Conyers v. Rossides, 558 F.3d 137, 143 (2d Cir. 2009).

When a party raises a "factual" challenge to jurisdiction, as defendant Vander Hey-Wright does here, the Court may refer to evidence outside the pleadings, Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000), and "retains considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction." APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003) (internal quotation marks omitted).

The Court must liberally construe submissions of pro se litigants, and interpret them "to raise the strongest arguments that they suggest." Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (internal quotation marks and citation omitted). Applying the pleading rules permissively is particularly appropriate when, as here, a pro se plaintiff alleges civil rights violations. See Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008). "Even in a pro se case, however ... threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation marks and citation omitted). Nor may the Court "invent factual allegations" plaintiff has not pleaded. Id.

B. Summary Judgment Standard

**\*7** The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law .... Factual disputes that

are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute regarding a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. See id. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010) (citation omitted). It is the moving party's burden to establish the absence of any genuine issue of material fact. Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. at 323. If the non-moving party submits evidence which is "merely colorable," summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal citations omitted). The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for him. Dawson v. Cty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court resolves all ambiguities and draws all permissible factual inferences in favor of the non-moving party. Nagle v. Marron, 663 F.3d 100, 105 (2d Cir. 2011). If there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper. See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004).

## II. Inadequate Medical Care

Construed liberally, the pro se plaintiff's complaint could be asserting claims under (i) Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), or (ii) state law tort claims for negligence or medical malpractice.

## A. Bivens Claims

"A Bivens action is a judicially-created remedy designed to provide individuals with a cause of action against federal officials who have violated their constitutional rights." Higazy v. Templeton, 505 F.3d 161, 169 (2d Cir. 2007). For liability to attach, Bivens defendants must be personally involved such that "through their own actions, they satisfy each element of the underlying constitutional tort." Turkmen v. Hasty, 789 F.3d 218, 250 (2d Cir. 2015).

In the context of inadequate medical care, to assert a viable claim, plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). This test has both an objective and a subjective component: plaintiff must plead facts showing (i) the alleged deprivation of medical care is "sufficiently serious," and (ii) the officials in question acted with a "sufficiently culpable state of mind." Salahuddin v. Goord, 467 F.3d 263, 279-80 (2d Cir. 2006).

**\*8** To satisfy the objective component, a condition is sufficiently serious if it may cause "death, degeneration, or extreme pain," Johnson v. Wright, 412 F.3d 398, 403 (2d Cir. 2005) (quoting Hemmings v. Gorczyk, 134 F.3d 104, 108 (2d Cir. 1998)), or if "the failure to treat [the] condition could result in further significant injury or the unnecessary and wanton infliction of pain." Harrison v. Barkley, 219 F.3d 132, 136 (2d Cir. 2000) (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)).

To satisfy the subjective component, a plaintiff must allege the defendant had a mental state akin to recklessness, which "requires that the charged official act[ed] or fail[ed] to act while actually aware of a substantial risk that serious inmate harm will result." Salahuddin v. Goord, 467 F.3d at 280 (citing Farmer v. Brennan, 511 U.S. 825, 836-37 (1994)). Plaintiff must allege "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer v. Brennan, 511 U.S. at 835. For example, "a deliberate indifference claim can lie where prison officials deliberately ignore the medical recommendations of a prisoner's treating physicians." Johnson v. Wright, 412 F.3d at 404 (citing Gill v. Mooney, 824 F.2d 192, 196 (2d Cir. 1987)).

Assuming, without deciding, that plaintiff exhausted his administrative remedies before filing suit,[13] the Court addresses plaintiff's <u>Bivens</u> claim as to each defendant.

### 1. Vander Hey-Wright

Plaintiff's claims against Vander Hey-Wright, a physician assistant and member of the Public Health Service ("PHS"), must be dismissed for lack of subject matter jurisdiction.

The Public Health Service Act ("PHSA") provides that a claim against the United States under the Federal Tort Claims Act ("FTCA") is the exclusive remedy for claims caused by the acts or omissions of PHS employees acting within the scope of their employment. [42 U.S.C. § 233(a)](); [Hui v. Castaneda, 559 U.S. 799 (2010)]() (holding the PHSA precludes <u>Bivens</u> actions against PHS employees for claims arising out of the performance of their medical functions related to their employment).

Here, there is no dispute regarding Ms. Vander Hey-Wright's employment status as a PHS member. Plaintiff argues she "did absolutely nothing" when he reported a painful medical condition. (Compl. at ¶ 10). Therefore plaintiff's allegations concern Ms. Vander Hey-Wright's "performance of medical ... functions ... while acting within the scope of [her] office or employment" as a physician assistant. [42 U.S.C. § 233(a)](). Accordingly, plaintiff's only method of redress against Vander Hey-Wright is to file suit against the United States under the FTCA. See [Cuoco v. Moritsugu, 222 F.3d 99, 113 (2d Cir. 2000)]() (instructing district court to enter summary judgment for defendants on absolute immunity grounds pursuant to [42 U.S.C. § 233(a)]()); [Adekoya v. Holder, 751 F. Supp. 2d 688, 693-94 (S.D.N.Y. 2010)]() (dismissing plaintiff's claims against PHS defendants for lack of subject matter jurisdiction).[14]

### 2. Sommer

**\*9** Defendants argue Dr. Sommer is entitled to summary judgment because she is qualifiedly immune.

The Court agrees.

A government official is entitled to qualified immunity for actions taken as a government official if (i) the conduct is not prohibited by federal law; (ii) the plaintiff's right was not clearly established at the time of the conduct, or (iii) the official's action was objectively legally reasonable in light of the legal rules that were clearly established at the time the action was taken. [Cuoco v. Moritsugu, 222 F.3d at 109](). These issues should be approached in sequence; if the first is resolved in favor of the official, both the second and third become moot. See [Rohman v. N.Y.C. Transit Auth., 215 F.3d 208, 216 n.4 (2d Cir. 2000)]().

Plaintiff's <u>Bivens</u> claim against Dr. Sommer does not survive the first criterion for qualified immunity because Dr. Sommer's conduct did not violate federal law.

Plaintiff failed to allege any facts showing Dr. Sommer acted with the requisite mental state to satisfy the subjective component of an Eighth Amendment claim for inadequate medical treatment.[15] Plaintiff's allegations as to Dr. Sommer are that he complained of his pain to her but he still experienced ongoing pain, and she told him he would send him to an outside doctor but did not, causing him to suffer and develop additional conditions. Construed liberally, the crux of plaintiff's allegations is (i) Dr. Sommer should have done more to diagnose his ailments sooner; (ii) a different course of treatment should have been provided; or (iii) Dr. Sommer was unable to treat his conditions effectively.

Given the undisputed extensive medical record evidencing Dr. Sommer's extensive and persistent treatment of plaintiff, none of these theories can support a deliberate indifference claim as to Dr. Sommer.

First, a delay in treatment does not necessarily invoke a deliberate indifference claim, especially when, as here, any delays were caused by intervening medical problems or difficulties in scheduling outpatient appointments. [Henderson v. Sommer, 2011 WL 1346818, at \*4 (S.D.N.Y. Apr. 1, 2011)]() (granting summary judgment as to plaintiff's Eighth Amendment claim because the delay in surgery resulted from a third-party's scheduling constraints); [Pizarro v. Gomprecht, 2013 WL 990998, at \*14 (E.D.N.Y. Feb. 13, 2013)]() report and recommendation adopted, [2013 WL 990997 (E.D.N.Y. Mar. 13, 2013)]() (delay in referring inmate for treatment was medically justified because the condition was likely a side effect of plaintiff's HIV medication and the treatment was likely to be

unsuccessful). [16] More fundamentally, plaintiff failed to allege Dr. Sommer caused any delay in plaintiff's treatment while aware of a substantial risk of harm to plaintiff.

Second, to the extent plaintiff's contentions amount to a disagreement over the treatment he received, that alone does not create a constitutional claim. Chance v. Armstrong, 143 F.3d at 703 ("So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); see also Hill v. Curcione, 657 F.3d 116, 123 (2d Cir. 2011) ("Issues of medical judgment cannot be the basis of a deliberate indifference claim where evidence of deliberate indifference is lacking."). Importantly, plaintiff failed to show Dr. Sommer intentionally advised an improper treatment method or advised a course of treatment while aware that such treatment carried a substantial risk of harm to plaintiff.

**\*10** Third, to the extent plaintiff contends Dr. Sommer was unable to treat his conditions effectively, this too does not establish a constitutional violation. Bryant v. Wright, 451 F. App'x 12, 14 (2d Cir. 2011) ("The bare allegation that the treatments have so far been unsuccessful is insufficient to state a claim for deliberate indifference.").

The undisputed record reflects that each time plaintiff complained of symptoms, Dr. Sommer promptly provided him with treatment responsive to his symptoms. When he complained the course of treatment was not working, Dr. Sommer followed up to find new diagnoses, try new medication, or refer him to consulting physicians to address his complaints. Thus, while Dr. Sommer seems to have been "aware of a substantial risk that serious inmate harm will result" if she failed to act, plaintiff failed to show Dr. Sommer intentionally rendered improper treatment or knew of and disregarded a substantial risk of serious harm to plaintiff. See Salahuddin v. Goord, 467 F.3d at 280.

Accordingly, Dr. Sommer is entitled to summary judgment.

### 3. Non-medical Staff

Defendants argue the non-medical staff members – Warden Recktenwald, Warden Hufford, and Mr.

McKinney – are entitled to summary judgment because they are qualifiedly immune.

The Court agrees.

Like Dr. Sommer, these defendants are entitled to qualified immunity because no conduct attributed to them is prohibited by federal law. See Cuoco v. Moritsugu, 222 F.3d at 109.

A defendant's denial of an administrative grievance or a refusal to override the medical advice of medical personnel are insufficient to establish liability for an Eighth Amendment violation. See Graham v. Wright, 2003 WL 22126764, at \*1 (S.D.N.Y. Sept. 12, 2003) ("It is well established that supervisory officials are generally entitled to delegate medical responsibility to facility medical staffs and are entitled to rely on the opinion of medical staff concerning the proper course of treatment.") (quotation marks omitted); Joyner v. Greiner, 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002) ("[A] prison administrator is permitted to rely upon and be guided by the opinions of medical personnel concerning the proper course of treatment administered to prisoners."). This rule is grounded in the principle that a plaintiff must allege defendants' personal involvement in the claimed violation of his rights. Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (identifying five ways in which a plaintiff may establish a supervisory defendant's personal involvement with an alleged constitutional violation).

Here, plaintiff argues Warden Recktenwald, Warden Hufford, and Mr. McKinney were deliberately indifferent to his medical problems because they knew of the medical staff's inability to treat him effectively, but took no action to remedy the situation. Plaintiff alleges Warden Recktenwald failed to help him obtain adequate medical treatment after he filed an administrative grievance, which permitted the medical staff to continue their deliberate indifference towards him. Plaintiff alleges Warden Hufford failed to direct medical staff to diagnose and treat his medical conditions, which emboldened the medical staff to leave plaintiff in distress. Plaintiff alleges Mr. McKinney responded to a message from plaintiff by referencing a neurologist appointment that allegedly never occurred.

**\*11** Plaintiff has not alleged any facts showing defendants Recktenwald, Hufford, or McKinney were personally involved in the alleged constitutional violation, either directly or in a supervisory fashion. Colon v. Coughlin, 58 F.3d at 873. Plaintiff's complaint merely states these defendants responded to or denied plaintiff's administrative grievances based on the opinions of medical personnel. Plaintiff does not allege these defendants had reason to distrust the competence of the medical staff. Cf. Smiley by Smiley v. Westby, 1994 WL 519973 at \*8 (S.D.N.Y. Sept. 22, 1994) (denying summary judgment because the prison warden had reason to believe that medical staff was deficient)).

Thus, Warden Recktenwald, Warden Hufford, and Mr. McKinney are entitled to summary judgment because they were entitled to rely on the judgment of the medical staff about the efficacy of the course of plaintiff's treatment, and plaintiff otherwise failed to allege their personal involvement in the alleged constitutional violations.

## B. State Law Claims

Construed liberally, plaintiff's complaint also contains state law tort claims for medical malpractice or negligence. (Compl. ¶ 24) ("Mr. Battle asserts that he suffered greatly as a direct result of medical negligence."). Having dismissed or granted summary judgment on plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over any state law claims in plaintiff's complaint pursuant to 28 U.S.C. § 1367(c)(3).

## CONCLUSION

Defendant Vander Hey-Wright's motion to dismiss for lack of subject matter jurisdiction is GRANTED.

Defendants Sommers, Recktenwald, Hufford, and McKinney's motion for summary judgment is GRANTED as to plaintiff's Eighth Amendment claim for deliberate medical indifference. The Court declines to exercise supplemental jurisdiction over any state law claims contained in plaintiff's complaint.

The Clerk is instructed to terminate the motion and close the case. (Doc. #50).

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

SO ORDERED:

**All Citations**

Slip Copy, 2016 WL 698145

### Footnotes

1   Although he was served with the required notices to pro se litigants pursuant to Local Civil Rules 12.1 and 56.2 (Docs. 63, 64), plaintiff did not submit a formal opposition to defendants' motion and did not submit a Local Civil Rule 56.1 statement.. When, as here, a non-movant fails to address the movant's assertion of material fact, the court may "consider the fact undisputed for purpose of the motion." Fed. R. Civ. P. 56(e)(2).

2   Plaintiff alleges he emailed Dr. Sommer details about his medical issues on August 5, 2013, and her response reflected the medical staff "did not know what his medical conditions were," and "[t]here were assumptions about whether the swollen glands were [a part] of the [HIV] disease but that was not to a medical certainty." (Compl. ¶ 4).

3   Plaintiff alleges "the referral either was not necessary, or should have been expedited, because the wait clearly caused more damage and pain." (Compl. ¶ 6). Plaintiff filed the first of four administrative grievances on August 15, 2013, seeking a definitive diagnosis and treatment. (Scannell-Vessella Decl., Ex. 3). Plaintiff attempted to exhaust this grievance by submitting three appeals. (Scannell-Vessella Decl., Exs. 4-6).

4   Plaintiff alleges he filed an administrative grievance on September 13, 2013, "requesting that the warden Order medical staff to immediately treat his debilitating condition and that he was suffering while no course of action was taken to address his pressing needs." (Compl. ¶ 13). This appears to be an appeal of his first grievance. (Scannell-Vessella Decl., Ex. 4, at 2230). See infra n. 3.

**5**    With respect to one of his administrative grievances, plaintiff alleges "Warden Hufford did not deny [plaintiff's] complaint, as indicated by his response. However, there was never [a] follow-up to determine [plaintiff's] condition." (Compl. ¶ 15). Although it is unclear which of the four administrative grievances plaintiff is referencing, it appears plaintiff is referring to the biopsy the surgeon cancelled.

**6**    Plaintiff alleges Ms. Vander Hey-Wright "inform[ed] [plaintiff] that Dr. Sommer instructed her to give him 'one' pain pill in the morning, afternoon, and 'two' at night. However, very quickly the pain medication was discontinued." (Compl. ¶ 10). Plaintiff was prescribed narcotic pain medication on twenty-seven different occasions during the relevant time period. (Walls Decl., Ex. 2). Plaintiff does not identify to which prescription he refers when he alleges the pain medication was very quickly discontinued. (Compl. ¶ 10).

**7**    As to his October 18, 2013, consultation with Dr. Sommer, plaintiff alleges "[s]he informed him that she was going to send him out to get the problem fixed. It did not happen. As of this complaint, she still has not sent him out." (Compl. ¶ 11) (emphasis in original). However, the record belies plaintiff's allegation. Dr. Sommer referred plaintiff to outside specialists on several occasions, both before and after October 18, 2013. In this instance, plaintiff's medical records reflect he was examined by an outside neurologist the following month.

**8**    Plaintiff filed his second of four administrative grievances on or about November 7, 2013. (Scannell-Vessella Decl., Ex. 7). Plaintiff stated he was in pain and "they are not doing anything about it." (Id. at G2235). Mr. McKinney, FCI Otisville's Health Services Administrator, responded to the grievance, explaining plaintiff had an appointment scheduled with a neurologist. Plaintiff alleges "[t]he facts demonstrate that the appointment never materialized." (Compl. ¶ 12). However, the record reflects plaintiff was examined by a neurologist on November 19, 2013. Plaintiff filed three subsequent appeals of this administrative grievance. (Scannell-Vessella Decl., Exs. 8-10).

**9**    A TENS unit is a portable device that sends electrical impulses to the body to block pain signals to the brain.

**10**    On March 10, 2014, plaintiff filed his third of four administrative grievances, arguing he was receiving "medically negligent" care and was subjected to a drug test in retaliation for filing prior grievances. (Scannell-Vessella Decl., Ex. 11 at G2217). Warden Recktenwald responded on March 19, 2014 outlining the treatment plaintiff had received to date, and explaining the drug test policy with respect to inmates receiving prescription narcotics. (Id. at 2219). Plaintiff did not appeal this grievance.

**11**    On June 9, 2014, plaintiff filed his fourth and final administrative grievance, claiming Ms. Vander Hey-Wright "'denied' [him] his right to medical attention when he arrived at sick-call on June 2, 2014." (Scannell-Vessella Decl., Ex. 12 at G2220). Plaintiff does not specifically refer to this event in his complaint. Plaintiff filed two appeals of this grievance. (Scannell-Vessella Decl., Ex. 13-14).

**12**    In his letter, plaintiff states his "contention is that the delay in diagnosis of Temporal Arteritis led to Parotitis and Bell's palsy. This series of events was preventable and had the cause of headaches been ascertained the year long period in which they continued." (Doc. #67 at 1). He attributes the loss of function in his facial muscles to "lack of attention [to] detail or failure to make an appropriate diagnosis." (Id.).

**13**    The Prison Reform Litigation Act states in relevant part: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). Although defendants argue certain of plaintiff's administrative grievances were not fully exhausted, the Court assumes, without deciding, plaintiff did fully exhaust his administrative grievances because, as discussed below, the Court dismisses or grants summary judgment to defendants on substantive grounds.

**14**    The complaint makes no mention of the FTCA. However, to the extent plaintiff brings an FTCA claim, it is dismissed. First, a plaintiff may not sue federal employees such as defendant Vander Hey-Wright under the FTCA; rather, the United States must be named as the defendant. See Pierre v. Napolitano, 958 F. Supp. 2d 461, 487 (S.D.N.Y. 2013). Plaintiff did not sue the United States in the instant action. Second, even assuming plaintiff had properly named the United States as a defendant, plaintiff's FTCA claim would still fail because nothing in the complaint suggests he exhausted his administrative remedies by filing a claim with the appropriate federal agency. See 28 U.S.C. § 2675(a) (the FTCA requires that before a claimant may initiate an action against the United States, "the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied."); Adeleke v. United States, 355 F.3d 144, 153 (2d Cir. 2004) (FTCA's administrative exhaustion requirement "applies equally to litigants with counsel and to those proceeding pro se"). Accordingly, any FTCA claim raised in the complaint is dismissed.

15    Defendants do not dispute plaintiff's medical conditions are sufficiently serious to satisfy the objective prong of a deliberate indifference claim.

16    Plaintiff will be provided with copies of all unpublished opinions cited in this decision. See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009).

**End of Document**        © 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by  Samuels v. Fischer,   S.D.N.Y.,   March 2, 2016

2010 WL 5072125
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Dana P. BROWN, Plaintiff,
v.
Kevin BRUN, et al., Defendants.

No. 10–CV–0397A.
|
Dec. 7, 2010.

**Attorneys and Law Firms**

Dana P. Brown, Comstock, NY, pro se.


DECISION AND ORDER

MICHAEL A. TELESCA, District Judge.


### *BACKGROUND*

**\*1** On September 8, 2010, the Court granted plaintiff permission to proceed *in forma pauperis,* dismissed a number of claims against a number of defendants alleged in the complaint for failure to state a claim upon which relief can be granted, *see* 28 U.S.C. § § 1915(e)(2)(B)(ii) and 1915A(b)(l), directed plaintiff to file an amended complaint by October 10, 2010 against defendants Conway and Fischer with respect to his procedural due process claims arising out of a Tier III Superintendent's Hearing, and directed that if plaintiff did not file an amended complaint by that date the claims against Conway and Fischer would be dismissed with prejudice and that the Clerk of the Court was to cause the summons and complaint to be served on defendants Kevin Brun, Lawrence Hale, Jason Ziolkowski, Joseph Jankowski, Christopher Fitch, Timothy Eberth and Lt. Murray regarding the assault and remaining due process claims alleged in the complaint. (Docket No. 4.) On September 16, 2008, the Court issued an Order clarifying what defendants should be served if plaintiff failed to file an amended complaint by October 10, 2010. In addition to the defendants identified above to be served, the Court directed that defendants Robert Brumstead and Steve Kujawkski be served. (Docket No. 5.)

By letter dated, September 14, 2010, and filed September 22, 2010, plaintiff appeared to advise; the Court that he did not intend to file an amended complaint and clarified that the defendants whom he alleges were personally involved in the assault and due process violations set forth in the complaint were Kevin Brun, Lawrence Hale, Jason Ziolkowski, Joseph ! Jankowski, Christopher Fitch, Timothy Eberth, Lt. Murray and Robert Brumstead, but not Steven Kujawski. [1] However, on October 8, 2010, plaintiff did, in fact, file an amended complaint (Docket No. 7, Amended Complaint) against the defendants originally named in the complaint and alleged to have assaulted plaintiff on October 1, 2009—Kevin Brun, Lawrence Hale, Jason Ziolkowski, Joseph Jankowski, Christopher Fitch and Timothy Eberth—and two others also allegedly involved in the assault—Robert Brumstead and Steve Kujawksi. (Amended Complaint, First Claim.) The amended complaint also names again Lt. Murray, the Hearing Officer, and Brian Fischer, Commissioner of the New York State Department of Correctional Services, whom affirmed Lt. Murray's disposition of guilt following the Superintendent's Hearing. (*Id.,* Second and Third Claim.) Two new defendants are also named in the amended complaint: P. Booth, a nurse, whom plaintiff alleges denied him medical treatment for an eye injury he suffered in the assault, and falsely reported that plaintiff was seen by a doctor on October 9, 2010, and that no injuries were noted during the examination (*id.,* Fourth Claim); and Dr. James T. Evans, a doctor, whom plaintiff alleges violated New York Civil Rights Law, § 50A by conducting an interview with plaintiff on October 9, 2010, with a correctional sergeant and two correctional officers present who "he[a]rd the whole complaint [plaintiff was making] against th[ei]r co-workers" (*id.,* Fifth Claim). For the following reasons, the claims against Commissioner Fischer and Dr. Evans are dismissed with prejudice for failure to state a claim upon which relief can be granted, *see* 28 U.S.C. § 1915(e)(2)(B)(ii) and 1915A(b)(1), and the Court will direct the Clerk of the Court to cause the United States Marshals Service to serve the summons and amended complaint upon defendants Kevin Brun, Lawrence Hale, Jason Ziolkowski, Joseph Jankowski, Christopher Fitch, Timothy Eberth, Robert Brumstead, Steve Kujawksi, Lt. Murray and P. Booth.

### DISCUSSION

**\*2** Sections 1915(e)(2)(B) and 1915A(a) of 28 U.S.C. require the Court to conduct an initial screening of the amended complaint. In evaluating the complaint, the Court must accept as true all of the factual allegations and must draw all inferences in plaintiff's favor. *See Larkin v. Savage,* 318 F.3d 138, 139 (2d Cir.2003) (per curiam); *King v. Simpson,* 189 F.3d 284, 287 (2d Cir.1999). While "a court is obliged to construe [*pro se* ] pleadings liberally, particularly when they allege civil rights violations," *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004), even pleadings submitted *pro se* must meet the notice requirements of Rule 8 of the Federal Rules of Civil Procedure. *Wynder v. McMahon,* 360 F.3d 73 (2d Cir.2004). "Specific facts are not necessary," and the plaintiff "need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Erickson v. Padus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal quotation marks and citation omitted).

Plaintiff brings this action pursuant to 42 U.S.C. § 1983. "To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton,* 126 F.3d 400, 405 (2d. Cir.1997) (citing *Eagleston v. Guido,* 41 F.3d 865, 875–76 (2d Cir.1994)).

### A. CLAIMS AGAINST COMMISSIONER FISCHER

Plaintiff again alleges only that Commissioner Fischer "upheld the due process violation" that allegedly occurred in the course of the Superintendent's Hearing conducted by Lt. Murray. (Amended Complaint, Third Claim.) As addressed in the Court's initial order in this case which, in part, directed plaintiff to file an amended complaint against both Fischer and Conway, Attica Superintendent, it is the well settled that a defendant must be personally involved in an alleged constitutional deprivation for a court to award damages under § 1983 *see, e.g., Provost v. City of Newburgh,* 262 F.3d 146, 154 (2d Cir.2001), and that there is an apparent split in the Circuit as to

whether the affirmance of disciplinary hearing disposition is sufficient to establish personal involvement. (Docket No. 4, Decision and Order, at 5–9) (collecting cases). "The distinction [between those cases that hold that affirmance of a disciplinary hearing is enough and those that hold it is not] appears to be that 'while personal involvement cannot be founded solely on supervision, liability can be found if the official proagtively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results.' " *Woodward v. Mullah,* No. 08–CV–0436A, 2009 WL 4730309, at \* 2–3 (W.D.N.Y. Dec.7, 2009) (quoting *Hamilton v. Smith,* 2009 WL 31995331, at \* 22 (N.D.N.Y.2009), report and recommendation adopted as modified, 2009 WL 3199520) and (citing *Odom v. Calero,* No. 06 Civ. 15527(LAK) (GWG). 2008 WL 2735868, at \* 7 (S.D.N.Y.2008) ("The reference in case law to an official who 'fails to remedy' a violation logically applies only to ongoing, and therefore correctable, constitutional violations-not to a specific event that is later subject to formal review by designated officials once the constitutional violation has already concluded.")).

**\*3** Because the original complaint alleged only that Fischer and Conway "upheld hearing," the Court found that said allegations were insufficient to state a claim and directed plaintiff to file an amended complaint against Fischer and Conway, and that, if the amended complaint did not set forth sufficient allegations of personal involvement, the amended complaint would be dismissed as against said defendants The amended complaint, which only names Fischer, is again insufficient to state a claim against Fischer inasmuch as it does not allege that he "proactively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results." *Woodward,* 2009 WL 4730309, at \* 2–3 (internal quotation marks and citations omitted.) Accordingly, the amended complaint is dismissed as against Fischer.

### B. CLAIM AGAINST DR. EVANS

Plaintiff alleges that Dr. Evans interviewed and examined him following the alleged sexual assault with a correctional sergeant and two correctional officers present in the examination room in violation of New York Civil Rights Law, § 50A. The gist of this claim appears to be that plaintiff was required to inform Dr. Evans of complaints against other correctional officers in the presence of their co-workers. This, however, fails to state a claim upon

which relief can be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii) and 1915A(b)(1). In the absence of a violation of one's federal constitutional rights, a violation of state statutory law does not create an actionable cause of action under 42 U.S.C. § 1983. *See United States v. Jakobetz,* 955 F.2d 786, 802 (2d Cir.1992) (recognizing that, even where evidence showed an alleged violation of N.Y.C.P.L. § 160.50, there was "no authority to indicate that [a defendant's] constitutional rights ha[d] been violated," and that, "at most ... [the act] violated a statutory right under New York law"). Accordingly, plaintiff's claims against Dr. Evans are dismissed with prejudice. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (leave to amend a complaint need not be granted when amendment would be futile).

IT IS HEREBY ORDERED that the claims against defendants Brian Fischer and James T. Evans, Doctor, are dismissed with prejudice and the Clerk of the Court is directed to terminate Brian Fischer and James T. Evans as parties to this action;

FURTHER, that the Clerk of the Court is directed to cause the United States Marshal to serve copies of the Summons, Amended Complaint, this Order, and the Orders filed September 8 and 16, 2010 (Docket Nos. 4 and 5), upon defendants Kevin Brun, Lawrence Hale, Jason Ziolkowski, Joseph Jankowski, Christopher Fitch, Timothy Eberth, Steven Kujawski, Lt. Murray, Robert Brumstead and P. Booth, R.N., at the Attica Correctional Facility, without plaintiff's payment therefor, unpaid fees to be recoverable if this action terminates by monetary award in plaintiff's favor; and

FURTHER, that pursuant to 42 U.S.C. § 1997e(g)(2), the defendants are directed to respond to the amended complaint.

**\*4 SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 5072125

Footnotes

1    The complaint had noted that plaintiff was not certain what defendants, in addition to assaulting him, had threatened to sexually assault him with a baton and that said defendants were Joseph Jankowski, Jason Ziolkowski and/or Steve Kujawski. Plaintiff's letter clarified, apparently, that plaintiff was not alleging that Kujawski had threatened to assault him but Kujawski is again named in the amended complaint.

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 2193997
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Ngina N. CAIN, Plaintiff,
v.
C.O. L. JACKSON, Defendant.

No. 05 Civ. 3914(LAP)(MHD).
|
July 27, 2007.

*MEMORANDUM AND ORDER*

LORETTA A. PRESKA, U.S.D.J.

**\*1** *Pro Se* Plaintiff Ngina **Cain** ("Plaintiff"), formerly incarcerated at the Bedford Hills Correctional Facility ("BHCF") in Bedford Hills, N.Y., brings this lawsuit pursuant to 42 U.S.C. § 1983, alleging violations of the Eighth Amendment by Defendant Lashaun **Jackson** ("Defendant"), formerly a Corrections Officer in the New York State Department of Correctional Services ("NYSDOCS") at the BHCF. Defendant has moved for summary judgment on the grounds that: (1) Plaintiff's allegations as to Defendant's actions, even if taken as true, do not amount to a violation of the Eighth Amendment; (2) the Defendant is entitled to Qualified Immunity; and (3) Plaintiff's claims against Defendant in his official capacity are barred by the Eleventh Amendment. For the reasons discussed below, the motion is GRANTED.

*BACKGROUND*

A. *Procedural Background*
On April 18, 2005, Plaintiff commenced a *pro se* action against twelve prison defendants. On March 30, 2006, this Court dismissed the claims against all but CO. Jackson. These remaining claims arise out of events that allegedly took place in November and December of 2003.

B. *Factual Background*
In January 2003, while incarcerated at the BHCF, Plaintiff fell from her cell bunk and injured her knee. (Pltf. 56.1 Stmt. ¶ 1). [1] In February 2003, Plaintiff again fell from her bunk and injured her back. (*Id.*). Jeffrey Norwood, M.D., who served as Plaintiff's primary care physician at BHCF, summarized Plaintiff's medical history (as it applies to this case) while incarcerated there:

> [Her] medical history through June, 2005 indicated arthritis in her left knee and **degenerative disc** disease in her cervical spine but no herniation or **disc** bulge. Arthritis and **degenerative disc** disease are common conditions that are not life threatening, but which usually present themselves in older patients. These conditions have been treated with physical therapy, muscle relaxers, nerve inhibiters and pain control medication, but have apparently not been completely resolved.

(Declaration of Jeffrey Norwood, M.D. dated Nov. 10, 2006 ("Norwood Decl.") ¶ 14.) From March 2003 through June 2003, Plaintiff was placed on a medical restriction by the medical unit that included "no lifting heavy objects ... [n]o shoveling, or other heavy outdoor work or groundwork [and n]o active sports/activities." (*Id.* Exhibit A, Plaintiff's medical records, 8-9.) From June 2003 to June 2004, the medical restriction was expanded to include "[n]o pushing/pulling activities like raking, mopping, [or] sweeping." (*Id.* at 2-3, 5.) The record indicates that on two relevant occasions, December 1, 2003 and March 3, 2004, Plaintiff was assigned by the BHCF Program Committee to be a porter, whose duties included "mop[ping], [and] lift[ing] garbage & buckets of water." (*Id.* at 6, 10.) Both sides agree that, at the time of the events at issue, Plaintiff was assigned as a porter. (Pltf. 56.1 Stmt. ¶ 9; Declaration of Benjamin Lee, dated Nov. 13, 2006, Exhibit A, Deposition of Plaintiff taken Sept. 25, 2006 ("Lee Decl. Exh. A"), Tr. 31 ln. 17-23.)

**\*2** Initially, Plaintiff claims that on November 21, 2003, she asked Defendant at approximately 8:00 a.m. to call the medical unit on her behalf in order to arrange a visit but that Defendant did not call the medical unit until approximately 10:30 or 11:00 a.m. (Lee Decl. Exh. A, Tr. 23-24; Declaration of Lashaun Jackson, dated Nov. 1, 2006 ("Jackson Decl.") ¶ 3.) The BHCF housing logs from that day, submitted by the Defendant, demonstrate that the medical unit was called on Plaintiff's behalf at 9:45 a.m. on November 21, 2003. (Jackson Decl. Exh. A.) While there is a discrepancy between the parties as to when exactly the medical unit was called, even if the Court

accepts Plaintiff's lengthier time frame as true, the delay was not sufficient to implicate the Eighth Amendment.

Second, Plaintiff contends that on November 24, 2003, Defendant instructed her to clean a bathroom in the BHCF housing unit in violation of her medical restriction because the activity involved the use of a large scrub brush that also involved some pushing and pulling. (Lee Decl. Exh. A, Tr. 33-37.) Defendant disputes this action violated Plaintiff's medical restriction and caused her neck pain and muscle spasms. (*See* Lee Decl. ¶¶ 11, 12; Exh. A, Tr. 45; Jackson Decl. ¶ 4.) Again, even if the Court accepts Plaintiff's version of the facts, which is disputed, as explained below these facts do not rise to the level of an Eighth Amendment violation.

The third incident allegedly took place on November 25, 2003. (Jackson Decl. ¶ 11.) Plaintiff claims that in the morning Defendant again refused to call the medical unit on her behalf. (Jackson Decl. Exh. A ¶¶ 11-12; Lee Decl. Exh. A Tr. 50-63). The Defendant also allegedly ordered Plaintiff to pick up cleaning supplies as part of her programming as a porter. (Jackson Decl. Exh. A ¶¶ 11-12; Lee Decl. Exh. A, Tr. 50-63.) Plaintiff contends this was another violation of her medical restriction (*see supra* at 3.) This assertion is disputed by Defendant, but the disagreement as to the facts here are immaterial because, as discussed below, even if the Court accepts Plaintiff's allegations as true, the purported behavior does not amount to a violation of the Eighth Amendment. (Pltf. 56.1 Stmt at 7.) Plaintiff then apparently went to the medical unit without permission at approximately 8:05 a.m. (Jackson Decl. ¶ 12; Exhibit B, Inmate Disciplinary files ("Jackson Decl. Exh. B"), Tr. 4; Lee Decl. Exh. A, Tr. 52-57.) While the precise timing of the events is unclear, both sides agree that after a brief wait at the medical unit's "bullpen," Plaintiff was escorted back to her unit and given a "ticket" for having violated the BHCF rules, namely "being out of place" and "leaving an assigned area without authorization." (Jackson Decl. SI 12; Jackson Decl. Exh. B; Lee Decl. ¶ 16.) Plaintiff was found guilty of these violations in a later disciplinary hearing, the findings of which are not challenged here. (Jackson Decl. Exh. B.)

**\*3** That same day, Plaintiff allegedly again asked Defendant to call the medical unit at approximately 11:00 a.m. but that Defendant refused. Plaintiff contends that she was unable to visit the medical unit until approximately 3:00 p.m., a delay of approximately four

hours. (Lee Decl. Exh. A Tr. 63-64.) Defendant disagrees that he did anything wrong and submitted a BHCF housing log that indicates Plaintiff went to receive her medication at 4:45 p.m. (Jackson Decl. Exh. A at 399.)

Finally, Plaintiff alleges that on or about December 1, 2003, Defendant delayed her access to her prescribed medication for several hours. (*Id.* at 78-80.) Defendant disputes this allegation. (Jackson Decl. ¶ 13.)

### *Discussion*

#### A. *Legal Standard for Summary Judgment*

"Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material facts and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (quoting Fed.R.Civ.P. 56(c)). "[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986) (citing Fed.R.Civ.P. 56(e)). "Factual disputes that are irrelevant or unnecessary" cannot defeat a motion for summary judgment. *Id.* at 248.

"In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to the non-movant, in this case [Ms. Cain]." *See Lucente v. Int'l Bus. Machs. Corp,* 310 F.3d 243, 253 (2d Cir.2002) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). Only if it is apparent that no rational fact-finder "could find in favor of the nonmoving party because the evidence to support its case is so slight" should summary judgment be granted. *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994).

#### B. *Section 1983*

42 U.S.C. § 1983 provides a procedure for persons alleging a constitutional deprivation to bring a claim but itself creates no substantive rights. *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993). Accordingly, to state a claim under § 1983, a plaintiff must allege that a defendant acting under color of state law has deprived her of a right, privilege, or

immunity guaranteed by the Constitution. *See* 42 U.S.C. § 1983. Here, there is no dispute that the Defendant was an employee of the New York State Department of Corrections acting under color of state law. The remaining question is whether Plaintiff can establish a violation of any of her constitutional rights.

C. *Plaintiff's Expert Medical Evidence*

Before addressing the merits of the alleged Eighth Amendment violation in this case, the admissibility of a medical report from Dr. Joseph Suarez submitted by Plaintiff as expert testimony must be addressed. Plaintiff contends that a one-page questionnaire submitted as part of her 56.1 Statement establishes that some of the allegations in her complaint amount to an Eighth Amendment violation. (Pltf. 56.1 Stmt. ¶¶ 7, 12.) However, for the reasons set forth by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592-93 (1993), the questionnaire submitted by Dr. Suarez is deemed inadmissible.

*1. Legal Standard for Expert Testimony*

**\*4** The principles governing admissibility of evidence do not change on a motion for summary judgment. *Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir.1997). As the Supreme Court explained in *Daubert,* 509 U.S. at 592-93, Federal Rule of Evidence 702 requires the Court to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable."[2] *Ruggiero v. Warner-Lambert Co.,* 424 F.3d 249, 253 (2d Cir.2005). In *Daubert,* the Supreme Court enumerated "a list of factors that, while not constituting a 'definitive checklist or test,' a district court might consider ...: whether a theory or technique has been and could be tested, whether it had been subjected to peer review, what its error rate was, and whether scientific standards existed to govern the theory or technique's application or operation." *Nimely v. City of New York,* 414 F.3d 381, 397 (2d Cir.2005) (quoting *Daubert,* 509 U.S. at 593-94) (ellipses in original). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 266 (2d Cir.2002).

*2. Application to Legal Standard for Expert Testimony*

In this case, the expert testimony submitted by Plaintiff consists of a questionnaire with six questions pertaining to various medical conditions requiring a "yes" or "no" answer from a doctor. Dr. Suarez, Plaintiff's proposed expert, did not even examine Plaintiff, and Plaintiff does not assert that he did. The questionnaire consists merely of general, conclusory questions[3] that do not profess to be based on any scientific technique or medical examination of the Plaintiff, thus not meeting the minimum standards Courts of Appeals here and elsewhere have generally required for expert testimony to be admissible. *See McCulloch v. H.B. Fuller Co,* 61 F.3d 1038, 1043-44 (2d Cir.1995) (holding that an experienced medical doctor's testimony was admissible because it was based on a range of factors, including his care and treatment of the Plaintiff, his review of her medical records, his training and experience, the use of a specific scientific analysis in coming to his conclusions, and his reference to various scientific and medical treatises); *see also Carroll v. Morgan,* 17 F.3d 787, 790 (5th Cir.1994) (holding that a doctor was qualified under *Daubert* to give an expert opinion on standard of medical care based on thirty years of experience and his review of the medical records); *Hopkins v. Dow Corning Corp.,* 33 F.3d 1116, 1125 (9th Cir.1994) (holding that the district court properly admitted expert testimony under *Daubert* that was based on, *inter alia,* the doctors' clinical experience and review of the medical records). Plaintiff's expert testimony is so conclusory in nature and lacking in reliability that it does not reach the minimum of any of the enumerated factors in *Daubert* and is ruled inadmissible.

D. *Legal Standard for Eighth Amendment violation*

**\*5** It is obvious that by virtue of their imprisonment, inmates must rely on prison officials to treat their medical needs. *Estelle v. Gamble,* 429 U.S. 97, 103 (1976). The Supreme Court has "therefore conclude[d] that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' *Gregg v. Georgia,* 428 U.S. 153, 182-83, 96 (1976), proscribed by the Eighth Amendment." *Estelle,* 429 U.S. at 104. The Eighth Amendment can be implicated "by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with [the] treatment once prescribed." *Id.* at 104-05 (internal footnotes omitted).

"The Constitution does not[, however,] contemplate that prisoners receive unfettered access to medical care." *Alston v. Howard,* 925 F.Supp. 1034, 1040 (S.D.N.Y.1996). In order to prevail on an Eighth Amendment claim alleging a failure to provide sufficient medical attention, an inmate must prove "deliberate indifference to [her] serious medical needs." *Estelle,* 429 U.S. at 105-06. Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are "serious." *Hudson v. McMillian,* 503 U.S. 1, 9 (1992).

"The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway,* 37 F.3d at 66. First, the alleged deprivation must be, in objective terms, "sufficiently serious" to implicate the Eighth Amendment. *Hathaway,* 37 F.3d at 66 (quoting *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). Second, the inmate must establish that the defendant acted with a "sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66.

### 1. Legal Standard for First Prong, "Serious Injury"

The Court of Appeals has enumerated several factors that courts may consider in determining whether a prisoner's medical condition is sufficiently serious to give rise to a potential Eighth Amendment violation. These include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Rodriguez v. Mercado,* No. 00 Civ. 8588, 2002 WL 1997885, at *7 (S.D.N.Y. Aug. 28, 2002) (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)); *see Evening v. Reilly,* No. 98 Civ. 6718, 2001 WL 1150318, at *9 (S.D.N.Y. Sept. 28, 2001)). "It is well established that more than minor discomfort or injury is required in order for a plaintiff to demonstrate a serious medical need." *Evening,* 2001 WL 1150318, at *9. The "standard contemplates 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " *Hathaway,* 37 F.3d at 66 (quoting *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting)). It is only those deprivations denying "the minimal civilized measures of life's necessities" that are sufficient to form the basis of an Eighth Amendment violation. *Wilson,* 501 U.S. at 298.

### 2. Application to First Prong, "Serious Injury"

**\*6** Applying this standard for proving an Eighth Amendment violation, Plaintiff has not demonstrated that any of the injuries she allegedly suffered were "sufficiently serious." Even if the Court were to resolve all the disputed facts in the *pro se* Plaintiff's favor, the facts do not rise to the level required for the Eighth Amendment to be implicated. Courts in this circuit have found no "serious medical need" in injuries complained of that were similar to-or more serious than-the injuries alleged by Plaintiff. *See Evans v. Bonner,* 196 F.Supp.2d 252, 256 (E.D.N.Y.2002) (holding that untimely provision of medication to an HIV-positive inmate did not cause sufficiently serious injury to give rise to an Eighth Amendment violation); *see also Mercado,* 2002 WL 1997885 at *2-3, 8 (migraines and back pain not "sufficiently serious" to implicate the Eighth Amendment); *Henderson v. Doe,* No. 98 Civ. 5011, 1999 WL 378333, at *2 (S.D.N.Y. June 10, 1999) (broken finger not a severe injury); *Veloz v. New York,* 35 F.Supp.2d 305, 312 (S.D.N.Y.1999) (pain from foot fracture, bone cyst, and degenerative arthritis not sufficiently serious); *Alston v. Howard,* 925 F.Supp. 1034, 1040 (S.D.N.Y.1996) (chronic ankle arthritis not a serious medical condition); *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (holding that a bunion deformity did not constitute a serious medical condition).

This Court fully acknowledges the fact that Plaintiff has experienced pain as a result of her two falls while at the BHCF and does not seek to minimize that unfortunate fact. In the context of the Eighth Amendment, however, it is the particular risk of harm faced by the Plaintiff due to a challenged deprivation of care, rather than the severity of her underlying medical condition, considered in the abstract, that is relevant. *Smith v. Carpenter,* 316 F.3d 178, 186 (2d Cir.2003) (citing *Chance,* 143 F.3d at 702-03). The pain and discomfort that Plaintiff alleges as a result of the delay in her receiving medical care and prescription medications, as well as the alleged pain and discomfort she experienced as a result of scrubbing bathroom walls for approximately 20 minutes on November 23, 2003, while not minimized by this Court, is simply insufficient to implicate the Eighth Amendment. As even delays of up to eight hours in visiting an infirmary do not amount to an Eighth Amendment violation, *Linden v. Westchester County,* No. 93 Civ. 8373, 1995 WL 686742, at *3 (S.D.N.Y. Nov. 20, 1995), Plaintiff's allegations with regard to Defendant's alleged delay in granting Plaintiff

access to medical care, even if true, are not serious enough to implicate the Eighth Amendment.

Furthermore, Plaintiff's primary care physician at BHCC, Dr. Norwood, stated under penalty of perjury that

> with a reasonable degree of medical certainty that any short term (twenty minute) activity involving cleaning the bathroom floor would not create a serious medical risk, and certainly would not create a risk of death, degeneration, or extreme pain. Rather, any such cleaning activity may have caused Ms. Cain slight short term discomfort until she was later able to take her medication, but would not have any long term effects and would not result in extreme pain.

**\*7** (Norwood Decl. ¶ 16.) Even viewing the facts of the case in the light most favorable to Plaintiff, she has failed to demonstrate that she suffered any pain or deprivation sufficiently serious to implicate the Eighth Amendment.

### 3. *Legal Standard for Second Prong, "Deliberate Indifference"*

Even if Plaintiff had demonstrated injuries severe enough to rise to the level of a serious medical need, she has not demonstrated that Defendant knowingly and intentionally put her at risk or disregarded a substantial risk of serious harm to her. *See Farmer,* 511 U.S. 825, 835-37 (1979); *Hathaway,* 37 F.3d at 67. To satisfy the subjective element of the deliberate indifference standard, an inmate must demonstrate that the prison official's conduct was more than negligent, but she need not show that it was "undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. Rather, it must be established that the prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Hathaway,* 37 F.3d at 66 (quoting *Farmer,* 511 U.S. at 837).

### 4. *Application to Second Prong, "Deliberate Indifference"*

Applying this standard, Plaintiff has failed to establish that Defendant knew of and disregarded "an excessive risk to [the Plaintiff's] health or safety ...." *Hathaway,* 37 F.3d at 66 (quoting *Farmer,* 511 U.S. at 837).

Plaintiff alleges that on four instances Defendant displayed "deliberate indifference" to her "serious medical needs." [4] Plaintiff has submitted no evidence or testimony, other than her own allegations, to support any of these claims. Even if true, however, Plaintiff's allegations of delays of several hours in her access to medical care (*see supra* at 2-5) do not amount to a constitutional violation. Plaintiff did receive medical treatment on each day in question; even if her version of the facts is accepted, it would only indicate that her access to such treatment was delayed for a few hours, which is insufficient to implicate the Eighth Amendment. (*See supra* at 10-11).

As for Plaintiff's allegations that Defendant violated her medical restriction by ordering her to clean the bathroom, Plaintiff fails to establish that Defendant acted with "deliberate indifference" here as well. Plaintiff does not allege that Defendant assigned her to be a porter. Consequently, the Defendant did not display any deliberate indifference to her needs by simply asking her to do her previously assigned tasks. Once she stopped cleaning after twenty minutes because of her alleged pain, Plaintiff does not allege that Defendant forced her to continue working. Plaintiff asserts only that she was subsequently "written up" for refusing to complete her assigned task. (Lee Decl. Exh. A Tr. 43.) By not forcing Plaintiff to continue cleaning once she stopped, but instead following prison procedures and writing her a "ticket," Defendant did not display any "deliberate indifference" to any of Plaintiff's alleged "serious medical needs." Accordingly, Plaintiff fails to state an Eighth Amendment claim.

### E. *Alleged Violation of consent decree in Todaro v. Coughlin*

**\*8** Plaintiff also alleges that Defendant violated a consent decree regarding inmate medical care at BHCF known as the *"Todaro v. Coughlin* consent decree." [5] Plaintiff claims that Defendant denied her request to receive medication or medical treatment on four days and that, on November 24, 2003, Defendant forced Plaintiff to clean a bathroom for twenty minutes. (*See supra* pp. 2-6).

The consent decree provides, *inter alia,* that sick call screenings are conducted based on facility protocols and that doctor appointments must be made within 28 days of an inmate's request. *See Defendant's Reply Memorandum of Law in Further Support of His Motion for Summary Judgment,* Exhibit A, Summary of Right to Medical Care as Guaranteed by *Todaro v. Coughlin* ("Deft's Reply Mem. Exh. A"), The consent decree specifically distinguishes between screenings and the administration of medication but does not impose a timetable for when medication must be given after it is requested.

Plaintiff's complaints are not, however, covered by the consent decree in *Todaro v. Coughlin.* Any delay of a few hours in seeing medical personnel or the administration of medication on three or four occasions would not implicate the *Todaro* consent decree.

### CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment (dkt. no. 36) is granted. The Clerk of the Court shall mark this action closed and all pending motions denied as moot.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2193997

Footnotes

1   "Pltf. 56.1 Stmt." refers to the "Statement" filed by Plaintiff on May 24, 2007. The Court construes "complaints filed by *pro se* litigants liberally and 'interpret[s] them to raise the strongest arguments that they suggest.' " *Pabon v. Wright,* 459 F.3d 241, 248 (2d Cir.2006)) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Although the Plaintiff in this case filed a general "Statement" in response to the Defendant's 56.1 Statement ("Def. 56.1 Stmt."), the Court construes it as a 56.1 Statement.

2   Rule 702 of the Federal Rules of Evidence, which governs the admissibility of expert testimony, provides as follows:
    If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

3   Questions and answers submitted by Plaintiff and Dr. Suarez include:
    Question: "1. Could cleaning a bathroom, which includes filling a large mop bucket filled with water, scrubbing, mopping, sweeping, bending, etc., create a risk of death, degeneration, or extreme pain in a person diagnosed with paraspinal and trapezial muscle spasms, neck sprain, and strain, degenerate disk disease of the cervical spine with numbness and tingling of limbs, and with a MRI that reveal a signal change in the posterior horn of the meniscus with moderate to severe patella cartilage erosion and irregularity? (bathroom is a large institutional bathroom)"
    Answer: "Not Death just pain"
    Question: "Could cleaning an institutional bathroom used by 70 people exacerbate the above-mention conditions stated in question number 1? (cleaning that would take 20 minutes)?"
    Answer: "Yes"
    Question: "Can degenerative disck disease become life threatening?"
    Answer: "No"

4   Plaintiff does not actually apply the test described by the Court of Appeals in *Hathaway,* but as a *pro se* litigant, the Court assumes that Plaintiff intends to do so.

5   The consent decree seems is referred to as *Todaro v. Coughlin* by both parties, but there is no citation available to a case by that name. *Todaro v. Ward,* 431 F.Supp. 1129 (S.D.N.Y.1977) is the original case from which the consent decree seems to have originated.

---

2013 WL 1987225
United States District Court,
S.D. New York.

CAPITOL RECORDS, INC. et al., Plaintiffs,

v.

MP3TUNES, LLC et al, Defendants.

No. 07 Civ. 9931(WHP).

|

May 14, 2013.

*MEMORANDUM AND ORDER*

WILLIAM H. PAULEY III, District Judge.

**\*1** Plaintiffs EMI, Inc. and fourteen record companies and music publishers (collectively, "EMI") and Defendant Michael Robertson, the CEO of MP3tunes, LLC, a defunct locker storage service for MP3 music files, seek reconsideration of this Court's Memorandum and Order, dated October 25, 2011 (the "October 2011 Order"), *Capitol Records, Inc. v. MP3tunes, LLC,* 821 F.Supp.2d 627 (S.D.N.Y.2011). These motions spring from the Second Circuit's decision in *Viacom International Inc. v. YouTube, Inc.,* 676 F.3d 19 (2d Cir.2012). Robertson also seeks reconsideration of that portion of the October 2011 Order holding him directly liable for copyright infringement of certain songs and this Court's July 20, 2012 Order finding personal jurisdiction over him. Finally, Robertson moves for summary judgment on the issue of his vicarious liability for MP3tunes' copyright infringement. For the following reasons, EMI's motion is granted in part and denied in part and Robertson's motions are granted in part and denied in part.

*DISCUSSION*

A motion for reconsideration under Local Rule 6.3 "will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked ... that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp.,* 70 F.3d 255, 257 (2d Cir.1995). It is not an invitation to re-litigate issues this Court has already decided. Reconsideration requires "an intervening change of controlling law, the

availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Virgin Atl. Airways Ltd. v. Nat'l Mediation Bd.,* 956 F.2d 1245, 1255 (2d Cir.1992). As such, reconsideration is an "extraordinary remedy." *Hinds Cnty., Miss. v. Wachovia Bank N.A.,* 700 F.Supp.2d 378, 407 (S.D.N.Y.2010).

Where there is an arguable "intervening change of controlling law," the Court should consider whether the change justifies a departure from the "law of the case" and revision of a previous decision. *Pescatore v. Pan Am. World Airways,* 97 F.3d 1, 6 (2d Cir.1996). "Cogent" or "compelling" reasons must exist to justify such action. See *Doe v. NYC Dep't of Soc. Servs.,* 709 F.2d 782, 789 (2d Cir.1983). "It is not enough ... that [a party] could now make a more persuasive argument" under more recent case law. *Fogel v. Chestnutt,* 668 F.2d 100, 109 (2d Cir.1981). A court must instead have a "clear conviction of error with respect to a point of law on which its previous decision was predicated." *Fogel,* 668 F.2d at 109 (internal citations omitted).

I. *Reconsideration in View of Viacom International v. YouTube*

The October 2011 Order relied on Judge Stanton's decision in *Viacom,* 718 F.Supp.2d 514 (S.D.N.Y.2010). Because portions of that decision were later reversed by the Second Circuit, the parties urge this Court to reconsider several of its rulings.

A. *Willful Blindness*

**\*2** First, Plaintiffs argue that *Viacom* directs district courts to engage in explicit fact-finding on the issue of willful blindness before determining that a party is entitled to the protections of the Digital Millennium Copyright Act ("DMCA") safe harbors. In *Viacom,* the Second Circuit considered "the application of the common law willful blindness doctrine in the DMCA context" as an issue of first impression and held that "the willful blindness doctrine may be applied, in appropriate circumstances, to demonstrate knowledge or awareness of specific instances of infringement under the DMCA." 676 F.3d at 34–35. Thus, where a service provider is "aware of a high probability of the fact [of infringement] and consciously avoid[s] confirming that fact," that provider is willfully blind to infringement and may lose the protections of the safe harbor. *Viacom,* 676 F.3d at 35.

*Viacom* offers little guidance on how to reconcile the tension between the doctrine of willful blindness and the DMCA's explicit repudiation of any affirmative duty on the part of service providers to monitor user content. *See* 17 U.S.C. § 512(m) (safe harbor protection shall not be conditioned on "a service provider monitoring its service or affirmatively seeking facts indicating infringing activity"). While *Viacom* hints in a footnote that knowledge of general infringing activity would likely not constitute willful blindness, *see Tiffany (NJ) Inc. v. eBay Inc.,* 600 F.3d 93, 107 (2d Cir.2010), it eschewed any bright line rules in favor of "explicit fact-finding" on the issue. 676 F.3d at 35 n. 10.

Defendants argue that this Court already considered the issue of willful blindness when it found that MP3tunes "does not purposefully blind itself to its users' identities and activities." *MP3tunes,* 821 F.Supp.2d at 638. But the context of that ruling was an evaluation of the sufficiency of MP3tunes' repeat infringer policy, which every service provider claiming DMCA safe harbor protection must implement. Such a finding does not "explicitly" address the issue of whether MP3tunes "engaged in a deliberate effort to avoid guilty knowledge" regarding the sideloaded content itself, as opposed to tracking its users' activities. *Viacom,* 676 F.3d at 35 (quoting *In re Aimster Copyright Litig.,* 334 F.3d 643, 650 (7th Cir.2003)). MP3tunes' ability to identify repeat infringers does not mean that it never looked the other way when confronted by a high probability that certain conduct was infringing. As Judge Stanton noted on remand, "[a]pplying the doctrine [of willful blindness] requires attention to its scope," and "[i]n imputing knowledge of the willfully disregarded fact, one must not impute more knowledge than the fact conveyed." *Viacom Int'l. Inc. v. YouTube, Inc.,* ―― F.Supp.2d ――, No. 07 Civ. 2103(LLS), 2013 WL 1689071, at *4 (S.D.N.Y. April 18, 2013). But "[u]nder appropriate circumstances the imputed knowledge of the willfully-avoided fact may impose a duty to make further inquiries that a reasonable person would make [.]" *Viacom,* 2013 WL 1689071, at *4.

 **\*3** This Court finds that a jury could reasonably interpret several documents in the record as imposing a duty to make further inquiries into "specific and identifiable" instances of possible infringement. *Viacom,* 676 F.3d at 32. For example, an email received by MP3tunes in April 2007 gives a specific blog title and states, "[a]lthough I don't like ratting myself out, everything I post is in clear

violation of the DMCA .... please remove any MP3s that are linked to that site." (Declaration of Andrew Bart ("Bart Decl."), dated Oct. 29, 2010 Ex. 70.) Another email from November 2007 states, "if you search for 'the clash I fought the law'... you will get 5 results ... 2 of which point to the website www.officerjellynutz.com[.] This website blatantly acknowledges that it contains infringing MP3's." (Bart Decl. Ex. 92.) In a third email, an MP3tunes employee acknowledges that while "it's not clear if [content from a user's site] is all copyright [sic] material ... it probably is though." (Bart Decl. Ex. 65.) Because *Viacom* emphasizes the importance of explicit fact-finding in establishing willful blindness, this Court vacates that portion of the October 2011 Order granting summary judgment to Defendants on the issue of contributory infringement liability for those songs not subject to DMCA-compliant takedown notices and finds that factual issues preclude summary judgment.

### B. *"Red Flag" Knowledge of Infringement*

Service providers can lose the protection of the DMCA safe harbors if they have actual or apparent (also called "red flag") knowledge of infringing content. *See* 17 U.S.C. §§ 512(c)(1) (A) and (d)(1). In the October 2011 Order, this Court found that Plaintiffs failed to show either actual or red flag knowledge of infringement for songs that were not the subject of DMCA-compliant takedown notices. *MP3tunes,* 821 F.Supp.2d at 645. Plaintiffs now argue that *Viacom* establishes that red flag knowledge can be demonstrated by evidence other than formal takedown notices, such as internal and third-party communications regarding the content at issue.

In *Viacom,* the Second Circuit affirmed that DMCA safe harbor protections can be lost only where a provider has actual or apparent knowledge of "specific and identifiable instances" of infringement. 676 F.3d at 32. In doing so, Judge Cabranes rejected Viacom's argument that red flag knowledge could be shown through a "general awareness that infringement may be occurring." *Viacom,* 676 F.3d at 35. Instead, *Viacom* establishes an exquisite "subjective/objective" standard for distinguishing between "actual" and "red flag" knowledge: "the actual knowledge provision turns on whether the provider actually or 'subjectively' knew of specific infringement, while the red flag provision turns on whether the provider was subjectively aware of facts that would have made the specific infringement 'objectively' obvious to a reasonable person." *Viacom,* 676 F.3d at 31. But both actual and

red flag knowledge "apply only to specific instances of infringement." *Viacom,* 676 F.3d at 31.

**\*4** While *Viacom* found Judge Stanton's decision and others—including this Court's October 2011 Order—to be "generally in accord" with its view of the specificity requirement, the Second Circuit nevertheless reversed Judge Stanton's grant of summary judgment to the defendant service providers as premature. 676 F.3d at 32. Because YouTube executives decided not to remove specific content they acknowledged among themselves was almost certainly infringing, the Second Circuit was "persuaded that the plaintiffs may have raised a material issue of fact regarding YouTube's knowledge or awareness of specific instances of infringement .... especially in the absence of any detailed examination of the extensive record on summary judgment[.]" 676 F.3d at 34. EMI contends that it introduced similar evidence sufficient to create a material issue of fact regarding Defendants' red flag knowledge of infringement.

Since something less than a formal takedown notice may now establish red flag knowledge and EMI offers communications acknowledging likely infringement, the issue of Defendants' red flag knowledge cannot be resolved on summary judgment. This Court reaches this conclusion reluctantly, given MP3tunes' salutary practice of sending instructions regarding DMCA-compliant takedown notices to third parties reporting possible infringement and the DMCA's disavowal of any duty on the part of service providers to monitor user content. *See UMG Recordings, Inc. v. Veoh Networks, Inc.,* 665 F.Supp.2d 1099, 1108 (C.D.Cal.2009) ("[I]f investigation of facts and circumstances is required to identify material as infringing, then those facts and circumstances are not red flags.") (internal citations omitted); *Perfect 10, Inc. v. CCBill LLC,* 488 F.3d 1102, 1114 (9th Cir.2007) ("We do not place the burden of determining whether [materials] are actually illegal on a service provider."). Accordingly, this Court withdraws its prior grant of summary judgment to Defendants on their lack of red flag knowledge and instead concludes that there are material issues of fact that warrant trial.

## C. *Inducement of Copyright Infringement as a Distinct Cause of Action*

Finally, EMI contends the *Viacom* ruling confirmed that inducement of copyright infringement is a cause of action separate and distinct from contributory copyright infringement. EMI relies on a footnote in which the Second Circuit cited *Metro–Goldwyn–Mayer Studios Inc. v. Grokster* for the proposition that "[d]octrines of secondary copyright infringement include contributory, vicarious, and inducement liability." *Viacom,* 676 F.3d at 29 n. 5 (citing 545 U.S. 913, 930, 125 S.Ct. 2764, 162 L.Ed.2d 781 (2005)). On October 16, 2009, this Court dismissed EMI's stand-alone inducement claim as duplicative of its contributory copyright infringement claim, also relying on *Grokster. Capitol Records, Inc. v. MP3tunes, LLC,* 07 Civ. 9931(WHP), 2009 WL 3364036, at \*4 (S.D.N.Y. Oct. 16, 2009). EMI attributes this Court's reading of *Grokster* to legal uncertainty in 2009 about whether inducement liability could be a stand-alone cause of action. *See, e.g., Arista Records LLC v. Usenet.com, Inc.,* 633 F.Supp.2d 124, 150 n. 17 (S.D.N.Y.2009) ("it is worth noting that several courts recently have expressed doubt as to whether inducement of infringement states a separate claim for relief, or rather whether it is a species of contributory infringement.").

**\*5** In view of subsequent decisions including *Viacom,* EMI asks this Court to revive its dismissed inducement claim as a separate cause of action. Defendants contend that the *Viacom* footnote does not announce an intervening change in law as to whether inducement liability is a stand-alone cause of action. But *Viacom's* reading of *Grokster* nevertheless warrants reconsideration of the dismissal of EMI's claim. *See Virgin Atl. Airways,* 956 F.2d at 1255 (a court may reconsider its own decisions prior to final judgment).

According to EMI, an inducement of copyright infringement claim requires a showing of bad faith: that the defendant engaged in purposeful conduct that encouraged copyright infringement. *Arista Records LLC v. Lime Group LLC,* 784 F.Supp.2d 398, 425 (S.D.N.Y.2011); *see also Grokster,* 545 U.S. at 937 ("The inducement rule, instead, premises liability on purposeful, culpable expression and conduct[.]"). Contributory infringement, on the other hand, requires only that the defendant, "with knowledge of the infringing activity, ... materially contributes to the infringing conduct of another." *Lime Group,* 784 F.Supp.2d at 432. Critically, EMI argues that the DMCA safe harbor cannot shelter a defendant from an inducement claim, because "the intentional nature of inducement is incompatible with the basic premise of DMCA immunity." (Pls.' Br. in Supp. of Mot. for Recons., dated Nov. 12, 2012 at 19.)

This Court is aware of no authority for the proposition that the DMCA safe harbor is *per se* unavailable in an inducement claim, or that evidence of inducement would obviate the requirement to prove actual or red flag knowledge of infringement. While Judge Baer noted in *Usenet* that "if Defendants were aware of ... red flags [pointing to user infringement], or worse yet, if they encouraged or fostered such infringement, they would be ineligible for the DMCA's safe harbor provisions," he revoked the safe harbor protection as a discovery sanction and not because he concluded that plaintiffs established inducement liability. *Usenet.com,* 633 F.Supp.2d at 142. Rather than introducing a categorical bar to the safe harbor, the case law indicates only that inducement conduct may be relevant to establish an exception to safe harbor protection, such as actual or apparent knowledge of infringement. *See Columbia Pictures Indus., Inc. v. Fung,* 710 F.3d 1020, 1043 (9th Cir.2013) ( "while [the defendant's] inducing actions do not necessarily render him *per se* ineligible for protection under § 512(c), they are relevant to our determination that [the defendant] had 'red flag' knowledge of infringement").

This is not a remarkable observation given that the DMCA safe harbor exceptions are aimed at bad faith infringers. *MP3tunes,* 821 F.Supp.2d at 637 ("The purpose of subsection 512(i) is to deny protection to websites that tolerate users who flagrantly disrespect copyrights."). Indeed, EMI advanced evidence of inducement at summary judgment for that purpose. Such evidence included MP3tunes touting Sideload.com as a source for "free music on the internet" and encouraging users to add MP3 files from the internet to sideload.com. (Bart Decl. Ex. 86.) But this Court rejected that evidence in finding that MP3tunes "did not promote infringement" or tolerate blatant infringers. *MP3tunes,* 821 F.Supp.2d at 645. Regardless of whether an inducement claim can be a separate cause of action, this Court finds that such a claim would be futile. While EMI argues that it has "significant further evidence" demonstrating defendants' intent to encourage infringement, that proposition is not buttressed by testimony or documents. The evidence before the Court is not sufficient to meet the "high degree of proof" required for an inducement claim. *See Fung,* 710 F.3d at 1034. And given the zealous advocacy throughout this litigation, this Court doubts that EMI held back evidence on its motion

for summary judgment. Accordingly, this Court denies EMI's request to revive its inducement claim as futile.

### D. *Infringement of EMI's Cover Art*

**\*6** Robertson also cites *Viacom* as a basis for reconsideration of this Court's ruling regarding the alleged infringement of EMFs copyrighted album cover art. In October 2006, pursuant to a licensing agreement with Amazon.com, MP3tunes' Lockersync program began allowing users to retrieve and display the corresponding album cover art from Amazon.com while playing a song in their MP3tunes lockers. *MP3tunes,* 821 F.Supp.2d at 635. If cover art was not part of a music file or stored on a user's computer, LockerSync retrieved the cover art from Amazon.com and displayed a link to that website. *MP3tunes,* 821 F.Supp.2d at 635. Under the licensing agreement, MP3tunes was permitted to display the cover art for the "principal purpose" of driving traffic to Amazon.com's website. *MP3tunes,* 821 F.Supp.2d at 635. EMI maintains that MP3tunes directly infringed its copyrights in the cover art, in breach of the licensing agreement with Amazon.com. In the October 2011 Order, this Court found questions of fact precluded a ruling because of "contradictory proof on the issues of MP3tunes" use and storage of cover art, and the direction of traffic to Amazon.com. *MP3tunes,* 821 F.Supp.2d at 650.

Robertson now contends that *Viacom* precludes copyright infringement liability for the cover art because it is protected by the DMCA safe harbor, and it is undisputed that the cover art was never the subject of any takedown notices. The § 512(c) safe harbor "is only available when the infringement occurs 'by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider.' " *Viacom,* 676 F.3d at 39 (quoting 17 U.S.C. § 512(c)(1)). In *Viacom,* the Second Circuit concluded that the § 512(c) safe harbor "is clearly meant to cover more than mere electronic storage lockers." *Viacom,* 676 F.3d at 38. Rather, its protections "extend[ ] to software functions performed 'for the purpose of facilitating access to user-stored material.' " *Viacom,* 676 F.3d at 39 (citing *UMG Recordings, Inc. v. Veoh Networks, Inc.,* 620 F.Supp.2d 1081, 1088 (C.D.Cal.2008)). The Second Circuit went on to find that YouTube's "related videos" function, "by which a YouTube computer algorithm identifies and displays 'thumbnails' of clips that are 'related' to the video selected by the user" was such a function: "Because the

algorithm 'is closely related to, and follows from, the storage itself,' and is 'narrowly directed toward providing access to material stored at the direction of users,' .... the related videos function is also protected by the § 512(c) safe harbor." *Viacom,* 676 F.3d at 39–40 (quoting *UMG Recordings,* 620 F.Supp.2d at 1092)).

MP3tunes' cover art function uses an algorithm that retrieves, copies, stores, and displays cover art from Amazon.com related to those songs a user chooses to sideload. (Defs.' Br. in Supp. of Mot. for Recons. ("D.Br."), dated Nov. 12, 2012 at 27.) Robertson likens MP3tunes' cover art algorithm to YouTube's 'related videos' algorithm, noting that both were fully automated and required no input from service provider employees. But while MP3tunes' cover art algorithm retrieved and copied cover art solely in response to a user's song selection, the cover art itself was provided by Amazon.com, not other MP3tunes users. As such, the cover art is not stored at the direction of a user, but rather presented to users by MP3tunes as part of an automated marketing ploy. Further, Robertson admits that "MP3tunes used the cover art for the principal purpose of driving traffic to Amazon.com's website." (D. Br. at 29.) As such, the primary purpose of the cover art algorithm is not narrowly tailored to "facilitat[e] access to user stored material" but rather to prompt users to go to a separate website entirely for the purpose of purchasing music. *Viacom,* 676 F.3d at 39.

**\*7** According to Robertson, *Viacom* affords safe harbor protection to any software functions or "architectural decisions" which "enhance user experiences" through a fully automated system operating solely in response to user input. (D. Br. at 27.) But "facilitating access to user stored material" and "enhancing user experiences" are not coextensive. *Viacom* approves the former, but does not address the latter. Under Robertson's interpretation, § 512(c) would protect any fully automated software function that "enhances" a user's experience by, for example, responding to a user's sideload of one song by automatically sideloading additional songs by the same artist. Such an interpretation of *Viacom* would stretch the definition of "storage by direction of a user" beyond the pale. Therefore, this Court declines to rule that MP3tunes' cover art algorithm is shielded by the § 512(c) safe harbor. As such, Robertson's motion for reconsideration of this issue is denied and EMI's cover art infringement claim must proceed to trial.[1]

## II. *Robertson's Liability for Direct Copyright Infringement of 47 Songs*

In the October 2011 Order, this Court found Robertson liable for direct copyright infringement of forty-seven songs he personally sideloaded from unauthorized websites in order to "seed" Sideload.com with quality songs. *MP3tunes,* 821 F.Supp.2d at 649. The issue was decided *sua sponte. See* Fed. R. Civ. Pro. 56(f); *Garanti Finansal Kiralama A.S. v. Aqua Marine and Trading Inc.,* 697 F.3d 59, 64 (2d Cir.2012) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgment *sua sponte,* so long as the losing party was on notice that it had to come forward with all of its evidence."). This Court now reconsiders this ruling with the benefit of briefing from Robertson.

To establish direct copyright infringement, a plaintiff must prove ownership of a valid copyright and unauthorized copying by a third party. *See Island Software & Computer Serv., Inc. v. Microsoft Corp.,* 413 F.3d 257, 260 (2d Cir.2005). Robertson offers various factual arguments attacking the validity of EMI's copyrights in the songs and suggesting that many of them were sideloaded from authorized websites. Most of these arguments are identical to those previously advanced by MP3tunes, which this Court rejected in finding that EMI stated a prima facie case of copyright ownership in numerous songs, including the forty-seven now at issue. *See MP3tunes,* 821 F.Supp.2d at 647. This Court also found that those songs were copied unlawfully from unauthorized third party websites. *MP3tunes,* 821 F.Supp.2d at 647. Robertson's recycled arguments—including his "works for hire" argument —do not warrant a different result for the bulk of the sideloaded songs.[2] However, this Court finds that Robertson has created an issue of fact as to EMI's ownership of the copyrights for two of the songs he sideloaded, "White Christmas" by Frank Sinatra and "Devil in Me" by 22–20s, because Plaintiffs did not provide registrations for those copyrights. Further, EMI relies on copyrights registered as compilations for thirteen of the songs Robertson sideloaded. Because compilations contain pre-existing constituent works that may have been fixed prior to February 15, 1972 or that may have been previously registered by another owner, Robertson has created an issue of fact with respect to those songs. *See* U.S. Copyright Office, Copyright Registration for Sound

Recordings, Copyright Circular # 56, at 4 (2004) ("The copyright in the compilation of recordings is separate and distinct from copyright (if any) in the recordings themselves.").

 *8  While Robertson proffers some new evidence, it falls short of what this Court indicated would be required to rebut a finding of direct infringement of the remaining songs—either evidence that the websites involved in free viral marketing campaigns were identical to the URLs from which Robertson sideloaded, or evidence sufficient to show a broad implied license to use the songs. See *MP3tunes,* 821 F.Supp.2d at 647–48. For instance, Robertson points to a letter from Hopeless Records stating that it was "authorized" to offer free MP3s of the song "Eternal Rest" by Avenged Sevenfold. (Declaration of Michael Robertson ("Robertson Decl."), dated Nov. 11, 2012 Ex. 7.) Similarly, Robertson's counsel offers a conversation he had with an Amazon.com legal assistant, who indicated that Amazon.com was "authorized" to make the song "A Groovy Kind of Love" by the Royal Philharmonic Orchestra available for download, though she could not confirm it was for free. (Declaration of Mark Lafayette, dated Nov. 12, 2012 at ¶ 11.) But this evidence fails to show that Plaintiffs themselves authorized any free downloads, or when such downloads were even offered. Similarly, a screenshot indicating that Spin.com offered a free MP3 file of another song at issue by the band Panic at the Disco is unauthenticated and does not show that EMI authorized the promotion. (Robertson Decl. Ex. 4.) Such evidence does not constitute the "narrow circumstances" under which courts find implied licenses. *Ulloa v. Universal Music and Video Distrib. Corp.,* 303 F.Supp.2d 409, 416 (S.D.N.Y.2004). Nor does it suffice to show abandonment of Plaintiffs' copyrights. See *Capitol Records, Inc. v. Naxos of Am., Inc.,* 372 F.3d 471, 483–84 (2d Cir.2004).

Because this Court finds that Robertson fails to establish a broad implied license for the songs at issue, the equitable defenses he raises against EMI are without merit. Further, this Court rejects Robertson's request to reopen discovery or revisit earlier discovery disputes. Relief under Rule 56(d) "is not available when summary judgment motions are made after the close of discovery." *Espada v. Schneider,* 522 F.Supp.2d 544, 549 (S.D.N.Y.2007). Discovery in this action was supervised by Magistrate Judge Maas and closed in January 2010. This Court declines to entertain another encore.

III. *Personal Jurisdiction over Defendant Robertson*

In July 2012, this Court ruled it had personal jurisdiction over Robertson. On his reconsideration motion, Robertson advances substantially the same arguments this Court previously rejected, including his argument that "sideloading" is distinct from "uploading" in determining the situs of copyright injury under *Penguin Group (USA) Inc. v. American Buddha,* 16 N.Y.3d 295, 302, 921 N.Y.S.2d 171, 946 N.E.2d 159 (2011)—an argument this Court still finds to be without merit. (See Transcript, dated July 20, 2012 ("July 2012 Tr.") at 5:5–7.) A motion for reconsideration is not an opportunity to "treat the court's initial decision as the opening of a dialogue ... in response to the court's rulings." *De Los Santos v. Fingerson,* No. 97 Civ. 3972(MBM), 1998 WL 788781, at *1 (S.D.N.Y. Nov.12, 1998). Therefore, this Court addresses only one of Robertson's arguments.

 *9  Robertson, a California resident, contends this Court erred in finding that he committed tortious conduct that could reasonably be expected to cause injury in New York under its long arm statute, CPLR § 302(a)(3)(ii). In making that finding, this Court relied on its *sua sponte* ruling in the October 2011 Order that Robertson was directly liable for copyright infringement of songs he personally sideloaded to MP3tunes' server. (July 2012 Tr. at 4:3–10 .) Robertson argues that this is improper. But this Court has now reaffirmed Robertson's liability for most of the forty-seven songs after affording him an opportunity to brief the issue. Further, a showing of conclusive liability for tortious conduct is not required for personal jurisdiction. Rather, "where the parties have conducted extensive discovery regarding the defendant's contacts with the forum state, but no evidentiary hearing has been held, the plaintiff's prima facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over the defendant." *Metro. Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560, 567 (2d Cir.1996). The record EMI submitted on summary judgment satisfies this burden. Therefore, this Court adheres to its finding of personal jurisdiction over Robertson.

IV. *Robertson's Secondary Copyright Infringement Liability*

Whether Robertson was vicariously liable for the contributory infringement of those songs that MP3tunes failed to remove upon receipt of DMCA-compliant takedown notices was not before this Court in October 2011. This Court now considers Robertson's motion for summary judgment on the issue of his vicarious liability. To prevail on a motion for summary judgment, the moving party must demonstrate each essential element of its infringement claim or defense. *Jorgensen v. EpiclSony Records,* 351 F.3d 46, 50 (2d Cir.2003). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Davis v. Blige,* 505 F.3d 90, 97 (2d Cir.2007). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The Court resolves all factual ambiguities and draws all inferences in favor of the non-moving party. *Liberty Lobby,* 477 U.S. at 255; *Jeffreys v. City of N.Y.,* 426 F.3d 549, 553 (2d Cir.2005).

To be vicariously liable for MP3tunes' contributory infringement, Robertson must have (1) had the right and ability to supervise the infringing conduct and (2) received a financial benefit directly attributable to the infringing conduct. *Usenet.com,* 633 F.Supp.2d at 156; *see also Grokster,* 545 U.S. at 930 (a defendant is liable for vicarious copyright infringement by "profiting from direct infringement while declining to exercise a right to stop or limit it"); *Viacom,* 676 F.3d at 36 ("The common law imposes liability for vicarious copyright infringement when the right and ability to supervise coalesce with an obvious and direct financial interest in the exploitation of copyrighted materials[.]") (internal alterations and quotations omitted).

**\*10** Robertson argues that he is entitled to summary judgment on the issue of his vicarious liability because this Court found, in evaluating whether MP3tunes was eligible for the DMCA safe harbor, that MP3tunes "neither received a direct financial benefit nor controlled the infringing activity." *MP3tunes,* 821 F.Supp.2d at 646. Thus, Robertson contends that EMI is collaterally estopped from proving the financial benefit prong of the vicarious liability test. Robertson also argues that the "law of the case" doctrine prohibits a finding of vicarious

liability. Under this doctrine, a "decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation." *In re PCH Assocs.,* 949 F.2d 585, 592 (2d Cir.1991).

The DMCA safe harbor is lost where a direct financial benefit from the users' infringing activity is found. But vicarious liability arises from common law, not from the DMCA. *See Viacom,* 676 F.3d at 37–38 (finding that the DMCA is not a codification of common law vicarious liability principles for copyright infringement). Under the common law vicarious liability standard, there must be "a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of how substantial the benefit is in proportion to a defendant's overall profits." *Ellison v. Robertson,* 357 F.3d 1072, 1079 (9th Cir.2004); *see also Usenet.com,* 633 F.Supp.2d at 157 ("the law is clear that to constitute a direct financial benefit, the 'draw' of infringement need not be the primary, or even a significant, draw—rather, it need only be 'a' draw."). Further, the financial benefit prong for vicarious liability has been found even where no financial benefit was realized. *See, e.g., A & M Records, Inc. v. Napster, Inc.,* 114 F.Supp.2d 896, 921 (N.D.Cal.2000) ("direct financial benefit does not require earned revenue, so long as the defendant has economic incentives for tolerating unlawful behavior"), rev'd on other grounds, 239 F.3d 1004 (9th Cir.2001). Because it is clear that the "direct financial benefit" prong of the common law vicarious liability standard is construed more broadly than it is under the DMCA, Robertson's collateral estoppel and "law of the case" arguments are without merit.

While Robertson argues that he did not personally benefit from MP3tunes' infringement because he is not a shareholder of MP3tunes and has not held any membership interest since 2006, it is undisputed that he held a beneficial interest in the SKL trust, which held a substantial interest in MP3tunes. *Cf. Lime Group,* 784 F.Supp.2d at 439 (holding that an individual holding an indirect ownership interest could be liable for that company's infringement). As such, there is a genuine issue of material fact as to whether Robertson benefited from the infringement in satisfaction of the common law vicarious liability standard. Further, "[a]ll persons and corporations who participate in, exercise control over, or benefit from the infringement" may be held jointly and severally liable as copyright infringers. *Usenet .com,* 633

F.Supp.2d at 158. Whether Robertson was "personally and intimately mvolved in many of the activities that form the basis of [MP3tunes'] copyright liability" is an open question. *Usenet.com,* 633 F.Supp.2d at 158. Accordingly, Robertson's motion for summary judgment is denied.

 **\*11** Finally, because there are issues of fact regarding whether Robertson can be held liable for the infringement of MP3tunes, or whether Robertson received any commercial benefit from the infringement, EMI's unfair competition claim against Robertson will also proceed to trial.

*CONCLUSION*

For the foregoing reasons, EMI's motion for reconsideration in light of *Viacom v. YouTube* is granted in part and denied in part. Specifically, EMI's motion

is granted as to the issue of willful blindness and "red flag" knowledge, and denied as to the inducement of copyright claim. Defendant Robertson's motion for reconsideration of the October 2011 Order regarding direct copyright infringement is granted in part and denied in part. Robertson's motions for (1) reconsideration of the October 2011 Order regarding infringement of EMI's cover art, (2) reconsideration of the July 2012 Order regarding personal jurisdiction, and (3) summary judgment as to his vicarious liability are denied. The Clerk of Court is directed to terminate the motions pending at ECF No.'s 333, 334, and 341.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1987225, 2013 Copr.L.Dec. P 30,427, 107 U.S.P.Q.2d 1770

Footnotes

1   To the extent EMI failed to list the artist of any cover art registered on a form SR, copyright ownership is a disputed issue that must proceed to trial. *See* U.S. Copyright Office, Copyright Registration for Sound Recordings, Copyright Circular # 56, at 3 (2004).

2   Robertson's arguments regarding the availability of statutory damages or attorney's fees for three songs by the music group Air and his argument that some of the sideloaded songs violate the same copyright relate to the issue of damages, and this Court does not resolve them now.

**WESTLAW**  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

 **\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*' s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

### B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

### *Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with

the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

Footnotes

1    In light of this finding, there is no need to consider the defendant's qualified immunity argument.

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4464861
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

James DALEY, Plaintiff,

v.

John VonHAGEN, Nurse Administrator, Angela
Bartlett, Deputy Superintendent, Robert Griffen,
Superintendent, Wesley Canfield, Medical Doctor
and Benjamin Oaks, Medical Doctor, Defendants.

No. 11–CV–1071Sr.
|
Sept. 20, 2012.

ORDER

JOHN T. CURTIN, District Judge.

### INTRODUCTION

**\*1** Plaintiff, James Daley, proceeding *pro se,* has filed a
Complaint (Docket No. 1) and an Amended Complaint
(Docket No. 5) against five officials or the Southport
Correctional Facility and has requested leave to proceed
*in forma pauperis.* (Docket Nos. 2, 4). The Court grants
the Plaintiff leave to proceed as a poor person, and
has reviewed the Amended Complaint pursuant to 28
U.S.C. §§ 1915(e)(2)(B) and 1915A. For the reasons set
forth below, the Court determines that the Amended
Complaint should be construed and re-designated as
a Supplemental Complaint, and that plaintiffs claims
asserted in the Complaint and Supplemental Complaint
must be dismissed for failure to state a claim.

### STANDARD OF REVIEW

Section 1915(e)(2)(B) of 28 U.S.C. provides that the Court
shall dismiss a case in which *in forma pauperis* status has
been granted if the Court determines that the action (i) is
frivolous or malicious; (ii) fails to state a claim upon which
relief may be granted; or (iii) seeks monetary relief against
a defendant who is immune from such relief. In addition,
28 U.S.C. § 1915A(a) requires the Court to conduct
an initial screening of "a complaint in a civil action in

which a prisoner seeks redress from a governmental entity
or officer or employee of a governmental entity," *id.,*
regardless of whether or not the inmate has sought *in
forma pauperis* status under 28 U.S.C. § 1915.

In evaluating a complaint, the Court must accept as true
all of the factual allegations and must draw all inferences
in plaintiff's favor. *See Larkin v. Savage,* 318 F.3d 138,
139 (2d Cir.2003) (per curiam); *King v. Simpson,* 189 F.3d
284, 287 (2d Cir.1999). "Specific facts are not necessary,"
and the plaintiff "need only 'give the defendant fair notice
of what the ... claim is and the grounds upon which it
rests.' " *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct.
2197, 167 L.Ed.2d 1081 (2007) (quoting *Bell Atlantic
Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167
L.Ed.2d 929 (2007) (internal quotation marks and citation
omitted); see also *Boykin v. Keycorp,* 521 F.3d 202, 213
(2d Cir.2008) (discussing pleading standard in *pro se* cases
after *Twombly* ). "A document filed *pro se* is to be liberally
construed, ..., and a *pro se* complaint, however inartfully
pleaded, must be held to less stringent standards than
formal pleadings drafted by lawyers." *Erikson,* 551 U.S.
at 94 (internal quotation marks and citations omitted).
Generally, the Court will afford a *pro se* plaintiff an
opportunity to amend or to be heard prior to dismissal
" 'unless the court can rule out any possibility, however
unlikely it might be, that an amended complaint would
succeed in stating a claim.' " *Abbas,* 480 F.3d at 639
(quoting *Gomez v. USAA Federal Savings Bank,* 171 F.3d
794, 796 (2d Cir.1999) (per curiam)).

Plaintiff brings this action pursuant to 42 U.S.C. § 1983.
"To state a valid claim under 42 U.S.C. § 1983, the
plaintiff must allege that the challenged conduct (1) was
attributable to a person acting under color of state law,
and (2) deprived the plaintiff of a right, privilege, or
immunity secured by the Constitution or laws of the
United States." *Whalen v. County of Fulton,* 126 F.3d 400,
405 (2d. Cir.1997) (citing *Eagleston v. Guido,* 41 F.3d 865,
875–76 (2d Cir.1994)).

### PLAINTIFF'S ALLEGATIONS

**\*2** Plaintiff filed his original complaint on December 19,
2011. (Docket No. 1). Thereafter, before the screening of
the original Complaint could be completed, plaintiff filed
an Amended Complaint. (Docket No. 5). An amended
complaint ordinarily supercedes an original complaint

and renders it of no legal effect, *see Arce v. Walker,* 139 F.3d 329, 332 n. 4 (2d Cir.1998) (quoting *International Controls Corp. v. Vesco,* 556 F.2d 665, 668 (2d Cir.1977)). However, in the instant matter, the Court's duty to construe *pro se* complaints with "special solicitude" and interpret them to raise the "strongest [claims] that they suggest ...," *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474–75 (2d Cir.2006) (per curiam) (citations omitted), leads it to deem the Amended Complaint to be a supplement to the original complaint.

While the same individuals are named as defendants in both complaints, and the claims asserted all pertain to the medical treatment plaintiff received at Southport, the Court's review of the complaints, particularly with respect to the dates of the alleged violations of plaintiff's rights, indicates that the Amended Complaint was intended to assert an additional claim or claims rather than restate or amend the claims asserted in the original Complaint. The Court will accordingly direct the Clerk of the Court to re-designate the Amended Complaint as the "Supplemental Complaint," and will thus refer in this Order to both the Complaint (Docket No. 1) and the Supplemental Complaint (Docket No. 5).

As noted, plaintiffs claims all relate to his medical treatment at Southport, specifically to the medications he was prescribed. In the Second Claim of the Complaint, from which (as explained below) the First Claim stems, plaintiff alleges that on July 17, 2011 he was seen by defendant Southport physician Benjamin Oaks concerning the medications Flexeril and Voltaren, which were not working to alleviate his pain; in addition, he states that he had been on Flexeril since May, 2010 even though, he claims, it should only be used for two or three weeks. The Second Claim further alleges that plaintiff had previously, on June 3, 2011, seen defendant facility physician Wesley Canfield, who had informed him that his "psoas minor tendon" was the cause of his pain, and placed him on Flexeril and Indocin "which I was already on but on a lower dose." Plaintiff states, as the constitutional basis for the First Claim, denial of medical treatment in violation of the Eighth Amendment.

The First Claim of the Complaint, which names Nurse Administrator John VonHagen, Deputy Superintendent of Programs Angela Bartlett and Superintendent Griffen as defendants, alleges that on December 12, 2011, the defendants "granted my grievance for the pain medication

for my back not working & not having the doctors giving me proper medical treatment." Plaintiff states, as the constitutional basis for his claim against these defendants, "failure to protect."

**\*3** The First Claim of the Supplemental Complaint alleges that on December 7, 2009, defendants Drs. Oaks and Canfield had both prescribed muscle relaxants and anti-inflammatory drugs which had not helped him with the pain that he was suffering, and asserts denial of medical treatment as the basis for the claim.

The Second Claim of the Supplemental Complaint, which names VonHagen, Bartlett and Griffen as defendants, alleges that defendants Drs. Oaks and Canfield had continued plaintiff on Flexal [1] for a year and a half even though he was supposed to be on it for 2–3 weeks. It would appear, given that plaintiff states "failure to protect" as the basis of the Second Claim against defendants VonHagen, Bartlett and Griffen, that he is attempting to allege supervisory liability against these defendants for Drs. Oaks and Canfield's prescription of Flexal.

### DISCUSSION

A claim for denial of medical care rises to the level of a constitutional violation only where the facts alleged show that a defendant was deliberately indifferent to a plaintiff's serious medical needs. *See Estelle v. Gamble,* 429 U.S. 97, 104–05, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976); *Ross v. Kelly,* 784 F.Supp. 35, 43–44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828, 121 L.Ed.2d 698 (1992). This standard has both an objective and subjective component. Plaintiff's medical needs must be objectively serious. "A serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.' " *Harrison v. Barkley,* 219 F.3d 132, 136–137 (2d Cir.2000) (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks omitted)). In *Harrison,* the Second Circuit pointed out that

> [medical] conditions ... vary in severity and ... a decision to leave a condition untreated will be constitutional or not depending on the facts of the particular case. Thus, a prisoner with a hang-nail has no constitutional right to treatment, but if prison officials deliberately ignore

an infected gash, "the failure to provide appropriate treatment might well violate the Eighth Amendment."

*Id.* (quoting *Chance,* 143 F.3d at 702). *Compare Chance* (finding serious dental need where plaintiff alleged that he suffered extreme pain, his teeth deteriorated, and he had been unable to eat properly) and *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996) (deprivations of needed eyeglasses may produce consequences that "adequately meet the test of 'suffering' [under] *Gamble*' ), *with Banks v. Mannoia,* 890 F.Supp. 95, 99 (N.D.N.Y.1995) ("The serious medical need requirement contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain").

For his claim to survive this initial review, plaintiff must also adequately allege that the prison official had actual knowledge of plaintiffs serious medical needs, but was deliberately indifferent. *See Farmer v. Brennan,* 511 U.S. 825, 837,114 S.Ct. 1970, 1978–79, 128 L.Ed.2d 811 (1994); *Brock v. Wright,* 315 F.3d 158 (2d Cir.2003); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). "[N]ot every lapse in prison medical care will rise to the level of a constitutional violation." *Smith v. Carpenter,* 316 F.2d 178, 184 (2d Cir.2003). Also, mere disagreement over the proper treatment does not create a constitutional claim because prison officials have broad discretion in determining the type and extent of medical treatment given to inmates. *Thomas v. Pate,* 493 F.2d 151, 157 (7th Cir.1974), *cert. denied,* 423 U.S. 877, 96 S.Ct. 149, 46 L.Ed.2d 110 (1975).

**\*4** In the instant matter, even crediting plaintiff's allegations that he suffered from pain and that the medications the defendant physicians prescribed for him did not work, and assuming that the resulting failure to adequately relieve his pain constituted a serious medical condition, there are no allegations of acts or failures to act that would demonstrate deliberate indifference to plaintiff's medical needs in violation of the Eighth Amendment. Plaintiff does not allege that the defendant physicians ignored his condition or refused to prescribe medications to relieve his pain and discomfort. To the contrary, as recited above, the allegations of the Complaint and Supplemental Complaint state that Drs. Oaks and Canfield examined him, advised him of the cause of the pain he was suffering, and prescribed muscle relaxing and anti-inflammation drugs. Plaintiff's allegations also indicate that his prescriptions were changed and the dosage of one medication was

reduced when he met with Dr. Canfield in June, 2011, and that the administration of *Flexeril* was in fact terminated in December, 2011. Plaintiff's contention that the prescriptions were not effective, or that he was kept on one or more of the drugs for a longer period than might be recommended or advisable amount to nothing more than plaintiff's disagreement with the method or duration of treatment. Such disagreements are insufficient to establish a basis for an Eighth Amendment indifference claim which requires, as indicated above, more than a showing of negligence. *See, e.g., Reyes v. Gardener,* 93 Fed. Appx. 283, 285 (2d Cir.2004) (mere disagreement regarding appropriate prescription treatment is insufficient to establish deliberate indifference); *Morrishaw v. Druger,* 09–CV–527 (DNH/DRH), 2010 U.S. Dist. LEXIS 67606, at *8–9, 2010 WL 2400429 (N.D.N.Y. May 25, 2010) (Magistrate's Report) ("To the extent that Morrishaw is claiming that, when he advised Dr, Druger that the drops were making his eyes blurry, another prescription should have been ordered, such contentions are nothing more than a disagreement in the method of treatment. Such disagreements are insufficient to establish a basis for an Eighth Amendment claim.... At worst, it could be argued that Dr. Druger's provision of the eye drops was negligent given Morrishaw's complaints of blurriness. However, such contentions are still insufficient to support an Eighth Amendment claim."); *Gipson v. LaPlante,* 09–CV–1188(RNC), 2010 U.S. Dist. LEXIS 14685, at *3–4, 2010 WL 670228 (D.Conn. Feb. 19, 2010) ("Even assuming [the defendant physician] erred in prescribing *Bactrim* in the first instance, in continuing to use it, and in simultaneously ordering *Loperamide,* mere negligence in treating a medical condition does not violate the Eighth Amendment, and there is no indication that [the defendant] acted with a more culpable state of mind akin to criminal recklessness.").

Accordingly, the Court determines that plaintiff's claims against defendants Dr. Oakes and Dr. Canfield must dismissed for failure to state a claim pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A.

**\*5** Inasmuch as plaintiff's "failure to protect" claims in both complaints against supervisory defendants— namely, Superintendent Griffen, Deputy Superintendent of Programs Bartlett and Nurse Administrator VonHagen —are premised upon plaintiff's claims that Dr. Oakes and Dr. Canfield were deliberately indifferent to his serious medical needs, the dismissal of those claims requires the

dismissal of the claims against these defendants as well. Even if the Court determined that plaintiff's allegations against Drs. Oates and Canfield established a denial of medical treatment claim, to the extent that plaintiff's assertion that defendants Griffen, Bartlett and VonHagen failed to protect him can be construed as alleging that they should have intervened in Drs. Oaks and Canfield's treatment of him, his allegations would still fail to state a claim against these three defendants. Superintendents and deputy superintendents like defendants Griffen and Bartlett "are not generally involved in the treatment of inmates ...," *Kemp v. Wright,* 01 CV 562(JG), 2005 U.S. Dist. LEXIS 6624, at *25, 2005 WL 893571 (S.D.N.Y. Apr. 19, 2005), and it is generally reasonable for non-medical personnel to rely on qualified medical staff to deal with an inmate's medical needs. *Id.,* 2005 U.S. Dist. LEXIS 6624, at *26, 2005 WL 893571 (citing *McKenna v. Wright,* 386 F.3d 432, 437 (2d Cir.2004); *see also, Cuoco v. Moritsugu,* 222 F.3d 99, 111 (2d Cir.2000) ("Cuoco was under medical treatment. Cuoco suggests no basis on which to conclude that Moore or Hershberger should have challenged the responsible doctors' diagnosis. One can imagine the repercussions if non-medical prison officials were to attempt to dictate the specific medical treatment to be given to particular prisoners-for whatever reason. It was, as a matter of law, objectively reasonable for Moore and Hershberger not to have done so with respect to Cuoco"). Moreover, a prerequisite for liability under § 1983 is personal involvement by the defendants in the alleged constitutional deprivation. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997); *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986). "Mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (citing *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

Plaintiff's allegations in the instant matter do not suggest any reason why Griffen or Bartlett should have intervened in the medical treatment prescribed by Drs. Oaks and Canfield, nor does plaintiff allege any personal involvement by them in his medical treatment. Moreover, to the extent that the First Claim of the Complaint alleges that they, together with defendant VonHagen, granted his grievance with respect to his complaint about the effectiveness of the pain medication he had been prescribed, this result would indicate that the defendants *did* protect plaintiff when the matter properly came to their attention. Plaintiff does not allege any personal involvement with respect to defendant Nurse Administrator VonHagen.

### CONCLUSION

**\*6** Plaintiff has met the statutory requirements of 28 U.S.C. § 1915(a) and filed an Authorization with respect to the filing fee. Accordingly, plaintiffs request to proceed *in forma pauperis* is granted. Plaintiff's Amended Complaint will be re-designated and re-docketed by the Clerk of the Court as a Supplemental Complaint. For the reasons discussed above, the Complaint, including the Supplemental Complaint, is dismissed with prejudice pursuant to 28 U .S.C. §§ 1915(e)(2)(B)(ii) and 1915A. Plaintiff is forewarned that his right to pursue further relief in federal court at public expense will be greatly curtailed if he has three actions or appeals dismissed under the provisions of 28 U.S.C. §§ 1915(e)(2)(B) and 1915A. *See* 28 U.S.C. § 1915(g).

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a) (3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

### ORDER

IT HEREBY IS ORDERED, that plaintiffs request to proceed *in forma pauperis* is granted;

FURTHER, that the Clerk of the Court is directed to re-docket plaintiff's Amended Complaint (Docket No. 5) as plaintiff's Supplemental Complaint;

FURTHER, that the Complaint is dismissed with prejudice; and

FURTHER, that leave to appeal to the Court of Appeals as a poor person is denied.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4464861

Footnotes

1     It is unclear whether plaintiff is referring to the same or different drugs when he objects to having been placed on Flexeril (Complaint) and Flexal (Supplemental Complaint). They are different drugs, though both are apparently muscle relaxants. *See* http:// www.druos.com/cdi/flexeril.html (Drug Information Online/Drugs.Com., entry on Ftexeril; http:// www.flexyx.com/F/Flexal .html (Flexyx drug information, entry on Flexal).

---

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 1606753
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

David DECAYETTE, Plaintiff,
v.
Glenn S. GOORD, et al., Defendants.

No. 9:06–CV–783.
|
June 8, 2009.

West KeySummary

1    **Federal Civil Procedure**
        👈 **Civil Rights Cases in General**
        Genuine issue of material fact as to whether
        prison official had a reasonable opportunity
        to intervene in an incident precluded summary
        judgment in favor of inmate who brought a
        § 1983 action against a prison official who
        allegedly failed to intervene while other prison
        officials where beating inmate in violation
        of his Eighth amendment right. There were
        multiple issues of fact, including whether the
        other prison officials actually beat inmate,
        and if so whether prison official observed
        the beating, and if she observed the beating,
        whether she was capable of preventing or
        mitigating it. U.S.C.A. Const.Amend 8 42
        U.S.C.A. § 1983.

        Cases that cite this headnote

**Attorneys and Law Firms**

David Decayette, Romulus, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the
State of New York, Christina L. Roberts–Ryba, Esq., of
Counsel, New York, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

 **\*1**  This matter brought pursuant to 42 U.S.C. § 1983
was referred to the Hon. George H. Lowe, United
States Magistrate Judge, for a Report–Recommendation
pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

The Report–Recommendation dated March 31, 2009
recommended that Defendants' motion be granted in part
and denied in part. On April 21, 2009, Plaintiff filed
an objection to the Report–Recommendation. Plaintiff's
objection focused primarily on the dismissal of the
Complaint against Defendant Commissioner Goord for
lack of sufficient personal involvement. On May 19,
2009, Defendant Volpe filed an objection to the Report–
Recommendation on the grounds that the action against
her should be dismissed in its entirety.

When objections to a magistrate judge's Report–
Recommendation are lodged, the Court makes a *"de
novo* determination of those portions of the report or
specified proposed findings or recommendations to which
objection is made." *See* 28 U.S.C. § 636(b)(1). After such a
review, the Court may "accept, reject, or modify, in whole
or in part, the findings or recommendations made by
the magistrate judge. The judge may also receive further
evidence or recommit the matter to the magistrate judge
with instructions." *Id.*

Having reviewed the record *de novo* and having
considered the issues raised in Plaintiff's and Defendant's
objections respectively, with the exception of the Eighth
Amendmente claim of inadequate medical care against
Defendant Volpe, this Court has determined to accept
the recommendations of Magistrate Judge Lowe for the
reasons stated in the Report–Recommendation.

For a plaintiff to succeed on a claim of inadequate
medical care in violation of the Eighth Amendment, two
factors must be shown: (1) that the plaintiff's medical
need was sufficiently serious; and (2) that the defendant
was deliberately indifferent to that serious medical need.
*Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50
L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d
698, 702 (2d Cir.1998). A plaintiff's medical need is
deemed sufficiently serious under an Eighth Amendment
claim if, looked at objectively, it is "a condition of
urgency, one that may produce death, degeneration, or
extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66

(2d Cir.1996) (citations omitted). A defendant acts with deliberate indifference when she "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference." *Id.*

Plaintiff has failed to show that the alleged injuries present at the time of his interactions with Defendant Volpe were sufficiently serious to satisfy the first prong. While it is unclear from Plaintiff's testimony whether Defendant Volpe was present at the time that the alleged injuries were suffered (Dkt. No. 36–4, at 43, lines 7–23), or whether she was brought into the room shortly thereafter, this distinction is immaterial to this claim. Plaintiff admits that his visible injuries were limited to cuts, bruises and swelling. Dkt. No. 36–4, at 49, lines 12–18. Injuries of this nature are not conditions of urgency that threaten death, degeneration or extreme pain. *Hickey v. City of New York,* No. 01–Civ. 6506(GEL), 2004 WL 2724079, *16 (S.D.N.Y. Nov. 29, 2004) (holding that cuts and bruises do not constitute sufficiently serious medical needs). Moreover, during a meeting with medical personnel on August 5, 2004, which was seven days after the alleged assault, the only injury complained of by Plaintiff was back pain (Dkt. No. 36–4, at 48, 49). Plaintiff admits that his back pain was caused by a 2002 bus accident, and does not allege that it was exacerbated by the incident in question. Dkt. No. 36–4, at 15–16. Accordingly, Plaintiff has failed to demonstrate that he had a sufficiently serious medical need.

**\*2** Assuming, *arguendo,* that Plaintiff's alleged injuries were sufficiently serious, Plaintiff has provided insufficient evidence that Defendant Volpe both knew of and disregarded any such injuries. Plaintiff alleges that he currently suffers nerve damage in his groin area as a result of the alleged assault. Dkt. No. 36–4, at 9. However, the evidence provided by Plaintiff is insufficient to show that Defendant Volpe either knew of or disregarded such injury during her encounters with Plaintiff on or about July 29, 2004 and July 31, 2004.

The first interaction between Defendant Volpe and Plaintiff occurred on July 29, 2004. Dkt. No. 36–12, at 7. According to Plaintiff, Defendant Volpe was either in the room during the alleged assault, or she was brought into the room immediately thereafter. Dkt. No. 36–4, at 43, lines 7–23. However, Plaintiff does not allege that he notified Defendant Volpe of any specific injuries, including to his groin, during this interaction. Further, the fact that Plaintiff was wearing undershorts during this interaction suggests that, even upon visual inspection, Defendant Volpe would likely have been unable to observe an injury to Plaintiff's groin. While Plaintiff does allege to have had blood visible in his underwear, he did not notice this blood until July 31, 2004 (Dkt. No. 1, at 6), approximately two days after his initial interaction with Defendant Volpe. Accordingly, there is an insufficient basis upon which to conclude that Defendant Volpe was aware of Plaintiff's alleged groin injury at the time of their initial interaction.

The second interaction between Defendant Volpe and Plaintiff occurred on or about July 31, 2004. Dkt. No. 36–4, at 43. On this date, Plaintiff alleges that he noticed blood in his underwear and notified Capt. Felix. Dkt. No. 1, at 5–6. Plaintiff was subsequently removed from his cell to be photographed and inspected. *Id.* Shortly thereafter, Defendant Volpe attended to Plaintiff and attempted to retrieve a urine sample from him. Dkt. No. 36–4, at 43. Plaintiff states that he was unable to provide a urine sample at that time, and that another nurse obtained a urine sample from him the following day. Dkt. No. 36–4, at 46, lines 5–13. Plaintiff admits that he saw medical staff on the day that he was removed from his cell to be inspected and photographed, which was the same day that Defendant Volpe attempted to retrieve his urine sample. Dkt. No. 36–4 at 46–47. Further, Plaintiff admits that he has received consistent medical care from a urologist from the time of the alleged assault to the present date. Dkt. No. 36–4, at 10. As such, there is insufficient evidence to suggest that Defendant Volpe disregarded Plaintiff's injuries once she became aware of the possibility that they may exist.

For the foregoing reasons, Plaintiff has not provided sufficient evidence upon which a fair minded trier of fact could reasonably conclude that he sustained sufficiently serious injuries, or that Defendant Volpe acted with deliberate indifference to a serious injury of which she was aware.

**\*3** It is therefore

**ORDERED** that summary judgment be granted dismissing all claims against Defendants Goord, Allard, Berry, Meeks, Martin, and Sugg; and it is further

**ORDERED** that summary judgment be granted dismissing the Eighth Amendment claim of inadequate medical care against Defendant Volpe; and it is further

**ORDERED** that Defendant Volpe's motion for summary judgment be denied as to the Eighth Amendment claim of failure to intervene.

The case shall proceed to trial against Defendant Volpe on Plaintiff's Eighth Amendment claim of failure to intervene, against Defendants Schewnki and Roberts on Plaintiff's Eighth Amendment claims of excessive force, and against Defendants Schewnki and Roberts on Plaintiff's First Amendment retaliation claims.

**IT IS SO ORDERED.**

### *REPORT–RECOMMENDATION AND ORDER*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Thomas J. McAvoy, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Generally, David Decayette ("Plaintiff") alleges that in July and August of 2004, while he was incarcerated at the Franklin Correctional Facility ("Franklin C.F."), ten employees of the New York State Department of Correctional Services ("DOCS") violated certain of his constitutional rights. (*See generally* Dkt. No. 1 [Plf.'s Compl.].) Currently pending before the Court is Defendants' motion for partial summary judgment [1] pursuant to Fed.R.Civ.P. 56. (Dkt. No. 36.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND

### A. Summary of Plaintiff's Complaint
Liberally construed, Plaintiff's Complaint alleges as follows. (Dkt. No. 1.) Plaintiff and another inmate (identified in subsequent pleadings as inmate Rashad) were transferred to Franklin C.F. on or about the same

day. Certain of Rashad's personal property was missing. On or about July 13, 2004, Defendants Sgt. Berry and Corrections Officer Sugg confiscated certain of Plaintiff's personal property. These Defendants permitted Rashad, who was gang affiliated, to view Plaintiff's personal property, including personal photographs.

In his Memorandum of Law submitted in opposition to Defendants' summary judgment motion, Plaintiff alleges that although Rashad's property was not found among Plaintiff's property, Rashad nevertheless believed that Plaintiff possessed it. Rashad threatened Plaintiff, claiming that while viewing Plaintiff's personal property he had obtained information concerning Plaintiff's family and their address. Rashad warned of "serious problems" if he did not get his property back. Dkt. No. 39, at 8–9. [2]

In his Complaint Plaintiff alleges that he subsequently filed a grievance concerning this matter. It appears that the grievance was in the form of a letter to Defendant Goord, then the Commissioner of DOCS. Upon the recommendation of Defendant Goord, Plaintiff was interviewed by Defendant Lt. Meeks. Defendant Berry gave Plaintiff "an ultimatum [to] re-write and sign a statement informing Comm. Goord that there was a misunderstanding." Dkt. No. 1, at 2. Plaintiff declined to do so, and he was issued a false misbehavior report.

**\*4** Without being given a formal hearing on the report Plaintiff was taken to the Special Housing Unit ("SHU"). Upon his arrival at SHU he was confronted by Defendants Sgt. Schewnki, Corrections Officer Roberts, and an unidentified Corrections Officer. They "started reminding the plaintiff about the incident with the statement that he refused to write," (Dkt. No. 1, at 4), and then they beat him. He suffered significant injuries and endured severe pain, but he was denied medical treatment.

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment
Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining

whether a genuine issue of material [3] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [4]

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." [5] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [6] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [7]

Where a plaintiff has failed to respond to a defendant's properly filed and facially meritorious memorandum of law (submitted in support of its motion for summary judgment), the plaintiff is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court. [8] Stated another way, where a defendant has properly filed a memorandum of law (in support of a properly filed motion for summary judgment), and the plaintiff has failed to respond to that memorandum of law, the only remaining issue is whether the legal arguments advanced in the defendant's memorandum of law are *facially meritorious.* [9] A defendant's burden in making legal arguments that are facially meritorious has appropriately been characterized as "modest." [10]

Finally, in construing Plaintiff's claims, the Court has afforded Plaintiff's Complaint the liberal construction that all pleadings must be afforded, under Fed.R.Civ.P. 8. *See* Fed.R.Civ.P. 8(f) ("All pleadings shall be so construed as to do substantial justice."). Furthermore, the pleadings of *pro se* litigants are construed with even more liberality than is required under Fed.R.Civ.P. 8, [11] and the Court has done so here. The rationale for extending this special liberality to the pleadings of *pro se* litigants is that, generally, *pro se* litigants are unfamiliar with legal terminology and the litigation process.

## III. ANALYSIS

### POINT I

**The claims against Defendants Goord and Allard should be dismissed because of a lack of personal involvement.** [12]

**\*5** " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ). [13] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant. [14] If the defendant is a supervisory official, such as a DOCS Commissioner or a correctional facility superintendent, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct. [15] In other words, supervisory officials may not be held liable merely because they held a position of authority. [16] Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. [17]

With respect to Defendant Goord, in 2004 he was the Commissioner of DOCS. Dkt. No. 1 at 1. Defendant Allard was the Superintendent of Franklin C.F. *Id.* In his Complaint Plaintiff alleges that he "wrote a letter" to them, [18] advising them as to what had occurred and his concerns. *Id.,* at 2–3. In his "Statement Pursuant to Rule 7.1(a)(3)," Plaintiff alleges that Goord "ordered an investigation into the incident." Dkt. No. 39, at 3. The investigation was conducted by Defendant Meeks. Dkt. No. 1, at 2; Dkt. No. 39, at 4; Dkt. No. 36–7, at 2–3.

The foregoing does not constitute personal involvement in the alleged constitutional violations. "Defendant Goord was, during the time in question, entitled to (1) refer letters

of complaint to subordinates ..., and (2) rely on those subordinates to conduct an appropriate investigation and response." *Fletcher v. Goord,* 07–CV–0707, 2008 WL 4426763, at * 17 (N.D.N.Y. Sept.25, 2008) (Sharpe, J., adopting Report–Recommendation by Lowe, M.J., on *de novo* review); *see also Cabassa v. Gummerson,* 01– CV–1039, 2008 WL 4416411, at *7 (N.D.N.Y. Sept.24, 2008) (Hurd, J., adopting Report–Recommendation by Lowe, M.J. on *de novo* review) ("[A]s the superintendent of Auburn C.F., Defendant Walker was entitled to rely on his subordinate correctional officers (including the three members of the Periodic Review Committee) to conduct an appropriate investigation of an issue at the facility, without personally involving Defendant Walker in that issue."); *Garvin v. Goord,* 212 F.Supp.2d 123, 126 (W.D.N.Y.2002) ("[W]here a commissioner's involvement in a prisoner's complaint is limited to forwarding of prisoner correspondence to appropriate staff, the commissioner has insufficient personal involvement to sustain a § 1983 cause of action."); *cf. Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (DOCS Commissioner was not personally involved in alleged constitutional violation where he forwarded plaintiff's letter of complaint to a staff member for decision, and he responded to plaintiff's letter inquiring as to status of matter).

**\*6** Accordingly, it is recommended that summary judgment be granted in favor of Defendants Goord and Allard, dismissing the Complaint as against them.

### POINT II

### The conduct of Defendants Berry and Sugg in the examination of Plaintiff's personal property did not amount to a constitutional violation. [19]

As indicated above, Plaintiff and another inmate ("Rashad") were transferred to Franklin C.F. on the same day. Certain of Rashad's personal property was missing. Plaintiff alleges that "Defendants Berry and Sugg elected to allow inmate Rashad to go through Plaintiff's property to look for his missing items." Dkt. No. 39, at 2. Plaintiff's objection appears to be that Berry and Sugg alone should have examined his property and taken an inventory to ascertain whether Rashad's missing property was included with his. *Id.,* at 2–3. Berry and Sugg have declared under oath that at no time did they "allow the plaintiff's property

to be viewed by inmate Rashad or any other inmate." Dkt. No. 36–8, at 2; *see also* Dkt. No. 36–11, at 2–3. In addition, Plaintiff has no non-hearsay evidence to support his claim that Rashad examined his property. Dkt. No. 39, at 3. Finally, Plaintiff has not even alleged, not to mention proffered admissible evidence, that Berry and Sugg knew or should have known that Rashad subsequently would threaten Plaintiff.

In any event, even assuming *arguendo* that Plaintiff's version of the events is correct, there were no constitutional violations. With respect to the Fourth Amendment, it provides that "[t]he right of the people to be secure in their persons ... against unreasonable searches ... shall not be violated." U.S. Const. amend IV. "What is reasonable, of course, depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (internal quotation marks and citation omitted). "Thus, the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Skinner,* 489 U.S. at 619 (internal quotation marks and citations omitted). In so doing, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (citations omitted), *accord, Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). The Fourth Amendment's proscription against unreasonable searches does not apply *at all* within the confines of a prison cell. *Hudson v. Palmer,* 468 U.S. 517, 526, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). Therefore, Plaintiff has not stated a Fourth Amendment claim.

With respect to the Eighth Amendment, generally, to prevail on a claim of inadequate prison conditions, a plaintiff must show two things: (1) that the conditions of his confinement resulted in deprivation that was *sufficiently serious;* and (2) that the defendant acted with *deliberate indifference* to the plaintiff's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005). "[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence." *Farmer,* 511 U.S. at 835. Here, again assuming *arguendo* that Plaintiff's

version of the events is correct, for Defendants Berry and Sugg to have allowed Rashad to go through Plaintiff's property to look for his missing items, at a point in time when they had no reason to anticipate the alleged subsequent events, clearly was not a serious deprivation. Similarly, their conduct, at the most, was negligent, and not deliberately indifferent.

**\*7** Accordingly, it is recommended that summary judgment be granted in favor of Defendants Berry and Sugg, dismissing Plaintiff's claims based upon the examination of his personal property.

### POINT III

**Plaintiff's excessive force claims against
Defendants Allard, Meeks, Berry,
Sugg, and Martin should be dismissed.**

In his Complaint Plaintiff alleges that the aforementioned Defendants, along with Defendants Schewnki and Roberts (and John Doe), "wantonly and with malice assaulted and battered him." Dkt. No. 1, at 7. However, in his "Statement Pursuant to Rule 7.1(a) (3)," Plaintiff stated that Defendants Roberts and Schewnki (and John Doe) "beat him"; "those were the only Defendants that beat Plaintiff." Dkt. No. 39, at 5. His deposition testimony was consistent with these statements. Dkt. No. 36–4, at 26–33.

Defendants Schewnki and Roberts have not moved for summary judgment on Plaintiff's excessive force claims. Dkt. No. 36–13, at ii (ftn.1). Given Plaintiff's concession that only Defendants Schewnki and Roberts allegedly beat him, it is recommended that summary judgment be granted in favor of all other Defendants, dismissing as against them Plaintiff's Eighth Amendment excessive force claims.

### POINT IV

**Triable issues of fact exist as to whether Defendant Volpe
was deliberately indifferent to a serious medical need.**

To prevail on an Eighth Amendment claim of inadequate medical care, a plaintiff must show two things: (1) that

the plaintiff had a *sufficiently serious* medical need; and (2) that the defendant was *deliberately indifferent* to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). To be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting) (citations omitted); *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance,* 143 F.3d at 702. With respect to the second prong, "deliberate indifference describes a state of mind more blameworthy than negligence;" it is a state of mind akin to criminal recklessness. *Farmer,* 511 U.S. at 827, 835.

The argument of Defendant Volpe (a Registered Nurse) that Plaintiff's Eighth Amendment claim of insufficient medical care should be dismissed as against her opens with the contention that she "was brought into the room after [Plaintiff] was allegedly assaulted by Defendants Roberts and Schewnki." Dkt. No. 36–13, at 10. In support of this contention, Volpe cites to page 39 of the transcript of Plaintiff's deposition, at lines 22–25. It is dismaying to this Court that Volpe failed to cite to the following questions and answers that appear on the same page of the transcript:

Q: Why is [Volpe] a defendant? Why do you have her listed here as a defendant?

**\*8** A: Because she was—she was—she was in the room at the time during the incident happened and she never entered into the record that she noted that—she noticed that I was bleeding.

Q: She was in the room when you're claiming that the three officers—

A: Right.

Q:—beat you?

A: Right.

Dkt. No. 36–4, at 39, lines 5–15. In his Memorandum of Law[20] Plaintiff states:

Upon Plaintiff's arrival at the S.H.U. Defendant Roberts began to physically assault Plaintiff, and Sgt. Schewnski eventually joined in the assault as Defendant Volpe watched from the doorway.

Dkt. No. 39, at 10. In his "Statement Pursuant to Rule 7.1(a) (3)" Plaintiff states: "during and after he was being beat, he saw Defendant Volpe." Dkt. No. 39, at 5. In short, there clearly is an issue of fact as to whether Defendant Volpe observed the alleged beating. If the trier of fact concludes that she did, and accepts Plaintiff's version of the alleged beating (punching and slapping both sides of his face, punching him in the ribs, kicking him in the groin area; *see* Dkt. No. 36–4 at 32–37) and further accepts Plaintiff's version of his condition following the alleged beating ("multiple bruises, cut above my eye, and as well as blood that was shown to my underwear and stuff like that"; Dkt. No. 36–4, at 47; *see also* Dkt. No. 1, at 3–5), a finding of an Eighth Amendment violation would not be unreasonable.

Accordingly, it is recommended that Defendant Volpe's motion for summary judgment dismissing Plaintiff's Eighth Amendment claim as against her be denied.

### POINT V

**Triable issues of fact exist as to whether Defendant Volpe is liable for failing to intervene during the alleged beating of Plaintiff.**

Liberally construed, based upon the allegations referenced above in Point IV, Plaintiff has asserted a failure to intervene cause of action against Defendant Volpe.

Law enforcement officials can be held liable under § 1983 for not intervening in a situation where another officer is violating an inmate's constitutional rights. *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008). A state actor may be held liable for failing to prevent another state actor from committing a constitutional violation if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.; see also Ricciuti v. N.Y.C. Transit Authority,* 124 F.3d 123, 129 (2d Cir.1997) ("Failure to intercede to prevent an unlawful arrest can

be grounds for § 1983 liability.") Whether an officer can be held liable on a failure to intervene theory is generally a question of fact for the jury to decide. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1992) ( "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.").

**\*9** Here there are multiple issues of fact, including whether Defendants Schewnki and Roberts beat the Plaintiff, if so whether Defendant Volpe observed the beating, and if so whether she was capable of preventing or mitigating it. Accordingly, it is recommended that dismissal of Plaintiff's Eighth Amendment failure to intervene claim as against Defendant Volpe be denied.

### POINT VI

**Plaintiff's retaliation claims based upon allegedly false misbehavior reports should be dismissed. [21]**

In order to state a cause of action for retaliation, a plaintiff must plead facts plausibly suggesting that (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)).

In his Complaint Plaintiff alleges that "on or about July 26, 2004, after filing a grievance the plaintiff was interviewed by Lt. Meeks, per recommendation by Comm. Glenn Goord." Dkt. No. 1, at 2. This "grievance" presumably was the letter that he wrote to Defendant Goord. *Id.* at 2–3. In his Memorandum of Law Plaintiff alleges that he "was subjected to retaliation by receiving false misbehavior reports, for exercising his first amendment right to file grievances pertaining to the search for his personal property." Dkt. No. 39, at 8. Again, the only "grievance[ ] pertaining to the search for his personal property" that is reflected in the record is the letter to Defendant Goord.

The Court acknowledges that Plaintiff's right to send a letter of complaint to Defendant Goord was a constitutionally protected activity. *Davis,* 320 F.3d at 352–53. However, first, the only "inmate misbehavior reports" that are reflected in the record were issued by *non-parties. See* Dkt. No. 36, Exhibits B and C. In addition, Plaintiff has proffered no evidence whatsoever that these non-parties were even aware of the existence of his letter to Defendant Goord. Accordingly, there is no party defendant in this action against whom Plaintiff has made a retaliation claim based upon an allegedly false inmate misbehavior report. Furthermore, there is no evidence of a causal connection between the protected conduct, *i.e.,* the letter to Defendant Goord, and the "adverse actions," *i.e.,* the issuance of the inmate misbehavior reports. Therefore it is recommended that summary judgment be granted dismissing Plaintiff's retaliation claims based upon allegedly false misbehavior reports.

### POINT VII

**Triable issues of fact exist with respect to Plaintiff's retaliation claims against Defendants Schewnki and Roberts. [22]**

As noted above, Plaintiff's right to send letters of complaint to Defendant Goord was a constitutionally protected activity. *Davis,* 320 F.3d at 352–53. Also as noted above, Defendants Schewnki and Roberts are not seeking summary judgment on Plaintiff's excessive force claims. Questions of fact clearly exist as to whether they took "adverse action" against him.

**\*10** Finally, on the "causal connection" prong of the retaliation cause of action, in his Complaint Plaintiff alleges, in paragraph "14", that prior to the commencement of the alleged beating, Defendants Schewnki and Roberts "started reminding the plaintiff about the incident with the statement that he refused to write." Dkt. No. 1, at 4. This "incident with the statement that he refused to write" presumably is the one described in paragraph "4" of the Complaint, when Defendant Berry allegedly gave Plaintiff "an ultimatum [to] re-write and sign a statement informing Comm. Goord that there was a misunderstanding." *Id.,* at 2. In short, there clearly are triable questions of fact as to whether there was a causal connection between Plaintiff's letter to Defendant Goord

and the alleged beatings by Defendants Schewnki and Roberts. Accordingly, it is recommended that Plaintiff's First Amendment retaliation claims against Defendants Schewnki and Roberts proceed to trial.

### POINT VIII

**Plaintiff's Fourteenth Amendment Due Process claims should be dismissed. [23]**

In his Complaint Plaintiff alleges that he was not "afforded substantive Due Process" and that his Fourteenth Amendment right "against arbitrary and capricious conduct" [24] was violated. Dkt. No. 1, at 6 and 7. However, as the Supreme Court has repeatedly held, "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth ... Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the [more generalized notion] of substantive due process." *United States v. Lanier,* 520 U.S. 259, 272, n. 7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (citing *Graham v. Connor,* 490 U.S. 386, 392–94 [1989] ). Because the Court has already analyzed Plaintiff's claims under the appropriate specific legal standards, an analysis is not required under the Fourteenth Amendment substantive due process standard.

However, in addition to substantive due process, the Due Process Clause of the Fourteenth Amendment has a procedural component. *Zinernon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property ... *without due process of law." Id.* at 125–126 [internal quotations marks and citations omitted; emphasis in original]. In his Memorandum of Law Petitioner argues that "Defendants Sugg and Berry violated his Procedural Due Process Rights ... against unreasonable searches." Dkt. No. 39, at 8.

"[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dept. of Corr. v. Thompson,* 490 U.S.

454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). Here the Court already has conducted the first step analysis of the conduct of Defendants Berry and Sugg and found no deprivation of a property interest. *See* Point II above. Therefore an analysis is not required under the Fourteenth Amendment procedural due process standard.

**\*11** Accordingly, it is recommended that the Defendants' motion for summary judgment dismissing Plaintiff's Fourteenth Amendment due process claim be granted.

### POINT IX

### Qualified Immunity [25]

The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan,* ––– U.S. ––– , –––, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 812, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). A determination of this issue involves deciding whether the facts that a plaintiff has alleged, or shown, make out a violation of a constitutional right, and whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Pearson,* 129 S.Ct. at 815–16 (citing *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

A right is sufficiently clearly established if 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " *Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007). The following three factors are considered when determining whether a particular right was clearly established at the time a defendant acted:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would

have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992).[26] "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy,* 505 F.3d at 169–70 (citations omitted).[27] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). As the Supreme Court has explained,

> [T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341.

However, when "there are facts in dispute that are material to a determination of reasonableness," dismissal on the basis of a qualified immunity defense is inappropriate. *Thomas v. Roach,* 165 F.3d 137, 143 (2d Cir.1999); *Ali v. Szabo,* 81 F.Supp.2d 447, 461 (S.D.N.Y.2000) ("The Court cannot conclude as a matter of law that [the officers'] conduct was objectively reasonable since there are material issues of fact as to whether [plaintiff] was obeying the officers' order and who started the physical confrontation.").

**\*12** The Court has recommended that Defendant Volpe should not be entitled to summary judgment because triable issues of fact exist as to whether she was deliberately indifferent to a serious medical need of Plaintiff's and as to whether she is liable for failing to intervene during the alleged beating of Plaintiff. Therefore, Defendant Volpe should not be entitled to summary judgment on the defense of qualified immunity. *See Hemphill v. Schott,* 141 F.3d 412, 418 (2d Cir.1998) ("[S]ummary judgment based either on the merits or

on qualified immunity requires that no disputes about material facts remain.") (citations omitted); *Deal v. Yurack,* No. 9:04–CV–0072, 2007 WL 2789615, at *14 (N.D.N.Y. Sept.24, 2007) (Kahn, J.) (adopting Report–Recommendation of Magistrate Judge David E. Peebles, finding that whether "the defendants maintained a good faith belief that their actions did not violate clearly established rights depends on the resolution of fact issues similar to those identified as precluding entry of summary judgment on the merits of plaintiff's retaliation and excessive force claims. As such ... the court is not currently positioned to determine defendant's entitlement to qualified immunity."). [28] Accordingly, I recommend denying summary judgment in this regard.

**ACCORDINGLY,** it is

**RECOMMENDED** that summary judgment be granted dismissing all claims against Defendants Goord, Allard, Berry, Meeks, Martin, and Sugg; and it is further

**RECOMMENDED** that Defendant Volpe's motion for summary judgment be denied; and it is further

**RECOMMENDED** that the case proceed to trial against Defendants Volpe, Schewnki and Roberts on Plaintiff's Eighth Amendment claims of excessive force and failure to intervene, against Defendants Schewnki and Roberts on Plaintiff's First Amendment retaliation claims, and against Defendant Volpe on Plaintiff's Eighth Amendment claim of inadequate medical care; and it is further

**ORDERED** that the Clerk serve copies of the electronically-available-only opinions cited on pages 4, 5, 7, and 20 of this Report–Recommendation on Plaintiff.

**ANY OBJECTIONS to this Report–Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report–Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on** *de novo* **review, will ordinarily refuse to consider arguments, case law and/ or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.** [29]

**BE ALSO ADVISED that the failure to file timely objections to this Report–Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 1606753

Footnotes

1    The motion is made on behalf of all Defendants except Roberts and Schewnki.

2    The page numbers referred to in this Report–Recommendation are those assigned by the ECF system.

3    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

4    *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

5    Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

6    *Matsushita,* 475 U.S. at 585–86; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ....").

7    *Ross v. McGinnis,* 00–CV–0275, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added]. The undersigned will provide a copy of all electronically-available-only opinions in this Report–

Recommendation to Plaintiff in light of the Second Circuit's recent decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

8    N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown ."); N.D.N.Y. L.R. 7.1(a) (requiring opposition to motion for summary judgment to contain, *inter alia,* a memorandum of law); *cf.* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's *response* ... must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so *respond,* summary judgment, if appropriate, shall be entered against the adverse party.") [emphasis added]; *see, e.g., Beers v. GMC,* 97–CV–0482, 1999 U.S. Dist. LEXIS 12285, at *27–31, 1999 WL 325378 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3] ).

9    *Hernandez v. Nash,* 00–CV–1564, 2003 U.S. Dist. LEXIS 16258, at *7–8, 2003 WL 22143709 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b][3], "the court must review the motion to determine whether it is *facially meritorious"* ) [emphasis added; citations omitted] ).

10    *See Ciaprazi v. Goord,* 02–CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

11    *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) ("[C]ourts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest.") [internal quotation marks and citation omitted].

12    Plaintiff failed to respond to Defendants' legal arguments on this point. *See* discussion at pages 4–5 above. Nevertheless the Court has performed an independent review of the record.

13    *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

14    *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

15    *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

16    *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

17    *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

18    Beyond Plaintiff's allegation the record reflects only a letter to Defendant Goord, which was forwarded to Defendant Allard. Dkt. No. 36–7, at 5.

19    Plaintiff failed to respond to Defendants' legal arguments on this point. *See* discussion at pages 4–5 above. Nevertheless the Court has performed an independent review of the record.

20    In an Affidavit Plaintiff swears that "[a]ll statements made by me in my Complaint and associated documents are true." Dkt. No. 39, at 1. Fed.R.Civ.P. 56(e) provides: "When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Here the Court is mindful of the special leniency to be afforded to a *pro se* litigant alleging a civil rights violation.

21    Plaintiff failed to respond to Defendants' legal arguments on this point. *See* discussion at pages 4–5 above. Nevertheless the Court has performed an independent review of the record.

22    Plaintiff has failed to respond to Defendants' legal arguments on this point. *See* discussion at pages 4–5 above. Nevertheless the Court has performed an independent review of the record.

23    Plaintiff has failed to respond to Defendants' legal arguments on this point. *See* discussion at pages 4–5 above. Nevertheless the Court has performed an independent review of the record.

24    "Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrence v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) [internal quotations marks and citations omitted], *aff'g,* 91–CV–1196, Memorandum–Decision and Order (N.D.N.Y. Jan. 26, 1993) (DiBianco, M.J.) (granting summary judgment to defendants in inmate's civil rights action).

25    Plaintiff has failed to respond to Defendants' legal arguments on this point. *See* discussion at pages 4–5 above. Nevertheless the Court has performed an independent review of the record.

26    *See also Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005); *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996); *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *Prue v. City of Syracuse,* 26 F.3d 14, 17–18 (2d Cir.1994); *Calhoun v. New York State Division of Parole,* 999 F.2d 647, 654 (2d Cir.1993).

27    *See also Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") [citation omitted]; *Davis v. Scherer,* 468 U.S. 183, 190, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

28    *See also Jeanty v. County of Orange,* 379 F.Supp.2d 533, 542 (S.D.N.Y.2005) ("[T]he same genuine issues of material fact that preclude summary judgment on plaintiff's excessive force claim, also preclude application of the defense of qualified immunity at the summary judgment stage."); *Dellamore v. Stenros,* 886 F.Supp. 349, 352 (S.D.N.Y.1995) (finding that material factual disputes exist on the issue of qualified immunity for the same reasons that the court denied the motion for summary judgment on the plaintiff's Eighth Amendment excessive force claim).

29    *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *see also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection[ ].") [citations omitted]; *Greenhow v. Sec 'y of Health & Human Servs.,* 863 F.2d 633, 638–39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson–Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990–91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

---

2003 WL 22126764
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Frank GRAHAM, Plaintiff,

v.

Lester N. WRIGHT, etc., et al., Defendant(s).

No. 01 Civ.9613 NRB.
|
Sept. 12, 2003.

State prisoner filed civil rights action under § 1983 against prison officials, alleging violations of the Eighth and Fourteenth Amendments. On defendants' objections to magistrate judge's report and recommendation that their motion to dismiss be granted in part and denied in part, the District Court, Buchwald, J., held that: (1) officials who were not personally involved in the alleged deliberate indifference could not be liable for money damages under § 1983, but (2) prisoner's claim that physicians who treated him failed to timely diagnose his medical condition supported deliberate indifference claim.

Ordered accordingly.

West Headnotes (3)

[1]    **Civil Rights**
       👉 Criminal Law Enforcement;Prisons

Prison official who ultimately denied prisoner's grievance alleging deliberate indifference by medical personnel at correctional facility from which prisoner had been transferred was not personally involved in the alleged deliberate indifference, and thus, he could not be liable for money damages under § 1983 for alleged violation of prisoner's Eighth Amendment rights. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

5 Cases that cite this headnote

[2]    **Civil Rights**
       👉 Criminal Law Enforcement;Prisons

State corrections agency's chief medical officer who implemented guidelines for diagnosis and treatment of Hepatitis C never personally treated prisoner, and thus, he could not be liable for money damages under § 1983 for deliberate indifference to prisoner's medical needs. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

[3]    **Prisons**
       👉 Particular Conditions and Treatments

       **Sentencing and Punishment**
       👉 Medical Care and Treatment

Prisoner's claim that physicians who treated him failed to timely diagnose his Hepatitis C supported Eighth Amendment claim for deliberate indifference to his medical needs; physicians failed to present evidence that medical community had not yet acquired its knowledge of Hepatitis C at time they treated prisoner, such that they could not have knowingly disregarded an excessive risk to prisoner's health or safety. U.S.C.A. Const.Amend. 8.

Cases that cite this headnote

**Attorneys and Law Firms**

Frank Graham, Clinton Correctional Facility-Annex, Dannemora, NY, pro se.

Kevin P. McCaffrey, Assistant Attorney General, New York, NY, for Defendants.

*MEMORANDUM AND ORDER*

BUCHWALD, J.

 **\*1** On October 31, 2001, plaintiff, Frank Graham ("plaintiff" or "Graham"), an incarcerated inmate in the custody of the New York State Department of Correctional Services ("DOCS"), filed this complaint

pursuant to 42 U.S.C. § 1983 alleging violations of the Eighth and Fourteenth Amendments. Specifically, plaintiff, who has been diagnosed with Hepatitis C, alleged in his complaint that the defendants failed to diagnose his condition in a timely manner and to provide him with adequate medical treatment. In addition, plaintiff alleged that DOCS' policy of imposing special requirements for the treatment of inmates diagnosed with Hepatitis C violates the Fourteenth Amendment. On February 4, 2002, defendants moved to dismiss plaintiff's complaint for lack of subject matter jurisdiction and for failure to state claim. On August 22, 2003, Magistrate Judge Pitman issued a Report and Recommendation granting defendants' motion in part and denying it in part. Familiarity with that Report and Recommendation is assumed. On September 8, 2003 defendants filed objections to the Report and Recommendation only with respect to defendants Graceffo, Matthews, and Keane.

We concur with Judge Pitman's decision to dismiss plaintiff's claims for: (1) injunctive relief ordering a liver biopsy and evaluation by a liver specialist; (2) injunctive relief ordering a revision of the DOCS Guidelines; and (3) monetary damages against all of the individual defendants in their official capacity.[1] We also concur with Judge Pitman's decision to deny defendants' motion to dismiss plaintiff's claim for monetary damages against Drs. Graceffo, Makram, Lancellotti, and Milicevic in their individual capacities.[2] We disagree, however, with Judge Pitman's decision to sustain plaintiff's monetary damages claims against defendants Wright[3] and Keane.

**I. Defendant Keane**

[1] While Judge Pitman found that plaintiff sufficiently alleged the requisite "personal involvement" we find that plaintiff's claim against defendant Keane should be dismissed for failure to state a claim. Plaintiff's claim against Keane stems entirely from Keane's review and denial of plaintiff's grievance. To the extent that plaintiff argues that Keane ignored the allegations within his grievance of deliberate indifference by medical personnel at facilities prior to his transfer to the Woodbourne facility, we fail to see how Keane could have responded to and/or remedied these allegations within the framework of the grievance process.[4] Moreover, as to Keane's determination that "plaintiff must use the sick call procedure and obtain a doctor's appointment if he wishes to receive treatment", Plaintiff's Complaint, Ex.

B, Inmate Grievance Response, we note that this determination was unanimously upheld by the Central Office Review Committee "upon a full hearing of the facts and circumstances ... and upon recommendation of the Division of Health Services." *Id.,* Inmate Grievance Program Central Office Review Committee Denial of Grievance. It is well established that supervisory officials are "generally entitled to delegate medical responsibility to facility medical staffs and are entitled to rely on the opinion of medical staff concerning the proper course of treatment." *Abdush-Shahid v. Coughlin,* 933 F.Supp. 168, 183 (N.D.N.Y.1996). In the instant case, plaintiff has not suggested that defendant Keane, as part of his investigation of plaintiff's grievance, failed to appropriately rely on the opinion of medical staff in coming to his determination, nor has he alleged that defendant Keane was deliberate or malicious in his ultimate denial of the grievance. Accordingly, we find that plaintiff has failed to state a claim against Keane and dismiss plaintiff's claim against him in his individual capacity.

**II. Defendant Wright**

**\*2** [2] Plaintiff's claims against defendant Wright, the Associate Commissioner Chief Medical Officer of DOCS, stem from his allegations that he was injured as a result of Wright's implementation of Guidelines for the diagnosis and treatment of Hepatitis C. However, as plaintiff does not allege that he was ever personally treated by Dr. Wright, and as we concur with Judge Pitman's determination that plaintiff lacks standing to challenge the Guidelines' special requirements for the treatment of Hepatitis C, we find that plaintiff cannot sustain a claim against Wright.[5] Accordingly, we hold that defendant's claim for monetary damages against this defendant is dismissed.

**III. Defendants Graceffo and Matthews**

[3] With respect to Graceffo and Matthews, despite defendants' objections, we continue to concur with Judge Pitman's decision to dismiss plaintiff's claims against these defendants. Drs. Graceffo and Matthews treated plaintiff between the years 1990 and 1992. As Judge Pitman indicated in footnote 1 of his Report and Recommendation, there exists a discrepancy with regard to the date on which plaintiff alleges his deliberate indifference claim commenced. Clearly relevant to a proper analysis of the date on which a deliberate

indifference claim accrued is the time frame in which the medical community acquired sufficient knowledge of Hepatitis C so that a failure to diagnose the condition might possibly be an Eighth Amendment violation. Neither party has submitted admissible evidence on the precise time frame in which the medical community acquired its knowledge of Hepatitis C. [6] While defendants may ultimately prevail at the summary judgment stage if the facts show that Drs. Graceffo and Matthews could not, based on the knowledge available to the medical community generally, have knowingly disregarded an excessive risk to plaintiff's health or safety during the period of 1990-1992, we find that it is not appropriate at this time to grant defendant's motion to dismiss plaintiff's claim against these defendants on the pleadings alone.

*CONCLUSION*

For the reasons set forth in this Opinion and in Judge Pitman's Report and Recommendation, we dismiss all claims against the defendants with the exception of plaintiff's claims for monetary damages against Drs. Graceffo, Makram, Lancellotti, and Milicevic in their individual capacities. Having resolved this initial motion, we note that it would assist the resolution of this case, perhaps even by summary judgment, if plaintiff's entire medical record was made available.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 22126764

Footnotes

1   To avoid confusion, we note that there appears to be a typographical error on page 20 of Judge Pitman's Opinion. The sentence which currently reads, "However, plaintiff's claims against the individual defendants in their personal capacity are barred by Eleventh Amendment immunity" should instead read as follows: "However, plaintiff's claims against the individual defendants in their personal capacity are *not* barred by Eleventh Amendment immunity."

2   While we ultimately concur with Judge Pitman's decision to deny defendants' motion to dismiss plaintiff's deliberate indifference claims on the theory that "certain instances of medical malpractice may rise to the level of deliberate indifference", *Hathaway v. Coughlin,* 99 F.3d 550, 553 (1996) we note that in order to survive, plaintiff's deliberate indifference claims against each of these defendants must demonstrate a level of "culpable recklessness" beyond ordinary negligence. *Id. See also Estelle v. Gamble,* 429 U.S. 97, 106 & n. 14, 97 S.Ct. 285, 50 L.Ed.2d 251, (1976); ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.") Thus, while it would be inappropriate to dismiss plaintiff's claims on the merits at this stage, going forward, plaintiff has a heavy burden in order to sustain his claims against these defendants.

3   Defendants have not specifically objected to Judge Pitman's denial of their motion to dismiss plaintiff's claims against defendant Wright.

4   Plaintiff filed his grievance while at the Woodbourne facility. The evidence indicates that Keane did not "ignore" plaintiff's allegations of past deliberate indifference but rather notified plaintiff that his request for a monetary judgment "is not accepted and is not a part of the grievance mechanism." This determination was subsequently affirmed on review by the Central Office Review Committee.

5   As an aside, we note that the portions of the Guidelines challenged by plaintiff, namely that the inmate must successfully complete an ASAT program or at least be concurrently enrolled in such a program and that there must be an anticipated incarceration period for the inmate of at least 12 months appear to be highly rational in light of the fact that severe side effects, including death, may result from treatment of the patient with interferon-alpha-2b or 2a combined with ribavirin for 6-12 months, and that active substance abuse, including alcohol abuse, can cause life threatening consequences to a patient following the treatment regimen.

6   While plaintiff does alleges a time frame in which the medical community became aware of Hepatitis C, he provides no support for this assertion nor does he do so with any degree of precision. *See* Compl. ¶ 19 ("The beginning of defendants deliberate indifference started in 1992-93 when the medical community became aware of the Hep. C virus....")

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4365274
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Patrick GUILLORY, Plaintiff,
v.
Kurt ELLIS, et al, Defendants.

No. 9:11–CV–600 (MAD/ATB).
|
Signed Aug. 29, 2014.

**Attorneys and Law Firms**

Patrick Guillory, Dannemora, NY, pro se.

Office of the New York State Attorney General, The Capitol, Gregory J. Rodriguez, AAG, of Counsel, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

**I. INTRODUCTION**

 *1 Plaintiff, an inmate currently in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), commenced this civil rights action, pursuant to 42 U.S.C. § 1983, on May 31, 2011. See Dkt. No. 1. The remaining claims are that Defendants violated Plaintiff's constitutional rights under the First Amendment's Free Exercise Clause, as well as his rights under the Religious Land Use and Institutionalized Person's Act ("RLUIPA"), and subsequently retaliated against him for attempting to exercise these rights by destroying Plaintiff's mail and thus denying him access to the courts. See Dkt. Nos. 1, 210.

In a very thorough Report–Recommendation dated July 23, 2014, Magistrate Judge Baxter recommended that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's complaint in its entirety. See Dkt. No. 210. Specifically, Magistrate Judge Baxter first found that in relation to the December 7, 2010 incident, Defendant Ready acted within the bounds of his employment and according to the documentation before

him and thus, his inadvertent denial that caused Plaintiff to miss one religious service did not substantially burden Plaintiff's free exercise of his religion. See id. at 14. With regards to the March 20, 2011 incident, Magistrate Judge Baxter found that Defendant Ellis was not responsible for the shortened duration of the Purim celebration, and that while the delay may have been an inconvenience, Plaintiff was still able to participate in the service, thus satisfying the requirements of the First Amendment and RLUIPA. See id. at 19–20. Magistrate Judge Baxter also found that neither Defendant Ellis, nor Defendant Ready engaged in the conduct mentioned above as a way to retaliate against Plaintiff for any grievances that he had previously filed either against them or any other correctional officer. See id. at 39–40. Moreover, Magistrate Judge Baxter found that Defendant Kupiec did not interfere with Plaintiff's mail as a means to either retaliate against him or to deny him access to the courts. See id. 35–36. Finally, Magistrate Judge Baxter found that Plaintiff failed to establish that he suffered an adverse action as a result of Defendant Kupiec's alleged conduct. On August 4, 2014, the Court received objections to the Report–Recommendation from Plaintiff. See Dkt. No. 211.

**II. DISCUSSION**

**A. Plaintiff's objections**
In his objection to Magistrate Judge Baxter's Report–Recommendation, Plaintiff states that he objects to the Report in its entirety. See id. Plaintiff relays his astonishment at Magistrate Judge Baxter's choice to "excuse Def[endant] Kupiec's conduct" and at his finding that Plaintiff's position is "unfounded." See id. Plaintiff further objects to Magistrate Judge Baxter's Report on the grounds that he looked outside the pleadings and "only to the Defendants Affidavits" when making his determination to grant Defendants' motion for summary judgment. See id.

**B. Standard of review**
 *2 A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot

try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56(c)(e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2502, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). "However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* at 295 (citing *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, *1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Cary v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendation made by the magistrate judge." 28 U.S.C. § 636(b) (1).

## C. Application

**\*3** In the present matter, although Plaintiff has filed objections to Magistrate Judge Baxter's Report–Recommendation, the objections that are given are mostly conclusory and "merely recite the same arguments" that were originally presented to Magistrate Judge Baxter. *See O'Diah,* 2011 WL 933846, at *1; *see generally* Dkt. No. 211. Moreover, some of the objections that Plaintiff makes are of an accusatory nature, in that he charges Magistrate Judge Baxter with excusing the behavior of Defendant Kupiec based on her race, and supporting "the Defendants [r]eckless lies." *See* Dkt. No. 211 at 1 ("I'm sure if Kupiec was black you would have treated her like all of the blacks who appear before you who are 'ignorant of the law' "). Nearly all of Plaintiff's "objections" lack the specificity needed to make a *de novo* determination. In light of his *pro se* status, however, the Court will address the arguments raised.

Plaintiff argues that Magistrate Judge Baxter improperly considered disputed facts in rendering his recommendation. *See* Dkt. No. 211 at 3. Having reviewed the Report–Recommendation, the Court finds that Magistrate Judge Baxter correctly relied only on undisputed facts in rendering his determination or construed any disputed facts in Plaintiff's favor in finding that Plaintiff's allegations were insufficient as a matter of law to support his claims. *See, e.g.,* Dkt. No. 210 at 39 (finding that "neither the action allegedly taken by defendant Ready, nor the action allegedly taken by defendant Ellis rises to the level of an 'adverse action' under the case law"). Further, contrary to Plaintiff's allegations, Defendants' motion for summary judgment

was properly supported by the record, including affidavits and deposition transcripts.

Finally, contrary to Plaintiff's assertions, Magistrate Judge Baxter correctly determined that Defendant Boll was not personally involved in the alleged conduct. The letter to which Plaintiff refers clearly establishes that Defendant Boll did not conduct an investigation into the underlying subject of Plaintiff's grievance, but was merely conducting an "investigation" into the status of Plaintiff's grievance and a reminder that the "Inmate Grievance Program was instituted to handle issues such as yours." Dkt. No. 202–6 at Exhibit "A." Defendant Boll then stated that "[t]he CORC will conduct a thorough investigation to assure that your rights are observed and your issues are addressed. If any corrective action is needed, you will be notified. As your appeal to the CORC is pending, it is recommended that you await the decision." *Id.* Magistrate Judge Baxter correctly determined that Defendant Boll's response to Plaintiff was insufficient to establish her personal involvement. *See Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009).

The Court has thoroughly reviewed the parties' submissions and Magistrate Judge Baxter's comprehensive Report–Recommendation and finds that Magistrate Judge Baxter correctly recommended that the Court grant Defendants' motion for summary judgment and dismiss this case.

### III. CONCLUSION

**\*4** After carefully reviewing Magistrate Judge Baxter's Report–Recommendation, the parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Baxter's Report–Recommendation (Dkt. No. 210) is **ADOPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 202) is **GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In this civil rights complaint, plaintiff alleges that defendants subjected him to religious discrimination, denial of access to courts, and retaliation for the exercise of his First Amendment Rights, while he was incarcerated at Mid–State Correctional Facility. (Compl.; Dkt. 1). Plaintiff seeks monetary and injunctive relief.

### I. *Procedural History*

This case has had a long and complicated procedural history, complete with an appeal of the denial of a preliminary injunction to the Second Circuit, which dismissed plaintiff's appeal as lacking an arguable basis in law or fact. [1] (Dkt. No. 133). The court will attempt to briefly state the important aspects of the docket and outline the remaining issues. On October 31, 2012, defendants made a motion for judgment on the pleadings. (Dkt. No. 123). Plaintiff responded in opposition to that motion, but then also made a variety of other motions relating to venue, recusal, and discovery. (Dkt. Nos.119, 139, 140, 144, 145, 149).

On April 3, 2013, I issued an Order and Report–Recommendation, denying some of plaintiff's non-dispositive motions and recommending dismissal of some of his substantive claims on the pleadings. (Dkt. No. 148). On May 15, 2013, Judge D'Agostino affirmed my order and approved my recommendation. (Dkt. No. 155). Judge D'Agostino's order also disposed of plaintiff's Motion Requesting the Court to Take Judicial Notice of Plaintiff's State Court Decision (Dkt. No. 149), his "Motion for Reconsideration," (Dkt. No. 122), and ordered a response

to plaintiff's discovery motion (Dkt. No. 119). (Dkt. No. 155).

After Judge D'Agostino's Order, plaintiff filed additional motions: another Motion to Compel (Dkt. No. 159) and a Motion for Sanctions (Dkt. No. 160). On July 2, 2013, I held a telephonic conference with the parties regarding the outstanding motions, denying in part and granting in part, plaintiff's motions to compel (Dkt.Nos.119, 159); denying his motion for sanctions (Dkt.Nos.160); and finding that no action was necessary on other letters submitted by plaintiff. (Dkt.Nos.161–62). On September 13, 2013, plaintiff made a motion to "stop transfer" and requested that his deposition be held at his current facility, Wyoming Correctional Facility. (Dkt.Nos.173, 175). Plaintiff's transfer to Greene Correctional Facility rendered that motion moot, and it was denied on that basis. (Dkt. No. 178).

**\*5** On October 10, 2013, plaintiff made a motion for injunctive relief and appointment of counsel, which plaintiff later clarified was only a motion for appointment of counsel. (Dkt.Nos.182, 187). This court denied the motion on October 31, 2013, and plaintiff then sent the court a letter stating that he did not wish to be appointed counsel at the time of trial. (Dkt.Nos.189, 190). On January 7, 2014, plaintiff stipulated to the dismissal of all claims against defendants Fischer and Marlenga, which was "so ordered" by Judge D'Agostino on January 8, 2014. (Dkt.Nos.196–97). Defendants filed this summary judgment motion on February 4, 2014. (Dkt. No. 202). Plaintiff responded in opposition to the motion, and requested oral argument. (Dkt. Nos.205, 207). I denied plaintiff's motion for oral argument on April 18, 2014. (Dkt. No. 208).

Presently pending before me is the remaining defendants' motion for summary judgment, together with plaintiff's response in opposition. (Dkt.Nos.202, 205). Based upon Judge D'Agostino's order approving my recommendation on May 15, 2013 (Dkt. No. 155) and the parties' stipulation to dismiss all claims against defendants Fischer and Marlenga, the following defendants and claims remain:

1. A First Amendment Free Exercise Clause claim against defendants Ready and Ellis. (Compl.¶¶ 37–47, 65).

2. A Religious Land Use and Institutionalized Persons Act ("RLUIPA"), claim against defendants Ready and Ellis. (*Id.*)

3. A retaliation claim against defendants Ready and Ellis relating to the above First Amendment and RLUIPA issues.

4. First Amendment retaliation claims against defendant Kupiec relating to the opening, loss, or destruction of plaintiff's mail in retaliation for grievances filed against Kupiec and defendant Ready. (Compl.¶¶ 58–64).

5. A First Amendment denial of access to courts claim against defendant Kupiec. (Compl.¶¶ 67).

## II. *Facts*

Rather than engage in a lengthy discussion of the facts at the outset, the court will discuss the facts associated with each of plaintiff's claim within the relevant sections below.

## III. *Summary Judgment*

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475

U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

## IV. *Religion Claims*

### A. Legal Standards

### 1. First Amendment

**\*6** Inmates have the right under the First and Fourteenth Amendments to freely exercise a chosen religion. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). However this right is not limitless, and may be subject to restrictions relating to legitimate penological concerns. *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990). The analysis of a free exercise claim is governed by the framework set forth in *O'Lone v. Estate of Shabazz,* 482 U.S. 342 (1987) and *Turner v. Safely,* 482 U.S. 78, 84 (1987). This framework is one of reasonableness and is less restrictive than the standard ordinarily applied to the alleged infringements of fundamental constitutional rights. *Ford,* 352 F.3d at 588.

In *O'Lone,* the Supreme Court held that a regulation that burdens a protected right withstands a constitutional challenge if that regulation is reasonably related to legitimate penological interests. 482 U.S. at 349 (quoting *Turner,* 482 U.S. at 89). An individualized decision to deny an inmate the ability to engage in a religious exercise is analyzed under the same standard. *Salahuddin v. Goord,* 467 F.3d 263, 274 n. 4 (2d Cir.2006) (citations omitted). In *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988), the Second Circuit held that to assess a free exercise claim, the court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological interest."

The court must examine whether the challenged action has a legitimate, rational connection to the governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating that right; and the existence of alternative means of facilitating the exercise of that right that have only a *de minimis*

adverse effect on the valid penological interests. *See King v. Bennett,* No. 02–CV–349, 2007 WL 1017102, at \*4 (W.D.N.Y. March 30, 2007) (citing *Salahuddin,* 467 F.3d at 274). Finally, once prison officials state a legitimate penological interest to justify their actions, the burden shifts to plaintiffs to show that the defendants' concerns are "irrational." *Ford,* 352 F.3d at 595.

### 2. Religious Land Use and Institutionalized Persons Act

RLUIPA provides that

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (A) is in furtherance of a compelling governmental interest; and
>
> (B) is the least restrictive means of furthering that compelling governmental interest.

**\*7** 42 U.S.C. § 2000cc–1(a). Under RLUIPA, the plaintiff bears the burden of showing that his religious exercise has been burdened and that the burden is substantial. *Marria v. Broaddus,* 200 F.Supp.2d 280, 297 (S.D.N.Y.2002) (citing 42 U.S.C. § 2000cc–2(b)). The burden then shifts to the government to show that the burden furthers a compelling governmental interest ***and*** that it is the ***least restrictive*** means of achieving that interest. *Id*. The act defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A).

A "substantial burden" is one that places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Singh v. Goord,* 520 F.Supp.2d 487, 498 (S.D.N.Y.2007) (citing, *inter alia, Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996)). Inconvenience alone is insufficient to establish a substantial burden. *Id.* (citing *Westchester Day School v. Village of Mamaroneck,* 379 F.Supp.2d 550, 557 (S.D.N.Y.2005)). Furthermore, the substantial evidence test presupposes that some inconveniences may be so minor that they do not amount to a violation. *See McEachin v. McGuinnis,* 357 F.3d 197, 203 n. 6 (2d Cir.2004) (discussing in a footnote the applicability of the "time-honored maxim '*de minimis non*

*curat lex'* " ). However, the court should not attempt to engage in resolving disputes as to whether a particular practice is "central" or "mandatory" to a particular religion in determining whether a burden was substantial. *See Ford v. McGinnis,* 352 F.3d 582, 593–94 (2d Cir.2003) (discussing First Amendment protections).

## B. Application

### 1. December 7, 2010 Incident:

Plaintiff alleges that defendant Ready denied plaintiff the right to attend Jewish Services for Lubavitch on December 7, 2010, even though he was on the call-out list for the service, and while making disparaging remarks about plaintiff's religion. (Compl.¶¶ 37–47). This court originally recommended denying defendant's motion for judgment on the pleadings, notwithstanding defendants' argument that one interference with plaintiff's religious services would not rise to the level of a constitutional violation. I found, instead, that plaintiff claimed that Ready intentionally denied plaintiff the opportunity to attend this religious service, and that this action was also in retaliation for plaintiff filing a successful grievance against defendants Johnston and Ellis. (Dkt. No. 148 at 13). Based only on the facts as stated by plaintiff, and with a very liberal review by the court, this court recommended denying the motion for judgment on the pleadings.[2] (*Id.* at 14) (this court also noted that it was "unclear" how plaintiff's claims would fare after a well-supported summary judgment motion).

Defendant Ready has submitted a declaration in support of summary judgment. He states that he has been a corrections officer ("CO") at Mid–State since September of 2010. (Ready Decl. ¶ 2) (Dkt. No. 202–3). On December 7, 2010, he was working on Unit 7–2. (*Id.* ¶ 5). His duties included running the desk at the entrance door of Building 7—the Program Building, ensuring that inmates were where they were scheduled to be, and permitting movement as necessary pursuant to "call-out sheets." (*Id.*) When an inmate is listed on a call-out sheet, defendant Ready requires the inmate to sign out from his program, and then he is allowed to go to the "call-out." (*Id.* ¶ 6).

**\*8** Defendant Ready states that on December 7, 2010, plaintiff came to him and stated that he had to leave his program for a "call-out." However, plaintiff's name was not listed on the call-out sheets that defendant Ready was given for that day. (*Id.* ¶ 8). If an inmate's name

is not on the sheet, he is not permitted to go to the "call-out," so defendant Ready informed plaintiff that he had to return to his program because his name was not on the sheet. (*Id.* ¶ 1). Defendant Ready states that he never made any comment about plaintiff's religion. (*Id.* at 11). Plaintiff did not seem upset or angry, did not ask to see a sergeant or supervisor, and "merely complied with [defendant Ready's] instructions and returned to class." (*Id.* ¶ 12).

Defendant Ready states that the only reason that he prevented plaintiff from going to the call-out (religious service) was because his name was not on any of the call-out sheets that he had been given, and defendant Ready was not authorized to allow plaintiff to attend the call-out. (*Id.* ¶¶ 10, 14). Finally, defendant Ready points out that he had just transferred to Mid–State in September of 2010, thus, he was not aware of plaintiff's September 2010 grievance when Ready did not allow plaintiff to attend the religious service on December 7, 2010. (*Id.* ¶ 13).

As Exhibit I to plaintiff's complaint, he attaches a copy of the "call-out" for Tuesday, December 7, 2010. Plaintiff's name clearly appears on that call-out. (Compl.Ex. I). Father Robert Weber[3] has filed a declaration in support of defendants' motion for summary judgment, stating that in December 2010, he was the Coordinating Chaplain at Mid–State. (Weber Decl. ¶ 3) (Dkt. No. 202–7). Father Weber states that when he arrived at work on December 7, 2010, he realized that there was no call-out for the Lubavitch Youth Organization, members of which were visiting the Jewish inmates for Chanukah. (*Id.* ¶ 6). In an attempt to rectify this error, Father Weber "caused a callout to be generated with the names of those inmates who regularly attend Jewish Services ." (*Id.* at 7). Although Father Weber states that a copy of the call-out is attached to his declaration as Exhibit A, no such copy is attached. The court will assume that the call-out to which Father Weber refers is the one that is attached to plaintiff's complaint as Exhibit I. (Dkt. No. 1 at 46). Plaintiff's name is on that call-out.

Father Weber then states that, after Deputy Superintendent for Programs ("DSP") Phillips approved the call-out, it was "hand-delivered to the Housing Units within the correctional facility." (Weber Decl. ¶ 8). "Inadvertently, the callout was not added to the daily callout packet nor was it delivered to the program areas that day." (*Id.* ¶ 9). Although plaintiff's name certainly

appears on the call-out, unfortunately defendant Ready, who was at the Program Building that day, did not have that call-out in front of him when plaintiff approached to ask about going to services, and defendant Ready was justified in refusing to let plaintiff attend the services. The Superintendent's investigation of plaintiff's grievance resulted in the same finding:

> **\*9** The facility investigation revealed that the Jewish Services call-out was not submitted with the other scheduled inmate call-outs on the day before (12/6/10), which is normal procedure; therefore, it was not included with 12/7/10 facility call-out packet. The inmate call-out packets are normally distributed to all program areas, housing units as well as other staff/inmate areas the day before the call-outs are scheduled. On the morning of the posted call-out (12/7/10), this error was brought to the attention of the Coordinating Chaplain, who then had the Jewish Services call-out hand delivered to the housing units but not to the program areas. Although the 7–2 officer [Ready] and the grievant's general business instructor [Gruen] reviewed the p.m. call-outs to verify/confirm the grievant's statements, neither staff member would have been aware the grievant was listed on the 12/7/10 Jewish Services call-out scheduled for 2:00 p.m. nor would they have been aware that there was an addition to the original call-out packet because it was never delivered to their program area.

(Compl.Ex. L) (Dkt. No. 1 at 50).[4] This document, attached as an exhibit to plaintiff's complaint, corroborates defendant Ready's and Father Weber's version of the events. Defendant Ready did not intentionally deny plaintiff the opportunity to attend the service on December 7, 2010 because although plaintiff's name was on the call-out list, defendant Ready did not have that list in front of him,[5] and he would not even

have been aware that the list existed because it was not delivered to the program area. This one, clearly inadvertent incident, does not rise to the level of a constitutional violation committed by defendant Ready.[6]

In his response to defendants' motion for summary judgment, plaintiff states that the defendants are lying, and that the call-out was delivered to *"all"* program areas. (Pl.'s Mem. ¶ 10) (Dkt. No. 205–1 at 9). Plaintiff states that he reaches this sweeping *conclusion* because "[t]he location where the Jewish Services [are] held (Building # 101) is *a Program Area,"* and security staff in that area must have had the call-out because they would not have let the thirteen other Jewish inmates in the building. (*Id.*) (emphasis added). If one program area had the call-out, then all the program "areas" must have had the call-out. However, plaintiff's argument misses the point. Defendant Ready was not in Building # 101. He was in Unit 7–2 in Building 7,[7] and the fact that the building in which the religious services were actually held had the call-out,[8] does not "prove" or even raise a question of fact regarding whether the call-out had been sent to the other program areas, in the face of Father Weber's sworn statement that he did not send the call-out to the program areas. Although plaintiff states that Building # 101 is "a" program area, it is not "the" Program Building.[9]

In my prior report, I recommended denying defendants' motion to dismiss on the pleadings, notwithstanding case law holding that missing one religious service does not constitute a substantial burden on the inmate's right to the free exercise of his religion under either under the First Amendment or under RLUIPA. (Dkt. No. 148 at 13) (citing inter alia *Troy v. Kuhlmann,* No. 96 Civ. 7190, 1999 WL 825622, at \* 15 (S.D.N.Y. Oct. 15, 1999)). In granting **summary judgment,** the court in *Troy* stated that "courts in the Second Circuit have held that an inmate's right to practice his religion is not substantially burdened if an inmate missed one religious service for *a valid reason." Id.* (emphasis added). I did not rely on *Troy* in my prior report, because the defendants in this case brought a motion for judgment on the pleadings, and this court was bound by the facts as stated in plaintiff's complaint. Now that defendants have moved for summary judgment, the court may consider material outside the complaint, such as sworn declarations, in determining that, while plaintiff missed one religious service through the actions of defendant Ready, this inadvertent denial

did not substantially burden the plaintiff's free exercise of his religion. In denying plaintiff the opportunity to attend his call-out, defendant Ready acted according to the documentation before him. Even if a mistake were made, it was the lack of proper documentation that caused plaintiff to miss his service. [10] Neither the First Amendment, nor RLUIPA was violated by defendant Ready.

**2. The March 20, 2011 Incident**

 **\*10** The second incident occurred on March 20, 2011, when plaintiff claims that defendant Ellis intentionally cut short a visit from Lubavitch Rabbis who had come from Brooklyn to see plaintiff [11] at the facility. (Compl.¶ 65). Plaintiff claims that he was scheduled to meet with the Rabbis for one and one half hours in order to celebrate the Purim holiday. (*Id.*) Plaintiff claims that defendant Ellis cut the service to a matter of minutes and sent all of the Jewish inmates back to their housing units.

Defendant Ellis has submitted a declaration in support of defendants' motion for summary judgment. (Ellis Decl.) (Dkt. No. 202–5). Kurt Ellis is employed by DOCCS as a Protestant Reverend, and at the time of the declaration, held the position of Chaplain at Mid–State. (Ellis Decl. ¶¶ 1–2). Defendant Ellis states that on March 20, 2011, Rabbi Theodore Max scheduled a Purim celebration in the small chapel at MidState with some members of the Lubavitch organization. (*Id.* ¶ 5). The call-out was approved for 2:30 p.m. on March 20, 2011. Defendant Ellis spoke with Corrections Officer ("CO") Backer, the Building 101 main console officer and explained that the call-out was for 2:30, but that the Rabbi might be late because he was making Purim rounds at other facilities, and a delay was possible. (*Id.* ¶¶ 6–7).

Defendant Ellis states that at approximately 1:45 p.m., he noticed that plaintiff was working in the Law Library, which is adjacent to the Building 101 console. (*Id.* ¶ 8). Defendant Ellis mentioned to CO Backer that plaintiff was on the Purim call-out, but Ellis was not sure if plaintiff would need to go back to his housing unit at the 2:15 "go back" and then return for the Purim call-out. (*Id.*) CO Backer told defendant Ellis that plaintiff would have to go back to his housing unit and then return when it was time for the Purim call-out. (*Id.*)

Defendant Ellis told plaintiff that he knew that plaintiff had "an issue" before, and Ellis wanted to make sure that

plaintiff did not have any trouble that day. (*Id.* ¶ 9). Ellis told plaintiff that, because he was currently signed out for the Law Library, he would have to go back to his housing unit at 2:15 p.m. and then return "when they call for the service." Plaintiff responded that he did not have to go back and asked the Law Library officer whether plaintiff could go directly to the service from the Law Library at 2:30. CO Ippolito, the Law Library Officer gave plaintiff permission to do so. Defendant Ellis states that he left, but informed CO Backer what CO Ippolito told plaintiff, and CO Backer agreed that CO Ippolito "should not have said that." (*Id*.)

Reverend Ellis states that he has no authority over the procedure for "inmate movement" at the facility because movement is a matter of security. (*Id.* ¶ 10). At approximately 2:30 p.m., defendant Ellis went to the small chapel to see if the Rabbi had arrived, but the Rabbi was not there yet. Defendant Ellis went to check with CO Backer. Plaintiff also approached the "security bubble" to check with CO Backer. Plaintiff was told by CO Backer and by defendant Ellis that the Rabbi had not arrived, and plaintiff went back to the Law Library. (*Id.* ¶ 11).

 **\*11** Defendant Ellis then went to see if Rabbi Max had arrived, but was told that the Rabbi had not been seen. Defendant Ellis did his "weekly rounds in the Visitor's Center, signing into the Log Book at 2:45 p.m." (*Id.* ¶ 12). After a brief conversation with a staff member, defendant Ellis saw the Lubavitch volunteers pulling into the parking lot. Defendant Ellis greeted Rabbi Max and continued on his daily rounds, stopping at the Watch Commander's Office to inform him that Rabbi Max had arrived. (*Id.*)

Defendant Ellis states that he was not involved in calling inmates for the Purim Service, nor did he attend the Service on March 20, 2011. [12] Defendant Ellis continued with his daily rounds and did not return to his office until approximately 3:45 p.m ., at which time he noticed the inmates in the small chapel with the Rabbis. (*Id.* ¶ 16). Defendant Ellis states that after the service ended, he spoke to Rabbi Max, who stated that the service went well. (*Id.* ¶ 17). Defendant Ellis states that he was not in charge of the Service, he had no involvement in the time that the Service began or ended, and he did not order the inmates back to their housing units at the conclusion of the Service. (*Id.* ¶¶ 18–20).

Defendants have also submitted the declaration of Rabbi Theodore Max,[13] who states that he is a Chaplain who is responsible for leading the primary congregational worship and prayer services for Jewish inmates. (Max Decl. ¶¶ 1–3). He is assigned to multiple correctional facilities, including Mid–State. (*Id.* ¶ 4). Rabbi Max states that he coordinated the Purim celebration, and he was advised to schedule the call-out for 2:30, even though he was not scheduled to arrive until 2:45 that day. The Service was scheduled to last approximately one hour. (*Id.* ¶¶ 6–7). Rabbi Max states that he was on a "very tight" schedule on March 20, 2011 because he was scheduled to visit "at least three correctional facilities" before his visit to Mid–State. (*Id.*) When he and the members of the Lubavitch organization arrived at Mid–State, there was a long line of visitors, which delayed their entrance into the facility, causing the Purim celebration to begin later than 2:45 p.m. (*Id.* ¶¶ 10–11). Rabbi Max states that pursuant to facility rules, the inmates were still required to return to their cells at 3:45 p.m., and that the Purim celebration ended at that time. (*Id.* ¶ 12).

Plaintiff does not claim that he missed the celebration, only that the celebration was shorter than originally scheduled. Rabbi Max has explained that he arrived late, causing the service to begin later, and run shorter than anticipated. Defendant Ellis had nothing to do with scheduling the event, with Rabbi Max being late, or with shortening the service.

Plaintiff argues that defendant Ellis sent plaintiff back to the law library and the other Jewish inmates back to their housing units, for the purpose of shortening the service. In his response to the motion for summary judgment plaintiff states that during *his* deposition, the defendants "admitted" that defendant Ellis sent the Jewish inmates back to their cells to shorten the service. (Pl.'s Mem. ¶ 19) (citing Deposition Transcript ("DT") at 49). The deposition transcript is not an "admission" by defendants, and does not state that defendant Ellis sent the inmates back to their cells.

**\*12** During his deposition, plaintiff testified that Reverend Ellis allows *Protestant* inmates to come to the chapel before Ellis is ready to conduct the service, but does not allow Jewish inmates to go to their place of worship and wait if the Rabbi is not there. (DT at 49). "Whenever we go to the Jewish services, he sends us all back. 'Go back to your housing unit.' " (*Id.*) Defense counsel then

asked plaintiff a question: "even though the rabbis came a little bit late, and even though they sent some of the inmates back to their cells, you were able to meet with the rabbis that day and have a short prayer service." (*Id.*) This *question by counsel* is **not** an *admission by a defendant,* and counsel was making the point that "even if" what plaintiff said were true—that someone sent the Jewish inmates back to their cells because Rabbi Max had not arrived— plaintiff still attended the service, notwithstanding that it was shorter than anticipated.

Rabbi Max's declaration shows that *he* was late beginning the service, and the inmates were required to return to their cells at 3:45. Defendant Ellis had nothing to do with the length of the service.[14] Under the appropriate definition, plaintiff's religious rights were not substantially burdened. In order for the defendant's interference to be a "substantial burden" on the inmate's religious exercise, the interference must be more than an inconvenience, and plaintiff must demonstrate that the government's action pressured plaintiff to commit an act forbidden by his religion or prevented him from engaging in conduct or having a religious experience mandated by his faith. *Pugh v. Goord,* 571 F.Supp.2d 477, 504–05 (S.D.N.Y.2008); *Graham v. Mahmood,* No. 05–10071, 2008 WL 1849167, at \* 14 (S.D.N.Y. Apr. 22, 2008); *Gill v. Defrank,* No. 98 Civ. 7851, 2000 WL 897152, at \*1 (S.D.N.Y. July 6, 2000) (citing *Boomer v. Irvin,* 963 F.Supp.2d 227, 230 (W.D.N.Y.1997)).

In addition, although plaintiff may disagree, the shortening of his Purim celebration because the Rabbi was late or because plaintiff had to wait for other inmates to come back from their housing units did not amount to a "substantial burden." This delay may certainly have been "an inconvenience." However, plaintiff admits that the Service did occur, that prayers were said, and that the inmates were allowed to eat the food, albeit too quickly for plaintiff's liking. Thus, neither the Constitution, nor RLUIPA were violated by defendant Ellis. Plaintiff's retaliation claim will be discussed below.

## V. *Mail/Access to Courts/Retaliation*

### A. Legal Standards

#### 1. Mail

Among the protections enjoyed by prison inmates, subject to appropriate limitations, is the right "to the free flow

of incoming and outgoing mail" guaranteed by the First Amendment. *LeBron v. Swaitek,* No. 05–CV–172 (GLS/DRH), 2007 WL 3254373, at *6 (N.D.N.Y. Nov. 2, 2007) (Sharpe, J.) (quoting *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003)). "The boundary between an inmate's First Amendment right to free speech and the ability of prison officials to open or otherwise interfere with an inmate's mail is not precise." *Cancel v. Goord,* No. 00 CIV 2042, 2001 WL 303713, at *5 (S.D.N.Y. March 29, 2001). This right, however, must yield to the legitimate penological interests of prison officials when mail is monitored for the purpose of ensuring order in the prison by preventing illegal activities. *Duamutef v. Hollins,* 297 F.3d 108, 112–13 (2d Cir.2002) (citing, *inter alia, U.S. v. Workman,* 80 F.3d 688, 699 (2d Cir.1996)). "The [Supreme] Court has counseled judicial restraint in the federal courts' review of prison policy and administration, noting that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' " *Giano v. Senkowski,* 54 F.3d 1050, 1053 (2d Cir.1995) (quoting *Turner v. Safley,* 482 U.S. 78, 84 (1987)).

**\*13** Actions taken by prison administrators directed toward inmate mail are subject to the overarching consideration that a prison regulation infringing on an inmate's constitutional rights is valid so long as the regulation is "reasonably related to the legitimate penological interests." *Turner v. Safley,* 482 U.S. at 89. Applying this precept, "[c]ourts have constitutionally afforded greater protection ... to outgoing mail than to incoming mail." *Davis,* 320 F.3d at 351 (citations omitted). Nonetheless, the Second Circuit has held that " 'where good cause is shown, outgoing mail can be read' without violating inmates' First Amendment rights." *Workman,* 80 F.3d at 698 (quoting *Wolfish v. Levi,* 573 F.2d 118, 130 n. 27 (2d Cir.1978), *rev'd in part on other grounds sub nom., Bell v. Wolfish,* 441 U.S. 520 (1979)).

Prison security is a legitimate penological interest that justifies limitations on an inmate's First Amendment rights related to regular mail. *See Cancel v. Goord,* 2001 WL 303713, at *6. "[T]he interception of a prisoner's correspondence does not violate that individual's First Amendment rights 'if prison officials had good or reasonable cause to inspect the mail." *Knight v. Keane,* No. 99 Civ. 3955, 2005 U.S. Dist. LEXIS 18702, at *18 (S.D.N.Y. August 26, 2005) (citing *United States v. Felipe,* 148 F.3d 101, 108 (2d Cir.1998)) (Rep't–Rec.), *adopted* 2006 WL 89929 (S.D.N.Y. Jan. 12, 2006). To

establish a claim for interference with regular, non-legal mail, the plaintiff must show " 'a pattern and practice of interference that is not justified by any legitimate penological concern." *Singleton v. Williams,* No. 12 Civ.2021, 2014 WL 2095024, at *3 (S.D.N.Y. May 20, 2014) (quoting *Cancel, supra.*) An isolated incident is generally insufficient to establish a constitutional violation. *Id.* (citing *Davis,* 320 F.3d at 351).

Legal mail is entitled to a higher degree of protection than regular mail, and "prison policies or practices which interfere with legal mail on a regular basis whether incoming or outgoing must be supported by a legitimate penological interest other than mere general security concerns which permit interference with regular mail. *Cancel v. Goord,* 2001 WL 303713, at *6–7 (citing *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986)). Plaintiff must still show that prison officials " 'regularly and unjustifiably interfered with the ... legal mail." *Singleton,* 2014 WL 2095024, at *4 (quoting *Cancel, supra.*) As few as two incidents of mail tampering may constitute an actionable violation if the incidents suggest and ongoing practice of censorship that is unjustified by a substantial governmental interest or if the tampering unjustifiably chilled the inmate's right to access to courts as discussed below or impaired legal representation that plaintiff received. *Vega v. Rell,* No. 3:09–CV–737, 2013 WL 6273283, at *10 (D.Conn. Dec. 4, 2013) (citing *Washington,* 782 F.2d at 1139).

## 2. Access to Courts

**\*14** Legal mail claims are sometimes related to claims that defendants have denied an inmate access to courts by interfering with legal mail. It is well-settled that inmates have a constitutional right to "meaningful" access to the courts. *Bounds v. Smith,* 430 U.S. 817, 823 (1977). The Supreme Court held in *Bounds* that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." 430 U.S. at 828.

"Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.' " *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995). In addition, "to establish a constitutional violation based on a denial

of access to the courts, a plaintiff must show that the defendant's conduct was deliberate and malicious, and that the defendant's actions resulted in actual injury to the plaintiff.'" *Lewis v. Casey,* 518 U.S. 343, 351 (1996). *See Collins v. Goord,* 581 F.Supp.2d 563, 573 (S.D.N.Y.2008). In order to show actual injury, the defendants' conduct must have "hindered [plaintiff's] efforts to pursue a legal claim." 518 U.S. at 351.

### 3. Retaliation

In order to establish a claim of retaliation for the exercise of a First Amendment right, plaintiff must show that he engaged in constitutionally protected speech or conduct, and that the protected activity was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (citation omitted). This objective test applies whether or not the plaintiff was himself subjectively deterred from exercising his rights. *Id.*

To establish retaliation, the plaintiff must also establish a causal connection between the protected speech or conduct and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). Although a " 'plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' "[s]uch circumstantial evidence of retaliation, ... without more, is insufficient to survive summary judgment." *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 370 (S.D.N.Y.2011) (citations omitted).

Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* at 371. "Regardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show ... that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin,* 344 F.3d 282, 287–88 (2d Cir.2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)).

**\*15** The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. *Bennett,* 343 F.3d at 137. Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.' " *Smith v. Woods,* 9:03–CV–480 (DNH/GHL), 2006 WL 1133247, at \*3 & n. 11 (N.D.N .Y. Apr. 24, 2006) (quoting *Jeffreys v. City of New York,* 426 F.3d 549, 554–55 (2d Cir.2005)). To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or verified complaint "must, among other things, be based 'on personal knowledge.' " *Id.,* 2006 WL 1133247, at \*3 & n. 7 (collecting cases); Fed.R.Civ.P. 56(c)(4).

### B. Application

### 1. Defendant Kupiec

#### a. Relevant Facts—Interference/Retaliation

In his complaint, plaintiff alleged that after he filed a grievance against defendant Ready, which was denied on January 14, 2011, defendant Kupiec [15] began to lose and/or destroy plaintiff's packages that were received in the mail room. [16] (Compl.¶¶ 57–64). Plaintiff claims that on January 14, 2011, the same day that the Superintendent rendered a decision on plaintiff's grievance against defendant Ready, plaintiff received a package from Stratford Career Center, to study for his paralegal degree. (Compl.¶ 58). Plaintiff states "Defendant Theda Kupiec 'got word' of the complaint contra the aforesaid officers and started to intentionally lose and destroy the plaintiff's legal packages from said school." (*Id.*) Plaintiff states that the "package" with his text and exams was never recovered, but he did "receive the Paralegal Course from the school on the said date in question." [17] (*Id.* & Ex. M).

Plaintiff states that he "was never once called down to the package room or mail room in the entire month of [J]anuary, 2011." (Compl.¶ 58). He then states that "this only indicates that anytime an inmate (in this case the

plaintiff) files a grievance against the defendant's [sic] —retaliation takes place." (*Id.*) Plaintiff speculates that retaliation can take the form of missing packages or "planting weapons on the inmate ... to make sure that the inmates [sic] goes to the box (Special Housing Units) where he is limited to legal materials." [18] (*Id.*)

The complaint also alleges that after he appealed the Superintendent's decision regarding the December 7, 2010 incident against Ready, a "Notice of Intention to File a Claim" ("Notice") was improperly sent "regular" mail, rather than by Certified Mail as is required under New York State Law and notwithstanding that plaintiff paid for certified mail. (Compl.¶¶ 60–63). Plaintiff alleges that on March 15, 2011, his parents sent him a food package that he never received, purportedly due to the retaliation by defendant Kupiec. (Compl.¶ 63). Several paragraphs later, plaintiff states that, on May 17, 2011, defendant Kupiec "slashed open" plaintiff's legal mail, removed the documents outside of his presence, and sent the documents to plaintiff in a coffeestained, "stampless" envelope. (Compl.¶ 82). In plaintiff's response to defendants' motion for summary judgment, he also mentions an incident that is not part of the complaint. Plaintiff alleges that defendant Kupiec opened his mail and ripped up his "law school exam scores." (Dkt. No. 205–1, ¶ 33). This court will not consider this final allegation against defendant Kupiec. [19]

**\*16** Defendants have filed the declaration of defendant Theda Kupiec, Senior Mail Clerk at Mid–State. (Kupiec Decl. ¶¶ 1–2) (Dkt. No. 202–4). Defendant Kupiec states that her responsibilities include sorting outgoing mail and placing the appropriate postage after verification that the inmate has sufficient funds, in addition to sorting incoming mail for distribution to the housing units. (*Id.* ¶ 6). Defendant Kupiec states that she has no responsibility "whatsoever" with respect to "packages" that are received for inmates. She states that the mail room in which she works is located in Building 20 of the Administration Building, which is located outside of the secure fence around the facility. However, the "package room" is located in Building 101, which is located inside the secure fence. (*Id.* ¶¶ 7–8).

Defendant Kupiec states that she was not aware of any grievance plaintiff may have filed against defendant Ready, and that she does "not personally know Correction Officer Ready." (*Id.* ¶¶ 11–12). Defendant

Kupiec states that "at some point," she became aware of plaintiff's claim that he did not receive the Stratford Career Institute package, but because defendant Kupiec does not work in the package room, and has no responsibility for packages, she has no knowledge of the result of plaintiff's complaint. (*Id.* ¶ 14).

Defendant Kupiec states that she did inadvertently mail plaintiff's Notice via regular mail. (*Id.* ¶ 15). Plaintiff requested that the envelope be sent Certified, and defendant Kupiec first sent the mail to the Business Office to verify that plaintiff had adequate funds for certified mail. When the mail was returned to her with the authorization, defendant Kupiec inadvertently sent the mail with regular postage. Defendant Kupiec states that she realized her mistake when plaintiff filed a grievance, to which she responded by admitting her error and reimbursing plaintiff for the difference in the postage. Defendant Kupiec states that the mistake was hers, and no one "told" her to send the mail out via regular mail rather than certified. (*Id.* ¶¶ 15–16 & Ex. A). Exhibit A to defendant Kupiec's declaration is a copy of the memorandum that she sent to plaintiff apologizing for the error and reimbursing him for the cost of the mailing [20] Defendant Kupiec states that she is completely unaware of plaintiff's missing food package because she does not work in the package room. (*Id.* ¶ 17).

Defendant Kupiec also states that on May 18, 2011, she received a manila envelope from the package room with plaintiff's name and DIN number on it, with no indication that it was legal mail. [21] She opened the envelope to record the contents, and when she realized that the mail was from a court, she wrote which court the mail came from on the front of the envelope and send the mail to the Legal Officer. (*Id.* ¶ 19 & Ex. B). Exhibit B is the memorandum that defendant Kupiec wrote to the IGRC, explaining what happened with the manila envelope. [22] (*Id.*) Defendant Kupiec states that she did not open plaintiff's legal mail intentionally or in retaliation for any grievance, but merely in the "normal course of [her] job duties ...." (*Id.* ¶ 20).

**b. Discussion**

**\*17** These incidents do not show constitutional interference with plaintiff's mail, nor do the facts show that defendant Kupiec was retaliating against plaintiff for his grievances. First, it is clear that defendant Kupiec

does not work in the package room, and had no personal involvement in, and would not have been responsible for, either plaintiff's alleged text book "loss" or the alleged loss of his kosher food. [23] The court will focus on plaintiff's allegations that defendant Kupiec tampered with his mail on February 25, 2011 (certified mail claim) and on May 17, 2011 (opening of legal mail).

The fact that plaintiff's Notice was sent regular mail, rather than certified is not interference with plaintiff's mail. The mail was sent, it was just sent by a different method of delivery. [24] This mistake shows neither intent, nor a "pattern and practice" of interference. At worst, it shows an error by defendant Kupiec in sending out plaintiff's mail, for which plaintiff was reimbursed. [25] The incident in which defendant Kupiec sent plaintiff documents in a plain manilla envelope after she realized that the documents were sent by a court also shows an error by facility staff in the package room, that defendant Kupiec attempted to rectify by writing which court the documents came from on the envelope and having it delivered to plaintiff through the proper channels for legal mail. [26] Defendant Kupiec states that the court documents were already in the plain manilla envelope when she received them.

Plaintiff claims that defendant Kupiec was retaliating against plaintiff for the grievances that he filed. Plaintiff first mentions the grievance he filed against defendant Ready after the December 7, 2010 incident, which was denied by the Superintendent on January 14, 2011. [27] Plaintiff's statement that defendant Kupiec was aware of plaintiff's grievance against defendant Ready because an inmate named "Rogers" told defendant Kupiec about the grievance, is completely conclusory. The first time plaintiff ever mentioned inmate Rogers was at plaintiff's deposition. (Pl.'s Dep. at 61). Plaintiff stated that Inmate Rogers worked in the grievance office and knew who was filing grievances against officers, so Inmate Rogers told defendant Kupiec about the decision on plaintiff's grievance against Ready "because [plaintiff] was already putting in paperwork on why my legal mail was being messed with." (Pl.'s Dep. at 62). This statement by plaintiff is not even plausible. See *Jeffreys v. City of New York,* 426 F.3d 549, 555 (2d Cir.2005) (no genuine issue of material fact when plaintiff's explanation is not even plausible); *Haust v. United States,* 953 F.Supp.2d 353, 361 (N.D.N.Y.2013) (court may discredit plaintiff's self-serving testimony when it is so replete with inconsistencies and improbabilities that no reasonable fact-finder would undertake the suspension of disbelief necessary to credit the allegations made in his complaint) (quoting *Jeffreys, supra* ).

**\*18** Defendant Kupiec states that she does not know defendant Ready, and that plaintiff's allegation that an inmate named "Rogers" informed Kupiec of the grievance against Ready is untrue. (Kupiec Decl. ¶ 13). Although defendant Kupiec is aware that Inmate Rogers works in the grievance office, she could not identify Rogers, nor has she ever had any contact with him. (*Id.*) The grievance against defendant Ready had to do with religion, not mail. The fact that plaintiff may have begun "putting paperwork together" regarding a grievance about his legal mail against defendant Kupiec, which plaintiff did not file until March or April of 2011, would not support Inmate Rogers deciding to tell defendant Kupiec about a grievance filed against a different defendant, coincidentally on the same day that plaintiff claims a package was delivered for him. [28] As stated above, defendant Kupiec does not work in the package room and would not have been responsible for the alleged loss of any package delivered to the facility for plaintiff in January of 2011 or any other time.

In addition, it is difficult to establish one defendant's retaliation for complaints against another defendant. *See, e.g., Hare v. Hayden,* 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (citing *Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about a prior incident by another corrections officer); *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 369 (S.D.N.Y.2011) (plaintiff failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in) (collecting cases); *Ciaprazi v. Goord,* No. 9:02–CV–915 (GLS/DEP), 2005 WL 3531464, at *8–9 (N.D.N.Y. Dec. 22, 2005) (granting summary judgment and dismissing retaliation claim based only on plaintiff's conclusory allegations that the manifest falsity of the misbehavior report and testimony during the disciplinary hearing indicated the disciplinary matters were motivated by retaliatory animus due to grievances plaintiff filed against individuals other than

the defendants involved in the disciplinary action). *See also Faulk v. Fisher,* 545 F. App'x 56, 58–59 (2d Cir.2013) (temporal proximity to the protected action and excellent disciplinary history prior to the allegedly retaliatory misbehavior reports were insufficient to avoid summary judgment when there was no additional evidence, and neither of the officers were involved in the successful grievance); *Bennett v. Goord,* No. 06–3818–pr, 2008 WL 5083122, at *2 (2d Cir. Dec. 2, 2008) (citing *inter alia McPherson v. N.Y. City Dep't of Educ.,* 457 F.3d 211, 215 (2d Cir.2006) (speculation alone is insufficient to defeat a motion for summary judgment)).

**\*19** Plaintiff also may be claiming that defendant Kupiec's subsequent actions were in retaliation for the grievance that plaintiff ultimately filed against defendant Kupiec in March or April of 2011. In her declaration, defendant Kupiec denies ever opening plaintiff's legal mail in retaliation for a grievance filed against *her.* [29] (Kupiec Decl. ¶ 18). In any event, plaintiff suffered no adverse action, as defined by the case law, [30] as the result of defendant Kupiec inadvertently opening plaintiff's legal mail that was sent to her from the package room. [31] This action would not deter a similarly situated inmate from exercising his constitutional rights. This action also would not deter a similarly situated inmate from asserting his rights. [32] It does not show malice or retaliation by defendant Kupiec. Plaintiff's mail interference and retaliation claims may be dismissed.

**b. Access to Courts**

Plaintiff claims that defendant Kupiec's failure to send his Notice by certified mail denied plaintiff access to courts because he was forced to withdraw his action. [33] Plaintiff's allegation has no basis whatsoever. Plaintiff concedes that he withdrew his New York Court of Claims action of his own accord. At his deposition, plaintiff stated "I had to dismiss [the Court of Claims action] because after I found out about these reckless lies, I had to dismiss it." (Pl.'s Dep. at 79). At plaintiff's deposition, the Assistant Attorney General asked why plaintiff did not just send a new Notice if he really believed that his case would be dismissed without a notice sent by certified mail. It was clear that plaintiff would have had time to send a new one, and plaintiff had been reimbursed for the mail that was improperly sent. (*Id.* at 80–82). Plaintiff then

stated that the notice covered earlier incidents, and would have been untimely for the "earlier" incidents. (*Id.* at 82).

At the same time, plaintiff stated that he withdrew the action because he "wanted to change his theory" and go to federal court, because plaintiff stated that the "Court of Claims is only [for] negligence and property damage." (*Id.* at 83). Plaintiff then reasserted that the "Court" *would have* stricken his "motion" [34] because he did not serve the Attorney General with his Notice by certified mail. Plaintiff cannot "create" an access to courts claim by voluntarily withdrawing his action and then speculating what the court would have done if he had not withdrawn the action.

According to plaintiff, the Notice was required to be served on the Attorney General, not the Court. (T. 81). The court would have no way of knowing that the Notice was not served by certified mail, unless the Attorney General made a motion to dismiss on that basis. Even if the Attorney General made such a motion, plaintiff could have opposed the motion by stating that a mistake was made in mailing the item. There is no way to know that plaintiff's case would have been dismissed. In any event, it is clear from plaintiff's deposition that he would not have stayed in the Court of Claims. At his deposition, he clearly stated that he "wanted to change his theory" and go to Federal Court. (DT at 83). That is not a denial of access to courts "caused" by defendant Kupiec's conduct. Thus, plaintiff's access to courts claim may be dismissed.

**2. Defendants Ready and Ellis**

**\*20** Plaintiff alleges that the actions taken by defendants Ready and Ellis were in retaliation for a grievance that plaintiff filed on September 20, 2010 against defendant Ellis and CO Johnston. [35] Defendant Ready states that he did not know about the September 20, 2010 grievance on December 7, 2010, because he was transferred to Mid–State in September of 2010. (Ready Decl. ¶ 13). In his response, plaintiff argues that defendant Ready must have known about the September grievance because "it was not until November 24, 2010 that the Grievance Supervisor disciplined the officers including Ready regarding allowing inmates ... to adhere to Jewish memos and callouts." (Pl.'s Mem. at ¶ 24) (Dkt. No. 205–1 at 18).

First, the court notes that there is no indication the Ready, or any other officer was "disciplined." The Superintendent's response states that the facility policies were reviewed and "corrective action taken." [36] This does not mean "discipline ." The Superintendent's response also states that the "referenced employees were advised and clarification given with regards to this matter." (Pl.'s Ex. N(1) (Dkt. No. 205–1 at 93). Defendant Ready was not one of the employees referenced in the grievance and was not involved in the September incident. [37] Thus, he would not have been disciplined or even "advised" of the incident. The memorandum cited by plaintiff, dated November 24, 2010 was between C. Tapia, the IGP Supervisor and DSP Phillips.

The fact that the defendants work in the same facility, or even on the same unit, is not sufficient to show that defendant Ready was aware of plaintiff's grievance against two other officers or that he would have retaliated against plaintiff for a grievance in which she was not involved. As stated above, generally, it is difficult to show retaliation for actions taken against another officer. *Hare v. Hayden, supra,* 09 Civ. 3135, 2011 WL 1453789, at *4.

Further, the court finds that neither the action allegedly taken by defendant Ready, nor the action allegedly taken by defendant Ellis rises to the level of an "adverse action" under the case law. Keeping plaintiff out of one service because defendant Ready did not have the correct call-out list, is not an action that would deter a "similarly situated" individual from exercising his rights. With respect to defendant Ellis, even assuming that he had anything to do with shortening the Purim service (which this court has found that he did not), this action would certainly not deter someone similarly situated to plaintiff from asserting his rights. [38] Additionally, plaintiff claims that defendant Ellis was responsible for sending *all* the inmates back to their housing unit to wait for the Rabbis. Clearly, even if that were true, plaintiff concedes that he did not return to his housing unit, and defendant Ellis could not have been retaliating against plaintiff by taking action against other inmates. [39] Therefore, any retaliation claims against defendants Ellis and Ready may be dismissed.

## VII. *Personal Involvement*

### A. Legal Standards

**\*21** Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty,* 490 F .3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873) (2d Cir.1995)), *rev'd on other grounds, Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

The mere receipt of a letter or similar complaint is insufficient to constitute personal involvement; otherwise, a plaintiff could create personal involvement by any supervisor simply by writing a letter. (*Id.*) (citing *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002)). In order for a letter to suffice to establish personal involvement, plaintiff would have to show that the supervisor conducted a personal investigation or personally took action on the letter or grievance. *Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009); *Bodie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004). However, personal action does *not* include referring the letter to a subordinate for investigation. *Id.* (citing *Sealy v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997)); *Hartnett v. Barr,* 538 F.Supp.2d 511, 524 (N.D.N.Y.2008).

### B. Application

In my April 3, 2013 recommendation, I noted that in Judge D'Agostino's initial order, the allegations of personal involvement against defendants Fischer and Boll were "rather sparse." (Dkt. No. 148 at 24). Notwithstanding these "sparse" allegations, Judge D'Agostino allowed the case to continue as against these supervisory defendants.

(*Id.*) In a conclusory fashion, plaintiff claimed that he had so many documents from these two defendants, he could "flood the docket." (*Id.*) (citing Dkt. No. 129 at 22). Plaintiff's response to the defendants' motion for judgment on the pleadings implied that he could make the appropriate showing, perhaps by amending his complaint. Because at that time, I was recommending that this action proceed at least to a properly supported motion for summary judgment, I did not recommend dismissing the action as against defendants Fischer and Boll based on lack of personal involvement. (*Id.*)

**\*22** Plaintiff did not amend his complaint, and he later stipulated to dismissing the action as against Fischer. However, in his response to the motion for summary judgment, he maintains that defendant Boll was personally involved in the alleged constitutional violations because she stated in her response to interrogatories that her "office" became aware of plaintiff's September 9, 2010 grievance when a copy of plaintiff's correspondence to a Deputy Commissioner of Program Services was "forwarded to my office." (Dkt. No. 205–3 at 355). Defendant Boll states that she had no personal knowledge or recollection of the grievance itself because the Office of Counsel is not the appropriate department to file a grievance. (*Id*. at 355–56). Defendant Boll also states that "upon receipt of your letter, the matter was investigated by the Office of Counsel, and I responded to you on December 2, 2010. (Exhibit B attached hereto)." (*Id.* at 356). Plaintiff seizes upon this statement, and accuses defendant Boll of lying to the court because she "admits" that she responded to plaintiff.

First, it is unclear whether plaintiff's September 9, 2011 grievance against defendant Ellis has anything to do with the facts of this case. [40] Plaintiff has seen fit not to include the letter that defendant Boll said that she wrote to him in response. [41] However, defendant Boll has included the letter as an attachment to her declaration in support of the summary judgment motion. (Boll Decl. Ex. A) (Dkt. No. 202–6). In her declaration, defendant Boll states that as Deputy Commissioner and Counsel for DOCCS, she serves as legal counsel for the Commissioner of DOCCS and oversees DOCCS Office of Legal Counsel which is responsible for all of the legal services necessary for the day-to-day operation of the DOCCS Central Office and the correctional institutions that make up the department. (Boll Decl. ¶ 5).

Defendant Boll states that her office routinely received hundreds of letters per year from inmates or on behalf of inmates. (*Id.* ¶ 6). When the Office receives one of these letters, one of the defendant's support staff reads it and determines which of the attorneys on her staff or other staff person should address the issues in the letter. The letter is then forwarded to the attorney or other staff person to investigate and prepare a response, if warranted. The response may be prepared for the attorney's signature, a Deputy Counsel's signature, or defendant Boll's signature "depending on the circumstances." (*Id.*)

Contrary to plaintiff's accusations that defendant Boll is somehow trying to hide her involvement, defendant Boll admits responding to three letters received from the plaintiff. (*Id.* ¶ 7). The letter that plaintiff apparently believes is the "smoking gun" which shows that defendant Boll was personally involved in whatever constitutional violation the plaintiff alleged, is actually a letter reminding plaintiff that he had filed a grievance, and that his grievance had been appealed to the Central Office Review Committee ("CORC"), and a decision was pending. (*Id.* ¶ 8). In the letter, plaintiff was advised that the CORC would conduct a thorough investigation, and that plaintiff would be notified of its decision. (*Id.* & Ex. A). Defendant Boll states that she did not take any action to "investigate the claims contained in plaintiff's Inmate Grievance Complaint that [she] referenced in [her] December 2, 2010 letter to plaintiff." [42] (*Id.* ¶ 9).

**\*23** A reading of defendant Boll's letter supports her declaration. Her office's "investigation" was not an investigation of the "merits" of the grievance, it was merely an "investigation" of the status of plaintiff's grievance and a reminder that the "Inmate Grievance Program was instituted to handle issues such as yours." (*Id.* Ex. A). Defendant Boll was reporting to plaintiff that an investigation had been conducted by other officials of DOCCS. Defendant Boll then stated:

> The CORC will conduct a thorough investigation to assure that your rights are observed and your issues are addressed. If any corrective action is needed, you will be notified. As your appeal to the CORC is still pending, it is recommended that you await the decision.

(*Id.*) If an individual were able to create "personal involvement" by simply writing a letter to a superior, who was good enough to answer with an explanation such as this, it would eviscerate the well-settled principle that respondeat superior does not apply in civil rights cases. Clearly, defendant Boll did not conduct a "personal investigation" of the religious issue outlined in plaintiff's grievance.

Defendant Boll wrote another letter, dated January 28, 2011, in response to a new letter from plaintiff, dated December 20, 2011. (Boll Decl. ¶ 10 & Ex. B). Defendant Boll's letter merely stated that she had already written to plaintiff on December 2, 2010, and noted that the CORC had completed its review by correspondence dated December 8, 2010, accepting plaintiff's grievance in part. (Boll Decl. Ex. B). Defendant Boll further stated that plaintiff had been told "to bring further concerns to the attention of area supervisory staff, at [his] facility, at the time of the incident, for any remedial action deemed necessary." (*Id.*)

By the time of plaintiff's second letter to defendant Boll, the December 7th incident had occurred, and defendant Boll noted the "reoccurrence," stating that Superintendent William Hulihan had investigated the incident, "and advised you of his findings and actions on January 14, 2011." (*Id.*) Defendant Boll's explanatory letter does not create personal involvement as it is clear from the letter that she did not have anything to do with investigating the incident. She just determined that an investigation had taken place and was advising the plaintiff that he "should continue to follow the Directive for any further incidences that [h]e may have." (*Id.*)

Finally, plaintiff wrote to defendant Boll again, and she responded on March 3, 2011. (Boll Decl. ¶ 12 & Ex. C). Plaintiff claimed that no corrective action had been taken with regard to one of his grievances, and defendant Boll merely advised plaintiff that her office had contacted the staff at the correctional facility, who advised defendant Boll that plaintiff's claims had been properly investigated and corrective action had been taken. Defendant Boll took

no further action. (Boll Decl. ¶¶ 12, 14). Defendant Boll states that she took no investigative action on any of plaintiff's letters. (Boll Decl. ¶ 15). She merely inquired into the status of plaintiff's grievances and reported her findings to plaintiff. Defendant Boll's letters support her assertions, and plaintiff's attempt to create personal involvement by citing portions of one of the defendant's letters, without the entire letter must fail.

**\*24** Plaintiff may not understand the above-cited law and may be under the misapprehension that the simple fact that defendant Boll responded to his letters made her personally involved in the subject matter of the letter. The cases cited above show that this is not the law. Plaintiff is confusing the difference between a letter, telling him that someone else did an investigation, with a personal investigation of the merits after receipt of the letter. The former is not personal involvement, while the latter is personal involvement. Thus, the complaint may also be dismissed as against defendant Boll on this basis as well.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 202) be **GRANTED** and the complaint **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

Dated: July 23, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4365274

---

Footnotes

1    Plaintiff then attempted to appeal the Second Circuit decision to the United States Supreme Court. (Dkt. No. 130) (Notice of Appeal).

2    Plaintiff's response seems to take issue with the fact that defendants have now filed a motion for summary judgment because the case survived a prior motion for summary judgment, filed by plaintiff and a motion for judgment on the

pleadings, filed by defendants. (Pl.'s Mem. at ¶ ¶ 1–7) (Dkt. No. 205–1). Plaintiff faults the court for allowing defendants to respond to plaintiff's motion for summary judgment with a letter. (*Id.* ¶ 5). The court would point out that the lack of a "formal" response from the defendants did not prejudice plaintiff. The defendants did not, as plaintiff put it, "[get] away" with anything. *See* Pl.'s Mem. at 5. I noted in the Report–Recommendation that defendants had not formally responded to the motion for summary judgment. (Dkt. No. 54 at 8–9). The standard for summary judgment places the burden on the party moving for summary judgment to show that no question of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. at 323; Fed.R.Civ.P. 56(a). Unless that initial burden is met, the non-moving party need not make any showing. *See Salahuddin v. Goord,* 467 F.3d at 272–73. Only if the moving party satisfies its burden, is the non-moving party required to move forward with specific facts showing that there is a genuine issue for trial. *Id.* The fact that the court found, based upon the documents submitted by plaintiff, that a genuine issue of fact existed does not preclude a subsequent motion for *summary judgment* by defendants. The defendants' interim motion for judgment on the pleadings was denied because, based upon the facts stated in the complaint, plaintiff's claims had been stated. The summary judgment motion contains additional facts in the form of affidavits and deposition testimony. *See* Fed.R.Civ.P. 56(c). Even if the defendants had made a prior motion for summary judgment, the court has the discretion to consider multiple motions for summary judgment if the successive motion is supported by new material. *Robinson v.. Henschel,* No. 10 Civ. 6212, 2014 WL 1257287, at *8 (S.D.N.Y. March 26, 2014) (citing inter alia *Wechsler v. Hunt Health Sys., Ltd.,* 198 F.Supp.2d 508, 514 (S.D.N.Y.2002)). *See also Rodriguez v. It's Just Lunch, Internat'l,* No. 07 Civ. 9227, 2013 WL 1749590, at *1 (S.D.N.Y. April 23, 2013) (considering cross-motions for summary judgment "[f]ollowing discovery proceedings and multiple motions to dismiss.")

3    Father Weber is not a defendant in this action.

4    Unless otherwise specified, the pages associated with a docket number will be the pages assigned to the document by the court's electronic filing system. (CM/ECF).

5    Plaintiff was deposed on October 8, 2013, and a copy of his deposition transcript has been included in defendants' summary judgment motion. (Dkt. No. 202–3). During his deposition, plaintiff testified that defendant Ready "had the call-out on his desk." (Dkt. No. 202–2 at 22). While defendant Ready may have had a call-out or call-outs on his desk, he did not have one with the plaintiff's name on it.

6    Plaintiff has also alleged a retaliation claim based on this incident, and the court will discuss that claim below.

7    (Ready Decl. ¶¶ 5).

8    This court makes no such finding.

9    Plaintiff's own exhibits confirm this finding. (Pl.'s Ex. G) (Dkt. No. 205–3 at 26). In his grievance documents, plaintiff states that "I signed out of Mr. Gruen's class and informed him that I had a call-out per DSP Phillips to **report to Bldg # 101** to attend Jewish Services. I subsequently attempted to sign out @ the 7–2 security desk whereby Correctional Officer Ready ... asked me where I was going." (*Id.*) Clearly, Building # 101 is not the same as Building # 7. Thus, whether an officer in Building # 101 has a document does not prove that someone in Building # 7 was given the same document.

10   To the extent that the failure to provide the appropriate call-out sheet was negligent or simply a mistake, defendant Ready was not responsible for that omission, and in any event, negligence is not actionable under section 1983. *Riehl v. Martin,* No. 13–CV–439, 2014 WL 1289601 at *8 n. 14 (N.D.N.Y. March 31, 2014). In his response to the motion for summary judgment, plaintiff asks why, even if defendant Ready did not have the call-out, "did he fail to pick up the phone and just call the Chaplain's Office to verify that the [plaintiff] was on the call-out?" (Pl.'s Mem. at 15). The fact that defendant Ready may or may not have acted correctly or logically, at worst, could constitute negligent action, which is not actionable under section 1983 or under RLUIPA. *Id. See also Booker v. Maly,* No. 9:12–CV–246, 2014 WL 1289579, at *25 (N.D.N.Y. March 31, 2014) (mistakes not actionable under the U.S. Constitution) (citations omitted); *Scott v. Shansiddeen,* No.2013 WL 3187071, at *4 (N.D.N.Y. June 20, 2013) (negligent actions that 'impinge to some degree on an inmate's religious practices' are insufficient to support a claim under RLIUPA) (citing 42 U.S.C. § 2000cc, et seq.; *Carter v. Washington Dep't of Corr.,* No. C11–5626, 2013 WL 1090753, at *14 (W.D.Wash. Feb. 27, 2013); *Lovelace v. Lee,* 472 F.3d 174, 194 (4th Cir.2006) (simple negligence does not suffice to meet the fault requirement under section 3 of RLUIPA)).

11   Although the complaint initially states that the Rabbis came to see "the plaintiff," it is clear that there were other Jewish inmates who were scheduled to participate in the Purim Services.

12   The declaration says "March 20, 2011." Although plaintiff refers to this as the March 30, 2011 incident, Purim was actually March 19–20, 2011. The discrepancy in the dates is not relevant to this court's decision because it is clear that all parties are referring to the same incident.

13   Rabbi Max is not a defendant in this action.

14   In his response to defendants' motion for summary judgment, plaintiff has submitted his grievance and the Superintendent's response to plaintiff's grievance regarding this incident. (Dkt. No. 205–3, Pl.'s Exs. R–Z). In this

grievance, plaintiff alleged that defendant Ellis "felt the need to answer for the officers in the bubble by stating ... 'The Rabbi is not here so go back to the law library.' " (Pl.'s Ex. R at 2; CM/ECF p. 123). Plaintiff claimed that he complied, after the other officer repeated that plaintiff should go back to the law library. (*Id.*) Plaintiff asked to use the bathroom, and while using the bathroom, "he overheard the the 'voice over the mic [sic]' direct the other Jewish inmates back to their housing units because the Rabbis had not arrived." (*Id.* & Ex. Z). The issue in the grievance appeared to be that the inmates were not allowed to enter the chapel and wait for the Rabbis. Plaintiff complained that "the Rabbis arrived at approximately 2:43 p.m., and by the time the inmates who were sent back to their units arrived for the second time; the services did not start until 3:15 p.m. *As a result, the Jewish Services were shortened* and they were dismissed at 3:45 p.m." (Pl.'s Ex. Z) (emphasis added). The fact that the inmates were not allowed to enter the chapel prior to the Rabbi's arrival, has nothing do with shortening the service (which would have been cut short anyway, because it is clear that the Rabbis were late in arriving). Plaintiff seems to speculate that Ellis was responsible for the other officer ordering the inmates back to their units. (Pl.'s Ex. R, Dkt. No. 205–3 at 123). In his declaration, defendant Ellis states that he disagreed that plaintiff should have been allowed to return to the library to wait for the Rabbis, but this did not affect plaintiff's attendance at the Purim celebration.

15 Plaintiff originally named Sheila Marlenga, the "Facility Steward," as a defendant in connection with plaintiff's mail claims. The complaint was dismissed with prejudice as against Ms. Marlenga by stipulation, dated January 8, 2014. (Dkt. No. 197). Thus, the complaint has proceeded only as against defendant Kupiec with regard to the remaining issues.

16 The court notes that the allegations in plaintiff's complaint relate more to retaliation than simply interference with his mail. However, in his memorandum of law in opposition to defendants' summary judgment motion he has one paragraph in which he discusses both interference and retaliation separately. (Dkt. No. 205–1 at ¶ 34). Because interference with mail may be a separate and independent claim from retaliation, the court will discuss all possible claims that plaintiff may have regarding the alleged interference with his mail.

17 The allegations in the complaint are a little unclear. In his deposition, plaintiff states that he ultimately received the package. (DT at 107). A reading of plaintiff's grievance documents indicates that he may have received a replacement package after plaintiff's father contacted the school to explain that plaintiff did not receive the January 2011 package. (Pl.'s Ex. Z(12), Dkt. No. 205–3 at 223). The court also notes that materials relating to a paralegal "course" do not constitute "legal mail." Legal mail is included in the definition of "Privileged Correspondence" and is defined, in relevant part, as correspondence with attorneys, legal representatives, and legal services organizations. *See* DOCCS Directive 4421(II)(A)(2) (citing [7 NYCRR § 721.2](#)).

18 The court notes that plaintiff's statement about "planting weapons" is irrelevant because there is no such claim in this case.

19 A plaintiff may not amend his complaint in a memorandum of law or other filing. *[Bryant v. Greater New Haven Transit Dist.,](#)* No. 3:12–CV–71, 2014 WL 2993754, at *7 (D.Conn. July 2, 2014) (citation omitted). The court notes that this final incident could not have been included in the complaint because it occurred after plaintiff filed this action, and plaintiff was still exhausting administrative remedies regarding this allegation, long after this complaint was filed. (*See* Pl.'s Ex. Z(16), Dkt. No. 205–3 at 250) (IGRC's September 22, 2011 response to plaintiff's grievance—this action was filed on May 31, 2011). Plaintiff will not be prejudiced by this court's failure to consider this allegation against defendant Kupiec because he has raised the same claim in a subsequent action that has been assigned to Senior Judge Lawrence E. Kahn and Magistrate Judge Treece. *Guillory v. Fischer,* No. 9:12–CV–280. Magistrate Judge Treece declined to recommend dismissal of this allegation in a Report–Recommendation, noting that notwithstanding my consideration of the issue in recommending denial of plaintiff's motion for summary judgment, the claim was more properly before him. *See id.* at 13–16 (Dkt. No. 46 in 12–CV–280). It is more appropriate for Judge Treece to consider the allegations regarding plaintiff's test scores along with another factual allegation against defendant Kupiec that has not been mentioned in any part of this action and that occurred after the filing of this case.

20 A review of plaintiff's exhibits shows that, at the time plaintiff filed this action in May of 2011, he had not completed the exhaustion of administrative remedies as to his certified mail claim. He did not receive the CORC denial of his grievance until July 27, 2011. (Pl.'s Ex. Z(24), Dkt. No. 205–3 at 275). Although defendants raised failure to exhaust as a defense in their answer (Dkt. No. 46, ¶ 12), they have not argued failure to exhaust in their motion for summary judgment. While defendants would not have had the opportunity to argue non-exhaustion for claims that had not been raised prior to the motion for summary judgment (the test score claim discussed above), they would have had the opportunity to argue non-exhaustion as to claims that were in the complaint. Technically defendants have not waived the exhaustion requirement by raising it in their answer. *[Castillo v. Rodas,](#)* No. 09 Civ. 9919, 2014 WL 1257274, at *15 (S.D.N.Y. March 25, 2014). This court finds that it may recommend dismissal on the merits and will do so, rather that finding only that administrative remedies were not exhausted because defendants did not argue this in their motion.

21    A review of plaintiff's exhibits also shows that when he filed this action, he had not exhausted his administrative remedies regarding the allegation that defendant Kupiec "destroyed" his legal mail. The document, purporting to be a "grievance," in addition to various other things, was dated May 23, 2011. (Pl.'s Ex. Z(32), Dkt. No. 205–3 at 291–302, 293). It was addressed not only to the "Complaint Department" at Mid–State, but also to District Court Judge Mordue, Ruth Goldway from the Postal Regulatory Commission, and Anne Gallaudet from the U.S. Postal Service. (*Id.* at 291). The Superintendent's decision was dated June 16, 2011, after plaintiff filed this action. (Pl.'s Ex. Z(33), Dkt. No. 205–3 at 304). However, defendants have not argued non-exhaustion in their motion, and as stated in footnote 20 above, the court will consider the merits of the claim.

22    The memorandum explains that the envelope must have been delivered inadvertently to the package room. (Kupiec Decl. Ex. B). An individual working in the package room (defendant Kupiec speculated that it might have been a "fill in"), opened the envelope, realized it was legal mail, put it in a plain manilla envelope with plaintiff's name and number on it, and then sent it "over to the Mailroom for processing." (*Id.*) She noted that this was the "normal procedure for mail received in packages." (*Id.*) The court also notes that this memorandum is further support for defendant Kupiec's statement that the mail room and the package room are in two different locations.

23    Personal involvement is a prerequisite to the assessment of damages in a section 1983 case. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

24    Contrary to plaintiff's implication, there is no indication that defendant Kupiec would have been aware of the effect of her action. Defendant Kupiec is the senior mail room clerk. There is no indication that defendant Kupiec has any legal training or would have known the possible effect of sending plaintiff's Notice by regular mail.

25    To the extent that defendant Kupiec's actions could be considered negligent, as stated above, negligence is not actionable under section 1983. *See* n. 10, *supra.*

26    Plaintiff's response makes much of the fact that the "package" went to defendant Kupiec's office when she stated that she had nothing to do with packages. Plaintiff believes that this "admission" proves that defendant Kupiec was also tampering with his packages. Clearly, the item was not a "package," and that is why the package office sent it to defendant Kupiec. Unfortunately someone in the package office had already made a mistake in opening the envelope, placing the documents in another envelope with plaintiff's name and prison number on it. The only contact that defendant Kupiec states that she had with this mail was to place the name of the court on the envelope and have it delivered to plaintiff through the proper channels. This statement is not, as plaintiff claims, inconsistent with defendant Kupiec's statement that she does not work in the package room and has nothing to do with the packages that are delivered for inmates.

27    (Dkt. No. 1 at 50) (Superintendent's Decision dated 1/14/11). The September 2010 grievance is mentioned in this decision, but that grievance was against defendant Ellis. (*Id.*)

28    It is also unclear how inmate Rogers would know that plaintiff was contemplating a grievance against Kupiec because plaintiff only stated that he was "putting paperwork together" for a grievance about his mail, not that such a grievance had been filed. The connection between defendant Kupiec and defendant Ready is non-existent.

29    Plaintiff filed a grievance against defendant Kupiec on April 22, 2011. (Compl.Ex. Z(23)). The only actions that could have conceivably been in retaliation for grievances against defendant Kupiec herself would have been the May 17, 2011 incident involving the manilla envelope with court documents inside and the inadvertent tearing of plaintiff's test scores (which is not part of this action and apparently occurred in August of 2011, based on the August 22, 2011 memorandum of apology from defendant Kupiec). None of defendant Kupiec's other actions took place subsequent to the March or April grievance against her. (Pl.'s Ex. Z(19), Dkt. No. 205–3 at 256). Plaintiff filed a grievance about his test scores on September 1, 2011. (Pl.'s Ex. Z(18), Dkt. No. 205–3 at 254) (CORC decision dated January 18, 2012). At his deposition, plaintiff testified that he did not think he had filed any prior grievances against defendant Kupiec, and there are no documents in the record reflecting grievances prior to April 22, 2011. (DT at 111).

30    *Gill, supra.*

31    Contrary to plaintiff's assertion, this action by an employee in the package room does not prove that all packages go through defendant Kupiec. The legal mail was delivered to the package room in error, someone opened it, determined that it was *not* a "package," placed the documents in a plain manilla envelope with plaintiff's name and DIN number on it, and sent it to the mail room where defendant Kupiec works. She determined that the documents were from a court, placed them back in the manilla envelope, together with writing the name of the court from which they came, and sent them through the proper channels for legal mail. (Pl.'s Exs. Z(36); Z(35), Dkt. No. 205–3 at 316, 318) (CORC Determination dated 10/15/11; Memorandum from defendant Kupiec to DSP Phillips). Although plaintiff claimed that his legal mail was "destroyed," that is clearly not true, only the envelope was missing, and defendant Kupiec had nothing to do with that. *See* Pl.'s Ex. Z(32), Dkt. No. 205–3 at 293).

32    Even if the court were considering the test score incident, the court would find no adverse action because in a letter, dated November 14, 2011, Acting Commissioner for Program Services Catherine M. Jacobsen wrote to plaintiff, explaining the facility's response to the test tearing incident. (Pl.'s Ex. Z(31)) (Dkt. No. 205–3 at 289). The facility informed Acting Commissioner Jacobsen that "the mail was taped and placed into an envelope with a note of apology explaining the error." (*Id.*)

33    Plaintiff claims that the withdrawal of his action constitutes the "actual injury" he needs to establish an access to courts claim.

34    It is not clear what "motion" would have been stricken.

35    CO Johnston is a former defendant who was dismissed from this action pursuant to Judge D'Agostino's September 27, 2011 Order. (Dkt. No. 19).

36    The September incident was only tangentially related to the exercise of plaintiff's religious rights. Plaintiff had attended a religious service in the morning of September 9, 2010, and because of the religious holiday, he was excused from all programming on that day. Plaintiff chose to attend the law library in the afternoon because he had been excused from his other program, based upon a memorandum written by DSP Phillips. Plaintiff was prevented from doing so, but the grievance was resolved in his favor. However, plaintiff did not miss a religious service, he was only prevented from spending his free afternoon, pursuing non-religious activities the way he wished.

37    In fact, plaintiff was convinced that no "corrective action" was taken. However, he has included a memorandum from Christopher Tapia (IGP Supervisor) to Julie Dennis, dated December 7, 2010, stating that, after receiving a telephone call from DSP Phillips, Director Tapia spoke with CO Johnson the day Director Tapia received the plaintiff's complaint. (Pl.'s Ex. Z(42), Dkt. No. 205–3 at 341). Director Tapia explained the proper procedure and "clarified" the memo. "The corrective action was that the memo was clarified. All referenced staff are now aware and no other complaints received." (*Id.*) No "discipline" was involved, and there is no reference to defendant Ready in this memorandum and no reason that he would have been advised of the issue because he was not involved in the incident.

38    In fact, the only adverse action alleged in plaintiff's grievance (aside from the shorter service) was that the inmates were not allowed to wait in the chapel for the rabbi or rabbis to arrive. Clearly, this is not "adverse" within the meaning of a retaliation claim.

39    During his deposition, plaintiff testified that Ellis was "taking it out" on all the other Jewish inmates because of a grievance written by plaintiff against him. (Pl.'s Dep. at 54). Plaintiff's complaint was that "Ellis won't even open the door until the last minute, so we all just hanging out outside the chapel because Ellis won't open the door." (*Id.* at 55). Failure to open a door before services are about to start can hardly be categorized as "adverse action." Once again, the court does not make any findings against defendant Ellis. The court is assuming the facts, hypothetically, for purposes of this particular discussion.

40    Plaintiff's interrogatory asks when defendant Boll became "aware" of plaintiff's September 9, 2010 grievance against defendant Ellis. (Dkt. No. 205–3 ¶ 7). However, none of the claims in this law suit relating to defendant Ellis occurred in September of 2010. Thus, any information in the September 9, 2010 grievance would not have even made defendant Boll aware of the claims in this action.

41    Clearly plaintiff received a copy of the letter as indicated in the response to the interrogatory. The letter is not supportive of plaintiff's claim, and it is disingenuous of plaintiff to omit the letter and cite only parts of defendant Boll's response to the interrogatories. Plaintiff's accusations that defendant is "lying" to the court are completely unfounded, and apparently plaintiff did not read the defendant's affidavit or see the letter that was attached. Plaintiff is constantly accusing others of nefarious conduct, while omitting important facts himself.

42    The court must point out that the incident with defendant Ready did not occur until December 7, 2010, and the incident with defendant Ellis did not occur until March of 2011, so the plaintiff's first letter and defendant Boll's December 2nd response could not have been related to an incident that had not yet occurred and could not have "created" any personal involvement in any event.

2009 WL 890658
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Tyrone HOUSTON, Plaintiff,

v.

Glenn S. GOORD, et al., Defendants.

No. 9:03-CV-1412 (GTS/DEP).
|
March 31, 2009.

**Attorneys and Law Firms**

Tyrone Houston, Brooklyn, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the
State of New York, Stephen M. Kerwin, Esq., Assistant
Attorney General, of Counsel, for Defendants.

### DECISION and ORDER

Hon. GLENN T. SUDDABY, District Judge.

 **\*1** Currently before the Court in this *pro se* prisoner
civil rights action are Defendants' motion for summary
judgment (Dkt. No. 80), and United States Magistrate
Judge David E. Peebles's Report-Recommendation
recommending that Defendants' motion be granted and
Plaintiff's Complaint be dismissed in its entirety (Dkt. No.
85). Plaintiff has timely filed Objections to the Report-
Recommendation. (Dkt. No. 86.) For the reasons set
forth below, the Report-Recommendation is accepted and
adopted in its entirety, Defendants' motion is granted and
Plaintiff's Complaint is dismissed.

## I. RELEVANT BACKGROUND

On November 21, 2003, Plaintiff filed this action against
twenty-two (22) individuals currently and/or formerly
employed by the New York State Department of
Correctional Services, at various correctional facilities.
Generally, in his Complaint, Plaintiff alleges that his
rights under the First and Eighth Amendments were
violated when (1) certain Defendants had him transferred
in retaliation for grievances that he had filed, (2) certain
Defendants issued false misbehavior reports against him
in retaliation for grievances that he had filed, and (3)

certain Defendants deprived him of the opportunity to
engage in outdoor exercise on two separate occasions. (*See
generally* Dkt. No. 1.) [1]

On September 29, 2006, District Judge Lawrence E. Kahn
issued a Memorandum Decision and Order dismissing
(1) Plaintiff's claims for equitable relief due to Plaintiff's
release from incarceration, which mooted this claim,
and (2) Plaintiff's claims against the CORC and all of
the individual defendants in their official capacities on
Eleventh Amendment grounds. (Dkt. No. 69.)

On January 4, 2008, Defendants filed a motion
for summary judgment seeking dismissal of all of
Plaintiff's claims against them. (Dkt. No. 80.) Generally,
Defendants' motion is premised on the following three
grounds: (1) certain of Plaintiff's claims are procedurally
barred based upon his failure to exhaust available
administrative remedies with regard to those claims (2) no
reasonable factfinder could conclude that the issuance of
misbehavior reports or the transfer to different facilities
were *caused* by Plaintiff's filing of grievances; and (3)
no reasonable factfinder could conclude that Plaintiff
was subjected to cruel and unusual punishment based
on being denied certain exercise opportunities. (*Id.*) On
February 1, 2008, Plaintiff filed a response in opposition
to Defendants' motion. (Dkt. No. 82.).

On March 11, 2009, Magistrate Judge Peebles
issued a Report-Recommendation recommending that
Defendants' motion be granted, because (1) certain of
Plaintiff's claims were not properly exhausted, and (2)
no reasonable factfinder could rule in Plaintiff's favor on
any of his claims. (Dkt. No. 85.) Familiarity with the
grounds of the Report-Recommendation is assumed in
this Decision and Order. On March 20, 2009, Plaintiff filed
his Objections to the Report-Recommendation. (Dkt. No.
86.)

## II. APPLICABLE LEGAL STANDARDS

### A. Standard of Review on Objection from Report-
Recommendation
 **\*2** When specific objections are made to a magistrate
judge's report-recommendation, the Court makes a "de
novo determination of those portions of the report
or specified proposed findings or recommendations to
which objection is made." *See* 28 U.S.C. § 636(b)(1)

(C). [2] When only general objections are made to a magistrate judge's report-recommendation, the Court reviews the report-recommendation for clear error or manifest injustice. *See Brown v. Peters,* 95-CV-1641, 1997 WL 599355, at *2-3 (N.D.N.Y.Sept.22, 1997) (Pooler, J.) [collecting cases], aff'd without opinion, 175 F.3d 1007 (2d Cir.1999). [3] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94-CV-2826, 1995 WL 453299, at *1 (S.D.N .Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

**B. Standard Governing Motion for Summary Judgment**

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323-24 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must come forward with "specific facts showing a genuine issue [of material fact] for trial." Fed.R.Civ.P. 56(e)(2).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Anderson,* 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) [citation omitted]; *see also* Fed.R.Civ.P. 56(e)(2). As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts" [citations

omitted]. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986).

**\*3** As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* [citation omitted].

Implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute-even if that nonmoving party is proceeding *pro se.* [4] (This is because the Court extends special solicitude to the *pro se* litigant, in part by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.) [5] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules. [6] For this reason, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a moving party's statement to have been admitted where the nonmoving party has failed to properly respond to that statement [7]-even where the nonmoving party was proceeding *pro se* in a civil rights case. [8]

**III. ANALYSIS**

After carefully reviewing all of the papers in this action, including Magistrate Judge Peebles's Report-Recommendation and Plaintiff's Objections thereto, the Court rejects each of Plaintiff's Objections, and agrees with each of the conclusions stated in the Report-Recommendation. (*See* Dkt. Nos 85, 86.) Magistrate Judge Peebles employed the proper legal standards, accurately recited the facts, and reasonably applied the law to those facts. (*See* Dkt. No. 86.)

In particular, Magistrate Judge Peebles correctly determined that Plaintiff failed to exhaust some of his claims, as required by the Prison Litigation Reform Act, in that he failed to file grievances, and/or pursue these claims to completion, before bringing the claims to federal court. [9] Magistrate Judge Peebles also correctly determined that the only evidence that the misbehavior reports filed against Plaintiff were retaliatory is the fact

that they were filed in close proximity to Plaintiff's grievances. However, this inference alone is not enough for Plaintiff to defeat summary judgment, in light of the fact that (1) he was found guilty of at least some of the charges lodged in seven of the nine misbehavior reports with which he takes issue, (2) these reports were issued by nine different corrections officers in four different prisons, and (3) all but one of the officers submitted an affidavit expressly denying retaliatory motivation. [10] In addition, regarding Plaintiff's claim that his numerous transfers to various prison facilities was done in retaliation for filing grievances, as Magistrate Judge Peebles explained, (1) Plaintiff has offered no evidence that he was transferred in retaliation for filing grievances, and (2) Plaintiff has a history of claiming retaliation for numerous adverse actions taken against him. As a result, these retaliation claims are dismissed.

**\*4** Furthermore, as explained in Magistrate Judge Peebles' Report-Recommendation, Plaintiff's Eighth Amendment claims are without merit because (1) the harm that he allegedly suffered as a result of being denied the opportunity to exercise outdoors for less than two weeks is *de minimis,* and (2) being forced to exercise in an area that is eight-feet-five inches by six-feet-nine inches in size, while confined in a SHU facility, is not a constitutional violation. *See, e.g., Cody v. Jones,* 895 F.Supp. 431, 441 (N.D . N.Y.1995) (McCurn, J.) (applying *Sandin* and concluding that no liberty interest was triggered through the failure of the prison to regularly accord plaintiff one hour of daily outdoor exercise for a period of several months); *Anderson v. Coughlin,* 757 F.2d 33, 34-35 (2d Cir.1985) ("[T]hough courts have played a helpful role in assisting prisoners and prison officials to negotiate mutually acceptable terms for the provision of exercise opportunities, as has occurred in this case, they have not found in the Eighth Amendment a broad license to require prison officials to meet all of the recreational standards that have been recommended by penologists.") . [11]

In his Objections to the Report-Recommendation, Plaintiff argues, *inter alia,* that his failures to fully exhaust his available administrative remedies with regard to certain of his claims was due to his being transferred to different facilities shortly after filing grievances, and that his efforts to inform Defendant Goord and Wardens of this issue "are sufficient to invoke the limited exceptions to the grievance requirement." (Dkt. No. 86.) In addition, Plaintiff appears to argue that the Report-

Recommendation should not be adopted because of its failure to appreciate that the "personal involvement on [the] part of all Defendants [regarding his retaliation claims]" constitutes sufficient evidence of a conflict, thereby warranting denial of summary judgment. (Dkt. No. 86.) [12]

With regard to Plaintiff's exhaustion claim, as an initial matter, the Court is not persuaded by Plaintiff's argument that his letters to Defendants Goord and Wardens created an exception to the exhaustion requirement. [13] This is because (1) administrative remedies were available to Plaintiff, who is extremely experienced in the inmate litigation process, [14] (2) Defendants have not waived the exhaustion defense, and (3) special circumstances do not exist which would excuse Plaintiff from complying with the procedural requirements. [15] However, even if the Court were persuaded that Plaintiff's letters created an exception to the exhaustion requirement, such a finding would not help Plaintiff withstand summary judgment on the claims at issue. This is because, while Magistrate Judge Peebles found that some of Plaintiff's retaliatory transfer claims were unexhausted, Magistrate Judge Peebles also found that all of Plaintiff's retaliatory transfer claims were unsupported by sufficient record evidence from which a reasonable factfinder could conclude that the transfers were caused by Plaintiff's filing of grievances (as opposed to being caused by legitimate, penological considerations).

**\*5** Finally, with regard to Plaintiff's claim that a "conflict" existed (or exists) in this case, the Court rejects that argument. Plaintiff has not offered any evidence of such a conflict. The fact that District Judge Gary L. Sharpe issued a ruling in *Houston v. Leclaire,* 01-CV-0067, Decision and Order (N.D.N.Y. filed July 22, 2004) (Sharpe, J.) (denying, in part, defendants' motion for summary judgment requesting dismissal of Plaintiff's retaliation claim arising from the filing of false misbehavior reports against him, and the destruction of his legal materials, in 1999) in no way collaterally estops or otherwise precludes the Court from dismissing Plaintiff's claims in this current action due to a lack of supporting record evidence. [16] As a result, and for the reasons stated by Magistrate Judge Peebles in his Report-Recommendation, Plaintiff's retaliation claims with regard to the misbehavior reports are dismissed.

For all of these reasons, the Court grants Defendants' motion for summary judgment.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Peebles's Report-Recommendation (Dkt. No. 85) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 80) is **GRANTED;** and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED** in its entirety.

*REPORT AND RECOMMENDATION*

[DAVID E. PEEBLES](), United States Magistrate Judge.

Plaintiff Tyrone Houston, a former New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to [42 U.S.C. § 1983](), *inter alia,* alleging violation of his civil rights. In his complaint, plaintiff maintains that as a result of having been engaged in activity protected under the First Amendment to the United States Constitution, including filing grievances and commencement and pursuit of prior lawsuits, he was subjected by prison officials to a series of inter-prison transfers, the filing of false misbehavior reports, the imposition of unwarranted disciplinary confinement, and unfavorable program assignments. Plaintiff also complains of the deprivation of outdoor exercise, contending that the denial represented cruel and unusual punishment, in violation of his rights under the Eighth Amendment. Plaintiff's complaint seeks both equitable relief and the recovery of compensatory and punitive damages.

Currently pending before the court is a motion filed on behalf of the defendants seeking the entry of summary judgment dismissing each of plaintiff's claims. In support of their motion, defendants assert that certain of plaintiff's causes of action are procedurally barred, based upon his failure to exhaust available administrative remedies before filing suit, and that all of his claims are subject to dismissal on the merits, arguing that no reasonable factfinder could conclude that he was subjected to unlawful retaliation or

cruel and unusual punishment. For the reasons set forth below, I recommend that defendants' motion be granted.

I. *BACKGROUND* [1]

 **\*6** At the times relevant to his claims plaintiff Tyrone Houston, apparently also known as Tyrone Black, was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"). Plaintiff's claims, which are expansive in terms of both their substantive breadth and the time period involved, arise from incidents occurring while he was confined in various facilities operated by the DOCS including, the Mid-State Correctional Facility, the Mohawk Correctional Facility, the Marcy Correctional Facility, the Great Meadow Correctional Facility, the Downstate Correctional Facility, the Auburn Correctional Facility, the Five Points Correctional Facility, the Cayuga Correctional Facility, the Elmira Correctional Facility, and the Ogdensburg Correctional Facility.

During the period of his incarceration, plaintiff filed a series of grievances and commenced suits against various prison workers. Plaintiff claims that as a direct result of that activity he experienced recrimination, in the form of issuance of several false misbehavior reports, leading to procedurally flawed disciplinary hearings and ensuing unlawful disciplinary confinement in various facility special housing units ("SHUs"). Plaintiff also attributes the various inter-prison transfers which he experienced, including in October of 2000 to the Mohawk Correctional Facility in lieu of a facility closer to his place of residence, to retaliatory animus, in further response to his grievances and lawsuits. Plaintiff additionally asserts that while in disciplinary confinement, he was subject to a DOCS policy under which SHU inmates are ineligible for participation in outdoor exercise. As a result, plaintiff was unable to participate in such outdoor activities for an aggregate period of 222 days, extending intermittently from September of 2001 until mid-2003. [2]

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on November 21, 2003. Dkt. No. 1. As defendants, plaintiff's complaint names twenty-two present or past employees of the DOCS including the agency's commissioner, Glenn S. Goord, as well as the Central Office Review Committee (the

"CORC"), which was sued as an entity, and asserts claims against the defendants in both their individual and official capacities. [3] *Id.* Issue was joined by the filing of answers on behalf of the majority of the defendants on September 30, 2005, and by defendant Dana C. Smith on November 28, 2005, generally denying the material allegations of plaintiff's complaint and interposing various affirmative defenses. Dkt. Nos. 58, 60.

On January 4, 2008, following the completion of pretrial discovery, defendants moved for summary judgment dismissing plaintiff's complaint in its entirety. Dkt. No. 80. In their motion, defendants argue that portions of plaintiff's claims are procedurally barred, based upon his failure to exhaust available administrative remedies before commencing suit. Addressing the merits, defendants assert that plaintiff's claims lack factual support and that the record fails to contain evidence from which a reasonable factfinder could conclude that the adverse actions attributed by the plaintiff to retaliatory animus were in fact motivated by his protected activity. Defendants also contend that as a matter of law plaintiff's complaints regarding the denial of exercise do not implicate constitutional considerations. Plaintiff has since responded in opposition to defendants' motion in papers filed with the court on February 1, 2008. Dkt. No. 83.

**\*7** Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation to the assigned district judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). [4] *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see* Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,*

391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law ...." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process). When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is appropriately granted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. *Failure to Exhaust Remedies*

**\*8** In their motion defendants assert that, as a threshold matter, certain of plaintiff's claims are procedurally barred based upon his failure to exhaust available administrative remedies with regard to those claims.

With an eye toward "reduc[ing] the quantity and improv[ing] the quality of prisoner suits[,]" *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 988 (2002), Congress altered the inmate litigation landscape considerably through the enactment of the Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), imposing several restrictions on the ability of prisoners to maintain federal civil rights actions. An integral feature of the PLRA is a revitalized exhaustion of remedies provision which requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007). This limitation is intended to serve the dual purpose of affording "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court[,]" and "to improve the quality of inmate suits filed through the production of a 'useful administrative record.' " *Jones v. Bock,* 549 U.S. 199, 127 S.Ct. 910, 914-15 (2007) (citations omitted); *see Woodford,* 548 U.S. at 91-92, 126 S.Ct. at 2386; *see also Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532, 122 S.Ct. at 992 (citation omitted).

The failure of a prisoner to satisfy the PLRA's exhaustion requirement is not jurisdictional, but instead gives rise to a defense which must affirmatively be raised by a defendant in response to an inmate suit.[5] *Jones,* 127 S.Ct. at 918. In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94-95, 126 S.Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies).

"Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's

critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ). While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F .3d at 43 (quoting *Johnson,* 380 F.3d at 697-98) (emphasis omitted).

**\*9** New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by DOCS, and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003) and *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident.[6] 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to CORC, which makes the final administrative decision. *Id .* § 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

Without question the plaintiff, who by all accounts has frequently availed himself of New York's IGP while in DOCS custody, has filed grievances raising many of the issues forming the basis for his complaint in this action. The record now before the court, however, contains no indication that this is true with regard to all of Houston's claims. The only grievance which plaintiff claims to have lodged addressing the question of his many, allegedly retaliatory inter-prison transfers, for example, was filed on March 17, 2003. *See* Complaint (Dkt. No. 1) ¶ 46

and pp. 109-111.[7] Accordingly, it does not appear that plaintiff has exhausted available administrative remedies with respect to inter-prison transfers effectuated after the filing of that grievance, including his transfers 1) on June 13, 2003, into the Riverview Correctional Facility; 2) on June 16, 2003, into the Gouverneur Correctional Facility; and 3) on August 15, 2003, into the Elmira Correctional Facility. Similarly, there is no indication in the record now before the court that plaintiff's alleged denial of outdoor exercise covering the period from September 15, 2001 through November 21, 2001, forming the basis for a portion of plaintiff's cruel and unusual punishment claim, *see* Complaint (Dkt. No. 1) ¶ 47, was grieved. While plaintiff did apparently file a grievance on July 29, 2003 regarding his confinement in the Gouverneur SHU beginning on June 17, 2003, *see* Complaint (Dkt. No. 1) at p. 120, there is no evidence of pursuit of that grievance through to completion.

**\*10** In light of these failures and the fact that plaintiff has not offered any evidence which would indicate that the grievance procedure was not available to him or otherwise form a proper basis for excusing the grievance requirement, I recommend that the portions of plaintiff's claims for which there was no grievance filed and pursued to completion be dismissed on this procedural basis.[8]

## C. *Retaliation*

Plaintiff's complaint centers principally upon his claim of retaliation, which is comprised of two discrete components. First, plaintiff maintains that the issuance of various misbehavior reports, alleged by him to have contained false accusations, and resulting findings of guilt following disciplinary hearings, were prompted by his having engaged in protected activity, including the filing of grievances and lawsuits. Additionally, plaintiff asserts that for the same retaliatory reasons he was excessively transferred among various prison facilities, including into some at remote locations from his place of residence. In their motion, defendants contend that the record fails to disclose the basis upon which a reasonable factfinder could conclude that the adverse actions upon which plaintiff's retaliation claims hinge were in fact prompted by retaliatory animus.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588-90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that: 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff successfully shoulders this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*11** Analysis of retaliation claims thus requires thoughtful consideration of the evidence presented concerning the protected activity in which the inmate plaintiff has engaged and the adverse action taken against him or her, as well as evidence tending to link the two. When such claims, which ordinarily are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, the entry of summary judgment dismissing plaintiff's retaliation claims is warranted. *Flaherty,* 713 F.2d at 13.

It should also be noted that personal involvement of a named defendant in any alleged constitutional deprivation is a prerequisite to an award of damages against that individual under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). As is true of other types of claims, this principle applies to causes of action claiming unlawful retaliation. *See Abascal v. Hilton,* No. 04-CV-1401, 2008 WL 268366, at *10 (N.D.N.Y. Jan. 30, 2008) (Kahn, D.J. and Lowe, M.J.).

1. *False Misbehavior Report Claim*

In cases involving allegations of retaliation based on the filing of allegedly false misbehavior reports, "[t]he

| Date of Issuance | Author | Alleged Protected Activity Precipitating Issuance | Disposition |
|---|---|---|---|
| 4/8/01 | Van Slyke | Submission of grievance dated 4/12/01 against Van Slyke's girlfriend, identified only as "SHU Counselor".[9] | Dismissed (no hearing held) |

**\*12** *Id.*

The only evidence offered by the plaintiff which could potentially support the finding of a nexus between an instance of protected activity alleged in his complaint and a corresponding misbehavior report is the inference to be drawn from the relevant chronology. It is true such an inference, flowing from a closeness in proximity between protected activity and the issuance of a misbehavior report can in certain instances suffice to avoid summary judgment dismissal of a retaliation claim. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) citing *Flaherty v. Coughlin,* 713. F.2d 10, 14 (2d Cir.1983). As defendants note, however, in many circumstances this alone is insufficient to avoid summary judgment. *Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000); citing *Ayers v. Stewart,* 1996 WL 346049, at *1 (2d Cir.1999); *see*

difficulty lies in establishing a retaliatory motive." *Barclay v. New York,* 477 F.Supp.2d 546, 558 (N.D.N.Y.2007). Mere conclusory allegations of such retaliatory motivation will not suffice to survive a summary judgment motion; to establish retaliatory animus, which ordinarily must be shown circumstantially since direct evidence of such motivation is typically lacking, a plaintiff may cite such factors as "temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Id.* (citations omitted); *see also Rivera v. Goord,* 119 F.Supp.2d 327, 339 (S.D.N.Y.2000).

Plaintiff's complaint alleges the issuance of nine allegedly false misbehavior reports, each authored by a different corrections officer, between April 8, 2001 and June 9, 2003. Complaint (Dkt. No. 1) ¶¶ 13-29. In each instance plaintiff attributes the issuance to retaliatory motives, citing different protected activity, as follows:

*also Ethier v. City of Cohoes,* No. 1:02 Civ. 1584, 2006 WL 1007780, *7 (N.D.N.Y. April 18, 2006).

In this instance there are misbehavior reports issued which, taken in isolation, could give rise to a determination by a reasonable factfinder that the misbehavior report was issued in retaliation for protected activity. Taken together and considered in the light of all relevant facts, however, the record in this instance simply does not support the inference of such a connection. Prior to April of 2001, plaintiff had amassed a disciplinary record which included twelve separate findings of guilt in connection with alleged violations between October, 1993 and July, 27, 1999. *See* Kerwin Decl. (Dkt. No. 80-8) Exh. B. The allegedly retaliatory misbehavior reports now in dispute were issued over a two-year period by nine different corrections workers, while

plaintiff was incarcerated at four different prison facilities. With the exception of defendant Hammill, each of the individuals authoring the subject misbehavior reports has submitted an affidavit expressly denying having done so prompted by retaliatory motivation. [12] In seven of the nine instances, plaintiff was found guilty of at least some of the charges lodged, with an acquittal in one additional instance and one other misbehavior report having been dismissed for failure to conduct a timely disciplinary hearing. Given the totality of these circumstances, no reasonable factfinder could conclude that the issuance of the various misbehavior reports and resulting findings of guilty was prompted by retaliatory animus. I therefore recommend dismissal of this portion of plaintiff's retaliation claim.

2. *Prison Transfer Claim*

The second aspect of plaintiff's retaliation claim concerns his frequent transfer among prisons. [13] The record supports plaintiff's claim regarding the frequency of his prison transfers. Plaintiff was transferred among various New York prisons thirteen times between May 7, 2001 and August 15, 2003, as set forth below:

**\*13** Complaint (Dkt. No. 1) ¶¶ 7-10, 32-46; Knapp-David Aff. (Dkt. No. 80-22) Exh. B. Citing some specific instances of protected activity, plaintiff alleges that all of these transfers were prompted by retaliatory motives on the part of prison officials. *See* Complaint (Dkt. No. 1), *id.* Without question, prison officials retain significant flexibility and wide discretion in managing the corrections system and placing inmates appropriately. *See* N.Y. Correction Law §§ 23, 72 and 112(1); *see also Prins v. Coughlin,* 76 F.3d 504, 507 (2d Cir.1996) *citing Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538 (1976) (prisoner generally has no due process right to challenge a transfer from one facility to another). As the Supreme Court has noted, New York's statute governing prison transfers "imposes no conditions on the discretionary power to transfer, and we are advised by the State that no such requirements have been promulgated." *Montanye v. Haymes,* 427 U.S. 236, 243, 96 S.Ct. 2543 (1976).

While the discretion of prison officials to place and transfer prisoners is broad, it is not unfettered; when such a transfer is made out of purely retaliatory motivation, in response to constitutionally protected activity, a claim

of unlawful retaliation under the First Amendment is established. *Meriwhether v. Coughlin,* 879 F.2d 1037, 1046 (2d Cir.1989); *Hohman v. Hogan,* 597 F.2d 490, 492-93 (2d Cir.1979).

In this instance plaintiff's allegations of retaliatory transfers appear to center upon defendants Knapp-David, LeClaire and Goord. *See* Complaint (Dkt. No. 1) ¶¶ 32, 35-42, 45 and pp. 18-19, 79-81, 88-89, 91-92, 94-95. Plaintiff apparently theorizes that these high ranking DOCS officials undertook a campaign of retaliatory transfers in order to punish him for his filing of grievances and lawsuits against various corrections workers assigned to the prison to which plaintiff was assigned.

In an affidavit given in support of defendants' motion, defendant Knapp-David, formerly the Director of Classification and Movement for the DOCS, explains the hub system implemented by the agency to designate the 63,500 inmates in the system and the process utilized to effectuate inmate transfers. Knapp-David Decl. (Dkt. No. 80-22) ¶¶ 2-7. That affidavit reflects that "transfers of inmates between hubs or transfer of maximum security inmates were approved and made by classification analysts on [Knapp-David's] staff when [she] was the Director of Classification and Movement .... As a routine matter [she] was not personally involved in inmate transfer decisions." [14] *Id.* ¶ 3. In that declaration defendant Knapp-David denies both having any retaliatory motivation, and participating in the decisions to make the disputed transfers. *Id* . Since personal involvement is a constitutional violation is a pre-requisite to establishing liability, defendant Knapp-David is entitled to dismissal on this basis. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977).

**\*14** Aside from his sheer conjecture, plaintiff has offered no evidence from which a reasonable factfinder could determine that any of the cited prison transfers were ordered out of retaliation for plaintiff's filing of grievances and commencement of lawsuits, rather than resulting from legitimate, penological considerations. Given this and plaintiff's well documented history of claiming retaliation in connection with many adverse actions taken against him overtime by prison officials, I conclude that the entry of summary judgment dismissing this portion of plaintiff's retaliation claim is also warranted. [15]

D. *Cruel and Unusual Punishment*

The last element of plaintiff's complaint is focused upon the alleged denial of the opportunity to engage in outdoor exercise while confined to S-Blocks at Ogdensburg. Complaint (Dkt. No. 1) ¶¶ 47-48. Defendants maintain that they are entitled to the entry of summary judgment dismissing this claim as well.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 297-98, 111 S.Ct. 2321, 2323-2324 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M .J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

Without question, prison inmates must be afforded a reasonable opportunity for exercise. *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985); *see also Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996) and *Sostre v. McGinnis,* 442 F.2d 178, 193 & n .25 (2d Cir.1971)

(en banc), *rev'd on other grounds, cert. denied Sostre v. Oswald,* 404 U.S. 1049, 92 S.Ct. 11190 (1972). Not every deprivation of this opportunity, however, rises to a level of constitutional significance; instead, to sustain an Eighth Amendment claim a plaintiff must show that he or she was denied of all meaningful exercise for a substantial period of time. *See Davidson v. Coughlin,* 968 F.Supp. 121, 129 (S.D.N.Y.1997). When determining whether this showing has been made, a court may consider such relevant factors as 1) the duration of the deprivation; 2) its extent; 3) the availability of other out-of-cell activities; 4) the opportunity for in-cell exercise; and 5) the justification offered for the deprivation. *See Williams v. Goord,* 111 F.Supp.2d 280, 291 (S.D.N.Y.2000).

**\*15** Plaintiff's exercise claim is comprised of two components. First, he contends that when confined to an "S" block for disciplinary purposes he was not permitted to engage in outdoor exercise, but instead only permitted to exercise utilizing an outdoor recreation pen attached to his cell. *See* Complaint (Dkt. No. 1) ¶¶ 48 and p. 113. Secondly, plaintiff asserts that he was confined to his cell for twenty-four hours each day between March 22, 2003 and April 4, 2003, pending a hearing at the Ogdensburg Correctional Facility, and thus denied any meaningful opportunity to exercise during that period. (Dkt. No. 1) ¶ 49 and p. 116.

1. *"S" Block Confinement*

While confined in facility SHU's, plaintiff was restricted to an exercise area measuring eight feet five inches in width, six feet nine inches in depth, and with the ceiling height of twelve feet seven inches. Complaint (Dkt. No. 1) ¶¶ 47-48; Prack Aff. (Dkt. No. 80-30) ¶ 5. SHU exercise areas have three solid walls, with a fourth side made of woven rod security screen through which inmates can view the open surroundings. Prack Aff. (Dkt. No. 80-30) ¶ 5.

The relevant portions of plaintiff's complaint and exhibits describe standard SHU conditions of confinement, which have been found to pass constitutional muster. *See, e.g., Sostre v. McGinnis,* 442 F.2d at (outdoor exercise for one hour in small enclosed yard open to the sky consistent with Eighth Amendment); *Anderson,* 757 F.2d at 35) (holding that Eighth Amendment not violated when inmates confined to special housing unit were allowed one hour per day of outdoor exercise-with no access to indoor exercise area); *Young v. Scully,* Nos. 91 Civ. 4332, 91 Civ. 4801, 91 Civ. 6769, 1993 WL 88144, at *5 (S.D.N.Y. March 22,

1993) (holding that Eighth Amendment was not violated when inmate was deprived of exercise for periods lasting several days); and *Jordan v. Arnold,* 408 F. Supp 869, 876-877 (M.D.Pa.1976) (holding that Eighth Amendment not violated when inmates confined to special housing unit were allowed two hours of exercise per week). In this instance the court declines plaintiff's invitation to enter the arena of prison management, and instead recommends a finding that this portion of plaintiff's complaint fails to allege a cognizable constitutional deprivation.

2. *Denial of Exercise While at Ogdensburg*
The second element of plaintiff's cruel and unusual punishment claim relates to the denial of exercise for a period of thirteen days while awaiting a disciplinary hearing. *See* Complaint (Dkt. No. 1) ¶ 49 and p. 116. In order to sustain a constitutional claim this cause of action must assert an "unquestioned and serious deprivation of basic human needs" or "depri[vation] of the minimal civilized measure of life's necessities. *Anderson,* 757 F.2d at 35. The denial of exercise for a period of thirteen days is, relatively speaking, *de minimis* and does not rise to a level sufficient to support a constitutional deprivation. *See Young v. Scully,* 91 Civ. 4332, 91 Civ. 4801, 91 Civ. 6768 and 91 Civ. 6769, 1993 WL 88144, at *5 (deprivation of exercise over several days found to be *de minimis* ); *Davidson v. Coughlin,* 968 F.Supp. 121, 128-131 (S.D.N.Y.1997) (holding that "temporary and sporadic deprivations of outdoor activity [for no longer than fourteen days in a row] do not fall below the minimum standards of the Eighth Amendment"); *see also Trammell v. Keane,* 338 F.3d 155 (2d Cir.2003); *Branham v. Meachum,* 77 F.3d 626, 630-31(2d Cir.1996) (finding that keeping inmate on lockdown and "full restraint" status without outdoor exercise for a period of approximately twenty-two days does not violate the Eighth Amendment).

 **\*16** There appears to be another basis on which dismissal of this portion of plaintiff's complaint would be warranted. The deprivation of exercise while in Ogdensburg does not appear to be attributed to subjective indifference on the part of any of the named defendants to plaintiff's well being, but instead was the result of a facility procedure at Ogdensburg which was later amended following plaintiff's successful grievance regarding the matter. *See* Kurz Decl. (Dkt. No. 80-26) ¶ 9. Under these circumstances plaintiff has failed to establish the subject deliberate indifference on the part of any of the defendants

toward his safety and well being. *Hathaway v. Coughlin,* 99 F.3d 550, 554 (2d Cir.1996) (charged official must act with sufficiently culpable state of mind that is equivalent to criminal recklessness); *see also Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994).

IV. *SUMMARY AND RECOMMENDATION*
The plaintiff, a frequent litigator and an inmate who over the period of his confinement with the DOCS accumulated an extremely poor disciplinary record, now complains alleging that nine misbehavior reports authored by nine separate corrections officers at four corrections facilities over a two year period, seven of which resulted of findings of guilt following disciplinary hearings, were issued out retaliatory motivation. Having carefully considered the record now before the court, I conclude that no reasonable factfinder could agree that those misbehavior reports were issued for retaliatory purposes. Plaintiff further claims that various inter-prison transfers which he experienced over time were retaliatory, in response to his having filed grievances and lawsuits. Once again, the record fails to contain evidence from which a reasonable factfinder could draw this conclusion. Finally plaintiff contends that he was subjected to cruel and unusual punishment by the denial of adequate opportunities for exercise. Having carefully reviewed the record, I conclude that no reasonable factfinder could determine that he was in fact subjected to cruel and unusual punishment.

For these reasons, and additionally because certain of his claims are procedurally barred based upon his failure to exhaust available administrative remedies, I recommend dismissal of plaintiff's complaint in its entirety. It is therefore respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 80) be GRANTED, and that all plaintiff's claims in this action be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 890658

Footnotes

1  On September 30, 2005, all of the Defendants except one filed their Answer to Plaintiff's Complaint. (Dkt. No. 58.) On November 28, 2005, Defendant Smith filed her answer to the Complaint. (Dkt. No. 59.)

2  On de novo review, "[t]he judge may ... receive further evidence...." *28 U.S.C. § 636(b)(1)(C)*. However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g., Paddington Partners v. Bouchard, 34 F.3d 1132, 1137-38 (2d Cir.1994)* ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters, 894 F.2d 36, 40, n. 3 (2d Cir.1990)* (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

3  *See also Vargas v. Keane, 93-CV-7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec. 12, 1994)* (Mukasey, J.) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of *28 U.S.C. § 636*."), aff'd, *86 F.3d 1273 (2d Cir.)*, *cert. denied*, *519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996)*.

4  *Amnesty Am. v. Town of W. Hartford, 288 F.3d 467, 470 (2d Cir.2002)* [citations omitted]; *accord, Lee v. Alfonso*, No. 04-1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g*, 97-CV-1741, 2004 U.S. Dist. 20746, at *12-13 (N.D.N.Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak*, 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell, 289 F.Supp.2d 289, 295 (N.D.N.Y.2003)* (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan, 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003)* (Hurd, J.).

5  *Krug v. County of Rennselaer, 04-CV-0640, 2006 WL 2669122, at *3 (N.D.N.Y. Sept. 18, 2006)* (McAvoy, J.) ("When dealing with a *pro se* party, certain procedural rules apply so as to insure that the *pro se* litigant in not disadvantaged by the lack of legal training. In this regard, the Local Rules require that [a *pro se* party be informed of the consequences of failing to respond to a motion for summary judgment, before those consequences may be imposed]."); *see also Champion v. Artuz, 76 F.3d 483, 486 (2d Cir.1996)* ("This Court has also held that summary judgment should not be entered by default against a *pro se* plaintiff who has not been given any notice that failure to respond will be deemed a default.") [citations omitted]; *see also* Jessica Case, *"Pro Se Litigants at the Summary Judgment Stage: Is Ignorance of the Law an Excuse?" 90 Ky. L.J. 701, 704, n. 24 (Spring 2001)* ("The Second, Fourth, Seventh, Tenth, Eleventh, and D.C. Circuit Courts of Appeals mandate that notice of summary judgment requirements be given to *pro se* litigants.... The Ninth Circuit requires notice of summary judgment requirements for *pro se* prisoner litigants only.") [citations omitted].

6  *See McNeil v. U.S., 508 U.S. 106, 113 (1993)* ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *McKaskle v. Wiggins, 465 U.S. 168, 184 (1984)* ("Nor does the Constitution require judges to take over chores for a *pro se* [litigant] that would normally be attended to by trained counsel as a matter of course."); *Mohasco Corp. v. Silver, 447 U.S. 807, 826 (1980)* ("[I]in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law [even when that strict adherence inures to the detriment of a *pro se* litigant]."); *Faretta v. California, 422 U.S. 806, 834, n. 46 (1975)* ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir.2006)* ("[P]ro se status does not exempt a party from compliance with relevant rules of procedural and substantive law.") [citation omitted]; *LoSacco v. City of Middletown, 71 F.3d 88, 92 (2d Cir.1995)* ("Although *pro se* litigants should be afforded latitude, ... they generally are required to inform themselves regarding procedural rules and to comply with them .... This is especially true in civil litigation.") [internal quotation marks and citations omitted]; *Edwards v. I.N.S.,* 69 F.3d 5, 8 (2d Cir.1995) ("[W]hile a *pro se* litigant's pleadings must be construed liberally, ... *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them .") [citations omitted]; *Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir.1983)* ("[T]he right [to benefit from reasonable allowances as a *pro se* litigant]

does not exempt [the *pro se* ] party from compliance with relevant rules of procedural and substantive law.") [internal quotation marks and citations omitted].

7     Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3).

8     *See, e.g., Hassig v. N.Y.S. Dep't of Environmental Conservation,* 01-CV-0284, Decision and Order, at 7 (N.D.N.Y. filed March 4, 2004) (McAvoy, J.), *aff'd,* No. 04-1773, 2005 WL 290210 (2d Cir. Feb. 2, 2005); *Lee,* 2004 U.S. Dist. LEXIS 20746, at *12-13, 15, *aff'd,* No. 04-1921, 2004 U.S.App. LEXIS 21432; *Harvey v. Morabito,* 99-CV-1913, 2003 WL 21402561, at *1, 3-4 (N.D.N.Y. June 17, 2003)* (Sharpe, M.J.), *adopted by* 99-CV-1913, Order, at 2-3 (N.D.N.Y. filed Jan. 15, 2004) (Munson, J.), *aff'd,* No. 04-1008, 115 F. App'x 521 (2d Cir. Dec. 23, 2004); *Krug,* 2006 WL 2669122, at *2-3; *Fox,* 2006 U.S. Dist. LEXIS 9147, at *2-3; *Singleton v. Caron,* 03-CV-0455, 2005 WL 2179402, at *3-4 (N.D.N.Y. Sept. 5, 2005) (Peebles, M.J.), *adopted by* 03-CV-0455, 2006 WL 2023000, at *3 (N.D.N.Y. July 18, 2006) (Sharpe, J.); *Govan,* 289 F.Supp.2d at 295; *Butler v. Weissman,* 00-CV-1240, 2002 WL 31309347, at *3 (N.D.N.Y. June 20, 2002) (Sharpe, M.J.), *adopted by* 00-CV-1240, Decision and Order, at 1-2 (N.D.N.Y. filed July 22, 2002) (Kahn, J.); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 & n. 1 (N.D.N.Y.1999) (McAvoy, C.J.); *Costello v. Norton,* 96-CV-1634, 1998 WL 743710, at *1, n. 2 (N.D.N.Y. Oct. 21, 1998) (McAvoy, C.J.); *Squair v. O'Brien & Gere Eng'rs, Inc.,* 96-CV-1812, 1998 WL 566773, at *1, n. 2 (N.D.N.Y. Aug. 21, 1998) (Scullin, J.); *see also Monahan v. N.Y. City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing, in *pro se* civil rights case, district courts' discretion to adopt local rules like 7.1[a][3] "to carry out the conduct of its business").

9     The Court notes that a detailed recitation of the claims and Plaintiff's procedural errors are provided in Magistrate Judge Peebles's Report-Recommendation. (Dkt. No. 85, at 8-14.) Accordingly, the Court will not repeat this thorough analysis.

10     *See Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000) ("Although the temporal proximity of the filing of the grievance and the issuance of the misbehavior report is circumstantial evidence of retaliation, such evidence, without more, is insufficient to survive summary judgment.") (citing *Ayers v. Stewart,* No. 96-2013, 1996 WL 346049, at *1 [2d Cir.1999] ).

11     *See also Sostre v. McGinnis,* 442 F.2d 178, 187-92 (2d Cir.1971), *rev'd on other grounds, Sostre v. Oswald,* 404 U.S. 1049 (1972).

12     In addition, in his Objections to the Report-Recommendation, Plaintiff appears to argue, for the first time, that the Court lacks jurisdiction over his claims. The Court rejects this argument for a number of reasons, including the fact that (1) such a jurisdictional challenge is not timely, and (2) such a jurisdictional challenge flies in the face of Plaintiff's Complaint, which alleged that the Court had "jurisdiction over each of Plaintiff's claims."

13     "Under 42 U.S.C. § 1997e(a), an inmate must exhaust all administrative remedies prior to bringing any suits challenging prison conditions, including federal civil rights cases." *Chaney v. Koupash,* 04-CV-0136, 2008 WL 5423419, at *7 (N.D.N.Y. Dec. 30, 2008) (citing *Porter v. Nussle,* 534 U.S. 516, 524 (2002) [other citation omitted].). "While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that 'certain caveats apply.' " *Chaney,* 2008 WL 5423419, at *7 (citations omitted). "Exhaustion is generally achieved through the [Inmate Grievance Program]." *Id.* (citation omitted). "However, when inmates fail to follow the IGP, a court must conduct a three-part inquiry to determine if such failure is fatal to their claims." *Id.* "A court must consider whether (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement." *Id.* (citations omitted).

14     "Administrative remedies are unavailable when there is no possibility of relief for the action complained of." *Chaney,* 2008 WL 5423419, at *7 (citations and internal quotations omitted). "The test to determine the availability of an administrative remedy is an objective one asking whether 'a similarly situated individual of ordinary firmness' would have deemed it accessible." *Id.* (citation omitted). "Courts have found unavailability where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Id.* (citations and internal quotations omitted).

15     *See, e.g., Carini v. Austin,* 06-CV-5652, 2008 WL 151555, at *4 (S.D.N.Y. Jan. 14, 2008) (noting that an inmate must point to "an affirmative act by prison officials that would have prevented him from pursuing administrative remedies, ... [because] his transfer to another facility is not a 'special circumstance' that excuses his failure to exhaust").

16     To the extent that Plaintiff argues that there existed a conflict of interest resulting from his disciplinary hearing officers knowing each other, or knowing the correctional officers having charged Plaintiff with disciplinary charges, it is true that "[p]risoners have a constitutional right to have a fair and impartial hearing officer preside over their disciplinary hearings."

*Chaney,* 2008 WL 5423419 at *7 (citing *Sira v. Morton,* 380 F.3d 57, 69 [2d Cir.2004] ). "However, the degree of impartiality required of prison officials does not rise to the level of that required of judges as it is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Id.* (citations and internal quotations omitted). "While the Supreme Court held 'that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer] ...,' the Second Circuit has held that the test is whether there was 'reliable evidence' of the inmate's guilt." *Id.* (citations omitted).

1    In light of the procedural posture of the case the following recitation is drawn from the record now before the court, with all inferences drawn, and ambiguities resolved, in favor of the plaintiff. *See Wells-Williams v. Kingsboro Psychiatric Ctr.,* No. 03-CV-134, 2007 WL 1011545, at *2 (E.D.N.Y. Mar. 30, 2007) (citations omitted).

2    Each of these claims and their factual underpinnings will be discussed in more detail further on in this report.

3    Plaintiff's claim against the CORC, as well as those asserted against the remaining defendants in their official capacities, were dismissed by order issued by Senior District Judge Lawrence E. Kahn, on September 29, 2006 (Dkt. No. 69), acting on a report and recommendation issued by me on August 28, 2006. Dkt. No. 67.

4    This matter was transferred from Judge Kahn to District Judge Glenn T. Suddaby on October 2, 2008. *See* Dkt. No. 84.

5    In their answers, defendants have included an affirmative defense alleging plaintiff's failure to satisfy his exhaustion obligation. *See* Dkt. Nos. 58, ¶ 16 and 60, ¶ 16.

6    The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances." 7 N.Y.C.R.R. § 701 .6(g)(1)(i)(a)-(b).

7    In support of their motion, defendants have offered a version of plaintiff's complaint, which is exceedingly comprehensive, together with the extensive exhibits attached, all paginated for ease of reference. *See* Kerwin Decl. (Dkt. No. 80-8) Exh. A. In this report and recommendation I will adopt defendants' pagination when citing to those materials.

8    In his memorandum in opposition to defendants' motion, plaintiff alleges, for the first time, that certain prison officials, identified as defendants DeBejian and G. Molnar, interfered with his grievances out of retaliatory animus. *See* Plaintiff's Memorandum (Dkt. No. 82) at pp. 11-12. This conclusory statement draws no evidentiary support from the record, and is not viewed by the court as sufficient to invoke the limited exceptions by the Second Circuit in its group of decisions issued in 2004. *See, Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004); *Hemphill v. New York,* 380 F.3d 680 (2d Cir.2004); *Giano v. Goord,* 380 F.3d 670 (2d Cir.2004); *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004); and *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004). I note, moreover, that whether the *Hemphill* test survives intact following the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378 (2006), has been a matter of some speculation. In one relatively recent decision a judge of another district within this Circuit concluded that at least the first two prongs of the *Hemphill* three part inquiry, requiring the court to assess whether administrative remedies were in fact "available" to prisoners and whether defendants should be estopped from raising the affirmative defense of non-exhaustion, retain continued vitality. *Amador v. Superintendent of Dep't of Correctional Services,* No. 03 Civ. 0650(KTD)(GWG), 2007 WL 4326747, at *6-7 (S.D.N.Y. Dec. 4, 2007). I note that another judge of this court has similarly concluded that

> it appears that these decisions have **not** been overruled ... In [his] concurring opinion, Justice Breyer specifically noted that two circuits, the **Second** Circuit and Third Circuit, have interpreted the PLRA "in a manner similar to that which the [Supreme] Court today adopts(,) ...,"

> further buttressing the conclusion that the Second Circuit's *Hemphill* test retains vitality. *Miller v. Covey,* No. 9:05-CV 649, 2007 WL 952054, at *3 (N.D.N.Y. Mar. 29, 2007) (*Emphasis in original* ).

9    While the grievance for which plaintiff claims he was retaliated against in this count was filed on April 12, 2001, according to the exhibit attached to plaintiff's complaint, Houston contends that it was filed earlier and that there was a delay on the part of the IGRC in passing the complaint through for filing. *See* Houston Aff. (Dkt. No. 82) ¶ 4. While plaintiff's actual grievance complaints are annexed as exhibits in connection with other claims of retaliation, plaintiff did not include a copy of his handwritten grievance in this instance. It should be noted, however, that the handwritten complaints filed in other instances and the resulting formal IGRC sheet all bear the same filing dates. *See, e.g.,* Complaint (Dkt. No. 1) at pp. 19-21, 24-25, 59-61 and 116-18.

| 8/15/01 | Elliott | Grievances filed on 8/9/01 and and 8/12/01 [10] | Guilty (all counts) |
|---|---|---|---|

10    While plaintiff alleges having filed grievances on August 9, 2001 and August 12, 2001 against defendants Elliott and DeBejain, the record contains only the August 12, 2001 grievance. *See* Complaint (Dkt. No. 1) at ¶ 15 and pp. 20-21. Additionally, although plaintiff claims that the resulting false misbehavior report was issued on August 15, 2001 by both defendants Elliot and DeBejain, the report contains only Elliot's signature. *Id.* at p. 21.

| 8/20/01 | Kelley | Filing of grievances (dates and content unspecified) | Guilty (two counts)/Not Guilty (one count) |
| 8/23/01 | Wurst | Filing of grievances and lawsuits against defendant Wurst's "buddies at Mohawk" (dates and specifics not specified) | Guilty of all charges |
| 11/26/02 | Morse | Plaintiff "verbally complaining to [Morse's] supervisor about his racist behavior" (neither dates nor specifics provided) | Acquitted on all counts |
| 3/3/03 | Touron | "[Plaintiff's] exercise of freedom of information" (neither dates nor specifics provided) | Guilty on all counts |
| 3/22/03 | Shaver | Grievance filed on 3/12/03 | Guilty (two counts), Not Guilty (one count). |
| 5/29/03 [11] | Hammill | Written complaint dated 5/29/03 to defendant Smith re: defendant Hammill [submitted by plaintiff] | Guilty (all counts) |

[11] Plaintiff contends that this misbehavior report was issued on May 30, 2003, but backdated by one day. *See* Complaint (Dkt. No. 1) ¶ 26.

| 6/9/03 | Pirie | Pursuit of grievance appeal resulting in CORC decision dated 6/4/03 | Guilty (all counts); hearing result subsequently reversed on appeal to defendant Donald Selsky, Director of SHU/ Inmate Disciplinary Program |

[12] No explanation is offered for the failure to include an affidavit for that defendant.

[13] It should be noted that this is not the first time the plaintiff has had occasion to raise the claim of retaliation associated with this inter-prison transfers. In another action also filed in 2003, in the Western District of New York, plaintiff's complaint included claims of retaliation based upon prison transfers; plaintiff's claims in that case were dismissed, on motion for summary judgment, by order issued by District Judge David G. Larimer. *Houston v. ZenZen,* No. 03-CV-6118 L, (N.D.N.Y. September 26, 2005). *See* Kerwin Decl. (Dkt. No. 80-8) Exh. M (Decision and Order). Significantly, among the defendants named in that action was defendant Knapp-David. *Id.* It therefore could well be that plaintiff's claims in this action alleging retaliatory inter-prison transfer are barred by claim preclusion, or at the very least issue preclusion, based upon Judge Larimer's determination and the resulting judgment. *See Hill v. Coca Cola Bottling Co.,* 786 F.2d 550, 552-53 (2d Cir.1986) and *Kaufman v. Eli Lilly & Co.,* 65 N.Y.2d 449, 455, 482 N.E.2d 63, 67 (1985).

| *Date of Transfer* | *Transferee Facility* |
| --- | --- |
| 5/7/01 | Mohawk Correctional Facility |
| 9/15/01 | Marcy Correctional Facility SHU |
| 11/21/01 | Downstate Correctional Facility SHU |
| 11/23/01 | Great Meadow Correctional Facility SHU |
| 11/27/01 | Downstate Correctional Facility SHU |
| 12/2/01 | Auburn Correctional Facility SHU |
| 12/5/01 | Five Points Correctional Facility |
| 7/11/02 | Cayuga Correctional Facility |
| 8/16/02 | Auburn Correctional Facility |
| 2/3/03 | Ogdensburg Correctional Facility |
| 6/13/03 | Riverview Correctional Facility |
| 6/17/03 | Gouverneur Correctional Facility |
| 8/15/03 | Elmira Correctional Facility |

[14] In her declaration, Knapp-David also explained that inmate transfers can be prompted by a number of factors, including required court appearances or the need for specialized medical treatment, additionally pointing out that on occasion when an inmate is moved between hubs, a transfer may include short term stays at various facilities along the way. Knapp-David Decl. (Dkt. No. 80-22) ¶ 9. Knapp-David further explained that this is the likely reason for certain transfers in rapid succession not necessarily reflected on plaintiff's inmate transfer history including, for example, the September 2001 transfer from Marcy to Great Meadow, with an intermediate stop at Downstate, and a return trip through Downstate with

a final destination of Five Points, with only the Marcy to Five Points transfer having been noted on the plaintiff's transfer history. *See* Knapp-David Decl. (Dkt. No. 80-22) ¶ 9 and Exh. B.

15   In a declaration given in support of defendants' motion, Attorney Stephen M. Kerwin, Esq. recounts his search for actions commenced by the plaintiff, revealing eleven civil cases commenced by Houston against DOCS employees, several of which include allegations of retaliation. *See* Kerwin Decl. (Dkt. No. 80-8) ¶¶ 5, 9-11.

---

**End of Document**
© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 504164
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Norman S. HOWARD, Patrick S. Watson, Blake
Wingate, Darren Staton, Navarro Johnson, Christian
T. Martinez, Islime Duvivier, Francisco Ferreira,
Joseph Opperisano, Winston Cowell, Roger Smith,
John England, Calvin Ellis, Darren Mack, Alex
Wilson, Moses Suarez, Onett D. Brown, Hiram
Feliciano, Glenn Campbell, Francisco Amador,
Shashkov Konstantin, William Vielman, Ralphie
E. Hayes, Andre Livingston Williams, Frederick
Roberson, Wayne Sullivan, Raymond L. Edwards,
Demetrius Loving, Mike Holmes, Robert Fleming,
David Soto, Willie Vega, Troy Valentine, Ittiah
Mogai, Arthur Stewart, Robert Dragoti, Ernest
Langston, Anthony White, Angel Espada, Robert
Johnson, Reginald Milton, Richard Martinez,
Jr., Richard Webb, Kendall Hayes, Michael
Straker, Nestor Sanchez, Damilola Animashaun,
Arthur Jack, Willie Bowman, Frank Trifilio,
Jason Williams, Branan Boston, Jose Vazquez,
Raheem Watson, Jamal Armstead, Howard
Powell, George Etienne, Raymond Maxwell,
Alan Perez, Rasheen Everett, Anthony Cruz,
Anthony Pinder, and Benny Davis, Plaintiffs,
v.
CITY OF NEW YORK et al., Defendants.

Nos. 12cv4069, 12cv4080, 12cv4169, 12cv4170,
12cv4266, 12cv4274, 12cv4275, 12cv4299, 12cv4302,
12cv4306, 12cv4307, 12cv4346, 12cv4347, 12cv4382,
12cv4383, 12cv4393, 12cv4394, 12cv4396, 12cv4457,
12cv4517, 12cv4523, 12cv4524, 12cv4532, 12cv4533,
12cv4630, 12cv4634, 12cv4638, 12cv4670, 12cv4671,
12cv4694, 12cv4698, 12cv4699, 12cv4700,
12cv4803, 12cv4813, 12cv4896, 12cv4961, 12cv5127,
12cv5128, 12cv5129, 12cv5131, 12cv5132, 12cv5133,
12cv5134, 12cv5155, 12cv5253, 12cv5402, 12cv5404,
12cv5416, 12cv5517, 12cv5520, 12cv5668, 12cv5681,
12cv5687, 12cv5691, 12cv5695, 12cv5760, 12cv5768,
12cv5856, 12cv5867, 12cv5868, 12cv5870, 12cv5872.
|

Feb. 11, 2013.

*OPINION & ORDER*

PAUL A. ENGELMAYER, District Judge.

**\*1** Before the Court is the December 20, 2012 Report and
Recommendation of Magistrate Judge James C. Francis
IV, recommending that the Court dismiss plaintiffs'
complaints for failure to state a claim (the "Report"). For
the reasons that follow, the Court adopts the Report in
full as to all plaintiffs.

**I. Background**

The 63 *pro se* plaintiffs identified above bring similar
lawsuits pursuant to 42 U.S.C. § 1983 against the City
of New York (the "City"), Correction Commissioner
Dora B. Schriro, Mayor Michael Bloomberg, and Dr.
Jean Richards of Corizon (a correctional healthcare
services provider). The plaintiffs, who are or were inmates
or detainees in the custody of the New York City
Department of Correction at the Anna M. Kross Center
on Rikers Island ("AMKC"), allege violations of their
Eighth Amendment rights and seek injunctive relief as well
as compensatory and punitive damages. They allege that
they have not been provided with proper beds, which has
caused lower back, neck, and leg pain, as well as emotional
distress. *See* Report 5 (summarizing claims).

On August 27, 2012, the City moved to dismiss the
complaints pursuant to Federal Rule of Civil Procedure
12(b)(6). *See, e.g.,* No. 12 Civ. 4069(PAE)(JCF), Dkt.
16–18. Only one of the 63 plaintiff's—Raheem Watson
—opposed the motion to dismiss. *See* No. 12 Civ. 5687,
Dkt. 13. On December 20, 2012, Judge Francis issued the
Report, recommending that the City's motion to dismiss
the complaints be granted because all 63 complaints failed
to state a claim on which relief could be granted. *See, e.g.,*
No. 12 Civ. 4069(PAE)(JCF), Dkt. 22. The deadline for
plaintiffs to file objections to the Report was January 3,
2012. None of the 63 plaintiffs filed objections. Two filed
amended complaints.

**II. Discussion**

**A. Standard of Review**

In reviewing a Report and Recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). To accept those portions of the report to which no timely objection has been made, "a district court need only satisfy itself that there is no clear error on the face of the record." *Carlson v. Dep't of Justice,* No. 10 Civ. 5149(PAE)(KNF), 2012 WL 928124, at *1 (S.D.N.Y. Mar. 19, 2012) (citation omitted); *see also Wilds v. United Parcel Serv.,* 262 F.Supp.2d 163, 169 (S.D.N.Y.2003).

**B. Non–Objecting Plaintiffs**

Because none of the 63 plaintiffs here have submitted objections to the Report, a review for clear error is appropriate. Careful review of the Report reveals no facial error in its conclusions; the Report is therefore adopted in its entirety. Because the Report explicitly states that "[f]ailure to file timely objections will preclude appellate review," Report 25, these plaintiffs failure to object operates as a waiver of appellate review. *See Caidor v. Onondaga Cnty.,* 517 F.3d 601, 604 (2d Cir.2008) (citing *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989)).

**\*2** The Court emphasizes that in adopting the Report, it is also adopting Judge Francis's recommendation that plaintiffs be granted permission to amend their complaints to state a claim, if the facts so permit, of an Eighth Amendment violation. *See* Report 23–24. To do so, a plaintiff must allege that "(1) he had a pre-existing medical condition requiring a special bed to protect against serious damage to his future health; (2) he made that medical condition known to the prison officials; (3) he requested a special bed to accommodate such medical condition; and (4) his request was denied by an 'official [who knew] of and disregard[ed] an excessive risk to [the plaintiff's] health or safety.' " *Id.* at 24 (quoting *Phelps v. Kapnolas,* 308 F.3d 180, 186 (2d Cir.2002)). Plaintiffs may file, with the Pro Se Office, an amended complaint that plausibly makes out the elements of a constitutional violation. [1] Plaintiffs are advised that any such complaint, to be viable, must allege the elements of municipal liability or the personal involvement of the individual named defendant(s). The requirements to adequately plead such claims are set out in Judge Francis's Report. *See* Report 21–23.

**C. Amended Complaints**

Two plaintiffs, Langston and Straker, have already filed amended complaints in response to the Report. *See* No. 12 Civ. 4961(JCF), Dkt. 18 ("Langston Am. Compl."); No. 12 Civ. 5155(PAE) (JCF), Dkt. 27 ("Straker Am. Compl."). Because the Court adopts the Report and because the Report allowed plaintiffs a final opportunity to amend their pleadings, the Court accepts these amended complaints for filing.

**CONCLUSION**

For the reasons stated herein, the Court adopts the Report in full as to all of the plaintiffs listed above except Langston and Straker. Those 61 plaintiffs' complaints are hereby DISMISSED with leave to file an amended complaint. The Clerk of Court is directed to terminate any motion to dismiss pending in the cases listed above, and to close all of the cases except Nos. 12 Civ. 4961 and 12 Civ. 5155. The cases may be reopened without prejudice if a plaintiff files an amended complaint within 45 days.

The Court accepts for filing Langston and Straker's amended complaints. The City's motion to dismiss— No. 12 Civ. 4961(PAE) (JCF), Dkt. 19; No. 12 Civ. 5155(PAE)(JCF), Dkt. 24—is denied as moot. Defendants are directed to respond to the two amended complaint.

Finally, the Clerk of Court is respectfully directed to serve this Opinion and Order on each of the plaintiffs named in the caption at his address of record.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 504164

**Footnotes**

1    The Court notes that in 13 of these cases—case numbers 12 Civ. 4457, 12 Civ. 4532, 12 Civ. 4638, 12 Civ. 4700, 12 Civ. 4961, 12 Civ. 5127, 12 Civ. 5129, 12 Civ. 5404, 12 Civ. 5668, 12 Civ. 5681, 12 Civ. 5687, 12 Civ. 5691, and 12 Civ. 5872 —there is no record on ECF of whether the Report was, in fact, mailed to the plaintiff. The Court therefore is constrained

to assume that such a mailing did not occur. Because all 63 plaintiffs have the opportunity to amend their complaint in response to this Opinion so as to properly allege a constitutional claim, these 13 plaintiffs were not prejudiced by lack of notice of the Report.

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

⚑ KeyCite Yellow Flag - Negative Treatment

Report and Recommendation Adopted as Modified by [Howard v. City of New York,](#) S.D.N.Y., February 11, 2013

2012 WL 7050623
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Norman S. HOWARD, Plaintiff,
Patrick S. Watson, Plaintiff,
Blake Wingate, Plaintiff,
Darren Staton, Plaintiff,
Navarro Johnson, Plaintiff,
Christian T. Martinez, Plaintiff,
Islime Duvivier, Plaintiff,
Francisco Ferreira, Plaintiff,
Joseph Opperisano, Plaintiff,
Winston Cowell, Plaintiff,
Roger Smith, Plaintiff,
John England, Plaintiff,
Calvin Ellis, Plaintiff,
Darren Mack, Plaintiff,
Alex Wilson, Plaintiff,
Moses Suarez, Plaintiff,
Onett D. Brown, Plaintiff,
Hiram Feliciano, Plaintiff,
Glenn Campbell, Plaintiff,
Francisco Amador, Plaintiff,
Shashkov Konstantin, Plaintiff,
William Vielman, Plaintiff,
Ralphie E. Hayes, Plaintiff,
Andre Livingston Williams, Plaintiff,
Frederick Robertson, Plaintiff,
Wayne Sullivan, Plaintiff,
Raymond L. Edwards, Plaintiff,
Demetrius Loving, Plaintiff,
Mike Holmes, Plaintiff,
Robert Fleming, Plaintiff,
David Soto, Plaintiff,
Willie Vega, Plaintiff,
Troy Valentine, Plaintiff,
Ittiah Mogai, Plaintiff,
Arthur Stewart, Plaintiff,
Robert Dragoti, Plaintiff,
Ernest Langston, Plaintiff,
Anthony White, Plaintiff,
Angel Espada, Plaintiff,
Robert Johnson, Plaintiff,
Reginald Milton, Plaintiff,
Richard Martinez, Jr., Plaintiff,
Richard Webb, Plaintiff,
Kendall Hayes, Plaintiff,
Michael Straker, Plaintiff,
Nestor Sanchez, Plaintiff,
Damilola Animashaun, Plaintiff,
Arthur Jack, Plaintiff,
Willie Bowman, Plaintiff,
Frank Trifilio, Plaintiff,
Jason Williams, Plaintiff,
Branan Boston, Plaintiff,
Jose Vasquez, Plaintiff,
Raheem Watson, Plaintiff,
Jamal Armstead, Plaintiff,
HOWARD Powell, Plaintiff,
George Etienne, Plaintiff,
Raymond Maxwell, Plaintiff,
Alan Perez, Plaintiff,
Rasheen Everett, Plaintiff,
Anthony Cruz, Plaintiff,
Anthony Pinder, Plaintiff,
Benny Davis, Plaintiff,
v.
CITY OF NEW YORK, Commissioner Dora
B. Schriro, Mayor Michael Bloomberg, Dr.
Jean Richards of Corizon, Defendants.

Nos. 12 Civ. 4069(PAE)(JCF), 12 Civ. 4080(PAE)
(JCF), 12 Civ. 4169(PAE)(JCF), 12 Civ. 4170(PAE)
(JCF), 12 Civ. 4266(PAE) (JCF), 12 Civ. 4274(PAE)
(JCF), 12 Civ. 4275(PAE)(JCF), 12 Civ. 4299(PAE)
(JCF), 12 Civ. 4302(PAE)(JCF), 12 Civ. 4306(PAE)
(JCF), 12 Civ. 4307(PAE)(JCF), 12 Civ. 4346(PAE)
(JCF), 12 Civ. 4347(PAE)(JCF), 12 Civ. 4382(PAE)
(JCF), 12 Civ. 4383(PAE) (JCF), 12 Civ. 4393(PAE)
(JCF), 12 Civ. 4394(PAE)(JCF), 12 Civ. 4396(PAE)
(JCF), 12 Civ. 4457(PAE)(JCF), 12 Civ. 4517(PAE)
(JCF), 12 Civ. 4523(PAE)(JCF), 12 Civ. 4524(PAE)
(JCF), 12 Civ. 4532(PAE)(JCF), 12 Civ. 4533(PAE)
(JCF), 12 Civ. 4630(PAE) (JCF), 12 Civ.
4634(PAE)(JCF), 12 Civ. 4638(PAE)(JCF), 12 Civ.
4670(PAE)(JCF), 12 Civ. 4671(PAE)(JCF), 12 Civ.

4694(PAE) (JCF), 12 Civ. 4698(PAE)(JCF), 12
Civ. 4699(PAE)(JCF), 12 Civ. 4700(PAE)(JCF), 12
Civ. 4803(PAE)(JCF), 12 Civ. 4813(PAE) (JCF), 12
Civ. 4896(PAE)(JCF), 12 Civ. 4961(PAE)(JCF), 12
Civ. 5127(PAE)(JCF), 12 Civ. 5128(PAE)(JCF), 12
Civ. 5129(PAE) (JCF), 12 Civ. 5131(PAE)(JCF), 12
Civ. 5132(PAE)(JCF), 12 Civ. 5133(PAE)(JCF), 12
Civ. 5134(PAE)(JCF), 12 Civ. 5155(PAE) (JCF), 12
Civ. 5253(PAE)(JCF), 12 Civ. 5402(PAE)(JCF), 12
Civ. 5404(PAE)(JCF), 12 Civ. 5416(PAE)(JCF), 12
Civ. 5517(PAE) (JCF), 12 Civ. 5520(PAE)(JCF), 12
Civ. 5668(PAE)(JCF), 12 Civ. 5681(PAE)(JCF), 12
Civ. 5687(PAE)(JCF), 12 Civ. 5691(PAE) (JCF), 12
Civ. 5695(PAE)(JCF), 12 Civ. 5760(PAE)(JCF), 12
Civ. 5768(PAE)(JCF), 12 Civ. 5856(PAE)(JCF), 12
Civ. 5867(PAE) (JCF), 12 Civ. 5868(PAE)(JCF),
12 Civ. 5870(PAE)(JCF), 12 Civ. 5872(PAE)(JCF).

|

Dec. 20, 2012.

*REPORT AND RECOMMENDATION*

JAMES C. FRANCIS IV, United States Magistrate
Judge.

**\*1** TO THE HONORABLE PAUL A.
ENGELMAYER, U.S.D.J.:

All of the 63 *pro se* plaintiffs identified above bring
similar suits pursuant to 42 U.S.C. § 1983 against the City
of New York, Mayor Michael Bloomberg, Correction
Commissioner Dora B. Schriro (the "Commissioner"),
and Dr. Jean Richards, a manager at Corizon, a
correctional healthcare services provider. [1] The plaintiffs,
who are or were inmates or detainees in the custody of
New York City Department of Correction at the Anna
M. Kross Center on Rikers Island ("AMKC"), [2] claim
that their Eighth Amendment right to be free from cruel
and unusual punishment was violated by the defendants'
failure to provide proper beds, which allegedly caused
the plaintiffs lower back, neck, and leg pain as well as
emotional distress. [3] The plaintiffs seek compensatory
and punitive damages. The defendants have moved to
dismiss the complaint in each action pursuant to Rule
12(b)(6) of the Federal Rules of Civil Procedure, arguing
that (1) the plaintiffs fail to state a constitutional claim;
and (2) they fail to allege facts that would support
municipal liability or the personal involvement of any
individual defendant. After the defendants submitted the

motion to dismiss, one plaintiff submitted opposition
papers, while several others filed amended complaints,
none of which makes significant modifications to the
allegations of the original complaint. For the reasons set
forth below, I recommend that the motion be granted
and all 63 suits be dismissed with leave to file amended
complaints.

*Background*

The plaintiffs' complaints are part of a group of
approximately 90 civil actions concerning beds at AMKC.
The 63 complaints here were consolidated for the purposes
of a single motion to dismiss. [4] (Order dated Aug. 10,
2012 ("August 10 Order") at 4–5 in 12 Civ. 4069; [5] *e.g.*,
Memorandum Endorsement dated Aug. 24, 2012 in 12
Civ. 5402). Of the 63 cases, more than 50 make use of the
same typewritten, photocopied complaint, [6] with the only
differences among them being personal information such
as the plaintiffs' names and identification numbers, which
are written in by hand. Several others are handwritten
complaints with virtually identical wording. [7] Three
complaints, filed by plaintiffs Raheem Watson, Andre
Livingston Williams, and Michael Straker, make similar
allegations, but provide more detail. (Complaint of
Raheem Watson dated May 26, 2012 ("Watson Compl.");
Amended Complaint of Andre Livingston Williams dated
July 3, 2012 ("Williams Compl."); Second Amended
Complaint of Michael Straker dated Aug. 18, 2012
("Straker Compl.")).

In accordance with the standard for assessing a motion
to dismiss, the allegations in the plaintiffs' complaints are
taken as true.

In or around 2010, New York City began using new,
cheaper beds at Department of Correction facilities.
(Compl., ¶ II.D). According to the vast majority of the
complaints, the new beds are "incomplete" and, as was the
case with the beds previously used, do not accommodate
inmates who are taller than 5 feet, 11 inches. (Compl., ¶
II.D). The failure to issue bed frames and mattresses to
inmates on an individual basis has allegedly exacerbated
unspecified prior injuries [8] suffered by the plaintiffs,
and caused them "extreme lower back pain and leg
soreness." [9] (Compl., ¶¶ II.D, III). Most of the plaintiffs
also contend that because they were not given pillows, they
suffer from neck pain . [10] (Compl., ¶ II.D). Additionally,

the plaintiffs have allegedly suffered "extreme emotional distress as [they] cannot make a bed or mattress and everytime [sic] [they are] able to get an extra blanket to stuff with a sheet to build a mattress it is taken on the search." (Compl., ¶ III).

**\*2** The plaintiffs state that Mayor Bloomberg, the Commissioner, and the Corporation Counsel [11] "are all responsible to access [sic] a viable budgetary system in NEW YORK CITY to assure compliance with the State Correctional; health and hospital and chiropractic regulations for bedding et. al in the ... Correctional System." (Compl., ¶ II.D). In addition, the plaintiffs state that Dr. Richards has "failed to declare an emergency and have the health department mandate emergency measures." (Compl., ¶ II.D). The plaintiffs also allege that the City "chose to overlook health and or other legal ramifications" to inmates. (Compl., ¶ II.D).

Mr. Watson, who asserts he suffers from scoliosis, [12] alleges that Dr. Richards, as the "medical reviewer who gives and denies clearance to medical needs" at AMKC, should have "alerted the Medical Supervisory prison Official" and seen to it that Mr. Watson received a replacement mattress. (Notice of Motion in Opposition of Defendant's Motion to Dismiss of Raheem Watson ("Watson Opp.") at 1–3).

Mr. Watson and Mr. Williams both state that the mattresses are placed on a "metal foundation" despite the mattress manufacturer's warning that the they should be used without a foundation. (Watson Compl., ¶ II.D; Williams Compl., ¶ II.D). [13] Mr. Williams states that "the mattress was not made to be used with a foundation," and that the defendants knew that placing the mattress on a metal frame would cause harm. (Williams Compl., ¶ II.D).

*Discussion*

A. *Standard of Review for a Motion to Dismiss*
In considering a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus,* 551 U .S. 89, 94 (2007) (per curiam); *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 110–11 (2d Cir.2010). A complaint need not make " 'detailed factual allegations,' " but it must contain more than mere

" 'labels and conclusions' " or "formulaic recitation[s] of the elements of a cause of action.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Id.* (alteration in original) (quoting Twombly, 550 U.S. at 555). Further, courts "accept[ ] as true only factual allegations, and [do] not accept as true allegations stating only legal conclusions." *Braxton v. Nichols,* No. 08 Civ. 08568, 2010 WL 1010001, at \*1 (S.D.N.Y. March 18, 2010) (quoting *Harris v.. Mills,* 572 F.3d 66, 72 (2d Cir.2009) ("[T]hreadbare recitals of a cause of action, supported by mere conclusory statements, do not suffice [to establish entitlement to relief].")).

Where the complaint's factual allegations permit the court to infer only that it is possible, but not plausible, that misconduct occurred, the complaint fails to meet the minimum standard. *Iqbal,* 556 U.S. at 678. In ruling on a motion to dismiss, the court's task " 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.' " *GVA Market Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd.,* 580 F.Supp.2d 321, 327 (S.D.N.Y.2008) (quoting *Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of New York,* 375 F.3d 168, 176 (2d Cir.2004)).

**\*3** *Pro se* complaints are held to less stringent standards than those drafted by lawyers. *Erickson,* 551 U.S. at 94; *see also McKeown v. New York State Commission on Judicial Conduct,* 377 F. App'x 121, 122 (2d Cir.2010). In fact, pleadings of a *pro se* party should be read " 'to raise the strongest arguments that they suggest.' " *Kevilly v. New York,* 410 F. App'x 371, 374 (2d Cir.2010) (quoting *Brownell v. Krom,* 446 F.3d 305, 310 (2d Cir.2006)). Even after *Iqbal,* which imposed heightened pleading standards for all complaints, *pro se* complaints are to be liberally construed. *See Mills,* 572 F.3d at 71–72. Dismissal of a *pro se* complaint is nevertheless appropriate where a plaintiff has clearly failed to meet minimum pleading requirements. *See, e.g., Paul v. Bailey,* No. 09 Civ. 5784, 2010 WL 3292673, at \*4 (S.D.N.Y. July 21, 2010) (citing *Rodriguez v. Weprin,* 116 F.3d 62, 65 (2d Cir.1997)).

Finally, even when a plaintiffs does not oppose a Rule 12(b)(6) motion, the court must still determine, as a matter of law, whether the complaint sufficiently states a claim on which relief may be granted. *McCall v. Pataki,* 232

F.3d 321, 322–23 (2d Cir.2000); *Haas v. Commerce Bank,* 497 F.Supp.2d 563, 564 (S.D.N.Y.2007). If the pleading is adequate, "the plaintiff's failure to respond to a Rule 12(b) (6) motion does not warrant dismissal." *McCall,* 232 F.3d at 323.

B. *Plaintiffs' Claims*

To state a claim under 42 U.S.C. § 1983, the plaintiffs must show that, "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law, and (2) the conduct deprived the plaintiff of a right secured under the Constitution of the United States." *Snider v. Dylag,* 188 F.3d 51, 53 (2d. Cir.1999); *see also Thomas v. City of New York,* No. 11 Civ. 0578, 2012 WL 4889257, at *2 (S.D.N.Y. Oct. 16, 2012). The plaintiffs allege that they suffer severe physical pain, emotional distress, and exacerbation of prior injuries because the defendants' began providing new, "incomplete" beds to inmates at AMKC and failed to issue beds on an individual basis. (Compl., ¶¶ II.D, III). Construed liberally, the plaintiffs claim that the defendants' failure to provide them with larger beds has resulted in an unconstitutional condition of confinement and constitutes deliberate indifference to their serious medical needs.

1. *Conditions of Confinement*

The plaintiffs' complaints, read liberally, do not allege an Eighth Amendment claim with regard to the conditions of their confinement. In order to state a valid conditions-of-confinement claim, the plaintiffs must satisfy a two-part test: (1) objectively, the deprivation they suffered was "sufficiently serious" as to deny them "the minimal civilized measure of life's necessities," and (2) subjectively, the defendants acted with "deliberate indifference," *Wilson v. Seiter,* 501 U.S. 294, 298, 303 (1991), in that they "kn[ew] of and disregard [ed] an excessive risk to inmate health or safety," *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quotation omitted).

 *4 To meet the objective element of an Eighth Amendment claim, "a prisoner must prove that the conditions of his confinement violate contemporary standards of decency." *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002). The plaintiffs fail to meet this standard. The Eighth Amendment does not require "comfortable prisons." *See Rhodes v. Chapman,* 452 U.S. 337, 349 (1981). Rather, it forbids depriving prisoners of their "

'basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety,' " or exposing them to "conditions that 'pose an unreasonable risk of serious damage to [their] future health.' " *Phelps,* 308 F.3d at 185 (alteration in original) (quoting *Helling v. McKinney,* 509 U.S. 25, 32, 35 (1993)). Thus, "only extreme deprivations are sufficient to sustain a 'conditions-of-confinement' claim." *Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir.1999) (citing *Hudson v. McMillan,* 503 U.S. 1, 9 (1992)).

Here, the plaintiffs' claims are wholly conclusory. They merely state that the failure to issue pillows and "proper[ly] size[d]" beds to inmates on an individualized basis caused "pain in lower back and neck and legs," "emotional distress," and "[e]xacerbation of prior injuries." (Compl., ¶¶ II.D, III). But they fail to provide the factual detail necessary to allege plausibly that they suffered the injuries as a result of the beds at AMKC. For example, although the thrust of these actions seems to be that the beds provided at AMKC are uncomfortably short for inmates taller than five feet eleven inches, these form complaints do not allege any plaintiff's height. Nor are there sufficient factual allegations about how the beds and lack of pillows cause the claimed injuries. "[A] civil rights complaint must contain specific allegations of fact which indicate a deprivation of constitutional rights; allegations which are nothing more than broad, simple and conclusory statements are insufficient to state a claim under § 1983 ." *Williams v. City of New York,* No. 03 Civ. 5342, 2005 WL 2862007, at *3 (S.D.N.Y. Nov. 1, 2005) (internal quotation marks omitted); *see also Claudio v. Sawyer,* 675 F.Supp.2d 403, 407 (S.D.N.Y.2009). The plaintiffs' "naked assertions" that they suffered "extreme pain" as a result of inadequate beds, without more, does not meet the standard for pleadings in a § 1983 action. *See Iqbal,* 556 U.S. at 678.

Moreover, the conclusory allegations in these complaints describe conditions no more serious than those that courts have regularly found insufficient to satisfy the objective prong of the Eighth Amendment. "Simply stated, the Eighth Amendment does not mandate 'comfortable' [ ] beds." *Smith v. Woods,* No. 9:03–CV–480, 2006 WL 1133247, at *13 (N.D.N.Y. April 24, 2006) (footnote omitted) (noting that even if plaintiff were claiming that allegedly defective bed exacerbated spondylolisthesis, he failed to establish "sufficiently serious" deprivation for purposes of the Eighth Amendment); *see also Faunce v. Gomez,* 163 F.3d 605 (table), 1998 WL 658646, at

*1 (9th Cir. Sept. 17, 1998) (uncomfortable mattresses with insufficient bedding not deprivation of basic human needs as required to state a constitutional claim); *Walker v. Schultz,* No. 9:11–CV–287, 2012 WL 1037441, at *6 (N.D.N.Y. Jan. 20, 2012) (uncomfortable, short beds did not constitute unconstitutional condition of confinement; *Growins v. Greener,* No. 01 Civ. 6933, 2003 WL 943239, at *3 (S.D.N.Y. March 10, 2003) (short bed not basis for constitutional claim even assuming paraplegic prisoner's heel injuries were caused by contact with metal bed frame). Therefore, even liberally construed, the complaints fail to raise a plausible claim of a constitutional violation. *See Iqbal,* 556 U.S. at 678.

 *5 The plaintiffs cite a single case, *Delaney v. Selsky,* 899 F.Supp. 923 (N.D.N.Y.1995), stating that it stands for the proposition that "improper bedding is cause for significant and atypical hardship." (Compl., ¶ II.D). It does not. In *Delaney,* the court declined to grant a motion for summary judgment in favor of the defendants where an inmate who was almost seven feet tall claimed that he had been deprived of his due process rights when, without the benefit of a hearing, he was subjected to disciplinary confinement for 197 days in a special cell with a short bed that forced him to "stand or lay in an uncomfortable and compromising position" most of the time. *Delaney,* 899 F.Supp. at 927–28. That is, *Delaney* found that there was a issue of fact as to whether these conditions caused the inmate " 'atypical and significant hardship ... in relation to the ordinary incidents of prison life,' " *id.* at 926 (quoting *Sandin v. Connor,* 515 U.S. 472, 484 (1995)), thus entitling him to certain procedural protections, such as notice and a hearing, before it was imposed. *Id.* at 928. It does not, therefore, hold that the bedding *constituted* such a hardship, but merely left open the possibility that it *might.*

In any case, and more importantly, *Delaney's* ruling on that procedural due process question is largely irrelevant to the question presented here, because the Eighth Amendment imposes a different standard. It requires only that prison officials provide "humane conditions of confinement" including "adequate food, clothing, shelter, and medical care." *Farmer v. Brennan,* 511 U .S. 825, 832 (1994). To be actionable, the deprivation alleged must result in a denial of "the minimal civilized measure of life's necessities." *Wilson,* 501 U.S. at 298 (internal quotation marks omitted). That is, whether or not a short bed can constitute an "atypical and significant hardship" does not inform the question of whether or not it constitutes

cruel and unusual punishment. Indeed, the *Delaney* Court granted the defendants' motion for summary judgment on Mr. Delaney's Eighth Amendment claim, stating, "[T]he Eighth Amendment protection applies only to those situations where one has suffered a loss of necessities such as food or medical care." (Memorandum, Decision & Order, *Delaney v. Selsky,* No. 92–CV–320 (N.D.N.Y. June 20, 1995), at 4). Thus, *Delaney* actually undermines the plaintiffs' position here.

In addition, even if the complaints had pled a sufficiently serious deprivation in conditions of confinement, they fail to meet the subjective prong of a § 1983 claim. A defendant cannot be said to have been deliberately indifferent unless he "act[ed] with a sufficiently culpable state of mind." *Salahuddin v. Good,* 467 F.3d 263, 280 (2d Cir.2006) (citing *Wilson,* 501 U.S. at 300). While the Eighth Amendment does not require "conduct undertaken for the very purpose of causing harm," *Hathaway,* 37 F.3d at 66, defendants "must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and [they] must also draw the inference," *Farmer,* 511 U.S. at 837.

 *6 Here, most of the plaintiffs do not allege any facts indicating that any defendant "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Id.* at 837. These plaintiffs state only that Mayor Bloomberg and the Commissioner were "responsible to access [sic] a viable budgetary system" and "assure compliance with the State Correctional; health and hospital and chiropractic regulations for bedding et. al in the ... correctional system" and that Dr. Richards "failed to declare an emergency and have the health department mandate emergency measures." (Compl., ¶ II.D). Notably, the plaintiffs do not assert that the defendants had been "exposed to the information concerning the risk and thus must have known about it." *Farmer,* 511 U.S. at 842 (internal quotation marks omitted). Without such knowledge, they could not have possibly drawn the inference of substantial risk of harm.

Mr. Watson and Mr. Williams do state that the defendants placed the mattresses on a "metal foundation," despite tags attached to the mattresses that read "[t]his mattress is intended to be used without a foundation." (Watson Compl., ¶ II.D; Williams Compl., ¶ II.D; Mattress Tags, attached as Exh. B to Watson Opp). Mr. Watson and Mr. Williams allege that Mayor Bloomberg and

the Commissioner knew that placing the mattress on a metal frame would cause harm. (Watson Compl., ¶ II.D; Williams Compl., ¶ II.D). Mr. Watson states that the warning was likely made for "suitability and longevity of the product" as well as for a "chiropractic reason" and that the defendants had exhibited "obvious lack of concern, care, and decency." (Watson Opp. at 1–2). There is no allegation, however, that the defendants ever saw these tags. Moreover, those same tags also state that the mattresses "meet[ ] the requirements of 16 CFR 1633 (federal inflammability (open flame) standard for mattress sets) when used without a foundation," indicating that the warning relates to fire safety. (Mattress Tags, attached as Exh. B to Watson Opp.). Indeed, there is no reason to believe that the instructions relate to chiropractic health. Accordingly, the plaintiffs fail to state a constitutional claim based on conditions of confinement.

2. *Medical Need*

Even read liberally, the plaintiffs' complaints also fail to state a constitutional claim with regard to their medical needs. Such a claim has objective and subjective prongs similar to those required in the conditions claim discussed above. Thus, a plaintiff must allege that he was subjected to objectively sufficiently serious harmful conditions. *Wilson,* 501 U.S. at 297–98, 303. To satisfy this prong, a court must determine, first, if "the prisoner was actually deprived of adequate medical care" and, second, "whether the inadequacy in medical care is 'sufficiently serious.'" *Salahuddin,* 467 F.3d at 279–80. To meet the subjective element, there must be a showing that the official acted with deliberate indifference, in other words, that "the official 'kn[ew] of and disregard[ed] an excessive risk to inmate health or safety.'" *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) (quoting *Hathaway,* 99 F.3d at 553).

**\*7** No plaintiff has adequately alleged that the failure to provide him a larger bed is a sufficiently serious medical harm. "This standard contemplates a [showing by the prisoner that his medical need was] a condition of urgency, one that may produce death, degeneration, or extreme pain." *Lucas v. McCoy,* No. 10 Civ. 9611, 2011 WL 6005164, at \*2 (S.D.N.Y. Nov. 30, 2011) (alteration in original) (internal quotation marks omitted). The plaintiffs—even those who have claimed exacerbation of extant conditions—have failed to allege with any particularity that the failure to provide longer beds poses an excessive risk to their health.

Even if they had alleged such a condition of urgency, the plaintiffs do not allege that any of the defendants were made aware of the purported injuries suffered. Two plaintiffs, Mr. Watson and Mr. Williams, do assert that Dr. Richard was "aware through complaints of facts from which inference of substantial risk of serious harm could be drawn ... defendant drew that inference ☞ lack of correction indicated that they [sic] subjectively intended that harm to occur." (Watson Compl., ¶ II.D; Williams Compl., ¶ II.D). However, Mr. Watson and Mr. Williams state no details about the nature or timing of the complaints or to whom they were made. Their assertions are therefore entirely conclusory. *See Adekoya v. Holder,* 751 F.Supp.2d 688, 697 (S.D.N.Y.2010) (plaintiff did not satisfy subjective prong where his complaint states in conclusory terms that defendants were aware of his medical needs and failed to provide adequate care).

3. *Personal Involvement*

To successfully state a claim against an individual defendant, a "plaintiff must allege sufficient facts to demonstrate that defendant[ ] w[as] personally or directly involved in the violation, that is, that there was 'personal participation by one who ha[d] knowledge of the facts that rendered the conduct illegal.' " *Harris v. Westchester County Department of Corrections,* No. 06 Civ.2011, 2008 WL 953616, at \*9 (S.D.N.Y. April 3, 2008) (third alteration in original) (quoting *Provost v. City of Newburgh,* 262 F.3d 146, 155 (2d Cir.2011)). Personal involvement in a § 1983 violation may be shown by evidence that: (1) the official participated directly in the violation; (2) the official, after learning of the violation, failed to remedy the wrong; (3) the official created a policy or custom under which unconstitutional practices occurred; (4) the official was grossly negligent in supervising subordinates who caused the unlawful condition or event; or (5) the official exhibited deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Washington v. Kelly,* No. 03 Civ. 4638, 2004 WL 830084, at \*3 (S.D.N.Y. April 13, 2004).

With regard to Mayor Bloomberg and the Commissioner, the complaints here merely state that they have failed to "access [sic] a viable budgetary system ... to assure compliance with" state regulations. (Compl., ¶ II.D). Most of the plaintiffs state that Dr. Richards "failed to

declare an emergency and have the health department mandate emergency measures." (Compl.¶ II.D). These statements are made without any "further factual enhancement." *Iqbal,* 556 U.S. at 678 (internal quotation marks omitted). As such, they fail to support a plausible inference that the individual defendants were personally involved in the alleged violations.[14] *See Harris,* 2008 WL 953616, at *9.

**\*8** Mr. Watson and Mr. Williams state that Dr. Richards was aware, through complaints, that the plaintiffs should have been issued replacement mattresses. (Watson Compl., ¶ II.D; Williams Compl., ¶ II.D). Even if this were sufficient to show personal involvement, however, the plaintiffs fail to allege a constitutional violation for the reasons discussed above. Therefore, Dr. Richards' involvement in the conduct alleged in the complaints does not support liability. To survive a motion to dismiss, the complaints must present facts showing that each individual defendant had knowledge of conduct that constituted a constitutional violation and was personally involved in that conduct.

### 3. *Municipal Liability*

The plaintiffs also fail to state a claim against the City of New York. For a valid claim of municipal liability, "a plaintiff must make factual allegations that support a plausible inference that the constitutional violation took place pursuant to [a municipal policy or custom]." *Missel v. County of Monroe,* 351 F. App'x 543, 545 (2d Cir.2009) (citation omitted); *see also Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 690–91 (1978). An "official policy" may be implemented through a " 'policy statement, ordinance, regulation, or decision' " that is officially promulgated by a municipality's policy makers. *Anthony v. City of New York,* 339 F.3d 129, 139 (2d Cir.2003) (quoting *Monell,* 436 U.S. at 690). A "custom," for the purposes of municipal liability, must be so entrenched and well-established as to constitute a practice with the force of law. *Patterson v. County of Oneida, New York,* 375 F.3d 206, 226 (2d Cir.2004).

The plaintiffs do allege a custom, here: that the defendants do not "issue proper[ly] size[d] bed frame[s] and mattress[es]" even for those individuals who are, presumably, taller than average. (Compl., ¶ II.D). The problem is that this policy is not connected to any properly pled constitutional violation. Therefore, it cannot serve

as the predicate for a claim of municipal liability. *See, e.g., Missell,* 351 F. App'x at 545 (stating that the claimed policy must have caused a constitutional violation). The plaintiffs do not, for example, allege facts showing that there is a policy of refusing to provide non-standard beds, even in cases of medical necessity.

If any of the plaintiffs is able to state a claim for a violation of the constitution (which I discuss below), in order to allege municipal liability, he will also have to allege sufficient facts that make a plausible case for finding that a policy or custom caused that violation. *See, e.g., Iqbal,* 556 U.S. at 678.

### C. *Leave to Amend*

The Second Circuit has held that a *pro se* litigant should be afforded at least one opportunity to "amend his complaint prior to its dismissal for failure to state a claim, unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim." *Gomez v. USAA Federal Savings Bank,* 171 F.3d 794, 796 (2d Cir.1999) (per curiam); *see also Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991) (same). Because I cannot exclude the possibility that one or more of the plaintiffs here may be able to state a valid claim, they should be given an opportunity to amend the complaints.

**\*9** A plaintiff may state a valid claim of a constitutional violation, for example, if he can show that (1) he had a preexisting medical condition requiring a special bed to protect against serious damage to his future health; (2) he made that medical condition known to prison officials; (3) he requested a special bed to accommodate such medical condition; and (4) his request was denied by an "official [who knew] of and disregard[ed] an excessive risk to [the plaintiff's] health or safety." *See Phelps,* 308 F.3d at 185–86.

Likewise, although the complaints fail to allege facts that would support either personal involvement of individual defendants or municipal liability, the plaintiffs should be accorded the opportunity to submit amended pleadings that satisfy the standards for asserting such claims.

### *Conclusion*

For the foregoing reasons, I recommend that the defendants' motion to dismiss be granted and the plaintiffs' complaints be dismissed with leave to file

amended complaints. Pursuant to 28 U.S .C. § 636(b)(1) and Rules 72, 6(a), and 6(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Paul A. Engelmayer, Room 660, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

The Clerk of Court is respectfully directed to serve this Report and Recommendation on each of the plaintiffs named in the caption at his address of record.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 7050623

Footnotes

1   New York Governor Andrew Cuomo was named as a defendant in the complaints, but the Honorable Paul A. Engelmayer, U.S.D.J., summarily dismissed the claims against him. (*E.g.,* Order dated June 29, 2012 in 12 Civ. 4069).

2   One inmate, Alan Perez, does not appear to have been confined at AMKC, but rather at the George Motchan Detention Center, also located on Rikers Island.

3   Although it is unclear whether the plaintiffs are detainees awaiting trial or sentenced inmates at AMKC, the distinction is immaterial for the purposes of this discussion. Pretrial detainees' constitutional claims are analyzed under the due process clause of the Fourteenth Amendment to the Constitution, rather than the Eighth Amendment. *Benjamin v. Fraser,* 343 F.3d 35, 49 (2d Cir.2003), *overruled on other grounds by Caiozzo v. Koreman,* 581 F.3d 63 (2d Cir.2009). However, where the plaintiffs, as here, allege that the defendants have acted with deliberate indifference in perpetuating an unconstitutional condition of confinement or in failing to treat their serious medical needs, the analysis under the Fourteenth Amendment is the same as under the Eighth Amendment. *See Caiozzo,* 581 F.3d at 72. Therefore, as a shorthand, I will refer to the plaintiffs' claims as claims brought under the Eighth Amendment.

4   Judge Engelmayer ordered each of the plaintiffs to file an amended complaint naming the previously unnamed Corizon manager as a defendant once the City of New York had identified him as Dr. Jean Richards. (Order dated June 29, 2012 at 10–11 in 12 Civ. 4069). Most of the plaintiffs have failed to do so. However, for purposes of efficiency, I will assume that each of the plaintiffs has filed an amended complaint that complies with Judge Engelmayer's order.

5   The August 10 Order does not identify *Howard v. City of New York,* 12 Civ. 4069, as one of the cases to be addressed in the consolidated motion to dismiss, but instead lists case no. 12 Civ. 4609, a case wholly unrelated to these actions. (Aug. 10 Order at 4). It appears that two digits in the *Howard* case number were inadvertently transposed. This was a harmless error, however, because the defendants' motion to dismiss was served on Mr. Howard. (Certificate of Service dated Aug. 27, 2012 at 2 in 12 Civ. 4069).

6   These typewritten complaints are referred to collectively as the Complaint ("Compl.").

7   Examples include the Amended Complaint of Norman S. Howard dated Aug. 25, 2012 and the Amended Complaint of Ernest Langston dated Sept. 24, 2012.

8   Unlike other plaintiffs, Mr. Watson and Mr. Williams assert exacerbation of specific prior medical injuries—scoliosis, and Poland syndrome and scoliosis, respectively—which has resulted in "extreme pain in neck and lower back" for Mr. Watson and "extreme pain in lower back, shoulders and right leg" for Mr. Williams. (Waston Compl., ¶ III; Williams Compl., ¶ III).

9   Mr. Straker alleges that at two other Department of Correction facilities, he had been given a "double mattress permit" which had alleviated his back pain. (Straker Compl., ¶ II.A). However, once he arrived at AMKC, which did not honor the permit, he began experiencing "major pain in [his] lower back, neck and legs" which cause him to have to lie on his right side, "creating pain in [his] upper right shoulder." (Straker Compl., ¶¶ II.A, III).

10  Several plaintiffs assert in a note next to an exhibit attached to their pleadings that "dangerous" disinfectants are used to clean the mattresses. (Straker Compl. at 6; Complaint of Nestor Sanchez dated June 27, 2012 at 8; Complaint of Willie Bowman dated June 26, 2012 at 8). There is insufficient detail to determine whether they are trying to assert that the use of the cleaning liquid is a constitutional violation. Even if they were, the notes do not state a claim because the plaintiffs do not allege that the use of the disinfectants harmed them.

11  The plaintiffs do not name the Corporation Counsel as a defendant, nor could they. *See, e.g., Cincotta v. New York City Human Resources Administration,* 00 Civ. 9064, 2001 WL 897176 at *10 (S.D.N.Y. Aug. 9, 2001) (dismissing suit against Corporation Counsel because it is not suable entity).

12    Mr. Watson states that his scoliosis was caused when he slipped and fell at a Department of Correction facility. (Watson Opp. at 1). Although Mr. Watson's opinion regarding the causation of this condition is not entitled to any weight, medical records indicate that he was, indeed, diagnosed with mild scoliosis. (Medical Records dated Aug. 3, 2011, attached as Exh. A to Watson Opp., at 6).

13    Most of the plaintiffs have attached to their complaints copies of tags from the mattresses, which state in part that "[t]his mattress is intended to be used *without* a foundation." (Compl. at 9–11). The same label also notes that "[t]his mattress meets the requirements of 16 CFR 1633 (federal flammability (open flame) standard for mattress sets) when used without a foundation." (Compl. at 9–11).

14    Moreover, "the failure of a State authority to comply with State regulations" does not give rise to liability under Section 1983 unless there is "a specific conflict between a state plan or practice on the one hand and a federal mandate on the other." *Concourse Rehabilitation and Nursing Center, Inc. v. DeBuono,* 179 F.3d 38, 43 (2d Cir.1999) (internal quotation marks omitted). Thus, the allegations against Mayor Bloomberg and the Commissioner are further flawed.

**End of Document**                                                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**    © 2016 Thomson Reuters. No claim to original U.S. Government Works.    9

2013 WL 791540
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Mark INESTI, Plaintiff,

v.

Michael HOGAN, Ph D; Steven Rabinowitz, Dir. of
Kirby and (MPC); Tom Tuzel, M.D.; Dunbar, Capt.
at GRVC; Pressley, Capt. at GRVC, Defendants.

No. 11 Civ. 2596(PAC)(AJP).
|
March 5, 2013.

### REPORT AND RECOMMENDATION

ANDREW J. PECK, United States Magistrate Judge.

**\*1 To the Honorable Paul A. Crotty, United States
District Judge:**

Pro se plaintiff Mark Inesti (a/k/a Hector Ortiz) brings
this § 1983 action alleging violations of his federal
constitutional rights by New York City and New York
State officials. Inesti asserts claims against Captain
Sherma Dunbar (now Assistant Deputy Warden) and
Captain Anna Pressley ("City defendants") arising out of
alleged conditions of his confinement and failure to treat
his mental illness while he was held in the Mental Health
Assessment Unit for Infracted Inmates ("MHAUII")
at the George R. Vierno Center ("GRVC") on Rikers
Island. (Dkt. No. 38: Compl. ¶¶ 5–6, 16–40, 79–86, 90–
92, 94–96, 104–05, 138, 143–44.) [1] Inesti also raises claims
against former Office of Mental Health Commissioner
Michael Hogan, former Manhattan Psychiatric Center
("MPC") Executive Director Steven Rabinowitz, and staff
psychiatrist Dr. Tom Tuzel ("State defendants") arising
from his treatment in the MPC from September 2007
to November 2007 and the Kirby Forensic Psychiatric
Center ("Kirby") from November 2008 to January 2009,
facilities operated by the New York State Office of
Mental Health ("OMH"). (Compl.¶¶ 3–4, 9, 41–74, 81,
85–89, 106–07, 112–14, 117–35, 139–40.) Presently before
the Court are defendants' summary judgment motions.
(Dkt.Nos.78, 87.) For the reasons stated below, the City
and State defendants' summary judgment motions should
be *GRANTED.*

### FACTS [2]

The background facts underlying this dispute are set
forth in the Court's prior Report and Recommendation,
familiarity with which is assumed. *See Inesti v. Hicks,* 11
Civ. 2596, 2012 WL 2362626 (S.D .N.Y. June 22, 2012)
(Peck, M.J.), *report & rec. adopted,* 2012 WL 3822224
(S.D.N.Y. Sept. 4, 2012) (Crotty, D.J.).

#### The City Defendants

Beginning in 2007, Captain Anna Pressley was assigned
to MHAUII's Housing Area 13. (Dkt. No. 84: City
Defs. Rule. 56.1 Stmt. ¶ 2; Dkt. No. 83: Dunbar Aff. ¶
5.) Captain Sherma Dunbar was assigned to MHAUII's
Housing Area 11 beginning in June 2008. (City Defs. Rule
56.1 Stmt. ¶ 1; Dunbar Aff. ¶ 4.) MHAUII correction
officers manage inmates' food, showers, and recreation
time, but not medication, which is dispensed by medical
staff twice a day. (City Defs. Rule. 56.1 Stmt. ¶¶ 5–6;
Dunbar Aff. ¶¶ 8–9.) Food is served three times a day,
generally between 5 a.m. and 6 a.m., 11 a.m. and noon,
and 5 p.m. and 6 p.m. (City Defs. Rule. 56.1 Stmt. ¶
7; Dunbar Aff. ¶ 10.) If an inmate refuses food, the
matter is referred to the mental health department. (City
Defs. Rule. 56.1 Stmt. ¶ 7; Dunbar Aff. ¶ 10.) While
showers are offered daily, inmates may refuse a shower
or be denied one if they fail to comply with security
procedures. (City Defs. Rule. 56.1 Stmt. ¶ 8; Dunbar Aff.
¶ 11.) MHAUII inmates are allowed one hour of out-
of-cell recreation daily; inmates may refuse recreation or
be denied recreation for failing to comply with security
procedures. (City Defs. Rule. 56.1 Stmt. ¶ 9; Dunbar Aff.
¶ 12.) Searches of an inmate's person are only conducted
when an inmate returns after having left the housing area
or when an area-wide search for a particular purpose is
required. (City Defs. Rule. 56.1 Stmt. ¶ 10; Dunbar Aff.
¶ 13.)

**\*2** On November 16, 2006 while in jail at Rikers Island,
Inesti was sent to GRVC MHAUII Housing Area 11 of
as a result of a disciplinary infraction. (City Defs. Rule
56.1 Stmt. ¶ 15; Dkt. No. 81: DiCarlo Aff. ¶ 6 & Ex. H:
Inesti Infraction History at 2; DiCarlo Aff. Ex. I: Inesti
Movement History at 1–3.) On January 16, 2007, Inesti
was discharged from MHAUII and City Department of

Correction ("DOC") custody. (City Defs. Rule 56.1 Stmt. ¶ 18; DiCarlo Aff. Ex. I: Inesti Movement History at 4.)

On August 8, 2008, Inesti was arrested for attempting to steal clothing from a department store and admitted to Rikers Island. (City Defs. Rule 56.1 Stmt. ¶¶ 23–24; DiCarlo Aff. Ex. J: Det. Alfonso Aff.) From August 9, 2008 to September 12, 2008, Inesti was housed in the Anna M. Kross Center ("AMKC") on Rikers Island. (City Defs. Rule 56.1 Stmt. ¶¶ 24, 26; DiCarlo Aff. Ex. I: Inesti Movement History at 5–6.) From September 12, 2008 to October 2, 2008, Inesti was housed in non-punitive dormitories at the Otis Bantum Correctional Center ("OBCC"). (City Defs. Rule 56.1 Stmt. ¶ 26; DiCarlo Aff. Ex. I: Inesti Movement History at 7–8.) On October 2, 2008, Inesti was sent to Bellevue Hospital Prison Ward where he was psychiatrically evaluated pursuant to a C.P.L. Article 730 exam; Inesti was released back to OBCC on October 15, 2008. (City Defs. Rule 56.1 Stmt. ¶ 27; Dkt. No. 80: Carey 12/10/12 Aff. Ex. C: C.P.L. Art. 730 Exam. of Inesti; DiCarlo Aff. Ex. I: Inesti Movement History at 8.)

Inesti was found guilty of an assault on DOC staff with a weapon on October 19, 2008 and sent to MHAUII Housing Area 13–A. (DiCarlo Aff. Ex. H: Inesti Infraction History at 2; DiCarlo Aff. Ex. I: Inesti Movement History at 9.) In relation to his incarceration at MHAUII Housing Area 13–A, Inesti testified: "I wasn't really too stable or anything. I was argumentative and probably even abusive or violent because of what I was going through or not taking any medication, or anything like that, or getting any mental health treatment." (City Defs. Rule 56.1 Stmt. ¶ 29; Carey 12/10/12 Aff. Ex. A: Inesti Dep. at 32, 46–47, 60; *see also* Dkt. No. 91: Buskin Aff. Ex. A: Inesti Dep. at 93–94, 134–35.)

"The log book from Housing Area 13–A during the relevant time period clearly shows that Mr. Inesti was entitled to and offered three meals a day, regular sanitation, access to showers, out-of-cell relief, and medication (which he admits he sometimes refused)." (City Defs. Rule 56.1 Stmt. ¶ 30; Dkt. No. 82: Kril Aff Ex. L: GRVC 13–A Logbook.) Deviations from standard procedure would be noted in the logbook. (City Defs. Rule 56.1 Stmt. ¶ 31; *see generally* Kril Aff. Ex. L: GRVC 13–A Logbook.) On October 22, 2012, Inesti missed lunch because there was not enough food on the meal cart. (City Defs. Rule 56.1 Stmt. ¶ 31; Kril Aff. Ex. L:

GRVC 13–A Logbook at 35.) Inesti, however, also claims that he only received one meal a day, dinner, because of Captains Dunbar and Pressley. (Carey 12/10/12 Aff. Ex. A: Inesti Dep. at 35.) Inesti's claim is contradicted by the logbook. (Kril Aff. Ex. L: GRVC 13–A Logbook.) On several occasions, Inesti refused recreation. (Kril Aff Ex. L: GRVC 13–A Logbook at 30, 39, 43, 51, 55, 59, 64, 69, 76, 81, 89, 93–94, 98, 119, 132, 136, 150, 163, 167, 171, 179, 184.)

**\*3** When Inesti was deemed unfit for trial, he was released from MHAUII into the custody of OMH and sent to Kirby on November 26, 2008. (City Defs. Rule 56.1 Stmt. ¶¶ 35–36; Carey 12/10/12 Aff. Ex. D: 11/21/08 Order of Commitment; Carey 12/10/12 Aff. Ex. E: Kirby Discharge Psychiatric Records at 18; DiCarlo Aff. Ex. I: Inesti Movement History at 10.) Subsequently, Inesti was deemed fit to stand trial and returned to Rikers on January 27, 2009. (City Defs. Rule 56.1 Stmt. ¶ 40; Carey 12/10/12 Aff. Ex. E: Inesti Med. Records at 18–20.)

### The State Defendants

On September 24, 2007, Inesti was admitted to MPC pursuant to a final C.P.L. Article 730 Order. (Dkt. No. 96: State Defs. Rule 56.1 Stmt. ¶ 5; Dkt. No. 90: Rabinowitz Aff. ¶ 3.) During this period of commitment, Inesti wrote to OMH Commissioner Hogan complaining that MPC nurses were injecting him with psychotropic medication. (State Defs. Rule 56.1 Stmt. ¶¶ 2, 7; Dkt. No. 91: Buskin Aff. Ex. A: Inesti Dep. at 103–05.) Inesti never received a response from Commissioner Hogan, and OMH has no record of Inesti's letter to Commissioner Hogan. (State Defs. Rule 56.1 Stmt. ¶¶ 8–9; Buskin Aff. Ex. A: Inesti Dep. at 104; Dkt. No. 92: Blasen Aff. ¶¶ 2–3; Dkt. No. 93: Flagler Aff. ¶¶ 2–3; Dkt. No. 94: McNamara Aff. ¶¶ 2–3.) Inesti also made several complaints to Dr. Rabinowitz, the Executive Director of MPC and Kirby. (State Defs. Rule 56.1 Stmt. ¶¶ 3, 10; Buskin Aff. Ex. A: Inesti Dep. at 108–10, 112–13 .) As a result, Rabinowitz "called [Inesti] to his office and [Rabinowtiz] gave [Inesti] the transitional services that [Inesti] requested for a treatment plan." (Buskin Aff. Ex. A: Inesti Dep. at 113; *id.* at 108–10, 115, 123; State Defs. Rule 56.1 Stmt. ¶ 11.) Accordingly, Inesti was transferred to MPC's Transitional Living Residence ("TLR") on November 23, 2007. (State Defs. Rule 56.1 Stmt. ¶¶ 11–12; Rabinowitz Aff. ¶ 3; Buskin Aff. Ex. A: Inesti Dep. at 108–10, 113.) Inesti subsequently struck a TLR nurse and was arrested for assault. (State Defs. Rule 56.1 Stmt. ¶ 14; Buskin Aff.

Ex. A: Inesti Dep. at 83.) Inesti never saw Rabinowitz again after leaving MPC. (State Defs. Rule 56.1 Stmt. ¶ 13; Buskin Aff. Ex. A: Inesti Dep. at 115.)

On November 21, 2008, Inesti was ordered to the custody of OMH after being indicted for robbery and found unfit for trial. (State Defs. Rule 56.1 Stmt. ¶ 15; Buskin Aff. Ex. B: Commitment Order.) On November 26, 2008, pursuant to a C.P.L. Article 730 Order, Inesti was admitted to Kirby where Dr. Tuzel was his treating doctor. (State Defs. Rule 56.1 Stmt. ¶¶ 16–17; Rabinowitz Aff. ¶ 3; Dkt. No. 89: Tuzel Aff. ¶ 4.) Inesti received psychotropic intramuscular medication on four occasions while at Kirby, three of which were administered without Inesti's consent. (State Defs. Rule 56.1 Stmt. ¶¶ 18–19; Tuzel Aff. ¶ 6 & Ex. B: Inesti Med. Records.)

**\*4** Dr. Tuzel was personally involved only in one instance of Inesti receiving pshycotropic intramuscular medication without consent. (State Defs. Rule 56.1 Stmt. ¶ 21; Tuzel Aff. ¶ 6.) On December 26, 2008, Inesti complained that he was feeling " 'anxious,' 'nervous,' and 'irritable." (State Defs. Rule 56.1 Stmt. ¶ 22; Tuzel Aff. ¶ 8 & Ex. B: Inesti Med. Records at 204–05.) At 11:30 a .m., Inesti became " 'irritable,' 'loud,' and 'angry" and requested a second dose of medication. (State Defs. Rule 56.1 Stmt. ¶ 23; Tuzel Aff. ¶ 8 & Ex. B: Inesti Med. Records at 204–05.) Inesti went to Dr. Tuzel's office and was yelling and screaming. (State Defs. Rule 56.1 Stmt. ¶ 24; Tuzel Aff. ¶ 8 & Ex. B: Inesti Med. Records at 204–05.) Inesti was offered and refused intramuscular medication. (State Defs. Rule 56.1 Stmt. ¶ 25; Tuzel Aff. ¶ 8 & Ex. B: Inesti Med. Records at 204–05.) Concluding that Inesti presented a danger to himself and others due to his hostile and violent behavior, Dr. Tuzel ordered that Inesti be given Lorazepam for anxiety, Haloperidone for schizophrenia symptoms, and Diphenhydramine, a sleep aid. (State Defs. Rule 56.1 Stmt. ¶ 26; Tuzel Aff. ¶ 8 & Ex. B: Inesti Med. Records at 204–05.) While Inesti acknowledges that he can become violent when he does not take his medication, he does not recall if he was violent when he was medicated on December 26, 2009, but concedes that he was not "stable." (State Defs. Rule 56.1 Stmt. ¶¶ 27–28; Buskin Aff. Ex. A: Inesti Dep. at 134–36.) Inesti also conceded that the injections stabilized and calmed him. (Buskin Aff. Ex. A: Inesti Dep. at 136.)

On December 22 and 29, 2008, Inesti also received psychotropic injections without his consent, but these injections were not ordered or administered by Dr. Tuzel. (State Defs. Rule 56.1 Stmt. ¶ 29; Tuzel Aff. ¶ 9 & Ex. B: Inesti Med. Records at 192, 209.) On January 12, 2009, Inesti consented to and received psychotropic intramuscular medication. (State Defs. Rule 56.1 Stmt. ¶ 32; Tuzel Aff. ¶ 10 & Ex. B: Inesti Med. Records at 242.) By January 14, 2009, Inseti's standing order for pshychotropic medication was discontinued, but Inesti continued to request and receive Risperidone. (State Defs. Rule 56.1 Stmt. ¶¶ 33–34; Tuzel Aff. ¶¶ 11, 13–14 & Ex. B: Inesti Med. Records at 249–50; Tuzel Aff. Ex. C: Discharge Summary at 275.) On January 21, 22, 23, and 26, 2009, Inesti requested and received Risperidone. (State Defs. Rule 56.1 Stmt. ¶¶ 36–40; Buskin Aff. Ex. D: Inesti Med. Records at 263, 269–71, 273.)

On January 5, 2009, Kirby forensic psychiatrists determined that Inesti was competent to stand trial. (State Defs. Rule 56.1 Stmt. ¶ 30; Rabinowitz Aff. Ex. A: Model Report in Support of Competency Restoration.) On January 15, 2009, the New York Supreme Court ordered Inesti to be delivered to DOC custody and to appear in court on January 28, 2009. (State Defs. Rule 56.1 Stmt. ¶ 35; Buskin Aff. Ex. C: Order to Produce.) On January 27, 2009, Inesti was discharged from Kirby. (State Defs. Rule 56.1 Stmt. ¶ 41; Tuzel Aff. ¶ 4; Rabinowitz Aff. ¶ 3.)

**\*5** Inesti never wrote Commissioner Hogan regarding his treatment at Kirby. (State Defs. Rule 56.1 Stmt. ¶ 42; Buskin Aff. Ex. A: Inesti Dep. at 105.) While at Kirby, Inesti wrote one or two letters to Rabinowitz but never spoke with Rabinowitz regarding his treatment. (State Defs. Rule 56.1 Stmt. ¶¶ 43–44; Buskin Aff. Ex. A: Inesti Dep. at 115–16, 145–46.) Rabinowitz did not make the determination that Inesti was competent to stand trial or sign the corresponding paperwork. (State Defs. Rule 56.1 Stmt. ¶¶ 45–46; Rabinowitz Aff. ¶ 8 & Ex. A: Notification of Fitness to Proceed.) Rabinowitz had no intent to retaliate against Inesti for any complaints that Inesti made. (State Defs. Rule 56.1 Stmt. ¶ 47; Rabinowitz Aff. ¶ 6.)

On February 25, 2010, Inesti was convicted and sentenced to twenty years to life imprisonment. (State Defs. Rule 56.1 Stmt. ¶ 48.) *See New York v. Inesti,* 95 A.D.3d 690, 944 N.Y.S.2d 148 (1st Dep't), *appeal denied,* 19 N.Y.3d 1026, 953 N.Y.S.2d 559 (2012).

*Procedural History*

Inesti mailed his original complaint from the Clinton Correctional Facility, but listed his address as Downstate Correctional Facility. (Dkt. No. 2: Orig. Compl. at 1.) Inesti's original complaint was signed on April 20, 2010 (*id.* at 14), but the mailing envelope was postmarked April 7, 2011. Inesti does not indicate when he gave his original complaint to prison officials for delivery to the Court. The Court received Inesti's original complaint on April 12, 2011. (*Id.* at 1.)

The City and State defendants moved to dismiss Inesti's Second Amended Complaint. (Dkt.Nos.40, 42.) The Court granted in part and denied in part the motions to dismiss. *See Inesti v. Hicks,* 11 Civ. 2596, 2012 WL 2362626 (S.D.N.Y. June 22, 2012) (Peck, M.J.), *report & rec. adopted,* 2012 WL 3822224 (S.D.N.Y. Sept. 4, 2012) (Crotty, D. J.).

Presently before the Court are the City and State defendants' motions for summary judgment on the remaining claims in Inesti's second amended complaint. (Dkt.Nos.78, 87.)

The State defendants' summary judgment motion argues that: (1) Inesti's claims arising out his incarceration at MPC are time-barred, (2) Hogan was not personally involved in the alleged deprivation of Inesti's rights, (3) Rabinowitz was not personally involved in the alleged deprivation of Inesti's rights and did not retaliate against Inesti, (4) Dr. Tuzel did not violate Inesti's rights, and (5) the State defendants are entitled to qualified immunity. (*See* Dkt. No. 88: State Defs. Br.; Dkt. No. 104: State Defs. Reply Br.)

The City defendants' summary judgment motion argues, *inter alia,* that: (1) Inesti's claims against Dunbar and Pressley arising out of his first period of incarceration at MHAUII are time-barred, (2) Inesti failed to exhaust his administrative remedies, and (3) the City defendants were not deliberately indifferent to Inesti's confinement conditions or medical needs. (*See* Dkt. No. 85: City Defs. Br.; Dkt. No. 105: City Defs. Reply Br.)

### *ANALYSIS*

### I. *SUMMARY JUDGMENT STANDARD*

**\*6** Rule 56 of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U .S. 242, 247, 106 S.Ct. 2505, 2509–10 (1986); *Lang v. Ret. Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. *See, e.g., Adickes v.. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608 (1970); *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994); *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1223 (2d Cir.1994). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2552–53.

To defeat a summary judgment motion, the non-moving party must do "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986). Instead, the non-moving party must "cit[e] to particular parts of materials in the record" to show that "a fact ... is generally disputed." Fed.R.Civ.P. 56(c); *see, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 587, 106 S.Ct. at 1356; *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000) (At summary judgment, "[t]he time has come ... 'to put up or shut up.' " (citations omitted)), *cert. denied,* 540 U.S. 811, 124 S.Ct. 53 (2003).

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. at 2513.[3] The Court draws all inferences in favor of the non-moving party only after determining that such inferences are reasonable, considering all the evidence presented. *See, e.g., Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2d Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 489 (1987). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable

inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d at 37.

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact. *See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987); *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570 (1987). To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. at 2510. While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,][f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. at 2510 (citations omitted); *see also, e.g., Knight v. U.S. Fire Ins. Co.,* 804 F.2d at 11–12.

**\*7** "The Court recognizes that it must extend extra consideration to pro se plaintiffs" and that "pro se parties are to be given special latitude on summary judgment motions." *Salahuddin v. Coughlin,* 999 F.Supp. 526, 535 (S.D.N.Y.1998) (Peck, M.J.) (citations & quotations omitted); *see, e.g., McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (a pro se party's pleadings should be read liberally and interpreted " 'to raise the strongest arguments that they suggest' ").[4] "Nevertheless, proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* 93 Civ. 5981, 1999 WL 983876 at \*3 (S.D.N.Y. Oct. 28, 1999) (citing cases).[5]

## II. *DEFENDANTS SHOULD BE GRANTED SUMMARY JUDGMENT ON INESTI'S "REVOLVING DOOR" CLAIM FOR POST–RELEASE MENTAL HEALTH TREATMENT*

The heart of Inesti's complaint is that he was caught in a "revolving door" cycle between 2006 and 2008 where he was arrested, treated or not treated while in custody, and eventually released without a treatment plan, only to be arrested again because he was not receiving mental health treatment when not in custody. (Dkt. No. 38: Compl. ¶¶ 72–99; *see also* Dkt. No. 80: Carey 12/10/12 Aff. Ex.

A: Inesti Dep. at 48–49; Dkt. No. 103: Inesti Opp. Br. at ¶¶ 3, 15.) While the City and State have a duty of responsibility for an individual while he is in their custody, that duty does not extend beyond the individual's release from custody.

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cnty. Dep't of Social Servs.,* 489 U.S. 189, 199–200, 109 S.Ct. 998, 1005 (1989).[6] "[I]t is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause ...." *DeShaney v. Winnebago Cnty. Dep't of Social Servs.,* 489 U.S. at 200, 109 S.Ct. at 1006.[7] "[T]he State does not become the permanent guarantor of an individual's safety by having once offered him shelter." *DeShaney v. Winnebago Cnty. Dep't of Social Servs.,* 489 U.S. at 201, 109 S.Ct. at 1006.[8]

The City and State's duty to Inesti ended upon Inesti's discharge from custody. While this may not be sound policy, it is beyond the province of this Court to create a duty for City and State defendants to assume responsibility for Inesti's safety and general well-being after being released from custody. *See, e.g., McGhie v.. Main,* No. 11–CV–3110, 2011 WL 4852268 at \*5 (E.D.N.Y. Oct. 12, 2011) (denying deliberate indifference claim where plaintiff, who was on supervised release, "was not incarcerated or institutionalized when, as he alleges, he was deprived of necessary psychiatric care ... [even] though the Probation Department had previously been providing him with necessary care, he was, upon the cessation of that care, free to find treatment on his own"); *Cerbelli v. City of N.Y.,* 600 F.Supp.2d 405, 413 (E.D.N.Y.2009) (where psychiatric patient was released, after which he caused a disturbance at a police station resulting in his fatal shooting, the City was not liable since the N.Y.C. psychiatric facility "did not have a constitutional duty to protect him or provide him with medical services once he was no longer in its custody"); *Luna v. Weiner,* No. Civ.A. 05–2298, 2006 WL 1517747 at \*3–4 (D.N.J. May 23, 2006) ("As a parolee, [plaintiff] had the freedom to 'exercise normal responsibility for his own welfare,' and could have secured any medical attention of his choosing.

Once the plaintiff walked beyond the walls of the prison in which he was being held, he regained his ability to care for himself and moved beyond the factual context for his 'cruel and unusual punishment' claims before this Court about medical care." (citation omitted)).

**\*8** In any event, even if such a duty existed, which it does not, Inesti has sued individuals, and he has provided no evidence that it would have been their responsibility to arrange continuing post-release mental health care for him. The City and State defendants should be *GRANTED* summary judgment on this claim.

### III. *STATUTE OF LIMITATIONS*

#### A. *The Statute Of Limitations For § 1983 Actions*

The statute of limitations for a § 1983 action is three years. *See, e.g., Melendez v. Greiner,* 477 F. App'x 801, 803 (2d Cir.2012) ("The applicable statute of limitations for a § 1983 action arising in New York State is three years."), *cert. denied,* —— S.Ct. ——, 2013 WL 598715 (Feb. 19, 2013); *Donaldson v. N.Y.C. Dep't of Educ.,* 442 F. App'x 601, 602 (2d Cir.2011) (Plaintiff's "complaint falls well outside the three-year statute of limitations for section 1983 claims brought in New York." (citing *Patterson v.. Cnty. of Oneida,* 375 F.3d 206, 225 (2d Cir.2004))); *Harper v. City of N.Y.,* 424 F. App'x 36, 39 (2d Cir.2011) (statute of limitations for § 1983 claims is three years, which begins to run when plaintiff knows or has reason to know of the harm); *Storman v.. Klein,* 395 F. App'x 790, 792 (2d Cir.2010); *Warren v. Altieri,* 59 F. App'x 426, 427 (2d Cir.2003) (Plaintiff's " § 1983 action is governed by New York's three-year statute of limitations as set out in N.Y. C.P.L.R. § 214, the provision applicable to actions for personal injury."). [9]

"[F]ederal law governs the determination of the accrual date (that is, the date the statute of limitations begins to run) for purposes of the statute of limitations in a section 1983 action." *Ormiston v. Nelson,* 117 F.3d 69, 71 (2d Cir.1997); *accord, e .g., Cantor Fitzgerald Inc. v. Lutnick,* 313 F.3d 704, 710–11 (2d Cir.2002); *Eagleston v. Guido,* 41 F.3d 865, 871 (2d Cir.1994), *cert. denied,* 516 U.S. 808, 116 S.Ct. 53 (1995). In general, under federal law, "the time of accrual [is] that point in time when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Covington v. City of N.Y.,* 171 F.3d 117, 121 (2d

Cir.) (quotations omitted), *cert. denied,* 528 U.S. 946, 120 S.Ct. 363 (1999). [10]

The Court previously found that Inesti's original complaint was filed on April 7, 2011. *See Inesti v. Hicks,* 11 Civ. 2596, 2012 WL 2362626 at \*7–8 & n. 9 (S.D.N.Y. June 22, 2012) (Peck, M.J.) (citing cases), *report & rec. adopted,* 2012 WL 3822224 (S.D.N.Y. Sept. 4, 2012) (Crotty, D.J.). Absent tolling, Inesti's § 1983 claims prior to April 7, 2008 would be untimely.

#### B. *Statutory Tolling Of The Statute Of Limitations Under C.P.L.R. § 208*

"Although federal law determines when a section 1983 claim accrues, state tolling rules determine whether the limitations period has been tolled, unless state tolling rules would 'defeat the goals' of section 1983." *Abbas v. Dixon,* 480 F.3d 636, 641 (2d Cir.2007) (quoting *Pearl v. City of Long Beach,* 296 F.3d 76, 80 (2d Cir.2002), *cert. denied,* 538 U.S. 922, 123 S.Ct. 1574 (2003)). [11]

**\*9** New York law provides a toll for "insanity," as follows:

> If a person entitled to commence an action is under a disability because of infancy or insanity at the time the cause of action accrues, and the time otherwise limited for commencing the action is three years or more and expires no later than three years after the disability ceases, ... the time within which the action must be commenced shall be extended to three years after the disability ceases ....

C.P.L.R. § 208. This tolling provision has been held not to defeat § 1983's goals. *See Shonowsky v. City of Norwich,* No. 10–CV–0745, 2011 WL 4344028 at \*3 (N.D.N.Y. Apr. 18, 2011) (C.P.L.R. § 208 held not to be inconsistent with the policy underlying § 1983 in an unlawful arrest, excessive force and deprivation of due process case), *report & rec. adopted,* 2011 WL 4344039 (N.D.N.Y. Sept. 14, 2011); *Keitt v. City of N.Y.,* 09 Civ. 5663, 2010 WL 3466175 at \*7 (S.D.N.Y. Aug. 9, 2010), *report & rec. adopted,* 2010 WL 3466079 (S.D.N.Y. Sept. 2, 2010).

C.P.L.R. § 208's "toll for insanity [is] to be narrowly interpreted" to apply "to only those individuals who are unable to protect their legal rights because of an over-all inability to function in society." *McCarthy v. Volkswagen of Am., Inc.,* 55 N.Y.2d 543, 548, 450 N.Y.S.2d 457, 459–60 (1982). [12] "[T]he disability of insanity must [be] continuous during the relevant period." *Washington v. Doe,* 2011 WL 679919 at *2. [13] "Plaintiff bears the burden of establishing the applicability of section 208." *Shonowsky v. City of Norwich,* 2011 WL 4344028 at *3. [14]

Because § 208 provides no definition for the term "insanity," "an individual's mental capabilities is largely a factual question." *McCarthy v. Volkswagen of Am., Inc.,* 55 N.Y.2d at 548, 450 N.Y.S.2d at 459. [15] Under New York law, psychiatric hospitalization is not a per se basis for a toll under § 208. *See, e.g., McAdoo v. Jagiello,* No. 10–CV–355, 2011 WL 1577236 at *4 (N.D.N.Y. Apr. 26, 2011). [16] The "insanity [disability] need not have been adjudicated at the time the cause of action accrued." *McCarthy v. Volkswagen of Am., Inc.,* 55 N.Y.2d at 547, 450 N.Y.S.2d at 459. But it must be more than mere mental illness. E.g., *Reyes v. City of N.Y.,* 2000 WL 1505983 at *6 ("Indeed, 'apathy, depression, post-traumatic neurosis, psychological trauma and repression therefrom or mental illness alone have been held to be insufficient' without a demonstrated inability to function."); *Swartz v. Berkshire Life Ins. Co.,* 2000 WL 1448627 at *5 ("Difficulty in functioning is not sufficient to establish insanity for the purposes of § 208; rather, the plaintiff must be totally unable to function as a result of a 'severe and incapacitating' disability."). [17]

### C. *Application Of C.P.L.R. § 208 To Inesti*

In some cases, courts conduct hearings to determine whether a plaintiff's mental state met the § 208 standard for insanity, but a hearing is not necessary here because Inesti failed to meet his burden of establishing that he suffered from "severe and incapacitating" mental illness that was continuous during the relevant period. *See, e.g., Keitt v. City of N.Y.,* 09 Civ. 5663, 2010 WL 3466175 at *8 (S.D.N.Y. Aug. 9, 2010) ("In this case, no evidentiary hearing is necessary for the Court to determine whether Plaintiff is entitled to tolling under Section 208, as, even assuming that all of Plaintiff's factual allegations regarding the nature of his disability are true, they would not be sufficient to demonstrate the type of 'severe and

incapacitating disability' that could render him eligible for statutory tolling."), *report & rec. adopted,* 2010 WL 3466079 (S.D.N.Y. Sept. 2, 2010); *Carter v. Doe,* 05 Civ. 8432, 2006 WL 2109461 at *3 (S.D.N.Y. July 26, 2006) ("[N]o hearing is necessary because plaintiff's litigation history and medical records clearly preclude a finding that [plaintiff's] mental illness was sufficiently severe or continuous to warrant tolling the statute of limitations under Section 208. "); *Swartz v. Berkshire Life Ins. Co.,* 99 Civ. 9462, 2000 WL 1448627 at *4 (S .D.N.Y. Sept. 28, 2000) (Plaintiff "has not produced evidence sufficient to create an issue of fact as to his insanity as of April 1991, or to warrant a hearing on the subject."); *de los Santos v. Fingerson,* 97 Civ. 3972, 1998 WL 740851 at *5 (S.D.N.Y. Oct. 23, 1998) ("[I]t would strain logic to require that a hearing be held where a plaintiff has not only failed to satisfy his burden of showing insanity, but has also himself submitted evidence that establishes conclusively the lack of such disability.").

**\*10** Inesti asserts that he "suffers from a sever[e] mental illness and was fighting with demonic forces that hindered his role in society to be of sound mind when all the initial violations occurred" and "later when he was properly medicated and counseled by (OMH) staff plaintiff formulated his claim and submitted it." (Dkt. No. 103: Inesti Opp. Br. ¶ 24.) [18] Inesti bears the burden of establishing that he was insane pursuant to § 208, and Inesti has failed to do so. *See, e.g., Jones v. N.Y. Dep't of Corr.,* 11 Civ. 4477, 2011 WL 5865143 at *3 (S.D.N.Y. Nov. 22, 2011) (Peck, M.J.) (Plaintiff "is not entitled to equitable tolling because he has failed to show that his mental issues prevented him from timely filing his § 1983 claim."), *report & rec. adopted,* 2012 WL 1232963 (S.D.N.Y. Apr. 12, 2012); *Viti v. Guardian Life Ins. Co. of Am.,* 817 F.Supp.2d 214, 229 (S.D.N.Y.2011) (" 'Where a plaintiff suffers from a chronic mental illness, he must show that he was *actually impaired during the relevant time period .* ' '[C]ourts have repeatedly refused to apply equitable tolling where a plaintiff has evidenced an ability to pursue his or her legal rights during the relevant period.' " (citation omitted)); *Apionishev v. Columbia Univ.,* 09 Civ. 6471, 2011 WL 1197637 at *4 (S.D.N.Y. Mar. 25, 2011) ("[T]he burden of demonstrating the appropriateness of equitable tolling lies with the plaintiff. Specifically, a plaintiff must establish ... how the particular disability 'severely impair[ed][his] ability to comply with the filing deadline, despite [his] diligent effort to do so.' " (fn.omitted)); *Rhodes v. Senkowski,* 82 F.Supp.2d 160,

169–70 (S.D.N.Y.2000) (Plaintiff "must show that these medical problems rendered him unable to pursue his legal rights during the relevant time period.").

Inesti acknowledges that during his incarceration at MPC from September 24, 2007 to November 23, 2007, he sent one letter to Hogan and several complaints to Rabinowitz. (*See* page 6 above.) Inesti further admits that his complaints effectively got him transferred to a transitional program that he desired. (*See* page 6 above.) Inesti's admitted ability to pursue extrajudicial remedies demonstrate that he experienced lucid intervals and was able to protect his rights during the statutory period, thus further militating against the application of § 208's tolling provision. *See, e.g., Hills v. Praxair, Inc.,* No. 11–CV–678, 2012 WL 1935207 at *12 (W.D.N.Y. May 29, 2012) (asserting workers' compensation claim and engaging in settlement discussions evidenced plaintiff's ability to assert his legal rights); *Brown v. Greene,* No. 11 Civ. 4917, 2012 WL 911560 at *3 (E.D.N.Y. Mar. 16, 2012) (denying § 208 tolling where plaintiff complained to the mayor's office and other City officials, and was awarded custody of son in Family Court proceedings during the relevant period); *Shonowsky v. City of Norwich,* No. 10–CV–0745, 2011 WL 4344028 at *7 (N.D.N.Y. Apr. 18, 2011) (Upon "being advised of his right to consult with an attorney concerning his circumstances, [plaintiff] requested such a consultation. The record also reflects plaintiff's manifest intention from the outset to bring suit based upon the circumstances surrounding his arrest and involuntary commitment, and that to further that intention he made arrangements two days after his admission to have photographs taken of his injuries. These actions suggest plaintiff's ability to protect his legal rights notwithstanding his mental condition and involuntary commitment and therefore militate against the applicability of section 208."), *report & rec. adopted,* 2011 WL 4344039 (N.D.N.Y. Sept. 14, 2011); *Carter v. Doe,* 2006 WL 2109461 at *3 (no tolling under § 208 where plaintiff litigated two lawsuits pro se during the relevant period); *de los Santos v. Fingerson,* 1998 WL 740851 at *5 (§ 208 tolling denied where plaintiff maintained psychiatric appointments and pursued rights before Worker's Compensation Board); *Bedeau v. Santi,* 221 A.D.2d 396, 397–98, 633 N.Y.S.2d 533, 535 (2d Dep't 1995) (denying § 208 tolling where, *inter alia,* plaintiff pursued a Workers' Compensation claim), *appeal denied,* 88 N.Y.2d 1002, 649 N.Y.S.2d 370 (1996); *Cordero v. Epstein,* 22 Misc.3d 161, 166–67, 869 N.Y.S.2d 725, 729

(Sup.Ct.N.Y.Cnty.2008) (plaintiff not insane for purposes of § 208 where she verified several complaints, executed numerous affidavits, and executed several contracts).

**\*11** While Inesti suffered from mental illness, Inesti has failed to establish that prior to April 7, 2008 he was totally unable to function as a result of a severe and incapacitating disability. Because Inesti bears the burden of establishing the applicability of § 208 and § 208's toll is to be narrowly interpreted, Inesti was not insane within the meaning of § 208 and therefore is ineligible for § 208 tolling. Accordingly, Inesti's claims against the City defendants arising out of his incarceration at MHAUII from November 16, 2006 to January 16, 2007 and against the State defendants arising out of his incarceration at MPC from September 24, 2007 to November 23, 2007 are time-barred and should be dismissed.

## IV. *INESTI'S CLAIMS AGAINST THE STATE DEFENDANTS*[19]

### A. *Supervisors Hogan And Rabinowitz Should Be Granted Summary Judgment For Lack Of Personal Involvement*

#### 1. *Legal Standards For Personal Involvement In A § 1983 Cause Of Action*

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *accord, e.g., Ashcroft v.. Iqbal,* 556 U.S. 662, 676, 129 S.Ct. 1937, 1948 (2009) ( "Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *Murphy v. Cnty. of Chemung (In re Murphy),* 482 F. App'x 624, 627 (2d Cir.2012); *Farid v. Ellen,* 593 F.3d 233, 249 (2d Cir.2010); *Warheit v. City of N.Y.,* 271 F. App'x 123, 126 (2d Cir.2008); *Dyno v. Vill. of Johnson City,* 240 F. App'x 432, 434 (2d Cir.2007), *cert. denied,* 552 U.S. 1310, 128 S.Ct. 1874 (2008).[20]

In 1995, the Second Circuit held that:

> [t]he personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation,

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d at 873. [21] However, in 2009, the Supreme Court held that:

In a § 1983 suit ...—where masters do not answer for the torts of their servants-the term "supervisory liability" is a misnomer. Absent vicarious liability, each Government official, his or her title not withstanding, is only liable for his or her own misconduct. In the context of determining whether there is a violation of clearly established right to overcome qualified immunity, purpose rather than knowledge is required to impose ... liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities.

*12 *Ashcroft v. Iqbal,* 556 U.S. at 677, 129 S.Ct. at 1949. Although the Second Circuit has not weighed in on what remains of *Colon* after *Iqbal,* several decisions in this district have concluded that by specifically rejecting the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution," *id., Iqbal* effectively nullified several of the classifications of supervisory liability enunciated by the Second Circuit in *Colon. See, e.g., Bellamy v. Mount Vernon Hosp.,* 07 Civ. 1801, 2009 WL 1835939 at *6 (S.D.N.Y. June 26, 2009) ("Only the first and part of the third *Colon* categories pass *Iqbal*'s muster —a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred. The

other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated—situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate."), *aff'd,* 387 F. App'x 55 (2d Cir.2010). [22] While *Colon* permitted supervisory liability in situations where the supervisor knew of and acquiesced in a constitutional violation committed by a subordinate, these post-*Iqbal* district court decisions reason that *Iqbal*'s "active conduct" standard imposes liability only where that supervisor directly participated in the alleged violation or had a hand in creating a policy or custom under which the unconstitutional practices occurred.

These decisions may overstate *Iqbal*'s impact on supervisory liability. *Iqbal* involved allegations of intentional discrimination. *Ashcroft v. Iqbal,* 556 U.S. at 666, 129 S.Ct. at 1942. Where the alleged constitutional violation involved "invidious discrimination in contravention of the First and Fifth Amendments," *Iqbal* held that "plaintiff must plead and prove that the defendant acted with discriminatory purpose," whether the defendant is a subordinate or a supervisor. *Id.* at 676–77, 129 S.Ct. at 1948–49. It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Id.* at 677, 129 S.Ct. at 1949. Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth, Eighth or Fourteenth Amendments, the personal involvement analysis set forth in *Colon* may still apply. [23]

### 2. *Application Of The Personal Involvement Standard To State Supervisory Defendants Hogan And Rabinowitz*

#### a. *OMH Commissioner Hogan*

Even if Inesti's claims against Hogan are not dismissed as time barred, they still should be dismissed for lack of personal involvement. During Inesti's incarceration at MPC from September 24, 2007 to November 23, 2007, Inesti sent one letter to Hogan, in which he complained that MPC nurses were injecting him with psychotropic medication without his consent. (*See* page 6 above.) Inesti never received a response from Commissioner Hogan, and OMH has no record of Inesti's letter to Commissioner

Hogan. (*See* page 6 above.) During his incarceration at Kirby from November 2008 to January 2009, Inesti did not complain to Hogan. (*See* page 8 above.)

**\*13** Even assuming that all of the *Colon* factors survived *Iqbal,* Inesti's one complaint letter to Hogan is insufficient to establish personal involvement. *See, e.g., Goris v. Breslin,* 402 F. App'x 582, 584 (2d Cir.2010) (affirming dismissal of case where personal involvement "was limited to the receipt of two letters from [plaintiff], which [defendant] promptly referred to other individuals for investigation and response"); *Rivera v. Bloomberg,* 11 Civ. 629, 11 Civ. 4325, 2012 WL 3655830 at \*10 (S.D.N.Y. Aug. 27, 2012) ("Assuming *arguendo* that Commissioner ... received Plaintiffs' complaints and failed to act on them, this is not sufficient to establish supervisory liability. Were it otherwise, virtually every prison inmate who sues for constitutional torts by [prison officials] could name the [supervisor] as a defendant since the plaintiff must pursue his prison remedies, and invariably the plaintiff's grievance will have been passed upon by the [supervisor]." (quotations omitted)); *Soto v. Wright,* 11 Civ. 2289, 2012 WL 639166 at \*2 (S.D.N.Y. Feb. 28, 2012) (Crotty, D.J.) (no personal involvement where deputy commissioner and chief medical officer received one letter from plaintiff and asked someone else to respond); *Koehl v. Bernstein,* 10 Civ. 3808, 2011 WL 2436817 at \*16 (S.D.N.Y. June 17, 2011) (no personal involvement where superintendent merely disregarded plaintiff's complaints), *report & rec. adopted,* 2011 WL 4390007 (S.D.N.Y. Sept. 21, 2011); *Gonzales v. Wright,* No. 06–CV–1424, 2010 WL 681323 at \*10 (N.D.N.Y. Feb. 23, 2010) (The "mere receipt of letters from an inmate by a facility Superintendent regarding a medical claim is insufficient to constitute personal liability.").[24]

Accordingly, the State defendants' summary judgment motion should be *GRANTED* as to Inesti's claims against Hogan.

**b. *Rabinowitz***

Inesti asserts that Rabinowitz is personally involved because Inesti complained to Rabinowitz. (Dkt. No. 103: Inesti Opp. Br. ¶ 19.) While at Kirby, Inesti wrote one or two letters to Rabinowitz but never spoke with Rabinowitz regarding his treatment. (*See* page 8 above.) Inesti argues that "[i]f no action is taken and the complaints are simply ignored or not filed then a personal

involvement is being acted out by these authorit[ie]s in position to investigate and rectify matters." (Inesti Opp. Br. ¶ 19.) Case law does not support Inesti's argument. To the contrary, as discussed in relation to Commissioner Hogan's personal involvement, a few complaints alone are insufficient to establish personal involvement. (*See* cases cited on pages 27–28 above.)

Inesti also has failed to establish Rabinowitz's personal involvement in relation to his First Amendment retaliatory transfer claim. Inesti was admitted to Kirby pursuant to a C.P.L. Article 730 Order on November 26, 2008 after being indicted and found unfit for trial. (*See* page 5 above.) On January 5, 2009, Kirby forensic psychiatrists determined that Inesti was competent to stand trial. (*See* page 8 above.) "[W]hen clinical staff [find] a patient referred pursuant to CPL 730 to be fit," the Executive Director (Rabinowitz) normally would "certify that defendants were no longer incapacitated and were capable of understanding the proceedings against him." (Dkt. No. 90: Rabinowtiz Aff. ¶ 9.) Rabinowitz normally "would sign a 'Notification of Fitness to Proceed' based on the competency report of the defendant's treatment team at Kirby." (Rabinowtiz Aff. ¶ 9.) In Inesti's case, however, Deputy Director Vinny Miccoli "signed the 'Notification of Fitness to Proceed' " based on the competency report of Kirby's forensic psychiatrists. (Rabinowtiz Aff. ¶ 10 & Ex. A: Notification of Fitness to Proceed.) Thus, Miccoli, not Rabinowitz, certified that Inesti was no longer incapacitated and was capable of understanding the proceedings against him.

**\*14** Because the record fails to support Inesti's claim that Rabinowitz was personally involved in the transfer decision, the Court should find that Rabinowitz was not personally involved. *See, e.g., Gonzales v. Carpenter,* No. 08–CV–629, 2011 WL 768990 at \*5 (N.D.N.Y. Jan. 3, 2011) ("Plaintiff alleges nothing to support a plausible inference that a correctional sergeant, with no connection to the DOCS or OMH medical staff, could have caused the inmate's transfer for a mental health evaluation, even if [sergeant] knew of plaintiff's various prior lawsuits and was inclined to retaliate against him ..." (fn.omitted)), *report & rec. adopted,* 2011 WL 767546 (N.D.N.Y. Feb. 25, 2011); *McQuilkin v. Cent. N.Y. Psychiatric Ctr.,* No. 08–CV–975, 2010 WL 3765847 at \*15 (N.D.N.Y. Aug. 27, 2010) (plaintiff's claim that the prison superintendent transferred him in retaliation fails because "the record reflects the decision was made by OMH care providers

following an evaluation of plaintiff's mental status," not by the superintendent), *report & rec. adopted,* 2010 WL 3765715 (N.D.N.Y. Sept. 20, 2010); *Rivera v. Pataki,* 04 Civ. 1286, 2005 WL 407710 at *23 (S.D.N.Y. Feb. 7, 2005)* ("Plaintiff's remaining claims against [defendant] for retaliatory transfer ..., have no basis in the record and plaintiff has not alleged any specific personal involvement justifying [defendant's] supervisory liability. All claims as to defendant ... therefore are dismissed." (citation omitted)); *Lipton v. Cnty. of Orange,* 315 F.Supp.2d 434, 459 (S.D.N.Y.2004)* (no personal involvement by prison administrator or supervisor for alleged retaliatory transfer of pretrial detainee where neither participated in actual transfer and did not learn of the transfer until after it was accomplished). [25]

Accordingly, the State defendants' summary judgment motion should be *GRANTED* as to Inesti's claims against Rabinowitz.

**B. *Dr. Tuzel's Summary Judgment Motion Should Be Granted***

Inesti alleges that Dr. Tuzel was deliberately indifferent to Inesti's mental health needs and also that Dr. Tuzel injected him with psychotropic medication without Inesti's consent while Inesti was physically restrained. (Dkt. No. 38: Compl. ¶¶ 134, 136, 140; Dkt. No. 103: Inesti Opp. Br. ¶¶ 3, 6–7, 15, 21.) Because Inesti was a pretrial detainee, his claim is analyzed under the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment. *See, e.g., Inesti v. Hicks,* 11 Civ. 2596, 2012 WL 2362626 at *12 & n. 21 (S.D.N.Y. June 22, 2012) (Peck, M.J.) (citing cases), *report & rec. adopted,* 2012 WL 3822224 (S.D.N.Y. Sept. 4, 2012) (Crotty, D.J.).

**1. *Legal Standards For Inesti's Deliberate Indifference Claim Against Dr. Tuzel***

To prevail in a § 1983 action, a plaintiff must demonstrate that he has been denied a constitutional or federal statutory right and that the deprivation occurred under color of state law. *See* 42 U.S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 2254–55 (1988). "Section 1983 itself," however, "creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) (citation omitted), *cert. denied,* 512 U.S. 1240, 114 S.Ct. 2749 (1994).

**\*15** The Second Circuit has held that:

> while the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner.... Thus, the official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need.

*Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996). [26] The standard for such a claim is the same as one brought by a convicted prisoner under the Eighth Amendment. *Caiozzo v. Koreman,* 581 F.3d at 72.

As the Second Circuit has explained, "the deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). [27] "Objectively, the alleged deprivation must be 'sufficiently serious' ...." *Id.* at 553; *Smith v. Carpenter,* 316 F.3d at 183–84 ("The objective 'medical need' element measures the severity of the alleged deprivation ...."). [28] " 'The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves ....' " *Dean v. Coughlin,* 804 F .2d 207, 215 (2d Cir.1986). "[O]nly those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth [or Fourteenth] Amendment violation." *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324 (1991) (citation omitted); *see also, e.g., Dean v. Coughlin,* 804 F.2d at 215 (" '[T]he essential test is one of medical necessity and not one simply of desirability.' "). Thus, the constitutional protection is limited to " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d at 702; [29] *accord, e.g., Fransua v. Vadlamudi,* 2008 WL 4810066 at *1; *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) ("A serious medical condition exists where 'the failure to treat a prisoner's

condition could result in further significant injury or the unnecessary and wanton infliction of pain.' ").

The Second Circuit has stated that determining whether a deprivation is objectively serious entails two inquiries:

> Determining whether a deprivation is an objectively serious deprivation entails two inquiries. *The first inquiry is whether the prisoner was actually deprived of adequate medical care.* As the Supreme Court has noted, the prison official's duty is only to provide reasonable care. Thus, "prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable ..." and, conversely, failing "to take reasonable measures" in response to a medical condition can lead to liability.
>
> **\*16** Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious. Factors relevant to the seriousness of a medical condition include whether "a reasonable doctor or patient would find [it] important and worthy of comment," whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic and substantial pain." In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry "focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." Thus, although we sometimes speak of a "serious medical condition" as the basis for [such a] claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

*Salahuddin v. Goord,* 467 F.3d at 279–80 (citations omitted, emphasis added).

" 'Courts have repeatedly held that treatment of a psychiatric or psychological condition may present a serious medical need ....' " *Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir.2000); *see, e.g., Hamm v. Hatcher,* 05 Civ. 503, 2013 WL 71770 at \*8 (S.D.N.Y. Jan. 7, 2013); *Hale v. Rao,* 768 F.Supp.2d 367, 378 (N.D.N.Y.2011) ("Mental illness can constitute a serious medical need." (citing *Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir.1989)); *Coviello v. Westchester Cnty. Dep't of Corr.,* 06 Civ. 5369, 2010 WL 572125 at \*6 (S.D.N.Y. Jan. 25, 2010).

Where the plaintiff alleges delay or interruption in treatment rather than failure to receive treatment, "the serious medical need inquiry can properly take into account the severity of the temporary deprivation alleged by the prisoner." *Smith v. Carpenter,* 316 F.3d at 186. "[I]t's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for [these] purposes." *Id.* (citing *Chance v. Armstrong,* 143 F.3d at 702–03). "The absence of adverse medical effects or demonstrable physical injury is one ... factor that may be used to gauge the severity of the medical need at issue. Indeed, in most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Id.* at 187 (citations omitted).

**\*17** "Subjectively, the charged official must act with a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d at 553; *accord, e.g., Fransua v. Vadlamudi,* 2008 WL 4810066 at \*1; *Salahuddin v. Goord,* 467 F.3d at 280–81; *Smith v. Carpenter,* 316 F.3d at 184 ("[T]he subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind."); *Selby v. Coombe,* 17 F. App'x. at 37; *Chance v. Armstrong,* 143 F.3d at 702. "The required state of mind, equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) (quotations omitted, quoting *Hathaway v. Coughlin,* 99 F.3d at 553 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 1979 (1994))); *see, e.g., Caiozzo v. Koreman,* 581 F.3d at 71 (to establish a violation of his Fourteenth Amendment due process rights, a plaintiff "must prove, *inter alia,* that the government-employed defendant disregarded a

risk of harm to the plaintiff of which the defendant was aware"). [30]

Deliberate indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison [officials or] guards in intentionally denying or delaying access to medical care." *Estelle v. Gamble,* 429 U.S. 97, 104–05, 97 S.Ct. 285, 291 (1976) (fn.omitted). However, an "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." 429 U.S. at 105–06, 97 S.Ct. at 292; *accord, e.g .,Burton v. N.Y.S. Dep't of Corr.,* 93 Civ. 6028, 1994 WL 97164 at *2 (S.D.N.Y. Mar. 21, 1994) (Sotomayor, D.J.). "Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim .... " *Estelle v.. Gamble,* 429 U.S. at 106, 97 S.Ct. at 292. [31] As the Supreme Court has stated, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; accord, e.g., Smith v. Carpenter,* 316 F.3d at 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."); *Hathaway v. Coughlin,* 99 F.3d at 553; *Burton v. N.Y.S. Dep't of Corr.,* 1994 WL 97164 at *2.

## 2. *Application Of The Legal Standards To Inesti's Deliberate Indifference Claim*

Inesti alleges that Dr. Tuzel was deliberately indifferent to his need for proper mental health treatment. (Dkt. No. 103: Inesti Opp. Br. ¶¶ 6–7, 15, 21.) Inesti cites *McGuckin v. Smith,* 974 F.2d 1050, 1059–60 (9th Cir.1992), for the proposition that a serious medical need may exist where "a medical condition ... significantly affects an individual's daily activities" and asserts that his "medical condition p[e]rtaining to his mental illness has had serious consequences for him that at times he is unable to work, sleep, read, write or participate in every day normal activities." (Inesti Opp. Br. ¶ 6.) Inesti also asserts that Dr. Tuzel "abrupt[ ]ly stopped plaintiff[']s medication causing plaintiff sever[e] mental distress and pain" and falsely diagnosed Inesti of malingering, which ultimately led to him being found fit for trial, convicted, and sentenced to twenty years to life. (Inesti Opp. Br. at ¶¶ 6, 7, 15, 21.) Inesti also seems to argue that because Dr. Tuzel later prescribed medication to Inesti, Dr. Tuzel was deliberately indifferent for discontinuing Inesti's medication in the first

place. (Inesti Opp. Br. ¶¶ 7, 21 & Ex. E: Inesti 4/9/09 Prescription.)

**\*18** Inesti's medical records establish that Inesti received treatment at Kirby. (*See generally* Dkt. No. 91: Buskin Aff. Ex. D: Inesti Med. Records.) Inesti admits attending beneficial therapy groups directed by Dr. Tuzel. (Dkt. No. 88: State Defs. Br. at 20–21; Buskin Aff. Ex. A: Inesti Dep. at 138–39.) On January 12, 2009, Inesti consented to and received intramuscular medication. (*See* page 8 above.) Inesti also had a standing order for pshychotropic medication, and although the standing order was discontinued by January 14, 2009, Inesti continued to request and receive Risperidone. (*See* page 8 above.)

Inesti appears to disagree with the treatment offered and received, but he fails to provide any evidence that his mental health treatment or lack thereof while at Kirby resulted in an urgent threat to his health or was otherwise so grossly inadequate to rise to the level of deliberate indifference. *See, e.g., Bellotto v. Cnty. of Orange,* 248 F. App'x 232, 237 (2d Cir.2007) (Plaintiff's "treatment, which allegedly included missed medication dosages and inadequate monitoring of medications, also could not be found to rise to the level of a constitutional violation because the risk of harm that [appellant] faced as a result of the alleged treatment was not substantial .... [T]he only medical consequence he alleges was an anxiety attack, which ... resulted in no physical injuries and 'no acute distress.' "); *Hamm v. Hatcher,* 05 Civ. 503, 2013 WL 71770 at *9 (S.D.N.Y. Jan. 7, 2013) (ten-day interruption in medication resulting in withdrawal symptoms, including "exacerbated depression, nightmares, hopelessness, and suicidal thoughts" was insufficient to establish significant risk of serious harm); *Mastroianni v. Reilly,* 602 F.Supp.2d 425, 434 (E.D.N.Y.2009) (granting summary judgment for psychiatry department where medications were changed and discontinued but later reinstated because psychiatry department's actions "did not pose any particular risk of harm or result in actual adverse consequences to the plaintiff"); *Goodson v. Evans,* 438 F.Supp.2d 199, 202 (W.D.N.Y.2006) (granting summary judgment for defendants where plaintiff's course of treatment was changed but there was "no evidence, however, that those changes were incorrect or medically inappropriate"); *Atkins v. Cnty. of Orange,* 372 F.Supp.2d 377, 409–11 (S.D.N.Y.2005) (granting summary judgment

where plaintiffs' broad allegations—" 'over-medication with psychotropic drugs; denial of timely psychiatric evaluations; denial of emergency psychiatric care; denial of timely prescription drug administration; denial of adequate staffing of observation holding cells; denial of adequate therapeutic psychiatric care; and, denial of discharge planning and treatment plans' "—did not rise to a level of constitutional deprivation), *aff'd on other grounds,* 248 F. App'x 232 (2d Cir.2007); *Beckford v. Portuondo,* 151 F.Supp.2d 204, 218 (N.D.N.Y.2001) (Even "accepting that Plaintiff's mental health care was far from optimum, he was provided significant psychotropic medication, bi-weekly individual therapy sessions, and monthly medical reviews .... At most, Plaintiff disagrees with the treatment offered and alleges that he should have received more time with a psychiatrist, additional group therapy treatment, access to the facility's Intermediate Core Program, and increased out of cell and outdoor activity. Nowhere does Plaintiff allege that the failure to provide him these additional treatments resulted in an urgent threat to his life or limb or was otherwise so grossly inadequate to rise to the level of deliberate indifference."). [32]

**\*19** Because Inesti's claims do not satisfy the objective prong for deliberate indifference, there is no need to discuss whether Inesti's claims fulfill the subjective requirement. *See, e.g., Goris v. Breslin,* 402 F. App'x 582, 584 (2d Cir.2010) (Court need not reach subjective prong where plaintiff failed to satisfy the objective prong); *Smolen v. Fischer,* 12 Civ. 1856, 2012 WL 3609089 at \*12 n. 22 (S.D.N.Y. Aug. 23, 2012) (Peck, M.J.).

Accordingly, State defendants summary judgment motion as to Inesti's deliberate indifference claims against Dr. Tuzel should be *GRANTED.*

### 3. *Inesti's Forced Medication Claim Against Dr. Tuzel*

Psychiatric patients have a "significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Washington v. Harper,* 494 U.S. 210, 221–22, 110 S.Ct. 1028, 1036 (1990); *see, e.g., Kulak v. City of N.Y.,* 88 F.3d 63, 74 (2d Cir.1996) ("It is a firmly established principle of the common law of New York that every individual of adult years and sound mind has a right to determine what shall be done with his own body and to

control the course of his medical treatment." (quotations omitted)). [33]

However, "it is well-settled that a patient's liberty interest in not being involuntarily medicated is overridden in an emergency, where failure to medicate forcibly would result in a substantial likelihood of physical harm to that patient, other patients, or to staff members of the institution." *Odom v. Bellevue Hosp. Ctr.,* 93 Civ. 2794, 1994 WL 323666 at \*3 (S.D.N.Y. July 5, 1994); *see, e .g., Kulak v. City of N.Y.,* 88 F.3d at 74 ("Such a right may be set aside only in narrow circumstances, including those where the patient 'presents a danger to himself or other members of society or engages in dangerous or potentially destructive conduct within the institution.' "). [34]

A "decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg v. Romeo,* 457 U.S. 307, 323, 102 S.Ct. 2452, 2462 (1982) (fn.omitted); *see, e.g., Kulak v. City of N.Y.,* 88 F.3d at 75 ("A doctor will not be liable under § 1983 for the treatment decisions she makes unless such decisions are 'such a substantial departure from accepted judgment, practice, or standards as to demonstrate that [she] actually did not base the decision on such a judgment.' "); *Vanbrocklen v. Gupta,* No. 09–CV–897, 2010 WL 5575325 at \*5 (W.D.N.Y. Nov. 23, 2010); *McNair v. Kirby Forensic Psychiatric Ctr.,* 09 Civ. 6660, 2010 WL 4446772 at \*9 (S.D.N.Y. Nov. 5, 2010). "This standard requires more than simple negligence on the part of the doctor but less than deliberate indifference." *Kulak v. City of* N.Y., 88 F.3d at 75; *see, e.g., Britt v. Buffalo Mun. Hous. Auth.,* 827 F.Supp.2d 198, 208 (W.D.N.Y.2011); *Vanbrocklen v. Gupta,* 2010 WL 5575325 at \*5.

**\*20** Inesti alleges that Dr. Tuzel injected him with psychotropic medication without his consent while he was physically restrained. (Dkt. No. 103: Inesti Opp. Br. ¶¶ 3, 7.) While Inesti received intramuscular medication without his consent on three occasions, Dr. Tuzel was involved in only one administration. (*See* page 7 above.) On December 26, 2008, Inesti complained that he was feeling " 'anxious,' 'nervous,' and 'irritable,' " and at 11:30 a.m., Inesti became " 'irritable,' 'loud,' and 'angry' " and requested a second dose of medication. (*See* page 7

above.) While yelling and screaming in Dr. Tuzel's office, Inesti was offered and refused intramuscular medication. (*See* page 7 above.) Concluding that Inesti's hostile and violent behavior presented a danger to himself and others, Dr. Tuzel ordered that Inesti be give Lorazepam for anxiety, Haloperidone for schizophrenia symptoms and Diphenhydramine, a sleep aid. (*See* page 7 above.) While Inesti does not recall if he was violent on December 26, 2009, Inesti concedes that he was not " 'stable.' " (*See* page 7 above.) Inesti also admits that he can become violent when he does not take his medication. (See page 7 above.) Inesti also conceded that the injections stabilized and calmed him. (*See* page 7 above.)

The record establishes that Dr. Tuzel decided to medicate Inesti without his consent on December 26, 2008 because Inesti was a danger to himself and others. *See, e.g., Anthony v. City of N.Y.,* 339 F.3d 129, 142 (2d Cir.2003) (Sotomayor, C.J.) (involuntary medication did not violate due process rights where staff reasonably believed that plaintiff was a danger to herself or others); *Kulak v. City of N.Y.,* 88 F.3d at 74 (granting summary judgment to a prison doctor who forcibly administered Haldol to an inmate who was " 'extremely angry,' " had extensive history of mental illness, and was considered " 'imminently likely to engage in conduct posing a risk of physical harm to himself or others' "); *Murray v. Melendz,* 2011 WL 4595213 at *6 (granting summary judgment for doctor who injected plaintiff without his consent to calm him down and ensure his safety and the safety of prison staff); *Lombardo v. Stone,* 99 Civ. 4603, 2001 WL 940559 at * 10 (S.D.N.Y. Aug. 20, 2001) (granting summary judgment for defendants where defendants assert "plaintiff was assaultive and dangerous throughout this period and that medication was therefore necessary to protect his safety and the safety of others" and finding plaintiff's "conclusory allegations of a purported conspiracy by defendants do not raise a triable issue of fact").

Moreover, Dr. Tuzel's decision is presumptively valid, and Inesti has failed to establish that Dr. Tuzel's decision was a "substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *See, e.g ., Kraft v. City of N.Y.,* 696 F.Supp.2d 403, 415 (S.D.N.Y.2010) ( "Because plaintiff fails to offer any evidence that the doctor defendants' diagnoses, actions, and subsequent determinations ...

fell substantially below accepted medical standards, no reasonable jury could conclude that they violated plaintiff's substantive due process rights under the Fourteenth Amendment."), aff'd, 441 F. App'x 24 (2d Cir.2011); *Capellupo v. Nassau Health Care Corp.,* No. 06–CV–4922, 2009 WL 1705749 at *12 (E.D.N.Y. June 16, 2009) ("[T]he Court finds that plaintiff has failed to raise any genuine issues of material fact regarding defendants' comportment with the generally accepted standards of medical care and, by extension, their compliance with the requirements of the Mental Hygiene Law."); *Fisk v. Letterman,* 501 F.Supp.2d at 524 (granting summary judgment where plaintiff "has offered no evidence to support a claim that the defendants' decision to medicate her against her will deviated from accepted medical standards").

**\*21** Accordingly, the State defendants' summary judgment motion should be *GRANTED* as to Inesti's forcible medication claim against Dr. Tuzel.

## V. *CITY DEFENDANTS' SUMMARY JUDGMENT MOTION SHOULD BE GRANTED* [35]

### A. *Conditions Of Confinement*

### 1. *Legal Standard As To Conditions Of Confinement Of Pretrial Detainees*

The Supreme Court has held that because:

> [a] person lawfully committed to pretrial detention has not been adjudged guilty of any crime[,] ... the Government ... may detain him to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution.

*Bell v. Wolfish,* 441 U.S. 520, 536–37, 99 S.Ct. 1861, 1872–73 (1979); *see, e.g., Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 2300 (1995); *Schall v. Martin,* 467 U.S. 253, 269, 104 S.Ct. 2403, 2412 (1984); *Caiozzo v. Koreman,* 581 F.3d 63, 69 (2d Cir.2009) (pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment, not the Eighth Amendment, because pretrial detainees

cannot be punished); *Benjamin v. Fraser,* 264 F.3d 175, 188 (2d Cir.2001). [36]

> Not every disability imposed during pretrial detention amounts to "punishment" in the constitutional sense.... And the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into "punishment."
>
> *Bell v. Wolfish,* 441 U.S. at 537, 99 S.Ct. at 1873.

In regard to the demonstration of punishment,

> [a]bsent a showing of an expressed intent to punish, the determination whether a condition is imposed for a legitimate purpose or for the purpose of punishment "generally will turn on whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]."

*Benjamin v. Fraser,* 264 F.3d at 188 (quoting *Bell v. Wolfish,* 441 U.S. at 538, 995 S.Ct. at 1874) (alteration in original). This has been applied in the context of the distribution or allowances of food, water, showers, periods of exercise, and medical and mental health treatment to pretrial detainees. *See, e .g., Azor v. City of N.Y.,* No. 08 CV 4473, 2012 WL 1117256 at *4 (E .D.N.Y. Mar. 30, 2012) (food and bathing); *Felmine v. City of N.Y.,* No. 09–CV–3768, 2011 WL 4543268 at *22 (E.D.N.Y. Sept. 29, 2011) (food); *Waters v. Luxama,* 09 Civ. 4728, 2011 WL 1226421 at *2 (S.D.N.Y. Mar. 24, 2011) (food); *Smart v. City of N.Y.,* 2009 WL 862281 at *9 (food, water and bathroom); *Ruffino v. Lantz,* No. 08–CV–1521, 2009 WL 3571306 at *3 (D.Conn. Oct. 28, 2009) (recreation); *Webster v. City of N.Y.,* 333 F.Supp.2d 184, 200 (S.D.N.Y.2004) (food and water); *Curry v. Kerik,* 163 F.Supp.2d 232, 235–36 (S.D.N.Y.2001) (unsanitary and hazardous showering); *Heisler v. Kralik,* 981 F.Supp. 830, 838 (S.D.N.Y.1997) (showers and recreation), aff'd, No. 97–2869, 164 F.3d 618 (table), 1998 WL 636985 (2d Cir. July 21, 1998); *Davidson v. Coughlin,* 968 F.Supp. 121, 134 (S.D.N.Y.1997) (exercise); *Cuoco v. Hershberger,* 93 Civ. 2806, 1996 WL 648963 at *8 (S.D.N.Y. Nov. 6, 1996) (medical care); *Irrizarry v. Kenny,* 92 Civ. 1511, 1995 WL 678747 at *4 (S.D.N.Y.1995) (medical care); *see also, e.g., Silvera v. Conn. Dep't of Corr.,* 726 F.Supp.2d 183, 190 (D.Conn.2010) (mental health treatment); *Atkins v. Cnty. of Orange,* 372 F.Supp.2d 377, 407–10 (S.D.N.Y.2005)

(mental health treatment), *aff'd on other grounds,* 248 F. App'x 232 (2d Cir.2007); *Burke v. Warren Cnty. Sheriff's Dep't,* No. 90–CV–597, 1994 WL 675042 at *5 (N.D.N.Y. Nov. 25, 1994) (mental health treatment).

**\*22** Punishment has been found when a correctional official denies a prisoner a necessity of life over a period of several months whenever that official was working. *See, e.g., Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) ("While no court has explicitly held that denial of food is a per se violation of a prisoner's Eighth Amendment rights, under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." (citation omitted)); *Murphy v. Andrews,* No. 10CV0508, 2011 WL 5878351 at *4 (E.D.Tex. Oct. 11, 2011) ("[T]he summary judgment evidence, viewed in the light most favorable to the plaintiff, shows that [plaintiff] was repeatedly denied food, whenever [defendant] worked, over a period of several months, and that this denial was deliberately done for the very purpose of causing harm. These allegations are sufficient to survive the defendant's motion for summary judgment."), *report & rec. adopted,* 2011 WL 5878347 (E.D.Tex. Nov. 23, 2011); *George v. McGinnis,* No. 05–CV–84, 2008 WL 4412109 at *5 (W.D.N.Y. Sept. 23, 2008) ("While the Court would have no difficulty determining that the denial of[, *inter alia,*] ... exercise for twenty-three days was reasonably calculated to restore prison discipline and security in light of plaintiff's admission to possessing a container of feces in his cell, it could not justify withholding those items, as well as ... [others] from plaintiff for sixty days, as plaintiff affirms."); *Curry v. Kerik,* 163 F.Supp.2d at 236 ("Plaintiff's allegation that he was exposed to an unsanitary and hazardous showering area for over nine months is 'sufficiently serious' to meet the objective element of a Due Process claim based upon the conditions of his confinement."); *Arce v. Coughlin,* 93 Civ. 4702, 1996 WL 252371 at *5 (S.D.N.Y. May 14, 1996) ("If plaintiff was denied laundry service and prevented from cleaning his cell for 120 days, that could have resulted in hygiene conditions so poor as to deny plaintiff 'the minimal civilized measure of life's necessities.' ... At the very least, there exists an issue of fact as to the severity of the hygiene problem upon which plaintiff's Eighth Amendment claim is based.").

Absent a demonstration of an intent to punish, allegations of deprivation of the life necessities of a pretrial detainee are subject to the deliberate indifference analysis discussed

above. (See cases on pages 31–36 above.) See, e.g., *Cruz v. Reiner,* No. 11 Civ. 2131, 2011 WL 6204101 at *4 (E.D.N.Y. Dec. 12, 2011); *Lesane v. City of N.Y.,* 11 Civ. 2104, 2011 WL 5242721 at *2 (S.D.N.Y. Nov. 3, 2011); *Felmine v. City of N.Y.,* 2011 WL 4543268 at *21; *Kondziela v. Cnty. of Erie,* No. 09–CV–601, 2011 WL 4055163 at *3 (W.D.N.Y. Sept. 12, 2011); *Dilworth v. Goldberg,* 10 Civ. 2224, 2011 WL 3501869 at *19 (S.D.N.Y. July 28, 2011), *report & rec. adopted,* 2011 WL 4526555 (S.D.N.Y. Sept. 30, 2011); *Waters v. Luxama,* 2011 WL 1226421 at *2; *Bourdon v. Roney,* No. 99–CV–0769, 2003 WL 21058177 at * 10 (N.D.N.Y. Mar. 6, 2003); *Curry v. Kerik,* 163 F.Supp.2d at 236.

## 2. *Application Of The Conditions Of Confinement Legal Standard*

**\*23** Inesti asserts that he "was denied mental health treatment and transferred to Riker's Island Correctional Facility and placed in a(SHU) with no property alone in a cell for 24 hours a day denied any right to eat, shower, or out of cell relief." (Dkt. No. 103: Inesti Opp Br. ¶¶ 8, 9, 13, 22, 23.) [37] Inesti asserts that these deprivations, as well as being housed in punitive segregation, caused him to suffer "pain[,] humiliation[,] emotional distress[,] mental anguish[,] and physical injuries that limited [his] ability to eat[,] sleep[,] or work." (Dkt. No. 38: Compl. ¶ 138.)

Inesti's claims against the City defendants arising out of his incarceration at MHAUII from November 16, 2006 to January 16, 2007 are time-barred. (See page 23 above.)

Inesti also was incarcerated at MHAUII from October 19, 2008 to November 26, 2008 (see pages 4–5 above), but Inesti fails to provide any evidence to support his allegations. [38] Inesti provides affidavits from three MHAUII inmates. (See Inesti Opp. Br. Ex. G: Santiago Aff., Salgado Aff., Collins Aff.) Inesti is precluded from relying on the affidavits because Inesti failed to produce them to City defendants during discovery. (See Dkt. No. 105: City Defs. Reply Br. at 5–6; Dkt. No. 106: Carey 2/28/13 Aff. ¶¶ 5–9 & Ex. M: Inesti Dep. at 76–80.) After Inesti failed to produce the affidavits to City defendants, the Court warned Inesti that if he did "not produce the inmate affidavits, he [would] be precluded from using them on the summary judgment motion." (Dkt. No. 76: 11/30/12 Order at 2.) In any event, only one affidavit provides any relevant information about Inesti. (See Inesti Opp. Br. Ex. G: Santiago Aff., Salgado Aff., Collins Aff.)

Melvin Collins stated that in July and August 2008, he witnessed Pressley and Dunbar "continuously harass and target inmate (Mike Inesti) in cell # 13 by not feeding him, turning his water off for long ex[ ]tended periods of time, taunting, and having lower ranking officers physically abuse him, in the name of an 'extraction,' also refusing to give him medical attention." (Inesti Opp. Br. Ex. G: Collins Aff .) But according to Inesti's movement history, Inesti was not admitted to MHAUII Housing Area 13–A until October 19, 2008. (See page 4 above; City Defs. Reply Br. at 6 n. 5.) Collins' statement thus is insufficient to create a material issue of fact.

Moreover, City defendants established that MHAUII correction officials manage inmates' food, showers, and recreation time, but not medication, which is dispensed by medical staff twice a day. (See page 3 above.) Deviations from standard procedure are noted in the logbook. (See page 5 above.) "The log book from Housing Area 13–A during the relevant time period clearly shows that Mr. Inesti was entitled to and offered three meals a day, regular sanitation, access to showers, out-of-cell relief, and medication (which he admits he sometimes refused)." (See page 5 above.) While it is unlikely that prison logbooks would reflect the wrongful denial of a condition of confinement, Inesti does not contest the accuracy of the logbooks. Inesti's conclusory allegations without more are insufficient to defeat City defendants motion for summary judgment. [39]

**\*24** Inesti asserts that he "was denied all of his personal property [, including] pens, paper ... and reading material." (Inesti Opp Br. ¶¶ 8, 9, 13, 23.) Denial of such personal property, especially for a period of only thirty-seven days, is not sufficiently serious to sustain a condition of confinement claim. *See, e.g., Stewart v. Howard,* No. 09–CV–69, 2010 WL 3907137 at *3 (N.D.N.Y. Sept. 30, 2010) (denial of personal property was not sufficiently serious to sustain a condition of confinement claim); *Reeder v. Hogan,* No. 09–CV–520, 2010 WL 3909050 at *8 (N.D.N.Y. Sept. 30, 2010) ("New York in fact affords an adequate post-deprivation remedy [for the deprivation of personal property] in the form of, *inter alia,* a Court of Claims action .... This adequate post-deprivation state remedy would thus preclude [the plaintiff's] due process claim under § 1983 even if he had exhausted his administrative remedies. Accordingly, defendants' motion to dismiss plaintiff's claim that defendants unconstitutionally deprived him of

his personal property, is granted." (citations & quotations omitted)); *Dixon v. Goord,* 224 F.Supp.2d 739, 748 (S.D.N.Y.2002) (Plaintiff's "allegations of having been cut off from ... personal property ... and other normal incidents of SHU confinement, are not violations of the Eighth Amendment."); *Salahuddin v. Dalsheim,* 94 Civ. 8730, 1996 WL 384898 at * 14 (S.D.N.Y. July 9, 1996) (deprivation of, *inter alia,* personal property for seven days did not establish an objectively serious deprivation).

While Inesti alleges he was denied food (see Inesti Opp Br. ¶¶ 8–9, 13, 23), he failed to support his allegation with any evidence. At MHAUII, food is served three times a day, and if an inmate refuses food, the matter is referred to the mental health department. (*See* page 3 above.) While Inesti missed one lunch on October 22, 2012 because there was not enough food in the meal cart (see page 5 above), missing one meal is not sufficient to establish a constitutional violation. *See, e.g., Hooks v. Howard,* No. 07–CV–0724, 2010 WL 1235236 at *13 (N.D.N.Y. Mar. 30, 2010) (Being " 'denied the morning meal,' " "alleged by plaintiff to have occurred only on one occasion, while not to be condoned, are nonetheless *de minimis* and do not rise to a level of constitutional significance."); *Benjamin v. Kooi,* No. 07–CV–0506, 2010 WL 985844 at *11 (N.D.N.Y. Feb. 25, 2010) ("Based on this record, no reasonable fact-finder could conclude that ... being denied two or three meals would deprive [plaintiff] of the minimal measures of necessities required for civilized living."), *report & rec. adopted,* 2010 WL 985823 (N.D.N.Y. Mar. 17, 2010); *Parker v. Peek–Co,* No. 06–cv–1268, 2009 WL 211371 at *4 (N.D.N.Y. Jan. 27, 2009) ("While plaintiff alleges that he was deprived of two meals on that date as a result of the defendant's actions, such a deprivation, while not to be condoned, is *de minimis* and does not rise to a constitutional significance."); *Cruz v. Church,* No. 05–CV–1067, 2008 WL 4891165 at *12 (N.D.N.Y. Nov. 10, 2008) ("If ... meals[ ] are withheld from a prisoner on an isolated basis, such conduct, though not necessarily to be condoned, does not typically rise to a level of constitutional significance."); *Cagle v. Perry,* No. 04–CV–1151, 2007 WL 3124806 at *14 (N.D.N.Y. Oct. 24, 2007) (deprivation of two meals is "not sufficiently numerous, prolonged or severe to rise to the level of an Eighth Amendment violation"); *Barclay v. New York,* 477 F.Supp.2d 546, 555 (N.D.N.Y.2007) (being denied food for two or three days for a messhall violation did not constitute a constitutional violation).

**\*25** Inesti asserts that he was denied adequate clothing, only receiving a "smock." (Inesti Opp Br. ¶ 23; Dkt. No. 80: Carey 12/10/12 Aff. Ex. A: Inesti Dep. at 45–46.) Inesti said that he was given the smock because he "was out of control." (Carey 12/10/12 Aff. Ex. A: Inesti Dep. at 46.) Inesti acknowledged that the officers said he was "out of control" "[p]robably because the way [he] was acting.... [He] wasn't on [his] medication and [he] was hysterical and going through a whole bunch of problems with [his] mental illness." (Carey 12/10/12 Aff. Ex. A: Inesti Dep. at 46–47.) While wearing a smock may be unpleasant, Inesti's claim that he was denied clothing and only provided a smock does not rise to the level of a constitutional violation. *See, e.g., Reeder v. Hogan,* No. 09–CV–520, 2012 WL 4107822 at *21 (N.D.N.Y. July 11, 2012) ("Plaintiff further alleges he was extremely cold, had only a short-sleeved green state shirt, no sheets, blanket, ... sweatshirt ... for six days. Such conditions may have been unpleasant for plaintiff, but he has failed to establish an issue of fact as to if the conditions were wantonly imposed for the unnecessary infliction of pain or that they posed a threat to his health or safety." (citation & fns. omitted)), *report & rec. adopted,* 2012 WL 4106740 (N.D.N.Y. Sept. 19, 2012); *Borges v. McGinnis,* No. 03–CV–6375, 2007 WL 1232227 at *6 (W.D.N.Y. Apr. 26, 2007) (keeping inmate clothed only in paper gown and paper slippers with a thin mattress and no blanket in a room with an open window for three days did not meet the objective element of an Eighth Amendment violation where "plaintiff [did] not allege that he suffered anything more than frustration and discomfort"); *McNatt v. Unit Manager Parker,* No. 99CV1397, 2000 WL 307000 at *4 (D.Conn. Jan. 18, 2000) (totality of conditions in restrictive housing unit, including no clothing for six days and no shower shoes, while not pleasant, did not rise to the level of Eighth Amendment violation); *Salahuddin v. Dalsheim,* 1996 WL 384898 at *3, * 14 (for inmate who was not referred to mental health services, the deprivation "of his belt, shoe laces, and personal property for seven days, subjected to 24–hour observation, placed with mentally ill inmates, denied a change of 'Greens' " did not establish an objectively serious deprivation).

Inesti contends that he was denied recreation. (Inesti Opp Br. ¶¶ 8–9, 13, 23.) According to MHAUII procedures, inmates are allowed one hour of out-of-cell recreation daily, which the inmate may refuse or recreation may be denied for failure to comply with security procedures. (*See* page 3 above.) City defendants established that Inesti

was offered recreation, but that he refused recreation on a regular basis. (*See* page 5 above.) Inesti's access to but refusal to participate in recreation, for no more than 37 days, does not establish a constitutional violation. *See, e.g., Willard v. Ramsey,* No. 07–CV–1156, 2010 WL 786294 at *3 n. 10 (N.D.N.Y. Mar. 2, 2010) ("While [plaintiff] contends that he was deprived of showers and recreation, such claims are contradicted by the record which establishes that [plaintiff] was offered such activities and he refused to participate in them on numerous occasions. [Plaintiff's] access to, and refusal to accept, showers were the result of his own decisions and not unconstitutional conditions of confinement. The same is true of his recreational time."); *Davis v. Castleberry,* 364 F.Supp.2d 319, 322 (W.D.N.Y.2005) (granting summary judgment for defendants where "DOCS records indicate that plaintiff himself chose not to avail himself of his opportunities for exercise"); *see also, e.g., Barnes v. Craft,* No. 04–CV–1269, 2008 WL 3884369 at *9 (N.D.N.Y. Aug. 18, 2008) (Denial of outdoor exercise "for six days [was] simply not sufficiently severe and prolonged to rise to the level of an Eighth Amendment violation."); *Barclay v. New York,* 477 F.Supp.2d at 555 (There "is no evidence that [plaintiff] suffered any ill effects from denial of exercise, and there is no evidence that plaintiff was denied recreation for any reason other than as a disciplinary measure."); *Gibson v. City of N.Y.,* 96 Civ. 3409, 1998 WL 146688 at *3 (S.D.N.Y. Mar. 25, 1998) ("[T]he deprivation of the opportunity to participate in recreation for eight days in a sixty day period, even when coupled with the deprivation of an opportunity to exercise on two consecutive days, is not sufficiently serious to constitute punishment under the Fourteenth Amendment."); *Gill v. Pact Org.,* 95 Civ. 4510, 1997 WL 539948 at *10 (S.D.N.Y. Aug. 28, 1997) (twenty-six days of administrative segregation with deprivation of exercise "does not state a claim for denial of a cognizable liberty interest"); *Davidson v. Coughlin,* 968 F.Supp. 121, 131 (S.D.N.Y.1997) (deprivation of outdoor exercise for fourteen days did not violate Eighth Amendment).

**\*26** Inesti asserts that he was denied showers, soap and toothpaste. (Inesti Opp Br. ¶¶ 8–9, 13, 23.) While showers are offered daily, inmates may refuse or be denied a shower if they fail to comply with security procedures. (*See* page 3 above.) Inesti fails to provide any evidence that he was regularly denied showers, soap or toothpaste, and the logbook fails to note any deviations. Inesti's bald assertion is insufficient to overcome City

defendants' summary judgment motion. *See, e.g., Willard v. Ramsey,* 2010 WL 786294 at *3 n. 10 ("While [plaintiff] contends that he was deprived of showers ..., such claims are contradicted by the record which establishes that [plaintiff] was offered such activities and he refused to participate in them on numerous occasions. [Plaintiff's] access to, and refusal to accept, showers were the result of his own decisions and not unconstitutional conditions of confinement.... Moreover, [plaintiff] admits to at least taking one shower part way through his confinement. 'Nowhere has it been held that prisoners are entitled to complete and unfettered access to water or showers.' "); *McCoy v. Goord,* 255 F.Supp.2d 233, 260 (S.D.N.Y.2003) ("two-week suspension of shower privileges does not suffice as a denial of 'basic hygienic needs' ").[40]

The City defendants' summary judgment motion should be *GRANTED* as to Inesti's conditions of confinement claims against Dunbar and Pressley.

**B. Deliberate Indifference To Mental Health Needs**
Inesti further alleges that Captains Dunbar and Pressley were deliberately indifferent to his need for proper mental health treatment. (Dkt. No. 38: Compl. ¶ 16, 105.) While Inesti asserts that he was not getting any mental health treatment while at MHUAII, he acknowledges being offered and taking medication, as well as refusing medication when he was delusional. (Dkt. No. 80: Carey 12/10/12 Aff. Ex. A: Inesti Dep. at 44–45.) Inesti also admits that counselors went around at MHAUII but he "was not getting no out-of-cell relief." (Carey 12/10/12 Aff. Ex. A: Inesti Dep. at 44 .)

In any event, Inesti has failed to establish the personal involvement of Dunbar and Pressley as to his mental health treatment; it would be entirely appropriate for Captains Dunbar and Pressley to defer to medical staff as to Inesti's mental health treatment. *See, e.g., Daley v. VonHagen,* No. 1 1–CV–1071, 2012 WL 4464861 at *5 (W.D.N.Y. Sept. 20, 2012) ("Superintendents and deputy superintendents ... 'are not generally involved in the treatment of inmates ....,' and it is generally reasonable for non-medical personnel to rely on qualified medical staff to deal with an inmate's medical needs." (citation omitted)); *Hardy v. Diaz,* No. 08–CV–1352, 2010 WL 1633379 at *7 (N.D.N.Y. Mar. 30, 2010) ("The Superintendent cannot be liable under Section 1983 for failure to supervise the prison medical staff, because he lacks the medical

training and authority to do so."), *report & rec. adopted,* 2010 WL 1633390 (N.D.N.Y. Apr. 21, 2010); *Gonzales v. Wright,* No. 06–CV–1424, 2010 WL 681323 at \*10 (N.D.N.Y. Feb. 25, 2010) ("The Superintendent's and Deputy Superintendent's delegation of medical judgment to appropriate staff was proper as the Second Circuit has cautioned that non-medical Defendants should not intercede in the medical care and treatment of an inmate.... Concomitantly, the Second Circuit has also explicitly held the denial of a grievance on medical matter is insufficient to demonstrate personal involvement on behalf of a prison Superintendent." (citations omitted)); *Kemp v. Wright,* No. 01 CV 562, 2005 WL 893571 at \*9 (E.D.N.Y. Apr. 19, 2005) (dismissing personal involvement claim against non-medical superintendents where plaintiff claims that they failed to intercede in his medical treatment); *McKenna v. Wright,* 01 Civ. 6571, 2004 WL 102752 at \*5 (S.D.N.Y. Jan. 21, 2004) (Plaintiff's "position that [commissioner] is personally liable for 'his failure to ensure' that [associate commissioner and chief medical officer] properly resolved [plaintiff's] grievance, is merely an end-run around the legal standard and fails to establish [commissioner's] personal involvement." (citation omitted)). [41]

**\*27** Accordingly, the City defendants' summary judgment motion should be *GRANTED* as to Inesti's deliberate indifference claims against Dunbar and Pressley.

### *CONCLUSION*

For the reasons stated above, the State defendants' and City defendants' motions for summary judgment (Dkt.Nos.78, 87) should be *GRANTED.*

### *FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. [42] Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Paul A. Crotty, 500 Pearl Street, Room 735, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Crotty (with a courtesy copy to my chambers). Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466 (1985); *Ingram v. Herrick,* 475 F. App'x 793, 793 (2d Cir.2012); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825 (1992); *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v.. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983).

### All Citations

Not Reported in F.Supp.2d, 2013 WL 791540

### Footnotes

1   All references in this Report and Recommendation to "Compl." are to the Second Amended Complaint, unless otherwise noted. Defendants Dunbar and Pressley were incorrectly named in the Second Amended Complaint as "Dubar" and "Presseley." (Compl. at 1.)

2   Although both the City and State defendants provided Inesti with the required notice pursuant to SDNY–EDNY Local Civil Rule 56.2 (Dkt. Nos.79, 95), Inesti failed to comply with Local Civil Rule 56.1(b). Accordingly, the Court can and does rely on the City and State defendants' Local Rule 56.1 Statements.

    "Courts in this circuit have not hesitated to deem admitted the facts in a movant's Local [Civil] Rule 56.1 Statement that have not been controverted by a Local Rule 56.1 statement from the non-moving party." *Gadsden v. Jones Lang Lasalle Ams., Inc.,* 210 F.Supp.2d 430, 438 (S.D.N.Y.2002) (collecting cases) ....

    *Ballard v. Children's Aid Soc'y,* 781 F.Supp.2d 198, 202–03 (S.D.N.Y.2011); *accord, e.g., Wolfson v. Bruno,* 844 F.Supp.2d 348, 350–51 n. 4 (S.D.N.Y.2011) (Peck, M.J.); *Newsome v. Artale,* 09 Civ. 10196, 2011 WL 5172543 at \*1 n. 1 (S.D.N.Y. Nov. 1, 2011) ("Plaintiff's affidavit in opposition does not specifically controvert the relevant facts

set forth in Defendants' Rule 56.1 submission, and thus the Court deems admitted the facts recounted in Defendants' statement."); *Crawford–Bey v. N.Y. & Presbyterian Hosp.,* 08 Civ. 5454, 2011 WL 4530193 at * 1 n. 1 (S.D.N.Y. Sept. 30, 2011) ("Because Plaintiff failed to submit her own [Local Civil Rule] 56.1 statement, despite specific prompting from the Court, the facts set forth in Defendant's 56.1 statement ... are deemed admitted."); *Buckman v. Calyon Sec. (USA) Inc.,* 817 F.Supp.2d 322, 328 n. 42 (S.D.N.Y.2011) (Local Civil Rule "56.1 statements not explicitly denied by plaintiff are deemed admitted."); *Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals,* 812 F.Supp.2d 357, 361 n. 2 (S.D.N.Y.2011) ("[A]ny facts averred in Plaintiff's Rule 56.1 submission that are supported by the record and not specifically and expressly controverted by properly supported statements in Defendants' Reply Memorandum [are considered] to be admitted by Defendants."); *Butler v. Gonzalez,* 09 Civ.1916, 2010 WL 3398156 at *6 (S.D.N.Y. May 18, 2010), *report & rec. adopted,* 2010 WL 3398150 (S.D.N.Y. Aug. 26, 2010) (Crotty, D.J.).

3   *See also, e.g., Feingold v. New York,* 366 F.3d 138, 148 (2d Cir.2004); *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d at 36; *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d at 1223.

4   *See also, e.g., Ferran v. Town of Nassau,* 471 F.3d 363, 369 (2d Cir.2006); *Fuller v. Armstrong,* 204 F. App'x 987, 988 (2d Cir.2006), *cert. denied,* 552 U.S. 906, 128 S.Ct. 209 (2007); *Gildor v. U.S. Postal Serv.,* 179 F. App'x 756, 758 (2d Cir.2006); *Porter v. Coughlin,* 421 F.3d 141, 144 n. 2 (2d Cir.2005); *Hemphill v. New York,* 380 F.3d 680, 687 (2d Cir.2004); *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003); *Johnson v. Buffalo Police Dep't,* 46 F. App'x 11, 12 (2d Cir.2002), *cert. denied,* 539 U.S. 959, 123 S.Ct. 2645 (2003).

5   *See also, e.g., United States v. Acomb,* No. 99–6308, 216 F.3d 1073 (table), 2000 WL 899482 at *1 (2d Cir. June 29, 2000); *James v. Phillips,* 05 Civ. 1539, 2008 WL 1700125 at *3 (S.D.N.Y. Apr. 9, 2008); *Thompson v. Tracy,* 00 Civ. 8360, 2008 WL 190449 at *5 (S.D.N.Y. Jan. 17, 2008); *Bunting v. Nagy,* 452 F.Supp.2d 447, 454 (S.D.N.Y.2006); *Rodriguez v. McClenning,* 399 F.Supp.2d 228, 234 & n. 52 (S.D.N.Y.2005); *Pack v. Artuz,* 348 F.Supp.2d 63, 78 (S.D.N.Y.2004); *Rector v. Sylvania,* 285 F.Supp.2d 349, 353 (S.D.N.Y.2003); *Walker v. Vaughan,* 216 F.Supp.2d 290, 296–97 (S.D.N.Y.2002); *Hussein v. Waldorf–Astoria,* 134 F.Supp.2d 591, 596 (S.D.N.Y.2001) (Chin, D.J.), aff'd, 31 F. App'x 740 (2d Cir.2002).

6   *Accord, e.g., Matican v. City of N.Y.,* 524 F.3d 151, 156 (2d Cir.), *cert. denied,* 555 U.S. 1047, 129 S.Ct. 636 (2008); *Jacobs v. Ramirez,* 400 F.3d 105, 106 (2d Cir.2005); *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999); *Brooks v. Giuliani,* 84 F.3d 1454, 1466 (2d Cir.), *cert. denied,* 519 U.S. 992, 117 S.Ct. 480 (1996).

7   *Accord, e.g., Matican v. City of N.Y.,* 524 F.3d at 156; *Brooks v. Giuliani,* 84 F.3d at 1466.

8   *Accord, e.g., Matican v. City of N.Y.,* 524 F.3d at 156; *Jacobs v. Ramirez,* 400 F.3d at 106.

9   *See also, e.g., Corona Realty Holding, LLC v. Town of N. Hempstead,* 382 F. App'x 70, 72 (2d Cir.2010); *Mancuso v. Hynes,* 379 F. App'x 60, 61 (2d Cir.2010); *Walker v. Jastremski,* 430 F.3d 560, 561 (2d Cir.2005), *cert. denied,* 547 U.S. 1101, 127 S.Ct. 1887 (2006); *Patterson v. Cnty. of Oneida,* 375 F.3d at 225; *Pearl v. City of Long Beach,* 296 F.3d 76, 79 (2d Cir.2002), *cert. denied,* 538 U.S. 922, 123 S.Ct. 1574 (2003); *Paige v. Police Dep't of Schenectady,* 264 F.3d 197, 199 n. 2 (2d Cir.2001); *Connolly v. McCall,* 254 F.3d 36, 40–41 (2d Cir.2001); *Jones v. N.Y. Dep't Corr. (DOC) Jail,* 11 Civ. 4477, 2011 WL 5865143 at *2 (S.D.N.Y. Nov. 22, 2011) (Peck, M.J.), *report & rec. adopted,* 2012 WL 1232963 (S.D.N.Y. Apr. 12, 2012) (Crotty, D.J.); *Robinson v. Fischer,* 09 Civ. 8882, 2010 WL 5376204 at *5 (S.D.N.Y. Dec. 29, 2010) (Peck, M.J.); *Cotto v. Pabon,* 07 Civ. 7656, 2008 WL 4962986 at *5 (S.D.N.Y. Nov. 20, 2008) (Peck, M.J.); *Denis v. N.Y.S. Dep't of Corr. Servs.,* 05 Civ. 4495, 2006 WL 217926 at *11 (S.D.N.Y. Jan. 30, 2006) (Peck, M.J .), *report & rec. adopted,* 2006 WL 406313 (S.D.N.Y. Feb. 22, 2006).

10  *See also, e.g., Storman v. Klein,* 395 F. App'x at 792; *Assegai v. Bloomfield Bd. of Educ.,* 165 F. App'x 932, 934 (2d Cir.2006); *Washington v. Cnty. of Rockland,* 373 F.3d 310, 317 (2d Cir.2004); *Ormiston v. Nelson,* 117 F.3d at 71; *Eagleston v. Guido,* 41 F.3d at 871; *Singleton v. City of N.Y.,* 632 F.2d 185, 191 (2d Cir.1980), *cert. denied,* 450 U.S. 920, 101 S.Ct. 1368 (1981).

11  *Accord, e.g., Melendez v. Greiner,* 477 F. App'x 801, 803 (2d Cir.2012), *cert. denied,* —— S.Ct. ——, 2013 WL 598715 (Feb. 19, 2013); *Singleton v. City of N.Y.,* 632 F.2d 185, 191 (2d Cir.1980), *cert. denied,* 450 U.S. 920, 101 S.Ct. 1368 (1981).

12  *Accord, e.g., Steinberg v. Proctor,* Nos. 99–9332, 99–9334, 213 F.3d 626 (table), 2000 WL 687710 at * 1 (2d Cir. May 25, 2000); *Washington v. Doe,* No. 08CV4399, 2011 WL 679919 at *2 (E.D.N.Y. Feb. 16, 2011); *Estate of Mandarino v. Mandarino,* 699 F.Supp.2d 646, 654 (S.D.N.Y.2010), *aff'd,* 408 F. App'x 428 (2d Cir.2011); *Swartz v. Berkshire Life Ins. Co.,* 99 Civ. 9462, 2000 WL 1448627 at *4 (S.D.N.Y. Sept. 28, 2000).

13  *Accord, e.g., Carter v. Doe,* 05 Civ. 8432, 2006 WL 2109461 at *3 (S.D.N.Y. July 26, 2006); *de los Santos v. Fingerson,* 97 Civ. 3972, 1998 WL 740851 at *3 (S.D.N.Y. Oct. 23, 1998).

14    *Accord, e.g., Washington v. Doe,* 2011 WL 679919 at *2; *Marshall v. Downey,* No. 09–CV–1764, 2010 WL 5464270 at *6 (E.D.N .Y. Dec. 27, 2010); *Reyes v. City of N.Y.,* 00 Civ. 1050, 2000 WL 1505983 at *7 (S.D.N.Y. Oct. 6, 2000); *de los Santos v. Fingerson,* 1998 WL 740851 at *3; *Dumas v. Agency for Child Dev.-N.Y.C. Head Start,* 569 F.Supp. 831, 833–34 (S.D.N.Y.1983); *Graboi v. Kibel,* 432 F.Supp. 572, 580 (S.D.N.Y.1977); *Doe v. Holy See (State of Vatican City),* 17 A.D.3d 793, 794, 793 N.Y.S.2d 565, 567 (3d Dep't 2005), *appeal denied,* 6 N.Y.3d 707, 812 N.Y.S .2d 443 (2006).

15    *Accord, e.g., Matthews v. Town of Jewett,* No. 09–CV–1267, 2011 WL 2973618 at *2 (N.D.N.Y. July 21, 2011); *Shonowsky v. City of Norwich,* No. 10–CV–745, 2010 WL 4609305 at *1 (N.D.N.Y. Nov. 4, 2010); *dePoel v. City of N.Y.,* 772 F.Supp. 106, 108 (E.D.N.Y.1991).

16    *See also, e.g., Washington v. Doe,* 2011 WL 679919 at *3; *Shonowsky v. City of Norwich,* 2010 WL 4609305 at *1; *Joseph S. v. Hogan,* 561 F.Supp.2d 280, 315 (E.D.N.Y.2008); *dePoel v. City of N.Y.,* 772 F.Supp. at 108 ("Mere mental illness is insufficient.").

17    *See also, e.g., de los Santos v. Fingerson,* 1998 WL 740851 at *4; *dePoel v. City of N.Y.,* 772 F.Supp. at 108; *Dumas v. Agency for Child Dev.-N.Y.C. Head Start,* 569 F.Supp. at 833; *Burgos v. City of N.Y.,* 294 A.D.2d 177, 178, 742 N.Y.S.2d 39, 40 (1st Dep't 2002) ("vague and conslusory" description of plaintiff's " 'dementia and psychotic disorder' " is insufficient for toll); *Davis v. Reed,* 191 A.D.2d 348, 348, 596 N.Y.S.2d 4, 5 (1st Dep't) ("The conclusory assertion of repressed memory due to 'posttraumatic neurosis' is insufficient to invoke the tolling provisions of CPLR 208."), *appeal denied,* 82 N.Y.2d 749, 602 N.Y.S.2d 807 (1993).

18    Inesti makes another argument erroneously conflating the "continuous treatment" toll with the insanity toll. (*See* Inesti Opp. Br. at p. 12.) The Court need not address this argument because the "continuous treatment" toll applies to medical malpractice claims, not § 1983 claims. *See, e.g., Cole v. Miraflor,* 99 Civ. 0977, 2001 WL 138765 at *5 (S.D.N.Y. Feb. 19, 2001) (The "continuous treatment doctrine cannot apply to a § 1983 deliberate indifference claim because, first, 'courts have carefully distinguished deliberate indifference from medical malpractice,' and, second, 'the Supreme Court has stated ... that the statute of limitations provisions of personal injury actions shall apply to all section 1983 cases.' "); *West v. City of N.Y.,* 88 Civ. 1801, 1992 WL 249966 at *5 (S.D.N.Y. Sept. 22, 1992) ("While a medical malpractice action may share characteristics with a section 1983 action for deliberate indifference to medical needs, the continuing treatment doctrine does not apply here ...."). Moreover, the whole thrust of Inesti's complaint is that he was not under continuous treatment. (*See* Parts II, IV, V.)

19    The State defendants also assert a qualified immunity defense. (*See* Dkt. No. 88: State Defs. Br. at 24–25; Dkt. No. 104: State Defs. Reply Br. at 9.) Because the Court is recommending the grant of summary judgment to the State defendants on other grounds, the Court need not address qualified immunity.

20    *See, e.g., Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006); *Gill v. Tuttle,* 93 F. App'x 301, 302 (2d Cir.2004); *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 122 (2d Cir.2004); *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003), *cert. denied,* 543 U.S. 1093, 125 S.Ct. 971 (2005); *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999); *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Russo v. DiMilia,* 07 Civ. 5795, —— F.Supp.2d —— , 2012 WL 4108109 at * 18 (S.D.N.Y. Sept. 18, 2012); *Robles v. Khahaifa,* No. 09CV718, 2012 WL 2401574 at *8 (W .D.N.Y. June 25, 2012); *Allan v. Woods,* No. 05–CV–1280, 2008 WL 724240 at *5 (N.D.N.Y. Mar. 17, 2008) ("Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability."); *Tafari v. Annets,* 06 Civ. 11360, 2008 WL 2413995 at *10 (S.D.N.Y. June 12, 2008) (Peck, M.J.), *report & rec. adopted,* 2008 WL 4449372 (S.D.N.Y. Oct. 2, 2008), aff'd, 363 F. App'x 80 (2d Cir.), *cert. denied,* 130 S.Ct. 3475 (2010); *Zamakshari v. Dvoskin,* 899 F.Supp. 1097, 1109 (S.D.N.Y.1995) (Sotomayor, D.J. & Peck, M.J.) ("In order to maintain a cause of action [under § 1983] against any official, a plaintiff must show that the defendant was personally involved in the alleged deprivation of his constitutional rights, since the doctrine of *respondeat superior* does not apply to § 1983 actions.").

21    *Accord, e.g., Ziemba v. Clark,* 167 F. App'x 831, 833 (2d Cir.2006); *Samuels v. Selsky,* 166 F. App'x 552, 556 (2d Cir.2006); *Patterson v. Cnty. of Oneida,* 375 F.3d 206, 229 (2d Cir.2004); *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d at 127; *Hayut v. State Univ. of N.Y.,* 352 F.3d 733, 753 (2d Cir.2003); *Hernandez v. Keane,* 341 F.3d at 145; *Wright v. Smith,* 21 F.3d at 501; *see also, e.g., Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002).

22    *See, e.g., Doe v. New York,* No. 10 CV 1792, 2012 WL 4503409 at *8 & n. 3 (E.D.N.Y. Sept. 28, 2012); *Vann v. Fischer,* 11 Civ.1958, 2012 WL 2384428 at *5 & n. 9 (S.D.N.Y. June 21, 2012) ("In the Second Circuit, personal involvement in intentional discrimination is shown where 'the defendant participated directly in the alleged constitutional violation, [or] ... the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom ....' " "These are only the first and third scenarios listed in *Colon* in which personal involvement might be found, but the others have been invalidated by the Supreme Court's holding in *Iqbal* ...."); *James v. Orange Cnty.*

*Corr. Facility,* 09 Civ. 7226, 2011 WL 5834855 at *4 (S.D.N.Y. Nov. 18, 2011) ("There has been considerable division among the district courts of the Second Circuit as to whether *Iqbal* abrogates several factors of the *Colon* test and if so to what extent." (citing cases)); *Joseph v. Fischer,* 08 Civ. 2824, 2009 WL 3321011 at *14 (S.D.N.Y. Oct. 8, 2009) ("[U]nder *Iqbal,* ... [a] defendant is not liable under section 1983 if the defendant's failure to act deprived the plaintiff of his or her constitutional right."); *Newton v. City of N.Y.,* 640 F.Supp.2d 426, 448 (S.D.N.Y.2009) ("[P]assive failure to train claims pursuant to section 1983 have not survived the Supreme Court's recent decision in *Ashcroft v. Iqbal.*").

23    *See, e.g., Smolen v. Fischer,* 12 Civ. 1856, 2012 WL 5928282 at *5 (S.D.N.Y. Nov. 27, 2012) (Peck, M.J.); *Alli v. City of N.Y.,* 11 Civ. 7665, 2012 WL 4887745 at *6 (S.D.N.Y. Oct. 12, 2012) ("[W]here the claim does not require a showing of discriminatory intent, the personal-involvement analysis set forth in *Colon* should still apply."); *Inesti v. Hicks,* 11 Civ. 2596, 2012 WL 2362626 at *11 (S.D.N.Y. June 22, 2012) (Peck, M.J.), *report & rec. adopted,* 2012 WL 3822224 (S.D.N.Y. Sept. 4, 2012) (Crotty, D.J.); *Hodge v. Sidorowicz,* 10 Civ. 428, 2011 WL 6778524 at *16 (S.D.N.Y. Dec. 20, 2011), *report & rec. adopted,* 2012 WL 701150 (S.D.N.Y. Mar. 6, 2012) (Crotty, D.J.); *Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) (Peck, M.J .); *see also, e.g., Chao v. Ballista,* 630 F.Supp.2d 170, 178 n. 2 (D.Mass. July 1, 2009) (noting that the "state of mind required to make out a supervisory claim under the Eighth Amendment—i.e., deliberate indifference —requires less than the discriminatory purpose or intent that Iqbal was required to allege in his suit ...."); Michael Avery et al., *Police Misconduct: Law & Litigation* § 4:5 (2009) (discussing the impact of *Iqbal* on supervisor liability in § 1983 and *Bivens* actions); *cf. Caiozzo v. Koreman,* 581 F.3d 63, 66 (2d Cir.2009) (the standard is the same for Eighth Amendment and Fourteenth Amendment deliberate indifference claims).

24    *See also, e.g., Applegate v. Annuci,* No. 02–CV–0276, 2008 WL 2725087 at * 18 (N.D.N.Y. July 10, 2008) ("the mere writing of the letter to a superintendent, without response, is an insufficient basis to find personal involvement on the part of the Superintendent"); *Woods v. Goord,* 97 Civ. 5143, 1998 WL 740782 at *6 (S.D.N.Y. Oct. 23, 1998) ("Receiving letters or complaints ... does not render [prison superintendent] personally liable under § 1983."); *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D .N.Y.1997) (Kaplan, D.J. & Peck, M.J.) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability."); *Greenwaldt v. Coughlin,* 93 Civ. 6551, 1995 WL 232736 at *4 (S.D.N.Y. Apr. 19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.").

25    *See also, e.g., Walker v. Pataro,* 99 Civ. 4607, 2002 WL 664040 at * 15 (S.D.N.Y. Apr. 23, 2002) (Peck, M.J.) (no personal involvement where plaintiff "has not submitted any evidence to contradict [defendant's] claim that he was not involved in [plaintiff's] transfer"); *Jackson v. Johnson,* 15 F.Supp.2d 341, 365–66 (S.D.N.Y.1998) (Kaplan, D.J. & Peck, M.J.) (dismissing plaintiff's retaliatory transfer claim because plaintiff did not show that defendant correction officer or commissioner were personally involved in the transfer decision); *McFarlan v. Coughlin,* No. 97–CV–740, 1998 WL 185571 at *2 (N.D.N.Y. Apr. 15, 1998) ("Plaintiff submitted extensive documentation in support of his position [as to the retaliatory transfer], but none of the documentation indicated the involvement of any of these defendants."); *Burke v. McCoy,* No. 96–CV–0984, 1997 WL 610650 at *4 (N.D.N.Y. Oct. 1, 1997) (Pooler, D.J.) ("This evidence is insufficient to create an issue of fact as to [superintendent's] personal involvement in the transfer. [Plaintiff] does not controvert [defendant's] assertion that the transfer decision was made by DOCS in Albany and that [defendant] was not involved in [plaintiff's] transfer."), *aff'd,* No. 97–2780, 165 F.3d 13 (table), 1998 WL 801951 (2d Cir. Nov. 12, 1998).

26    *See also, e.g., Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 849–50, 118 S.Ct. 1708, 1718 (1998); *Caiozzo v. Koreman,* 581 F.3d 63, 70–72 (2d Cir.2009); *Grant v. N.Y.C. Dep't of* Corr ., No. 96–2469, 104 F.3d 355 (table), 1996 WL 734052 at *1 (2d Cir. Dec. 23, 1996); *Wicks v. Qualtere,* Nos. 95–CV–425, 95–CV–426, 1997 WL 176338 at *3 (N.D.N.Y. Apr. 4, 1997) (Pooler, D.J.); *Landy v. Irizarry,* 884 F.Supp. 788, 801 n. 20 (S.D.N.Y.1995).

27    *Accord, e.g., Fransua v. Vadlamudi,* No. 05–1715, 2008 WL 4810066 at *1 (2d Cir. Nov. 3, 2008); *Salahuddin v. Goord,* 467 F .3d 263, 279–81 (2d Cir.2006); *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003); *Selby v. Coombe,* 17 F. App'x. 36, 37 (2d Cir.2001); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

28    *See also, e.g., Fransua v. Vadlamudi,* 2008 WL 4810066 at *1; *Salahuddin v. Goord,* 467 F.3d at 279–81; *Selby v. Coombe,* 17 F. App'x. at 37; *Chance v. Armstrong,* 143 F.3d at 702.

29    The Second Circuit in *Chance v. Armstrong* identified several factors that are relevant in determining whether a serious medical condition exists, including " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.' " 143 F.3d at 702.

30    *See also, e.g., Sinkov v. Americor, Inc.,* 419 F. App'x 86, 89 (2d Cir.2011) ("evidence 'that [a defendant] *should have* been aware that [the detainee] was in immediate danger' was insufficient"); *Mayo v. Cnty. of Albany,* 357 F. App'x 339, 341 (2d Cir.2009) ("A plaintiff bringing a deliberate indifference claim must therefore demonstrate that the defendant

deliberately disregarded knowledge of the harm he knew he could cause as a result of his actions."); *Ross v. Westchester Cnty. Jail,* 10 Civ. 3937, 2012 WL 86467 at *5 (S.D.N.Y. Jan. 11, 2012) ("Deliberate indifference is a mental state akin to 'recklessness,' and is measured using a 'subjective test' that discerns whether the defendant was 'actually aware of an excessive risk to an inmate's health or safety,' and therefore 'act[ed] with a sufficiently culpable state of mind.' " (citation omitted)); *Mercado v. City of N.Y.,* 08 Civ. 2855, 2011 WL 6057839 at *4 (S.D.N.Y. Dec. 5, 2011).

31  *Accord, e.g., Salahuddin v. Goord,* 467 F.3d at 280; *Hathaway v. Coughlin,* 99 F.3d at 553; *Felipe v. N.Y.S. Dep't of Corr. Servs.,* No. 95–CV–1735, 1998 WL 178803 at *3 (N.D.N.Y. Apr. 10, 1998) (Pooler, D.J.).

32  *See also, e.g., Hanrahan v. Menon,* No. 07–CV–610, 2010 WL 6427650 at *10 (N.D.N.Y. Dec. 15, 2010) ("The conclusion of the mental health staff ... that plaintiff's primary health issue was substance abuse, and that he was not suffering from a major mental illness that required medication, clearly did not reflect deliberate indifference to a serious medical need."), *report & rec. adopted,* 2011 WL 1213171 (N.D.N.Y. Mar. 31, 2011), aff'd, *470 F. App'x 32 (2d Cir.2012); Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001) (Disagreements "over medications, diagnostic techniques ..., forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim.").

33  *See also, e.g., Meyers v. N.Y. Att'y Gen.,* No. 12–CV–4450, 2013 WL 244934 at *6 (E.D.N.Y. Jan. 17, 2013); *United States v. Hardy,* 878 F.Supp.2d 373, 381 (E.D.N.Y.2012); *Muhammad v. Rabinowitz,* 11 Civ. 2428, 2012 WL 1155098 at *4 (S.D.N.Y. Apr. 6, 2012); *Coleman v. State Sup.Ct.,* 697 F.Supp.2d 493, 506 (S.D.N.Y.2010); *Fisk v. Letterman,* 501 F.Supp.2d 505, 524 (S.D.N.Y.2007).

34  *See also, e.g., Meyers v. N.Y. Att'y Gen.,* 2013 WL 244934 at *6; *Murray v. Melendz,* Civ. No. 03–CV–1263, 2011 WL 4595213 at *5 (N.D.N.Y. Sept. 13, 2011), *report & rec. adopted,* 2011 WL 4595209 (N.D.N.Y. Sept. 30, 2011); *Jelich v. Hogan,* No. 09 Civ. 3278, 2009 WL 3497495 at *3 (E.D.N.Y. Oct. 27, 2009).

35  The City defendants also assert that Inesti failed to administratively exhaust his grievances as required by the Prison Litigation Reform Act ("PLRA"). (*See* Dkt. No. 85: City Defs. Br. at 7–12; Dkt. No. 105: City Defs. Reply Br. at 3–4.) Since the Court is recommending the denial of Inesti's claims on the merits, it need not address whether Inesti complied with the PLRA. *See, e .g., Roseboro v. Gillespie,* 791 F.Supp.2d 353, 359 n. 5 (S.D.N.Y.2011) (Peck, M.J.) ("Since this Court is denying [plaintiff's] claims on the merits, it need not address whether [plaintiff] complied with the PLRA."); *Henderson v. Sommer,* 08 Civ. 3440, 09 Civ. 611, 2011 WL 1346818 at *5 n. 3 (S.D.N.Y. Apr. 1, 2011) (addressing PLRA: "The Court 'need not specifically decide whether [Plaintiff's claims have] been exhausted because [such] claims fail on the merits.' ").

36  *See also, e.g., Woodward v. Morgenthau,* 740 F.Supp.2d 433, 438 (S.D.N.Y.2010); *Banks v. Stewart,* 08 Civ. 7463, 2010 WL 2697075 at *9–10 (S.D.N.Y. July 6, 2010); *Walker v. Shaw,* 08 Civ. 10043, 2010 WL 2541711 at *8 (S.D.N.Y. June 23, 2010); *Davis v. Shaw,* 08 Civ. 0364, 2009 WL 1490609 at *1 (S.D.N.Y. May 20, 2009); *Smart v. City of N.Y.,* 08 Civ. 2203, 2009 WL 862281 at *9 (S.D.N.Y. Apr. 1, 2009).

37  To the extent Inesti is rasing a new claim that he was denied due process in being sent to MHAUII, this claim is precluded. (*See* Inesti Opp. Br. at ¶¶ 8–13, 18 & at 13.) Inesti had several opportunities to amend his complaint, and Inesti cannot now assert a new cause of action, against unknown defendants, after the close of discovery. *See, e.g., Silverman v. Miranda,* 06 Civ. 13222, —— F.Supp.2d ——, 2013 WL 141773 at *3 (S.D.N.Y. Jan. 4, 2013) ("Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment." (quotations omitted)); *Lopez v. Gap, Inc.,* 883 F.Supp.2d 400, 413 (S.D.N.Y.2012); *De La Rosa v. City of N.Y. Police Dep't,* 09 Civ. 5290, 2010 WL 4177626 at *8 (S.D.N.Y. Oct. 22, 2010) ("Because these new claims appear for the first time in [summary judgment] opposition papers, they will not be considered by the Court."), *aff'd* 461 F. App'x 73 (2d Cir.), *cert. denied,* 133 S.Ct. 353 (2012).

38  While Inesti asserts that he was housed in MHAUII from August 8, 2008 to November 21, 2008 (Compl.¶ 104), Inesti's Movement History clearly demonstrates that he was incarcerated at MHAUII from October 19, 2008 to November 26, 2008 (*see* pages 4–5 above).

39  *Compare Headley v. Fisher,* 06 Civ. 6331, 2010 WL 2595091 at *4 (S.D.N.Y. June 28, 2010) (Crotty, D.J.) ("Contemporaneous Logbook entries eliminate any genuine issue of material fact that [plaintiff] was not deprived of opportunities to shower and go to recreation while under keep-lock status."), *Jacoby v. Cnty. of Oneida,* No. 05–CV–1254, 2009 WL 2971537 at *3 (N.D.N.Y. Sept. 11, 2009) ("Although Plaintiff contends, in his objections, that prison officials ... fabricate[d] the log book, he supplies no evidence to support these conclusory allegations."), and *Gaston v. Coughlin,* No. 98–CV–6016, 2005 WL 1177869 at *13 (W.D.N.Y. May 18, 2005) (Plaintiff "has submitted no affidavit or other sworn evidence challenging Defendant's statements, which are supported both by factual allegations and copies of the relevant log books.... [Plaintiff's] argument ignores the fact that nothing within the Activity Log supports his assertion that there was

sewage, feces and urine in the area in front of [plaintiff's] SHU cell, or even nearby, on any of the days in question, and [plaintiff's] bald, conclusory statement to the contrary is insufficient to defeat summary judgment." (citation omitted)), with *Headley v. Fisher,* 2010 WL 2595091 at *4 (Plaintiff "testified, however, that during his keep-lock confinement, another inmate provided him with only small amounts of food-not the meals to which he was entitled.... While this is not the strongest case, it cannot be said that there is no genuine issue of material fact with regard to [plaintiff's] claim that he was deprived of his meals during his keep-lock status. Certainly Defendants have produced no evidence that [plaintiff] received regular meals."), and *Moncrieffe v. Witbeck,* No. 97–CV–253, 2000 WL 949457 at *6 (N.D.N.Y. June 29, 2000) ("Because these logbooks do not contain clear entries for some of the dates in issue and would not likely reflect the wrongful denial of meals to an inmate by a corrections officer, they do not establish as a matter of law that defendants never denied plaintiff food.").

40 *See also, e.g., Reeder v. Hogan,* 2012 WL 4107822 at *21 ("Plaintiff further alleges he ... [had no] soap, washcloth, ... towel, ... toothbrush, toothpaste, or toilet paper for six days. Such conditions may have been unpleasant for plaintiff, but he has failed to establish an issue of fact as to if the conditions were wantonly imposed for the unnecessary infliction of pain or that they posed a threat to his health or safety." (citation & fns. omitted)); *Davidson v. Murray,* 371 F.Supp.2d 361, 373 (W.D.N.Y.2005) ("Likewise, on this record, no reasonable juror could find that plaintiff has satisfied the subjective element-i.e., that any of the named defendants knew plaintiff's need for personal hygiene and cleaning items posed an excessive risk to his health or safety at any time, yet disregarded that risk."); *Chavis v. Kienert,* No. 03–CV–0039, 2005 WL 2452150 at *21 (N.D.N .Y. Sept. 30, 2005) (denial of toiletries for a two-month period did not rise to the level of deliberate indifference to the prisoner's health or safety).

41 *See also, e.g., Gonzales v. Carpenter,* No. 08–CV–629, 2011 WL 768990 at *5 (N.D.N.Y. Jan. 3, 2011) (no personal involvement against non-medical correctional officer because the correctional officer had no influence over the plaintiff's medical treatment), *report & rec. adopted,* 2011 WL 767546 (N.D.N.Y. Feb. 25, 2011); *Smith v. Woods,* No. 05–CV–1439, 2008 WL 788573 at *9 (N.D.N.Y. Mar. 20, 2008) (prison social worker and psychologist had no authority to override treating psychiatrist's treatment of an inmate).

42 If Inesti requires copies of any of the cases reported only in Westlaw, he should request copies from defendants' counsel. *See Lebron v. Sanders,* 557 F.3d 76, 79 (2d Cir.2009); SDNY–EDNY Local Civil Rule 7.2.

2014 WL 4662221
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Phillip JEAN–LAURENT, Plaintiff,
v.
P.O. Diane BOWMAN, P.O. Russel Graziano,
Sgt. Joseph Mascia, City of New York,
P.O. Tawana Harvey, Shield # 12562, P.O.
Andres Gonzalez, Shield # 18072, and
Lieutenant Christopher Charles, Defendants.

No. 12 CV 2954(KAM)(LB).
|
Signed July 7, 2014.

**Attorneys and Law Firms**

Phillip Jean-Laurent, South Ozone Park, NY, pro se.

John F. McGoldrick, Kew Gardens, NY, Patrick Neil
Beath, NYC Law Department, New York, NY, for
Defendants.

### REPORT & RECOMMENDATION

BLOOM, United States Magistrate Judge.

 *1  Plaintiff, Phillip Jean–Laurent, brings this pro se civil
rights action against defendant police officers Bowman,
Harvey, Graziano, Mascia, Charles, and Gonzalez
alleging false arrest, malicious prosecution, abuse of
process, stigma plus defamation, and a violation of his
due process rights pursuant to 42 U.S.C. § 1983 as well as
various state law tort claims. Plaintiff also raises a *Monell*
claim against the City of New York. Plaintiff's instant
lawsuit stems from his 2011 arrest and prosecution for
patronizing a prostitute in Queens County, New York.[1]

Defendants[2] move for summary judgment on all of
plaintiff's claims except plaintiff's false arrest claim against
Harvey. ECF No. 91.[3] Plaintiff opposes defendants'
motion and cross-moves for summary judgment on his
false arrest, malicious prosecution, abuse of process,
and due process claims. ECF No. 82. The Honorable
Kiyo A. Matsumoto referred the parties' cross-motions

for summary judgment to me for a Report &
Recommendation pursuant to 28 U.S.C. § 636(b). For the
reasons set forth below, it is respectfully recommended
that defendants' motion for partial summary judgment
should be granted in part and denied in part and plaintiff's
motion for partial summary judgment should be denied.

### BACKGROUND [4]

At approximately 4:00 p.m. on May 5, 2011, plaintiff
was walking along Rockaway Boulevard towards the bus
stop at 130 th Street in Queens, New York when he was
"flagged" down by a "slim" "African–American lady" at
129 th Street. ECF No. 97, "Pl. Dep.", 61–62, 66. Plaintiff
states that the woman called him over and offered to have
sex with him in exchange for money; [5] plaintiff said no and
walked away towards the bus stop. *Id.* at 69. Suddenly,
several unmarked cars surrounded him and plain clothes
police officers jumped out. *Id.* at 74–75. Plaintiff was
handcuffed and placed in a police van. *Id.*

The slim, African–American woman was later identified
as defendant Harvey. ECF No. 92, "Harvey Aff.", ¶
2. On May 5, 2011, Harvey was working undercover,
posing as a prostitute as part of the New York City
Police Department's Operation Losing Proposition, an
undercover, sting operation implemented to reduce street
prostitution. *Id.* at ¶ 3; Guidelines [6] at 3. Harvey's account
of her interaction with plaintiff is very different from
plaintiff's version of events. Harvey states that plaintiff
approached her and said "Yo wassup" and asked "So how
much for some head?" Harvey Aff. at ¶¶ 10, 12. Harvey
says she responded "$30.00" and that plaintiff said "Cool.
Ok." *Id.* at ¶ 12. Harvey then directed plaintiff to meet her
down the block at 130 th Street. *Id.* at ¶ 15. As plaintiff
walked away, Harvey used a hand signal to direct the rest
of her team to arrest plaintiff. *Id.*

Once arrested, plaintiff states that he was held in the
police van with other individuals who had also been
arrested for patronizing a prostitute. Pl. Dep. at 81–
82. Sometime later, once the van was full, plaintiff and
these other individuals were taken to the precinct. Id
Thereafter, plaintiff was arraigned on a misdemeanor
charge of patronizing a prostitute in the third degree and
released. Id at 83, 85; ECF No. 82–2. The charge against

plaintiff was dismissed on March 12, 2012. PL Dep. at 84; Tr. [7] at 3.

**\*2** Plaintiff filed a notice of claim with the New York City Comptroller's Office on May 27, 2012. ECF No. 93–5; Pl. Dep. at 16. On June 11, 2012, plaintiff commenced the instant civil rights action against Harvey as well as Officer Graziano and Sergeant Mascia, who participated in plaintiff's arrest, and Officer Bowman, who swore out the misdemeanor complaint against plaintiff. ECF No. 1. The Court held several court conferences and the parties had more than six months to complete discovery. After the close of discovery and with defendants' consent, plaintiff filed an amended complaint naming two additional officers, Officer Gonzalez and Lieutenant Charles, who participated in the operation and plaintiff's arrest. ECF No. 100. Plaintiff's amended complaint also raises a *Monell* claim for municipal liability against the City of New York. *Id.* Defendants now move for summary judgment on all of plaintiff's claims except plaintiff's false arrest claim against Harvey. ECF No. 91. Plaintiff opposes defendants' motion and cross-moves for partial summary judgment. ECF No. 82.

### DISCUSSION

#### I. Standard of Review

"Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' " *Doninger v. Niehoff,* 642 F.3d 334, 344 (2d Cir.2011) (quoting Fed.R.Civ.P. 56(a)). A fact is material if it is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 202 (2d Cir.2007) (quoting *Anderson,* 477 U.S. at 248). "The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.,* 221 F.3d 394, 398 (2d Cir.2000); see also *Baker v. Home Depot,* 445 F.3d 541, 543 (2d Cir.2006)

(resolving all ambiguities and drawing all inferences in favor of the nonmoving party on summary judgment).

The moving party bears the initial burden of establishing that there are no material facts in dispute and must provide "affirmative evidence" from which a jury could return a verdict in its favor. *Anderson,* 477 U.S. at 257. Where the movant shows a prima facie entitlement to summary judgment, "the burden shifts to the non-movant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord,* 467 F.3d 263, 273 (2d Cir.2006). "Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." *Niagara Mohawk Power Corp. v. Jones Chem., Inc.,* 315 F.3d 171, 175 (2d Cir.2003) (quoting *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998)). "The 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." *Id.* (quoting *Anderson,* 477 U.S. at 252). Here, because plaintiff is proceeding pro se, I read his papers "liberally and interpret them to raise the strongest arguments that they suggest." *Brownell v. Krom,* 446 F.3d 305, 310 (2d Cir.2006) (internal quotations omitted).

#### II. False Arrest

**\*3** The elements of a false arrest claim [8] under § 1983 and New York law are "substantially the same." Lluberes, 2014 U.S. Dist. LEXIS 39799, at \*47; *accord Biswas v. City of New York,* 973 F.Supp.2d 504, 515 (S.D.N.Y.2013). To establish a claim for false arrest under § 1983, "a plaintiff must show that the defendant intentionally confined him without his consent and without justification." *Escalera v. Lunn,* 361 F.3d 737, 743 (2d Cir.2004) (internal quotation marks omitted); *compare with Minott v. Duffy,* 11 Civ. 1217(KPF), 2014 U.S. Dist. LEXIS 49791, at \*28 (S.D .N.Y. Apr. 8, 2014) (identifying the four elements under New York law as "[i] the defendant intended to confine him, [ii] the plaintiff was conscious of the confinement, [iii] the plaintiff did not consent to the confinement and [iv] the confinement was not otherwise privileged" (internal quotation marks omitted)).

Where, as here, an arrest is made without a warrant, "a presumption arises that the plaintiff's arrest was unlawful." *Jenkins v. City of New York,* 478 F.3d 76, 88 (2d Cir.2007). Defendants can rebut this presumption by demonstrating that there was probable cause for the arrest. *Little v. Massari,* 526 F.Supp.2d 371, 374

(E.D.N.Y.2007); *see also Jackson v. City of New York,* 11–CV–3028 (PKC), 2014 U.S. Dist. LEXIS 34769, at *34 (E.D.N .Y. Mar. 17, 2014) (explaining that "the existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest" (internal quotation marks omitted). Probable cause to arrest exists when an officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested *has committed or is committing a crime." Gonzalez v. City of Schenectady,* 728 F.3d 149, 155 (2d Cir.2013) (internal quotation marks omitted); *accord Jocks v. Tavernier,* 316 F.3d 128, 135 (2d Cir.2003) (internal quotation marks omitted).

### A. Personal Involvement

Defendant Bowman argues that she had no personal involvement in plaintiff's arrest. "In a claim for false arrest, each individual sued needs to have had personal involvement in the arrest in order to be held liable." *Minott,* 2014 U.S. Dist. LEXIS 49791, at *31 (internal quotation marks omitted); *see also Farrell v. Burke.* 449 F.3d 470, 484 (2d Cir.2006) ("personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983" (internal quotation marks omitted)). Both Harvey and Charles affirm that only they and Mascia, Graziano, and Gonzalez were part of the Operation Losing Proposition team that arrested plaintiff. Harvey Aff. at ¶ 6; Charles Aff. at ¶ 8. Despite their sworn statements, plaintiff states that more discovery is necessary to determine Bowman's involvement. The parties had over six months to conduct discovery; discovery in this action is closed.[9] *See* ECF Nos. 15, 66. Plaintiff presents nothing to demonstrate that Bowman was personally involved in plaintiff's arrest; therefore, Bowman's motion for summary judgment on this claim should be granted. *See Charles v. City of New York,* 1 Civ. 2783(AT), 2014 U.S. Dist. LEXIS 46751, at *23–24 (S.D.N.Y. Mar. 31, 2014) (dismissing plaintiff's false arrest claims against various officers where there was "no evidence linking [them] to the alleged wrongdoing in Plaintiff's arrest"); *Lluberes,* 2014 U.S. Dist. LEXIS 39799 at *28 (dismissing plaintiff's false arrest claim where plaintiff "proffered no proof to substantiate [the officer's] presence at his arrest").

### B. Probable Cause

**\*4** Not surprisingly, plaintiff and defendant Officer Harvey present two very different versions of their conversation on May 5, 2011. Harvey states that plaintiff solicited her to perform oral sex and agreed to pay $30. Harvey Aff., ¶¶ 12–14; ECF No. 92–1. Plaintiff maintains that Harvey "flagged me down" and "started asking me if I wanted to perform sexual acts with her for $100" and that plaintiff replied, "I don't have the time ... and walked away." Pl. Dep. at 61. Defendants concede that these differing accounts create a material issue of fact regarding whether Harvey had probable cause to arrest plaintiff. Plaintiff, nevertheless, argues that he should be granted summary judgment because the conversation between him and Harvey was recorded and he is entitled to an adverse inference because defendants failed to produce this recording despite his discovery request.[10]

For purposes of evaluating plaintiff's motion for summary judgment, the Court assumes without deciding that plaintiff is entitled to this adverse inference. *See Gill v. Arab Bank, PLC,* 893 F.Supp.2d 542, 551 (E.D.N.Y.2012) (assuming on summary judgment that plaintiff is entitled to an adverse inference); *see also Thaqi.* 2014 U.S. Dist. LEXIS 45107, at *22 (explaining that "even if an aggrieved party does not seek sanctions for spoliation, the party may still be entitled to an adverse inference on summary judgment.... Under this approach, the court is not required to make any factual findings, which are left to the jury"). However, even if an adverse inference is drawn regarding the failure to produce the recording, this does not resolve the issue of whether there was probable cause for plaintiff's arrest. *See Gill,* 893 F.Supp.2d at 550 (explaining that the a court cannot simply "infer that destroyed [evidence] would contradict the destroying's party's theory of the case, and corroborate the other[ ] party's theory" (internal quotation marks omitted)). While plaintiff may be entitled to have the jury draw an adverse inference based on plaintiff's failure to maintain the Kel recording, "we are required at summary judgment to draw all reasonable inferences in favor of the non-moving party." *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber,* 407 F.3d 34, 55 (2d Cir.2005) (denying summary judgment even though the moving party may have been entitled to an adverse inference). Accordingly, viewing the evidence on plaintiff's motion for summary judgment in the light most favorable to defendants as the Court must, plaintiff's motion for summary judgment on his false arrest claim should be denied.[11]

## C. Qualified Immunity for False Arrest

All of the individual defendants except Harvey argue that they are entitled to summary judgment on plaintiff's false arrest claim because they reasonably relied on Harvey's hand signal to arrest plaintiff. It is well established in this Circuit that "[p]lausible instructions from a superior or fellow officer support qualified immunity, where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists (e.g. a warrant, probable cause, exigent circumstances)." [12] *Anthony v. City of New York,* 339 F.3d 129, 138 (2d Cir.2002) (internal quotation marks omitted); *see also Loria v. Gorman,* 306 F.3d 1271, 1288 (2d Cir.2002) (stating that "[a]bsent significant indications to the contrary, an officer is entitled to rely on his fellow officer's determination that an arrest [is] lawful" (citing *Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir.2000)). Plaintiff argues, however, that Mascia, Graziano, Gonzalez, and Charles reliance on Harvey's hand signal was not reasonable under the circumstances. First, plaintiff states that these officers contemporaneously heard Harvey's conversation with plaintiff and thus knew there was no probable cause for the arrest. Next, plaintiff argues that because he did not have $30 on his person when he was arrested (the amount plaintiff allegedly agreed to pay for sex with Officer Harvey), it was objectively unreasonable for the officers to believe that there was probable cause to arrest him. However, even construed in the light most favorable to him, the record does not support plaintiff's theories.

**\*5** Lieutenant Charles affirms that the Kel receiver was in his car, that he was the sole occupant, and in any event, the Kel receiver was turned off prior to Harvey's conversation with plaintiff. Charles Aff., ¶¶ 11, 16, 18. Charles' version of the events is corroborated by the Guidelines which explain that there is only one receiver per Kel Kit and one "Kel car." *See* Guidelines at 4–5 ("A Kel kit consists of a transmitter and receiver."). Aside from his own speculation, plaintiff offers no evidence that the other officers heard the conversation between Harvey and plaintiff. Therefore, there is no basis in the record to conclude that Mascia, Graziano, Gonzalez or Charles heard plaintiff's conversation with Harvey or knew what price plaintiff and Harvey allegedly agreed upon when plaintiff was arrested. [13] Moreover, the officers'

reliance on Harvey's "hand signal ... indicating that plaintiff should be arrested for patronizing a prostitute" was reasonable. Harvey Aff. ¶ 15. Thus, these four officers' motion for summary judgment on plaintiff's false arrest claim should be granted. *See Anthony,* 339 F.3d at 138 (finding that the officers were entitled to qualified immunity because they "reasonably could have concluded, given [their fellow officer's] order, that probable cause existed"); Askins, 2012 U.S. Dist. LEXIS 19940, at *17–18 (finding the defendant officer entitled to qualified immunity "because it was objectively reasonable for him to rely on [his fellow officer's] information and instruction").

## III. Malicious Prosecution

To prevail on a § 1983 claim for malicious prosecution, "a plaintiff must show a violation of his rights under the Fourth Amendment and establish the elements of a malicious prosecution claim under state law." *Fulton v. Robinson,* 289 F.3d 188, 195 (2d Cir.2002) (citations omitted); *accord Hershey v. Goldstein,* 938 F.Supp.2d 491, 517 (S.D.N.Y.2013) ("A Section 1983 claim for malicious prosecution is determined by reference to the elements of the related state tort."). Under New York law, the elements of malicious prosecution are: (1) the commencement or continuation of criminal proceedings by defendants against plaintiff (2) with malice (3) and without probable cause; and (4) termination of those proceedings in plaintiff's favor. *Droz v. McCadden,* 580 F.3d 106, 109 (2d Cir.2009); *accord Colon v. City of New York,* 09 CV 0008(JBW), 09 CV 0009(JBW), 2012 U.S. Dist. LEXIS 28197, at *19 (E.D . N.Y. Feb. 9, 2012).

At the outset, plaintiff's motion for summary judgment on this claim should be denied. Although "[t]he probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest," the same genuine issues of material fact exist. *Stansbury v. Wertman,* 721 F.3d 84, 95 (2d Cir.2013); *see also Betts v. Shearman,* 751 F.3d 78, 83 (2d Cir.2014) (explaining that "[p]laintiff's false arrest, false imprisonment, and malicious prosecution claims therefore turn on whether ... there was 'arguable' probable cause to arrest"). The Court next considers defendants' arguments that many of the defendants did not commence criminal proceedings against plaintiff and that the state criminal action was not terminated in plaintiff's favor.

## A. Commencement of Criminal Proceedings

**\*6** To commence or continue a criminal proceeding, "a defendant must do more than report the crime or give testimony. He must play an active role in the prosecution." *Manganiello v. City of New York,* 612 F.3d 149, 163 (2d Cir.2010) (internal quotation marks omitted); *accord Wong v. Yoo,* 649 F.Supp.2d 34, 65 (E.D.N.Y.2009); *see also Charles,* 2014 U.S. Dist. LEXIS 46741, at \*37–38 (explaining that initiation of proceedings involves "more than merely reporting a crime and giving testimony" it requires active participation such as "giving advice and encouragement or importuning the authorities to act" (internal quotation marks omitted)). A police officer can play an active role in a prosecution by filing a complaint or corroborating affidavit or by presenting false information to or withholding material information from the prosecutor. *Costello v. Milano.* No. 12–CV–7216 (CS), 2014 U.S. Dist. LEXIS 62590, at \*16–17 (S.D.N.Y. May 6, 2014); *see also Cunninham v. New York City,* 04 Civ. 10232(LBS), 2007 U.S. Dist. LEXIS 69801, at \*13 (S.D.N.Y. Sept. 18, 2007) (stating that an officer actively participates in initiating a prosecution if she "fill[s] out complaining or corroborating affidavits" or "sw[ears] to and sign[s] a felony complaint" (internal quotation marks omitted)). Here, Bowman swore out the criminal complaint, ECF No. 77–3 at 2, and Harvey swore out a supporting deposition, ECF No. 82–6 at 2. Defendants do not dispute that "[t]his action alone is sufficient to satisfy the first element" as to these two defendants. *Struthers v. City of New York,* 12–CV–242, 2013 U.S. Dist. LEXIS 76916, at \*35 (E.D.N.Y. May 31, 2013) (citing *Rounseville v. Zahl,* 13 F.3d 625, 628 (2d Cir.1994)).

On the other hand, defendants argue that there is no evidence that the other defendant officers played an active role in plaintiff's prosecution. The only allegation brought against Gonzalez is that he participated in plaintiff's arrest. Am. Compl. at ¶ 16. Similarly, although Graziano assisted in plaintiff's arrest and completed the online arrest worksheet, ECF No. 82–5 at 3, and plaintiff alleges that Charles "authorized, approved and/or participated" in plaintiff's criminal prosecution, Am. Compl. at ¶ 24, neither swore out a criminal complaint or corroborating affidavit or presented any information to the prosecutor. Therefore, plaintiff's malicious prosecution claims against Gonzalez, Charles, and Graziano should be dismissed. *See Hewitt v. City of New York.* 09 CV 214(RJD)(MDG), 2012 U.S. Dist. LEXIS 141067, at \*23 n. 10 (E.D.N.Y. Sept. 27, 2012) (dismissing plaintiff's malicious prosecution claim

"for failure to set forth any proof that [the defendant officer's] involvement extended beyond plaintiff's arrest"); *see also Carter v. Port Auth. of N.Y. & N.J .,* 03 Civ. 8751(DLC), 2004 U.S. Dist. LEXIS 25633, at \*23–24 (S.D.N .Y. Dec. 17, 2004) (dismissing the malicious prosecution claim against an officer whose signed witness statement "was not one of the required documents to initiate criminal process"). In contrast, Mascia signed Harvey's supporting deposition under penalty of perjury. *See* ECF No. 82–6 at 2. Thus, Mascia fails to demonstrate that he did not play an active role in commencing the criminal prosecution against plaintiff. [14]

## B. Termination in Plaintiff's Favor

**\*7** Defendants also argue that plaintiff fails to establish the fourth element, termination of the criminal proceedings in his favor. Proceedings terminated because the charges are withdrawn or abandoned pursuant to an agreement or compromise with the accused are not terminations in plaintiff's favor. *Rothstein v. Carriere,* 373 F.3d 275, 287 (2d Cir.2004); *accord Poventud v. City of New York,* 750 F.3d 121, 131 (2d Cir.2014). The Second Circuit has also previously stated that a dismissal in the interest of justice "cannot provide the favorable termination required as the basis for a claim of malicious prosecution" because it is neither an acquittal nor a determination of the merits. *Hygh v. Jacobs,* 961 F.2d 359, 368 (2d Cir.1992) (citing various New York cases). However, since Hygh "the New York Court of Appeals has clarified that there is no 'per se rule that a dismissal in the interest of justice can never constitute a favorable termination. Rather, ... the question is whether, under the circumstances of each case, the disposition was inconsistent with the innocence of the accused.' " *D'Olimpio v. Crisafi,* 718 F.Supp.2d 357, 368 (S.D.N.Y.2010) (quoting *Cantalino v. Danner,* 96 N.Y.2d 391, 729 N.Y.S.2d 405, 754 N.E.2d 164, 167 (N.Y.2001)); *accord Widget v. Town of Poughkeepsie,* 12 Civ. 3459(ER), 2013 U.S. Dist. LEXIS 37138, at \*21 (S.D.N.Y. Mar. 18, 2013); *see also Guzman v. United States,* 11 Civ. 5834(JPO), 2013 U.S. Dist. LEXIS 131684, at \*24–25 (S.D.N.Y. Feb. 14, 2013) (citing various district court cases in this circuit that have applied the *Cantalino* rule); *cf Rothstein.* 373 F.3d at 286 (explaining that "New York law does not require a malicious prosecution plaintiff to prove her innocence, or even that the termination of the criminal proceeding was indicative of innocence. Rather, the plaintiff's burden is to demonstrate a final termination

that is not inconsistent with innocence”). *But see* *Lynch v. Suffolk Cnty. Police Dep't Inc.,* 348 F. App'x 672, 674 (2d Cir.2009) (continuing to cite *Hygh* to find that a dismissal in the interest of justice does not constitute a favorable termination); *Hershey,* 938 F.Supp.2d at 518 (citing *Hygh* for the same proposition).

Defendants argue the dismissal of the charge against plaintiff was based upon a compromise between the accused, the Court and the prosecutor. The record does not support defendants' position. The following interchange occurred between the parties at the state court hearing on March 12, 2012:

MR. SHAPIRO: Judge, at this time I move to dismiss the case in the interest of justice.

THE COURT: You want to give me a reason?

MR. SHAPIRO: Judge, as you know, my client has a parole hold. There are also substantial evidentiary issues in this case of the undercover officer.

THE COURT: You wish to be heard?

MS. DRUCKER: No, Judge.

THE COURT: The People, my understanding, is they had offered an ACD [15] with a one day sealing, is that correct?

**\*8** MS. DRUCKER: Yes, Judge.

THE COURT: Defendant refused. If we would need an undercover to come in to testify, which I feel could be a problem, I don't know how I would decide on a Hinton hearing [16] and based on that situation without that the defendant is still being held on a parole hold. I will grant the defendant's motion. The matter is dismissed and sealed.

Tr. at 3.

The transcript reflects that plaintiff explicitly refused the only compromise offered by the prosecutor, the ACD. That the prosecution did not oppose the motion to dismiss and that the Court mentioned that plaintiff faced a parole hold does not establish that the dismissal was based on a compromise or agreement between the Court, the prosecutor, and plaintiff.

Dismissal was also not inconsistent with plaintiff's innocence. The crux of plaintiff's claim here and in the state court is that Harvey lied about the conversation that occurred between them. Harvey was still working undercover at the time of the state proceedings. Thus, the trial judge stated it “could be a problem” for her to testify against plaintiff. Tr. at 3. Dismissal under these circumstances is best analogized to dismissal due to an uncooperative witness which this Court has “described as a circumstance where the plaintiff ‘was relieved of criminal charges in a neutral manner, i.e. one that carried no indicia of guilt or innocence.’ ” *Struthers,* 2013 U.S. Dist. LEXIS 76916, at \*43 (quoting *Smith–Hunter v. Harvey,* 95 N.Y.2d 191, 712 N.Y.S.2d 438, 734 N.E.2d 750, 756 (N.Y.2000) (Rosenblatt, J., concurring)); *see also Jovanovic v. City of New York,* 04 Civ. 8437(PAC), 2010 U.S. Dist. LEXIS 144388, at \*18 (S.D .N.Y. Sept. 28, 2010), *aff'd* 486 F. App'x 149 (2d Cir.2012) (explaining that “[b]ecause the termination of [plaintiff's] prosecution in the interest of justice,' was both final and ‘not inconsistent with' [plaintiff's] innocence, the termination of the criminal case was favorable to [plaintiff]”); *D'Olimmo,* 718 F.Supp.2d at 368–69 (denying summary judgment where there were “no facts in the record indicating that the termination of criminal charges was inconsistent with [plaintiff's] innocence; rather, [plaintiff] has testified that several of the documents underlying the initiation of his prosecution were forged and/or false”). Therefore, defendants fail to demonstrate as a matter of law that the proceedings did not terminate in plaintiff's favor.

## C. Qualified Immunity for Malicious Prosecution

In the alternative, defendants Bowman, Mascia, Gonzalez and Charles contend that as with the false arrest claim, they are entitled to qualified immunity on plaintiff's malicious prosecution claim because they reasonably relied on Harvey's statements in initiating the criminal proceedings. “[A]s with false arrest, an arresting officer is entitled to qualified immunity from a malicious prosecution claim if ‘(a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.’ ” *Hoyos v. City of New York,* 10–cv–4033 (NG), 2013 U.S. Dist. LEXIS 185630, at \*28–29 (E.D.N.Y. Dec. 10, 2013); *accord Holloway v. Joseph,* 10–CV–6470P, 2013 U.S. Dist. LEXIS 102065, at \*16 (W.D.N.Y. July 22, 2013) (citing

*Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir.1991)).

**\*9** Plaintiff argues that Bowman and Mascia [17] are not entitled to qualified immunity because they received several, substantially similar supporting depositions from Harvey alleging that men solicited her for sex on May 5, 2011, and thus, they knew that there was no probable cause for plaintiff's prosecution. *See* ECF No. 82–13. It is true that each of the supporting depositions detail an interaction on May 5, 2011, between Harvey and a man regarding money in exchange for sex. Id However, this is hardly surprising as the objective of Operation Losing Proposition is to target men who use the services of prostitutes. Guidelines at 3. Moreover, the supporting depositions regarding Harvey's interactions with these men are not verbatim, but rather include different details regarding the alleged conversations. *See* ECF No. 82– 13. As discussed *supra* Section II.B., Bowman, Mascia, Gonzalez, and Charles were entitled to rely on Harvey's statements absent significant indications that they lack veracity. *See* Loria, 306 F.3d at 1290 (granting qualified immunity on malicious prosecution claim because the officer "could rely on his [fellow officer's] statement" as he was unaware of "any information that would cast doubt on the verity" of the statement). Considering the totality of the circumstances, at the very least, officers of reasonable competence could disagree as to whether the probable cause test was met to arrest plaintiff. Therefore, Bowman, Mascia, Gonzalez, and Charles are entitled to qualified immunity and defendants' motion for summary judgment on plaintiff's malicious prosecution claim should be granted as to all of the individually named defendants except Harvey.

## IV. Abuse of Process

Under New York law, an abuse of process claim "lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act, (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino v. City of New York,* 331 F.3d 63, 69–70 (2d Cir.2003) (internal quotation marks omitted); *accord Hoffman v. Town of Southampton,* 523 F. App'x 770, 771 (2d Cir.2013). Plaintiff contends that defendants arrested and prosecuted him to obtain their collateral objective of meeting arrest quotas. In support of his position, plaintiff

attaches the criminal complaints filed against other individuals arrested during Operation Losing Proposition on May 5, 2011. Plaintiff argues that the Court should "infer from the time, rate and frequency of the arrests, the inconsistency in time when the arrest occurred, and the similar allegations regarding the circumstances that the defendants aimed to make a number of arrest[s] to meet an arrest quota irrespective of not having probable cause." ECF No. 84 at 22. Plaintiff's " 'conclusory allegations" regarding arrest quotas "will not suffice to defeat a motion for summary judgment." *Hill v. City of New York.* 05 Civ. 9473(RMB)(JCF), 2007 U.S. Dist. LEXIS 94969, at *13 (S.D.N.Y. Dec. 28, 2007) (internal quotation marks omitted); *see also Douglas v. City of New York,* 595 F.Supp.2d 333, 344 (S.D.N.Y.2009) (finding news reports of arrest quotas insufficient to demonstrate that "defendants arrested plaintiff to meet quotas"). Moreover, "[e]ven had he presented sufficient evidence, attempting to meet arrest quotas merely describes a possible motive. It does not indicate that the officers used the legal process for a purpose other than the purpose for which the law created it." *Brown v. City of New York,* 08– CV–5095 (FB)(MDG), 2013 U.S. Dist. LEXIS 47035, at *15 (E.D.N.Y. Mar. 29, 2013) (internal quotation marks omitted); *see also Morse v. Spitzer,* 07 CV 4793(CBA) (RML), 2011 U.S. Dist. LEXIS 35014, at *51 (E.D.N.Y. Mar. 15, 2011) (explaining that currying favor and trying to save jobs "may be improper motives, but they do not indicate a collateral purpose beyond or in addition to his criminal prosecution" (internal quotation marks omitted)). Therefore, defendants' motion for summary judgment on plaintiff's abuse of process claim should be granted and plaintiff's motion for summary judgment on this claim should be denied.

## V. Stigma Plus Defamation

**\*10** To establish a stigma plus defamation claim under § 1983, plaintiff must demonstrate "(1) the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights." *Burgos Vega v. Lantz,* 596 F.3d 77, 81 (2d Cir.2010) (internal quotation marks omitted); *accord Velez v. Levy,* 401 F.3d 75, 87 (2d Cir.2005). A defamatory statement alone is a state tort, not a constitutional violation; therefore, to prevail in a Section 1983 action plaintiff must demonstrate the "plus," "a specific and adverse action [by defendants] clearly

restricting the plaintiff's liberty." *Velez,* 401 F.3d at 87–88 (citing *Siegert v. Gilley,* 500 U.S. 226, 233, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991)); *see also Sadallah v. City of Utica,* 383 F.3d 34, 38 (2d Cir.2004) (stating that "[t]he state-imposed burden or alteration of status must be in addition to the stigmatizing statement" (internal quotation marks omitted)). Notwithstanding proof of these two elements, ' "the availability of adequate process defeats a stigma-plus claim." ' *Monserrate v. N.Y. State Senate,* 599 F.3d 148, 158 (2d Cir.2010) (quoting *Segal v. City of New York,* 459 F.3d 207, 213 (2d Cir.2006)); *accord Heffernan v. Corda,* 498 F. App'x 86, 89 (2d Cir.2012); *see also Balentine v. Tremblay,* 554 F. App'x 58, 60 (2d Cir.2014) (explaining that a stigma plus claim is "a stigmatizing statement plus a deprivation of a tangible interest *without due process of law* " (emphasis added) (internal quotation marks omitted)). Defendants do not contest that plaintiff can meet the first prong, but argue that plaintiff fails to demonstrate a specific and adverse action by defendants clearly restricting plaintiff's liberty. Defendants also argue that the availability of adequate process defeats plaintiff's stigma plus claim.

Plaintiff argues that the "plus" of defendants' defamatory statement that he solicited a prostitute was the "prolongation of intensive parole supervision" and the eventual revocation of his parole which resulted in his re-incarceration. ECF No. 79, "PL's Opp.", at 24. "[E]ven though New York State inmates have no liberty interest in parole, the denial of parole" and analogously the revocation of parole "certainly qualifies as a material state-imposed burden or state-imposed alteration of [the plaintiff's] status or rights." *Hall v. Marshall,* 479 F.Supp.2d 304, 314 (E.D.N.Y.2007) (internal citations omitted) (internal quotation marks omitted); see also *Avello v. Hammons,* 963 F.Supp. 262, 266 (S.D.N.Y.1997) (pointing out that in *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), "the state afforded parolees the right to remain at liberty as long as they complied with the conditions of their parole"); cf *Bertuglia v. City of New York.* 839 F.Supp.2d 703, 726 (S.D.N.Y.2012) (finding a separate government agency's involvement to be "indicia of government involvement 'in addition to' the stigmatizing statements" (quoting *Sadallah,* 383 F.3d at 38)). *But see Sloane v. Ruiz.* 08 Civ. 9305(GEL), 2009 U.S. Dist. LEXIS 31930, at *5 (S.D.N.Y. Apr. 15, 2009) (stating that a "parolee has 'no constitutionally protected guaranteed immunity from being falsely or wrongly accused of conduct which may

result in the deprivation of a protected liberty interest.' " (quoting *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986))).

**\*11** However, even if plaintiff is able to establish the "plus", his defamation claim under § 1983 should be dismissed because he was afforded adequate process prior to the revocation of his parole. Plaintiff admits that he was "served with a notice of parole violation" and was given the opportunity to attend both a preliminary and final revocation hearing. Pl. Dep. at 109. Plaintiffs decision not to attend the preliminary hearing and to only attend his final revocation hearing, Pl. Dep. 109–11, does not change the fact that he was afforded adequate process. *See Sloane,* 2009 U.S. Dist. LEXIS 31930, at *6–7 (explaining that "the resulting parole hearing ... gave him all the process he was due" and "[i]f plaintiff believed the false allegation of [criminal conduct] would be damaging to him in any way, he had every opportunity at the hearing to contest that allegation") *see also Monserrate,* 599 F.3d at 157, 158 (finding that due process had been satisfied where plaintiff received "sufficient" notice of the hearing and "sufficient opportunity to be heard"); *Spiteri v. Russo,* 12–CV–2780 (MKB)(RLM), 2013 U.S. Dist. LEXIS 128379, at *90–91 (E.D.N.Y. Sept. 7, 2013) (ruling that "because Plaintiff was given notice, an opportunity to be heard and legally had the ability to ... challenge the Board's determination Plaintiff's due process rights were not violated"). Accordingly, defendants' motion for summary judgment on plaintiff's stigma plus defamation claim under § 1983 should be granted.

## VI. Due Process

Plaintiff also alleges a substantive due process claim. "Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.' " *Albright v. Oliver,* 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (quoting *Graham v. Connor.* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)); *accord Russo v. City of Bridge port,* 479 F.3d 196, 208 (2d Cir.2007). "Because the Fourth Amendment provides the source for a claim under Section 1983 premised upon an alleged unlawful arrest and imprisonment or an allegedly malicious prosecution, plaintiff cannot state a substantive due process claim against defendants." *Conte v. Cnty of Nassau,* No. 06–

CV–4746 (JFB)(ETB), 2008 U.S. Dist. LEXIS 25694, at *44 n. 12 (E.D.N.Y. Mar. 31, 2008) (collecting cases); *see also Bryant v. City of New York,* 404 F.3d 128, 136 (2d Cir.2004) (" 'Substantive due pro[c]ess analysis is ... inappropriate ... [where a] claim is covered by the Fourth Amendment.' " (alteration in original) (quoting *Cnty of Sacramento v. Lewis,* 523 U.S. 833, 843, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998))); *George v. CSX Transp., Inc.,* 13–CV–2317(JS)(ARL), 2014 U.S. Dist. LEXIS 10324, at *13–14 (E.D.N.Y. Jan. 28, 2014) (dismissing plaintiffs' substantive due process claims as duplicative of his Fourth Amendment claims).

**\*12** At the same time, the Second Circuit has established that a person has "the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity." *Zahrey v. Coffey,* 221 F.3d 342, 349 (2d Cir.2000); *see also Jovanovic,* 486 F. App'x at 152 (explaining that "[a] person suffers a constitutional violation if an (1) investigating officer (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result"); *Brandon v. City of New York,* 705 F.Supp.2d 261, 276 (S.D.N.Y.2010) (noting that the Second Circuit has permitted "claims for both malicious prosecution and a denial of his fair right to trial based on the same alleged fabrication of evidence" (citing *Ricciuti v. N.Y. City Transit Auth.,* 124 F.3d 123, 130–31 (2d Cir.1997))). The crux of plaintiff's instant due process claim is that Harvey presented fabricated evidence to the other officers and the prosecutor which resulted in plaintiff's arrest and prosecution. Courts in this circuit have characterized this type of fabrication of the evidence claim as a procedural rather than substantive due process claim.[18] *See Zachary v. City of Newburgh,* 13 CV 5737(VB), 2014 U.S. Dist. LEXIS 57236, at *12–13 (S.D.N.Y. Apr. 1, 2014) (dismissing plaintiff's substantive due process claim, but finding that plaintiff alleged a procedural due process based on evidence fabrication); *Maldonado v. City of New York,* No. 11 Civ. 3514(RA), 2014 U.S. Dist. LEXIS 26239, at *36–37 (S.D.N.Y. Feb. 26, 2014) (dismissing plaintiff's substantive due process claim, but explaining that plaintiff's fabrication of evidence claims may proceed "via the Fourth Amendment and the procedural component of the Fourteenth Amendment's Due Process Clause"); *Pinter v. City of New York,* 976 F.Supp.2d 539, 575–76 (S.D.N.Y.2013) (recognizing a separate "fabrication-based due process claim").

Harvey was an investigating officer in plaintiff's case. She forwarded her statement about her conversation with plaintiff to the prosecutor and her statement would likely influence a jury. Furthermore, although the charges against plaintiff were eventually dismissed, Harvey's allegedly false statements led to plaintiff's arrest and brief pre-trial detention. Thus, plaintiff suffered a deprivation of liberty. *See Maldonado,* 2014 U.S. Dist. LEXIS 26239, at *31 (stating that "[e]ven though the alleged fabrication did not result in [plaintiff's] conviction, [the officer] could be held liable for any unjustified deprivation of [plaintiff's] liberty before and during trial"); Hoyos, 2013 U.S. Dist. LEXIS 185630, at *39 (explaining that false statements that cause an arrest or pre-trial detention demonstrate a deprivation of liberty caused by fabrication of evidence). As defendants' motion must be construed in the light most favorable to plaintiff and plaintiff has alleged that Harvey falsified statements, plaintiff's procedural due process claim should survive summary judgment. *See Perez,* 962 F.Supp.2d at 543 (denying summary judgment because "[t]here are genuine issues of material fact as to whether the defendant ... provided to the prosecution false information that served as the basis for the plaintiff's prosecution"); *Brandon,* 705 F.Supp.2d at 276 (denying summary judgment because questions of fact exist regarding fabrication of evidence and thus, whether the officer had probable cause to arrest plaintiff).

**\*13** Nonetheless, as discussed *supra* Section II.A., personal involvement of a defendant is a prerequisite to liability under Section 1983. *See, e.g., Spavone v. N.Y. State Dep't of Corr. Servs.,* 719 F.3d 127, 135 (2d Cir.2013). As plaintiff fails to demonstrate that any of the other defendants knew of or participated in Harvey's alleged fabrication of evidence, plaintiff's procedural due process claim should proceed only against Harvey. Accordingly, defendants' motion for summary should be granted with respect to plaintiff's substantive due process claim and with respect to plaintiff's procedural due process claim against all of the individually named defendants except for Harvey.

## VII. Municipal Liability

To hold a municipality liable under Section 1983, plaintiff "must prove that 'action pursuant to official municipal policy' caused his injury."[19] *Connick v. Thompson,* —— U.S. ——, ——, 131 S.Ct. 1350, 1359, 179 L.Ed.2d

417 (2011) (quoting *Monell v. N.Y. City Dep't of Soc. Servs. ,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)); *see also Gleason v. Scoppetta,* 13–2770–cv, 2014 U.S.App. LEXIS 9194, at *9 (2d Cir. May 19, 2014) (explaining that there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation" (internal quotation marks omitted)). Plaintiff concedes that he is unable to oppose defendant's motion for summary judgment on this ground, but requests that he be granted further discovery to support his claim of municipal liability. Pl. Opp. at 26.

The Court construes plaintiff's request as an application for discovery under Fed.R.Civ.P. 56(d). Fed.R.Civ.P. 56(d) provides that

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
>> (1) defer considering the motion or deny it;
>>
>> (2) allow time to obtain affidavits or declarations or to take discovery: or
>>
>> (3) issue any other appropriate order.

However, the parties had ample time and opportunity to conduct discovery in this matter and "[r]elief under 56(d) 'is not available when summary judgment motions are made after the close of discovery.' " *Capitol Records, Inc. v. MP3tunes, LLC,* 07 Civ. 9931(WHP), 2013 U.S. Dist. LEXIS 68793, at *31–32 (S.D.N.Y. May 14, 2013) (quoting *Espada v. Schneider,* 522 F.Supp.2d 549 (S.D.N.Y .2007)); *see also McAllister v. Price Rite.* CIVIL ACTION NO. 3:09–CV–01888 (VLB), 2013 U.S. Dist. LEXIS 131500, at *49 (D.Conn. Sept. 13, 2013) (denying pro se plaintiff's 56(d) request for further discovery since the parties had "ample time, reason, and opportunity to have completed discovery as to the Defendant's alleged liability").

Moreover, plaintiff has not filed an affidavit "setting forth the additional facts he [seeks] to discover;" this "omission 'is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.' " *Falso v. Rochester City Sch. Dist.,* 460 F. App'x 60, 61–62 (2d Cir.2012) (internal quotation marks omitted) (upholding denial of pro se litigant's request for additional discovery); *see also Gumbs v. Dynan,* 11–CV–857 (RRM) (LB), 2012 U.S. Dist. LEXIS 120664, at *52 (E.D.N.Y.

Aug. 26, 2012) (finding pro se plaintiff's failure to submit an affidavit "sufficient grounds for denying his discovery request").

**\*14** Finally, although it is true that plaintiff only received copies of the other criminal complaints from May 5, 2011, and the Guidelines for Operation Losing Proposition at the close of discovery, plaintiff does not "demonstrate that further discovery would likely uncover any evidence" that his arrest was due to an officially adopted, unconstitutional policy, custom, or practice. *Latimore v. NBC Universal TV. Studio,* 480 F. App'x 649, 651 (2d Cir.2012); *see also Lunts v. Rochester City Sch. Dist.,* 515 F. App'x 11, 14 (2d Cir.2013) (denying pro se plaintiffs' Rule 56(d) motion because plaintiffs failed to identify "any potentially discoverable evidence that would have raised a genuine issue of material fact as to any of their claims"). ' "In a summary judgment context an opposing party's 'mere hope that further evidence may develop prior to trial is an insufficient basis upon which to justify the denial of [a summary judgment] motion.' " *McAllister,* 2013 U.S. Dist. LEXIS 131500, at *48–49 (quoting *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1138 (2d Cir.1994)); *Gumbs,* 2012 U.S. Dist. LEXIS 120664, at *53 (" 'a bare assertion that the evidence supporting plaintiff's allegation is in the hands of the defendant is insufficient to justify a denial of a motion for summary judgment' " (quoting *Paddington Partners,* 34 F.3d at 1138)). Accordingly, plaintiff's request for further discovery is denied and defendants' motion for summary judgment on plaintiff's *Monell* claim is granted.

## VIII. State Law Claims

Plaintiff raises state law tort claims for injurious falsehood, intentional infliction of emotional distress (IIED), conspiracy, defamation, and respondeat superior liability against the individually named defendants. A condition precedent to bringing a tort claim against New York City employees is timely service of a notice of claim. N.Y. Gen. Mun. Law § 50–e; *Excell v. City of New York,* 12 Civ. 2874(BMC), 2012 U.S. Dist. LEXIS 93080, at *11 (E.D.N.Y. July 3, 2012). New York law provides that a notice of claim must be filed "within ninety days after the claim arises." N.Y. Gen. Mun. Law § 50–e. This requirement applies equally where, as here, the state tort claims are brought as pendent claims in a federal civil rights action. *Maloney v. Cnty. of Nassau,* 623 F.Supp.2d 277, 291 (E.D.N.Y.2007); *see also Zhao v. City of New York.* 656 F.Supp.2d 375, 404 (S.D.N.Y.2009)

("compliance with the filing requirements of *Section 50–e* is mandatory even if the claim is asserted in federal court" (citing *Hardy v. N.Y. City Health & Hosp. Corp.,* 164 F.3d 789, 793 (2d Cir.1999))). Failure to timely file a notice of claim bars relief on state-law tort claims. *Swinton v. City of New York.* 785 F.Supp.2d 3, 33 (E.D.N.Y.2011); *see also Excell,* 2012 U.S. Dist. LEXIS 93080, at *11 (failure to timely serve a notice of claim is grounds for dismissal).

Plaintiff argues that his March 28, 2012 notice of claim, ECF No. 93–5, was timely filed because the criminal charges against him were only dismissed on March 12, 2012. "As a general rule, 'a tort claim accrues as soon as the claim becomes enforceable i.e. when all elements of the tort can be truthfully alleged in a complaint.' " *Fed. Ins. Co. v. Distinguished Props. Umbrella Managers Inc.,* 721 F.Supp.2d 293, 297 (S.D.N.Y.2010) (quoting *IDT Corp. v. Morgan Stanley Dean Witter & Co.,* 12 N.Y.3d 132, 879 N.Y.S.2d 355, 907 N.E.2d 268, 273 (N.Y.2009)); *see also Kilmer v. Flocar. Inc.,* 212 F.R.D. 66, 71 (N.D.N.Y.2002) (stating that "[i]n New York, a tort claim accrues upon the occurrence of the last event necessary to give rise to a claim, generally at the time of injury"). Plaintiff's state law claims for injurious falsehood, defamation, and IIED [20] were enforceable when Harvey made the allegedly false statements to the prosecutor and other officers on May 5, 2011; therefore, these state law claims should be dismissed as time-barred. *See Chao v. Mt. Sinai Hosp.,* 10 CV 2869(HB), 2010 U.S. Dist. LEXIS 133686, at *17 (S.D.N.Y. Dec. 17, 2010) (a defamation claim "accrues on the date of publication of the allegedly defamatory statement" (citing *Firth v. State,* 98 N.Y.2d 365, 747 N.Y.S.2d 69, 775 N.E.2d 463, 464 (N.Y.2002)); *ACTV, Inc. v. Walt Disney Co.,* 01 CIV. 8402(JSR), 2002 U.S. Dist. LEXIS 8087 at *7 (S.D.N.Y. May 6, 2002) (dismissing plaintiff's injurious falsehood and other state law claims because "causes of action sounding (like these) in defamation and the like accrue at the time of publication"); *McCart v. Village of Mt. Morris.* 09–CV–6472, 2011 U.S. Dist. LEXIS 85804, at *8–9 (W.D.N.Y. Aug. 4, 2011) (finding that plaintiff's IIED claim accrued at the time of arrest because "the facts in support of [that] claim[ ] also relate to the allegedly unlawful arrest").

**\*15** A claim for malicious prosecution, on the other hand, only accrues when the charges against the plaintiff are terminated in his favor, in this case on March 12, 2012. *Bertuglia v. City of New York,* 839 F.Supp.2d

703, 739 (S.D.N.Y.2012); *accord Anderson v. City of New York,* 817 F.Supp.2d 77, 99 (E.D.N.Y.2011). Thus, plaintiff's March 28, 2012 notice of claim is timely with respect to any malicious prosecution claim. However, plaintiff does not explicitly raise a state law claim for malicious prosecution in his amended complaint. Nonetheless, as the Court must liberally construe a pro se litigant's papers to raise the strongest arguments that they suggest and plaintiff properly included a claim for malicious prosecution in his notice of claim, *see* ECF No. 93–5, the Court finds that plaintiff's instant action includes a state law claim for malicious prosecution against Harvey that survives summary judgment for the reasons discussed *supra* in Section III. Furthermore, under state law, "[u]nlike cases brought under *§ 1983,* municipalities may be liable for the common law torts, like false arrest and malicious prosecution, committed by their employees under the doctrine of respondeat superior." *L.B. v. Town of Chester,* 232 F.Supp.2d 227, 239 (S.D.N.Y.2002); *accord Maldonado,* 2014 U.S. Dist. LEXIS 26239, at *41; *see also Anderson v. City of New York.* 817 F.Supp.2d 77, 98 (E.D.N.Y.2011) (respondeat superior claims against a municipality are cognizable under New York state law). Accordingly, plaintiff's state law claim for malicious prosecution and derivative claim for respondeat superior liability against the City should survive summary judgment.

Finally, to establish conspiracy under New York law, plaintiff must demonstrate "an unlawful agreement between two or more persons, an overt act in furtherance of the agreement, intentional participation in the unlawful plan or purpose by all parties, and injury." *LaCourte v. JP Morgan Chase & Co.,* 12 Civ. 9453(JSR), 2013 U.S. Dist. LEXIS 129993, at *35–36 (S.D.N.Y. Sept. 4, 2013) (citing *Kashi v. Gratsos,* 790 F.2d 1050, 1055 (2d Cir.1986)); *accord L.B.,* 232 F.Supp.2d at 239. Plaintiff has presented no evidence to establish that the other defendant officers entered into an agreement with Harvey to fabricate evidence to arrest and commence a criminal proceeding against plaintiff. Therefore, this claim should be dismissed. *See LaCourte,* 2013 U.S. Dist. LEXIS 129993, at *37 (denying plaintiff's civil conspiracy claim because plaintiff failed to demonstrate "that each conspirator intentionally joined the venture with knowledge of its[ ] unlawful purpose"); *L.B.,* 232 F.Supp.2d at 239 (dismissing plaintiff's civil conspiracy claim because he made "no allegation of any agreement between two or more persons); *Quinn v. Teti,* No. 99–9433,

2000 U.S.App. LEXIS 27210, at *5 (2d Cir. Oct. 27, 2000) (affirming the dismissal of plaintiff's civil conspiracy claim because plaintiff failed to "present evidence of a corrupt agreement between two or more persons").

## CONCLUSION

**\*16** Accordingly, it is respectfully recommended that plaintiff's motion for summary judgment should be denied in its entirety and defendants' motion for summary judgment should be granted on all of plaintiff's claims against all of the individually named defendants except for defendant Harvey. Plaintiff's § 1983 false arrest, malicious prosecution, and procedural due process claims against defendant Harvey should proceed as well as plaintiff's state law malicious prosecution claim against the City based on respondeat superior.

## FILING OF OBJECTIONS TO THIS
## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court. Any request for an extension of time to file objections must be made within the fourteen-day period. Failure to file a timely objection to this Report generally waives any further judicial review. *Marcella v. Capital Dist. Physicians' Health Plan, Inc.,* 293 F.3d 42, 46 (2d Cir.2002); *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *see Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4662221

Footnotes

1   The state criminal court documents list Sam Jean–Laurent as defendant. Plaintiff suggests this was an error made by an officer during his arrest and that his full name is Phillip Sam Jean–Laurent. ECF No. 97, Pl. Dep., 22. The parties do not dispute that plaintiff is the Sam Jean–Laurent named in the state court arrest documents.

2   As defendants Gonzalez and Charles had not yet been served with process, defendants' motion for partial summary judgment, ECF No. 91, was filed on behalf of the City of New York, Harvey, Mascia, and Bowman. Since the filing of the motion, Gonzalez and Charles have been served and by letter dated June 26, 2014, join the defendants' motion for partial summary judgment. ECF No. 112. Gonzalez and Charles argue that the claims against them fail for the same reasons stated in the motion filed on behalf of Mascia and Graziano. *Id.*

3   Defendants' motion for summary judgment was originally filed as ECF No. 72. However, as defendants failed to serve plaintiff with the required Local Civ. R. 56.2 notice, the Court terminated defendants' motion. ECF No. 90; *see, e.g., Irby v. N.Y. City Transit Auth.,* 262 F.3d 412, 414 (2d Cir.2001) ("In the absence of such notice, "vacatur of the summary judgment is virtually automatic") Defendants re-served and re-filed their motion with the required Local Civ. R. 56.2 notice on May 16, 2014. ECF No. 91. With leave of the Court, plaintiff filed a supplemental response on June 9, 2014. ECF No. 107.

4   Although both parties submitted 56.1 statements as required, ECF Nos. 83 & 94, the Court cites to the supporting documents in the record instead of the parties' 56.1 statements.

5   Plaintiff could not recall the conversation verbatim, but states that it began with the woman asking him, "What's up? Do you want to do something?" PL Dep. at 68–69.

6   "Guidelines" refer to the "Guidelines for Conducting Operation Losing Proposition" promulgated by the City of New York Police Department. More than one copy of the Guidelines has been filed with the Court; the Court refers to the copy filed by plaintiff at ECF No. 82–11 and cites to the ECF page numbers.

7   "Tr." refers to the transcript of the proceedings held on March 12, 2012 in Queens County Supreme Court. More than one copy of the transcript has been filed; the Court refers to the copy filed by plaintiff at ECF No. 82–9 and cites to the page numbers in the original transcript.

8   False arrest and false imprisonment claims are " 'synonymous' " under New York law; therefore, the Court refers to both of these claims jointly as false arrest. *Lluberes v. City of Troy,* No. 11–CV–1346 (CFH), 2014 U.S. Dist. LEXIS 39799,

at *47 (N.D.N.Y. Mar. 21, 2014). The Clerk of Court is directed to send plaintiff the attached copies of all the unreported cases cited herein.

9    The Court considers plaintiff's request for additional discovery pursuant to Fed.R.Civ.P. 56(d) in further detail *infra* Section VII.

10    Plaintiff's belief that a recording of his conversation with Harvey exists arises from the NYPD Guidelines. The Guidelines require officers to use a "Kel kit," consisting of a transmitting wire that is secured to the undercover officer and a receiver that is placed in the car of a supervisor, during any Operation Losing Proposition. Guidelines at 17–18. Prior to commencing an operation, officers must field test the Kel kit. *Id.* at 22.

> Once the supervisor is satisfied with the proper functioning of the equipment, the undercover/decoy will place an initial heading on the tape. The heading will include the undercover/decoy's rank, name, shield and tax number the time, date, serial number of the Kel transmitter and receiver, and a statement declaring that he/she gives permission for the following conversations during an "Operation Losing Proposition" to be recorded.
>
> The undercover/decoy will proceed to the set and the supervisor will turn off the recording device, but maintain the monitoring capabilities of the Kel. The instant a potential "John" enters the set; the recording device should be switched on.
>
> *Id.*
>
> During discovery, plaintiff requested all "audio-visual recordings in connection with all arrests made in the prostitution sting operation on May 5, 2011;" defendants responded that there were none. *See* ECF No. 82–12 at 12. In their reply to their motion for summary judgment, defendants attach Lieutenant Charles' affidavit to support their position that no recording of plaintiff's interaction with Harvey exists. ECF No. 80–1, Charles Aff. Charles states that Harvey was wearing the Kel transmitter on May 5, 2011, and that they tested the Kel prior to starting the operation and it was working "appropriately." *Id.* at ¶¶ 9, 14. However, as Harvey moved away from Charles' vehicle which contained the Kel receiver, the quality of the transmission grew poor and became "unintelligible." *Id.* at ¶¶ 11, 17. As the "static and distortion" from the Kel impeded Charles' ability to hear the other police radios in his car, Charles turned off the Kel receiver. *Id.* at ¶ 18. Reading Charles' affidavit together with the Guidelines, it is unclear whether any recordings were made in connection with the arrests on May 5, 2011. Notably absent from Charles' affidavit is a statement that no recording was made of any of the arrests on May 5, 2011. Harvey's affidavit is also silent on this issue. In short, " 'the non-production of the evidence has not been satisfactorily explained' " to the Court. *Thaqi v. Wal–Mart Stores E., LP.* 09–CV–755 (JMA), 2014 U.S. Dist. LEXIS 45107, at *22 (E.D.N.Y. Mar. 31, 2014) (quoting *Mali v. Fed. Ins. Co.,* 270 F.3d 387, 391 (2d Cir.2013)). Defendants shall be prepared to address this issue if this Report is adopted.

11    As defendants do not move for summary judgment on plaintiff's false arrest claim against Harvey, the adverse inference that may be drawn regarding the recording need not be further addressed at this juncture.

12    This rule of law is often referred to as the fellow officer rule and in fact refers to two different, but similar doctrines-one for establishing probable cause to demonstrate that no constitutional violation occurred and another for establishing qualified immunity. *Askins v. City of New York.* No. 10 Civ. 2230(CM), 2012 U.S. Dist. LEXIS 19940, at *14 (S.D.N.Y. Feb. 13, 2012) (explaining that there are "two different doctrines implicating a fellow officer's knowledge"). In *Annunziata v. City of New York.* 06 Civ. 7637(SAS), 2008 U.S. Dist. LEXIS 42097 (S.D.N.Y. May 28, 2008), Judge Scheindlin discussed the key difference between these two doctrines. The fellow officer rule established under New York law provides that

> even if an arresting officer lacks personal knowledge sufficient to establish probable cause, the arrest will be lawful if the officer acts upon the direction of or as a result of a communication with a superior or fellow officer ... *provided that the police as a whole were in possession of information sufficient to constitute probable cause to make the arrest.*

*Annunziata,* 2008 U.S. Dist. LEXIS 19940, at *17 (emphasis added); *see also Jackson v. City of New York.* 939 F Supp.2d 219, 228 (E.D.N.Y.2013) (explaining that "an officer is entitled to rely on a fellow officer's report only when the reporting officer has the requisite probable case" (internal quotation marks omitted)). The doctrine of qualified immunity, on the other hand, applies when probable cause to arrest does not exist.

> While an arrest may be found unconstitutional if probable cause was in fact lacking, an officer who participates in the arrest is nonetheless immune from suit in his or her individual capacity under the doctrine of qualified immunity if it was objectively reasonable for him to rely on a fellow officer's report indicating the existence of probable case.

*Id.* at 18–19. Thus, "[t]he critical distinction between the doctrines is that the former requires that the imparting officer ... in fact have probable cause," while for the latter, "it may be that no officer actually had probable cause," but an arresting officer may nevertheless be "shielded from liability if he reasonably relied on the appearance of its existence." *Askins,* 2012 U.S. Dist. LEXIS 19940, at *17. Defendants, noting this distinction, properly move for summary judgment on the

grounds of qualified immunity because plaintiff is challenging that Harvey had probable cause for his arrest and Harvey is not moving for summary judgment on this claim.

13  Even if Harvey somehow communicated to the other defendant officers that plaintiff had agreed to $30, they were "not required to explore and eliminate every plausible claim of innocence before making an arrest." *Jaegly v. Couch,* 439 F.3d 149, 153 (2d Cir.2006) (citing *Caldarola v. Calabrese,* 298 F.3d 156, 167–68 (2d Cir.2002)); *see also Nzegwu v. Friedman,* 10–CV–02994 (CBA) (RML), 2014 U.S. Dist. LEXIS 44019, at *34 (E.D.N.Y. Mar. 31, 2014) (explaining that "the Court examines only the evidence that the officer relied on, 'not every theoretically plausible piece of exculpatory evidence or claim of innocence that might have existed' " (quoting *Panetta,* 460 F.3d at 398)); *Schnitter v. City of Rochester,* 931 F.Supp.2d 469, 477 (W.D.N.Y.2013) (stating that "police officers have no duty to search for exculpatory evidence, or to go to great lengths to determine whether the accuser's credibility might be called into question, absent some obvious reason to doubt her").

14  Nevertheless, plaintiff's malicious prosecution claim against Mascia should be dismissed because Mascia is entitled to qualified immunity. *See infra* Section III.C

15  An ACD refers to an adjournment in contemplation of dismissal. *See* N.Y.Crim. Proc. Law § 170.55. An ACD "is an adjournment of the action without date ordered with a view to ultimate dismissal of the accusatory instrument in furtherance of justice." Id It is well established that "[a]n ACD is not a favorable termination." *Hayward v. City of New York,* 12–cv–3220 (ENV)(CLP), 2013 U.S. Dist. LEXIS 127357, at *9 (E.D.N.Y. Aug. 25, 2013) (citing *Rothstein.* 373 F.3d at 287).

16  The state court refers to a hearing pursuant to *People v. Hinton,* 31 N.Y.2d 71, 334 N.Y.S.2d 885, 286 N.E.2d 265 (N.Y.1972) to determine whether the courtroom should sealed during a witness's testimony; it is often used to protect the identity of undercover officers. *See, e.g., Yung v. Walker,* 468 F.3d 169, 171, 173 (2d Cir.2006) (discussing the use of and standard at a Hinton hearing).

17  Although the record does not reflect whether Charles or Gonzalez received a copy of these supporting depositions, the Court assumes that plaintiff makes the same argument regarding Charles and Gonzalez as he makes regarding Bowman and Mascia.

18  Some courts also refer to this claim as a denial of the right to a fair trial. *See Jovanovic,* 486 F. App'x at 152; *Perez v. Duran,* 962 F.Supp.2d 533, 543 (S.D.N.Y.2013); *Brandon,* 705 F.Supp.2d at 276. Although plaintiff's amended complaint only explicitly raises a substantive due process claim, plaintiff's amended complaint, liberally construed, also raises a procedural due process/right to fair trial claim for fabrication of evidence. *See, e.g. Walker v. Mattingly,* 09–CV–845–JTC, 2012 U.S. Dist. LEXIS 48547, at *15 (W.D.N.Y. Apr. 4, 2012) (construing plaintiff's complaint to allege a due process claim under Section 1983).

19  In so far as plaintiff's *Monell* claim argues that defendants' failure to abide by the Guidelines regarding use of a Kel to record his conversation with Harvey caused his injury, it is unavailing. A "failure to follow policy" is "the antithesis of a link between policy and custom." *Walker v. Shaw.* 08 Civ. 10043(CM), 2010 U.S. Dist. LEXIS 62664, at *18 (S.D.N.Y. June 23, 2010); *accord Zacharv.* 2014 U.S. Dist. LEXIS 57236, at *14 (explaining that an alleged contravention of police policy "is the antithesis of a Monell claim").

20  The Court notes that there is continuing tort doctrine under New York law which " 'provides that, in certain tort cases involving continuous or repeated injuries, the statute of limitations accrues upon the date of the last injury.' " *Conte v. Cnty of Nassau,* No. 06–CV–4746 (JFB)(ETB), 2013 U.S. Dist. LEXIS 105207, at *76–77 (E.D.N.Y. July 26, 2013) (quoting *Mix v. Del. & Hudson Ry. Co.,* 345 F.3d 82, 88 (2d Cir.2003)). "To prevail on this claim, however, [plaintiff] must demonstrate that the conduct that falls within the limitations period [is] in and of itself actionable conduct and not merely the effect of prior tortious conduct." *Biberaj v. Pritchard Indus.,* 859 F.Supp.2d 549, 564 (S.D.N.Y.2012) (internal quotation marks omitted). Plaintiff's complaint does not allege that defendants took any action during the ninety-day limitations period preceding his notice of claim. In fact, plaintiff admitted during his deposition that Harvey and the other officers "refused to come in and testify" and "were not showing up" for court appearances. Pl. Dep. at 85–86. Therefore, there is no basis to find that defendants' conduct continued within the limitations period.

---

**End of Document**                                      © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 8492472
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Hasan Mohamed, Plaintiff,
v.
M. Powers, et al., Defendants.

9:14-CV-1389 (TJM/TWD)
|
Signed 12/10/2015

**Attorneys and Law Firms**

Hasan Mohamed, 09-A-0677, Fishkill Correctional
Facility, P.O. Box 1245, Beacon, New York 12508, pro se.

**DECISION AND ORDER**

THOMAS J. McAVOY, Senior United States District
Judge

**\*1 I. INTRODUCTION**

Plaintiff Hasan Mohamed commenced this action by filing
a pro se civil rights complaint pursuant to 42 U.S.C.
§ 1983 (" Section 1983"), together with an application
to proceed in forma pauperis ("IFP application"). Dkt.
No. 1 ("Compl."), Dkt. No. 5 ("IFP Application").
By Decision and Order filed on January 21, 2015, the
Court granted plaintiff's IFP application, and found that
plaintiff's claims were barred by the three-year statute
of limitations applicable to claims under § 1983, and
therefore subject to dismissal pursuant to 28 U.S.C. §
1915(e)(2)(B) and 28 U.S.C. § 1915A. Dkt. No. 7 (the "
January Order"). In light of his pro se status, plaintiff was
afforded an opportunity to submit an amended complaint
with facts demonstrating why his claims are timely, or
if untimely, why the Court should toll the applicable
limitations period. Id. at 9. On February 23, 2015, plaintiff
filed an amended complaint. Dkt. No. 8. In a Decision
and Order filed on April 6, 2015, the Court dismissed
plaintiff's action as time-barred, Dkt. No. 9 (the "April
Order"), and Judgment was entered. Dkt. No. 10. Plaintiff
appealed the Judgment and on September 22, 2015, the
Second Circuit vacated the dismissal and remanded the
matter to the Court for "factual findings on the length
of the administrative exhaustion period, its effect on the

applicable statute of limitations, and such further action
as may be appropriate." Dkt. No. 16. On September 23,
2015, the Court issued an Order directing plaintiff to
file a second amended complaint with, "facts sufficient
for the Court to determine the period during which the
statute of limitations on plaintiff's claims was tolled as
he exhausted his administrative remedies." Dkt. No. 17.
Currently before the Court is plaintiff's second amended
complaint. Dkt. No. 18.

**II. Legal Standard**

The legal standard governing the dismissal of a complaint
for untimeliness pursuant to 28 U.S.C. §§ 1915(e)(2)(B)
and 1915A was discussed at length in the January Order
and will not be restated here. *See* January Order at 8-10.

**III. Review of the Second Amended Complaint** [1]

Taking into account plaintiff's pro se status, the Court
construes the allegations in plaintiff's second amended
complaint with the utmost leniency. *See, e.g., Haines v.
Kerner,* 404 U.S. 519, 521 (1972) (holding that a pro
se litigant's complaint is to be held "to less stringent
standards than formal pleadings drafted by lawyers."). On
August 5, 2011, plaintiff received a misbehavior report,
prepared by defendant Sergeant M. Powers ("Powers").
*See* Sec. Am. Compl. at 3. The report listed the incident
date as August 4, 2011 and the location was described
as "facility compound." *See id.* In the report, Powers
described the incident as follows:

**\*2** ... on 08/03/11, you inmate Mohamed
Hassan, persuaded several members of the Muslim
Community to refuse participation in the Ramadan
evening services of 08/03/11. Your actions put's [sic]
you in violation of rule 104.12 that states "you shall
not lead, organize or urge others to participate in any
action which may be detrimental to the order of the
facility."

Dkt. No. 18-1 at 2.

As a result of the misbehavior report, a Tier III
Superintendent Hearing commenced on August 10, 2011
with defendant, D. Phelix ("Phelix") presiding. *See* Sec.
Am. Compl. at 3. Plaintiff objected to the misbehavior
report and argued that it was vague and incorrect and
thus, failed to provide proper notice. *See id.* at 4. On
August 17, 2011, plaintiff was found guilty of violating

the DOCCS rule related to demonstrations. *See id.* at 8. Plaintiff was sentenced to six months in the Special Housing Unit ("SHU"), loss of recreation, commissary, packages and phone privileges. Phelix also recommended a six month loss of good time. *See id.*; Dkt. No. 18-1 at 8. Plaintiff was confined to the SHU for 115 days and deprived of commissary, recreation, library, phone privileges and the right to worship. *See* Sec. Am. Compl. at 10. During his SHU confinement, plaintiff was confined to his cell for twenty-three hours each day and received smaller portions of food. *See id.*

On September 6, 2011, plaintiff filed an appeal of his Tier III disposition. *See* Sec. Am. Compl. at 10; Dkt. No. 18-1 at 9. On September 29, 2011, plaintiff wrote to the Director of Special Housing for the status of his appeal. *See* Dkt. No. 18-1 at 18. On October 5, 2011, plaintiff received a letter from Albert Prack ("Prack") advising that an appeal was not received. *See id.* at 20. Therefore, the September 29, 2011 letter was accepted as an appeal and plaintiff was afforded the opportunity to submit supplementary material. *See id.* On October 25, 2011, plaintiff re-submitted his appeal. *See id.* at 22. On November 15, 2011, the decision rendered at the August 2011 hearing was reviewed and reversed. *See* Dkt. No. 18-1 at 30.

Construed liberally, the second amended complaint contains the following claims: (1) Powers prepared a "false business record;" (2) defendants violated plaintiff's due process rights under the Fourteenth Amendment; (3) defendants denied plaintiff equal protection; and (4) the conditions of confinement violated plaintiff's Eighth Amendment rights. *See* Sec. Am. Compl. at 11. With respect to the timeliness issue, plaintiff, "has an aggregate of 90 days tolled, his exhaustion period extended from August 17, 2011 until November 15, 2011, which is the date of his administrative appeal". *See* Sec. Am. Compl. at 9.

## V. ANALYSIS

### A. Statute of Limitations
In the January Order, the Court discussed the statute of limitations for claims brought pursuant to § 1983:

> In *Section 1983* actions, the applicable statute of limitations is the State's "general or residual [state] statute [of limitations] for personal injury actions[.]"

*Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) (quoting *Owens v. Okure*, 488 U.S. 235, 249-50 (1989)). In New York, a three-year statute of limitations applies for personal injury actions and thus to *Section 1983* actions. *Id.*; *see also* N.Y. C.P.L.R. § 214(5). Although state law provides the relevant limitations period, federal law determines when a *Section 1983* action accrues, which has been held to be the time "when the plaintiff knows or has reason to know of the harm." *Connolly v. McCall*, 254 F.3d 36, 41 (2d Cir. 2001) (quotation omitted); *see also* *Covington v. City of New York*, No. 94 Civ. 4234, 916 F. Supp. 282, 285 (S.D.N.Y. Feb. 9, 1996) (quotation omitted) (same). "Thus, in determining when the statute begins to run, the proper focus is on the time of the [wrongful] act, not the point at which the consequences of the act become painful." *Covington*, 916 F. Supp. at 285 (quotation omitted).

*3 Dkt. No. 7 at 8.

Here, plaintiff's due process claims arise from a disciplinary hearing that concluded on August 17, 2011. After the hearing, Phelix sentenced plaintiff to SHU confinement and recommended a six month loss of good time. *See* Dkt. No. 18-1 at 8. "The Second Circuit has held that if the length of a plaintiff's confinement is affected by the result of a disciplinary hearing, the plaintiff's cause of action does not accrue until the guilty determination is reversed." *McEachin v. Drefus,* No. 06-CV-1489 (GLS/ GJD), 2008 W L 686812, at *2 (N.D.N.Y. March 10, 2008) (*citing Black v. Coughlin*, 76 F.3d 72, 75 (2d Cir. 1996)). Based upon the facts asserted in the second amended complaint and exhibits annexed thereto, the accrual date for plaintiff's procedural due process claims related to his disciplinary hearing occurred on November 15, 2011, the date when the disciplinary determination was reversed. *See* Dkt. No. 18-1 at 30; *see McEachin*, 2008 WL 686812, at *2 (finding that because plaintiff suffered a recommended loss of good time, his cause of action accrued when the disciplinary determination was reversed on appeal). The statute of limitations expired on November 15, 2014 and thus, plaintiff's claims are not time-barred. *See* Dkt. No. 7 at 8.

### B. False Misbehavior Report
In the January Order, the Court dismissed plaintiff's claims based upon the filing of a false misbehavior report holding:

It is well settled that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (citing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986), *cert. denied*, 485 U.S. 982 (1988)); *accord*, *Pittman v. Forte*, No. 9:01-CV-0100 (LEK/GLS), 2002 WL 31309183, at *5 (N.D.N.Y. July 11, 2002); *see also Santana v. Olson*, No. 07-CV-0098, 2007 WL 2712992, at *2 (W.D.N.Y. Sept. 13, 2007) ("[T]he filing of a false behavior report by a correctional officer does not state a claim for relief."). "The filing of a false report does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing." *Williams v. Smith*, 781 F.2d 319, 324 (2d Cir. 1986) (rejecting prisoner's "but for" argument as to guard who prepared misbehavior report but was not involved in Tier III hearing) (citation omitted).

Dkt. No. 7 at 12.

The Court has reviewed the second amended complaint and finds that plaintiff's claims related to the filing of a false misbehavior report suffer from the same infirmities as the original pleading. For the reasons set forth in the January Order, these claims are dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b).

### C. Fourteenth Amendment

To successfully state a claim under Section 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004); *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996). " Prison discipline implicates a liberty interest when it imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Ortiz*, 380 F.3d at 654 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)); *Tellier*, 280 F.3d at 80; *Hynes*, 143 F.3d at 658.

### 1. Liberty Interest

**\*4** In *Sandin v. Conner*, 515 U.S. 472 (1995), the United States Supreme Court determined that to establish a liberty interest, a plaintiff must sufficiently demonstrate that (1) the State actually created a protected liberty interest in being free from segregation; and that (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84; *Tellier*, 280 F.3d at 80; *Hynes*, 143 F.3d at 658. To determine whether an inmate has suffered an "atypical and significant hardship," the conditions imposed upon the inmate must be compared with those imposed upon the rest of the general population of the facility as well as those in administrative and protective confinement. *See Welch v. Bartlett*, 196 F.3d 389, 393 (2d Cir. 1999); *see also Vega v. Lantz*, 596 F.3d 77, 83 (2d Cir. 2010) ("To be actionable, the liberty interest must subject the prisoner to 'atypical and significant hardship ... in relation to the ordinary incidents of prison life.' ") (quoting *Sandin*, 515 U.S. at 484). W hen assessing the severity of the hardship imposed, a court should take into account both the duration and the conditions of the confinement, where appropriate. *See Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998); *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) (finding that while not the only factor to be considered, the duration of a disciplinary confinement remains significant under *Sandin*).

Specifically, while under certain circumstances confinement in the SHU of less than 101 days could be shown to meet the atypicality standard under *Sandin* (*see Colon*, 215 F.3d at 232 n.5), the Second Circuit generally takes the position that confinement in a SHU, without unusual conditions,[2] for a period of up to 101 days will generally not constitute an atypical hardship, while confinement for a period of more than 305 days has been held to be atypical even if under "normal conditions." *Ortiz*, 380 F.3d at 654; *Colon*, 215 F.3d at 231. It is the length of the actual punishment that is relevant in determining whether a period of SHU confinement implicates a cognizable liberty interest, and not the length of the sentence imposed. *Scott v. Albury*, 156 F.3d 283, 287–88 (2d Cir. 1998) (" No right to due process is implicated in the prison context unless a liberty interest has been deprived, and we read *Sandin [v. Conner]* to

require that we look to actual punishment in making this determination.").

In order to state a viable cause of action for a violation of due process arising from the hearing, plaintiff must first plead facts to establish that he had a liberty interest in being free from confinement in the SHU. As a result of the disciplinary hearing, plaintiff was sentenced to six months in the SHU. *See* Sec. Am. Compl. at 8. In total, plaintiff was confined to the SHU for 115 days and that he suffered "atypical and substantial hardships." *See id.* at 10. At this juncture, plaintiff has sufficiently plead a liberty interest subject to due process protection.

### 2. Procedural Due Process

In the context of a prison disciplinary hearing, inmates possess due process rights under the Fourteenth Amendment, but "the full panoply of rights" due a defendant in a criminal proceeding does not apply. *Applewhite v. Sheahan*, No. 08-CV-6045, 2013 W L 144957, at *10 (W.D.N.Y. Jan. 11, 2013) (citing *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974)). The Supreme Court enumerated certain procedural safeguards that must be afforded to an inmate during the course of a prison disciplinary proceeding in order to ensure that the minimum requirements of procedural due process are satisfied. *Wolff*, 418 U.S. at 539. Specifically, with respect to a disciplinary hearing, the Fourteenth Amendment requires that (1) the inmate receive at least twenty-four hours written notice of the disciplinary charges against him; (2) the inmate be permitted to call witnesses and present evidence "when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals;" (3) the inmate be judged by a fair and impartial hearing officer; (4) the disciplinary conviction be supported by some evidence; and (5) the inmate be provided with a written statement of fact findings that support the disposition as well as the reasons for the disciplinary action taken. *Id.* at 563-66.

**\*5** Construing the complaint liberally, plaintiff claims that during the course of his Tier III disciplinary hearing Phelix, the hearing officer, failed to provide plaintiff with documents necessary to present a defense, including a copy of the sign-out sheet for the B-2 Dorm for August 3, 2011. *See* Dkt. No. 18-1 at 4. Plaintiff also objected to the misbehavior report because it failed to provide plaintiff

with notice as required by 7 NYCRR § 251-3.1(c)(1)(2) (3). [3] *See id.* at 5; *see* Sec. Am. Compl. at 4, 6. Plaintiff also claims that Phelix improperly conducted "off the record" interviews of witnesses. *See* Dkt. No. 18-1 at 10.

Mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, *see e.g. Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), the Court finds that plaintiff's Fourteenth Amendment due process claim against Phelix survives sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed motion to dismiss or for summary judgment.

The Court reaches a different conclusion with respect to plaintiff's Fourteenth Amendment due process claim against Powers. Plaintiff does not have a constitutional protection against false testimony by a corrections officer at a hearing. *See Davis v. N.Y.*, No. 99-CV-0307, 1999 W L 1390247, at *2 (W.D.N.Y. Dec. 14, 1999) (holding that the alleged constitutional violations are based upon the conduct of the hearing not on the truth or falsity of any misbehavior report or testimony). Plaintiff's allegations against Powers do not implicate the due process in the proceeding itself and thus, are dismissed for failure to state a claim.

### D. Equal Protection
The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). " In order to establish an equal protection violation, the plaintiffs must show that they were treated differently than other people in similar circumstances and must establish that such unequal treatment was the result of intentional and purposeful discrimination." *Chaney v. Koupash*, No. 04-CV-0126 (LEK/DRH), 2008 W L 5423419, at *20 (N.D.N.Y. Dec. 30, 2008) (citing *Myers v. Barrett*, No. 95-CV-1534 (RSP/GJD), 1997 W L 151770, at *3 (N.D.N.Y. Mar. 28, 1997)). In addition, a valid equal protection claim may be brought by a "class of one" "where the plaintiff alleges that she [or he] has been intentionally treated differently from others similarly situated and that there is no rational basis f or the difference in treatment."

*Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir.2005).

Plaintiff fails to allege any facts to suggest how he was treated any differently than similarly situated inmates. Vague and conclusory allegations, are insufficient to plausibly suggest an equal protection violation. *See De Jesus v. Sears Roebuck & Co.*, Inc., 87 F.3d 65, 70 (2d Cir.1996); *see Byng v. Delta Recovery Servs., LLC.*, No. 13-0733 (MAD/ATB), 2013 WL 3897485, at *15, n. 5 (N.D.N.Y. July 29, 2013) (finding that Attica inmate alleged no facts in the complaint to indicate he was similarly situated to any one or that someone else was treated differently than he was). Accordingly, plaintiff's Fourteenth Amendment Equal Protection claim is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### E. Eighth Amendment – Conditions of Confinement

**\*6** The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The Second Circuit, in addressing the needs protected by the Eighth Amendment, has stated that sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." *Wolfish v. Levi*, 573 F.2d 118, 125 (2d Cir.1978), *rev'd on other grounds sub nom. Bell v. Wolfish*, 441 U.S. 520 (1979); *Lareau v. Manson*, 651 F.2d 96, 106 (2d Cir. 1981). "To demonstrate that the conditions of his confinement constitute cruel and unusual punishment, the plaintiff must satisfy both an objective test and a subjective test." *Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996) (citation omitted). To satisfy the objective element, "the plaintiff must demonstrate that the conditions of his confinement result 'in unquestioned and serious deprivations of basic human needs.' " *Id.* (citation omitted). Although the Constitution does not mandate a comfortable prison setting, prisoners are entitled to "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety." *Brown v. Doe*, No. 13 Civ 8409, 2014 WL 5461815, at *6 (S.D.N.Y. Oct. 28, 2014) (quoting, *inter alia, Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)). "[T]he inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citation omitted). With respect to the subjective element,

plaintiff must "demonstrate that the defendants imposed those conditions with 'deliberate indifference.' " *Jolly, 76 F.3d at 480* (citation omitted). To constitute deliberate indifference, "[t]he prison official must know of, and disregard, an excessive risk to inmate health or safety." *Walker*, 717 F.3d at 125.

In this case, plaintiff's alleged deprivations fall far short of satisfying the objective element of the Eighth Amendment. *See McNatt v. Unit Manager Parker*, No. 99-CV-1397, 2000 WL 307000, at *4 (D.Conn. January 18, 2000) (holding that the totality of conditions in restrictive housing unit, including stained, smelly mattresses; unclean cell; no bedding for six days; no cleaning supplies for six days; no toilet paper for one day; no toiletries or clothing for six days; no shower shoes; dirty showers; cold water that did not function properly; and smaller food portions, while not pleasant, did not rise to level of Eighth Amendment violation)); *see also Thomas v. Smith*, 559 F.Supp. 223, 224 (W.D.N.Y. 1983) (dismissing the complaint alleging unconstitutional denial of basic hygiene items such as deodorant, soap, shampoo while confined in Attica's SHU).

Moreover, even assuming plaintiff's allegations are sufficient to satisfy the objective prong of the Eighth Amendment analysis, the complaint lacks facts establishing which correctional officers were responsible or personally involved in the alleged unconstitutional conditions. It is well settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). Thus, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.'" *Austin v. Pappas*, No. 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986)) (other citation omitted). Plaintiff has not sufficiently alleged that any defendant acted with a deliberate state of mind. *See Gaston v. Coughlin*, 249 F.3d 156, 157 (2d Cir. 2001). Consequently, plaintiff's Eighth Amendment claims related to his conditions of confinement are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim. *See Gomez v. Sepiol*, 2014 WL 1575872, at *9 (W.D.N.Y. April 11, 2014); *see also Toliver v. Dep't of Corrs.*, No. 10 Civ. 6298, 2012 WL 4510635, at *9 (S.D.N.Y. Apr.

10, 2012) (dismissing the deliberate indifference claim for failure to plead facts identifying a responsible official who acted with a sufficiently culpable state of mind).

## VI. CONCLUSION
**WHEREFORE**, it is hereby

**ORDERED** that the claims that Powers filed a false misbehavior report and provided false testimony are **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted; and it is further

**\*7 ORDERED** that the following claims are **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted; (1) equal protection claims; (2) Fourteenth Amendment claims against Powers; and (3) Eighth Amendment claims based upon plaintiff's conditions of confinement; and it is further

**ORDERED**, that Powers is **DISMISSED** as a defendant herein; and it is further

**ORDERED**, that the Clerk shall issue summonses and forward them, along with copies of the complaint, to the United States Marshal for service upon remaining defendant. The Clerk shall forward a copy of the summonses and amended complaint to the Office of the New York Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED**, that a response to the complaint be filed by defendant, or his counsel, as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court. Plaintiff is required to promptly notify the Clerk's Office and all parties or their counsel of any change in his address; plaintiff's failure to do so may result in the dismissal of this action; and it is further;

**ORDERED** that the Clerk of the Court shall serve a copy of this Decision and Order on plaintiff in accordance with the Local Rules.

## All Citations

Not Reported in F.Supp.3d, 2015 WL 8492472

---

**Footnotes**

1    Plaintiff annexed exhibits to the second amended complaint including, *inter alia*, an Inmate Misbehavior Report, Hearing Disposition and copies of plaintiff's appeals of the decision rendered at a Tier III hearing. *See* Dkt. No. 18-1. To the extent that these documents are relevant to the incidents described in the second amended complaint, the Court will consider the exhibits. *See Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir. 1991) (the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference)

2    Under the "normal conditions of SHU confinement in New York," the prisoner is: placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day, limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors [are] permitted, but the frequency and duration [is] less than in general population. The number of books allowed in the cell [is] also limited. *Palmer v. Richards,* 364 F.3d 60, 65 n. 3 (2d Cir. 2004) (citation omitted).

3    7 N.Y.C.R.R. § 251-3.1 is entitled "Misbehavior Report." The relevant sections provide:
         (c) The misbehavior report shall include the following:
             (1) a written specification of the particulars of the alleged incident of misbehavior involved;
             (2) a reference to the inmate rule book number allegedly violated by the inmate, and a brief description of the rule;
             (3) the date, time and place of the incident
         7 N.Y.C.R.R. § 251-3.1

**End of Document**                © 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by    Roland v. Murphy,    E.D.N.Y.,    October 30, 2003

2002 WL 31075804
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jeffrey NELSON, Plaintiff

v.

Byron RODAS, et al., Defendants.

No. 01CIV7887RCCAJP.
|
Sept. 17, 2002.

Prison defendants moved for summary judgment on prisoner's civil rights claims. In issuing his report and recommendation, United States Magistrate Judge Peck, held that: (1) prisoner did not satisfy Prison Litigation Reform Act's (PLRA) exhaustion requirements with respect to non-medical claims; (2) if a prisoner's § 1983 complaint contains exhausted and unexhausted claims, district court may address the merits of the exhausted claims and dismiss only those that are unexhausted; and (3) prisoner failed to establish that prison defendants demonstrated deliberate indifference serious medical and dental conditions.

Motion granted as to exhausted claims; unexhausted claims dismissed.

West Headnotes (5)

[1]    **Civil Rights**
       👉 Criminal Law Enforcement;Prisons

       Prisoner's complaint letter to Commissioner of New York State Department of Correctional Services (DOCS) with respect to non-medical claims did not satisfy Prison Litigation Reform Act's (PLRA) exhaustion requirements in prisoner's civil rights action. 42 U.S.C. § 1997e(a).

       13 Cases that cite this headnote

[2]    **Civil Rights**
       👉 Criminal Law Enforcement;Prisons

       Prisoner asserting civil rights claims did not satisfy Prison Litigation Reform Act's (PLRA) exhaustion requirements with respect to non-medical claims by filing appeals from various disciplinary hearing dispositions. 42 U.S.C. § 1997e(a).

       8 Cases that cite this headnote

[3]    **Civil Rights**
       👉 Criminal Law Enforcement;Prisons

       If a prisoner's § 1983 complaint contains exhausted and unexhausted claims, district court may address the merits of the exhausted claims and dismiss only those that are unexhausted under Prison Litigation Reform Act (PLRA). 42 U.S.C. § 1983; 42 U.S.C. § 1997e(a).

       5 Cases that cite this headnote

[4]    **Civil Rights**
       👉 Criminal Law Enforcement;Prisons

       Prisoner failed to establish that prison defendants demonstrated deliberate indifference to serious medical and dental conditions regarding an abnormal growth of tissue-cells within his chest, a defective back, and worn-out amalgams fillings that caused him a perpetual headache; prisoner offered no evidence to support his claims other than conclusory allegations and refused to accept dental treatment. U.S.C.A. Const.Amend. 8; 42 U.S.C. § 1983.

       46 Cases that cite this headnote

[5]    **Conspiracy**
       👉 Pleading

       Prisoner's conclusory allegations did not state conspiracy claim under § 1985(3); additionally, conspiracy claim was not stated since prisoner failed to allege that defendants conspired against him because of any racial or

class-based, invidious discriminatory animus.
42 U.S.C. § 1985(3).

Cases that cite this headnote

REPORT AND RECOMMENDATION

PECK, Magistrate J.

**\*1** Pro se plaintiff Jeffrey Nelson, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, alleging that numerous Green Haven Correctional Facility employees violated his constitutional rights, and asserting claims for: (1) deliberate indifference to serious medical needs; (2) conspiracy; (3) retaliation; (4) deliberate indifference to serious harm; (5) excessive force; and (6) denial of due process. (Dkt. No. 2: Compl.; Dkt. No. 40: Am. Compl.) Nelson demands compensatory damages of $1.329 billion and punitive damages of an additional $1.329 billion. (Am. Compl. at 36–37.) After the conclusion of discovery, defendants moved for summary judgment under Fed.R.Civ.P. 56, or, in the alternative, to dismiss the amended complaint under Fed R. Civ. P. 12(b)(6).

For the reasons set forth below, (1) defendants' summary judgment motion should be GRANTED as to Nelson's claims against defendants Rodas, Koenigsmann and Licerio for deliberate indifference to serious medical needs and conspiracy; and (2) Nelson's remaining claims should be DISMISSED WITHOUT PREJUDICE for failure to exhaust administrative remedies.

PROCEDURAL BACKGROUND

At all times relevant to this action (October 2000 through May 2001), Nelson was an inmate under DOCS custody at Green Haven Correctional Facility (Dkt. No. 40: Am. Compl. at 3–6, 15–21; Dkt. No. 46: Defs. Br. at 2; Dkt. No. 48: Defs. 56.1 Stmt. ¶ 1),[1] and defendants were employed by DOCS at Green Haven.[2]

Nelson commenced this action by filing a complaint dated July 18, 2001, received by this Court's Pro Se Office on July 25, 2001 and filed as of August 23, 2001. (Dkt. No. 2: Compl.) The Court directed Nelson to amend his complaint to provide additional facts supporting the allegations in his complaint. (Dkt. No. 32: 2/6/02 Memo Endorsed Order.) On March 8, 2002, Nelson's amended complaint was filed. (Dkt. No. 40: Am. Compl.)

Nelson's claims in the amended complaint can be divided into two categories. The first category involves claims against defendants Byron Rodas, Dr. Carl Koenigsmann and Edward Licerio for deliberate indifference to Nelson's serious medical (and dental) needs and conspiracy relating thereto (hereafter, the "Medical Claims"). (Am. Compl. at 3–14; Dkt. No. 52: Nelson 4/30/02 Aff. ¶¶ 4–14; Dkt. No. 53: Nelson Br. ¶¶ 5–8.) The second category involves claims against the remaining sixteen defendants for excessive force, deliberate indifference to serious harm, denial of due process,[3] retaliation, and conspiracy relating to a variety of incidents at Green Haven, including, *inter alia,* physical attacks by corrections officers and fellow inmates, and various disciplinary measures levied against Nelson (hereafter, the "Non–Medical Claims"). (Am. Compl. at 15–35; Nelson 4/30/02 Aff. ¶¶ 15–33; Nelson Br. ¶¶ 9–12.)[4]

At the close of discovery, defendants moved for summary judgment, or, in the alternative, to dismiss the amended complaint. (Dkt.Nos.45–49, 54.)[5]

ANALYSIS

I. NELSON'S NON–MEDICAL CLAIMS SHOULD BE DISMISSED WITHOUT *PREJUDICE FOR FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES*

**\*2** Under 42 U.S.C. § 1997e(a), as amended by the Prison Litigation Reform Act of 1996 ("PLRA"), a prisoner must exhaust administrative remedies before bringing suit in federal court under federal law:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until

such administrative remedies as are available are exhausted.

[42 U.S.C. § 1997e(a)](#) This provision requires complete exhaustion in accordance with the administrative procedures within the New York State Department of Correctional Services ("DOCS"). Exhaustion is required even when a prisoner seeks a remedy that cannot be awarded by such administrative procedures. *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 988, 152 L.Ed.2d 12 (2002); *Booth v. Churner,* 532 U.S. 731, 741, 121 S.Ct. 1819, 1825, 149 L.Ed.2d 958 (2001). The Supreme Court this past term made clear that there are no exceptions to the PLRA's exhaustion requirement:

> [W]e hold that the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.

*Porter v. Nussle,* 122 S.Ct. at 992; *accord, e.g., Feaster v. United States Bureau of Prisons,* No. 00–0118, 37 Fed. Appx. 15, 16, 2002 WL 970941 at *1 (2d Cir. May 10, 2002) (applying *Porter v.. Nussle* holding to require exhaustion of prisoner's due process and retaliation claims).[6] Dismissal of an action for failure to comply with the PLRA is without prejudice. *E.g., Morales v. Mackalm,* 278 F.3d 126, 128, 131 (2d Cir.2002) (per curiam) (Second Circuit "clarif[ies] that if a district court dismisses a prisoner's complaint for failure to exhaust administrative remedies, it should do so without prejudice.").

DOCS has a well-established inmate grievance procedure ("IGP"):

> It consists of three levels. The first is the filing of a complaint with the facility's Inmate Grievance Review Committee. The second is an appeal to the facility superintendent. The final level is an appeal to the DOCS Central Office Review Committee in Albany.... A prisoner has not exhausted his administrative remedies until he goes through all three levels of the grievance procedure.

*Hemphill v. New York,* 198 F.Supp.2d 546, 548 (S.D.N.Y.2002); *see also, e.g., Perez v. Blot,* 195 F.Supp.2d 539, 542–43 (S.D.N.Y.2002); *Cruz v. Jordan,* 80 F.Supp.2d 109, 117–18 (S.D.N.Y.1999); *Vasquez v. Artuz,* 97 Civ. 8427, 1999 WL 440631 at *5 (S.D.N.Y. June 28, 1999) (Peck, M.J.); N.Y. Correct. Law §§ 138–39 (McKinney's 2002); Official Compilation of Codes, Rules & Regulations of the State of New York ("NYCRR") Title 7, § 701.1 *et seq..*

Nelson did not exhaust DOCS' grievance procedures with respect to any of the Non–Medical Claims.[7] Nelson concedes that he did not follow the formal grievance procedure with respect to his excessive force claim, but rather appealed directly to DOCS Commissioner Glenn Goord in a letter dated March 10, 2001. (Dkt. No. 52: Nelson 4/30/02 Aff. Ex. 1: 3/10/01 Nelson Letter to Goord; *see* Dkt. No. 50: 3/11/02 Hearing Tr. at 22; Dkt. No. 53: Nelson Br. at 9–11; Am. Compl. at iv; *see also* Dkt. No. 47: Gould Aff. Ex. B: Egan 3/25/02 Aff.) Nelson argues that, in light of correction officers' violent attacks and retaliatory behavior, he had "no other resource or remedy at the facility other than to file his complaint(s) ... directly to" Commissioner Goord. (Nelson Br. at 9; 3/11/02 Hearing Tr. at 22; Nelson 4/30/02 Aff. Ex. 1: 3/10/01 Nelson Letter to Goord.) According to Nelson, his situation qualified as an "emergency" under the IGP, thus allowing an appeal directly to Commissioner Goord in lieu of ordinary exhaustion. (Nelson Br. at 9–10.)

**\*3** Nelson is mistaken. DOCS grievance procedure establishes an expedited grievance procedure in cases of alleged staff "harassment" of an inmate, defined as "employee misconduct meant to annoy, intimidate, or harm an inmate." 7 NYCRR § 701.11(a). That procedure is as follows:

> (b) Procedure.
>
> (1) An inmate who feels that s(he) has been the victim of employee misconduct or harassment should first *report such occurrences to the immediate supervisor of that employee.* This does not preclude submission of a formal grievance.
>
> (2) All allegations of employee misconduct shall be given a grievance calendar number and recorded in sequence. All documents submitted with the allegation

must be *forwarded to the superintendent* by close of business that day.

(3) The superintendent or his designee shall promptly determine whether the grievance, if true, would represent a bona fide case of harassment as defined in subdivision (a) of this section. If not, then it shall be returned to the IGRC for normal processing.

7 NYCRR § 701.11(b) (emphasis added). Nelson did not follow this procedure when he wrote to Commissioner Goord. [8]

[1]   Courts have repeatedly held that complaint letters to the DOCS Commissioner or the facility Superintendent do not satisfy the PLRA's exhaustion requirements. *See, e.g. Saunders v. Goord,* 98 Civ. 8501, 2002 WL 1751341 at *3 (S.D.N.Y. July 29, 2002) ("It is well established that '[p]laintiffs may not bypass this procedure by sending letters directly to the Superintendent.' "); *Byas v. State,* 99 Civ. 1673, 2002 WL 1586963 at *2 (S.D.N.Y. July 17, 2002) ("Prisoners may not bypass this procedure [in 7 NYCRR § 701.11(b) ] by sending letters directly to the Superintendent.") (citing cases); *Nunez v. Goord,* 99 Civ. 4640, 2002 WL 1162905 at *1 (S.D.N.Y. June 3, 2002) (inmate's letter to prison Superintendent in lieu of filing grievance failed to exhaust excessive force claim); *Hemphill v. New York,* 198 F.Supp.2d at 548– 49 (same; letter to Superintendent does not satisfy 7 NYCRR § 701.11 procedures either); *Mills v. Garvin,* 99 Civ. 6032, 2001 WL 286784 at *3 (S.D.N.Y. Mar.2, 2001) (inmate's letters to prison officials were insufficient to exhaust his administrative remedies; "letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA."); *Noguera v. Hasty,* 99 Civ. 8786, 2000 WL 1011563 at *12 n. 23 (S.D.N.Y. July 21, 2000) (Peck, M.J.) ("The Court notes that simple letter complaints to the Commissioner of the New York State Department of Correctional Services about excessive force and medical indifference appear quite common, and such complaints are not normally sufficient to serve as a proxy for following and exhausting proper administrative remedies.") (citing cases), *report & rec. adopted in part,* 2001 WL 243535 (S.D.N.Y. Mar.12, 2001) (Wood, D.J.); *Beatty v. Goord,* 98 Civ. 2136, 2000 WL 288358 *4–5 (S.D.N.Y. Mar.16, 2000) (complaint dismissed without prejudice for failure to exhaust where inmate sent letters to prison medical director, Superintendent and Commissioner rather than following IGP); *Adams v. Galletta,* 96 Civ. 3750, 1999 WL 959368 at *3 (S.D.N.Y.

Oct.19, 1999) (letter to warden insufficient to exhaust administrative remedies); *Salahuddin v. Mead,* 95 Civ. 8581, 1997 WL 357980 at *4 (S.D.N.Y. June 26, 1997) (letter to Superintendent and Commissioner insufficient to exhaust), *rev'd on other grounds,* 174 F.3d 271 (2d Cir.1999). [9]

**\*4** [2]   Nelson also appears to claim that he satisfied the exhaustion requirement by filing appeals from various disciplinary hearing dispositions. (Dkt. No. 40: Am. Compl. at iv: "Chronology—Exhaustion of Administrative Remedies.") However, "[e]xhausting appeals of a disciplinary hearing determination does not constitute exhausting administrative remedies for [the inmate's] grievance, even if the underlying facts are the same." *Benjamin v. Goord,* 02 Civ. 1703, 2002 WL 1586880 at *2 (S.D.N.Y. July 17, 2002); *accord, e.g., Byas v. State,* 2002 WL 1586963 at *3 & n. 3 (inmate's claim unexhausted despite "the two letters he sent to Sing Sing Superintendent Greiner within days of the incident and ... his appeal of the disciplinary hearing determination;" "the fact that plaintiff appealed his disciplinary finding does not relieve him of the obligation to file a grievance"); *Cherry v. Selsky,* 99 Civ. 4636, 2000 WL 943436 at *1, 7 (S.D.N.Y. July 7, 2000) (exhaustion of grievance procedure necessary even though inmate appealed disciplinary charges).

Nelson asserts several other exhaustion arguments that border on the frivolous. He argues that the exhaustion requirement is satisfied if the inmate's complaint has been "reviewed at the highest levels of the agency." (Nelson Br. at 10, citing *Noguera,* 2000 WL 1011563 at *10–11.) While this may be true, Nelson has not submitted any evidence that his complaints were, "in fact," investigated at that level. Nelson also argues that a grievance procedure is essentially unavailable if the inmate does not know the identities of the relevant prison officials. (Nelson Br. at 11.) Whether or not this could ever be a factor, here Nelson has had no difficulty identifying his alleged attackers. (*See* Am. Compl. at 15–21.)

Finally, Nelson argues that "an administrative remedy may be inadequate 'because of some doubt as to whether the agency was empowered to grant effective relief' " or because exhaustion would otherwise be futile. (Nelson Br. at 10–11, quoting *McCarthy v. Madigan,* 503 U.S. 140, 147, 112 S.Ct. 1081, 1088, 117 L.Ed.2d 291 (1992).) The Supreme Court, however, has made clear that *McCarthy*

was superseded by the PLRA: "Congress has mandated exhaustion clearly enough, regardless of the relief offered through administrative procedures." *Booth v. Churner,* 532 U.S. at 739–41 & n. 6, 121 S.Ct. at 1824–25 & n. 6 ("we will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise"); *see also, e.g., Saunders v. Goord,* 2002 WL 1751341 at *3 (rejecting plaintiff's argument that corrections officers interfered with his ability to file administrative grievances, stating that "there is no general futility exception [to] the exhaustion requirement under the PLRA.").

In short, Nelson's Non–Medical Claims have not been administratively exhausted, and therefore should be dismissed without prejudice. [10]

Defendants argue, however, that "pursuant to the PLRA's requirement that 'no action' may be brought until administrative remedies are exhausted, 42 U.S.C. § 1997e(a)," Nelson's failure to exhaust his excessive force claims requires the Court to dismiss Nelson's *entire* complaint. (Defs. Br. at 38.) Defendants offer no case law or analysis to support this proposition (*id.*), despite this Court's specific instructions to defense counsel to address the issue. (*See* Dkt. No. 50: 3/11/02 Conf. Tr. at 23–26.)

**\*5** **[3]** The issue thus is whether the PLRA compels a rule of "total exhaustion"—whether a district court must dismiss a prisoner's entire § 1983 action if some but not all claims are administratively unexhausted, or if the Court may dismiss only those claims that are unexhausted while ruling on the exhausted claims. The decisions are divided on the issue. Some require "total exhaustion." *See, e.g., Julian–Bey v. Crowley,* No. 00–2313, 24 Fed. Appx. 393, 395, 2001 WL 1555950 at *2 (6th Cir. Dec.3, 2001) (dismissing "mixed" complaint; rejecting argument that "the exhaustion of at least one claim is sufficient to prevent dismissal"); *Graves v. Norris,* 218 F.3d 884, 885 (8th Cir.2000) ("When multiple prison condition claims have been joined, as in this case, the plain language of § 1997e(a) requires that all available prison grievance remedies must be exhausted as to all of the claims."); *Taylor v. Clarke,* No. C 99–4190, 2002 WL 535421 at *2 (N.D.Cal. Apr.3, 2002) ("An action containing both exhausted and unexhausted [§ 1983] claims at the time of filing should be dismissed without prejudice."); *Rivera v. Whitman,* 161 F.Supp.2d 337, 339–43 (D.N.J.2001) (plain language of § 1997e(a), as well as the legislative

intent and policy interests behind it, compel a "total exhaustion" rule). [11] Other decisions, however, do not. *See, e.g., McElhaney v. Elo,* No. 98–2173, 230 F.3d 1358 (table), 2000 WL 1477498 at *3 (6th Cir. Sept.25, 2000) ("If a [§ 1983] complaint contains exhausted and unexhausted claims, the district court may address the merits of the exhausted claims and dismiss only those that are unexhausted."); *Riley v. Richards,* No. 99–1327, 210 F.3d 372 (table), 2000 WL 332013 at *2 (6th Cir. Mar.23, 2000) (same); *Hartsfield v. Vider,* 199 F.3d 305, 309 (6th Cir.1999) (same); *Johnson v. True,* 125 F.Supp.2d 186, 188 (W.D.Va.2000) ( "total exhaustion" rule contradicts congressional intent and policy), *appeal dismissed,* 32 Fed. Appx. 692 (4th Cir.2002); *Cooper v. Garcia,* 55 F.Supp.2d 1090, 1094–95 (S.D.Cal.1999) (same); *Jenkins v. Toombs,* 32 F.Supp.2d 955, 958–59 (W.D.Mich.1999) (same).

The Second Circuit has not addressed the issue, and the few district court decisions in this Circuit also are split. *Compare Saunders v. Goord,* 2002 WL 1751341 at *3 (dismissing inmate complaint containing some unexhausted claims, citing "the plain language of 42 U.S.C. § 1997e(a)"), *with Espinal v. Coughlin,* 98 Civ. 2579, 2002 WL 10450 at *1 (S.D.N.Y. Jan.3, 2002) (dismissing unexhausted claims while ruling on merits of exhausted claims, without discussing why court could do so).

The Court need not try to predict what the Second Circuit (and eventually the Supreme Court) will do, nor take its own position in this general debate. At least on the particular facts of this case, the Court believes it appropriate to address the merits of the exhausted Medical Claims while dismissing the Non–Medical Claims without prejudice. [12]

**\*6** Discovery in this case was completed at the time of the Supreme Court's February 26, 2002 *Porter v. Nussle* decision. (*See* Dkt. No. 18: Rule 16 Scheduling Order, setting a 2/27/02 discovery cut-off date.) The parties and the Court expended a great deal of resources before *Porter v. Nussle* changed the governing law in the Second Circuit. That alone does not preclude retroactive application of *Porter v. Nussle* to pending cases. Here, however, it is significant that the Medical and Non–Medical Claims are easily separated, since they involve discrete parties and acts. (*Compare* Am. Compl. at 3–14 *with id.* at 15–35.) Even under these facts, the Court could dismiss the entire action without prejudice. But I see no reason why the Court cannot exercise its discretion in these particular

circumstances to dismiss without prejudice the separable Non–Medical Claims while reaching the merits (or rather, lack thereof) of the fully exhausted Medical Claims.

Accordingly, I recommend that only the Non–Medical Claims be dismissed without prejudice as unexhausted, and that the separable exhausted Medical Claims be adjudicated on the merits.

## II. SUMMARY JUDGMENT SHOULD BE GRANTED TO DEFENDANTS WITH RESPECT TO NELSON'S CLAIMS OF DELIBERATE INDIFFERENCE TO *SERIOUS MEDICAL NEEDS AND CONSPIRACY RELATING THERETO*

A. *Factual Background Regarding Nelson's Medical Claims*
Shortly after Nelson was transferred to Green Haven on October 11, 2000 (Dkt. No. 48: Defs. 56.1 Stmt. ¶ 11; Dkt. No. 40: Am. Compl. ¶ 8), he submitted a letter dated October 16, 2000 to Green Haven's "Health Services Director," stating:

> May I please be seen by an Medical Doctor. I am requesting a full check up for an blood test for hormone poison, level of mercury poison, problems with my back as i am in need of defecating my back start's stiffen with pressur.
>
> And my left knee have a tore tigament. As i walk up the stair's my knee give out.
>
> May I please be seen and treated by an Independent Medical Doctor.

(Dkt. No. 47: Gould Aff. Ex. 1; [13] *see* Am. Compl. at 3; Defs. 56.1 Stmt. ¶ 11.) Two days later, on October 18, 2000, Nelson was interviewed by defendant Byron Rodas, a Green Haven physician's assistant. (Am. Compl. at 3; Dkt. No. 52: Nelson 4/30/02 Aff. ¶ 5; Defs. 56.1 Stmt. ¶¶ 7, 9, 12.) Nelson alleges that while he "was explaining his medical condition, ... Rodas became very defensive saying 'I'm the doctor here and I determine what examination and treatment you require, and from what i see here there is nothing wrong with you.' The interview was terminated and plaintiff was not physically examine [d]." (Am. Compl. at 3; *see* Nelson 4/30/02 Aff. ¶ 5.)

Nelson wrote a second letter, dated October 23, 2000, to defendant Dr. Carl Koenigsmann, Green Haven's Medical

Director, complaining about Rodas' conduct, claiming that he was suffering from "hormone poison, mercury poison," muscle spasms in his back, and torn ligaments in his knee, and requesting a full examination by an "Independent Outside Medical Doctor" as well as a blood test and a "CAT scan." (Gould Aff. Ex. 2; Am. Compl. at 4.) [14] Dr. Koenigsmann responded to Nelson's October 16 and 23, 2000 letters by memorandum dated November 1, 2000, stating: "This will acknowledge receipt of your letter regarding treatment issues and/or issues with your Primary Care Provider ["PCP"]. A copy of your letter has been forwarded to your Primary Care Provider for response. The PCP's response and your medical folder will be reviewed." (Gould Aff. Ex. 3; *see* Am. Compl. at 4; Defs. 56.1 Stmt. ¶ 13.)

**\*7** Nelson alleges that on October 24, 2000, he was examined by defendant Edward Licerio, a Green Haven dentist, who allegedly advised Nelson that at a "follow-up appointment," Nelson's "worn-out amalgams fillings" that were causing Nelson's "headache and memory-loss" would be removed. (Am. Compl. at 4; Nelson 4/30/02 Aff. ¶ 6; *see* Defs. 56.1 Stmt. ¶¶ 7, 9.) Nelson allegedly explained to Licerio that as Nelson was eating, the "silver spoon ...came in contact with the worn-out fillings, causing plaintiff to receive an electric-charge." (Am. Compl. at 4.) Nelson claims that at a November 14, 2000 follow-up appointment, Licerio refused to remove the fillings, "giving plaintiff no logical reason" for the refusal. (Am. Compl. at 4–5; Nelson 4/30/02 Aff. ¶ 6.) Licerio also requested Nelson to "sign some medical document(s)," which Nelson refused because he allegedly did not understand the handwriting. (Am. Compl. at 5.)

Nelson's Dental Treatment Records, signed by Licerio, state in relevant part:

> Oct 26 2000 Place on [illegible] & filling list
>
> Nov 14 2000 Doesn't want any dental filling done on him, he wants me to take out all his silver fillings in his mouth his request has been denied, he refused to sign the refusal slip.

(Nelson 2/22/02 Aff. Ex. 8.)

Nelson claims that "Licerio was deliberately indifferent to plaintiff serious medical needs by his reckless and complete denial to treat plaintiff for the worn-out filling within his teeth." (Am. Compl. at 6.)

Nelson references a November 19, 1998 report by Dr. Elizabeth Gaary:

Bilateral mammography was performed in the craniocaudad and mediolateral oblique projections. There are no prior studies available for comparison.

There are no clustered irregular microcalcifications. There is no evidence of skin thickening or nipple retraction. There are no lymph nodes visualized. Bilateral right greater than left gynecomastia is noted. [15]

Clinical correlation recommended. If there is a palpable abnormality, ultrasound may be of help for further evaluation.

IMPRESSION: Bilateral gynecomastia right greater than left. If there is a palpable abnormality, ultrasound may be of help for further evaluation.

(Nelson 2/22/02 Aff. Ex. 6; *see* Am. Compl. at 6; Nelson 4/30/02 Aff. ¶ 8.) Based on this report, Nelson claims that Rodas and Dr. Koenigsmann knew of and were deliberately indifferent to Nelson's serious medical needs, presumably regarding the gynecomastia, in denying Nelson access to a doctor for diagnosis and treatment. (Am. Compl. at 6; Nelson 4/30/02 Aff. ¶ 9.) Based on the above allegations, Nelson charges Rodas, Dr. Koenigsmann, and Licerio with "conspiracy." (Am. Compl. at 10–11; Nelson 4/30/02 Aff. ¶¶ 12–14.)

Nelson filed an "Inmate Grievance Complaint" dated November 21, 2000, in which he requested to be examined by an independent outside medical doctor, a "TOMOGRAPHY, and CAT–SCAN for detail viewing of my back and knee, a blood test to identifie certain poison, and to be treated by an out-side dentist who is knowledgeable in removing worn-out toxic amalgams fillings." (Gould Aff. Ex. 4; *see* Am. Compl. at iv; Defs. 56.1 Stmt. ¶ 14.)

**\*8** On December 6, 2000, Dr. Koenigsmann responded by memo to an inquiry from the facility grievance coordinator:

I have reviewed the medical record as it relates to this grievance. I have also referred it to the Dental Department for evaluation. The investigation reveals

that the patient has had evaluations for his back and knee pains in the past including x rays. The decision to proceed with additional studies or specialty referrals is best determined by the Primary Provider. At his time, based on prior examination and results of prior work up, the Primary Provider does not feel these needs exist. Regarding the follow up of the laboratory work performed, the results are available on the medical record and have been reviewed by the Primary Provider. I will request a follow up appointment with the Provider to review the laboratory results.

Pertaining to [Nelson's] claim that a Dental provider had recommended the removal of the patient's amalgam fillings, this is incorrect. The Dental provider responded that [Nelson] requested the removal of the amalgam fillings. Currently there are no generally accepted Dental recommendations for the removal of amalgam fillings nor restrictions on the use of amalgam fillings.

(Gould Aff. Ex. 5; *see* Defs. 56.1 Stmt. ¶ 15.)

The Inmate Grievance Resolution Committee held a hearing on January 2, 2001, and denied Nelson's complaint. (Gould Aff. Ex. 6, first page; Defs. 56.1 Stmt. ¶¶ 16–17.) Nelson appealed to Superintendent Greiner (Gould Aff. Ex. 6, last page; Defs. 56.1 Stmt. ¶ 17), who denied the grievance in a statement dated January 10, 2001:

Grievant would like a check up from an outside doctor, including such tests as a CAT scan and blood work. He also would like to have work done by an outside Dentist.

The investigation indicates that X-rays have been completed for knee & back pain. Your primary provider feels that further studies are not indicated at this time.

Your primary provider should set up an appointment with you to review results of the lab work. There was no indication that your amalgam fillings need to be removed and this is generally not recommended. There are also no restrictions on using said filling. The use of an outside dentist[ ] is not indicated.

Grievance is denied.

(Gould Aff. Ex. 7; *see* Defs. 56.1 Stmt. ¶ 17.)

Nelson appealed Superintendent Greiner's decision to the Central Office Review Committee ("CORC"), noting the additional complaint that he had mistakenly been provided with "hemorrhoidal ointment" instead of appropriate medicine for his back pain. (Gould Aff. Ex. 7; Defs. 56.1 Stmt. ¶¶ 17–18.) The CORC issued a unanimous report dated February 21, 2001:

> Upon full hearing of the facts and circumstances in the instant case, and upon recommendation of the Division of Health Services, the action requested herein is hereby accepted only to the extent that CORC upholds the determination of the Superintendent for the reasons stated.

**\*9** CORC notes that the grievant has been examined by the doctor and received appropriate medical treatment. CORC also notes that the doctor determined that there was no medical need for the additional tests requested by the grievant. Contrary to the grievant's assertions, CORC has not been presented with sufficient evidence to substantiate any malfeasance by the employee referenced in this instant complaint.

CORC asserts that, consistent with Health Services Policy Manual Item # 1.21—Health Care Referrals, the Facility Health Services Directors (FHSD) have the sole responsibility for providing treatment to the inmates under their care. The FHSDs have the responsibility of determining what outside health referrals are needed by the target population. Outside specialists may only make recommendations for treatment; however, the implementation of those recommendations is at the discretion of the FHSDs, based on their professional judgment.

(Gould Aff. Ex. 8; *see* Defs. 56.1 Stmt. ¶ 19.)

B. *Summary Judgment Standards in Section 1983 Cases* [16]
Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty*

Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment—here, defendants. *See, e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994); *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1223 (2d Cir.1994). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2552–53.

To defeat a summary judgment motion, the non-moving party must do "more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp. .,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Instead, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *accord, e.g ., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 587, 106 S.Ct. at 1356.

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513; *see also, e.g., Chambers v. TRM,* 43 F.3d at 36; *Gallo v. Prudential,* 22 F.3d at 1223. The Court draws all inferences in favor of the nonmoving party—here, Nelson—only after determining that such inferences are reasonable, considering all the evidence presented. *See, e.g., Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2d Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 489 (1987). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM,* 43 F.3d at 37.

**\*10** In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact. *See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987); *Knight v.*

*United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant. *See, e.g., Anderson v. Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment [,][f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510 (citations omitted); *see also, e.g., Knight v. United States Fire Ins. Co.,* 804 F.2d at 11–12.

"The Court recognizes that it must 'extend extra consideration' to pro se plaintiffs" such as Nelson and that "pro se parties are to be given special latitude on summary judgment motions." *Salahuddin v. Coughlin,* 999 F.Supp. at 535 (citations & internal quotations omitted); *see also, e.g., McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (a pro se party's pleadings should be read liberally and interpreted " 'to raise the strongest arguments that they suggest' "). Moreover, the pro se party must be given express notice of the consequences of failing to respond appropriately to a motion for summary judgment. *See, e.g., Trammel v. Coombe,* No. 97–2622, 201 F.3d 432 (table), 1999 WL 1295856 at *2 (2d Cir. Dec.23, 1999); *McPherson v. Coombe,* 174 F.3d 276, 280–81 (2d Cir.1999) (" '[t]he failure of a district court to apprise *pro se* litigants of the consequences of failing to respond to a motion for summary judgment is ordinarily grounds for reversal.' ") (citations omitted); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999); *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Defendants' notice of motion duly advised Nelson of the nature of a summary judgment motion and the consequences of failing to appropriately respond. (*See* Dkt. No. 45: Notice of Motion for Summary Judgment; Dkt. No. 49: 3/25/02 Notice to Pro Se Litigant Opposing Motion for Summ. Judgment Per Local Civil Rule 56.2.)

"Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* 93 Civ. 5981, 1999 WL 983876 at *3 (S.D.N.Y. Oct.28, 1999) (citing cases); *see also, e.g., Smith v. Planas,* 975 F.Supp. 303, 305 n. 2 (S.D.N.Y.1997).

Because Nelson has verified his Amended Complaint (Dkt. No. 40: Am. Compl.; Dkt. No. 41: Nelson 2/22/02 Aff. In Supp. of Am. Compl. ¶ 2), this Court will accept for purposes of this motion all admissible facts set forth in the Amended Complaint that are based on Nelson's personal knowledge and about which Nelson is competent to testify. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("A verified complaint is to be treated as an affidavit for summary judgment purposes ... provided that it meets the other requirements for an affidavit under Rule 56(e) ... requiring affidavits to be made on personal knowledge, to set forth facts that would be admissible in evidence, and to demonstrate the affiant's competency to testify to the matters in the affidavit ..."); *accord, e.g., Davidson v. Bennis,* No. 96–2999, 152 F.3d 917 (table), 1998 WL 391112 at *1 (2nd Cir. May 20, 1998) (pro se prisoner's verified complaint was "treat[ed] as an affidavit for summary judgment purposes"); *Johnson v. Doe,* 00 Civ. 3920, 2001 WL 314618 at *1 (S.D.N.Y. Mar.30, 2001) ("Although a verified complaint may serve as an affidavit for summary judgment purposes, [citing *Colon* ], mere verification does not transform rhetoric, conclusions, and other non-admissible statements into admissible evidence.").

### C. Applicable Law Regarding Claims of Deliberate Indifference to Serious Medical *Needs* [17]

**\*11** To prevail in a § 1983 action, a plaintiff must demonstrate that he has been denied a constitutional or federal statutory right and that the deprivation occurred under color of state law. *See* 42 U .S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 2254–55, 101 L.Ed.2d 40 (1988). "Section 1983 itself," however, "creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) (citation omitted), *cert. denied,* 512 U.S. 1240, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994).

The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials and conduct that offends "evolving standards of decency." *E.g., Hudson v. McMillan,* 503 U.S. 1, 5, 8, 112 S.Ct. 995, 998, 1000, 117 L.Ed.2d 156 (1992); *Wilson v. Seiter,* 501 U.S. 294, 297, 308, 111 S.Ct. 2321, 2323, 2329, 115 L.Ed.2d 271 (1991); *Estelle v. Gamble,* 429 U.S. 97, 102, 104–05, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976);

*Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976).

To establish an Eighth Amendment violation based on a claim that a prison official has placed an inmate's health in danger, the inmate must show that the prison official acted with "deliberate indifference" to the inmate's serious medical needs. *See, e.g., Helling v. McKinney,* 509 U.S. 25, 32, 113 S.Ct. 2475, 2480, 125 L.Ed.2d 22 (1993); *Estelle v. Gamble,* 429 U.S. at 104–05, 97 S.Ct. at 291. The deliberate indifference test applies to dental as well as medical claims. *Chance v. Armstrong,* 143 F.3d 698, 702–03 (2d Cir.1998) (citing cases).

As the Second Circuit has explained, "the deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "Objectively, the alleged deprivation must be 'sufficiently serious .' " *Id.; see also, e.g., Hudson v. McMillian,* 503 U.S. at 9, 112 S.Ct. at 1000 ("Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious' "). " 'The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves ....' " *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). "[O]nly those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (citation omitted); *see also, e.g., Dean v. Coughlin,* 804 F.2d at 215 (" '[T]he essential test is one of medical necessity and not one simply of desirability.' "). Thus, Eighth Amendment protection is limited to " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d at 702; [18] *accord, e.g., Morales v. Mackalm,* 278 F.3d 126, 132 (2d Cir.2002); *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) ("A serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.' ").

**\*12** "Subjectively, the charged official must act with a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d at 553. "The required state of mind,

equivalent to criminal recklessness, is that the official " 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " " ' *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) (quoting *Hathaway v. Coughlin,* 99 F.3d at 553 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994))); *see also, e.g., LaBounty v. Coughlin,* 137 F.3d 68, 72–73 (2d Cir.1998) ("To succeed in showing deliberate indifference, [plaintiff] must show that the acts of defendants involved more than lack of due care, but rather involved obduracy and wantonness in placing his health in danger.").

Deliberate indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care." *Estelle v. Gamble,* 429 U.S. at 104–05, 97 S.Ct. at 291 (fn.omitted); *accord, e.g., Kaminsky v. Rosenblum,* 929 F.2d 922, 926 (2d Cir.1991) ("Cruel and unusual punishment may consist of prison officials delaying an inmate access to needed medical care.") [19] However, an "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle v. Gamble,* 429 U.S. at 105–06, 97 S.Ct. at 292; *accord, e.g., Burton v. New York State Dep't of Corrections,* 93 Civ. 6028, 1994 WL 97164 at \*2 (S.D.N.Y. March 2, 1994) (Sotomayor, D.J.). "Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Estelle v. Gamble,* 429 U.S. at 106, 97 S.Ct. at 292. [20] As the Supreme Court has stated, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble,* 429 U.S. at 106, 97 S.Ct. at 292; *accord, e.g., Hathaway v. Coughlin,* 99 F.3d at 553; *Burton v. New York State Dep't of Corrections,* 1994 WL 97164 at \*2. An act of malpractice will amount to deliberate indifference only if "the malpractice involves culpable recklessness, *i.e.,* an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d at 553); *Harrison v. Barkley,* 219 F.3d at 139 ("We agree that the mere malpractice of medicine in prison does not amount to an Eighth Amendment violation.... This principle may cover a delay in treatment based on a bad diagnosis or erroneous calculus of risks and costs, or a

mistaken decision not to treat based on an erroneous view that the condition is benign or trivial or hopeless, or that treatment is unreliable, or that the cure is as risky or painful or bad as the malady.... [But][c]onsciously disregarding an inmate's legitimate medical needs is not 'mere medical malpractice.' "); *Hathaway v. Coughlin,* 37 F.3d at 66 ("Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm.").

**\*13** "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong,* 143 F.3d at 703; *accord, e.g ., Hathaway v. Coughlin,* 37 F.3d at 70 (Jacobs, C.J., dissenting) (" 'We do not sit as a medical board of review. Where the dispute concerns not the absence of help, but the choice of a certain course of treatment, or evidences mere disagreement with considered medical judgment, we will not second guess the doctors.' "); *Culp v. Koenigsmann,* 2000 WL 995495 at \*7 ("Mere disagreements with the quality of medical care, however, do not state an Eighth Amendment claim."); *see also, e.g., Troy v. Kuhlmann,* 96 Civ. 7190, 1999 WL 825622 at \*6 (S.D.N.Y. Oct.15, 1999) ("a prisoner's disagreement with the diagnostic techniques or forms of treatment employed by medical personnel does not itself give rise to an Eighth Amendment claim"); *Brown v. Selwin,* 98 Civ. 3008, 1999 WL 756404 at \*6 (S.D.N.Y. Sept.24, 1999) (citing cases); *Negron v. Macomber,* 95 Civ. 4151, 1999 WL 608777 at \*6 (S.D.N.Y. Aug.11, 1999); *Espinal v. Coughlin,* 98 Civ. 2579, 1999 WL 387435 at \*3 (S.D.N.Y. June 14, 1999).[21]

### D. *Nelson's Medical Indifference Claims Should Be Dismissed*

**[4]** Nelson asserts that defendants demonstrated deliberate indifference to the following three "serious medical conditions":

(i) ... an abnormal growth of tissue-cells within plaintiff chest that serve no physiological function.

(ii) The worn-out amalgams fillings thats causing plaintiff perpetual headache especially when awaking in the morning, and chewing certain food, and

(iii) plaintiff defective back—as plaintiff in need of having to defecate his back muscle stiffen with pressure.

(Dkt. No. 40: Am. Compl. at 5; *see* Dkt. No. 52: Nelson 4/30/02 Aff. ¶ 11.)

Nelson offers no evidence to support his claims other than the conclusory allegations in his verified complaint. (Am. Compl. at 3–14; *see also* Nelson 4/30/02 Aff. ¶¶ 4– 14.) Unfortunately, defendants fail to fill the gap: through attorney neglect they did not depose Nelson (*see* fn.5 above) and have submitted no admissible evidence on this motion other than copies of Nelson's complaint letters, the State's written responses, and the records pertaining to Nelson's grievance procedure, largely consisting of rank hearsay. (Dkt. No. 47: Gould Aff. Exs. 1–8; *see also* Dkt. No. 46: Defs. Br. at 6–14.) Indeed, defense counsel has not bothered to submit copies of Nelson's medical records.[22] The Assistant Attorney General's performance in this case did little to help the Court, or his clients. The Court thus is left guessing as to Nelson's course of medical treatment or lack thereof.[23]

Nevertheless, Nelson has the burden on this motion. While a plaintiff alleging medical indifference in a Section 1983 action is not required to produce "expert medical testimony," *Hathaway v. Coughlin,* 37 F.3d 63, 68 (2d Cir.1994), Nelson "may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that '[his] version of the events is not wholly fanciful.' " *Morris v. Lindau,* 196 F.3d 102, 109 (2d Cir.1999) (§ 1983 action) (quoting *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.), *cert. denied,* 524 U.S. 911, 118 S.Ct. 2075, 141 L.Ed.2d 151 (1998)). And although Nelson, as a pro se litigant, is granted a certain degree of leeway, the superficial allegations of his amended complaint fail to satisfy the stringent requirements of an Eighth Amendment claim, for the following reasons.

**\*14** Nelson's first grievance relates to "an abnormal growth of tissue-cells within plaintiff chest that serve no physiological function." (Am. Compl. at 5; *see* Nelson 4/30/02 Aff. ¶ 11.) This apparently refers to a November 19, 1998 report by Dr. Elizabeth Gaary which noted that Nelson's "bilateral right ... gynecomastia" was "greater" than his left gynecomastia. (*See* pages 16–17 above.) Nelson, however, entirely fails to allege how this

gynecomastia is " 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " *Morales v. Mackalm,* 278 F.3d 126, 132 (2d Cir.2002); *see also* cases cited at pages 25–26 above. His allegations thus fail to satisfy the pleading standard for a medical indifference claim, much less the standard for opposing a summary judgment motion.

Second, Nelson complains of indifference to his "defective back—as plaintiff in need of having to defecate his back muscle stiffen with pressure." (Am. Compl. at 5; *see* Nelson 4/30/02 Aff. ¶ 11.) Nelson elsewhere referred to this problem as "muscle spasm[s]" in his back. (Nelson 2/22/02 Aff. Ex. 4: 10/23/00 Nelson Letter to Koenigsmann.) This claim should be rejected, both because there is no evidence that Nelson's alleged back problems were sufficiently serious to qualify as an Eighth Amendment violation, and because Nelson's claim concerns not the absence of help, but the choice of a certain course of treatment.

Severe back pain, especially if lasting an extended period of time, can amount to a "serious medical need" under the Eighth Amendment. [24] Here, however, Nelson merely alleges "back spasms," without describing the intensity or duration of the pain. That is insufficient to survive a summary judgment motion, even under the most liberal standard. *See, e.g., Tobias v. County of Putnam,* 191 F.Supp.2d 364, 379 (S.D.N.Y.2002) ("we do not believe that [plaintiff's] injuries caused him such extreme pain as to meet his burden. He does not allege in his complaint that he suffered extreme pain, but rather just vague 'physical injury.' "); *Benitez v. Pecenco,* 92 Civ. 7670, 1995 WL 444352 at *3 (S.D.N.Y. July 27, 1995) (§ 1983 medical indifference claim dismissed because "there is nothing in the record to suggest that plaintiff's back pain was severe or excruciating"); *Sassower v. City of White Plains,* 89 Civ. 1267, 1995 WL 222206 at *8 (S.D.N.Y. Apr.13, 1995) (granting defendants summary judgment because, *inter alia,* "Plaintiff does not even attest that she experienced a life threatening condition, nor that she suffered from extreme pain or the threat of death or degeneration. In fact, according to Plaintiff's affidavits, she suffered simply from 'stress and strain.' "). [25] While Nelson's pleading might survive a motion to dismiss, more is required to survive summary judgment, even from a pro se plaintiff.

In addition, Nelson's complaint seems to be, not that the prison authorities failed to treat his back pain, but that they refused Nelson's request for a CAT scan and for

a consultation with an outside physician. (*See* pages 15, 17–18, 29–31 above.) Nelson's complaints thus amount to no more than a disagreement about the proper course of treatment that cannot form the basis of an Eighth Amendment claim:

> **\*15** [T]he question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court ....

*Estelle v. Gamble,* 429 U.S. 97, 107, 97 S.Ct. 285, 293, 50 L.Ed.2d 251 (1976); *accord, e.g., Randle v. Mesrobian,* No. 98–1590, 165 F.3d 32 (table), 1998 WL 551941 at *3 (7th Cir. Aug.27, 1998) ("inmates have no automatic right to consult with outside physicians") (citing cases); *Austin v. Rhode Island Dep't of Corr.,* No. 00–104, 2001 WL 1136101 at *5 (D.R.I. Aug.24, 2001) (refusal of prisoner's request to be examined by outside physician did not state a § 1983 claim); *Fulmore v. Mamis,* 2001 WL 417119 at *8–9 & n. 26 (Physician's failure to order CAT scan or orthopedic shoes, and refusal to refill prisoner's inhaler medication on certain occasions reflected, "at most, ... a difference in opinion as to [prisoner's] medical treatment rather than any deliberate indifference to [prisoner's] medical needs," citing cases); *Wicks v. Qualtere,* 95–CV–426, 1997 WL 176338 at *3 (N.D.N.Y. Apr.4, 1997) (Pooler, D.J.) (refusal to order X-ray did not state a claim). [26]

Finally, Nelson claims an Eighth Amendment violation based on indifference to his "worn-out amalgams fillings thats causing plaintiff perpetual headache especially when awaking in the morning, and chewing certain food(s)." (Am. Compl. at 5; *see* Nelson 4/30/02 Aff. ¶ 11.) In contrast to his other medical indifference claims, Nelson's dental indifference claim at least minimally alleges the nature and severity of his pain, which allegations might be sufficient to state a claim. *Cf. Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (Denying summary judgment: "District courts in this Circuit have ruled that a one-year delay in treating a cavity can evidence deliberate indifference on the part

of prison officials.... It follows that (1) outright refusal of any treatment for a degenerative condition that tends to cause acute infection *and* pain if left untreated and (2) imposition of a seriously unreasonable condition on such treatment, both constitute deliberate indifference on the part of prison officials."); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (Denying motion to dismiss where prisoner "alleged that he has been in 'great pain' for at least six months, that he has been unable to chew properly, ... that he has choked on his food," and that he has lost "one and possibly three of his teeth," "all because of [the prison doctors'] actions."); *Ramos v. O'Connell,* 28 F.Supp.2d 796, 802 (W.D.N.Y.1998) (summary judgment denied where prisoner alleged that his tooth pain was so "unbearable" that "he was unable to chew food properly, and that the denial of dental treatment caused the infected tooth to abscess"); *Dennis v. Milicevic,* 97 Civ. 7147, 1998 WL 474200 at *3 (S.D.N.Y. Aug.13, 1998) (severe chronic headache following operation raised issue of material fact "of whether a sufficiently serious [medical] condition existed"). But here, again, Nelson's complaint appears to be not that his dental problems were not treated, but that they were not treated to his liking—namely, by taking out all of the silver (amalgam) fillings in his mouth that were allegedly causing his headaches and memory loss. (Am. Compl. at 4–5; Nelson 4/30/02 Aff. ¶ 6; Nelson 2/22/02 Aff. Ex. 8: Dental Treatment Record.)[27] Such a disagreement over the proper course of treatment cannot support an Eighth Amendment Claim, especially where plaintiff offers no evidence as to the efficacy of the requested alternative treatment.

**\*16** Indeed, Nelson's refusal to accept dental treatment (*see* Nelson 2/22/02 Aff. Ex. 8: Dental Treatment Record) effectively rebuts his claim of deliberate indifference to serious medical needs. *See, e.g., Brown v. Selwin,* 98 Civ. 3008, 1999 WL 756404 at *6–7 (S.D.N.Y. Sept.24, 1999) (finding no deliberate indifference when it was "uncontroverted that [plaintiff] refused medical treatment on several occasions"); *Ross v. Kelly,* 784 F.Supp. 35, 46–47 (W.D.N.Y.) (evidence failed to establish deliberate indifference to medical needs where plaintiff was largely to blame for many of the delays in his treatment due to his second-guessing of physician's advice and refusal of treatment), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828, 121 L.Ed.2d 698 (1992).

### E. *Nelson's Conspiracy Claims Under §§ 1983 and 1985 Should Be Dismissed*

**[5]** Nelson alleges that defendants **Rodas**, Koenigsmann, and Licerio conspired to deny him adequate medical care in violation of 42 U.S.C. §§ 1983 and 1985. (Dkt. No. 40: Am. Compl. at 3–14; Dkt. No. 52: Nelson 4/30/02 Aff. ¶¶ 4–14.) "To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999).[28] "To state a cause of action under § 1985(3), a plaintiff must allege (1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States." *Thomas v. Roach,* 165 F.3d 137, 146 (2d Cir.1999). Further, the § 1985 conspiracy must also be motivated by " 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.' " *Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.,* 7 F.3d 1085, 1088 (2d Cir.1993).

Nelson's conspiracy allegations are entirely conclusory, and should therefore be dismissed. *See, e.g., Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir.1993) (affirming summary judgment dismissing conspiracy claim based only on conclusory allegations); *Rivera v. Goord,* 119 F.Supp.2d 327, 345 (S.D.N.Y.2000) (Plaintiff "alleges no specific facts that would indicate the existence of any kind of conspiracy against him. The mere use of the word 'conspiracy,' without more, does not state a claim under § 1985."). Further, Nelson's § 1985 conspiracy claim should be dismissed for the additional reason that he failed to allege that defendants conspired against him because of any racial or class-based, invidious discriminatory animus. *See, e.g., Brown v. City of Oneonta,* 221 F.3d 329, 341 (2d Cir.2000); *Moore v. Gardner,* 199 F.Supp.2d 17, 24 (W.D.N.Y.2002).

### CONCLUSION

**\*17** For the reasons set forth above, defendants should be granted summary judgment dismissing Nelson's medical claims, and Nelson's remaining claims should be dismissed without prejudice for failure to exhaust administrative remedies.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Richard C. Casey, 500 Pearl Street, Room 1950, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Casey. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2002 WL 31075804

## Footnotes

1    On November 19, 2001, Nelson was transferred to Clinton Correctional Facility. (Am. Compl. at 1–2.)

2    Defendants include: physician's assistant Byron Rodas, Medical Director Carl Koenigsmann, dentist Edward Licerio, corrections counselors Joseph Joseph and Jim Temple, Superintendent Charles Greiner, Deputy Superintendents Jeff McKoy and Gayle Haponik, Corrections Officers Tracy Kohler, Barry Barizone, Jim Lawyer, James Weckesser, "Kordougber," Alvin Thomas and Charles Butenhoff, Sergeant John Ross, Lieutenant Michael Nagy, education supervisor Frank Meeuwisse, and an unknown "John Doe." (Am. Compl. at iii.)

     Nelson's original complaint also named Commissioner Goord and Attorney General Spitzer as defendants. (Compl.) On Nelson's consent at the February 6, 2002 conference, his claims against those defendants were dismissed with prejudice. (Dkt. No. 33: 2/8/02 Order .)

3    While Nelson's amended complaint does not expressly reference the Due Process Clause, his allegations, construed liberally, appear to claim a denial of due process in various disciplinary proceedings. (Am. Compl. at 15–21.) *See, e.g., LaBounty v. Kinkhabwala,* No. 99–0329, 2 Fed. Appx. 197, 200–01, 2001 WL 99819 at \*2–3 (2d Cir.2001) (reversing dismissal of procedural due process claim arising out of prisoner's disciplinary hearing).

4    Nelson's submissions are not a model of clarity, often rendering his claims difficult to understand. In one particularly bizarre passage, Nelson appears to confuse this Court with NASA Mission Control:

     Therefore the Magistrate Judge residing is a scientist in the Laws of Land of the United States in the Southern Jurisdiction, District Court of New York State whom adheres and give fair elevation to the United States Constitution and the laws subsequently thereof. As in the near future the constitution and the Laws of the Land of the United States will be firmly establish in the United States Space Society. As the United States NASA—"NATIONAL AERONAUTICS AND SPACE ADMINISTRATION" path the way by advancing the technology for adequate comfortable living condition in such atmosphere.

     (Dkt. No. 41: Nelson 2/22/02 Aff. ¶ 5.)

5    The Court's ability to decide the summary judgment motion was seriously hampered by the failure of the Assistant Attorney General on this case to take plaintiff Nelson's deposition. The Assistant Attorney General tried to "pull a fast one" by submitting a proposed order for the taking of Nelson's deposition (an order is needed to depose an incarcerated party) *after* the discovery cut-off date, which the Court accordingly denied. (*See* Dkt. No. 39: 3/11/02 Memo Endorsed Order; *see also* Dkt. No. 43: 3/20/02 Memo Endorsed Order, again denying request to depose Nelson, noting that "[t]he Court is not amused by defense counsel's conduct.")

**6**     Prior to the Supreme Court's decision in *Porter v. Nussle,* the Second Circuit had ruled that claims like Nelson's which applied only to the plaintiff, such as "particular instances of assault or excessive force," did not relate to general "prison conditions" and thus were not subject to the PLRA's exhaustion requirement. *Nussle v. Willette,* 224 F.3d 95, 106 (2d Cir.2000), *rev'd, Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In *Porter v. Nussle,* the Supreme Court reversed, declaring that claims of every sort relating to prison life—including claims for excessive force against an individual inmate—had to be exhausted before an action could be commenced in this Court pursuant to 42 U.S.C. § 1983. *Porter v. Nussle,* 122 S.Ct. at 988; *see also Lawrence v. Goord,* 238 F.3d 182, 185 (2d Cir.2001) (retaliation claims need not be exhausted), *vacated,* 535 U.S. 901, 122 S.Ct. 1200, 152 L.Ed.2d 139 (2002).

**7**     Defendants originally asserted that only Nelson's excessive force claim was unexhausted, (Dkt. No. 46: Defs. Br. at 34–38; Dkt. No. 54: Defs. Reply Br. at 6–10), effectively ignoring Nelson's apparent failure to exhaust the remaining Non–Medical Claims. Rather than *sua sponte* dismissing such claims for lack of exhaustion, the Court gave Nelson an "opportunity to be heard" on the exhaustion issue (Dkt. No. 57: 8/5/02 Order), as required by *Neal v. Goord,* 267 F.3d 116, 123–24 (2d Cir.2001). Nelson, however, did not respond.

**8**     The IGP also provides for other "emergency situations" as follows:

(a) Definition. An emergency shall include, but is not limited to, a situation, action, or condition in which an inmate or an employee's health, safety, or welfare is in serious threat or danger. The IGP supervisor will determine if a grievance falls within this category.

(b) The IGP supervisor shall refer any grievance of an emergency nature directly to the appropriate response level with the authority to ensure an immediate or expeditious, meaningful response.

7 NYCRR § 701.9. The "IGP supervisor" is a prison employee at Green Haven, *see* 7 NYCRR §§ 701.4(a)(2), 701.4(b) (2)(i), 701.4(d), and is not Commissioner Goord. Nelson thus has no basis to argue that the IGP's exhaustion procedure can be circumvented by the "emergency situation" procedure contained in 7 NYCRR § 701.9, which simply requires the IGP supervisor to direct a grievance to an "appropriate response level" in the event of an emergency.

**9**     Contrary to the *dicta* in *Perez v. Blot,* 195 F.Supp.2d 539, 544–46 (S.D.N.Y.2002), this Court construes *Marvin v. Goord,* 255 F.3d 40, 43 n. 3 (2d Cir.2001), as holding merely that a grievance through informal channels satisfies the exhaustion requirement *if* the prisoner thereby obtained a favorable resolution of his grievance.

**10**    In a March 25, 2002, letter to the Court, Assistant Attorney General Anthony Gould represented that:

In light of the Court's concern [expressed at the March 11, 2002 conference] that a dismissal of this action on exhaustion grounds might leave plaintiff without a remedy for his excessive force claim, Deputy DOCS Commissioner Anthony Annucci has indicated that, given the particular facts and circumstances of this case, plaintiff herein will be permitted to file a late grievance as to the alleged excessive force incident in March 2001, and that the grievance will be addressed on its merits without reference to the late date of its filing.

(Dkt. No. 58.) By letter dated September 16, 2002, the State declined to extend that position to all the unexhausted claims. (Dkt. No. 63: 9/16/02 Letter to Court from Assistant Attorney General Rebecca Ann Durden.) The Court strongly suggests to Nelson that he file all grievances within fourteen days of this Report & Recommendation. *See* 7 N.Y.C.R.R. § 701.7(a)(1). The Court need not decide now what the effect would be on a future suit if DOCS denies Nelson's grievance as untimely. The Court reiterates its concern, however, that while DOCS' requirement that grievances be brought within fourteen days may serve valid institutional purposes, it may be too short a "statute of limitations" period to the extent exhaustion of grievance procedures is a PLRA prerequisite to a § 1983 lawsuit. The Court's concern is especially great for suits, such as Nelson's, brought during the period before the Supreme Court clarified the exhaustion requirement. The Court further notes that 7 N.Y.C.R.R. § 701.7(a) provides for "exceptions" to the fourteen day limit "based on mitigating circumstances" and gives as an example of such a circumstance "referrals back to the IGP by the courts." DOCS would be well-advised to carefully decide whether to grant an "exception" in this case.

**11**    *See also, e.g., Lira v. Director of Corr. of State of Calif.,* No. C 00–905, 2002 WL 1034043 at *3 (N.D.Cal. May 17, 2002); *Thorp v. Kepoo,* 100 F.Supp.2d 1258, 1263 (D.Haw.2000); *Keenan v. Twommey,* No. 1:97–cv–549, 1999 U.S. Dist. LEXIS 11829 at *2–17 (W.D.Mich. July 29, 1999), *aff'd,* 229 F.3d 1152 (6th Cir.2000); *Abenth v. Palmer,* No. C 96–3938, 1997 WL 255332 at *1 (N.D.Cal. Apr.28, 1997).

**12**    The alleged acts about which Nelson complains in his Non–Medical Claims took place from October 2000 through May 2001 (Dkt. No. 40: Am. Compl. at 15–21), and Nelson thus may have relied on the Second Circuit's August 24, 2000 decision in *Nussle v. Willette,* 224 F.3d 95, 106 (2d Cir.2000), *rev'd, Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), in which the Second Circuit held that the PLRA's exhaustion requirements did not apply to excessive force claims. Inmates who relied on the Second Circuit's *Nussle* decision would have a good argument after dismissal of such a suit that DOCS' time limits for grievances should be extended for a reasonable time after the dismissal order.

*See, e.g., Peoples v. Beldock,* No. 01–CV–6326, 2002 WL 1750742 at *2 (W.D.N.Y. July 10, 2002) (complaint dismissed without prejudice for failure to exhaust despite fact that Second Circuit's *Nussle* decision governed at the time complaint was filed; "Should plaintiff choose to file a new grievance, he can thus attempt to show that the intervening change in the law occasioned by [the Supreme Court's decision in] *Nussle* constitutes 'mitigating circumstances' that would justify an exception to the time limit imposed by the [DOCS grievance] regulations. 7 N.Y.C.R.R. § 701.7(a)(1)."); *Hemphill v. New York,* 198 F.Supp.2d 546, 550 (S.D.N.Y.2002) ("Since reliance on the Second Circuit's interpretation [in *Nussle* ] of the PLRA would be the only possible factor that might augur in favor of non-retroactive application of the Supreme Court's [*Porter v. Nussle* ] decision, there is no equitable basis to evade the firm rule of retroactivity" where Second Circuit decision in *Nussle* came long after plaintiff failed to file a grievance).

13    Where both parties submitted the same document, the Court refers to only a single cite for the exhibit.

14    Nelson also requested "tomography" (Gould Aff. Ex. 2)—an apparently redundant request for a "CAT scan" ("Computerized Axial *Tomography* "). *See Dorland's Illustrated Medical Dictionary,* 295, 1847–48 (29th ed.2000).

15    "Gynecomastia" is "excessive growth of the male mammary glands, in some cases including development to the stage at which milk is produced, usually associated with metabolic derangements that lead to estrogen accumulation, testosterone deficiency, and hyperprolactinemia. A mild form may develop transiently during normal puberty." *Dorland's Illustrated Medical Dictionary* (29th ed.2000).

16    For additional cases authored by this Judge discussing the summary judgment standards in Section 1983 cases, in language substantially similar to that in this entire section of this Report and Recommendation, *see, e.g., Walker v. Pataro,* 99 Civ. 4607, 2002 WL 664040 at *4–5 (S.D.N.Y. Apr.23, 2002) (Peck, M.J.); *Espinal v. Goord,* 00 Civ. 2242, 2001 WL 476070 at *5–7 (S.D.N.Y. May 7, 2001)(Peck, M.J.); *Fulmore v. Mamis,* 00 Civ. 2831, 2001 WL 417119 at *5 (S.D.N.Y. Apr.23, 2001) (Peck, M.J.); *Freeman v. Strack,* 99 Civ. 9878, 2000 WL 1459782 at *4 (S.D.N.Y. Sept.29, 2000) (Peck, M.J.); *Culp v. Koenigsmann,* 99 Civ. 9557, 2000 WL 995495 at *4 (S.D.N.Y. July 19, 2000) (Peck, M.J.); *Carbonell v. Goord,* 99 Civ. 3208, 2000 WL 760751 at *4 (S.D.N.Y. June 13, 2000) (Peck, M.J.); *Greenfield v. City of New York,* 99 Civ. 2330, 2000 WL 124992 at *3 (S.D.N.Y. Feb.3, 2000) (Peck, M.J.); *Salahuddin v.. Coughlin,* 999 F.Supp. 526, 534 (S.D.N.Y.1998) (Rakoff, D.J. & Peck, M.J.); *Watson v. McGinnis,* 981 F.Supp. 815, 817 (S.D.N.Y.1997) (Kaplan, D.J. & Peck, M.J.).

17    For additional cases authored by this Judge discussing the governing standard in medical indifference claims, in language substantially similar to that in this entire section of this Report and Recommendation, *see Espinal v. Goord,* 00 Civ. 2242, 2001 WL 476070 at *7–10 (S.D.N.Y. May 7, 2001); *Fulmore v. Mamis,* 00 Civ. 2831, 2001 WL 417119 at *7– 8 (S.D.N.Y. Apr.23, 2001) (Peck, M.J.); *Freeman v. Strack,* 99 Civ. 9878, 2000 WL 1459782 at *5–6 (S.D.N.Y. Sept.29, 2000) (Peck, M.J.); *Culp v. Koenigsmann,* 99 Civ. 9557, 2000 WL 995495 at *6–7 (S.D.N.Y. July 19, 2000) (Peck, M.J.); *Carbonell v. Goord,* 99 Civ. 3208, 2000 WL 760751 at *5–6 (S.D.N.Y. June 13, 2000) (Peck, M.J.).

18    The Second Circuit in *Chance v. Armstrong* identified several factors that are relevant in determining whether a serious medical condition exists, including " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." ' 143 F.3d at 702. The Second Circuit in that case stated that a medical condition could be serious where the prisoner alleged that he "suffered extreme pain, his teeth deteriorated, and he has been unable to eat properly." *Id.* at 703.

19    *See, e.g., Hathaway v. Coughlin,* 37 F.3d 63, 67 (2d Cir.1994) (delay for more than two years in removing broken pins from prisoner's hip despite nearly fifty complaints of pain), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Liscio v. Warren,* 901 F.2d 274, 277 (2d Cir.1990) (failure to provide medical attention to a delirious inmate for three days); *Archer v. Dutcher,* 733 F.2d 14, 15–17 (2d Cir.1984) (denying summary judgment where plaintiff "identifie[d] intentional efforts on the part of defendants to delay her access to medical care at a time [when] she was in extreme pain"); *Williams v. Vincent,* 508 F.2d 541, 544 (2d Cir.1974).

20    *Accord, e.g., Hathaway v. Coughlin,* 99 F.3d at 553; *Felipe v. New York State Dep't of Correctional Servs.,* No. 95–CV– 1735, 1998 WL 178803 at *3 (N.D.N.Y. Apr.10, 1998) (Pooler, D .J.).

21    Furthermore, a delay in medical treatment does not necessarily invoke the Eighth Amendment:

Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, this Court has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a "life-threatening and fast-degenerating" condition for three days; or delayed major surgery for over two years. No such circumstances are present here. At no point was [plaintiff's] condition "fast-degenerating" or "life-threatening," and there is no indication that [defendant] delayed treatment in order to punish him. Moreover,

any delay in treatment in this case does not rise to the egregious level identified in *Hathaway.* That [plaintiff] feels something more should have been done to treat his injuries is not a sufficient basis for a deliberate indifference claim. *Demata v. New York State Correctional Dep't of Health Servs.,* No. 99–0066, 198 F.3d 233 (table), 1999 WL 753142 at *2 (2d Cir. Sept.17, 1999) (citations omitted) (summary judgment for defendants where plaintiff complained of knee injury in February 1994 and surgery not performed until March 1997); *accord, e.g., Freeman v. Strack,* 2000 WL 1459782 at *9 (no Eighth Amendment claim against nurse who scheduled inmate with appendicitis requiring appendectomy for appointment two hours later rather than seeing inmate immediately where "[t]here was nothing in [the inmate]'s medical history which would have put [the nurse] on notice that [plaintiff] was suffering from the onset of appendicitis ... and there is no evidence that [the officer] gave [the nurse] any reason to believe that there was an emergency on hand"); *Culp v. Koenigsmann,* 2000 WL 995495 at *7–8 (rejecting claim based on fact that one doctor recommended arthroscopic surgery for knee injury in April 1999, while another doctor concluded that surgery was not warranted until more conservative measures like physical therapy had been tried and failed).

22   Nelson submitted copies of his cryptic dental treatment records from Green Haven. (Dkt. No. 41: Nelson 2/22/02 Aff. Ex. 8.)

23   Although defendants submitted a statement pursuant to Rule 56.1 (Dkt. No. 48), it largely fails to cite supporting admissible evidence. *See* S.D.N.Y. Local Civil Rule 56.1(d) ("Each statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible ....").

24   *See, e.g., Hathaway v. Coughlin,* 37 F.3d at 67 (finding plaintiff with degenerative hip condition who experienced great pain over an extended period of time and had difficulty walking had "serious medical needs"); *Ramos v. Artuz,* 00 Civ. 0149, 2001 WL 840131 at *11 (S.D.N.Y. July 25, 2001) (claim of chronic back pain survived motion to dismiss); *Cole v. Artuz,* 97 Civ. 0977, 2000 WL 760749 at *5 (S.D.N.Y. June 12, 2000) (claim relating to chronic back injury survived motion to dismiss); *Bryant v. Artuz,* 96 Civ. 3274, 1998 WL 24360 at *2 (S.D.N.Y. Jan.23, 1998) (prisoner's allegation of severe back pain following disc surgery was held to be sufficiently serious medical condition to survive a motion for summary judgment); *Gill v. Gilder,* 95 Civ. 7933, 1996 WL 103837 at *5 (S.D.N.Y. Mar.8, 1996) (denying defendants' motion to dismiss where plaintiff had alleged that a back problem caused him "severe pain"); *cf., Solomon v. Moore,* 97 Civ. 0201, 2000 WL 385521 at *2–3 (S.D.N.Y. Apr.14, 2000) (back pain did not rise to level of violation: "These alleged problems [including back pain] taken together are clearly 'conditions which many people suffer from and function despite on a day-to-day basis and the fact that a sufferer is incarcerated does not elevate every perceived lack of treatment to the level of cruel and unusual punishment.' ").

25   *See also, e.g., Fulmore v. Mamis,* 00 Civ. 2831, 2001 WL 417119 at *8 (S.D.N.Y. Apr.23, 2001) (Peck, M.J.) ("At no point was [plaintiff's] condition 'fast-degenerating' or 'life-threatening,' and there is no indication that [defendant] delayed treatment in order to punish him. Moreover, any delay in treatment in this case does not rise to the egregious level identified in *Hathaway* [*v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ]. That [plaintiff] feels something more should have been done to treat his injuries is not a sufficient basis for a deliberate indifference claim.").

26   *See, e.g., Kelley v. Lutz,* No. 95–16003 87 F.3d 1320 (table), 1996 WL 341299 at *1 (9th Cir. June 19, 1996) (prison doctor's denial of inmate's request for CAT scan did not constitute deliberate indifference where inmate had been seen by several specialists and x-rays did not reveal any abnormality); *Vento v. Lord,* 96 Civ. 6169, 1997 WL 431140 at *5 (S.D.N.Y. July 31, 1997) (Sotomayor, D.J.) ("plaintiff's [denied] x-ray request and claim that without new x-rays her physical therapy is ineffective fails to state a claim of deliberate indifference"); *Sharp v. Jeanty,* 93 Civ. 0220, 1993 WL 498095 at *2 (S.D.N.Y. Nov.30, 1993) (Leval, D.J .) (dismissing complaint where prisoner's knee was x-rayed but he was not given an orthroscan, because plaintiff's medical "records indicate[d] an extensive and ongoing course of medical treatment" of his injury, and many of his allegations amounted to "second-guessing the treatments of his health care providers", and explaining that " '[a] prisoner's disagreement with his prescribed treatment does not afford a basis for relief under § 1983.' "); *see also, e.g., Burley v. O.D.O.C.,* No. CV–99–1462, 2000 WL 1060658 at *4–5 (D.Or. July 11, 2000) (granting defendants summary judgment on Eighth Amendment claim where "[p]laintiff disputes that the lumbar/ sacral spine x-ray shows that nothing is wrong with his head, neck, and back" and "believes that only an 'MRI' or 'Cat Scan' can confirm his injuries in those areas"); *Lewis v. Herbert,* No. Civ. A. 96–2933, 1996 WL 663874 at *4 (E.D.Pa. Nov.14, 1996) ("[E]ven if Defendant's decision not to ... order an X–Ray or Cat Scan ... amounted to medical malpractice, a tort is not transformed into a constitutional violation simply because the victim is a prisoner."); *Coppage v. Mann,* 906 F.Supp. 1025, 1038–39 (E.D.Va.1995) (rejecting plaintiff's argument that prison doctor was deliberately indifferent when he ordered two diagnostic tests which were less effective than an MRI; "The case law draws a clear distinction between situations in which the physician provides no medical care, which may amount to deliberate indifference, and those in which the physician provides merely substandard care, which amounts at most to negligence."); *Trejo v. Gomez,* No. C–

93–0360, 1995 WL 429247 at \*3 (N.D.Cal. July 13, 1995) (rejecting claim that prison doctor's failure to order CAT scan or MRI for inmate complaining of neck, back and shoulder pain constituted deliberate indifference); *Johnson v. Department of Corr.,* 92 Civ. 7716, 1995 WL 121295 at \*3 (S.D.N.Y. Mar.21, 1995) (summary judgment for defendants where inmate suffering from hip condition who was examined and treated on numerous occasions complained he should have received an MRI; "the Eighth Amendment does not mandate the use of any particular medical technology or course of treatment"); *Wilkerson v. Marshall,* No. C 94–0009, 1994 WL 564650 at \*1–4 (N.D.Cal. Oct.3, 1994) (rejecting inmate's claim that prison doctor's failure to order an MRI constituted deliberate indifference); *Lopez v. Medical Dep't,* Civ. A. No. 90–5287, 1990 WL 174361 at \*1 (E.D.Pa. Nov.6, 1990) (prison medical staff's refusal to "take x-rays, perform a CAT scan and administer other medical tests" did not give rise to Eighth Amendment claim).

Nelson's claim regarding his allegedly torn knee ligament suffers from the same deficiencies, and should therefore be dismissed as well. (Am. Compl. at 5; *see* Nelson 4/30/02 Aff. ¶ 11.) His isolated assertion that "As i walk up the stair's my knee give out" fails to make out a claim. *See, e.g., Espinal v. Coughlin,* 98 Civ. 2579, 2002 WL 10450 at \*4 (S.D.N.Y. Jan.3, 2002) (plaintiff's claim relating to "an exacerbated injury to his knee" was "at most an allegation of negligence or disagreement with a course of treatment which does not rise to the deliberate indifference standard").

27    The November 14, 2000 entry in his Dental Treatment Record states: "Doesn't want any dental filling done on him, he wants me to take out all his silver fillings in his mouth his request has been denied, he refused to sign the refusal slip." (Nelson 2/22/02 Aff. Ex. 8; *see* page 16 above.)

28    *Accord, e.g., Espinal v. Goord,* 00 Civ. 2292, 2001 WL 476070 at \*10 (S.D.N.Y. May 7, 2001) (Peck, M.J.); *Sundwall v. Leuba,* No. Civ. A. 300CV1309, 2001 WL 58834 at \*8 (D.Conn. Jan.23, 2001), *aff'd,* 28 Fed. Appx. 11 (2d Cir.2001); *Cipolla v. County of Rensselaer,* 129 F.Supp.2d 436, 449 (N.D.N.Y.), *aff'd,* 20 Fed. Appx. 84 (2d Cir.2001); *Santiago v. City of New York,* 98 Civ. 6543, 2000 WL 1532950 at \*8 (S.D.N.Y. Oct.17, 2000).

---

**End of Document**       © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 827781
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Kenneth Samuels, Plaintiff,
v.
Commissioner Brian Fischer, Albert Prack,
Superintendent Philip D. Heath, D. Keyser,
M. Barnes, C. Gamble, Correction Captain R.
Brereton, Correction Sergeant K. White, Correction
Officer L. Gould, T. Bellinger, R. Woody, Jr.,
Correction Officer C. Dowtin, Correctional Officer
J. Freeman, Correctional Sgt. Schrader, and
Correctional Officer S. Luciano, Defendants.

Case No. 13-CV-8287 (KMK)
|
Signed March 1, 2016
|
Filed March 2, 2016

**Synopsis**
**Background:** State prisoner brought § 1983 action against
prison officials and correctional officers, alleging violation
of his right to due process in connection with disciplinary
hearing, and excessive force. Defendants moved to dismiss
for failure to state a claim.

**Holdings:** The District Court, Kenneth M. Karas, J., held
that:

[1] conclusory allegations that prison officials knew
of correctional officers' use of excessive force were
insufficient to state § 1983 supervisory liability claim;

[2] general allegation that prison officials failed to train
subordinate was insufficient to state § 1983 supervisory
liability claim;

[3] allegation that officers passed along prisoner's appeals
for others to consider was insufficient to state a § 1983
supervisory liability claim;

[4] prison officials' affirmance of disciplinary hearing
sufficiently established their personal involvement, as
required to state § 1983 supervisory liability claim;

[5] prisoner sufficiently stated § 1983 due process claim
against prison employee appointed to assist him in
disciplinary proceedings;

[6] allegations were sufficient to state a § 1983 claim
against corrections officer for failure to intervene in use of
excessive force against prisoner;

[7] allegations were sufficient to state a § 1983 deliberate
indifference claim against officers who took custody of
prisoner after prison nurse determined he needed outside
care; and

[8] any failure of prisoner to exhaust administrative
remedies was not evident on the face of the complaint.

Motion granted in part and dismissed in part.

West Headnotes (33)

**[1]** **Federal Civil Procedure**
👉 Pro Se or Lay Pleadings
**Federal Civil Procedure**
👉 Civil rights proceedings in general
District Court must construe pro se pleadings
liberally and interpret them to raise the
strongest arguments that they suggest,
particularly where civil rights are at issue.

Cases that cite this headnote

**[2]** **Attorney and Client**
👉 Rights of litigants to act in person or by
attorney
Liberal treatment afforded to pro se litigants
does not excuse a pro se party from
compliance with relevant rules of procedural
and substantive law.

Cases that cite this headnote

**[3]**  **Civil Rights**
   👈 Vicarious liability and respondeat
superior in general;supervisory liability in
general

In an action under § 1983, defendants
cannot be held liable under a theory
of respondeat superior; because vicarious
liability is inapplicable to § 1983 suits,
plaintiff must plead that each Government-
official defendant, through the official's own
individual actions, has violated the law. 42
U.S.C.A. § 1983.

Cases that cite this headnote

**[4]**  **Civil Rights**
   👈 Prisons and jails;probation and parole

Prisoner's conclusory allegations that prison
officials knew of correctional officers' use
of excessive force did not sufficiently plead
officials' personal involvement in the alleged
violation of prisoner's rights, as required to
state § 1983 supervisory liability claim arising
out of officers' use of excessive force. 42
U.S.C.A. § 1983.

Cases that cite this headnote

**[5]**  **Civil Rights**
   👈 Criminal law enforcement;prisons

Prisoner's general allegation that prison
officials failed to train subordinates did
not sufficiently plead officers' personal
involvement in correctional officers' alleged
violation of prisoner's rights, as required to
state § 1983 supervisory liability claim, absent
some factual connection between their failure
to train and the harm that eventually befell
prisoner. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[6]**  **Civil Rights**
   👈 Vicarious liability and respondeat
superior in general;supervisory liability in
general

To establish personal involvement on basis
of failure to train, as required to bring
§ 1983 supervisory liability claim, plaintiff
must show that defendant knew or should
have known that there was a high degree
of risk that his subordinates would behave
inappropriately, but either deliberately or
recklessly disregarded that risk by failing
to take action that a reasonable supervisor
would find necessary to prevent such a risk,
and that failure caused a constitutional injury
to plaintiff. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[7]**  **Civil Rights**
   👈 Criminal law enforcement;prisons

Prisoner's allegation that prison
superintendent acknowledged his officers
were corrupt in a statement during prison
orientation did not sufficiently plead his
personal involvement in correctional officers'
alleged violation of prisoner's rights, as
required to state § 1983 supervisory
liability claim, where there was nothing
to suggest one way or the other that
the allegedly "unconstitutional practices" of
which superintendent was aware were the
same as those prisoner alleged. 42 U.S.C.A. §
1983.

Cases that cite this headnote

**[8]**  **Civil Rights**
   👈 Criminal law enforcement;prisons

Prisoner's allegation that Commissioner
of New York Department of
Correctional Services (NYDOCS) and prison
superintendent passed along prisoner's
appeals for others to consider, did not
sufficiently plead their personal involvement
in the alleged violation of prisoner's due
process rights, as required to state a
§ 1983 supervisory liability claim. U.S.
Const.Amend. 14; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[9]** **Constitutional Law**
👉 Protections Provided and Deprivations Prohibited in General

To present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendants deprived him of that interest as a result of insufficient process. U.S. Const.Amend. 5, 14.

Cases that cite this headnote

**[10]** **Prisons**
👉 Punitive, Disciplinary, or Administrative Confinement

**Prisons**
👉 Segregation

Conditions of confinement are a distinct and important consideration in determining whether a confinement in a prison's special housing unit (SHU) rises to the level of atypical and severe hardship, and, therefore, courts should consider the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions.

Cases that cite this headnote

**[11]** **Constitutional Law**
👉 Segregation

A confinement longer than an intermediate one, and normal special housing unit (SHU) conditions, is a sufficient departure from the ordinary incidents of prison life to require procedural due process protections. U.S. Const.Amend. 5, 14.

Cases that cite this headnote

**[12]** **Civil Rights**
👉 Criminal law enforcement;prisons

Prison officials' affirmance of prisoner's allegedly unconstitutional disciplinary hearing sufficiently established their personal involvement in the disciplinary process, as required to state § 1983 supervisory liability claim arising out of alleged violation of due process; officials considered prisoner's

objections and had the power to abrogate or preserve punishment, that, allegedly, was improperly imposed. U.S. Const.Amend. 14; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[13]** **Prisons**
👉 Counsel or other assistance

Under New York law, an employee assistant appointed to a prisoner in disciplinary proceedings is not obliged to go beyond the specific instructions of the inmate because if he did so he would then be acting as counsel in a prison disciplinary proceeding, assistance to which a prisoner is not entitled; rather, the assistant is to act as the inmate's surrogate. N.Y. Comp. Codes R. & Regs. tit. 7, §§ 251-4.1, 251-4.2.

Cases that cite this headnote

**[14]** **Prisons**
👉 Harmless error

Under New York law, any violations of a prisoner's qualified right to employee assistance in a disciplinary hearing are reviewed for harmless error. N.Y. Comp. Codes R. & Regs. tit. 7, §§ 251-4.1, 251-4.2.

Cases that cite this headnote

**[15]** **Constitutional Law**
👉 Discipline and classification

**Prisons**
👉 Counsel or other assistance

Prisoner's allegation that he asked prison employee appointed to assist him in disciplinary proceedings to obtain documents and interview witnesses, but that employee failed to do so without explanation, was sufficient to state § 1983 violation of due process claim against employee. U.S. Const.Amend. 14; 42 U.S.C.A. § 1983; N.Y. Comp. Codes R. & Regs. tit. 7, § 251-4.1.

Cases that cite this headnote

**[16]** **Sentencing and Punishment**
 🔑 Conditions of Confinement

Under the Eighth Amendment, prison officials must take reasonable measures to guarantee the safety of inmates in their custody. U.S. Const.Amend. 8.

Cases that cite this headnote

**[17]** **Civil Rights**
 🔑 Use of force in general

**Civil Rights**
 🔑 Use of force;protection from violence

Law enforcement officials, including prison officials, can be held liable under § 1983 for failing to intervene in a situation where another official is violating an inmate's constitutional rights, including the use of excessive force, in their presence; specifically, an officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know that excessive force is being used, provided there was a realistic opportunity to intervene to prevent the harm from occurring. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[18]** **Prisons**
 🔑 Protection from violence, assault, or abuse

**Sentencing and Punishment**
 🔑 Use of force

**Sentencing and Punishment**
 🔑 Physical restraints

Prisoner's allegations that, in the course of his assault by corrections officers, he was handcuffed, shoved down a flight of stairs, and pushed up against a wall, whereupon corrections officer questioned why prisoner was still standing and still breathing, were sufficient to state a § 1983 claim asserting violation of Eighth Amendment against the officer for failure to intervene in use of excessive force against prisoner. U.S. Const.Amend. 8; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[19]** **Prisons**
 🔑 Protection from violence, assault, or abuse

**Sentencing and Punishment**
 🔑 Use of force

Allegations that corrections officer repeatedly ordered officers who were beating prisoner to stop and stated, "that's enough," fell far short of alleging that officer had reason to know that excessive force was being used and had a realistic opportunity to intervene to prevent the harm from occurring, as required to state a § 1983 claim asserting violation of Eighth Amendment based on failure to intervene. U.S. Const.Amend. 8; 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[20]** **Sentencing and Punishment**
 🔑 Medical care and treatment

Eighth Amendment forbids deliberate indifference to serious medical needs of prisoners. U.S. Const.Amend. 8.

Cases that cite this headnote

**[21]** **Sentencing and Punishment**
 🔑 Medical care and treatment

Deliberate indifference to a prisoner's serious medical needs, as violates Eighth Amendment, may be manifested through the intentional denial of a prisoner's access to medical care. U.S. Const.Amend. 8.

Cases that cite this headnote

**[22]** **Sentencing and Punishment**
 🔑 Medical care and treatment

An Eighth Amendment deliberate indifference claim contains two requirements: (1) the alleged deprivation of adequate medical care must be sufficiently serious, and (2) the charged officials must be subjectively

reckless in their denial of medical care. U.S. Const.Amend. 8.

Cases that cite this headnote

**[23]** **Sentencing and Punishment**
👉 Medical care and treatment

To establish an alleged deprivation of adequate medical care was sufficiently serious, as required to support a prisoner's Eighth Amendment deliberate indifference claim, prisoner must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health. U.S. Const.Amend. 8.

Cases that cite this headnote

**[24]** **Sentencing and Punishment**
👉 Medical care and treatment

In determining whether charged prison officials were subjectively reckless in their denial of medical care to an inmate, in action alleging deliberate indifference in violation of Eighth Amendment, the question is whether officials knew of and disregarded an excessive risk to inmate's health or safety and were both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and also drew the inference; in other words, in medical-treatment cases not arising from emergency situations, it suffices if inmate proves that the official acted with deliberate indifference to inmate health. U.S. Const.Amend. 8.

Cases that cite this headnote

**[25]** **Sentencing and Punishment**
👉 Medical care and treatment

Deliberate indifference is a mental state equivalent to subjective recklessness and requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result; in contrast, mere negligence is not enough to state a claim for deliberate indifference. U.S. Const.Amend. 8.

Cases that cite this headnote

**[26]** **Sentencing and Punishment**
👉 Medical care and treatment

Mere disagreement over proper medical treatment does not create a deliberate indifference claim under Eighth Amendment, and accordingly, so long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation. U.S. Const.Amend. 8.

Cases that cite this headnote

**[27]** **Prisons**
👉 Particular Conditions and Treatments

**Sentencing and Punishment**
👉 Medical care and treatment

Prisoner's allegations that corrections officers took custody of him after medical staff nurse determined he needed outside medical care, and placed him, shackled, in a van where he sat at a prison check point for several hours before finally being taken to hospital emergency room, were sufficient to state a § 1983 deliberate indifference claim in violation of Eighth Amendment. U.S. Const.Amend. 8; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[28]** **Prisons**
👉 Exhaustion of Other Remedies

Prison Litigation Reform Act's (PLRA) exhaustion requirement applies to all personal incidents while in prison, and includes actions for monetary damages despite the fact that monetary damages are not available as an administrative remedy. Civil Rights of Institutionalized Persons Act § 7, 42 U.S.C.A. § 1997e(a).

Cases that cite this headnote

**[29]** **Prisons**

👈 Exhaustion of Other Remedies

Prison Litigation Reform Act (PLRA) mandates proper exhaustion, that is, using all steps that the agency holds out, and doing so properly, which entails completing the administrative review process in accordance with the applicable procedural rules. Civil Rights of Institutionalized Persons Act § 7, 42 U.S.C.A. § 1997e(a).

Cases that cite this headnote

---

**[30]** **Prisons**
👈 Pleading

**Prisons**
👈 Evidence

Defendants bear the burden of proving failure to exhaust administrative remedies under Prison Litigation Reform Act (PLRA), and prisoner plaintiffs need not plead exhaustion with particularity. Civil Rights of Institutionalized Persons Act § 7, 42 U.S.C.A. § 1997e(a).

Cases that cite this headnote

---

**[31]** **Prisons**
👈 Exhaustion of Other Remedies

A court may not dismiss for failure to exhaust administrative remedies under Prison Litigation Reform Act (PLRA) unless it determines that such remedies are available. Civil Rights of Institutionalized Persons Act § 7, 42 U.S.C.A. § 1997e(a).

1 Cases that cite this headnote

---

**[32]** **Federal Civil Procedure**
👈 Motion and proceedings thereon

**Federal Civil Procedure**
👈 Motion

When nonexhaustion is not clear from the face of a prisoner's complaint, a defendant's motion to dismiss for failure to exhaust administrative remedies may be converted to a motion for summary judgment limited to the narrow issue of exhaustion under

Prison Litigation Reform Act (PLRA), and the relatively straightforward questions about prisoner's efforts to exhaust, whether remedies were available, or whether exhaustion might be, in very limited circumstances, excused. Civil Rights of Institutionalized Persons Act § 7, 42 U.S.C.A. § 1997e(a).

1 Cases that cite this headnote

---

**[33]** **Civil Rights**
👈 Prisons and jails;probation and parole

Any failure of prisoner to exhaust administrative remedies under Prison Litigation Reform Act (PLRA) was not evident on the face of prisoner's § 1983 complaint in action alleging excessive force and denial of due process in disciplinary proceedings, thus precluding a motion to dismiss for failure to state a claim based on the purported non-exhaustion, where complaint alleged that prisoner filed grievance about assault by corrections officers, and that officers refused to provide prisoner with forms necessary to grieve the alleged due process violation. U.S. Const.Amend. 8, 14; 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act § 7, 42 U.S.C.A. § 1997e(a).

1 Cases that cite this headnote

---

**Attorneys and Law Firms**

Kenneth Samuels, Malone, NY, Pro Se.

Mary Kim, Esq., New York State Office of the Attorney General, New York, NY, Counsel for Defendants.

---

OPINION & ORDER

KENNETH M. KARAS, District Judge:

**\*1** Plaintiff Kenneth Samuels ("Plaintiff") brings this action against defendants Brian Fischer ("Fischer"), Albert Prack ("Prack"), Philip Heath ("Heath"), William Keyser ("Keyser"), Michael Barnes ("Barnes"), Corey

Gamble ("Gamble"), Ronald Brereton ("Brereton"), Kenneth White ("White"), Brian Schrader ("Schrader"), LaToya Gould ("Gould"), Timothy Bellinger ("Bellinger"), Ronald Woody ("Woody"), Calvin Dowtin ("Dowtin"), Jonathan Freeman ("Freeman"), and Steven Luciano ("Luciano") alleging violations of his constitutional and statutory rights pursuant to 42 U.S.C. § 1983. [1] Fischer, Prack, Heath, Keyser, Barnes, Gamble, White, Schrader, Freeman, and Luciano (collectively, "Defendants") have moved to dismiss the Amended Complaint. [2] For the reasons stated herein, the Motion is granted in part, and denied in part.

## I. Background

### A. Factual Background

The following facts are taken from the Amended Complaint and are accepted as true for purposes of this Motion. At the time of the events described herein, Plaintiff was an inmate at Sing Sing Correctional Facility ("Sing Sing"). (Am. Compl. 2 (Dkt. No. 25).)

### 1. The Alleged Assault

On November 16, 2010, Plaintiff entered the B-block housing unit, from which he took his shower gear, and went to the Q-Gallery to wait in line for the "bathhouse run." (Am. Compl. ¶ 15.) By the time that Plaintiff had been waiting in line for at least 20 minutes, he asked Woody what the hold-up was. (Id. ¶ 16.) Woody told him that A-Block was running prisoners to the auditorium for movies. (Id.) Plaintiff then asked Woody if he could return to his cell, skipping the bathhouse, and go to the yard when the bathhouse returned. (Id.) Woody said no, telling Plaintiff that because he put down for the bathhouse, he had to go to it. (Id.)

Ten minutes later, an announcement was made instructing all prisoners waiting for the bathhouse run to return all cigarettes to their cells. (See id.) Plaintiff and several other prisoners went to the back of the Q-Gallery, where Plaintiff showed Bellinger his cigarettes. (Id. ¶ 17.) Bellinger waved Plaintiff and other inmates through. (Id.) Plaintiff then returned the cigarettes to his cell on W-Gallery. (Id.) Upon returning, Plaintiff heard Dawtin call down to Bellinger, instructing him to stop the inmate

coming off of R-Gallery, apparently in reference to Plaintiff. (See id.) Bellinger told Dawtin that Plaintiff had just returned cigarettes to his cell on W-Gallery, but Dawtin replied that he did not call W-Gallery, telling Bellinger to send Plaintiff back. (Id.) Plaintiff attempted to explain to Dawtin that he had been in the Q-Gallery waiting for the bathhouse run prior to the announcement. (Id.) Dawtin cut Plaintiff off, saying that he did not call W-Gallery, instructing Plaintiff to "take it back and lock it in." (Id.) [3]

**\*2** Plaintiff then proceeded back down the gallery to his cell while speaking to Bellinger, during which time Woody sarcastically told Plaintiff that he should not have put down for the bathhouse anyway. (Id. ¶ 18.) Plaintiff responded, saying, "no one['s talking to you[;] mind your fucking business." (Id.) While Plaintiff was waiting for Gould to open his cell, Plaintiff saw Woody, Dawtin, and Bellinger approaching. (Id. ¶ 19.) Plaintiff then put his hands on the fenced gate, but Woody said that it was "to[o] late for that" and began pushing Plaintiff back in the direction from which he had come. (Id.) Gould stood in the middle of the W-Gallery while Plaintiff was being pushed and shoved down the gallery. (Id.) At that time, Woody, Dawtin, and Bellinger began punching Plaintiff and striking him on the back of the head. (Id.) Plaintiff turned around and said that all of this was unnecessary. (Id.) Woody, Dawtin, and Bellinger continued throwing punches, striking Plaintiff around the face. (Id.) Plaintiff then tried to flee, but Woody grabbed him by the collar of his shirt as Bellinger and Dawtin drew their batons. (See id.) Plaintiff, fearing for his life, attempted to break Woody's hold on his collar but could not. (Id.) Plaintiff, fearing further assault, attempted to defend himself successfully blocking with his arm a blow from Bellinger's baton, which Bellinger swung toward Plaintiff's head. (Id.) Dawtin them rammed his baton into Plaintiff's forehead, causing Plaintiff's head to snap back and Plaintiff's shirt to rip. (See id.) As Plaintiff stumbled back, Woody struck Plaintiff on the head with his baton, causing Plaintiff to fall to the ground. (Id.) As Plaintiff tried to get up, he was repeatedly struck on the head and arms. (Id.)

The attack continued until Barnes, who repeatedly ordered Woody, Dawtin, and Bellinger to stop, said, "that's enough; that's enough." (See id. ¶ 20.) During that time, Gould watched, doing nothing to stop the assault. (Id.) Plaintiff was then handcuffed, shoved down a flight

of stairs, and pushed up against a wall. (*Id.*) Gamble shouted, "[W]hy is he still standing[?] [W]hy is he still breathing?" (*Id.*) Plaintiff was then made to stand in the back of the shower, bleeding and in agonizing pain for 20 minutes before being taken to medical staff. (*Id.*)

Plaintiff was then examined by C. Nugent ("Nugent"), a medical staff nurse, who told Plaintiff that he would be taken to an outside hospital. (*Id.* ¶ 21.) Schrander, Freeman, and Luciano then shackled Plaintiff and placed him in a van, where Plaintiff sat at a Sing Sing check point for several hours, during which time Plaintiff was bleeding and in excruciating pain before being taken to the Mount Vernon Emergency Room. (*Id.*) Once there, Plaintiff was treated and received seven sutures to close the wounds to his head. (*Id.*) As a result of the assault, Plaintiff alleges that he suffered contusions as well as bleeding lacerations and abrasions on his head with swelling and abrasions to his arms and neck. (*Id.* at unnumbered 11.) As a result of the injuries to his head, Plaintiff was still receiving pain medication at the time of the Amended Complaint. (*Id.*)

### 2. Proceedings Brought By And Against Plaintiff

On November 17, 2010, in what Plaintiff alleges to have been an "effort to shield the unwarranted, unprovoked assault," Plaintiff was issued two "Misbehavior Reports" dated November 16, 2010, alleging that he violated various rules of inmate behavior and charging him with two counts of violent conduct (Rule 104.11), two counts of creating a disturbance (Rule 104.13), two counts of assault on staff (Rule 100.11), "[i]nterference with [e]mployee," two counts of refusing direct orders (Rule 106.10), "[o]ut of [p]lace" (Rule 109.10), and a movement regulation violation (Rule 109.12). (*Id.* ¶ 22.) Lieutenant Pickens reviewed the misbehavior reports "allegedly written by [D]efendants Woody[ ] [and] Bellinger," and ordered Plaintiff confined to the special housing unit ("SHU"). (*Id.* ¶ 23.)

Heath designated Brereton to serve as the hearing officer, (*id.*), and, on November 21, 2010, Brereton commenced the "Tier III" hearing, in which Plaintiff entered a plea of not guilty to each of the charges. (*Id.* ¶ 24.) Plaintiff asked for help obtaining documents and locating and interviewing witnesses; accordingly, Brereton assigned White to assist Plaintiff. (*Id.*) On November 23, 2010, Brereton concluded the hearing and found Plaintiff guilty

of violent conduct (Rule 104.11), creating a disturbance (Rule 104.13), two counts of assault on staff (Rule 100.11), two counts of refusing a direct order (Rule 106.10), movement regulation (Rule 109.12), and interference with employee (Rule 107.10). (*Id.*) Accordingly, Brereton imposed as penalties 30 months' confinement in the SHU, 30 months' loss of packages, commissary, and phones, as well as twelve months' recommended loss of "[g]ood time." (*Id.*)

**\*3** Shortly thereafter, Plaintiff sought discretionary review from Heath. (*Id.* ¶ 25.) "[S]uch review was passed along and subsequently denied." (*Id.*) On January 20, 2011, Plaintiff filed an administrative appeal, which Fischer designated Prack to review. (*Id.*) By notice dated February 14, 2011, Prack, "acting on behalf of Fischer," notified Plaintiff that the November 23, 2010 superintendent's hearing had been affirmed. (*Id.*)

On June 9, 2011, Plaintiff commenced an Article 78 proceeding, challenging the denial of his administrative appeal. (*Id.* ¶ 26.) Later, on November 9, 2011, those proceedings were transferred to the Third Department of the New York Supreme Court's Appellate Division, and Plaintiff filed his brief on January 12, 2012, which raised the same grounds as his Article 78 proceedings. (*See id.* ¶¶ 26–27.) By the time that the relief that Plaintiff had sought was granted, he had served 22 months of his 30-month penalty, and Plaintiff remained in "segregative confinement" until August 28, 2012. (*Id.* ¶ 27.)

According to Plaintiff, Brereton and White "deliberately[,] intentionally [,] and knowingly deprived [P]laintiff" of his constitutional due process rights in the context of a disciplinary proceeding by "failing to conduct a fair hearing by a neutral arbitrator," by "denying Plaintiff the right to call witnesses in support of his defense," and also by "adequate [sic] assistance [,] as well as [an] erroneously written Misbehavior Report." (*Id.* ¶ 28.) Likewise, Plaintiff alleges that Heath, Keyser, Fischer, and Prack, "upon learning of the violations[,] did allow[,] permit, approve, assist, sanction [ ][,] conspire [ ][,] or act[ ] in concert with [D]efendant Brereton." (*Id.* ¶ 29.)

### 3. Allegations Concerning Particular Prison Officials' Knowledge

Plaintiff makes a few allegations related to certain Defendants' knowledge about conditions at Sing Sing. For example, Plaintiff alleges that Fischer, Heath, Keyser, Gamble, and Barnes were all aware of the high volume of use of force incidents at Sing Sing, in which officers used excessive, unnecessary force on prisoners. (*Id.* ¶ 9.) These Defendants, Plaintiff alleges, "failed to properly supervise and adequately train their official[s] or subordinates in the use of force as there [are] ... systemic, gross inadequacies in training and supervision of officials under their control." (*Id.*)

With respect only to Fischer, Heath, and Keyser, Plaintiff alleges that these three "failed to ensure that their subordinates were properly and adequately trained and periodically [updated] on the proper usage of force." (*Id.* ¶ 13.) Their failure to "properly screen area supervisors and officers in conducting stress test[s] created and condone[d] the unlawful[,] unconstitutional, [and] customary practices of excessive use of force." (*Id.*)

Finally, Plaintiff makes certain allegations relating to Fischer and Keyser alone. For example, Plaintiff alleges that Fischer was "grossly negligent in supervising his subordinates who were entrusted with the duty of ensuring their subordinates were properly or adequately trained in the use of force." (*Id.* ¶ 12.) Plaintiff alleges that Fischer "had knowledge of a high volume of excessive use of force incidents at Sing Sing, through numerous complaints," but nevertheless "allowed the unlawful customary unconstitutional practices of excessive use [of] force to continue by failing to act." (*Id.*) Additionally, Plaintiff alleges that "Fischer[ ] created a policy and/or custom that allowed unnecessary excessive use of force in Sing Sing to exist by failing [to] supervise or punish officials who failed to properly conduct fair and impartial investigations and who themselves committed or condoned the unlawful, unconstitutional violations." (*Id.* ¶ 14.) Keyser, Plaintiff alleges, was "grossly negligent in supervising subordinates who brutally, maliciously assaulted Plaintiff without provocation" and "had knowledge of the high volume of excessive use of force incidents occurring at Sing Sing," but nevertheless "failed to correct or remedy the wrongful unconstitutional acts committed by his subordinates," which incidents, Plaintiff alleges, were reported to Keyser. (*Id.* ¶ 10.)

### B. Procedural Background

**\*4** On November 19, 2013, Plaintiff brought suit against Barnes, Bellinger, Brereton, Dowtin, Fischer, Gamble, Gould, Heath, Keyser, Prack, White, Woody, and certain John Doe defendants. (*See* Dkt. No. 2.) Afterwards, the Court issued an Order of Service, (Dkt. No. 5), and Plaintiff, on March 14, 2014, filed his Amended Complaint, naming each of the currently-named defendants "jointly, severally[,] and individually and in his/her individual and not in [his or her] official capacity." (Am. Compl. at unnumbered 14.) Another Order of Service was issued on October 7, 2014. (Dkt. No. 45.) On December 12, 2014, Defendants submitted a premotion letter in advance of their anticipated Motion to Dismiss. (Dkt. No. 51.) On February 25, 2015, the Court held a Pre-Motion Conference and adopted a briefing schedule for the instant Motion. (Dkt. No. 56.) Defendants filed their Motion and accompanying papers on April 22, 2015, (Dkt. Nos. 59–63), to which Plaintiff filed his Opposition on July 13, 2015, (Dkt. No. 72), and in support of which Defendants filed their reply on August 3, 2015, (Dkt. No. 75). In addition, the nonmoving defendants filed their Answer on May 7, 2015, (Dkt. No. 66), to which Plaintiff filed an "Opposition" on July 13, 2015, (Dkt. No. 71). Plaintiff requested discovery from Defendants on August 5, 2015, (Dkt. No. 80); however, in response to a letter motion from the defendants, (Dkt. No. 81), the Court stayed discovery until after resolution of the pending Motion, (Dkt. No. 82), a decision which Plaintiff asked the Court to reconsider, (Dkt. No. 83), but which the Court stood by, (Dkt. No. 84).

### II. Discussion

### A. Standard of Review

Defendants move to dismiss Plaintiff's Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citations, internal quotation marks, and alterations omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678,

129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (internal quotation marks and alterations omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level ...." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, 127 S.Ct. 1955, and, although a plaintiff need only allege "enough facts to state a claim to relief that is plausible on its face," *id.* at 570, 127 S.Ct. 1955, if a plaintiff has not "nudged [his or her] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged— but it has not 'show[n]'—'that the pleader is entitled to relief.' " (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79, 129 S.Ct. 1937 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); *see also Graham v. Macy's Inc.*, No. 14–CV–3192, 2015 WL 1413643, at *1 n. 1 (S.D.N.Y. Mar. 23, 2015) ("For the purpose of resolving the motion to dismiss, the [c]ourt assumes all well-pled facts to be true ...."). Further, "[f]or the purpose of resolving [a] motion to dismiss, the [c]ourt ... draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T&M Prot. Res., Inc.*, 992 F.Supp.2d 302, 304 n. 1 (S.D.N.Y.2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir.2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir.1999) (internal quotation marks omitted); *see also Hendrix v.*

*City of N.Y.*, No. 12–CV–5011, 2013 WL 6835168, at *2 (E.D.N.Y. Dec. 20, 2013) (same).

**\*5** **[1]** **[2]** Lastly, because Plaintiff is proceeding pro se, the Court must construe his pleadings liberally and "interpret them to raise the strongest arguments that they suggest." *Maisonet v. Metro. Hosp. & Health Hosp. Corp.*, 640 F.Supp.2d 345, 347 (S.D.N.Y.2009) (internal quotation marks omitted); *see also Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474–75 (2d Cir.2006) (same). This admonition "applies with particular force when a plaintiff's civil rights are at issue." *Maisonet*, 640 F.Supp.2d at 348; see also *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir.2004). However, the liberal treatment afforded to pro se litigants does not excuse a pro se party "from compliance with relevant rules of procedural and substantive law." *Maisonet*, 640 F.Supp.2d at 348 (internal quotation marks omitted).

## B. Analysis

### 1. Fischer, Heath, and Keyser's Personal Involvement

**[3]** To begin, Defendants move to dismiss the claims against Fischer, Heath, and Keyser for lack of personal involvement. "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir.2013) (italics omitted); *see also Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir.2006) ("[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (internal quotation marks omitted)); *Davila v. Johnson*, No. 15–CV–2665, 2015 WL 8968357, at *4 (S.D.N.Y. Dec. 15, 2015) ("It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' ") (some internal quotation marks omitted) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir.1994)); *Lovick v. Schriro*, No. 12–CV–7419, 2014 WL 3778184, at *3 (S.D.N.Y. July 25, 2014) (dismissing § 1983 claims where the complaint contained "no allegations whatsoever indicating that [the defendants] were personally involved in the purported violations" of the plaintiff's constitutional rights). Relatedly, "[i]n an action under 42 U.S.C. § 1983, defendants cannot

be held liable under a theory of respondeat superior," *Quezada v. Roy*, No. 14–CV–4056, 2015 WL 5547277, at *7 (S.D.N.Y. Sept. 18, 2015) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)); in other words, "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the [law]," *Iqbal*, 556 U.S. at 676, 129 S.Ct. 1937; *see also Fortunato v. Bernstein*, No. 12–CV–1630, 2015 WL 5813376, at *6 (S.D.N.Y. Sept. 1, 2015) ("Supervisory status, without more, is not sufficient to subject a defendant to [§] 1983 liability." (internal quotation marks omitted)).

"Before *Iqbal*, the most important case in this Circuit regarding the evidence required to establish the personal involvement of a supervisory official was *Colon v. Coughlin*, 58 F.3d 865 (2d Cir.1995)." *Haynes v. Mattingly*, No. 06–CV–1383, 2014 WL 4792241, at *7 (S.D.N.Y. Sept. 24, 2014), *aff'd*, (2d Cir. Oct. 27, 2015). Under the framework set forth in that case, courts find personal involvement of a supervisory defendant where the plaintiff shows that

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*6 *Grullon*, 720 F.3d at 139 (alteration in original) (italics omitted) (quoting *Colon*, 58 F.3d at 873); *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir.2014) (quoting *Colon*, 58 F.3d at 873) (same). Since then, the Second Circuit has recognized that the "[*Iqbal*] decision ... may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations," *Grullon*, 720 F.3d at 139; however, "[it] has thus far declined to resolve the question," *Goldner v. City of New London*, No. 14–CV–173, 2015 WL 1471770, at *7 (D.Conn. Mar. 31, 2015); *see also Fortunato*, 2015 WL 5813376, at *6 (noting that "the continuing validity of the *Colon* factors has been called into question by the Supreme Court's ruling in *Iqbal*"). The Court need not put its oar in the water concerning the continued vitality of *Colon*, however, because Plaintiff's complaints founder even under *Colon*.

Before delving into Plaintiff's specific allusions to Fischer, Heath, and Keyser, it would likely be helpful to briefly touch upon who, exactly, these Defendants are. First, as Plaintiff observes, Fischer was the Commissioner of the New York Department of Corrections and Community Supervision ("DOCS"), (*see* Am. Compl. ¶ 2), and the former Superintendent of Sing Sing, (*see* Opp'n to Defs.' Mot. for Summ. J. [sic] ("Pl.'s Opp'n") 4 (Dkt. No. 72)). As has been noted in litigation, Fischer was appointed Acting Commissioner of DOCS on January 1, 2007, and was confirmed as Commissioner on March 12, 2007. *See Rahman v. Fischer*, No. 08–CV–4368, 2010 WL 1063835, at *2 n. 4 (S.D.N.Y. Mar. 22, 2010). Also, as Plaintiff alleges, Heath was at the time of the incident the Superintendent of Sing Sing. (Am. Compl. ¶ 3.) Finally, as Plaintiff alleges, Keyser was the Deputy Superintendent of Security at Sing Sing. (*Id.* ¶ 4.)

### a. Pure Legal Conclusions

[4] To begin, many of Plaintiff's allegations either (1) posit without explanation that incidents of officers' excessive use of force were known to Fischer, (*id.* ¶¶ 9, 12; Pl.'s Opp'n 4), Heath, (Am. Compl. ¶¶ 9, 11; Pl.'s Opp'n 4), or Keyser, (Am. Compl. ¶¶ 9, 10; Pl.'s Opp'n 4), or (2) attribute conduct to one or more of them that largely mirrors—or is at least very similar—the wording of one of the *Colon* prongs without further factual development, (Am. Compl. ¶ 10) (Keyser/prong four); *id.* ¶ 11 (Heath/prong four); *id.* ¶ 12 (Fischer/prong four); *id.* ¶ 14 (Fischer/prong three); *id.* ¶ 29 (all three/prong two); Pl.'s Opp'n 4 (all three/prong two); *id.* at 7 (all three/prong two).

With regard to the former, as the Supreme Court has made clear, "conclusory ... allegations" are "disentitle[d] ... to the presumption of truth." *Iqbal*, 556 U.S. 681, 129

S.Ct. 1937; *see also Shepherd v. Fischer*, No. 10–CV–1524, 2015 WL 1246049, at *13 (N.D.N.Y. Feb. 23, 2015) (rejecting as "appear[ing] to assert a non-cognizable constitutional claim or ... vague and conclusory" certain claims against Fischer where the plaintiff alleged that he "[was] aware" of certain problems at a DOCS facility (internal quotation marks omitted)), *adopted by* 2015 WL 1275298 (N.D.N.Y. Mar. 18, 2015); *Vann v. Fischer*, No. 11–CV–1958, 2012 WL 2384428, at *6 (S.D.N.Y. June 21, 2012) (dismissing claims against DOCS Commissioner for lack of personal involvement where the plaintiff alleged that the Commissioner "ha[d] knowledge of actions taken" (first alteration in original) (internal quotation marks omitted)). [4] Similarly, the latter is insufficient, as Second Circuit law has long taught that, even within the context of the *Colon* framework, "merely recit[ing] the legal elements of a successful § 1983 claim for supervisory liability ... does not meet the plausibility pleading standard." *Dotson v. Farrugia*, No. 11–CV–1126, 2012 WL 996997, at *6 (S.D.N.Y. Mar. 26, 2012); *see also Lindsey v. Butler*, 43 F.Supp.3d 317, 329 (S.D.N.Y.2014) ("Conclusory accusations regarding a defendant's personal involvement in the alleged violation, standing alone, are not sufficient ...." (internal quotation marks omitted)), *reconsideration granted in part on other grounds*, No. 11–CV–9102, 2014 WL 5757448 (S.D.N.Y. Nov. 5, 2014), *reconsideration denied*, 2015 WL 1501625 (S.D.N.Y. Apr. 1, 2015); *Vogelfang v. Capra*, 889 F.Supp.2d 489, 502 (S.D.N.Y.2012) ("To the extent [the plaintiff] may argue that [two of the defendants] failed to properly supervise subordinates who were violating her rights, the mere fact that a defendant possesses supervisory authority is insufficient to demonstrate liability for failure to supervise under § 1983." (internal quotation marks omitted)). Thus, to the extent that Plaintiff's allegations contravene these rules, they cannot make out a claim of personal involvement.

### b. Receipt of Reports

**\*7** Additionally, Plaintiff alleges that reports of excessive force—either from other inmates or DOCS' reporting system—were made to Fischer, (Am. Compl. ¶ 12; Pl.'s Opp'n 3–4), Heath, (Am. Compl. ¶ 11; Pl.'s Opp'n 3–4), and Keyser, (Am. Compl. ¶ 10; Pl.'s Opp'n 3–4). Ample Second Circuit case law makes clear that a plaintiff does not state a claim where he alleges only that a supervisory official received reports of wrongdoing.

*See Pagan v. Westchester Cty.*, No. 12–CV–7669, 2014 WL 982876, at *22 (S.D.N.Y. Mar. 12, 2014) (noting in the context of a claim against the commissioner of Westchester County Department of Corrections that "[e]vidence of notification, via letters or complaints, of an unconstitutional condition is alone not sufficient to indicate that a defendant is personally involved in the unconstitutional conduct"), *reconsideration granted on other grounds*, 2015 WL 337403 (S.D.N.Y. Jan. 26, 2015); *Hobson v. Fischer*, No. 10–CV–5512, 2011 WL 891314, at *4–5 (S.D.N.Y. Mar. 14, 2011) (dismissing Fischer from lawsuit for lack of personal involvement where the plaintiff "[did] not allege that Fischer personally participated in the denial of [the plaintiff's] grievances" and "[did] not elaborate as to how Fischer knew about the alleged violations," but "argue[d] that Fischer knew or sh[o]uld have known, of the alleged constitutional violations as the Commissioner of DOCS and the former Superintendent of Sing Sing"); *Rahman*, 2010 WL 1063835, at *5 (dismissing excessive force claims brought against two deputy DOCS commissioners for lack of personal involvement reasoning as to one that the allegation that he "received 'several' complaints of staff assaulting prisoners" is "insufficient allegation of notice of any policy or custom of assaults by corrections officers," and noting, as to the other, that allegations against him rested, in part, "on complaints sent to his office" but that "[t]his is not a sufficient allegation of personal involvement"); *Voorhees v. Goord*, No. 05–CV–1407, 2006 WL 1888638, at *5–6 (S.D.N.Y. 2006) (finding alleged receipt of some 60 grievances relating to prison official by then-Commissioner Glenn Goord insufficient to establish Goord's personal involvement); *cf. Gillard v. Rovelli*, No. 12–CV–83, 2014 WL 4060025, at *10 (N.D.N.Y. Aug. 14, 2014) (noting that the plaintiff "contend[ed] that [the deputy superintendent for security] was advised of ... ongoing threats made by [a corrections officer]," but observing that "[the plaintiff] [did] not allege how and when [the deputy superintendent] was advised of such threats"). This is arguably consistent with the oft-repeated logic of the Second Circuit that "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim," *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir.2003) (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir.1985)), and that "[t]he bare fact that [a defendant] occupies a high position in the New York prison hierarchy is insufficient to sustain [a plaintiff's] claim," *Colon*, 58 F.3d at 874.

Of course, these cases should not be taken to state more than they do. While receiving reports of excessive force does not, without more, save a seat at the defense table for DOCS commissioners, prison superintendents, or a deputy superintendent for security, the receipt of such reports is certainly not inconsistent with personal involvement. Therefore, to the extent that Plaintiff can offer additional factual details concerning Fischer's, Heath's, or Keyser's involvement in his alleged constitutional harms, he should do so in a Second Amended Complaint. *See Pagan*, 2014 WL 982876, at *22 (declining to dismiss claims against the Commissioner of the Westchester County Department of Corrections on the grounds that the "plaintiffs allege[d] more than mere notification through written correspondence," further "claim[ing] that [the commissioner] had daily meetings with the senior members of his staff, during which he was made aware of these ongoing issues" and that, despite these meetings, the commissioner persisted in ignoring the violations); *Rahman v. Fisher*, 607 F.Supp.2d 580, 586 (S.D.N.Y.2009) ("To the extent that [the] plaintiff is able to plead that a pattern of assaults by guards existed prior to [the date of the plaintiff's alleged assault] that did or should have put supervisory defendants on notice of a condition that left unaddressed could be reasonably expected to result in an assault on an inmate such as [the plaintiff], then he may be able to state a claim for supervisory liability against such defendants.").

### c. Failure To Train

**[5]** **[6]** Plaintiff also alleges that Fischer, Heath, Keyser, or some combination thereof failed to adequately train or supervise subordinates. (*See* Am. Compl. ¶¶ 2–4, 9–13).[5] An allegation that a defendant failed to adequately train or supervise subordinates implicates the fourth *Colon* factor, i.e., that "the defendant was grossly negligent in supervising subordinates who committed the wrongful acts." *Colon*, 58 F.3d at 873. However, to establish personal involvement on that basis

**\*8** Plaintiff must show that [the defendant] "knew or should have known that there was a high degree of risk that his subordinates would behave inappropriately, but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor

would find necessary to prevent such a risk, and that failure caused a constitutional injury to Plaintiff."

*Frederick v. Sheahan*, No. 10–CV–6527, 2014 WL 3748587, at *8 (W.D.N.Y. July 29, 2014) (alterations omitted) (quoting *Poe v. Leonard*, 282 F.3d 123, 142 (2d Cir.2002)); *see also Kucera v. Tkac*, No. 12–CV–264, 2013 WL 1414441, at *6 (D.Vt. Apr. 8, 2013) (noting an "alleged failure [to supervise or train] [would] satisfy the fourth *Colon* factor if [the officers] 'knew or should have known that there was a high degree of risk that subordinates would behave inappropriately but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable officer would find necessary to prevent such a risk.'" (alterations omitted) (quoting *Poe*, 282 F.3d at 142)). A general allegation that Fischer, Heath, and/or Keyser failed to train subordinates, however, is insufficient to establish personal involvement, absent some factual connection between their failure to train and the harm that eventually befell Plaintiff. *See, e.g.*, *McRae v. Gentile*, No. 14–CV–783, 2015 WL 7292875, at *5 (N.D.N.Y. Oct. 20, 2015) (finding no personal involvement by prison superintendent where the plaintiff alleged that the "[superintendent's] negligent training and supervision of the [d]efendant [c]orrections [o]fficers caused the Plaintiff's injuries" but "provide[d] no facts to support [the superintendent's] personal involvement in the alleged assault," reasoning that "[v]ague and conclusory allegations that a supervisor negligently failed to train or supervise subordinate employees are not sufficient to establish personal involvement so as to give rise to personal liability." (internal quotation marks omitted)), *adopted by* 2015 WL 7300540 (N.D.N.Y. Nov. 18, 2015); *Shepherd*, 2015 WL 1246049, at *13 (rejecting as too conclusory or otherwise non-cognizable the assertion that Fischer and two superintendent defendants, "acting alone and/or in conjunction with each other [,] were aware of there being a systematic, gross inadequacies in training as well [as] supervision of subordinates in the use of force, and further failed to take corrective as well as preventative measures, which caused the violation of [the] plaintiff's rights." (first alteration in original) (internal quotation marks omitted)); *McKenna v. Wright*, No. 01–CV–6571, 2004 WL 102752, at *5 (S.D.N.Y. Jan. 21, 2004) (concluding that the "plaintiff's position that [the DOCS commissioner] [was] personally liable for 'his failure to ensure' [an associate commissioner's sufficient resolution of the plaintiff's grievance], is merely an end-run around the legal standard and fails to establish [the

commissioner's] personal involvement," and concluding that, "[b]ecause [the] plaintiff makes no further allegations as to [the commissioner's] involvement, [the] plaintiff's claims against [the commissioner] are dismissed"); *Pacheco v. Fischer*, No. 09–CV–614, 2011 WL 831524, at *2 (N.D.N.Y. Jan. 19, 2011) ("[The] [p]laintiff's conclusory allegations that defendant Fischer failed to properly train staff and supervise employees at one of the many facilities in his Department [are] not enough to establish his personal involvement in the violations alleged by [the] plaintiff"), *adopted by*, 2011 WL 830266 (N.D.N.Y. Mar. 3, 2011); *cf. Pettus v. Morgenthau*, 554 F.3d 293, 299–300 (2d Cir.2009) (concluding that, "[t]o the extent the complaint attempts to assert a failure-to-supervise claim ..., it lacks any hint that [the DOCS commissioner] acted with deliberate indifference to the possibility that his subordinates would violate [the plaintiff's] constitutional rights" where the complaint alleged that the DOCS commissioner was responsible for "the hiring, practices, policies, customs, screening, training, supervising, controlling and disciplining" of DOCS employees). Here, Plaintiff's allegations that Fischer, Heath, and Keyser failed to adequately train their subordinates—at least as currently stated—are too conclusory to pass muster. To the extent that Plaintiff is able to make factual allegations connecting Fischer's, Heath's, and Keyser's putative failure to adequately train and supervise their employees with the injuries Plaintiff sustained, he should do so in his Second Amended Complaint.

### d. Statement During Orientation

**\*9** **[7]** In an interesting allegation, Plaintiff asserts that "Heath acknowledged the fact that his officer[ ]s were corrupt given his statement during orientation at Sing Sing," which statement, Plaintiff says, was "an indication of [Heath's] actual knowledge of pattern of unconstitutional practices at the facility." (Pl.'s Opp'n 4.) Unlike many of the other allegations in the Amended Complaint, this is not wholly conclusory; to the contrary, it is a specific reference to a specific statement by a specific Defendant, which, Plaintiff seems to suggest, demonstrates that Heath knew unconstitutional practices were afoot. Nevertheless, it too comes up short, because, in its current form, there is nothing to suggest one way or the other that the allegedly "unconstitutional practices" of which Heath was aware were the same as those alleged

in Plaintiff's Amended Complaint. *Cf. Voorhees*, 2006 WL 1888638, at *5–6 (finding no personal involvement by DOCS commissioner in lawsuit bringing excessive force claim where there were allegedly more than 60 grievances filed on a prison employee, reasoning that "[i]nmates and staff could have complained to [the commissioner] about all manner of alleged shortcomings in [the employee's] performance, including being rude, verbally abusive, irrational[,] or even engaging in minor acts of physical abuse such as shoving or pushing inmates"). To the extent that Plaintiff is able to allege facts demonstrating that Heath knew that unconstitutional practices like those alleged in this case were occurring, he should do so in a Second Amended Complaint.

### e. Referral of Appeals

**[8]** Plaintiff also alleges that he "sought discretionary review [of his Tier III hearing] from Heath," which was "passed along and subsequently denied," and that, "[o]n January 20, 2011, [P]laintiff filed his administrative appeal contesting the erroneous determination of Brereton raising a number of grounds for relief" and that "Fischer[ ] designated Prack[ ] to review Plaintiff's administrative appeal." (Am. Compl. ¶ 25.) [6] These allegations, however, are not enough because case law makes clear that a prison official's personal involvement does not spring into being simply because an appeal, which he delegates to another, was originally directed to him. *See Kasiem v. Rivera*, No. 09–CV–9665, 2011 WL 166929, at *5 (S.D.N.Y. Jan. 18, 2011) ("To the extent that [the plaintiff's] claims rest on allegations that [two prison supervisors] referred his complaints/appeals to others for investigation and that they were the supervising officers for defendants who violated his rights, those claims must be dismissed for failure to allege personal involvement in the violation of the plaintiff's rights."); *cf. Koehl v. Bernstein*, No. 10–CV–3808, 2011 WL 2436817, at *10 (S.D.N.Y. June 17, 2011) (noting that the second *Colon* category does not apply to prison official whose only opportunity to rectify due process violation in tier III proceedings was through appeal because "affirming the administrative denial of a prison inmate's grievance by a high-level official is insufficient to establish personal involvement under [§] 1983." (internal quotation marks omitted)), *adopted by* 2011 WL 4390007 (S.D.N.Y. Sept. 21, 2011); *Foreman v. Goord*, No. 02–CV–7089, 2004 WL 1886928, at *7 (S.D.N.Y. Aug. 23, 2004) ("The

fact that [the superintendent] affirmed the denial of [the] plaintiff's grievances is insufficient to establish personal involvement.").[7] Here, because Plaintiff seems to allege that Heath and Fischer merely passed along their appeals for others to consider, he has not adequately alleged their personal involvement.[8]

### 2. Failure to State a Claim

**\*10** Additionally, Defendants move to dismiss the claims against them for failure to state a claim on various grounds. (*See* Mem. of Law in Supp. of Defs.' Mot. To Dismiss ("Defs.' Mem.") 8–11 (Dkt. No. 62).)

### a. Due Process Claims

**[9]** **[10]** **[11]** Defendants move to dismiss Plaintiff's due process claims against Prack and White. (*Id.* 9.)[9] "[T]o present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir.2004) (alteration in original) (internal quotation marks omitted). The Supreme Court has held that inmates retain due process rights in prison disciplinary proceedings. *See Wolff v. McDonnell*, 418 U.S. 539, 563–72, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (describing the procedural protections that inmates are to receive when subject to significant disciplinary punishment). However, the Supreme Court has also held that "[p]rison discipline implicates a liberty interest [only] when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Ortiz*, 380 F.3d at 654 (quoting *Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)); *see also Vega v. Lantz*, 596 F.3d 77, 83 (2d Cir.2010) (same). The Second Circuit has explained that "[t]he length of disciplinary confinement is one of the guiding factors in applying *Sandin's* atypical and significant hardship test." *Hanrahan v. Doling*, 331 F.3d 93, 97 (2d Cir.2003) (internal quotation marks omitted). The duration of confinement, however, is "not the only relevant factor," as the Second Circuit has "explicitly avoided a bright line rule that a certain period of [Solitary Housing Unit ('SHU') ] confinement automatically fails to implicate due process rights." *Palmer v. Richards*, 364 F.3d 60,

64 (2d Cir.2004) (internal quotation marks omitted). Indeed, "[t]he conditions of confinement are a distinct and equally important consideration in determining whether a confinement in SHU rises to the level of atypical and severe hardship," and, therefore, courts should consider "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions." *Id.* (internal quotation marks omitted); *see also Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir.1999) ("Both the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical."). Nevertheless, "[a] confinement longer than an intermediate one [i.e., 101 and 305 days], and normal SHU conditions, is a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin.*" *Palmer*, 364 F.3d at 65 (internal quotation marks omitted); *see also Gonzalez v. Hasty*, 802 F.3d 212, 223 (2d Cir.2015) ("A period of confinement under typical SHU conditions lasting longer than 305 days ... triggers a protected liberty interest ...."). Significantly, the Second Circuit has cautioned that "[i]n the absence of a detailed factual record, [it has] affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short—less than the 30 days that the *Sandin* plaintiff spent in SHU—and there was no indication that the plaintiff endured unusual SHU conditions." *Palmer*, 364 F.3d at 65–66; *see also Houston v. Cotter*, 7 F.Supp.3d 283, 298 (E.D.N.Y.2014) (same).

**\*11** Given Plaintiff's allegation that he was initially sentenced to 30 *months* in the SHU—which is, to risk stating the obvious, considerably longer than 30 days—this Court is not prepared to rule as a matter of law that he could not state a due process claim. *See Palmer*, 364 F.3d at 65–66. This is quite likely unsurprising, as Plaintiff alleges that it was Brereton who commenced the Tier III hearing, (Am. Compl. ¶ 24), but certain named defendants, including Brereton, do not seek dismissal because "Plaintiff's allegations seem to raise issues that cannot be resolved in a motion to dismiss," (Defs.' Mem. 1 n.2). The remaining questions, then, are (1) whether a prison official who affirms a disciplinary determination is sufficiently involved to make out a due process claim, and (2) whether an "employee assistant" can be held liable for a due process violation.[10]

### i. Appeals Claim (Prack and Keyser)

Interestingly, "[c]ourts within the Second Circuit are split over whether ... an allegation [that a defendant affirmed a disciplinary proceeding] is sufficient to establish personal liability for supervisory officials." *Scott v. Frederick*, No. 13–CV–605, 2015 WL 127864, at \*17 (N.D.N.Y. Jan. 8, 2015). On the one hand, some courts have concluded that merely affirming a disciplinary proceeding is not enough to create personal involvement, while others have determined that it is. *Compare id.* ("We subscribe to the affirmance-plus standard, which holds that the mere rubber-stamping of a disciplinary determination is insufficient to plausibly allege personal involvement."); *Hinton v. Prack*, No. 12–CV–1844, 2014 WL 4627120, at \*17 (N.D.N.Y. Sept. 11, 2014) ("Courts within the Second Circuit are split over whether the mere allegation that a supervisory official affirmed a disciplinary determination is sufficient to establish personal liability. We subscribe to the affirmance plus standard, which holds that the mere rubber-stamping of a disciplinary determination is insufficient to plausibly allege personal involvement."); *and Brown v. Brun*, No. 10–CV–397, 2010 WL 5072125, at \*2 (W.D.N.Y. Dec. 7, 2010) (noting that "there is an apparent split in the Circuit as to whether the affirmance of disciplinary hearing disposition is sufficient to establish personal involvement," and concluding that "[t]he distinction ... appears to be that while personal involvement cannot be founded solely on supervision, liability can be found if the official proa[c]tively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results" (internal quotation marks omitted)) *with Tolliver v. Lilley*, No. 12–CV–971, 2014 WL 10447163, at \*12 (S.D.N.Y. Oct. 24, 2014) ("Prack received [the plaintiff's] grievance, reviewed it and acted on it, personally. Accordingly, the allegations against Prack are sufficient to state personal involvement and dismissing the claims against him based on this ground is not warranted ...."), *adopted sub nom. Tolliver v. Skinner*, No. 12–CV–971, 2015 WL 5660440 (S.D.N.Y. Sept. 25, 2015); *Murray v. Arquitt*, No. 10–CV–1440, 2014 WL 4676569, at \*12 (N.D.N.Y. Sept. 18, 2014) ("The affirmation of an allegedly unconstitutional disciplinary hearing appears to establish personal involvement."); *and Delgado v. Bezio*, No. 09–CV–6899, 2011 WL 1842294, at \*9 (S.D.N.Y. May 9, 2011) ("[I]t cannot be said that the *Iqbal* holding precludes liability where, as is alleged here, supervisory personnel affirmed a decision that they knew to have been imposed in violation of Plaintiff['']s due process rights, thus continuing a deprivation of liberty without due process of law").

**\*12** **[12]** The Court thinks the better view is that an affirmance of an unconstitutional disciplinary proceeding can be sufficient to find personal involvement. This is so for several reasons. First, on a simple conceptual level, it is difficult to imagine how a prison official could be deemed uninvolved where that official considered the inmate's objections and had the power to abrogate or preserve punishment, that, allegedly, was improperly imposed. *Cf. Tolliver*, 2014 WL 10447163, at \*12 (finding personal involvement where a prison official "reviewed" and "acted on" an inmate's grievance). Second, the Court does not think there is any tension between such a determination and *Iqbal*, the relevant teaching of which was that "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677, 129 S.Ct. 1937. Third, if *Colon* indeed survived *Iqbal*, the Court finds it telling that the Second Circuit held that personal involvement could be found where "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong," without further clarifying that "fail[ing] to remedy the wrong," is not enough where the defendant also affirmed the decision. *See Colon*, 58 F.3d at 873. Therefore, the Court declines to dismiss the claims against Prack and Keyser for failure to state a claim due to lack of personal involvement.

### ii. Employee Assistant Claim (White)

Defendants argue that the claim against White should be dismissed because "[a]n employee assistant in a prison disciplinary hearing has been described as 'merely a surrogate for the inmate, not a legal adviser or advocate' and a claim of inadequate assistance fails to state a constitutional claim." (Defs.' Mem. 9) (quoting *Dawes v. Carpenter*, 899 F.Supp. 892, 896 (N.D.N.Y.1995)). Even if that job description is apt, the lesson Defendants draw from it is not.

**[13]** **[14]** The Second Circuit has recognized that "[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges." *Eng v. Coughlin*, 858 F.2d 889, 897 (2d Cir.1988);

*see also Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993) ("The Supreme Court has recognized institutional concerns that in general bar an inmate from obtaining counsel. We have held, however, that in certain circumstances an inmate will be unable to 'marshal evidence and present a defense,' without some assistance." (citations omitted) (quoting *Eng,* 858 F.2d at 898) (citing *Wolff,* 418 U.S. at 570, 94 S.Ct. 2963)); *Gonzalez v. Chalk,* No. 13–CV–5486, 2014 WL 1316557, at *4 (S.D.N.Y. Apr. 1, 2014) ("[U]nder certain circumstances including the confinement of the inmate in the SHU, the inmate has a right to assistance in marshalling evidence and preparing a defense." (citing *Eng,* 858 F.2d at 897–98)); *Peralta v. Vasquez,* No. 01– CV–3171, 2010 WL 391839, at *3 (S.D.N.Y. Feb. 4, 2010) ("While there is no right to counsel, prison officials have a constitutional obligation to provide assistance to an inmate 'in marshaling evidence and presenting a defense when he is faced with disciplinary charges.'" (quoting *Eng,* 858 F.2d at 897)), *aff'd sub nom. Peralta v. Goord,* 402 Fed.Appx. 594 (2d Cir.2010). Accordingly, New York's regulations provide when an inmate is entitled to an employee assistant under certain circumstances, *see* N.Y. Comp. Codes R. & Regs. tit. 7, § 251–4.1, and describe the scope of that assistant's obligations, *see id.* § 251-4.2; *see also Moore v. Peters,* 92 F.Supp.3d 109, 126 (W.D.N.Y.2015) ("New York's regulations entitle a prisoner to an employee assistant to help him prepare for a disciplinary hearing." (citing N.Y. Comp. Codes R. & Regs. tit. 7, §§ 251–4.1, 251–4.2)); *see also LeBron v. Artus,* No. 06–CV–532, 2008 WL 111194, at *8 (W.D.N.Y. Jan. 9, 2008) (same). An employee assistant is "not obliged to go beyond the specific instructions of the inmate because if he did so he would then be acting as counsel in a prison disciplinary proceeding, assistance to which a prisoner is not entitled;" rather, the assistant is "to act as [the inmate's] surrogate." *Silva,* 992 F.2d at 22 (emphasis omitted). Additionally, "any violations of this qualified right [to employee assistance] are reviewed for 'harmless error.'" *Pilgrim v. Luther,* 571 F.3d 201, 206 (2d Cir.2009).

**\*13** In his Opposition to Defendants' Motion, Plaintiff elaborates on White's assistance, alleging that:

Plaintiff met with White in SHU and requested that he interview Gould, B [e]llinger, Dowtin[,] Woody, Barnes and inmate[ ] witnesses located in B-Block on (W) Whiskey gallery and obtain photos and documents generated as a result of the incident i.e. Use of force; To-from; Unusual incident; Investigative reports; Logbook entries (from specific locations), photos of injuries or

other [ ]wise .... White returned and read a document that reiterated what was written in the Misbehavior Reports and told [P]laintiff he could not have it, but gave Plaintiff a B-Block Logbook entry and showed him a witness list.

White[ ] failed to provide adequate assistance by failing to interview actual witnesses, provide requested documents and photos .... White provided no relevant documents and clearly failed to interview witnesses given the fact no notes were provided of an interview with inmates or officers and all prisoner [ ]s testified to being in the prison yard when Plaintiff was assaulted, except one inmate.

(Pl.'s Opp'n 8–9.) [11] In response, Defendants argue that (1) despite Plaintiff's "elaboration" in his Opposition papers, he provides "no facts to support [his] allegations" concerning White, such that they are "essentially conclusory," and (2) that "[P]laintiff does not claim that *no* assistance was given, but rather that the assistance was inadequate" and that "[s]uch a claim of inadequate assistance generally does not rise to a constitutional violation." (Defs.' Reply Mem. of Law in Supp. of their Mot. To Dismiss ("Defs.' Reply") 7 (Dkt. No. 75) (emphasis added).)

**[15]** Plaintiff has alleged sufficient facts to state a claim against White. Read liberally, Plaintiff's opposition alleges that he asked White to obtain certain documents and to interview certain witnesses, but that White failed to do so without explanation. Although an inmate's "right to assistance" may not always "translate to a wholesale right to receive all of the documentary evidence requested," *Scott,* 2015 WL 127864, at *11, Plaintiff's specific allegations about White's failures are nevertheless sufficient to state a claim against him, *see Brooks v. Prack,* 77 F.Supp.3d 301, 316 (W.D.N.Y.2014) (finding that the plaintiff stated a claim against his employee assistant where, inter alia, "[the] [p]laintiff ... identified specific documents that he requested [the employee assistant] deliver to him but that he never received"); *Cepeda v. Urban,* No. 12–CV–408, 2014 WL 2587746, at *7 (W.D.N.Y. June 10, 2014) (declining to dismiss claim against employee assistant where "[the] [p]laintiff allege[d] he was essentially denied an inmate assistant in connection with the disciplinary hearing because [the employee assistant], who was assigned to assist [the] [p]laintiff, failed to interview the witnesses identified by [the] [p]laintiff or to retrieve any of the documents [the]

[p]laintiff had requested"); *Friedland v. Otero*, No. 11–CV–606, 2014 WL 1247992, at *7 (D.Conn. Mar. 25, 2014) (denying summary judgment on procedural due process claim where "there [was] conflicting evidence as to whether [the plaintiff] asked [his employee assistant] to secure witness testimony or statements to be submitted at the hearing and whether the lack of access to these statements or testimony deprived [the] [p]laintiff of the opportunity to marshal evidence and present a defense"). Therefore, Plaintiff's claims against White are not dismissed.

### b. Eighth Amendment Claims

**\*14** The Eighth Amendment to the Constitution proscribes "cruel and unusual punishments." Plaintiff brings two distinct sets of Eighth Amendment claims against various Defendants, one against prison officials for their conduct during Plaintiff's alleged beating at the hands of other officers, and one relating to the delay in taking Plaintiff to the emergency room. (*See* Am. Compl. ¶¶ 20–21.) The Court will address each in turn.

### i. Claims against Gamble and Barnes

**[16]** **[17]** Under the Eighth Amendment, prison officials must "take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir.1996); *see also McRae*, 2015 WL 7292875, at *2 (same). Moreover, "[l]aw enforcement officials, including prison officials, can be held liable under § 1983 for failing to intervene in a situation where another official is violating an inmate's constitutional rights, including the use of excessive force, in their presence." *McRae*, 2015 WL 7292875, at *2 (citing, inter alia, *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir.2001)); *see also Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir.1994) ("It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence."); *Rahman v. Acevedo*, No. 08–CV–4368, 2011 WL 6028212, at *8 (S.D.N.Y. Dec. 5, 2011) ("A law enforcement officer 'has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers.' " (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir.1997))); *Tavares v. City of N.Y.*, No. 08–CV–3782,

2011 WL 5877550, at *7 (S.D.N.Y. Oct. 17, 2011) ("A law enforcement officer has an affirmative duty to intercede on behalf of a citizen whose constitutional rights are being violated in his presence by other officers." (internal quotation marks omitted) (quoting *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir.1988))), *adopted by*, 2011 WL 5877548 (S.D.N.Y. Nov. 23, 2011). Specifically, "[a]n officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know that excessive force is being used," provided there was "a realistic opportunity to intervene to prevent the harm from occurring." *Rahman*, 2011 WL 6028212, at *8 (ellipses and internal quotation marks omitted) (quoting *Anderson*, 17 F.3d at 557); *see also Curley*, 268 F.3d at 72 ("Failure to intercede results in liability where an officer observes excessive force is being used or has reason to know that it will be." (citing *Anderson*, 17 F.3d at 557)); *Tavares*, 2011 WL 5877550, at *7 ("An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know that excessive force is being used, or that any constitutional violation has been committed by a law enforcement official." (alterations and ellipses omitted) (quoting *Anderson*, 17 F.3d at 557)); *Jean–Laurent v. Wilkerson*, 438 F.Supp.2d 318, 327 (S.D.N.Y.2006) ("Liability will attach only when (1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene."), *aff'd*, 461 Fed.Appx. 18 (2d Cir.2012).

**\*15** **[18]** Here, Plaintiff alleges that, in the course of his assault, he was "handcuffed[,] ... shoved down a flight of stairs[,] and pushed up against a wall w[h]ere ... Gamble shouted [']why is he still standing[?] [W]hy is he still breathing[?][']" (Am. Compl. ¶ 20.) Defendants, however, argue that this fails to state a claim because "[e]ven vile and abusive language ... [,] no matter how abhorrent or reprehensible, cannot form the basis for a § 1983 claim." (Defs.' Mem. 10) (ellipses in original) (internal quotation marks omitted) (quoting *Harris v. Fischer*, No. 11–CV–6260, 2014 U.S. Dist. LEXIS 107503, at *46, 2014 WL 3859242, at 28 (S.D.N.Y. Aug. 1, 2014).) True though this proposition may be, it of course cannot be stretched to insulate an officer from § 1983 liability that he would otherwise have faced had he instead stood silent during

an assault by his coworkers. Perhaps recognizing the conceptual distinction between Gamble's words judged by their content and the same words—to borrow a phrase from evidence law—as a verbal act, Defendants argue that, unlike the cases Plaintiff cites to show that an official who intends to incite unconstitutional conduct by his statements may be held liable for a constitutional violation, Gamble "made the statement after the alleged incident." (Defs.' Reply 8.) Such a distinction is, however, too flimsy for two reasons. First, it not completely clear from the Amended Complaint—particularly when read with an accommodating eye on Plaintiff's pro se status—that Plaintiff really does allege, as Defendants say, that Gamble made his statement after the assault concluded. *See Triestman*, 470 F.3d at 476. (*See also* Am. Compl. ¶ 20.) Second, the dispositive question is not when Gamble made his statement; rather, it is whether he had reason to know of the use of force and a reasonable opportunity to prevent the harm. *See Rahman*, 2011 WL 6028212, at *8. Even if Gamble made the statement in question after the assault, it would be perfectly plausible that he did so having already seen the assault and having already made up his mind not to stop it. Therefore, the Court cannot say that the facts, as alleged, make an Eighth Amendment claim against Gamble implausible.

[19] The story is different with respect to Barnes, however. As to Barnes, Plaintiff alleges only that he "repeatedly ordered [the] [D]efendants [who were beating Plaintiff] to stop" and "stat[ed][,] [']that[']s enough[;] that[']s enough.[']" (Am. Comp. ¶ 20.) This, of course, falls far short of alleging that Barnes had reason to know that excessive force was being used and had a realistic opportunity to intervene to prevent the harm from occurring. *See Rahman*, 2011 WL 6028212, at *8. There is simply no reason—in the absence of allegations to the contrary—to believe that Barnes saw the assault, declined to prevent it, had a road-to-Damascus moment, and, then, at least verbally tried to stop the assault. Therefore, the claims against Barnes are dismissed without prejudice.

The Court is concerned, however, that Plaintiff may not have fully understood that Defendants sought dismissal of the claims against Barnes because the section of Defendants' Memorandum dealing with Barnes also sought dismissal of claims against Fischer, Heath, Keyser, Prack, Barnes, White, Gamble, Schrader, Freeman, and Luciano, and included for each of those Defendants a subheading identifying them by name and presenting

arguments specific to why the claims should be dismissed against that Defendant (sometimes along with two others). (*See* Defs.' Mem. 8–11.) In contrast, the only time that Barnes is mentioned in the argument section of the brief is (1) a footnote in a separate, earlier section otherwise dealing *only* with Fischer, Heath, and Keyser, (*see id.* at 6 n.4), and (2) in an introductory sentence with accompanying heading and conclusion sentence saying that Plaintiff failed to state a claim against Barnes but not explaining why, (*see id.* 8, 11.) Moreover, Plaintiff, in contrast to his approach with respect to the other Defendants in Barnes's section, did not present any arguments as to why he stated a claim against Barnes. (*See generally* Pl.'s Opp'n.) In the future, the Court hopes that counsel for Defendants will structure their briefs in such a way as to minimize the risk that a pro se party like Plaintiff will not have to struggle to determine the full scope of their arguments. In the meantime, Plaintiff will have an opportunity to re-visit his claims against Barnes if he wants to further amend his complaint.

### ii. Claims against Schrader, Freeman, and Luciano

The Amended Complaint also alleges that Schrader, Freeman, and Luciano violated Plaintiff's Eighth Amendment rights by leaving him shackled in a van at a check point while he was in excruciating pain for several hours before taking him to the emergency room. (Am. Compl. ¶ 21.)

[20]  [21]  [22]  [23]  "The Eighth Amendment forbids deliberate indifference to serious medical needs of prisoners." *Spavone v. N. Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir.2013) (internal quotation marks omitted). "The Supreme Court has held that an officer's 'deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment.' " *Kennedy v. City of N.Y.*, No. 12–CV–4166, 2015 WL 6442237, at *14 (S.D.N.Y. Oct. 23, 2015) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). "[S]uch indifference may be manifested through the intentional denial of a prisoner's access to medical care ...." *Id.* (citing *Estelle*, 429 U.S. at 104, 97 S.Ct. 285); *see also Quezada v. Roy*, No. 14–CV–4056, 2015 WL 5970355, at *18 (S.D.N.Y. Oct. 13, 2015) ("Prison officials violate the Eighth Amendment if they are deliberately indifferent to an inmate's serious medical

needs by denying or delaying his access to medical care or by intentionally interfering with his treatment." (internal quotation marks omitted)). "There are two elements to a claim of deliberate indifference to a serious medical condition." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir.2009). "The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious." *Spavone*, 719 F.3d at 138 (internal quotation marks omitted). Analyzing this objective requirement requires two inquiries. "The first inquiry is whether the prisoner was actually deprived of adequate medical care." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir.2006). [12] The second inquiry is "whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.* at 280. To meet this requirement, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir.2013). "There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir.2003). Nevertheless, the Second Circuit has "presented the following non-exhaustive list of factors to consider when evaluating an inmate's medical condition: (1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Morales v. Fischer*, 46 F.Supp.3d 239, 247 (W.D.N.Y.2014) (quoting *Brock*, 315 F.3d at 162) (internal quotation marks omitted).

**\*16** **[24]** **[25]** **[26]** "The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care." *Spavone*, 719 F.3d at 138. Under the second prong, the question is whether defendants "knew of and disregarded an excessive risk to [a plaintiff's] health and safety and that [they were] both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and also drew the inference." *Caiozzo*, 581 F.3d at 72 (alterations and internal quotation marks omitted). In other words, "[i]n medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Nielsen v.*

*Rabin*, 746 F.3d 58, 63 (2d Cir.2014) (internal quotation marks omitted). "Deliberate indifference is a mental state equivalent to subjective recklessness" and it "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (internal quotation marks omitted). In contrast, mere negligence is not enough to state a claim for deliberate indifference. *See Walker*, 717 F.3d at 125; *Vail v. City of N.Y.*, 68 F.Supp.3d 412, 424 (S.D.N.Y.2014). Moreover, "mere disagreement over the proper treatment does not create a constitutional claim," and accordingly, "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir.1998); *see also Banks v. Annucci*, 48 F.Supp.3d 394, 407–08 (N.D.N.Y.2014) (same).

**[27]** Here, Plaintiff alleges that, after being "made to stand in the back of [a] shower bleeding and in agonizing pain for twenty minutes or more," he was then taken to be examined by medical staff nurse Nugent. Nurse Nugent then examined Plaintiff and told him that he would be taken to an outside hospital, but Schrander, Freeman, and Luciano shackled Plaintiff and "placed him in a van where [he] sat at a Sing Sing check point bleeding in excruciating pain for several hours before finally being taken to Mount Vernon Emergency Room." (*See* Am. Compl. ¶¶ 20–21.) Read liberally, Plaintiff alleges that these three Defendants took custody of Plaintiff —beaten and bloodied—from a medical professional who determined that Plaintiff needed outside medical care, and left him to languish in excruciating pain for hours. This states an Eighth Amendment claim. *See Espinosa v. McCabe*, No. 10–CV–497, 2012 WL 4108884, at \*11 (N.D.N.Y. Aug. 28, 2012) (recommending the defendants' summary judgment motion be denied where the plaintiff asserted that, after being assaulted and losing consciousness, three defendants "abandoned him and failed to provide notification to the proper individuals that medical assistance was necessary" and two others moved the plaintiff, who was moaning in pain, to a cell where they left him), *adopted by* 2012 WL 4107908 (N.D.N.Y. Sept. 19, 2012); *Scott v. Abate*, No. 93–CV–4589, 1995 WL 591306, at \*1 (E.D.N.Y. Sept. 27, 1995) (finding that the plaintiff stated a claim against a defendant correction officer where the defendant failed to take the plaintiff to the clinic after an accident); *Hodge v. Coughlin*, No. 92–CV–622, 1994 WL 519902, at \*11 (S.D.N.Y. Sept. 22, 1994) (noting that "[t]o establish [a claim of

deliberate indifference to serious medical needs on the part of nonmedical prison personnel] [a] plaintiff must prove that prison personnel intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problems known to the attendant prison personnel or that the inmate suffered a complete denial of medical treatment."), *aff'd*, 52 F.3d 310 (2d Cir.1995). More specifically, Plaintiff adequately satisfies the objective prong that "the alleged deprivation of adequate medical care ... be sufficiently serious," *Spavone*, 719 F.3d at 138, because he suffered hours of "excruciating pain" allegedly after a beating, (*see* Am. Compl. ¶¶ 19–21), which is objectively serious, *see, e.g.*, *Reeder v. Artus*, No. 09–CV–575, 2010 WL 3636138, at *9 (N.D.N.Y. July 27, 2010) (concluding in excessive force context that the plaintiff satisfied the objective requirement where he alleged that he suffered "excruciating pain in his fingers, face and neck; a swollen face, knee and fingers; black eyes; and a bloody ear"), *adopted by*, 2010 WL 3636132 (N.D.N.Y. Sept. 9, 2010). Likewise, the subjective prong is fulfilled because, by knowing—whether from seeing his injuries, hearing about the beating, speaking with Nugent, or anything else—about Plaintiff's need to go to an outside medical facility but yet leaving him to suffer in a van for hours, these Defendants were "aware of a substantial risk [of] serious inmate harm" and yet "fail[ed] to act." *Nielsen*, 746 F.3d at 63. Therefore, Plaintiff has stated a claim against these Defendants under the Eighth Amendment. [13]

### 3. Failure to Exhaust

**\*17** Defendants argue that Plaintiff has failed to fully administratively exhaust his claims against Schrader, Freeman, and Luciano as required by the Prison Litigation Reform Act ("PLRA"). (*See* Defs.' Mem. 12–14.)

**[28]** **[29]** The PLRA provides that "[n]o action shall be brought with respect to prison conditions under [§] 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement applies to all personal incidents while in prison, *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (holding exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes"); *see also* *Johnson v. Killian*, 680 F.3d 234, 238 (2d Cir.2012) (same), and includes actions for monetary damages despite the fact that monetary damages are not available as an administrative remedy, *Booth v. Churner*, 532 U.S. 731, 741, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001) (holding exhaustion is required "regardless of the relief offered through administrative procedures"). Moreover, the PLRA mandates " 'proper exhaustion'—that is, 'using all steps that the agency holds out, and doing so properly,' ... [which] entails ... 'completing the administrative review process in accordance with the applicable procedural rules.' " *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir.2011) (quoting *Woodford v. Ngo*, 548 U.S. 81, 88, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)).

**[30]** **[31]** The Second Circuit has made clear that "administrative exhaustion is not a jurisdictional predicate," but rather failure to exhaust "is an affirmative defense." *Giano v. Goord*, 380 F.3d 670, 675 (2d Cir.2004) (citation omitted). Accordingly, "defendants bear the burden of proof [,] and prisoner plaintiffs need not plead exhaustion with particularity." *McCoy v. Goord*, 255 F.Supp.2d 233, 248 (S.D.N.Y.2003); *see also* *Miller v. Bailey*, No. 05–CV–5493, 2008 WL 1787692, at *3 (E.D.N.Y. Apr. 17, 2008) (explaining that the exhaustion requirement "must be pleaded and proved by a defendant" (citing *Jones v. Bock*, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007))). Further, "[a] court may not dismiss for failure to exhaust administrative remedies unless it determines that such remedies are available." *Rossi v. Fischer*, No. 13-CV-3167, 2015 WL 769551, at *4 (S.D.N.Y. Feb. 24, 2015) (internal quotation marks omitted) (quoting *Abney v. McGinnis*, 380 F.3d 663, 668 (2d Cir.2004)). The Second Circuit has likewise recently made clear that "[w]hether an administrative remedy was available to a prisoner in a particular prison or prison system is ultimately a question of law," and "defendants bear the initial burden of establishing, by pointing to legally sufficient sources such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute." *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir.2015) (citation, alteration, and internal quotation marks omitted); *see also* *Perez v. City of N.Y.*, No. 14–CV–7502, 2015 WL 3652511, at *2 (S.D.N.Y. June 11, 2015) (same).

Importantly, the Second Circuit has recognized certain exceptions to the exhaustion requirement that apply when: "(1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense ... or acted in such a[ ] way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure" to exhaust his remedies. *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 175 (2d Cir.2006) (citing *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir.2004)). "[T]he resolution of the exhaustion issue does not necessarily fit exactly into any of these three categories, and a particular fact pattern may implicate one or a combination of these factors." *Pagan v. Brown*, No. 08–CV–724, 2009 WL 2581572, at *5 (N.D.N.Y. Aug. 19, 2009) (citing *Giano*, 380 F.3d at 677 n. 6). Therefore, a motion to dismiss pursuant to Rule 12(b)(6) for failure to exhaust should be granted only if "nonexhaustion is clear from the face of the complaint, and none of the exceptions outlined by the Second Circuit [is] germane." *Lovick*, 2014 WL 3778184, at *4 (alterations and internal quotation marks omitted); *see also Lee v. O'Harer*, No. 13–CV–1022, 2014 WL 7343997, at *3 (N.D.N.Y. Dec. 23, 2014) ("Dismissal under Rule 12(b)(6) for failure to exhaust is appropriate if such failure is evidenced on the face of the complaint and incorporated documents."); *Sloane v. Mazzuca*, No. 04–CV–8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) ("[B]y characterizing non-exhaustion as an affirmative defense, the Second Circuit suggests that the issue of exhaustion is generally not amenable to resolution by way of a motion to dismiss." (internal quotation marks omitted)).

**\*18** Despite the foregoing, it is not entirely clear that these exceptions—colloquially referred to as the *Hemphill* exceptions—remain good law after the Supreme Court's decision in *Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). In *Woodford*, the Supreme Court held that the PLRA's exhaustion requirement mandates not merely "exhaustion *simpliciter*" but rather "proper exhaustion," which "demands compliance with an agency's deadlines and other critical procedural rules." *See Woodford*, 548 U.S. at 83, 88, 91, 126 S.Ct. 2378. Although Second Circuit law confirms that *Woodford* may indeed have imperiled the *Hemphill* exceptions' vitality, it has not yet explicitly determined whether these three exceptions remain good law. *See, e.g.*, *Amador*, 655 F.3d at 102 ("Subsequent decisions have questioned the continued viability of this framework following the

Supreme Court's decision in *Woodford* ...."); *Ruggiero*, 467 F.3d at 176 ("We need not determine what effect *Woodford* has on our case law in this area, however, because [the plaintiff] could not have prevailed even under our pre-*Woodford* case law."); *Rambert v. Mulkins*, No. 11–CV–7421, 2014 WL 2440747, at *11 (S.D.N.Y. May 30, 2014) (noting that "the Second Circuit has left unresolved the continuing vitality of the *Hemphill* exceptions in light of the Supreme Court's ruling in *Woodford v. Ngo*," but concluding that "*Hemphill* remains good law").

**[32]** Nevertheless, when nonexhaustion is not clear from the face of the complaint, a defendant's motion may be converted to a motion for summary judgment "limited to the narrow issue of exhaustion and the relatively straightforward questions about [the] plaintiff's efforts to exhaust, whether remedies were available, or whether exhaustion might be, in very limited circumstances, excused." *Stevens v. City of N.Y.*, No. 12–CV–1918, 2012 WL 4948051, at *3 (S.D.N.Y. Oct. 11, 2012) (quoting *McCoy*, 255 F.Supp.2d at 251); *see also Rambert*, 2014 WL 2440747, at *6 (same); *Smalls v. Jummonte*, No. 08–CV–4367, 2010 WL 3291587, at *3 (S.D.N.Y. Aug. 13, 2010) (same). When doing so in the context of an action brought by a pro se prisoner, the potential consequences of a motion for summary judgment as well as the procedural requirements for responding to one must first be explained, and the Court should also allow Plaintiff the opportunity to take discovery. *See Hernández v. Coffey*, 582 F.3d 303, 305, 307–08 (2d Cir.2009) (noting that "[i]n the case of a pro se party ..., notice is particularly important because the pro se litigant may be unaware of the consequences of his failure to offer evidence bearing on triable issues," and that, "[a]ccordingly, pro se parties must have unequivocal notice of the meaning and consequences of conversion to summary judgment" (alterations, internal quotation marks, and italics omitted)). As a result, in the PLRA exhaustion context, courts have insisted upon limited discovery before converting a motion to dismiss for failure to exhaust administrative remedies as required by the PLRA into a summary judgment motion. *See, e.g.*, *Lovick*, 2014 WL 3778184, at *5 (observing that "when converting a Motion to Dismiss into a Motion for Summary Judgment under Fed. R. Civ. P. 12(d), notice to the parties is mandated, particularly when a pro se litigant is involved," and accordingly "permit[ting] the parties to engage in limited discovery confined solely to the issue

of administrative exhaustion"); *Pratt v. City of N.Y.*, 929 F.Supp.2d 314, 319 (S.D.N.Y.2013) (noting that the court could convert the motion to dismiss into a motion for summary judgment on the issue of PLRA exhaustion, but observing that, if it were to do so, "the parties would be entitled to an opportunity to take discovery and submit additional relevant evidence, and the parties have not yet been allowed such an opportunity"); *Stevens*, 2012 WL 4948051, at *6–7 (converting a motion to dismiss into a motion for summary judgment, but allowing for a period of discovery limited to the issue of administrative exhaustion); *cf. Rodriguez v. Warden, Metro. Corr. Facility*, No. 13–CV–3643, 2015 WL 857817, at *10 (S.D.N.Y. Feb. 27, 2015) (noting that, "if the [c]ourt were to convert the motion [for judgment on the pleadings into one for summary judgment], all parties must be afforded the opportunity to present supporting material," and observing that "the [c]ourt may permit limited discovery exclusively on the issue of exhaustion" (alterations and internal quotation marks omitted)).

**\*19** A number of courts have, however, declined to convert the motion where discovery may reveal whether administrative remedies were available to a plaintiff or other special circumstances would excuse his failure to exhaust. *See McNair v. Rivera*, No. 12–CV–6212, 2013 WL 4779033, at *6 (S.D.N.Y. Sept. 6, 2013) (declining to convert motion because "bifurcating discovery, with additional motion practice, creates the potential for complication and delay," and because the court "[did] not anticipate that full fact discovery [would] be sufficiently laborious ... to counter [the] plaintiff's interest in a timely disposition of his suit"); *Rosenberg v. Coon*, No. 12–CV–3803, 2013 WL 1223516, at *2 n. 1 (S.D.N.Y. Mar. 27, 2013) ("[The] [d]efendants submit the declaration of the Director of the Inmate Grievance Program ..., which cannot properly be considered on a motion to dismiss. Because the [c]ourt declines to convert [the] defendants' motion to a motion for summary judgment, it does not consider the declaration."); *Shapiro v. Cmty. First Servs., Inc.*, No. 11–CV–4061, 2013 WL 1122628, at *6 (E.D.N.Y. Mar. 18, 2013) (declining to convert a motion to dismiss into a motion for summary judgment because discovery had not yet occurred and because Fed. R. Civ. P. 12(d) contained no authority to convert a Rule 12(b)(1) motion into a motion for summary judgment); *Pratt*, 929 F.Supp.2d at 319 (declining to convert motion to dismiss into a motion for summary judgment on the issue of exhaustion of administrative remedies and denying

motion to dismiss on such grounds, noting that "[w]hether administrative remedies were in fact available to the plaintiff and whether they were otherwise ineffective are questions of fact that cannot be resolved on this motion to dismiss").

**[33]** Here, Plaintiff's non-exhaustion is not clear from the face of the Amended Complaint, which indicates that he did file a grievance, albeit about "[t]he assault by correctional officer[ ]s C. Dowtin, R. Woody Jr., [and] T. Bellinger." (*See* Am. Compl. 4.) [14] Moreover, Plaintiff argues that his "failed attempt to file a second grievance can be attributed to the Sgt. and officer[ ]s assigned in SHU at Sing Sing Correctional Facility, who refused to provide [P]laintiff with ... grievance forms." (Pl.'s Opp'n 13–14.) It would thus be premature to dismiss Plaintiff's claims for failure to exhaust his administrative remedies. The Court would, however, be within its rights to convert the Motion to Dismiss into a summary judgment motion; however, the Court declines to do so. *See Pratt*, 929 F.Supp.2d at 319 (noting that the court could convert motion to dismiss into summary judgment motion on PLRA issue but declining to do so). Here, the Court does not think there is sufficient reason to bifurcate discovery and delay the ultimate resolution of this case in order to facilitate resolution of the PLRA issue before other issues that may come up on a summary judgment motion. *See McNair*, No. 2013 WL 4779033, at *6.

---

## III. Conclusion

For the foregoing reasons, the Court grants Defendants' Motion in part, and the claims against Fischer, Heath, and Barnes are hereby dismissed. Additionally, Plaintiff's claims against Keyser are dismissed, except for the claim relating to his review of Plaintiffs' disciplinary proceedings. These dismissals are without prejudice, meaning that Plaintiff will be given an opportunity to amend his complaint, but he must do so within 30 days. Defendants' Motion is in all other respects denied.

The Clerk of the Court is respectfully requested to terminate the pending Motion. (*See* Dkt. No. 59.)

SO ORDERED.

**All Citations**

--- F.Supp.3d ----, 2016 WL 827781

Footnotes

1   The Amended Complaint apparently misspells Defendant William Keyser's last name as "Keysor." (Mem. of Law in Supp. of Defs.' Mot. To Dismiss ("Defs.' Mem.") 1 & n.1 (Dkt. No. 62).)

2   Contradictorily, the Memorandum of Law in Support of the Motion to Dismiss both identifies Gould as one of the movants in its preliminary statement and conclusion, (*see* Defs.' Mem. 1, 14), and also says in a footnote that "Defendants do not move on behalf of ... Gould," among others, (*id.* 1 n.2). Because the Memorandum of Law presents no arguments about why the Amended Complaint should be dismissed with respect to Gould, the Court proceeds on the assumption that she has in fact not so moved.

3   Here and elsewhere, context suggests—although it is not entirely clear—that Plaintiff is quoting one of the Defendants.

4   Although, as acknowledged, courts have questioned the impact of *Iqbal* on the *Colon* factors, they have done so in the context of considering *Iqbal's* proscription of respondeat superior liability in § 1983 and *Bivens* suits. *See, e.g., Reynolds v. Barrett,* 685 F.3d 193, 206 n. 14 (2d Cir.2012) (noting that "*Iqbal* has, of course, engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in *Colon*" after describing *Iqbal's* holding as to vicarious liability (citing *Iqbal,* 556 U.S. at 676–77, 129 S.Ct. 1937)). There is no question that *Iqbal's* other holdings—for instance, its clarification that a court need not accept legal conclusions as true when faced with a motion to dismiss, *see Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937—apply with no less force in a *Colon* analysis than in any other area of law.

5   Of course, an allegation that one of these Defendants was grossly negligent in supervising subordinates—which Plaintiff does allege in that manner, (*see, e.g.,* Am. Compl. ¶ 10)—runs headlong into the rule discussed earlier that mere recital of the *Colon* prongs does not establish personal involvement. (*See supra* section II(B)(1)(a).)

Additionally, in one obscure allegation, Plaintiff asserts that "[t]he failure of Key[s]er, [H]eath[,] and Fischer to properly screen area supervisors and officers in conducting stress test [sic] created and condone[d] the unlawful unconstitutional, customary practices of excessive use of force." (Am. Compl. ¶ 13.) In so saying, the Court believes that Plaintiff is further alleging supervisory failures on these three Defendants' part, but, candidly, the Court is not certain. Should Plaintiff elect to submit an Amended Complaint, if he has specific allegations to make concerning these Defendants' role in a prison stress test, he should include them.

6   Keyser's involvement in this appeals process, which is unclear from these allegations, will be discussed later. (*See infra* section II(B)(2)(a).)

7   As will be discussed later, "there is an apparent split in the Circuit as to whether the affirmance of disciplinary hearing disposition is sufficient to establish personal involvement." *Brown v. Brun,* No. 10–CV–397, 2010 WL 5072125, at *2 (W.D.N.Y. Dec. 7, 2010). Although the Court respectfully questions the proposition that affirming an unconstitutional disposition is insufficient to establish personal involvement, it nevertheless believes the logic underlying decisions coming to the opposite conclusion demonstrates that simply *referring* a case for a determination is not enough.

8   To be sure, the second *Colon* prong indicates that personal involvement may be found where "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong." *Colon,* 58 F.3d at 873. And, indeed, "there is some authority for the proposition that, where a defendant is in a position to remedy an ongoing' constitutional violation but fails to do so, he or she can be held liable under [§] 1983" in such cases. *Blalock v. Jacobsen,* No. 13–CV–8332, 2014 WL 5324326, at *10 (S.D.N.Y. Oct. 20, 2014); *see also Zappulla v. Fischer,* No. 11–CV–6733, 2013 WL 1387033, at *9 (S.D.N.Y. Apr. 5, 2013) ("[I]f a plaintiff alleges that a constitutional violation is ongoing, and that a defendant, after being informed of a violation through a report or appeal, failed to remedy the wrong, the plaintiff's claim against that defendant should not dismissed under Rule 12(b)(6)."). To the extent that this doctrine accurately states the law, it is not clear that Plaintiff's appeal relating to the alleged use of excessive force put Fischer and Heath on notice of an *ongoing* violation. *See Smith v. Wildermuth,* No. 11–CV–241, 2013 WL 877399, at *9 (N.D.N.Y. Jan. 24, 2013) (applying ongoing violation doctrine and finding no personal involvement on the part of the prison superintendent in a case (1) where the plaintiff alleged (a) that prison officials attacked him, (b) that the officials filed false incident reports to cover up their attack, and (c) that an inmate was beaten by a guard every month since the superintendent took over; and (2) where the superintendent denied the plaintiff's grievance regarding the alleged use of excessive force, reasoning that "[the superintendent] denied [the] [p]laintiff's grievance about a one-time event"), *adopted by* 2013 WL 877512 (N.D.N.Y. Mar. 11, 2013).

9    In his Opposition, Plaintiff indicates that "Keyser ... reviewed the hearing proceeding and determined that [it] complied with the Procedures for Implementing Standards of Inmate behavior Chapter V, Title 7 N.Y.C.R.R....." (Pl.'s Opp'n 7.) Plaintiff additionally attaches an exhibit reflecting the outcome of Plaintiff's Tier III disciplinary proceedings, with a stamp on it that reads "I have reviewed this hearing and find that it complies with Chapter V Title 7 of N.Y.C.R.R." and is apparently signed by Keyser. (*Id.* Ex. D.) Plaintiff's only reference to Keyser in this regard in his Amended Complaint is the assertion that he "subsequently determined the Tier III hearing complies with the provisions of Chapter V Title 7 of N.Y.C.R.R." (Am. Compl. ¶ 4.) While it is not clear that Defendants seek dismissal of Keyser on the same grounds as Prack, perhaps because they did not read this line as endeavoring to state a claim against Keyser on this basis, dismissal would nevertheless be inappropriate for the same reasons as with Prack.

10    Defendants do not cast the former issue as one of personal involvement, but the case law makes clear that is the concern animating the debate. *See Jackson v. Bradt*, No. 13–CV–4, 2014 WL 2505218, at *4 (W.D.N.Y. May 29, 2014) (noting that "the only allegation [against Prack] is that he affirmed [a lieutenant's] disposition" in a disciplinary proceeding, which is, "alone[,] ... insufficient to state a claim against Prack" and citing another case which, in part, endorsed the proposition that "personal involvement cannot be founded solely on supervision, liability can be found if the official proactively participated in reviewing the administrative appeals" (internal quotation marks omitted)).

11    In resolving the instant Motion, it is appropriate to consider allegations contained in Plaintiff's Opposition. *See Anderson v. Buie*, No. 12–CV–6039, 2015 WL 9460146, at *13 (W.D.N.Y. Dec. 23, 2015) (liberally construing the pro se plaintiff's submissions to consider a document referenced repeatedly in opposition to motion to dismiss); *Elliott v. Nestle Waters N. Am. Inc.*, No. 13–CV–6331, 2014 WL 1795297, at *7 (S.D.N.Y. May 6, 2014) (considering, among other things, an exhibit attached to an opposition brief in part "in light of the policy permitting courts to consider facts alleged for the first time in a pro se plaintiff's opposition to a motion to dismiss"); *Rodriguez v. McGinnis*, 1 F.Supp.2d 244, 246–47 (S.D.N.Y.1998) ("Although material outside a complaint generally is not to be taken into consideration on a motion to dismiss, the policy reasons favoring liberal construction of pro se complaints permit a court to consider allegations of a pro se plaintiff in opposition papers on a motion where ... consistent with the complaint.").

12    "As the Supreme Court has noted, the prison official's duty is only to provide reasonable care." *Salahuddin*, 467 F.3d at 279 (citing *Farmer v. Brennan*, 511 U.S. 825, 844–47, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

13    In his Opposition, Plaintiff prevails upon the Court to "take note of the [D]efendant[s'] failure to contest [P]laintiff['s] factual claims of conspiracy between [D]efendant[ ]s Schrader, Freeman, Luciano, who[ ] collaborated with each other and other unknown correction official [ ]s in delaying [P]laintiff's transfer to [the] outside hospital." (Pl.'s Opp'n 12.) Specifically, Plaintiff says that these three "conspired with [D]efendants B[e]llinger, Woody Jr., and Dowtin in delaying [P]laintiff's emergenc[y] medical needs by holding [P]laintiff shackled and handcuffed in a van ... for several hours while he was bleeding and in obvious pain." (*Id.* at 11 (citing Am. Compl. ¶¶ 8, 20, 21).) Neither these allegations nor the Amended Complaint, however, adequately state a claim for conspiracy in this regard. "To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir.1999); *see also Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 324–25 (2d Cir.2002) (same); *Randle v. Alexander*, 960 F.Supp.2d 457, 475 (S.D.N.Y. 2013) (same); *Barnes v. Abdullah*, No. 11–CV–8168, 2013 WL 3816586, at *9 (S.D.N.Y. July 22, 2013) (same). Even read liberally, however, the Amended Complaint and Plaintiff's Opposition—apart from its conclusory assertions of a conspiracy—simply do not include factual content by which the Court could surmise a conspiracy. Indeed, perhaps to the contrary, the Amended Complaint—in one of the paragraphs Plaintiff cites to suggest there was a conspiracy—alleges that Schrander, Freeman, and Luciano "act [ed] *individually or in conjunction* with each other and other named defendants" to violate his rights. (*See* Am. Compl. ¶ 8 (emphasis added).) That ambivalence, rather than plausibly alleging, arguably *undercuts* the likelihood of a conspiracy. The Amended Complaint does, of course, provide a basis to think that these three Defendants worked together to harm Plaintiff, thereby "act[ing] in concert to inflict an unconstitutional injury," *Pangburn*, 200 F.3d at 72. But that cannot be enough to create a § 1983 conspiracy because, otherwise, a conspiracy could spontaneously exist whenever multiple actors were responsible for a single constitutional tort.

14    To be sure, one could cry expressio unius est exclusio alterius and argue that this means the Amended Complaint betrays Plaintiff's non-exhaustion with respect to his claims against Schrader, Freeman, and Luciano. However, liberally construing Plaintiff's Amended Complaint, it could also be taken to mean that Plaintiff thought he had exhausted his remedies with all his claims growing out of "[t]he assault by [the] correctional officer[ ]s." (*See* Am. Compl. 4.)

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Declined to Follow by    Samuels v. Fischer,    S.D.N.Y.,    March 2,
2016

2015 WL 127864
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Harold J. SCOTT, Plaintiff,
v.
Peter FREDERICK, Captain J.
Facteau, Mrs. Edna Aiken, Randy
Nichols, and Albert Prack, Defendants.

No. 9:13–CV–605.
|
Signed Jan. 8, 2015.

**Attorneys and Law Firms**

Harold J. Scott, Elmira, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State
of New York, The Capitol, Colleen D. Galligan, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendants.

### DECISION & ORDER

THOMAS J. McAVOY, Senior District Judge.

**\*1** This *pro se* civil rights action pursuant to 42 U.S.C.
§ 1983, alleging violations of Plaintiff's due process rights
under the Fourteenth Amendment of the United States
Constitution during a prison disciplinary hearing, was
referred to the Honorable Randolph F. Treece, United
States Magistrate Judge, for a Report–Recommendation
pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

In the Report–Recommendation, dated August 28, 2014,
Magistrate Judge Treece recommends that Defendants'
motion to dismiss for failure to state a claim upon
which relief can be granted, dkt. # 15, be granted
in part and denied in part. Magistrate Judge Treece
recommends that the motion be: granted with respect
to Defendants Edna Aiken, Captain J. Facteau, and
Randy Nichols; granted without prejudice with respect to
Defendant Albert Prack; granted with respect to Plaintiff's

claims that Defendant Peter Frederick violated his due
process rights by failing to provide sufficient notice of the
disciplinary re-hearing, failing to record the entire hearing,
and improperly re-starting the hearing; and denied with
respect to Plaintiff's claims that Defendant Frederick
denied him the opportunity to present a defense and for
being biased.

Plaintiff filed a timely objection to the Report–
Recommendation pursuant to 28 U.S.C. § 636(b)
(1). When objections to a magistrate judge's Report–
Recommendation are lodged, the Court makes a *"de
novo* determination of those portions of the report or
specified proposed findings or recommendations to which
the objection is made." *See* 28 U.S.C. § 636(b)(1). After
such a review, the Court may "accept, reject, or modify,
in whole or in part, the findings or recommendations
made by the magistrate judge. The judge may also receive
further evidence or recommit the matter to the magistrate
judge with instructions." *Id.*

Having reviewed the record *de novo* and having considered
the issues raised in the Plaintiff's objections, this Court has
determined to accept the recommendation of Magistrate
Judge Treece for the reasons stated in the Report–
Recommendation.

It is therefore ordered that:

(1) Plaintiff's Objections, dkt. # 30, to the Report–
Recommendation of Magistrate Judge Treece, dkt. # 25,
are hereby OVERRULED;

(2) The Report–Recommendation is hereby ADOPTED;

(3) The Defendants' motion to dismiss, dkt. # 15, is hereby
GRANTED in part and DENIED in part, as follows:

   a. the motion is GRANTED as to Plaintiff's claims
   against Defendants Aiken, Facteau and Nicholas and
   each of these Defendants are DISMISSED from the
   action;

   b. the motion is GRANTED without prejudice as to
   Plaintiff's claim against Defendant Prack;

   c. the motion is GRANTED with respect to Plaintiffs
   claims that Defendant Frederick violated his due
   process rights by failing to provide subsequent notice of

the re-hearing, failing to record the entire hearing, and improperly re-starting the hearing; and

d. the motion is DENIED with respect to Plaintiffs claims that Defendant Frederick denied him the opportunity to present a defense and for being biased.

**\*2** Plaintiff may file an amended complaint within 30 days of the date of this Order.

**IT IS SO ORDERED.**

**HAROLD J. SCOTT,** Plaintiff,

—v—

**PETER FREDERICK,** *Senior Counsel /Hearing Officer Clinton Correctional Facility,* **CAPTAIN J. FACTEAU,** *Correctional Captain, Clinton Correctional Facility,* **MRS. EDNA AIKEN,** *Correction Counsel / Tier Assistant, Clinton Correctional Facility,* **RANDY NICHOLS,** *Correction Officer, Clinton Correctional Facility,* **ALBERT PRACK,** *Appeals Review Official, Department of Correctional Services and Community Supervision,* Defendants.

### *REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Harold J. Scott brings this action, pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his due process rights in connection with a Tier III Superintendent's Hearing held at Clinton Correctional Facility ("CCF"). *See generally* Dkt. No. 1, Compl. Defendants move to dismiss Plaintiff's Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), on the grounds that Plaintiff fails to state a claim for which relief can be granted and that they are entitled to qualified immunity. *See generally* Dkt. No. 15–1, Defs.' Mem. of Law. Plaintiff opposes the Motion. Dkt. No. 19, Pl.'s Mem. of Law. For the reasons stated below, we recommend that the Defendants' Motion be **GRANTED** in part and **DENIED** in part.

### I. STANDARD OF REVIEW

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). The trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds by Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

"Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, ... matters to which the court may take judicial notice[,]" as well as documents incorporated by reference in the complaint. *See Spence v. Senkowski,* 1997 WL 394667, at *2 (N.D.N.Y. July 3, 1997) (*citing Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991)); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991) (citing Fed. R. C iv. P. 10(c)). Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint'* may be considered by the court in ruling on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (quoting *Cortec Indus. ., Inc. v. Sum Holding L.P.,* 949 F.2d at 47). However, "even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *Faulkner v. Beer,* 463 F.3d 130, 134 (2d Cir.2006). "It must also be clear that there exists no material disputed issues of fact regarding the relevance of the document." *Id.*

**\*3** The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL–CIO v. Scherm3erhorn,* 373 U.S. 746, 754 n. 6, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963); *see also Arar v. Ashcroft,* 585 F.3d 559, 567 (2d Cir.2009). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal,* 556 U.S. at 697 (citing *Twombly* ). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. at 678. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* In this respect, to survive dismissal, a plaintiff "must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (quoting *Bell Atl. Corp. v. Twombly,* 440 U.S. at 555). Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts [which he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* 556 U.S. at 679–80.

With this standard in tow, we consider the plausibility of Plaintiff's Complaint.

## II. DISCUSSION

### A. Background

The following summary is taken from Plaintiff's Complaint. [1]

On May 5, 2010, while at CCF, Plaintiff was ordered to submit a urine specimen for drug testing. Compl. at ¶ 6–1. Two days later, on May 7, Defendant Randy Nichols, a Corrections Officer at Clinton Annex, tested Plaintiff's urine using a SYVA VIVA–JR Emit drug test. Plaintiff's urine twice tested positive for opiates. *Id.* at ¶ 6–3. Defendant Nichols verified with CCF's main clinic that none of Plaintiff's medications could issue a false urine result. *Id.* at ¶ 6–4. Defendant Nichols issued a Misbehavior Report and had Plaintiff confined to keeplock status. *Id.* at ¶ 6–6.

**\*4** On May 8, 2010, Plaintiff was served with a copy of the Misbehavior Report, however, it lacked a copy of Appendix C to Directive 4937. [2] *Id.* at ¶ 6–7. On May 12, Defendant Edna Aiken, who was appointed to act as Plaintiff's employee-assistant, met with Plaintiff. *Id.* at ¶ 6–11. Plaintiff requested that Defendant Aiken produce the following documents:

(a) a copy of the DOCS Leasing Contract for the urinalysis machine currently in use; (b) a copy of the operator's Manual for the urinalysis machine currently in use; (c) the name, make, model number and year of manufacture of the urinalysis machine currently in use; (d) a copy of all maintenance log entries for the urinalysis machine, including, a copy of all scheduled maintenance program(s); (e) a copy of the EMIT OPIATE ASSAY insert instructions, labeling detailing the instructions to be used in conducting the testing which lists limitations etc.; (f) a copy of all sections of the Operator's manual concerning or relating to the effects of operator's error(s) or false results; (g) a copy of the most recent Emit Cross–Activity List for opiates; (h) a copy of all freezer log entries regarding [his] urine; (i) a copy of the procedures for forwarding urine specimens recommended by Clinton Annex; (j) a copy of officer NICHOLS certificate stating he was trained to conduct the testing; and (k) any and all information regarding faulty testing in using the machine.

*Id.* at ¶ 6–12.

Defendant Aiken left and returned with "a copy of the DOCS computer entry stating that Officer Nichols[ ] had passed training on the SYVA/ETS System on September 23, 2008, and a copy of Directive No. 4937." *Id.* at ¶ 6–13. Defendant Aiken did not provide Plaintiff with any other requested document, but informed him that "her secretary was 'gathering the remaining documents on the list' and she would put them in the hearing officer's package to be given to him at the hearing." *Id.* at ¶¶ 6–14 & 6–15.

On May 13, 2010, Defendant Peter Frederick, a senior counselor at CCF, commenced a Tier III Superintendent's

Hearing. *Id.* at ¶ 6–19. Plaintiff pled not guilty to drug use, objected to the fact that he had not received certain documents as promised, and pointed out that Defendant Aiken claimed she would place certain documents in the Hearing package. *Id.* at ¶¶ 6–20 & 6–21. Upon reviewing the Hearing package, Defendant Frederick found a "Certificate of Training for Officer RANDY E. NICHOLS[,] dated September 23–24, 2008, on a[n] EMIT VIVA–JR SYSTEM, a maintenance record from Siemen's Healthcare Diagnostics [,] dated April 15, 2010, regarding repairs[,] and daily and weekly maintenance records, but nothing else." *Id.* at ¶ 6–23. Defendant Frederick did not provide copies of these documents to Plaintiff. *Id.* at ¶ 6–24. Defendant Frederick determined that the other documents Plaintiff requested were irrelevant and denied their production or introduction at the Hearing. *Id.* at ¶ 6–25.

**\*5** At some point, Defendant Frederick made an off-the-record phone call to an unidentified "senior urine testing officer" at Clinton Annex, who, according to Defendant Frederick, stated that "Officer NICHOLS[ ] was 'properly trained' and that the urinalysis machine was 'reliable.' " *Id.* at ¶¶ 6–31 & 6–32. Defendant Frederick neither recorded this telephone conversation nor noted the officer as a witness on the Hearing record sheet. *Id.* at ¶ 6–33. Instead, Defendant Frederick noted on the record that "he telephoned a more experienced officer at the annex and that the officer 'testified' that officer NICHOLS was properly trained and that the machine was 'reliable.' " *Id.* at ¶ 6–34. Plaintiff then stated that he intended to call the SYVA Company as a witness to "dispute the Certificate of training and manufacturing of the analyzer [;]" the Hearing was then adjourned. *Id.* at ¶ 6–37.

On May 17, 2010, the Hearing reconvened and Defendant Frederick provided Plaintiff with a copy of the CCF-main security urine log entries, but noted that the EMIT OPIATE ASSAY instruction sheet was irrelevant. *Id.* at ¶ 6–38. Plaintiff reinstated a previous objection regarding Defendant Frederick acting as both the hearing officer and his employee-assistant. *Id.* at ¶ 6–39. Defendant Frederick responded that "as long as he can go looking for the information, he can do both. [I]ts [his] prerogative to find out the information [he] need[s]; its [his] choice." *Id.* at ¶ 6–40. Plaintiff objected to not being able to question the officer who had given off-the-record testimony as to the reliability of the urinalysis machine, to which Defendant Frederick remarked that, "it was established that the machine is reliable." *Id.* at ¶¶ 6–41 through 6–44. Plaintiff then asked about the formal procedure recommended by Clinton Annex for forwarding his urine specimen, and the Hearing was adjourned so that the testing officer could be called as a witness. *Id.* at ¶¶ 6–45 & 6–46.

On May 25, 2010, the Hearing was reconvened and Defendant Nichols testified over the phone. *Id.* at ¶ 6–47. Plaintiff sought to ask Defendant Nichols a series of questions regarding his training, at least some of which were designed to "expose weaknesses in his testing ability." *Id.* at ¶¶ 6–49 through 6–53. Defendant Frederick refused to allow Plaintiff to ask several questions on "relevancy grounds claiming that it was not necessary to answer 'because neither you nor I can understand the technical stuff, we don't have the skill and training to understand those things; what matters is that the machine is *reliable* and *was* working properly.' " *Id.* at ¶ 6–54 (emphasis in original).

In the middle of questioning Defendant Nichols, the tape recorder shut-off. *Id.* at ¶ 6–57. Defendant Frederick turned the cassette tape over and started recording over previously recorded testimony and objections, and then adjourned the Hearing for disposition. *Id.* at ¶ 6–59. Upon realizing this technical snafu, Defendant Frederick sought Plaintiff s permission to begin the Hearing anew, but Plaintiff refused to consent. *Id.* at ¶¶ 6–60 through 6–62. Defendant Frederick then claimed that Defendant Captain Facteau advised him to start the Hearing over. *Id.* at ¶ 6–63. Plaintiff objected claiming that Defendant Facteau had no authority to order or advise Frederick to begin a new hearing, but Defendant Frederick started the Hearing over anyway. *Id.* at ¶¶ 6–64 through 6–66. At that point, Defendant Frederick noted that a copy of Appendix C had not been provided to Plaintiff with his Misbehavior Report and was not in the Hearing package; he adjourned the Hearing, retrieved a copy of the Appendix and, after giving Plaintiff approximately twenty-one minutes to review the Appendix, reconvened the Hearing and reviewed the Appendix on the record. *Id.* at ¶¶ 6–67 through 6–71. Plaintiff once again pled not guilty to the charge of drug use. The Hearing Officer reused Defendant Nichols's testimony from the prior Hearing and allowed Plaintiff to restate some of his previous objections. *Id.* at ¶¶ 6–72 through 6–74.

**\*6** Plaintiff again requested that a witness from the SYVA Company be called and questioned as to whether

they manufactured the Viva–Jr. drug testing system, had vouched for its reliability, had certified Defendant Nichols, and if they certify the equipment of other companies. *Id.* at ¶ 6–76. Defendant Frederick refused to call such a witness on the grounds that such testimony "would only show or confirm that another company makes the Viva–Jr analyzer and would not show that the machine was not reliable." *Id.* at ¶ 6–77. Defendant Frederick refused to write or issue a written statement as to his reason for refusing to call this witness. *Id.* at ¶¶ 6–78 & 6–79.

The Hearing concluded on May 25, 2010, and Plaintiff was found guilty of drug use and assessed a penalty of five months in special housing unit ("SHU") confinement, with one month deferred for seven months. *Id.* at ¶¶ 6–92 & 6–93. "The statement of Evidence relied on clearly states the misbehavior report and testimony given by CO R. NICHOLS and inmate Scott's testimony. 'Reliability of testing done was main reason for finding of guilt. There was no proof offered regarding human or mechanical error.' " *Id.* at ¶ 6–83.

On May 26, 2010, Plaintiff wrote to Superintendent Thomas La Valley[3] "complaining about the illegal rehearing, particularly asking whether or not he authorized defendant FACTEAU to direct defendant FREDERICK to commence a *new* hearing." *Id.* at ¶ 6–95 (emphasis in original). On June 2, Defendant Facteau responded to Plaintiff's letter, informing him that " 'I advised SCC Frederick to *re-record* the *parts* of your Tier III hearing which was [sic] recorded over. This direction was proper.' " *Id*. at ¶ 6–96.

Plaintiff's cell location was changed to a "lockdown block," cell D–3–8, where each gallery is sealed off and recreation occurs in small single-man cages for one-hour a day. *Id.* at ¶ 6–98.[4] "D–3–8 was a filthy cell ... the sink and toilet [were] filthy and covered in black dirty stuff; the walls in the cell were covered in heavy phlegm/mucus (from someone's nose); the cell smelled badly and made your skin crawl[ ]." *Id.* at ¶ 6–99.

On June 10, 2010, Plaintiff was packed up for a transfer to Upstate Correctional Facility ("UCF"), which is composed entirely of SHU units, to finish out his SHU sentence. *Id.* at ¶ 6–102. Plaintiff arrived at UCF on June 11, 2010. *Id.* at ¶ 6–103. Upon arrival, Plaintiff's property was placed in storage, but later confiscated after

he had a verbal altercation with an officer. *Id* . at ¶¶ 6–105 through 6–107. Also, his legal mail was read, over his objection and mental health interviews were conducted within earshot of other inmates. *Id.* at ¶¶ 6–108 through 6–110. Plaintiff complained about being deprived writing materials so as to appeal his Disciplinary Hearing as well as the deprivation of "adequate soap to wash himself with and to wash his clothing with." *Id.* at ¶¶ 6–111 & 6–113.

**\*7** On June 18, 2010, Plaintiff filed an administrative appeal of his Disciplinary Hearing with Defendant Prack. *Id.* at ¶ 6–112. On July 22, 2010, Defendant Prack affirmed Defendant Nichols's Hearing determination. That same date, the "Disciplinary Review Committee (DRC) at Upstate granted plaintiff a three-week time-cut 'based on [his] positive adjustment' and recalculated his SHU release date to August 17, 2010. *Id.* at ¶ 6–115. Plaintiff was released from SHU on August 23, 2010. *Id.*

On March 11, 2011, Plaintiff initiated an Article 78 proceeding in State court challenging the May 25, 2010 disciplinary determination. *Id.* at ¶ 6–116. "On March 30, 2012, the defendant's [5] [sic] administratively reversed the Hearing determination, on the advise [sic] of the NYS Attorney General's Office and expunged the May 25, 2010 determination." *Id.* at ¶ 6–117. Thereafter, on July 5, 2010, the Appellate Division dismissed Plaintiff's Article 78 petition as moot.

### B. Plaintiffs Claims

Plaintiff alleges that as a result of his May 2010 Disciplinary Hearing he was confined in keeplock and/or SHU for 109 days. During this confinement, Plaintiff alleges that he was subjected to filthy and unhygienic conditions, including a dirty smelly cell at CCF, and while at UCF was deprived of his property, had his privacy invaded, and was denied adequate soap for washing himself and his clothing. He further expounds upon the isolating and restrictive conditions he endured during his time at UCF. Plaintiff asserts that in connection with his Disciplinary Hearing his due process rights were violated by the Defendants. Specifically, he claims that Defendant Aiken failed to provide adequate assistance by failing to provide him with all the documents he requested prior to his Disciplinary Hearing and also violated his confidentiality when instead of giving documents directly to him, she provided his list of requested documents

to the Hearing Officer. Plaintiff claims that Defendant Frederick violated his due process rights during the course of his Disciplinary Hearing when he prejudged his guilt, acted as both assistant and hearing officer, failed to obtain and consider documents requested by Plaintiff, questioned a witness off-the-record and outside of Plaintiff's presence, prevented Plaintiff from fully interrogating certain witnesses as well as refused to call certain witnesses on Plaintiff's behalf, failed to properly record the entire Hearing, and restarted the Hearing without providing adequate notice. Plaintiff further contends that Defendant Nichols testified falsely and that Defendant Facteau improperly authorized Defendant Frederick to restart Plaintiff's Hearing. Lastly, Plaintiff contends that Defendant Prack improperly affirmed Defendant Frederick's disciplinary determination.

### C. Due Process

The Due Process Clause of the Fourteenth Amendment protects against restraints or conditions of confinement that "exceed[ ] the sentence in ... an unexpected manner[.]" *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). To state a due process claim under § 1983, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)). Inmates' liberty interests are derived from two sources: (1) the Due Process Clause of the Fourteenth Amendment; and (2) state statute or regulations. *Id.* With regard to liberty interests arising directly under the Due Process Clause, the Supreme Court has "narrowly circumscribed its scope to protect no more than the 'most basic liberty interests in prisoners[,]' " *Arce v. Walker,* 139 F.3d at 333 (quoting *Hewitt v. Helms,* 459 U.S. 460, 467, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)), and limited to freedom from restraint that "exceed[ ] the sentence in ... an unexpected manner[,]" *Sandin v. Conner,* 515 U.S. 472, 478, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

**\*8** Turning to liberty interests created by the state, the Supreme Court states that such liberty interests shall be limited solely to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. at 484; *see also Giano v. Selsky,* 238 F.3d

223, 225 (2d Cir.2001) (citing *Sandin* ); *Welch v. Bartlett,* 196 F.3d 389, 392 (2d Cir.1999).

Factors relevant to an analysis of what constitutes an atypical and significant hardship include "(1) the effect of the confinement on the length of prison incarceration, (2) the extent to which the conditions of segregation differ from other routine prison conditions, and (3) the duration of the disciplinary segregation compared to discretionary confinement." *Spaight v. Cinchon,* 1998 WL 167297, at \*5 (N.D.N.Y. Apr.3, 1998) (citing *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)); *see also Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (stating that in assessing what constitutes an atypical and significant hardship, "[b]oth the conditions [of confinement] and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical" (citation omitted)). Though the length of the confinement is one guiding factor in a *Sandin* analysis, the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard. *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999) (citations omitted). Nevertheless, the Court of Appeals has stated that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer v. Richards,* 364 F.3d at 64–65 (quoting *Colon v. Howard,* 215, F.3d 227, 232 (2d Cir.2000)); *see also Hanrahan v. Doling,* 331 F.3d 93, 97–98 (2d Cir.2003) ("[W]here the actual period of disciplinary confinement is insignificant or the restrictions imposed relatively minor, such confinement may not implicate a constitutionally protected liberty interest."); *Edmonson v. Coughlin,* 1996 WL 622626, at \*4–5 (W.D.N.Y. Oct.4, 1996) (citing cases for the proposition that courts within the Second Circuit tend to rule, as a matter of law, that "disciplinary keeplock or SHU confinement to 60 days or less in New York prisons is not an atypical or significant hardship in relation to the ordinary incidents of prison life"); *Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (noting that segregative sentences of 125–288 days are "relatively long" and therefore necessitate "specific articulation of ... factual findings before the district court could properly term the confinement atypical or insignificant"). Accordingly, the court must "make a fact-intensive inquiry" that would examine the actual conditions of confinement within SHU. *Palmer v. Richards,* 364 F.3d

at 65 (citations omitted); *see also Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997). If the conditions of confinement are undisputed, a court may decide the *Sandin* issue as a matter of law. *Palmer v. Richards,* 364 F.3d at 65. If, however, normal conditions of SHU exist, but the period of confinement is longer than the intermediate duration, then it would constitute a significant departure from ordinary prison life requiring the protection of procedural due process under *Sandin. Id.*

**\*9** Once a prisoner makes a threshold showing of atypical and significant confinement, the court should determine whether that prisoner, prior to his confinement, was afforded the minimum requirements of due process. *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). A prisoner placed in disciplinary segregation must be provided (1) advanced written notice of the charges against them at least twenty-four hours prior to the hearing; (2) the opportunity to appear at the hearing, to call witnesses, and to present rebuttal evidence; and (3) written statement as to the evidence relied upon and the reasons for the disciplinary action. *Id.* at 564–66; *see also Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986); *Taylor v. Rodriguez,* 238 F.3d 188, 192 (2d Cir.2001) (quoting *Hewitt v. Helms,* 459 U.S. at 476). Additionally, inmates are entitled to be judged by a fair and impartial hearing officer and the disciplinary conviction should be supported by some evidence. *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999) (citing *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985) (some evidence to support conviction) & *McCann v. Coughlin,* 698 F.2d 112, 121–22 (2d Cir.1983) (fair and impartial hearing officer)).

### 1. Liberty Interest

As noted above, Plaintiff alleges that as a result of his Disciplinary Hearing he was confined in keeplock/SHU for approximately 109 days, during which time he was subjected to filthy and unhygienic conditions and was deprived of adequate soap and other property. In light of the Second Circuit's requirement that we make detailed factual findings of the conditions endured by Plaintiff, and in light of the record before us, we find that for purposes of the pending Motion, Plaintiff sufficiently alleges that he had a protected liberty interest in remaining free from the atypical and significant hardships he endured during

his segregated disciplinary confinement. *See Samms v. Fischer,* 2013 WL 5310215, at \*7 (N.D.N.Y. Sept.20, 2013) (noting that "[i]t is possible that 60 days in an unsanitary cell in SHU could ... constitute an atypical and significant hardship in relation to the ordinary incidents of prison life sufficient to convey on a prisoner a protected liberty interest under the due process clause") (citations omitted); *see also Palmer v. Richards,* 364 F.3d at 65–66 (surveying cases in support of the proposition that "[i]n the absence of a detailed factual record, we have affirmed dismissal of due process claims only in cases where the period of time spent SHU was exceedingly short—less than the 30 days that the *Sandin* plaintiff spent in SHU—and there was no indication that the plaintiff endured unusual SHU conditions.") (citations omitted); *Gonzalez–Cifuentes v. Torres,* 2007 WL499620, at \*3 (N.D.N.Y. Feb. 13, 2007) (finding that for the purposes of a motion to dismiss, plaintiff's allegation that he spent ninety days in keeplock was sufficient to require the court to engage in detailed fact finding before dismissing his claim). Accepting the Complaint as true, Plaintiff has adequately pled a liberty interest, however, we reach no conclusion as to whether or not these claims will be sufficient to withstand a properly filed motion for summary judgment after the development of a more detailed factual record.

**\*10** Accordingly, we must now determine whether Plaintiff has plausibly alleged that any of the Defendants deprived him of one or more of the minimum requirements of due process to which he was entitled.

### 2. Defendant Aiken

Plaintiff alleges that Defendant Aiken provided constitutionally inadequate pre-hearing assistance because, *inter alia,* (1) she violated his duty to maintain inmate-employee-assistant confidentiality when she provided Defendant Frederick with a copy of the list of documents he had requested, and (2) she failed to provide Plaintiff with all of the documents he requested before the Hearing. *See* Compl. at ¶¶ 6–11 through 6–18, 6–21 through 6–24, 6–27 through 6–29, 7–2, & 7–4.

Plaintiff's claim that Defendant Aiken violated his purported right to inmate-employee-assistant confidentiality is completely meritless. While Plaintiff may have been entitled to prehearing assistance, he is not entitled to any sort of confidentiality by virtue of that

arrangement. *Accord Loving v. Selsky,* 2009 WL 87452 at *2 (W.D.N.Y.2009) (citing *Silva v. Casey,* 992 F.2d 20, 22 (2d. Cir.1993), for the proposition that the duty to provide pre-hearing assistance "falls far short of the right to counsel that the Sixth Amendment guarantees to criminal defendants.' "); *see also Jackson v. Johnson,* 30 F.Supp.2d 613, 619 (S.D.N.Y.1998) ("An assistant's role is to act as 'merely a surrogate for the inmate, not a legal adviser or advocate.").

Plaintiff also contends that Defendant Aiken provided constitutionally deficient assistance to him when she failed to provide him with all the requested documents. The Court acknowledges that Plaintiff had a right to receive some assistance prior to his Hearing, particularly in light of the fact that he was confined to keeplock status before the Hearing. *Eng v. Coughlin,* 858 F.2d 889, 897 (2d Cir.1988) ("Prison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges."). Indeed, this duty is of particular importance when, as here, the prisoner is in segregative confinement prior to the disciplinary hearing. *Id.* ("When the inmate is disabled, either by being confined full-time to SHU or transferred from the prison in which the incidents occurred, the duty of assistance is greater because the inmate's ability to help himself is reduced."); *Loving v. Selsky,* 2009 WL 87452, at *1 ("In particular, an inmate must be provided some assistance when circumstances hamper the inmate's ability to prepare a defense, such as when the inmate is confined to SHU prior to the hearing."); *see also Hernandez v. Selsky,* 572 F.Supp.2d 446, 453 (S.D.N.Y.2008) ("The obligation to provide assistance is greater as the inmates' ability to prepare a defense is reduced."); *Louis v. Ricks,* 2002 WL 31051633, *10 (S.D.N.Y. Sept.13, 2002) (holding that inmates in keeplock confinement are entitled to pre-hearing assistance).

**\*11** "While the assigned assistant's precise role is not defined, it certainly should include gathering evidence, obtaining documents, and relevant papers, and interviewing witnesses." *Pilgrim v. Luther,* 2005 WL 6424703, at *8 (S.D.N.Y. Sept.12, 2005). Plaintiff's right to assistance, however, does not translate to a wholesale right to receive all of the documentary evidence requested. *Eng v. Coughlin,* 858 F.2d at 898 (noting that assistance "must be provided in good faith and in the best interests of the inmate" and finding that the

employee-assistant who was requested to interview an onerous amount of witnesses "must attempt to determine independently who the most relevant witnesses might be and to interview them"); *Shepard v. Coughlin,* 1993 WL 77385, at *5 (S.D.N.Y. Mar.16, 1993). Plaintiff has not alleged that Defendant Aiken refused to provide him with any assistance; indeed, Plaintiff acknowledges that Defendant Aiken provided him with some of the documents he requested prior to the Hearing and included others in Plaintiff's Hearing packet. Accordingly, Plaintiff has failed to state a Due Process claim against Defendant Aiken. Nonetheless, even if Defendant Aiken erred by not producing all of the documents requested and by divulging the list of documents to the Hearing Officer, we find that she is entitled to qualified immunity.

The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Eng v. Coughlin,* 858 F.2d 889, 895 (2d Cir.1988). Qualified immunity provides government officials "immunity from suit, rather than a mere defense to liability." *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). Whether an official protected by qualified immunity may be held liable for an alleged unlawful action turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time the action was taken. *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Lewis v. Cowan,* 165 F.3d 154, 166 (2d Cir.1999).

Qualified immunity is an affirmative defense that must be pled by the official claiming it. *Satchell v. Dilworth,* 745 F.2d 781, 784 (2d Cir.1984) (citing *Harlow v. Fitzgerald,* 457 U.S. at 815). The only pleading filed in the present case thus far is the Complaint. Defendants have not raised this affirmative defense in a responsive pleading, as set forth in Federal Rule of Civil Procedure 8(c), but rather in their Memorandum of Law in support of the Motion to Dismiss. Dkt. No. 15–1. Generally, "the defense of qualified immunity cannot support the grant of a ... 12(b) (6) motion for failure to state a claim upon which relief can be granted." *Green v. Maraio,* 722 F.2d 1013, 1018 (2d Cir.1983); *see also McKenna v. Wright,* 386 F.3d 432,

435 (2d Cir.2004) (quoting *Green* ). An exception to this general rule exists where the complaint itself sets up, on its face, the qualified immunity defense; in such an occasion, dismissal for failure to state a claim would be appropriate. *Roniger v. McCall,* 22 F.Supp.2d 156, 162 (S.D.N.Y.1998) (citing *Green v. Maraio,* 722 F.2d at 1019); *see also McKenna v. Wright,* 386 F.3d at 435.

**\*12** Based upon the allegations of the Complaint, the Court finds that Defendant Aiken is entitled to qualified immunity because neither of the rights asserted by Plaintiff are clearly established and no reasonable person in Aiken's position would have believed that they were acting in such a way that violated Plaintiff's rights. To determine whether a right was clearly established for purposes of qualified immunity, courts must consider "whether the right was defined with reasonable specificity; whether decisional law of the Supreme Court and the [Second Circuit] supports its existence; and whether, under preexisting law, a defendant official would have reasonably understood that his [or her] actions were unlawful." *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *see also Reichle v. Howards,* ––– U.S. ––––, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012) ("To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." (citations, modifications, and internal quotation marks omitted)); *Nicholas v. Miller,* 189 F.3d 191, 195 (2d Cir.1999).

The Court is unable to find any Supreme Court or Second Circuit precedents clearly establishing that Defendant Aiken either owed a duty of confidentiality to Plaintiff or was required to provide Plaintiff with every document he requested. While attorney-client communications are protected by a privilege of confidentiality, it is clear that Plaintiff was not entitled to assistance from an attorney in order to help prepare a defense to the charges pending against him and that Defendant Aiken was not acting in such capacity. *Silva v. Casey,* 992 F.2d at 22 ("The assistant is not obliged to go beyond the specific instructions of the inmate because if he did so he would then be acting as counsel in a prison disciplinary proceeding, assistance to which a prisoner is not entitled."). Furthermore, the applicable State regulations that establish a New York State inmate's right to employee assistance do not extend a cloak of

confidentiality to any discussion between the assistant and inmate, nor do the applicable rules place an obligation on the assistant to procure every item requested by an inmate. *See, e.g.,* N.Y. COMP. CODES R. & REGS. tit. 7, § 251–4.2. [6] Accordingly, we recommend that Defendants' Motion be **GRANTED** with respect to Plaintiff's claims against Defendant Aiken because we find that no due process violation occurred by her actions and because she would nevertheless be entitled to qualified immunity. [7] Defendant Aiken should accordingly be **DISMISSED** from this action.

### 3. Defendant Nichols

Plaintiff alleges, *inter alia,* [8] that Defendant Nichols intentionally testified falsely "that SYVA was the manufacturer of the Viva–Jr analyzer [.]" Compl. at ¶ 7–18. However, the presentation of false testimony does not deprive an inmate of the minimum requirements of due process. *See Thomas v. Calero,* 824 F.Supp.2d 488, 499 (S.D.N.Y.2011) (citing *Mitchell v. Senkowski,* 158 F. App'x 346, 349 (2d Cir.2005) for the proposition that a prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest "extends as well to false testimony by corrections personnel at prison disciplinary hearings"). Plaintiff does not assert that Defendant Nichols testified falsely in retaliation for the exercise of some constitutional right, and in liberally construing Plaintiff's Complaint, the Court finds that no other plausible claim is stated against Defendant Nichols based upon his role in testing Plaintiff's urine and authoring the Misbehavior Report.

**\*13** Accordingly, we recommend that Defendants' Motion be **GRANTED** with respect to Plaintiff's claim against Defendant Nichols and that Defendant Nichols be **DISMISSED** from this action.

### 4. Defendant Frederick

Plaintiff alleges that during the course of his Disciplinary Hearing and Re-hearing, Defendant Frederick violated his due process rights in a variety of ways. Specifically, Plaintiff alleges, *inter alia,* [9] that Defendant Frederick (1) took off-the-record testimony from an unidentified

witness, Compl. at ¶¶ 6–31 through 6–34; (2) failed to record the entire Hearing, *id.* at ¶¶ 6–57, 6–59, 6–60, & 6–75; (3) illegally re-started the Hearing, *id.* at ¶¶ 6–61, 6–63, 6–64, & 6–66; (4) failed to provide him with twenty-four hours notice of the Rehearing, *id.* at ¶¶ 6–86 & 6–87; and, (6) refused to provide certain documents, interrupted his attempts to question Officer Nichols, and refused to call a witness from the SYVA Company to testify as to the reliability and accuracy of the urinalysis tests conducted by Defendant Nichols, *id.* at ¶¶ 6–71, & 6–76 through 6–79.

As noted above, pursuant to *Wolff,* Plaintiff is entitled to minimum due process protections including (1) advanced written notice of the charges against them at least twenty-four hours prior to the hearing; (2) the opportunity to appear at the hearing, to call witnesses, and to present rebuttal evidence; and (3) written statement as to the evidence relied upon and the reasons for the disciplinary action.[10] *Wolff v. McDonnell,* 418 U.S. at 564–66. Additionally, Plaintiff was entitled to be judged by a fair and impartial hearing officer and his disciplinary conviction should be supported by some evidence. *Kalwasinski v. Morse,* 201 F.3d at 108. We consider each of Plaintiff's contentions within the framework of those constitutional protections to which he was entitled.

### a. Notice

"Notice" should be something more than a mere formality. *Benitez v. Wolff,* 985 F.2d 662, 665 (2d Cir.1993). "The effect of the notice should be to compel 'the charging officer to be [sufficiently] specific as to the misconduct with which the inmate is charged' to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report." *Taylor v. Rodriguez,* 238 F.3d at 192–93 (quoting *McKinnon v. Patterson,* 568 F.2d 930, 940 n. 11 (2d Cir.1977)) (alteration in original).

Plaintiff's claim that Defendant Frederick failed to give him adequate notice of the Rehearing falls short of stating a due process claim. In liberally construing Plaintiff's Complaint, it appears that once the decision was made to restart the Hearing, Plaintiff believed he was entitled to have the entire process begin anew, including the notion

that he be provided with notice of the charges against him twenty-four hours in advance of the hearing. To be clear, Plaintiff does not accuse the Defendants of failing to give proper notice of the charges against him prior to the commencement of the initial Hearing. Instead, he imposes an extra notice requirement on the Defendants at the point in the Hearing when Defendant Frederick determined that he needed to start the Hearing anew. Based upon the allegations in the Complaint, it is clear that Plaintiff received a copy of the Misbehavior Report at 8:30 a.m. on May 8, 2010, and that his Disciplinary Hearing initially began on May 13, 2010. Compl. at ¶¶ 6–7 & 6–19. Thus, it is clear that Plaintiff received constitutionally adequate notice well in advance of the twenty-four hour minimum. *See Sira v. Morton,* 380 F.3d 57, 70 (2d Cir.2004) (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. at 564, for the proposition that "[d]ue process requires that prison officials give an accused inmate written notice of the charges against him twenty-four hours prior to conducting a disciplinary hearing"). Plaintiff does not challenge the sufficiency of that notice, and, indeed, his specific attempts to gather evidence and mount a defense belie any notion that the content of the initial notice failed to adequately apprise him of the charges against him and the factual basis for such charges. This Court finds no basis for Plaintiff's claim that upon restarting the Hearing, Defendant Frederick was constitutionally compelled to provide identical notice of which Plaintiff already received. Accordingly, we find that Plaintiff was provided with proper notice and has failed to state a due process violation.

### b. Opportunity to Present a Defense

**\*14** With regard to the second *Wolff* factor, a prisoner is entitled to an opportunity to present his defense by calling witnesses and presenting evidence. *See Wolff v. McDonnell,* 418 U.S. at 566 ("[A]n inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense[.]"). In the case at bar, Plaintiff asserts several violations of his right to call witnesses and present rebuttal evidence. Specifically, Plaintiff alleges that Defendant Frederick refused his request to call a witness from the SYVA Company to testify as to the reliability of the EMIT–Jr. machine, failed to provide written reasons for his denial of certain witnesses, refused to provide him with copies of documents without explanation,

improperly denied requests for documents on grounds of relevancy, interfered with his ability to question Defendant Nichols regarding his ability to properly test Plaintiff's urine sample by denying or rephrasing his questions, and took testimony from an unidentified officer off-the-record and outside the presence of Plaintiff. Such claims, as pled, are sufficient at this early stage to plausibly state a due process violation claim against Defendant Frederick. *See Kearney v. Goord,* 2011 WL 1260076, at *7 (W.D.N.Y. Mar.4, 2011) ("Plaintiff's allegation that C.H.O. Schoelkoff denied him due process by refusing to call witnesses requested by plaintiff, by refusing to ask witnesses questions proffered by plaintiff and denying plaintiff access to documents, resulting in four months SHU confinement, is sufficient to state a cause of action."); *Collins v. Ferguson,* 804 F.Supp.2d 134, 139 (W.D.N.Y.2011) (finding plaintiff had stated a due process violation where he alleged that "Ferguson refused to provide plaintiff with documents relating to the testing of plaintiff's urine sample, that he refused to ask witnesses certain 'vital' questions that had been requested by plaintiff, that he 'continually rephrased questions' to the officer witnesses in a way that was designed to elicit answers that were detrimental to plaintiff's defense, and that he accepted the officers' testimony at face value, without any corroborating documentary support"). And because Plaintiff's right to present a defense is clearly established, at this juncture, we cannot state that Defendant Frederick is entitled to qualified immunity. Thus, we recommend that Defendants' Motion be **denied** as to these claims for due process violations against Defendant Frederick.

### c. Hearing Officer Bias

Plaintiff asserts that Defendant Frederick prejudged his guilt and conducted the Hearing in a biased fashion. While an inmate is *not* entitled to a hearing officer with the same level of impartiality required by judges, he is entitled to a hearing untainted by arbitrary or pre-determined findings of guilt. *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989). Nonetheless, a hearing officer's limited impartiality requirements are satisfied where the record contains "some evidence" to support the officer's findings. *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility

of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached." *Id.* at 455–56 (citations omitted). That being said, only " 'reliable' evidence can constitute 'some evidence.' " *Sira v. Morton,* 380 F.3d at 76 (citing *Luna v. Pico,* 356 F.3d 481, 488 (2d. Cir.2004)).

**\*15** The Court is mindful that according to the Complaint, Defendant Frederick's Statement of Evidence relied upon referenced the drug tests conducted by Defendant Nichols and that results of such tests may satisfy the requirement of "some evidence." *Scott v. Nichols,* 2013 WL 2237840, at *10 (N.D.N.Y. May 21, 2013) (surveying cases for the proposition that drug test results are more than sufficient to meet the "some evidence" standard). However, at this early stage, in light of the Court's obligation to liberally construe Plaintiff's Complaint to raise the strongest claim suggested therein, especially considering Plaintiff's adamant challenge to the reliability of the test, and based upon the above recommendations regarding Defendant Frederick's alleged interference with Plaintiff's ability to mount a legitimate defense as it pertains to Plaintiff's attempts to contest the validity of the tests, the Court finds that Plaintiff has nudged his claim alleging hearing officer bias into the plausible realm and should be permitted to proceed. Thus, the Court recommends **denying** Defendants' Motion as it pertains to Plaintiff's allegations regarding Defendant Frederick's bias. As with the prior analysis, the Court finds it inappropriate to assess at this juncture whether Defendant Frederick would be entitled to qualified immunity as to Plaintiff's claims of bias.

### d. Other Due Process Allegations

Plaintiff alleges that Defendant Frederick violated his due process rights when he failed to record the entire Hearing improperly restarted the Hearing. Neither of these allegations rise to the level of a due process protection.

First, Defendant Frederick's failure to record the entire Hearing did not deprive Plaintiff of any minimum requirements of due process. *See Ramsey v. Goord,* 661 F.Supp.2d 370, 393 (W.D.N.Y.2009) (failure to record a portion of Plaintiff's disciplinary hearing did not rise

to a due process violation). Indeed, "the *only* process due an inmate is that minimal process guaranteed by the Constitution as outlined in *Wolff." Ramsey v. Goord,* 661 F.Supp.2d 370, 393 (W.D.N.Y.2009) (quoting *Shakur v. Selsky,* 391 F.3d 106, 119 (2d Cir.2004)). "Significantly, *Wolff* did not include electronic recording of a disciplinary hearing among the due process requirements." *Id.; see also Holcomb v. Lykens,* 337 F.3d 217, 224 (2d Cir.2003) (cited in *Ramsey* for the proposition that New York State's regulation requiring that a disciplinary hearing be recorded does not impute a federal constitutional protection).

Second, Plaintiff's argument that Defendant Frederick lacked authority/jurisdiction to restart his Hearing purportedly in violation of state regulations, does not allege a cognizable due process violation. *See A'Gard v. Perez,* 919 F.Supp.2d 394, 403 (S.D.N.Y.2013) (citing *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990), for the proposition that "[a]ny alleged violations of prison directives or regulations do not give rise to a federal claim, because federal constitutional standards rather than state law define the requirements of procedural due process.") (internal alterations and quotation marks omitted); *Johnson v. Goord,* 487 F.Supp.2d 377, 400 (S.D.N.Y.2007) (quoting *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) for the proposition that "a § 1983 claim brought in federal court is not the appropriate forum to urge violations of prison regulations or state law").

**\*16** As such, we recommend **granting** Defendants' Motion as it pertains to purported due process violations stemming from Defendant Frederick's failure to record the entire Hearing and restarting the Hearing.

### 5. Defendant Facteau

Plaintiff alleges that Defendant Facteau lacked authority to order or advise Defendant Frederick to restart the Hearing. Compl. at ¶¶ 6–61 through 6–64, 6–95, 6–96, 7–22, & 7–23. Plaintiff also claims that Defendant Facteau was aware of, yet failed to remedy, the fact that Plaintiff did not receive twenty-four hours notice of the disciplinary rehearing. *Id.* at ¶¶ 7–10 & 7–11. Plaintiff's theories of liability against Defendant Facteau are diametrically opposed. On the one hand, he appears to question Defendant Facteau's authority to authorize a rehearing, while at the same time, he criticizes Defendant Facteau's

failure to remedy purported due process violations committed by Defendant Frederick. Based upon the factual allegations of the Complaint, it appears, to some extent, that Plaintiff seeks to hold Defendant Facteau liable based upon a theory of supervisory liability.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannotbe applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at \*2 (S.D.N.Y. Sept.15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

The Second Circuit has stated that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if he: (1) directly participated in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; or (4) was grossly negligent in managing subordinates who caused the unlawful condition or event. *Williams v. Smith,* 781 F.2d 319, 323– 24 (2d Cir.1986) (citations omitted). Pointedly, "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)); *see also Wright v. Smith,* 21 F.3d at 501 (defendant may not be held liable simply because he holds a high position of authority).

As noted above, no due process violation occurred when Defendant Frederick restarted Plaintiff's Hearing, thus, Plaintiff cannot maintain an action against Defendant Facteau based on the fact that he authorized or advised Defendant Frederick to re-record the Disciplinary Hearing or for his failure to remedy that alleged violation. *See Wesolowski v. Harvey,* 784 F.Supp.2d 231, 234 (W.D.N.Y.2011) (citing *Campo v. Keane,* 913 F.Supp. 814, 826 (S.D.N.Y.1996), for the proposition that "plaintiff

cannot state a claim [against a supervisory official] for personal involvement in a constitutional violation, where no underlying constitutional violation occurred").

**\*17** Accordingly, we recommend that Defendants' Motion be **GRANTED** with respect to Plaintiff's claims against Defendant Facteau and that Defendant Facteau be **DISMISSED** from this action.

### 6. Defendant Prack

Aside from a slew of wholly conclusory allegations in his wherefore clause, Plaintiff's sole allegation against Defendant Prack is that he affirmed Defendant Frederick's disciplinary determination. Compl. at ¶ 6–114. Courts within the Second Circuit are split over whether such an allegation is sufficient to establish personal liability for supervisory officials. We subscribe to the affirmance-plus standard, which holds that the mere rubber-stamping of a disciplinary determination is insufficient to plausibly allege personal involvement. *See Brown v. Brun,* 2010 WL 5072125, at \*2 (W.D.N.Y. Dec.7, 2010) (noting that courts within the Second Circuit are split with regard to whether the act of affirming a disciplinary hearing is sufficient to allege personal involvement of a supervisory official, and concluding that the distinction appears to hinge upon whether the official proactively participated in reviewing the administrative appeal or merely rubber-stamped the results). Here, Plaintiff fails to allege a single fact from which it could plausibly be inferred that Defendant Prack did anything other than rubber-stamp his disciplinary determination. *See generally* Compl. Accordingly, we recommend that Defendants' Motion be **GRANTED** with respect to Defendant Prack and that he be **DISMISSED** from this action. **However,** the Second Circuit has cautioned courts in this District from dismissing *pro se* complaints "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Thompson v. Carter,* 284 F.3d 411, 416 (2d Cir.2002) (quoting *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991)); *see also Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir.1999) ("Certainly the court should not dismiss without granting leave to amend at least once when a liberal reading of the [*pro se* ] complaint gives any indication that a valid claim might be stated."). Therefore, in light of the Second Circuit's directive and the fact that some of

Plaintiff's other claims are proceeding, we recommend that Plaintiff be **GRANTED LEAVE TO AMEND** his Complaint in order to further specify, how, if at all, Defendant Prack proactively participated in reviewing Plaintiff's administrative appeal.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion to Dismiss (Dkt. No. 15) be **GRANTED** in part and **DENIED** in part as follows:

1. **GRANTED** as to Plaintiff's claims against Defendants Aiken, Facteau, and Nichols and each of these Defendants should be **DISMISSED** from this action;

2. **GRANTED without prejudice** as to Plaintiff's claim against Defendant Prack, with the caveat that Plaintiff be granted leave to amend his Complaint in accordance with the above;

**\*18 3. GRANTED** with respect to Plaintiff's claims that Defendant Frederick violated his due process rights by failing to provide sufficient notice of the Re-hearing, failing to record the entire Hearing, and improperly re-starting the Hearing; and

4. **DENIED** with respect to Plaintiff's claims that Defendant Frederick denied him the opportunity to present a defense and for being biased; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

Date: August 28, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 127864

Footnotes

1   In their Memorandum of Law, Defendants state that "Plaintiff quotes extensively from segments of the Tier hearing record and had clearly relied upon that record in the course of drafting the Complaint." Dkt. No. 15–1, Defs.' Mem. of Law, at p. 4 n. 2. They argue, therefore, that documents they submit in support of their Motion should be deemed to be part of Plaintiff's Complaint and considered for purposes of the instant Motion. *Id.* Plaintiff counters that any references in his Complaint were made from his own personal handwritten notes and not the documents Defendants offer and, moreover, Defendants failed to provide the Court with a full record. Dkt. No. 19, Pl.'s Mem. of Law, at pp. 2–4. Given Plaintiff's objections, we decline Defendants' invitation. Accordingly, we do not consider the documents offered by Defendants for purposes of deciding the instant Motion. *See Sira v. Morton,* 380 F.3d 57, 67 (2d Cir.2004) (citing *Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989), for the proposition that "[l]imited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint.").

2   In his Complaint, Plaintiff references a New York State Regulation that requires that certain documentation be attached to a misbehavior report. Compl. at ¶ 6–9 (referencing N.Y. Comp.Codes R. & Regs. tit. 7, § 1020.4(e)(1)(iv), which deals with the requisite paperwork that must accompany a misbehavior report issued to an inmate who refuses to submit a urine sample). Although Plaintiff does not cite to the correct section of the pertinent Regulation, the Court takes judicial notice that pursuant to New York State Regulation, when a positive result is obtained from a urine specimen a misbehavior report shall be issued and

> shall be accompanied by the request for urinalysis test form, the inmate's test report from the laboratory or facility, a copy of the methods and procedures used by the testing laboratory or facility, and a statement of the scientific principles and validity of the testing apparatus used by the laboratory or facility.

N.Y. COMP.CODES R. & REGS. tit. 7, § 1020.4(f)(2)(iii).

3   Superintendent Thomas La Valley was dismissed as a Defendant from this action. *See* Dkt. No. 4, Dec. & Order, dated July 18, 2013.

4   It is unclear when Plaintiff's cell assignment was changed to D–3–8.

5   It is unclear which Defendant reversed the disposition.

6   The full text of the relevant Regulations states as follows:

> The assistant's role is to speak with the inmate charged, to explain the charges to the inmate, interview witnesses and to report the results of his efforts to the inmate. He **may** assist the inmate in obtaining documentary evidence or written statements which may be necessary. The assistant may be required by the hearing officer to be present at the disciplinary or superintendent's hearing.

N.Y. COMP.CODES R. & REGS. tit. 7, § 251–4.2

7   Alternatively, given that Defendant Frederick considered each of Plaintiff's requests and ultimately determined that many of the documents Plaintiff requested from Defendant Aiken were irrelevant, Defendant Aiken's failure to provide Plaintiff with those documents should be dismissed as harmless error. *See Louis v. Ricks,* 2002 WL 31051633, at *15 (S.D.N.Y. Sept.13, 2002) (applying harmless error to plaintiff's claim that his right to due process was violated where he was provided with inadequate assistance prior to his prison disciplinary hearing).

8   In his Complaint, Plaintiff attributes due process violations to Defendant Nichols based upon the actions of other Defendants. For example, Plaintiff claims that Defendant Nichols violated Plaintiff's due process rights by denying him constitutionally adequate pre-hearing assistance and for preventing him from introducing certain documents during the Hearing. Compl. at ¶¶ 7–6 & 7–8. Plaintiff does not, however, assert that Defendant Nichols had a position of authority over any of the other Defendants. And, aside from alleging that Nichols testified falsely, Plaintiff fails to allege any facts from which it would be plausible to infer that Defendant Nichols was somehow personally involved in any other constitutional wrongdoing. *See generally* Compl. We therefore only consider those allegations of due process violations for which Plaintiff provides allegations of fact attributing Defendant Nichols's personal involvement. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (noting that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983").

9 As with his allegations against Defendant Nichols, Plaintiff attributes wrongdoing to Defendant Frederick without alleging concomitant factual allegations supporting Defendant Frederick's personal involvement. For example, Plaintiff accuses Defendant Frederick violated his constitutional rights when Defendant Aiken failed to provide adequate pre-hearing assistance. Compl. at ¶ 7–2. We only consider here, as we must, those claims against Defendant Frederick that are supported by factual allegations regarding his personal involvement in alleged wrongdoing.

10 It does not appear that any of Plaintiff's factual allegations regarding purported due process violations fall within this category, therefore, we do not discuss this constitutional protection. In any event, it is uncontested that Plaintiff received a written disposition from Defendant Frederick explaining the reasons for his disciplinary determination. Compl. at ¶ 6–83.

---

**End of Document**          © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1791079
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Charles WATSON, Plaintiff,
v.
M.D. Lester N. WRIGHT, et al., Defendants.

No. 08–CV–00960(A)(M).
|
March 26, 2013.

**Attorneys and Law Firms**

Charles Watson, Pine City, NY, pro se.

George Michael Zimmermann, Office of the New York
State Attorney General, Buffalo, NY, for Defendants.

### REPORT and RECOMMENDATION

JEREMIAH J. McCARTHY, United States Magistrate
Judge.

 **\*1**  This case was referred to me by Hon. Richard J.
Arcara for supervision of pretrial proceedings, including
preparation of a Report and Recommendation on
dispositive motions [36].[1] Before me is defendants'
motion for summary judgment [239]. Oral argument was
held on September 19, 2012[254]. Thereafter, plaintiff
made post-argument submissions [255, 256]. For the
following reasons, I recommend that defendants' motion
be granted in part and denied in part.

### BACKGROUND

Plaintiff, an inmate, commenced this action *pro se*
pursuant to 42 U.S.C. § 1983, alleging that defendants
have been deliberately indifferent to his medical needs
while he was incarcerated by the New York State
Department of Corrections and Community Supervision
("DOCCS").[2] Fourth Amended Complaint dated June 7,
2011[212]. Plaintiff suffers from Hepatitis C (defendants'
Statement of Undisputed Facts [239–2], ¶ 11) and alleges

that his symptoms include nausea and pruritus[3] (*id.,* ¶¶
12–13).

### Lakeview Correctional Facility

Plaintiff was transferred to the Lakeview Correctional
Facility on July 26, 2007 (*id.,* ¶ 27). At that time,
defendant Lawrence Wilcox, N.P. reviewed his medical
records (*id.,* ¶ 30), which indicated that he had been
previously prescribed Vistaril for a bout of hives (also
known as urticaria) which he experienced as a reaction to
medications he was receiving as part of his Hepatitis C
treatment (*id.,* ¶ 32). Although he was no longer receiving
the Hepatitis C medication and had not had any further
incidents of hives, he had continued to receive Vistaril. (*id.,*
¶¶ 32–34; Wilcox Declaration [239–10], ¶ 7). Therefore,
Nurse Wilcox determined that the Vistaril should be
discontinued. Defendants' Statement of Undisputed Facts
[239–2], ¶ 35.[4] On July 29, 2007, plaintiff was also
examined by defendant Kathleen Johnson, R.N., who
found no rashes, hives or skin irritations (*id.,* ¶ 41).

During his July 29, 2007 examination plaintiff complained
of nausea, itching and an inability to eat (*id.,* ¶ 40). He
was offered hydrocortisone cream, but refused (*id.,* ¶ 43).
The following day, plaintiff was seen by Nurse Johnson
in sick call for the same complaints (*id.,* ¶ 46). During
this examination, plaintiff conceded that he rubbed his
skin to cause it to become red. (*id.,* ¶ 48; Zimmerman
Declaration [239–3], Ex. B, p. 52). Other than this self-
inflicted irritation, no rash was observed (*id.,* ¶¶ 49–50).
Plaintiff was also examined by Nurse Wilcox on July 30,
2007, but he did not observe any hives (*id.,* ¶¶ 54, 58). At
that time, plaintiff indicated that he needed to continue
taking Vistaril to control his anxiety and to assist him
to sleep (*id.,* ¶ 61). In response, Nurse Wilcox submitted
a mental heath referral for plaintiff's anxiety. Wilcox
Declaration [239–10], ¶ 13; Zimmerman Declaration [239–
3], Ex. A, Bates No. 03020.

Although plaintiff asked to continue the low-fat, high
fiber diet he had been receiving at his prior facility,
plaintiff's liver functions were normal (defendants'
Statement of Undisputed Facts [239–2], ¶ 11, ¶¶ 63–
64). Therefore, Nurse Wilcox determined that plaintiff's
special diet could be discontinued (*id.,* ¶ 66). Plaintiff was
caught hoarding food on July 30 and 31, 2007, which
indicated to Nurse Wilcox that plaintiff had an adequate

appetite (*id.,* ¶¶ 68–70; Zimmerman Declaration [239–3], Ex. A, Bates No. 03020).

**\*2** On August 1, 2007, plaintiff was provided with Lidex, a skin ointment, by Nurse Johnson for complaints of dry skin (*id.,* ¶ 72). Despite complaints of a rash and itching, Nurse Johnson saw no signs of redness or irritation when she examined him on August 8, 2007 (*id.,* ¶¶ 73–74). However, she did observe signs of Versicolor, and stated that she would have Nurse Wilcox evaluate that condition (*id.,* ¶ 76). That same day, plaintiff was seen by Nurse Wilcox, but he did not observe any rash (*id.,* ¶¶ 78, 80). On August 15, 2007, plaintiff requested and was given a 30–day supply of Lidex (*id.,* ¶ 81).

On August 22, 2007, plaintiff requested a referral to a gastroenterologist, but Nurse Wilcox determined that no referral was needed based on his current medical condition (*id.,* ¶ 85). Nurse Wilcox believed that this request should be addressed by plaintiff's permanent facility, to which he was scheduled to be transferred shortly (*id.,* ¶ 84). Plaintiff was transferred from Lakeview to Attica Correctional Facility on September 4, 2007 (*id.,* ¶ 151).

Plaintiff made various complaints about his medical treatment while incarcerated at Lakeview. On August 7, 2007, plaintiff submitted a complaint to defendant James Steeg, the Nurse Administrator, complaining about his medical treatment at Lakeview, including the failure to be seen by a medical doctor and the discontinuance of his special diet and Vistaril. Plaintiff's Ex. H [246–5]. In response, on August 9, 2007 Nurse Administrator Steeg advised plaintiff to contact defendant Ian Caisley, M.D., Lakeview's Facility Health Services Director ("FHSD") (*id.*). Responding to an August 16, 2007 memorandum from plaintiff to Ronald Moscicki, the Superintendent at Lakeview, by memorandum dated August 16, 2007, defendant Richard C. Moffit, the acting Deputy Superintendent for Administration ("DSA"), advised plaintiff that he had investigated the matter and found that Nurse Wilcox's August 2, 2007 memorandum to plaintiff "thoroughly and clearly" addressed his medical concerns, and reminded him that he could continue to follow the callout procedure to address his medical concerns. Moffit Declaration [239–7], Ex. A, Bates No. 01001. When plaintiff on August 19, 2007 requested to be seen by a physician and complained that his problems were being ignored, by memorandum dated August 21, 2007, DSA Moffit advised plaintiff:

"Since arriving at Lakeview ..., you have been seen by the Health Services Unit, including the Nurse Practitioner, on at least eight separate occasions. I understand that Diagnostic Tests, Physical Therapy Consultations, and Treatments have been recommended by the Health Care Staff for you during your brief time here at Lakeview" (*id.,* Bates No. 00998).

He also advised plaintiff that his letter would be forwarded to Dr. Caisley for his review and recommendation (*id.*). In an August 24, 2007 Memorandum from Dr. Caisley to DSA Moffit, he indicated that he had completed a chart review and concluded that plaintiff's "problems [were] being adequately addressed" (*id.,* Bates No. 01005).

**\*3** Plaintiff also filed a number of grievances arising from his medical care. Moscicki Declaration [239–8], 8, Ex. B. These grievances were denied by the Inmate Grievance Review Committee ("IGRC"), and were unsuccessfully appealed to Superintendent Moscicki and to the Central Office Review Committee ("CORC"), which was coordinated by defendant Karen Bellamy, DOCCS Inmate Grievance Program Director (*id.;* Bellamy Declaration [239–4], ¶¶ 1, 4).

Plaintiff's First Cause of Action alleges that Nurses Wilcox and Johnson and Dr. Caisley "summarily discontinu[ed][his] prescriptions for non-medical reasons, refus[ed] to examine the [him], den[ied][him] access to a medical doctor for non-medical reasons" causing him "lose weight", "aggravate [his] chronic fatigue" and to "be in substantial pain and discomfort", in deliberate indifference to his "serious medical needs" and in violation of the Eighth Amendment. Fourth Amended Complaint [212], ¶ 42. His Second Cause of Action alleges that defendants Lester Wright, the Chief Medical Officer for DOCCS, [5] Superintendent Moscicki, DSA Moffit and Nurse Administrator Steeg were personally involved in the deliberate indifference alleged in the First Cause of Action by "failing to follow [DOCCS'] policy and have [him] seen by a medical doctor after numerous unresolved complaints; deferring to and allowing the determination of a Nurse Practitioner to overrule the prescriptions and orders of doctors and specialists; and failing to properly investigate [his] concerns causing [him] to suffer substantial pain and discomfort ... to lose substantial weight ... an adverse effect of the Plaintiff's life activities of eating and sleeping" in deliberate indifference to his serious medical needs, in violation of the Eighth

Amendment. *Id.,* ¶ 43. His Third Cause of Action alleges that "[t]he policy of [DOCCS] to discontinue medications upon a prisoner's transfer from facility to facility, [thereby] causing a lapse in the administration of a prisoner's medication", constitutes deliberate indifference, in violation of the Eighth Amendment. *Id.,* ¶ 44.

**Clinton Correctional Facility**

Plaintiff was eventually transferred to Clinton Correctional Facility on October 15, 2009. Defendants' Statement of Undisputed Facts [239–2], ¶ 152. On October 23, 2009, he was seen by Kang Lee, M.D., a physician at Clinton (*id.,* ¶ 155).[6] Accordingly to Dr. Lee, his chart revealed that plaintiff had stage IV cirrhosis, related to his Hepatis C (*id.,* ¶ 157), but did not have any symptoms of Hepatitis C infection (*id.,* ¶ 162). Plaintiff was also given a blood test on September 3, 2009 that revealed normal liver functioning (*id.,* ¶ 160). Dr. Lee planned to monitor his blood levels every three months and to refer him back to a gastroenterologist, if necessary (*id.,* ¶ 164).[7]

On October 15, 2010, plaintiff's prescription for Ensure (a dietary supplement for individuals who are not obtaining adequate nutrition with a normal diet) was discontinued because his body mass index demonstrated that he was receiving adequate nutrition. Johnson Declaration [192–1], Ex. A, Bates No. 002582; Defendants' Statement of Undisputed Facts [239–2], ¶¶ 170–172.[8] He gained weight in the six-month period following the cessation of Ensure, and his blood tests showed no nutritional deficit. Defendants' Statement of Undisputed Facts [239–2], ¶¶ 173–174. While incarcerated at Clinton, plaintiff was on a therapeutic, high fiber, low fat diet (*id.,* ¶ 176). He was also prescribed Prilosec for nausea and Vistaril for his complaints of itching on January 26 and February 23, 2011 (*id.,* ¶ 184; Johnson Declaration [192–1], ¶¶ 22–23). He has also been prescribed lotion for his skin when it was medically indicated; however, even if it is not medically indicated, inmates can purchase skin lotions at the commissary (*id.,* ¶¶ 187–188).

**\*4** Plaintiff's requests for access to more frequent showers to moisturize his skin were denied because it was not medically indicated (*id.,* ¶¶ 194–196; Johnson Declaration [192–1], ¶ 13). Plaintiff's requests to see

a dermatologist have also been denied as not being medically indicated (*id.,* ¶¶ 198–199).

Plaintiff's Fourth Cause of Action alleges that "[t]he refusal of defendants Koenigsmann, Johnson and Bellamy to have [him] seen by a hepatologist and authoritatively diagnose the condition of Plaintiff's liver disease and offer treatment options; the refusal of defendants to provide for treatments to ameliorate the symptoms of [his] extrahepatic manifestations such as showers and lotion for the pruritus, the Ensure for [his] gastric and nutritional maladies" constitutes deliberate indifference, in violation of the Eighth Amendment. Fourth Amended Complaint [21], ¶ 45.

**ANALYSIS**

**A. Summary Judgment Standard**

"A party moving for summary judgment bears the burden of establishing that there exists no genuine issue of material fact warranting a trial.... In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew, N.Y.,* 75 F.3d 98, 107 (2d Cir.), *cert. denied,* 517 U.S. 1190, 116 S.Ct. 1678, 134 L.Ed.2d 780 (1996); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"Once that burden has been established, the burden then shifts to the non-moving party to demonstrate specific facts showing that there is a genuine issue for trial.... To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor." *Guerrero v. Lowe's Home Centers, Inc.,* 462 F.Supp.2d 399, 406 (W.D.N.Y.2006) (Siragusa, J.), *aff'd,* 254 Fed. Appx. 865 (2d Cir.2007) (Summary Order). *See also Celotex,* 477 U.S. at 322 (Fed.R.Civ.P. ("Rule") "56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

**B. Deliberate Indifference Standard**

In order to establish a violation of the Eighth Amendment arising out of inadequate medical treatment, plaintiff must prove that defendants acted with "deliberate indifference to [his] serious medical needs". *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The "deliberate indifference" standard has both objective and subjective components. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). To satisfy the objective component, the alleged medical need must be "sufficiently serious." *Id.* A "sufficiently serious" medical need is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Id.* "Factors that have been considered include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

**\*5** To satisfy the subjective component, plaintiff must show that the defendant officials acted with a "sufficiently culpable state of mind" in depriving him of adequate medical treatment. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). "The subjective element of deliberate indifference 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' " *Id. See also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003), *cert. denied,* 543 U.S. 1093, 125 S.Ct. 971, 160 L.Ed.2d 905 (2005) (likening the necessary state of mind to "the equivalent of criminal recklessness"). In order to be found "sufficiently culpable," the official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; [he] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

**C. Medical Treatment at Lakeview**
Plaintiff's First and Second Causes of Action relate to the medical treatment he received while at Lakeview. Fourth Amended Complaint [212], ¶¶ 42, 43. Nurses Wilcox and Johnson and Dr. Caisley argue that these claims should be dismissed as against them because they were not deliberately indifferent to plaintiff's medical needs (defendants' Memorandum of Law [239–1], Point I). DSA

Moffit, Superintendent Moscicki, Nurse Administrator Steeg, and Director Bellamy argue that even if there was deliberate indifference, they had no personal involvement in this deprivation (*id.,* Points II and III).

**1. Nurses Wilcox and Johnson and Dr. Caisley**

**a. Plaintiff's Pruritus**
Defendants admit that plaintiff suffers from Hepatitis C, which they concede is a "serious illness" (defendants' Memorandum of Law [239–1], p. 18). However, they dispute whether plaintiff's Hepatitis C has resulted in a symptom that may produce death, degeneration, or extreme pain. I conclude that plaintiff's complaints of pruritus (itching) arising from his Hepatis infection do not constitute an objectively serious condition. *See Benitez v. Ham,* 2009 WL 3486379, \*11 (N.D.N.Y.2009) ("[T]he evidence shows that Plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation"); Judge Arcara's September 29, 2011 Decision and Order [222–1], p. 7 (denying plaintiff's fourth motion for a preliminary injunction—"Plaintiff has failed to establish that his pruritus ... [is a] serious medical condition [ ]", *citing Benitez* ).

Moreover, plaintiff has not raised a triable issue of fact as to whether defendants were deliberately indifferent to this condition. While plaintiff may disagree with the treatment provided for his pruritus, he was regularly provided with Lidex, an ointment for dry skin.[9] Johnson Declaration [239–6], ¶¶ 9, 11. "Deliberate indifference [will not] be found when an inmate simply prefers an alternative treatment or feels that he did not get the level of medical attention that he desired." *Shire v. Greiner,* 2007 WL 840472, \*12 (S.D.N.Y.2007). *See Tafari v. Stein,* 2009 WL 331378, \*7 (W.D.N.Y.2009) (Scott, M.J.), *reconsideration denied,* 2009 WL 1322317, 2009 WL 1579530 ("it is well-established that a prisoner is not entitled to receive the medical treatment of his choice. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment or a different doctor does not give rise to an Eighth Amendment violation").

**b. Plaintiff's Weight Loss**
**\*6** Plaintiff also alleges nausea and other gastrointestinal issues associated with his Hepatitis infection. According to plaintiff, defendants "chose to ignore the Plaintiff's

complaints of gagging, nausea, the urge to vomit and inability to eat as signs of serious gastric issues". Plaintiff's Opposition to Statement of Uncontested Material Facts [246], ¶ 8. Associated with defendants' failure to provide such treatment, plaintiff alleges that he experienced significant weight loss while at Lakeview. *Id.,* ¶ 11.

Although defendants repeatedly deny that plaintiff suffered *any* weight loss at Lakeview (defendants' Statement of Undisputed Facts [239–2], ¶ 145; defendants' Memorandum of Law [239–1], pp. 8, 9, 11; Caisley Declaration [239–5], ¶ 14; Wilcox Declaration [239–10], ¶ 32), these denials are belied by plaintiff's medical records, which demonstrate that he experienced a significant and rapid weight loss while at Lakeview, with his weight decreasing from 234 lbs. on June 11, 2007, to 219 lbs. on August 28, 2007, and to 203 lbs. on September 7, 2007. Plaintiff's Opposition to Defendants' Statement of Uncontested Material Facts [246], Ex. G. Corresponding to his precipitous weight loss, plaintiff made repeated complaints that he was nauseous, that he was gagging on his food, and that he was unable to eat. *See* Wilcox Declaration [239–10], ¶¶ 20, 21; Johnson Declaration [239–6], ¶¶ 7, 8, 10. [10]

While "[c]omplaints of abdominal pain [and] vomiting ... d[o] not constitute a serious medical need", *Ross v. McGinnis,* 2004 WL 1125177, *10 (W.D.N.Y.2004) (Schroeder, M.J.), "rapid weight loss ... may present a serious medical condition". *Anderson v. Kooi,* 2011 WL 1315721, *12 (N.D.N.Y.2011), *adopted,* 2011 WL 1256942 (N.D.N.Y.2011). [11] Whether plaintiff's apparent rapid weight loss was attributable to defendants' failure to have him seen by a gastric specialist, failure to continue his therapeutic diet, failure to prescribe Vistaril, [12] or some combination of these factors, since I must give plaintiff every favorable inference (for purposes of this motion), I conclude that a triable issue of fact exists as to whether plaintiff's weight loss—especially when coupled with plaintiff's Hepatitis C—constitutes a sufficiently serious condition under the objective prong. *See Bourgoin v. Weir,* 2011 WL 4435695, *7 (D.Conn.2011) ("The significant weight loss-more than forty pounds [in approximately 11 months]-may be objective evidence of a deterioration in the state of Mr. Bourgoin's health.... The record is such that reasonable jurors could find that Mr. Bourgoin suffered from an objectively serious medical condition"). [13]

Turning to the subjective prong, defendants argue that they did not ignore plaintiff's complaints of nausea and an inability to eat, but rather they believed that his complaints were unfounded based on the fact that he had taken his food tray (Johnson Declaration [239–6], ¶ 10) and that he was hoarding food in his cell (Wilcox Declaration [239–10], ¶¶ 13, 18). [14] They also argue that they used their professional judgment to determine that plaintiff did not require Vistaril, a therapeutic diet, or a referral to an outside specialist, and that plaintiff's claims amount to a disagreement as to the proper course of treatment. Defendants' Memorandum of Law [239–1], p. 10.

*\*7* Again, giving plaintiff every favorable inference for purposes of this motion, defendants' conduct could be viewed as more than mere negligence or a disagreement as to treatment. Any reasonable belief by defendants that plaintiff's complaints were unfounded is difficult to reconcile with plaintiff's significant and rapid weight loss, which would have been manifest. Defendants' conspicuous failure to even acknowledge—much less address—this weight loss establishes a genuine issue of material fact exists as to whether they were deliberately indifferent to a potentially serious medical need.

### 2. DSA Moffit, Superintendent Moscicki, Nurse Administrator Steeg, Grievance Director Bellamy and Chief Medical Officer Wright

Prior to *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), it had been well settled that "[t]he personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). However, in *Iqbal,* the Supreme Court clouded this issue when it rejected the argument that "a supervisor's mere

knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution", concluding that "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal,* 556 U.S. at 677.

Since *Iqbal,* some districts courts have determined that not all five of *Colon's* categories of conduct that may give rise to supervisory liability remain viable. *See e.g., Spear v. Hugles,* 2009 WL 2176725, *2 (S.D.N.Y.2009) ("only the first and third *Colon* factors have survived the Supreme Court's decision in *Iqbal* "); *Bellamy v. Mount Vernon Hospital,* 2009 WL 1835939, *6 (S.D.N.Y.2009), *aff'd,* 387 Fed. Appx. 55 (2d Cir.2010) (Summary Order) ("The Supreme Court's decision in *Iqbal v. Ashcroft* abrogates several of the categories of supervisory liability enumerated in *Colon v. Coughlin. Iqbal's* active conduct standard only imposes liability on a supervisor through section 1983 if that supervisor actively had a hand in the alleged constitutional violation. Only the first and part of the third *Colon* categories pass *Iqbal's* muster")[15]; *Bryant v. County of Monroe,* 2010 WL 4877799, *3 (W.D.N.Y.2010) (Siragusa, J.) ("The Court ... is persuaded by the analysis of ... *Iqbal* ... in *Bellamy* ").[16] However, I agree "with the apparent majority view that where, as here, the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth, Eighth or Fourteenth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply." *Shepherd v. Powers,* 2012 WL 4477241, *10 (S.D.N.Y.2012).

### a. DSA Moffit

**\*8** Notwithstanding DSA Moffit's argument that it was "not in the realm of [his] authority ... to dictate treatment plans" (defendants' Memorandum of Law [239–1], p. 15), defendants concede that DSA Moffit "supervised the medical department" and that he "responded to plaintiff's written complaints after ... investigating the matters raised by plaintiff". *Id.* The Second Circuit has held that "[w]hen allegations of improperly denied medical treatment come to the attention of a supervisor of a medical program, his adjudicating role concerning a grievance cannot insulate him from responsibility for allowing the continuation of allegedly unlawful policies within his supervisory responsibility". *McKenna v. Wright,* 386 F.3d 432, 438 (2d Cir.2004). DSA Moffit's conduct extended beyond merely

adjudicating a grievance-he also received complaints from plaintiff, and responded in detail to his complaint that he was "being ignored". Moffit Declaration [239–7], Ex. A, Bates No. 00998. When coupled with his role as the supervisor of the medical department, these facts raise a triable issue as to his personal involvement. Therefore, I recommend that his motion for dismissal be denied.

### b. Superintendent Moscicki

Superintendent Moscicki argues that he is not a physician or medically trained, and that he relied on the opinion of the medical professionals who examined plaintiff. Moscicki Declaration [239–8], ¶ 22. Defendants further argue that Superintendent Moscicki lacks personal involvement in any alleged deliberate indifference since his "participation in plaintiff's issues was solely to uphold the denial of the plaintiff's grievances by the [IGRC]". Defendants' Memorandum of Law [239–1], p. 16. I agree. "The fact that [the] Superintendent ... affirmed the denial of plaintiff's grievance—which is all that is alleged against him—is insufficient to establish personal involvement". *Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002); *Ramos v. Wright,* 2011 WL 2462482, *6 (N.D.N.Y.2011), adopted* 2011 WL 2462472 (N.D.N.Y.2011) (dismissing claims against superintendent on personal involvement grounds where "[p]laintiff's sole factual allegation against Defendant Superintendent Smith, [was] that he affirmed the resolution of Plaintiff's institutional grievance and indicated that Plaintiff was receiving adequate medical attention"); *Henry v. Lempke,* 680 F.Supp.2d 461, 464 (W.D.N.Y.2010) (Larimer, J.) ("To the extent that [Superintendent] Lempke may have, in the course of his official duties, denied or affirmed the denial of certain grievances filed by the plaintiff, 'the denial of [a] plaintiff's grievance-[where that] is all that is alleged against him-is insufficient to establish personal involvement [in a constitutional violation]' by a prison superintendent"); *Ramsey v. Goord,* 2005 WL 2000144, *8 (W.D.N.Y.2005) (Skretny, J.) ("the fact that a prison official in the prison chain of command affirms the denial of an inmate's grievance is not enough to establish the requisite personal involvement of that official"); *Vogelfang v. Capra,* 2012 WL 832440, *7 (S.D.N.Y.2012) ("an officer tasked only with reviewing an administrative determination is not 'personally involved' even if the underlying determination implicates a plaintiff's constitutional rights"); *White v. Sears,* 2011 WL 2728443, *8 (N.D.N.Y.2011), adopted* 2011 WL 2728431 (N.D.N.Y.2011) ("To the extent

that Superintendent Sears is named as a defendant because he denied Plaintiff's grievance, the denial of Plaintiff's grievance is insufficient to establish personal involvement"). [17]

**\*9** While he is uncertain whether it was ever sent, Superintendent Moscicki also acknowledges the existence of an unsigned memorandum dated August 10, 2007 from him responding to an August 6, 2007 letter from plaintiff's brother, Anderson Bernier. Moscicki Declaration [239–8], ¶ 8, Ex. A. In this correspondence, Superintendent Moscicki stated that he could not provide Bernier with any information about his brother's health care "because of privacy laws", but "assure[d][him] that [plaintiff] is being appropriately administered to". *Id.,* Ex. A.

"The law is clear ... that a prison official's mere response to a grievance, by itself, is not sufficient to establish personal involvement for purposes of § 1983." *Hidalgo v. Kikendall,* 2009 WL 2176334, \*4 (S.D.N.Y.2009). Nevertheless, "[a] supervisor's detailed, specific response to a plaintiff's complaint" may suffice to establish personal involvement. *Mateo v. Fischer,* 682 F.Supp.2d 423, 430–31 (S.D.N.Y.2010); *see Rosario v. Fischer,* 2012 WL 4044901, \*5 (S.D.N.Y.2012), *adopted* 2012 WL 6681695 (S.D.N.Y.2012) ("a *pro forma* response to a letter or grievance" does not amount to personal involvement); *Brooks v. Chappius,* 450 F.Supp.2d 220, 226 (W.D.N.Y.2006) (Larimer, J.) ("in general personal involvement will not be found unless 'the supervisor's response is detailed and specific' "). [18]

Even giving plaintiff the benefit of every favorable inference, I conclude that Superintendent Moscicki's assurance to plaintiff's brother that plaintiff was being properly treated, without any explanation of the treatment he was receiving or the complaints at issue, is insufficient to establish Superintendent Moscicki's personal involvement. Therefore, I recommend that the claims against him be dismissed.

**c. Nurse Administrator Steeg**
Defendants likewise argue that Nurse Administrator Steeg did not have sufficient personal involvement, since his "only involvement with plaintiff's medical care was to respond to correspondence from plaintiff. The issues addressed in plaintiff's correspondence were addressed by Steeg, and nothing in plaintiff's correspondence indicated

the existence of a constitutional violation". Defendants' Memorandum of Law [239–1], p. 17.

Nurse Administrator Steeg received a complaint from plaintiff dated August 7, 2007, complaining that his Vistaril and special diet had been discontinued and that these "medical regimens helped control [his] allergic reaction of ... rejection of certain foods". Plaintiff's Opposition to Defendants' Statement of Uncontested Material Facts [246], Ex. H. He responded to plaintiff's complaint by stating that "[a]ll questions directly relating to medical therapy and medication should be directed to the facility Medical Director here". *Id.*

As discussed above, a generalized response such as this to a complaint is not sufficient to establish personal involvement. *See Mateo,* 682 F.Supp.2d at 430–31. "Nor is it enough that a supervisor forwarded a complaint or grievance to another official for handling." *Id.* at 430. Therefore, I recommend that defendant Nurse Administrator Steeg be dismissed for lack of personal involvement.

**d. Chief Medical Officer Wright**
**\*10** Without making any specific arguments, defendants appear to move for summary judgment as against defendant Dr. Wright for lack of personal involvement in the alleged deliberate indifference to plaintiff's medical needs that occurred at Lakeview. Defendants' Memorandum of Law [239–1], p. 19. In response, plaintiff relies on his August 2, 2007 letter to Dr. Wright complaining that he "can not eat" (plaintiff's Affidavit [246], Ex. B–4, and a letter dated August 28, 2007 from Dr. Wright to Mr. Bernier, stating that "an investigation regarding [his] concern with the health care services being provided" and to "be assured that [plaintiff] is receiving necessary health care and services" *Id.,* Ex. B–9. [19]

As discussed above, such a generalized response is insufficient to establish Dr. Wright's personal involvement. Therefore, I recommend that the claims against him be dismissed.

**e. Karen Bellamy, Grievance Director** [20]
Defendants argue that Grievance Director Bellamy's involvement was limited to "uphold[ing] the denial of the plaintiff's grievances", but that he did not review

them. Defendants' Memorandum of Law [239–1], p. 17. Plaintiff does not respond to this argument. Therefore, I recommend that Grievance Director Bellamy be dismissed for lack of personal involvement.

**D. Medical Treatment at Clinton**
Plaintiff's Fourth Cause of Action relates to plaintiff's medical treatment at Clinton. Fourth Amended Complaint [212], ¶ 45. Plaintiff alleges that defendants refused to have him seen by a hepatologist, to provide him with showers and lotion for pruritus, and to provide him with Ensure for his gastric and nutritional maladies. *Id.* I will address each of the allegations individually:

**1. Alleged Failure to be Treated by a Hepatologist**
Defendants argue that plaintiff's claim arising from their failure to refer him to a hepatologist should be dismissed due to his failure to exhaust administrative remedies. Defendants' Memorandum of Law [239–1], pp. 18–19, 21–22. *See* Gregory Declaration [239–11], ¶¶ 9, 10. In response, plaintiff does not dispute that he failed to exhaust his administrative remedies with respect to defendants' alleged failure to refer him to a hepatologist. Instead, he argues, "[t]he semantics of the term hepatologist is beside the point. The Plaintiff has been seen by a gastroenterologist who specializes in liver issues and he has recommended treatment with the new triple drug therapy. Defendant Koenigsmann has yet to inform the Plaintiff of what [DOCCS] will do as to that recommendation. This treatment is the community standard". Plaintiff's Memorandum of Law [246], p. 10.

Even assuming that plaintiff exhausted his claim concerning a referral to a hepatologist, "there is no recognized Board Certification for hepatology in New York, and the treatment of liver disease falls under the area of gastroenterology". Lee Declaration [86] ¶ 17. Moreover, plaintiff has been seen by a gastroenterologist, and Dr. Lee will request a referral in the future, if appropriate. *Id.,* ¶ 18. Thus, I conclude that plaintiff has received what his complaint seeks. Fourth Amended Complaint [212], p. 16, "Wherefore" Clause, ¶ 4 (seeking an injunction directing "that the Plaintiff be seen by a hepatologist").

**\*11** In opposition to defendants' motion for summary judgment, plaintiff argues that defendants have failed to act on the gastroenterologist's recommendation that

he be treated with a new triple drug therapy. Plaintiff's Memorandum of Law [246], pp. 10–11. However, this allegation was not raised in plaintiff's Fourth Amended Complaint. [21] "It is black letter law that a party may not raise new claims for the first time in opposition to summary judgment." *Brandon v. City of New York,* 705 F.Supp.2d 261, 278 (S.D.N.Y.2010). Therefore, I will not consider these allegations. *See Lyman v. CSX Transportation, Inc.,* 364 Fed.Appx. 699, 702 (2d Cir.2010) (Summary Order) ("we cannot conclude that the district court abused its discretion in failing to consider plaintiff's new theories of liability"); *Fullwood v. Association for the Help of Retarded Children, Inc.,* 2010 WL 3910429, \*7 (S.D.N.Y.2010).

Even if plaintiff had asserted a claim of deliberate indifference arising from defendants' failure to treat him with a triple drug therapy, "[t]he Eighth Amendment does not entitle plaintiff to the treatment of his choice". *Berry v. Wright,* 2011 WL 231626, \*6 (W.D.N.Y.2011) (Schroeder, M.J.).

**2. Alleged Failure to Provide Plaintiff with Showers and Lotion for His Pruritus**
As discussed above, plaintiff's complaints of itching arising from his Hepatis infection do not constitute an objectively serious condition. *See Benitez,* 2009 WL 3486379 at \*11. Even if plaintiff's pruritus constituted a serious medical condition, the record demonstrates that defendants were not deliberately indifferent to this condition. He received Vistaril for his complaints of itching (defendants' Statement of Undisputed Facts [239–2], ¶¶ 176, 184–185; Johnson Declaration [192–1], ¶¶ 22–23) and was prescribed lotion for his skin when it was medically indicated. Defendants' Statement of Undisputed Facts [239–2], ¶ 187; Johnson Declaration [192–1], ¶ 15. Plaintiff also fails to dispute that even if his requests for lotion were denied, that he was able to purchase lotion through the commissary. Johnson Declaration [192–1], ¶ 16.

Additionally, plaintiff alleges that he was deprived of a shower pass to ameliorate his pruritus (Fourth Amended Complaint [212], ¶ 39). In response, Dr. Johnson states that "increase ... showering actually increases skin dryness, and is not medically indicated for dry skin". Johnson Declaration [192–1], 11. This amounts to a disagreement as to the proper treatment for plaintiff's

pruritus. However, "disagreements over treatment do not rise to the level of a Constitutional violation", *Graham v. Gibson,* 2007 WL 3541613, *5 (W.D.N.Y.2007) (Siragusa, J.), as "the Constitution does not require that an inmate receive a particular course of treatment". *Tafari,* 2009 WL 331378, at *7. Therefore, I recommend that these claims be dismissed.

### 3. Alleged Failure to Provide Plaintiff with Ensure
 **\*12** Plaintiff alleges that he was prescribed Ensure "in December, 2009, per the direction of the gastric specialist", but that it was discontinued without notification. Fourth Amended Complaint [212], ¶ 40. According to plaintiff, "[d]ue to [his] gastrointestinal issues and the recurrent nausea which creates an [i]nability to eat properly, at times ... the Ensure would assist [him] with the proper absorption of nutrients and help relive [*sic* ] the fatigue that [he] experiences, consequent of the Hep C". Fourth Amended Complaint [212], ¶ 40. Defendants explain that plaintiff was taken off of Ensure in October 2010 "because his body mass index revealed that it was no longer medically indicated from [*sic* ] him" and that this was explained to him. Johnson Declaration [192–1], ¶ 25.

It is undisputed that at the time plaintiff was prescribed Ensure he weighed between 200 and 210 lbs. (Zimmerman Declaration [239–3], Ex. B, p. 42), and that when his Ensure was discontinued, he weighed 228 lbs. Johnson Declaration [192–1], Ex. A, Bates No. 02582. It is also undisputed that he continued to gain weight after his Ensure was discontinued, weighing 240 lbs on March 31, 2011. Johnson Declaration [192–1], ¶ 26, Ex. A, Bates No. 02586. His blood tests also showed no nutritional deficit. Id., ¶ 27.

The record demonstrates that defendants did not ignore plaintiff's inability to eat and the necessity for nutritional supplementation. While plaintiff may disagree with the decision to discontinue his Ensure, this again amounts to a disagreement between the parties as to the type of treatment plaintiff's condition required, which is insufficient to establish deliberate indifference. See *Graham,* 2007 WL 3541613 at *5.

### E. DOCCS' Policy of Discontinuing Medications
Plaintiff's Third Cause of Action alleges that DOCCS has a policy of discontinuing medications upon an inmate's transfer into a new facility, in deliberate indifference

to a prisoner's serious medical needs. Fourth Amended Complaint [212], ¶ 44. DOCCS concedes that it has a policy of reviewing all treatments and medications when care of a new patient is commenced, but alleges that this "is the same as that for the community at large". Defendants' Memorandum of Law [239–1], p. 20. In fact, it argues that "[t]he policy which the plaintiff desires, which is for new medical providers to simply rubber stamp the decisions of prior providers .... would amount to deliberate indifference". *Id.*

Aside from challenging the discontinuance of his Vistaril prescription and therapeutic diet at Lakeview, plaintiff does not appear to specifically respond to these arguments or to address this cause of action in his opposition to defendants' motion for summary judgment.

In any event, DOCCS' policy of having an inmate's medications reevaluated at each new facility they are transferred does not establish deliberate indifference, even if such policy permits facilities to reach different conclusions concerning what medications should be prescribed or treatment should be administered. *See Porter v. Jin,* 2010 WL 3767876, *2 (W.D.N.Y.2010) (Arcara, J.) ("The fact that plaintiff may have received surgery after being examined by another physician at a different correctional facility does not transform what otherwise may be a medical malpractice claim to a claim of deliberate indifference in violation of the Eighth Amendment"). Therefore, I recommend that this claim be dismissed.

### CONCLUSION

 **\*13** For these reasons, I recommend that plaintiff's first cause of action be dismissed to the extent it arises from plaintiff's pruritus; that his second cause of action be dismissed against defendants Moscicki, Steeg, Wright, Bellamy; and that his third and fourth causes of action be dismissed in their entirety, but that defendants' motion otherwise be denied.

Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by April 12, 2013 (applying the time frames set forth in Fed.R.Civ.P. ("Rules") 6(a)(1)(c), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to

object timely ... waives any right to further judicial review of [this] decision". *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir.1988); *Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. *Patterson–Leitch Co. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985, 990–91 (1st Cir.1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure,

written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection ... supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1791079

Footnotes

1   Bracketed references are to the CM/ECF docket entries.

2   Pruritus is defined as itching. Stedman's Medical Dictionary (27th Edition 2000).

3   Pruritus is defined as itching. Stedman's Medical Dictionary (27th Edition 2000).

4   By memorandum dated August 2, 2007, from Nurse Wilcox to plaintiff, he explained his decision to discontinue plaintiff's Vistaril. Moffit Declaration [239–7], Ex. A, Bates No. 00989.

5   Carl Koenigsmann, M.D., is Dr. Wright's successor as DOCCS' Chief Medical Officer. The parties previously agreed that pursuant to Fed.R.Civ.P. ("Rule") 25(d)(1) Dr. Koenigsmann should be substituted for Dr. Wright with respect to plaintiff's official capacity claim. Zimmermann Declaration [205], ¶ 11; Defendants' Memorandum of Law [239–1], p. 4 n. 2.

6   The Lee Declaration referenced in Defendants' Statement of Undisputed Facts ( [239–2], ¶¶ 152–157; 160–164) did not accompany defendants' motion for summary judgment. It was filed [86] in response to plaintiff's second motion for a preliminary injunction and expedited hearing [77].

7   While plaintiff has not named Dr. Lee as a defendant, Vonda Johnson, M.D., the FHSD at Clinton, is a defendant.

8   The Johnson Declaration referenced in Defendants' Statement of Undisputed Facts ( [239–2], ¶¶ 169–174, 176, 179–185, 187–190, 194, 196–200, 204–211) did not accompany defendants' motion for summary judgment. It was filed [192–1] in response to plaintiff's fourth motion for a preliminary injunction and expedited hearing [183].

9   Plaintiff states that his pruritus interfered with his sleeping. Plaintiff's Opposition to Statement of Uncontested Material Facts [246], ¶ 7.

10  In opposition to defendants' motion for summary judgment, plaintiff also alleges in his Memorandum of Law [246] that he "suffered constant and chronic gastric pain during his 40 day stay at [Lakeview]" (*id.,* p. 7). However, this contention is not supported by the medical records which he references. *Id.*

11  *Compare with* Hutchinson v. New York State Correctional Officers, 2003 WL 22056997, *5 (S.D.N.Y.2003) ("the court has not been convinced that digestion problems, weight loss, and dizziness are conditions 'of urgency, ... [which] may produce death, degeneration, or extreme pain' ").

12  Plaintiff argues that "[e]ven though Vistaril is not intended for the gastric symptoms, [his] symptoms were ameliorated due to the anti-emetic and anti secretory effect on bile acids of the Vistaril." Plaintiff's Memorandum of Law [246], p. 7. He also alleges that when he was transferred to Attica, "[i]t would come to light after testing by a gastric specialist that [he] suffered from gastritis, esophagitis and H. Pylori. That was the cause of [his] nausea when eating". Plaintiff's Affidavit [246], ¶ 17; *see* Plaintiff's Memorandum of Law [246], p. 7.

13  There may be possible explanations for plaintiff's apparent weight loss, but defendants offer *no* explanation for the weight loss plaintiff's medical records depict.

14  According to plaintiff, he "was not able to eat the foods served on the regular diet", thus he "would at times keep a fruit or some milk from breakfast so that he could eat later, to starve off his hunger". Plaintiff's Affidavit [246], ¶ 14.

15  "[T]he *Iqbal* issue was not raised on appeal" in *Bellamy.* Stresing v. Agostinoni, 2012 WL 2405240, *4 (W.D.N.Y.2012) (Skretny, J).

16    Adding to the uncertainty, "[t]he Second Circuit has not yet addressed which, if any, of the *Colon* categories survive *Iqbal* ." *Jamison v. Fischer,* 2012 WL 4767173, *4 (S.D.N.Y.2012).

17    *Compare with McKenna,* 386 F.3d at 437–38 ("Although it is questionable whether an adjudicator's rejection of an administrative grievance would make [the defendant deputy superintendent for administration] liable for the conduct complained of", where the defendant was responsible for the prison's medical program and "allegations of improperly denied medical treatment come to [his] attention ..., his adjudicating role concerning a grievance cannot insulate him from responsibility for allowing the continuation of allegedly unlawful policies within his supervisory responsibility").

18    *Compare with Ramos v. Artuz,* 2001 WL 840131, *10 (S.D.N.Y.2001) (finding personal involvement where the defendant "defended and explained Green Haven's treatment of plaintiff, both to plaintiff and to Legal Aid Society").

19    Dr. Wright also advised Mr. Bernier that he was unable to divulge any specific health information without a release from plaintiff. Plaintiff's Affidavit [246], Ex. B–9. However, "defendant Wright's actions in telling Plaintiff's family members that Plaintiff would need to sign medical release forms is not enough to subject Defendant Wright to personal liability."*Anderson,* 2011 WL 1315721 at *8.

20    Although Bellamy appears to be named only in plaintiff's Fourth Cause of Action arising from his care at Clinton, defendants have addressed her role with respect to plaintiff's treatment at Lakeview. Defendants' Memorandum of Law [239–1], p. 12.

21    The Fourth Amended Complaint [212] merely alleges that "plaintiff has learned that Dependent on the stage of the Plaintiff's liver disease, there are interventions to help ameliorate the Plaintiff's condition" (*id.,* ¶ 36).

---

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.